## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF CONNECTICUT
## HARTFORD DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| THE NORWICH ROMAN CATHOLIC DIOCESAN CORPORATION,[1] | Case No: 21-20687 (JJT) |
| Debtor. | |

## DECLARATION OF REVEREND PETER J. LANGEVIN REGARDING THE DIOCESE'S ASSETS AND OPERATIONS AND IN SUPPORT OF THE CHAPTER 11 PETITION AND FIRST DAY PLEADINGS

Pursuant to 28 U.S.C. § 1746, Reverend Peter J. Langevin, hereby certifies and declares as follows:

1.      I am the Chancellor of The Norwich Roman Catholic Diocesan Corporation, also known as the Roman Catholic Diocese of Norwich, the debtor and debtor-in-possession in the above-captioned chapter 11 case (the "Debtor" or the "Diocese"). I have served as Chancellor of the Diocese since January 2, 2019.  I am familiar with the assets, liabilities, and sources of income for the Diocese.[2]

2.      As Chancellor, my duties include ensuring that the recorded history of the Diocese and the records and files that keep the Diocese running are orderly and accessible.  I also serve as the official notary of all documents issued by the bishop and assist in disseminating information to clergy, parishes, and Catholic faithful throughout the Diocese.

---

[1] The Debtor in this chapter 11 case is The Norwich Roman Catholic Diocesan Corporation, also known as The Roman Catholic Diocese of Norwich.  The last four digits of the Debtor's federal tax identification number are 7373, and its mailing address is 201 Broadway, Norwich, CT 06360.

[2] The information contained herein is intended to be as complete and accurate as possible. However, certain information may need to be supplemented or amended. The Debtor and its professionals will continue to make further disclosures and amendments as necessary and which are material when additional information becomes available.

3.     I respectfully submit this Declaration based upon: (a) my personal knowledge of certain facts stated herein, (b) information supplied to me by others associated with the Diocese, (c) my review of relevant documents, and (d) my experience and knowledge of Diocesan operations. If I were called to testify, I would testify to the facts as set forth herein. I am authorized by the Diocese to submit this Declaration.

4.     On July 15, 2021 (the "Petition Date"), the Diocese filed a voluntary petition under chapter 11 of title 11 of the United States Code (11 U.S.C. § 101 et seq., the "Bankruptcy Code") commencing its chapter 11 reorganization case (this "Chapter 11 Case").

## THE DIOCESE

5.     The Diocese is a Roman Catholic diocese in Connecticut and a small part of New York founded in 1953 by Pope Pius XII, encompassing Middlesex, New London, Windham and Tolland counties in Connecticut, as well as Fisher Island, New York.  The Most Reverend Michael R. Cote, D.D. has been the Bishop of the Diocese since May 14, 2003.  Monsignor Leszek T. Janik is the Diocese's Vicar General.

6.     In addition to its various ministries, including Catholic Charities, Saint Vincent de Paul, Catholic Family Services, Campus Ministry, Ministry to the Sick, the Norwich Diocesan Council of Catholic Women, and others, the Diocese owns land on which three separately incorporated non-profit high schools operate:  Mercy High School and Xavier High School in Middletown, Connecticut, and Saint Bernard High School in Uncasville, Connecticut.

7.     Mount St. John, which was established in 1904 as a separate corporate entity, owns approximately eighty (80) acres of land and a historic building in Deep River Connecticut (the "MSJ Property"), from which it operated a non-profit residential school for boys. The school's residential program closed in 2013, but thereafter Mount St. John continued as a day school for

boys.  The Connecticut Department of Children and Families and juvenile courts throughout the state referred special needs minors to the school.  Mount St. John and the Diocese have been named in approximately 54 lawsuits brought by former Mount St. John students alleging sexual abuse while attending the school (the "Survivors").  As a result of those lawsuits, a declining student body, and the resulting drop in revenue, Mount St. John closed its doors and ceased operating in 2019, while the Diocese has single-handedly borne the responsibility of defending the lawsuits with nominal coverage for such claims.

8.      Mount St. John retained Cushman & Wakefield and has listed the MSJ Property for sale because it ceased operating in late 2019 and has had no revenue with which to maintain the property.  In order to maintain the MSJ Property pending sale, Mount St. John became indebted to the Diocese for not less than $5,140,911.00, comprised of accounts payable to the Diocese of approximately $2,986,132.00, and a mortgage loan of approximately $2,154,779.00.

9.      The Diocese, Mount St. John, and their coverage provider, Catholic Mutual Relief Society of America ("Catholic Mutual"), have since actively engaged in extensive, detailed, transparent, and good faith negotiations with counsel to the Survivors in an effort to address and atone for the Survivors' claims.

10.      The Diocese kept counsel to the Survivors and other parties in interest informed as to its intent to file this case and to reorganize.

11.      The Diocese has filed several motions and applications seeking relief on an expedited basis (collectively the "First Day Motions").[3] The First Day Motions seek relief intended to facilitate a smooth transition into this Chapter 11 Case so that the Diocese can continue its mission by maintaining employee compensation, maintaining various programs for employees,

---

[3] The Diocese only seeks to have heard on an expedited basis the Motion to Seal, the Cash Management Motion, and the Wages and Benefits Motion (each as defined herein).

parishioners, clerics, and others who rely on the programs and services provided by the Diocese, and preserving and maintaining the property available to satisfy the Diocese's creditors. I have reviewed each of the First Day Motions and am familiar with their contents. I respectfully submit that all the First Day Motions are vital to the Diocese's reorganization efforts and expedited approval of the First Day Motions is important to the Diocese's successful reorganization.

<u>PURPOSE AND GOALS OF THE CHAPTER 11 FILING</u>

12.    The Diocese does not seek Chapter 11 relief to evade responsibility for any asserted abuse claims or for any decisions made by Diocesan authorities when addressing that misconduct. In fact, the Diocese is committed to pursuing the truth, evidenced by its publication of a list of credibly accused clergy, and by recently retaining Retired Judge Michael E. Riley of Pullman & Comley to conduct a thorough diocesan accountability investigation. The Diocese has never prohibited any person from telling his/her story or speaking his/her truth in public.

13.    The Diocese has disclosed the names of accused clergy and refers matters concerning  allegations of sexual abuse to the Department of Children and Families, and when appropriate, law enforcement.  The Most Reverend Michael R. Cote, D.D. has acknowledged past shortcomings by the Diocese and has attempted to offer aid and comfort to survivors of abuse. The Diocese has established standards for the training and background assessment of all employees, clerics and volunteers who will likely interact with children and young people. The Diocese has commenced this Chapter 11 Case in order to (a) provide an orderly claims administration process that will ensure a more equitable distribution of funds to creditors, including survivors of abuse; and (b) bring about a reorganization of the Diocese that will ensure that the mission of the Diocese may continue to be fulfilled in service of the Catholic faith.

## OPERATIONS

14.     The Diocese, through its central administrative offices: (a) provides operational support to the Catholic parishes, schools and certain other Catholic entities that operate within the territory of the Diocese (each, an "Other Catholic Entities"); (b) maintains properties on which certain schools operate (Mercy High School, Xavier High School and St. Bernard's High School); (c) provides comprehensive risk management services to the Other Catholic Entities; (d) administers certain priest and lay person employee pensions (collectively, the "Pensions") for the benefit of priests and lay employees of the Diocese and the Other Catholic Entities; and (e) other administrative and operational support.

## REVENUE AND EXPENSES

15.     The Diocese is a not-for-profit Religious Corporation under Connecticut state law. For the past several years, the Diocese's expenses have exceeded its revenue. Gross revenue for the fiscal year ended June 30, 2020 was approximately $14,340,626.00, while expenses before taking into account certain non-recurring activity were approximately $14,155,607.00. Gross revenue for the fiscal year ended June 30, 2019 was approximately $14,878,436 and expenses before taking into account certain non-recurring activity were approximately $16,364,925.00.

16.     The primary source of revenue used by the Diocese to support its operations comes from monthly parish assessments. The Diocese assesses parishes an annual amount based primarily on historical parish offertory. Assessments are collected for general Diocesan operating purposes, to fund its ministries, and to support priest retirement obligations. Additional sources of operating funds include (i) revenue from the Annual Catholic Appeal of the Diocese of Norwich, Inc. ("ACA") (a separately incorporated non-profit fund-raising entity

that subsidizes ministries of the Diocese), (ii) contributions, collections and bequests from the faithful, and (iii) realized investment gains.

## INVESTMENTS

### A.    Short-Term Investments

17.    The Diocese holds certain short-term investments, the gains and proceeds of which are used in fulfilling its religious, charitable and educational mission by providing funding for education, religious personnel development, insurance and health care needs, canonically required offices and other capital needs.

18.    In addition to the short-term investments, the Diocese holds certain long-term investments.

19.    All Diocesan short-term investments and long-term investment as of June 30, 2021, are reflected on Exhibit C to the Cash Management Motion (defined below).

### B.    Donor Restricted Funds

20.    Short-term and long-term investments in the amount of $1,430,980.06 are restricted for donors' intentions.

## TRUSTS

### A.    Walter E. Swaton Trust

21.    The Diocese is a beneficiary under the Walter E. Swaton Trust.  Pursuant to the terms of the trust, any income received from the trust is restricted and may only be used for the support of needy seminarians of the Diocese.  In the year preceding June 30, 2020, the Diocese received approximately $15,422.00 from the trust.

B.      Cooke Trust

22.     The Diocese is a beneficiary under the Dorothy H. Cooke Trust.  Pursuant to the terms of the trust, any income received from the trust is restricted and may only be used for the creation of parish lay libraries and reading rooms for adults and to advance ecumenical understanding.  In the year preceding June 30, 2020, the Diocese received no distributions from the trust.

## CAPITAL STRUCTURE

A.      Secured Debt

23.     As of the Petition Date, no known creditor held or was asserting a security interest in any Diocesan property or assets except as stated herein.

B.      Unsecured Debt

24.     The Diocese owes its ordinary course vendors approximately $27,318.92 as of the Petition Date, for the delivery of goods and services to the Diocese, which are used in the operation of the Diocese's business, including providing support for its ministries and other outreach programs. These creditors are essential to the Diocese's operations, as they provide the items and services necessary to continue the Diocese's mission.

25.     The Diocese also a guarantor for the following debts:

- Farmington Bank loans to Mercy High School with outstanding amount due as of the Petition Date of approximately $309,614 as of June 30, 2019, which may be secured by the real property upon which the school sits; and

- RBS Citizens, N.A. loans to Xavier High School Corporation of Middletown, with an outstanding amount due as of the Petition Date of approximately $5,035,000 as of June 30, 2021, which may be secured by the real property upon which the school sits.

26.     The Diocese also has an unsecured "Demand Credit Line" in the amount of $500,000 in total availability, which sum, and available credit is essential to the daily operation of

the Diocese in order to meet expenses as they come due. As of the Petition Date, the amount outstanding on the Demand Credit Line was approximately $276,534.00.

C.    Litigation Claims

27.    As of the Petition Date, the Diocese had been named in approximately 54 lawsuits commenced by individuals asserting sexual abuse claims for acts that are alleged to have occurred at Mount St. John, Inc. as of the Petition Date. The abuse and other litigation claims represent a large liability to the Diocese that may inhibit the Diocese from engaging in and providing its various ministries, charitable works and other aid that the Diocese provides to its community. The Diocese is nevertheless committed to recognizing, comforting and compensating the survivors of sexual abuse.

28.    For years prior to the Petition Date, the Diocese has engaged in candid, transparent and continuous settlement negotiations with counsel to the Survivors, and it intends to continue to do so in order to emerge from bankruptcy with an agreement amongst all stakeholders.

THE FIRST DAY MOTIONS

29.    To further its charitable mission and continue operations, the Debtor respectfully requests that the following First Day Motions be granted.

**I.    DEBTOR'S MOTION FOR ENTRY OF AN ORDER AUTHORIZING THE DIOCESE TO FILE PORTIONS OF SCHEDULE F, THE MASTER CREDITOR MAILING MATRIX, AND OTHER PLEADINGS AND DOCUMENTS UNDER SEAL (the "Motion to Seal")**

30.    In the Motion to Seal, the Debtor seeks the entry of interim and final orders (i) authorizing and approving special noticing and confidentiality procedures to protect the identities and personal contact information of survivors of abuse, minors, parents or legal guardians, and employees; (ii) authorizing the Debtor to implement certain procedures for the mailing and publication of the notice announcing the commencement of this chapter 11 case and the meeting

of creditors to be held pursuant to section 341 of the Bankruptcy Code (the "Notice of Commencement"); and (iii) granting related relief

31.     To protect the confidentiality of the identities and personal contact information of certain holders of claims against the Debtor arising from allegations of abuse ("Abuse Claims"), including certain of the Survivors that have commenced prepetition lawsuits against the Debtor using a Doe or other pseudonym (collectively, "Doe Claimants"), minors, and current and former employees of the Debtor, the Debtor is requesting entry of the Proposed Interim Order and the Proposed Final Order authorizing the redaction of the list containing the name and address of each creditor required by Bankruptcy Rule 1007(a) (the "Creditor Matrix"), the schedules of assets and liabilities, and any pleadings or other documents, including affidavits of service, filed in this chapter 11 case containing such information in accordance with the following procedures described in the Motion to Seal (the "Confidentiality Procedures").

32.     The Debtor is a defendant in approximately 54 prepetition lawsuits asserting Abuse Claims by Survivors, and the Debtor is aware of certain other holders of potential Abuse Claims that have not commenced lawsuits prepetition. While some Survivors have made their Abuse Claims public, many of the lawsuits alleging Abuse Claims have been filed by Doe Claimants who wish to remain anonymous.

33.     Due to the nature of the allegations by holders of Abuse Claims, including the Doe Claimants, which pertain to sexual abuse, the redaction of the identities and personal contact information from all documents filed in this chapter 11 case will aid in protecting such persons against the disclosure of a scandalous matter in publicly filed Court documents.

34.     The Confidentiality Procedures are also consistent with certain of the Debtor's other confidentiality obligations. Regarding certain Doe Claimants, and as reflected in certain court-

ordered stipulations filed in prepetition lawsuits, the Debtor has agreed to designate certain Doe Claimants with pseudonyms in public filings in state court to preserve the anonymity of such Doe Claimants.  As described above, the Confidentiality Procedures will preserve the anonymity of such Doe Claimants.

35.     In recognition of the sensitivity of disclosure related to these litigants, the Debtor respectfully submits that the Court has the authority to approve the Confidentiality Procedures described above and should authorize the Confidentiality Procedures to protect the privacy of abuse survivors and preserve their identities from public disclosure.

36.     The Creditor Matrix may also include current and retired employees of the Debtor. In order to protect against the risk of identity theft and the disclosure of personal identifying information, the Debtor is requesting authority to redact the home addresses and other personal contact information for these individuals.

37.     Pursuant to section 107 of the Bankruptcy Code, the Debtor respectfully submits that it is appropriate to authorize the Debtor to redact from any paper filed with the Court in this chapter 11 case personal contact information of the Debtor's employees because such information could be used to perpetrate identity theft. The threat of identity theft is of particular importance in these proceedings, which the Debtor expects to garner substantial media publicity. The Debtor proposes to provide an unredacted version of the Creditor Matrix and any related and the other Distribution Parties, along with other parties in interest upon reasonable request.

38.     While certain survivors have made their Abuse Claims public, a substantial number of the lawsuits have been filed by Doe Claimants who wish to remain anonymous. The Debtor requests authority to have Epiq Corporate Restructuring, LLC, the Debtor's authorized claims and noticing agent (the "Claims and Noticing Agent"), send the Notice of Commencement to: (i)

holders of Abuse Claims and their known counsel for whom the Debtor obtained sufficient contact information within the three years immediately preceding the Petition Date and who have: (a) filed, or threatened to file, lawsuits against the Debtor on account of Abuse Claims, (b) otherwise contacted the Debtor to report Abuse Claims, (c) entered into any settlement agreement with the Debtor relating to an Abuse Claim, or (d) received any payment from the Debtor relating to an Abuse Claim; and (ii) counsel of record for the holders of Abuse Claims. In addition, the Debtor seeks authority to have the Claims and Noticing Agent mail the Notice of Commencement to the creditors identified on the Creditor Matrix.

39.     Due to the unquantified number of "unknown" claimants who may hold Abuse Claims in this chapter 11 case, the Debtor also proposes to publish, as soon as practicable, the Notice of Commencement (i) once in a national publication (in the national editions, as relevant) of a publication such as USA Today, The National Catholic Register, The National Catholic Reporter, and once in local Connecticut publications such as the Hartford Courant or the Norwich Bulletin, and (ii) on the Case Website (as defined below). Publication of the Notice of Commencement as proposed above is the most practical method by which to notify unknown holders of Abuse Claims who do not receive the Notice of Commencement by mail and other parties in interest of the commencement of this chapter 11 case. Notice by publication will also ensure an efficient use of limited estate resources.

40.     Additionally, the Debtor, through the Claims and Noticing Agent, has established a dedicated case website (the "Case Website") and toll-free number in connection with this chapter 11 case. The Case Website address and toll-free number will be prominently displayed in all printed notice documents, as well as other relevant information relating to this chapter 11 case. Included within the Case Website will be a page specifically tailored to and designed for Survivors,

which will, among other things, inform them in plain English of important dates and deadlines, afford them the ability to view key documents in this chapter 11 case free of charge, and allow them (and other creditors) to register their email addresses and consent to electronic notice for the duration of this case. If elected, any further notices that are required to be sent to such parties would be sent by email during this case.

II.   **DEBTOR'S MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING DEBTORS TO PAY PREPETITION WAGES, SALARIES, REIMBURSABLE EXPENSES, AND OTHER OBLIGATIONS ON ACCOUNT OF COMPENSATION AND BENEFITS PROGRAMS; (II)CONTINUE COMPENSATION AND BENEFITS PROGRAMS; AND (III) GRANTING RELATED RELIEF (the "Wages and Benefits Motion")**

**The Diocese and Its Mission**

41.   The 51 parishes located within the Debtor's geographic region (the "Parishes") play a central role in the lives of Catholics by administering key aspects of the Catholic Faith, including: baptism, education, communion, Mass, confirmation, marriage, and bereavement, including last rites, funeral services, and support. Each of the Parishes is a nonprofit organization separately incorporated under the laws of the State of Connecticut. None of the Parishes are debtors in this Chapter 11 Case. As more fully described below, the Debtor provides certain administrative services to the Parishes.

42.   The Debtor also provides services for three high schools within its geographic region: Mercy High School Corporation; Xavier High School Corporation of Middletown; and Saint Bernard School of Montville, Incorporated (the "High Schools"). Each of the High Schools is a nonprofit organization separately incorporated under the laws of the State of Connecticut. None of the High Schools are debtors in this Chapter 11 Case.

43.   And the Debtor provides services for several charitable organizations to further its pursuit of the Catholic mission to serve the poor, the hungry, those in need, and those that cannot

help themselves (the "Other Catholic Entities"), which include The Annual Catholic Appeal, Inc.; St. Vincent de Paul Place, Norwich, Inc.; St. Vincent DePaul, Middletown, Inc.; Diocese Of Norwich Outreach To Haiti, Inc.; Norwich Diocesan Cemetery Corporation; Catholic Charities, Diocese of Norwich, Incorporated; Holy Apostles College and Seminary, Inc.; Holy Family Home and Shelter, Inc.; St. Joseph's Living Center, Inc.; St. James School Associations, Inc.; and Saint John Paul II School. The Other Catholic Entities are not debtors in this Chapter 11 Case.

44.     The Debtor, through its central administrative offices: (a) provides operational support to certain of the Parishes within the Diocese, the High Schools, and the Other Catholic Entities (collectively, the "Participating Employers"); (b) maintains the properties on which the High Schools operate; (c) provides comprehensive risk management services to the Participating Employers; (d) administers employee benefits, including medical, insurance, and retirement benefits, for the clergy and lay employees of the Debtor (the "Diocesan Employees") and for employees of the Participating Employers (the "Non-Diocesan Employees"); (e) administers payroll for the Debtor and for certain of the Participating Employers; and (e) coordinates other administrative services as needed.

**Diocesan Employee Payroll**

45.     The Debtor currently employs and administers payroll for approximately 32 Diocesan Employees, 19 of whom are classified as lay employees, and 13 of whom are clergy. Of the lay employees, one is a part-time salaried employee; three are part-time hourly employees; one is a full-time hourly employee; and 14 are full-time salaried employees. Of the clergy, five are

full-time salaried employees, five are part-time salaried employees, and three are inactive.[4]  The

Debtor also administers a retirement program for 21 retired priests as more fully described herein.

46.    The Debtor's average aggregate gross monthly payroll for Diocesan Employees for

the preceding 12-month period (excluding, without limitation, the amounts owed in connection

with Deductions, Payroll Taxes, Employee Benefits, and the Debtor's Workers' Compensation

Program (each as defined below)) is approximately $75,538.00.  The Debtor's lay employees are

paid on a bi-weekly basis, and clergy are paid monthly.

47.    On July 8, 2021, the Debtor issued payroll to its lay employees for the pay period

ending June 26, 2021.  And on June 30, 2021, the Debtor issued payroll to its clergy for the month

of June.  Since those dates and prior to the Petition Date, Diocesan Employees have continued to

provide services for the Debtor and are thus entitled to receive their prepetition wages and benefits

payable during that interim period prior to the Petition Date. Additionally, compensation may be

due and owing as of the Petition Date because:

    a.    discrepancies may exist between the amounts paid and the amounts Diocesan
        Employees believe should have been paid, which, upon resolution, may reveal that
        additional amounts are owed to such employees; and

    b.    some payroll checks issued to Diocesan Employees prior to the Petition Date may
        not have been presented for payment or cleared the banking system and,
        accordingly, have not yet been honored and paid as of the Petition Date.

48.    As of the Petition Date, the aggregate amount of accrued wages, salaries, overtime

pay, commissions, and other compensation (excluding, without limitation, the amounts owed in

connection with Deductions, Payroll Taxes, Employee Benefits, and the Debtor's Workers'

Compensation Program (each as defined below)) earned prior to the Petition Date that remains

unpaid to Diocesan Employees is approximately $34,776.75 (the "Unpaid Compensation").

---

[4] Under canon law, the Diocese is required to pay priests even though they are inactive.  The aggregate gross amount
paid to inactive priests is $2,525.00 per month.

49.    Through the Wages and Benefits Motion, the Debtor requests authority to pay all such Unpaid Compensation to Diocesan Employees in the ordinary course of business in an amount not to exceed $34,776.75.  The Debtor submits that no Diocesan Employee is owed more than $13,650 for Unpaid Compensation or Employee Benefits (as defined below).[5]

**Non-Diocesan Employee Payroll Processing and Administration**

50.    In addition to the Diocesan Employees, the Debtor administers payroll for approximately 52 Non-Diocesan Employees, which work at the following Participating Employers:  The Annual Catholic Appeal, Inc.; St. Vincent de Paul Place, Norwich, Inc.; St. Vincent DePaul, Middletown, Inc.; and Diocese Of Norwich Outreach To Haiti, Inc. (the "Non-Diocesan Payroll Entities").

51.    Paycor, Inc. (the "Payroll Processor" or "Paycor"), processes payroll for both the Diocesan Employees as well as the employees of the Non-Diocesan Payroll Entities.  The Debtor and the Non-Diocesan Payroll Entities consolidate payroll funds into a single account in the Debtor's name, which Paycor then uses to fund employee payroll.[6][7]  By centralizing the payroll processing services and maintaining a single relationship with Paycor for payment of payroll, the

---

[5] To the extent that the Debtor discovers that an employee does have a section 507(a)(4) claim for Unpaid Compensation that exceeds the $13,650 cap, the Debtor, by this Motion, only seeks authority to honor such claim up to the $13,650 statutory cap.  However, the Debtor reserves the right to request authority to honor any such section 507(a)(4) claims that exceed the $13,650 cap after notice and a hearing.

[6] In order to disburse payroll to the Debtor's and the Non-Diocesan Payroll Entities' employees, the Diocese funds or causes to be funded payments to Paycor, which are then reimbursed to the Debtor by each of the Non-Diocesan Payroll Entities.  As a part of its administrative responsibilities pursuant to certain services agreements, Paycor makes payments to the employees on the Debtor's and the Non-Diocesan Payroll Entities' behalf using such funds.  While the Non-Diocesan Payroll Entities fund their own payroll, some receive subsidies from the Debtor as approved by its budget committee to facilitate those entities' and the Debtor's charitable missions, which may be netted against the amount collected from each such entity.  Prior to the Petition Date, the Debtor funded gross payroll of approximately $114,237.20 for the lay employees of the Debtor and the Non-Diocesan Payroll entities for the pay period ending July 10, 2021, which is scheduled to be paid to employees on July 22, 2021.

[7] The Debtor's property director, a Diocesan Employee, also serves as the cemetery director for the Norwich Diocesan Cemetery Corporation, which reimburses the Debtor for a portion of the employee's salary.

Diocese is able to provide a streamlined payment system for all wages as well as administrative cost savings to it and the Non-Diocesan Payroll Entities.

52.     The average aggregate gross monthly compensation for Non-Diocesan Employees (excluding, without limitation, amounts owed in connection with Deductions, Payroll Taxes, Employee Benefits, and the Debtor's Workers' Compensation Program (each as defined below), is approximately $67,360.72.

53.     Through the Wages and Benefits Motion, the Debtor seeks authority to continue providing payroll processing and administration services for the Non-Diocesan Payroll Entities during the pendency of this case in the ordinary course of business, including collecting funds from the Non-Diocesan Payroll Entities and transferring funds to Paycor[8] to pay the wages of the Non-Diocesan Payroll Entities' employees.

**Deductions and Withholding**

54.     During each applicable pay period, the Debtor deducts certain amounts from the paychecks of its employees and of the employees of the Non-Diocesan Payroll Entities for which it administers payroll, including pre-tax and after-tax deductions attributable to certain Employee Benefits discussed herein (such as an employee's share of health or dental insurance premiums) and charitable contributions (collectively, the "Deductions") and forwards those amounts to various third-party recipients.    For the most recent pay period, these Deductions totaled approximately $12,803.00.  The Debtor believes that these Deductions were remitted to the various third-party recipients prior to the Petition Date; however, in the event that such amounts have not been remitted, the Debtor seeks authority to continue to forward these prepetition Deductions, in

---

[8] Paycor's services are crucial to the smooth functioning of the Debtor's payroll system and, therefore, to the Debtor's operations generally. As of the Petition Date, the Debtor believes that no amount is owed to Paycor. The Debtor requests authority to continue to pay Paycor or such other Payroll Processor as it may from time to time select in the ordinary course of business as routinely done prior to the Petition Date.

an amount not to exceed $12,803.00, to the applicable third-party recipients on a postpetition basis in the ordinary course of business, as was routinely done prior to the Petition Date. The Debtor also seeks authority to forward any Deductions that have accrued prior to the Petition Date, in an amount not to exceed $12,803.00, to the applicable third-party recipients in the ordinary course of business.

55.    Further, the Debtor and the Non-Diocesan Payroll Entities are required by law to withhold from an employee's wages amounts related to, among other things, federal, state and local income taxes, social security and Medicare taxes (collectively, the "Withheld Amounts") for remittance to the appropriate taxing authorities.  The Debtor and the Non-Diocesan Payroll Entities must then make matching payments for social security and Medicare taxes (the "Employer Payroll Taxes," and together with the Withheld Amounts, the "Payroll Taxes").  The Payroll Taxes for the Debtor's and the Non-Diocesan Payroll Entities' employees for the most recent pay period ending July 10, 2021, totals approximately $29,318.73.  The Debtor believes that these Payroll Taxes were remitted to the various taxing authorities before the Petition Date; however, in the event that such amounts were not remitted, the Debtor seeks authority to continue to forward these prepetition Payroll Taxes, in an amount not to exceed $29,318.73, to the applicable taxing authorities on a postpetition basis in the ordinary course of business, as was routinely done prior to the Petition Date.

56.    Between the pay period that ended June 26, 2021, and the Petition Date, the Debtor's and the Non-Diocesan Payroll Entities' employees have continued to provide services to their respective employers and are thus entitled to receive prepetition wages upon which Payroll Taxes have been withheld.  As of the Petition Date, the accrued and outstanding prepetition obligations with respect to the Payroll Taxes on those wages are approximately $37,918.67, which

represents approximately 14 business days of accrued Payroll Taxes for lay employees and 12 business days of accrued Payroll Taxes for clergy.

57.     Through the Wages and Benefits Motion, the Debtor seeks authority, in its sole discretion, to continue to honor and process the prepetition Payroll Taxes on a postpetition basis, including forwarding the Payroll Taxes to the appropriate taxing authorities on behalf of itself and of the Non-Diocesan Payroll Entities it administers payroll for in the ordinary course of business.

**Benefits Processing and Administration**

58.     Approximately 25 Diocesan Employees and 654 Non-Diocesan Employees are enrolled into consolidated benefit plans (as more fully described below) in order to take advantage of economies of scale (the "Employee Benefits").

59.     The Debtor and the Participating Employers use Reta Trust ("Reta"), a national nonprofit employer trust that purchases healthcare and other benefits for Catholic organizations, to purchase benefits for both Diocesan Employees and Non-Diocesan Employees.  The Debtor collects the premiums for all Non-Diocesan Employee benefits from the Participating Employers through a third-party vendor, Benefit Administrative Systems, LLC ("BAS"), which deposits those funds into a segregated account that the Debtor uses to pay the Employee Benefits of the Diocesan Employees and Non-Diocesan Employees. [9] [10]

---

[9] In order to ensure timely payment of premiums, the Debtor funds, or causes to be funded, payments to Reta, which are then reimbursed to the Debtor by each of the Participating Employers through BAS. While the Participating Employers fund their own employees' Employee Benefits, some receive subsidies from the Debtor as approved by its budget committee to facilitate those entities' and the Debtor's charitable missions, which may be netted against the amount collected from each such entity.

[10] BAS charges each of the Participating Employers its employees' share of applicable benefits premiums, along with an approximately 6% administrative fee (except that health insurance premiums for employees enrolled in the PPO option are not subject to the administrative fee), which is collected in the Debtor's segregated medical account. If a Participating Employer fails to timely reimburse the diocese, a receivable is booked with respect to that employer.  The administrative fee is utilized in part to offset delinquent reimbursements.  Historically, the administrative fee has been sufficient to ensure that outflows from the segregated medical account do not exceed inflows, thus preventing any accrued receivables from diluting the Debtor's estate.

60.     Currently, Diocesan Employees and Non-Diocesan Employees receive the following Employee Benefits:

    a.     <u>Health, Dental, and Vision</u>.  Full time employees are eligible to receive health insurance, prescription drug coverage, and employee assistance programs through Blue Cross Blue Shield of California, and dental coverage through Delta Dental. The employer pays 100% of medical and dental coverage for covered employees. Employees have the ability to pay for additional coverage for family members. Employees also have the option to obtain vision coverage through Superior Vision, which is paid by the employee.

    b.     <u>Life Insurance</u>.  Full time employees are eligible for term life insurance through The Hartford.  The employee pays 100% of the cost of insurance.

    c.     <u>Disability</u>.  All employees are eligible to enroll in long term disability and accident insurance through AFLAC.  The employee pays 100% of the cost of these benefits.

61.     Through the Wages and Benefits Motion, the Debtor seeks authority to (a) continue administering the Employee Benefits for Diocesan Employees and Non-Diocesan Employees in the ordinary course of business; (b) continue making all contributions to such programs and, with respect to the employees of Participating Employers, receive reimbursement for such contributions; (c) continue to pay any claims and administrative fees related thereto, including to Reta and BAS; and (d) pay any and all such amounts to the extent that they remain unpaid on the Petition Date.

**<u>Retirement Benefits</u>**

62.     The Diocesan Employees and Non-Diocesan Employees are eligible to participate in various retirement plans (the "<u>Retirement Benefits</u>") based upon whether an employee is clergy or non-clergy.

63.     Non-clergy lay employees of the Diocese, the Parishes, and the Other Catholic Entities are required to participate in a defined-benefit plan (the "<u>Lay Employee Retirement Plan</u>"). The Lay Employee Retirement Plan is administered by Christian Brothers Services, Inc.

("Christian Brothers"), an independent entity that administers retirement and benefit programs for charitable organizations throughout the country.  The Lay Employee Retirement Plan is a church plan exempt from ERISA.  The Debtor withholds retirement contributions from the payroll of lay employees of the Diocese and the Non-Diocesan Payroll Entities, which it then transfers to Christian Brothers.  Participating Employers other than the Non-Diocesan Payroll Entities withhold lay employee retirement contributions and pay those contributions directly to the plan administrator of the Lay Employee Retirement Plan.

64.    Lay employees are also eligible to participate in a 403(b) defined contribution plan administered by Pen ServPlan Services, Inc. (the "Optional 403(b) Plan").  Participation in this benefit is optional and paid for by the employee.

65.    Diocesan Employees and Non-Diocesan Employees that are clergy participate in a separate retirement plan, the Diocese of Norwich Retirement Plan for Priests (the "Priest Retirement Plan").  The Priest Retirement Plan is also a church plan exempt from ERISA.  Each employer contributes $1,500 per quarter per priest it employs to the Priest Retirement Plan, which is held in a trust account administered by the Debtor for the benefit of the plan beneficiaries.  There are currently 21 retired priests receiving retirement income from the Priest Retirement Plan.  The Diocese uses Paycor to distribute these payments.  Based on the most recent actuarial report, the Priest Retirement Plan is fully funded.  Retired priests also receive health insurance benefits through Reta, which are paid for by the Debtor.

66.    Through the Wages and Benefits Motion, the Debtor seeks authority to (a) continue administering the Retirement Benefits for Diocesan Employees and Non-Diocesan Employees in the ordinary course of business; (b) continue making all contributions to such plans; (c) continue

to pay any claims and administrative fees related thereto; and (d) pay any and all such amounts to the extent that they remain unpaid on the Petition Date.

**Reimbursement of Employee Expenses**

67.     In the ordinary course of business, the Debtor reimburses Diocesan Employees and for certain reasonable and customary expenses necessarily incurred in the scope of their service to the Diocese (collectively, the "Business Expenses").  To obtain reimbursement of Business Expenses, an employee is required to submit receipts to its respective ministry director, who then submits the expense for reimbursement to the employee through the Debtor's central administrative office.

68.     The Debtor's reimbursement of such ordinary course expenses is critical to the maintenance of employee morale, the efficient operation of the Diocese's ministries and fundraising, and thus the preservation of the Debtor's chapter 11 estate on a postpetition basis.

69.     Year to date, the Debtor has only incurred $45.07 in Business Expenses.  Although the Debtor requests that employees submit reimbursement requests promptly, there is inevitably some lag time between the incurrence of a Business Expense and processing the Debtor's reimbursement thereof. The Debtor believes all Business Expenses have been reimbursed, but to the extent employees have incurred Business Expenses that have not been reimbursed, the Debtor wishes to reimburse those expenses.

70.     Through the Wages and Benefits Motion, the Debtor is requesting authority to pay all prepetition Business Expenses in the ordinary course of its business.

**Other Employment-Related Benefits**

71.     The Debtor provides certain additional benefits and stipends to various individuals with respect to services they perform for the Diocese (the "Other Employment-Related Benefits").

72.    Certain diocesan priests are housed at various Parishes within the Diocese.  The Diocese pays a $250 per month stipend directly to each Parish housing a diocesan priest as rent. Currently, the Debtor provides such a stipend for three diocesan priests.

73.    In the ordinary course of its business and pursuant to its obligations under Canon Law, the Debtor maintains a residence on its campus that the bishop uses as lodging and for official fundraising and entertainment purposes.  The Debtor pays all maintenance, utilities, and expenses associated with the residence, which average approximately $1,527.00 per month.  The Debtor also pays various expenses the bishop incurs in the performance of his duties, which average approximately $800 per month.

74.    The Debtor is also responsible for the training and housing of seminarians in training to become priests.  The Debtor currently employs six full-time seminarians.[11]  In addition to payroll and benefits, the Diocese pays tuition for seminarians, which averages approximately $36,022.97 per seminarian per year.[12] [13]

75.    Finally, consecrated brothers and sisters (the "Religious") of various Catholic orders and institutes (each an "Institute") provide services to the Diocese's various ministries. While Religious are compensated by their respective Institutes, the Diocese provides certain expenses and a stipend to compensate them for work performed for the Diocese.  The Debtor provides a monthly stipend of $2,340.78 per Religious.  The stipend is paid directly to each Religious' Institute.  The Debtor also pays for health insurance for each Religious, or if an Institute provides its own health insurance, the Debtor will reimburse the Institute for the cost of annual premiums (approximately $11,076.00 for the year ending June 30, 2021).  Religious also receive

[11] The seminarians are considered lay employees until they are incardinated, at which point they become clergy.
[12] The seminarians receive reduced pay while at seminary.
[13] The seminarians attend Pope St. John XXIII National Seminary and Mount Saint Mary's Seminary.  Due to the pandemic, the seminarians were sent home.  The Debtor currently has a tuition credit that will be applied in the fall.

a housing allowance of $250.00 per month unless they live in parish or diocesan housing.  And Religious can receive reimbursement for up to $5,000 per year annually for vehicle expenses, or if authorized to use a diocesan vehicle, up to $125.00 per month in gas expenses.  There are currently five Religious serving in the Diocese's various ministries.

76.     Through the Wages and Benefits Motion, the Debtor seeks authority to (a) continue administering the Other Employment-Related Benefits in the ordinary course of business; (b) continue making all payments on account of such benefits; (c) continue to pay any claims and administrative fees related thereto; and (d) pay any and all such amounts to the extent that they remain unpaid on the Petition Date.

**Paid Leave**

77.     Diocesan Employees are provided with paid time off ("PTO").  PTO encompasses holidays, vacation, sick leave, personal leave, court duty, bereavement, military leave, and office closure.

78.     Diocesan Employees are provided with approximately 21 paid holidays each year.

79.     The Debtor's vacation pay policy is based primarily on length of service. A Diocesan Employee must have one year of continuous service as a salaried employee before being entitled to use paid vacation.  Employees receive 10 days of paid vacation per year after one full year of employment, 15 days of paid vacation per year after 5 years of employment, and 20 days of paid vacation per year after 10 years of employment.  In most instances, an employee is entitled to receive compensation for unused vacation days upon termination up to a maximum of four weeks.

80.     Full-time and part-time employees accrue 10 sick days per year, up to a maximum of 60 sick days.  Unused sick days are not paid out upon an employee's resignation or termination.

81.     The Debtor's PTO costs are included in gross payroll.  Accordingly, and except for amounts owing in connection with accrued but unused vacation, all prepetition amounts related to PTO should be included in the aggregate amount of Unpaid Compensation.

82.     Through the Wages and Benefits Motion, the Debtor requests authority to continue to honor its PTO policies in the ordinary course of business, and to honor and pay, in its sole discretion, any and all prepetition amounts related thereto subject to the statutory cap set forth in section 507(a)(4) of the Bankruptcy Code.

**Workers' Compensation Program**

83.     The Diocese carries workers' compensation coverage through The Travelers Indemnity Company ("Travelers") for itself and the Participating Employers (the "Workers' Compensation Program").  The Diocese pays the premiums for the Workers' Compensation Program, and Participating Employers are then billed for their respective share of premiums and reimburse the Diocese for same.  The premiums for the coverage year ending June 30, 2022 total $283,498.00.  For the two-year period ending April 1, 2021, the total amount paid for claims under the Workers' Compensation Program was approximately $98,098.00.

84.     By covering their employees under a single workers' compensation program, the Diocese and Participating Employers benefit from significant cost savings as a result of the pooled risk and the allocation of plan overhead.  Indeed, obtaining workers' compensation insurance for any one of these entities alone would be more expensive due to the small number of employees that would be covered.

85.     Through the Wages and Benefits Motion, the Debtor seeks authority, to be exercised in its sole discretion, to continue to maintain its Workers' Compensation Program in the ordinary course of business and to pay any and all prepetition amounts related thereto including,

without limitation, any payments for workers' compensation claims, deductibles and fees owed for administrative costs, and other amounts required in connection with the Workers' Compensation Program, as such amounts become due in the ordinary course of the Debtor's business.

### III. DEBTOR'S MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS AUTHORIZING DEBTOR TO (I) CONTINUE INSURANCE COVERAGE AND INSURANCE PROGRAMS ENTERED INTO PREPETITION AND SATISFY PREPETITION OBLIGATIONS RELATED THERETO AND (II) RENEW, AMEND, SUPPLEMENT, EXTEND, OR PURCHASE INSURANCE POLICIES; AND (III) GRANTING RELATED RELIEF (the "Insurance Motion")

86.     In the ordinary course of business, the Debtor maintains various forms of insurance coverage (the "Insurance Coverage") for itself and certain of the Parishes, High Schools, and Other Catholic Entities within the geographic bounds of the Diocese (the "Participating Entities").  In order maintain appropriate and cost-effective Insurance Coverage, the Debtor maintains certain insurance policies and participates in a risk-sharing pool (the "Insurance Programs").

**The Insurance Programs**

87.     The Debtor and Participating Entities are insured for property, general liability, bodily injury, sexual misconduct, flood, and other liability through the Catholic Mutual Relief Society of America ("Catholic Mutual"), a pooled self-insurance fund for Catholic organizations in North America.[14]  Depending on the type of liability and subject to certain terms, coverage limits, and exclusions, Catholic Mutual provides coverage for the Debtor and Participating Entities through its pooled self-insurance fund and various reinsurance arrangements.

---

[14] Catholic Mutual is a nonprofit organization classified under section 501(c)(3) of the Internal Revenue Code of 1986, as amended.  It is not an insurance company.

88.     The Debtor's annual premium to provide coverage for itself and the Participating Entities through Catholic Mutual for the coverage year beginning July 1, 2021, is $1,178,742.00.[15]

89.     In addition to an annual premium, Catholic Mutual participants must meet certain thresholds in the pooled self-insurance fund, which are calculated on an annual basis.  Depending on the status of the fund in each particular coverage year, the Debtor may be required to contribute money into the fund or entitled to receive a distribution from the fund.  For coverage year 2021, the required contribution amount is $41,116.00.  This amount is included in the 2021 premium above.

90.     Subject to certain terms, coverage limits, and exclusions, The Travelers Indemnity Company ("Travelers") provides automobile coverage for the Debtor and the Participating Entities.  The annual premium for automobile coverage for the coverage year beginning July 1, 2021, is $80,298.00.

91.     Subject to certain terms, coverage limits, and exclusions, the Debtor has a WorldRisk Foreign Commercial Package Policy through American International Group, Inc. ("AIG", and with Catholic Mutual and Travelers, the "Insurance Providers"), which it obtained through insurance broker the Gowrie Group ("Gowrie").  The annual premium for this policy for the coverage year beginning July 1, 2021 is approximately $5,426.00, which the Debtor pays through Gowrie.

**Other Insurance-Related Expenses**

92.     Catholic Mutual also provides risk management services, including an assigned risk manager, for the Debtor and Participating Entities.  The annual service fee (the "Risk Management Fee") for these risk management services is $138,000.00, paid in semi-annual installments.  The

---

[15] The Debtor is considering adding cyber-risk coverage, which could potentially increase the premium for the coverage year.

Risk Management Fee is mandatory and must be paid in order for the Debtor and the Participating Entities to continue to receive coverage.

93.     The Debtor is required to pay deductibles and other out-of-pocket costs up to certain amounts on a per-occurrence basis (the "Insurance Deductibles").  The Debtor budgets a reserve to cover any such costs and pays the first $25,000 of out-of-pocket expenses for any claims made by the Debtor or the Participating Entities.  For the coverage year ending June 2021, the Debtor paid approximately $261,436.00 in out-of-pocket costs related to various claims covered by the Insurance Programs.

94.     The Debtor funds the premiums for the Insurance Coverage, any contributions to the pooled self-insurance fund, any reserves, and any service fees and other fees related to the Insurance Programs from (a) its own budget for Insurance Coverage and (b) billing each Participating Entity a portion of the total cost for Insurance Coverage on a monthly basis.  The amount billed to each Participating Entity takes various factors into account in order to fairly allocate costs and risk and ensure sufficient funding.

95.     Through the Insurance Motion, the Debtor requests entry of the Proposed Interim Order and Proposed Final Order, pursuant to sections 105, 363 and 1112(b) of the Bankruptcy Code, authorizing but not directing the Debtor in the ordinary course of business to (i) continue administering the Insurance Programs for the Debtor and Participating Entities in the ordinary course of business consistent with past practices; (ii) continue funding all premiums, contributions, reserves, and service fees related to Insurance Coverage and receiving reimbursement for same; (iii) renew, amend, supplement, extend, purchase, or terminate Insurance Coverage in the ordinary course of business; and (iv) pay any and all amounts related to the Insurance Programs that remained unpaid on the Petition Date.

**IV.    MOTION OF DEBTOR FOR ENTRY OF AN ORDER (I) APPROVING PROPOSED FORM OF ADEQUATE ASSURANCE OF PAYMENT TO UTILITY PROVIDERS (II) ESTABLISHING PROCEDURES FOR DETERMINING ADEQUATE ASSURANCE OF PAYMENT FOR FUTURE UTILITY SERVICES, (III) PROHIBITING UTILITY PROVIDERS FROM ALTERING, REFUSING, OR DISCONTINUING UTILITY SERVICE, AND (IV) GRANTING RELATED RELIEF (the "Utility Motion")**

**The Utility Services and Utility Providers**

96.    In the ordinary course of business, the Debtor incurs expenses for, among other things, electricity, natural gas, water, sewage, telecommunications, internet and data services, and waste management (including trash and recycling) (the "Utility Services"). Five utility providers (collectively, the "Utility Providers") provide Utility Services to the Debtor directly or indirectly through a landlord, including those entities identified on Exhibit B to the Utility Motion (the "Utility Service List").

97.    The Debtor's day-to-day operations rely heavily on the provision of the Utility Services. Any interruption in the Utility Services could seriously disrupt the Debtor's ability to operate. It would also jeopardize the Debtor's restructuring efforts and, ultimately, creditor recoveries. Therefore, it is critical that utility services continue uninterrupted during this chapter 11 case.

98.    On average, the Debtor spent approximately $10,673.00 per month on Utility Services for the 12-month period ending May 31, 2021. The Debtor has historically paid its Utility Providers on a regular and timely basis. As of the Petition Date, the Debtor understands that it is current with all Utility Providers, except for Utility Services that have not yet been billed, have been billed but are not yet due, and have been paid with checks that have not yet cleared (the "Gap Period Obligations").

**Proposed Adequate Assurance**

99.     Pursuant to section 366(c)(2) of the Bankruptcy Code, a utility may alter, refuse, or discontinue a debtor's utility service if the utility does not receive "adequate assurance of payment" from the debtor within thirty (30) days after the commencement of the debtor's chapter 11 case. Section 366(c)(1) of the Bankruptcy Code defines "assurance of payment" of postpetition charges as "(i) a cash deposit; (ii) a letter of credit; (iii) a certificate of deposit; (iv) a surety bond; (v) a prepayment of utility consumption; or (vi) another form of security that is mutually agreed on between the utility and the debtor or the trustee." 11 U.S.C. § 366(c)(1).

100.     The Debtor intends to pay all Gap Period Obligations and ongoing postpetition utility obligations owed to the Utility Providers for Utility Services in a timely manner and projects that its cash on hand and future cash flow will be sufficient to pay such obligations to Utility Providers in the ordinary course of business.  Further, each Utility Provider that currently holds a deposit will be entitled to retain that deposit as security.  The Debtor contends that the assurances detailed in this paragraph (the "Proposed Adequate Assurance") satisfy the requirements of section 366.

> ## V.     DEBTOR'S MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING THE CONTINUED USE OF THE DEBTOR'S CASH MANAGEMENT SYSTEM, BANK ACCOUNTS AND BUSINESS FORMS AND (II) GRANTING RELATED RELIEF (the "Cash Management Motion")

**The Debtor's Cash Management System**

101.     In the ordinary course of business, the Debtor utilizes a centralized cash management system (the "Cash Management System") to collect, manage, invest and disburse funds in support of its mission.  The Debtor holds accounts with a number of financial institutions (the "Banks") in order to facilitate the Cash Management System.  A list of the Debtor's bank accounts can be found attached hereto as Exhibit C (the "Bank Accounts").

102.    A diagram setting forth the flow of funds among the Bank Accounts and summarizing the Cash Management System, as it exists on the Petition Date, is attached hereto as Exhibit D.

A.    The Debtor's Accounts

103.    In the ordinary course of business, the Debtor maintains the Bank Accounts described herein to facilitate the financial operations of its central administrative offices.

104.    *The Main Bank Accounts.*  As of the Petition Date, the Debtor maintained the following accounts (the "Main Accounts"): (a) its primary operating account (the "General Fund") with People's Bank ("People's"), which is a non-interest-bearing account; (b) a non-interest-bearing deposit account (the "Deposit Account") with People's; (c) an interest-bearing account denominated as an "insurance reserve" (the "Insurance Reserve")[16] with Janney Montgomery Scott ("Janney"); (d) a medical account (the "Medical Account") with People's; (e) a payroll account (the "Payroll Account") with People's; and (f) a checking account[17] (the "Checking Account").  The General Fund acts as the Debtor's central repository of funds and is the primary payor account for substantially all of the Debtor's expenses.

105.    *The General Fund.*  The General Fund is funded from multiple sources.  The ACA receives pledges which are deposited into an ACA (i.e., non-debtor) account at Dime Bank.  From that account, funds for ACA expenses are transferred to separate non-debtor accounts at Janney Montgomery Scott.  ACA pays some of its own expenses through those non-debtor accounts, while the Debtor pays certain ACA expenses, including payroll and benefits.  Funds to cover ACA's

---

[16] The designation of the Insurance Reserve account as such is a misnomer, as that account is neither used to fund insurance premiums nor is it a reserve.  Rather, it is an unrestricted savings account that is not reserved for any specific purpose, insurance or otherwise.  This is a legacy account that historically had been used to fund insurance payments, but it has not been used for insurance purposes for some time and the nomenclature simply never changed.

[17] Referenced on Exhibit C as the Business Advantage Account.

payroll and benefits are transferred further from those non-debtor accounts into the General Fund. In addition, checks and cash received by the Debtor are placed initially into the Deposit Account. Those funds are then transferred to the General Fund to cover Debtor expenses.

106.    *The Deposit Account*.  The Deposit Account acts as the account into which cash and checks collected by the Debtor are deposited.  Funds from the Deposit Account are regularly transferred to the General Account to cover the Debtor's expenses.

107.    *The Insurance Reserve*.  The Insurance Reserve is an interest-bearing savings account.  Funds are transferred between the Insurance Reserve and the General Fund as needed to cover expenses from the General Fund while maintaining a balance in the Insurance Reserve as much as possible in order to maximize interest income in that account.

108.    *The Medical Account*.  As is discussed in detail in *Debtor's Motion for Entry of Interim and Final Orders (I) Authorizing Debtors to (A) Pay Prepetition Wages, Salaries, Reimbursable Expenses, and Other Obligations on Account of Compensation and Benefits Programs and (B) Continue Compensation and Benefits Programs; and (II) Granting Related Relief*, Debtor maintains a medical account at People's.  Employer-funded and employee-withheld health insurance premiums are deposited into this account for the benefit of Debtor's employees. In addition, the Debtor's third-party benefits administrator, Benefit Administrative Systems, LLC ("BAS"), collects premiums from certain of the Parishes within the Diocese, the High Schools, and the Other Catholic Entities (collectively, the "Participating Employers"), which are deposited into the Medical Account.  Debtor and non-debtor funds in the Medical Account are aggregated and used to pay healthcare premiums for both the Debtor's employees and the employees of Participating Employers whose healthcare premiums were funded through this account.

Additional funds are transferred from the Medical Account to the General Fund (and ultimately into the Payroll Account) to cover benefits-related payroll costs.

109.    *The Payroll Account*.  The Debtor maintains its payroll account at People's.  The payroll account is funded from the General Fund to satisfy the payroll obligations of the Debtor and ACA; St. Vincent de Paul Place, Norwich, Inc.; St. Vincent DePaul, Middletown, Inc.; and Diocese Of Norwich Outreach To Haiti, Inc. (the "Non-Diocesan Payroll Entities").  Payment of payroll for the Debtor and Non-Diocesan Payroll Entities is handled through a third-party payroll administrator, Paycor, Inc. ("Paycor").  In addition, funds from two non-debtor retirement accounts maintained for diocesan priests maintained at Janney for the benefit of diocesan priests are transferred into the Payroll Account for disbursement through Paycor to retired priests in accordance with the Debtor's applicable retirement plan documents for retired priests.

110.    *The Checking Account*.  The sole purpose of the Checking Account is to have an account with a debit card used solely by the Bishop for discretionary expenses in support of the Debtor's mission.  As of July 13, 2021, the Checking Account had a balance of $8,697.39. Periodically, as the balance in the Checking Account dips below $5,000, the Debtor replenishes it up to approximately $10,000 by transferring funds from the General Fund.  The Checking Account is not used for any purpose other than the Bishop's use of the debit card tied to the Checking Account.

B.    Restricted Donor Accounts

111.    The Debtor maintains four separate accounts to hold funds donated to the Debtor subject to donor-restrictions on their use (the "Donor Restricted Funds"): (a) The Dorothy H. Cooke Ecumenical Fund at Janney (investment account); (b) the Seminarian Education Fund at Janney (investment account); (c) a Gift Annuity account at Janney (investment account); and (d)

a Mae-Lee Trust certificate of deposit account at People's.  No funds are transferred into or out of any of these restricted accounts.  Change in value in each of these accounts is recorded monthly but funds remain on deposit and may not be used for any purpose inconsistent with the intent of the donation.  The three Donor Restricted Funds that are investment accounts are self-directed accounts, not managed account.  Janney does not make transactions in these accounts other than at the Debtor's direction.  The Debtor's Chief Financial Officer makes all investment decisions, in consultation with the Debtor's Chancellor or Bishop, with respect to these accounts.

112.   As of July 13, 2021, the aggregate value of all donor-restricted accounts maintained by the Debtor was approximately $1.4 million.  However, two of the four donor-restricted accounts have balances less than $50,000.  The costs and administrative burden of moving the Donor Restricted Funds to new accounts at banks that are authorized depositories under the U.S. Trustee Guidelines would be unreasonably high compared to the small balances that exist in half of these accounts.

C.  Unrestricted Investment Accounts

113.   The Debtor maintains seven separate unrestricted investment accounts (the "Unrestricted Investment Accounts"):

(i)     *Norwich Roman Catholic Diocesan Corp. Reserve Fund* held at Janney Montgomery Scott.  Funds in this account are invested in a diverse portfolio of mutual funds, bonds, exchange traded funds and unit investment trusts.

(ii)    *Priest Needs Account* held at Janney Montgomery Scott.  Funds in this account are invested in a diverse portfolio of mutual funds, bonds, exchange traded funds and unit investment trusts.

(iii)   *Priest Needs Account - Managed* held at Janney Montgomery Scott.  Funds in this account are invested in a diverse portfolio of stocks.

(iv)    *Norwich Roman Catholic Diocesan Corp SAM Account* held at Morgan Stanley. Funds in this account are invested in a diverse portfolio of stocks and bonds.

(v)   *The King Family Fund for Priests & Seminarians* held at Morgan Stanley.  Funds in this account are invested in a diverse portfolio of stocks and bonds.

(vi)  *Norwich Roman Catholic Diocesan Corp. Continuing Education* account held at Morgan Stanley.  Funds in this account are invested in a diverse portfolio of stocks and bonds.

(vii) *Michael & Catherine King Vocation Fund* held at Morgan Stanley.  Funds in this account are invested in a diverse portfolio of stocks and bonds.

No funds are transferred into or out of any of these unrestricted accounts.  Change in value in each of these accounts is recorded monthly.  The Unrestricted Investment Accounts are self-directed accounts, not managed accounts. Neither Janney nor Morgan Stanley makes transactions in any of these accounts other than at the Debtor's direction. The Debtor's Chief Financial Officer makes all investment decisions, in consultation with the Debtor's Chancellor or Bishop, with respect to these accounts.

114.   As of July 13, 2021, the aggregate value of all unrestricted accounts maintained by the Debtor was approximately $7.66 million.  Because a number of these accounts are maintained at the same institution as the Donor Restricted Funds, as to which the Debtor seeks authority to continue to maintain those accounts at the same institution without having to incur the burden and expense of moving them to a depository authorized under the U.S. Trustee Guidelines, it would be economical, efficient and appropriate to permit the Debtor to continue to maintain its unrestricted investment accounts at the same institution.  As to unrestricted investment accounts maintained at Morgan Stanley, the Debtor should not be required to bear the burden and expense of moving those accounts to an authorized depository because Morgan Stanley is a large, sophisticated and reputable national investment bank and advisory services firm.

**Compliance with U.S. Trustee Guidelines**

115.   The Operating Guidelines and Reporting Requirements for Debtors in Possession and Trustees (the "U.S. Trustee Guidelines") generally require chapter 11 debtors to, among other

things, deposit all estate funds into an account with an authorized depository that agrees to comply with the requirements of the Office of the United States Trustee for the District of Connecticut (the "U.S. Trustee").  As of the Petition Date, all of the Main Accounts other than the Insurance Reserve were held with a bank (People's) that is an authorized depository under the U.S. Trustee Guidelines and is insured by the Federal Deposit Insurance Corporation.  Moreover, all of these accounts are located in the U.S.  Separately, with respect to the Insurance Reserve, Janney, where that account is maintained, is a large, sophisticated and reputable investment advisory services firm, and the Insurance Reserve is insured.  It would be disruptive to the Debtor's relationship with Janney, where it maintains other accounts, to transfer the Insurance Reserve to another institution, and given the limited benefit to doing so, on balance, it would be more economical and efficient – and in the best interests of the Debtor and its stakeholders – for the Debtor to continue to maintain the Insurance Reserve at Janney as a debtor-in-possession account.  Accordingly, the Debtor submits that its accounts at People's are in compliance with the U.S. Trustee Guidelines and its accounts at Janney are consistent with the U.S. Trustee Guidelines, and the Debtor seeks authority to continue to maintain its accounts at those institutions as debtor-in-possession accounts.  With respect to accounts maintained at Janney which is not on the authorized depository list in this District, the Debtor submits that requiring the Debtor to move those accounts would impose an undue burden without significant benefit at a time when the Debtor and its key personnel must focus their efforts on other important tasks at the outset of this case geared toward a successful reorganization for the benefit of its stakeholders.  As such, the Debtor respectfully requests authority to continue to maintain at Janney those accounts that were housed there as of the Petition Date.

116.    In the event the Debtor's accounts are not in an account or financial institution that meets the requirements of the United States Trustee or section 345(b) of the Bankruptcy Code, for the reasons stated above, the Debtor respectfully requests that the Court relieve the Debtor of its obligation to comply with the requirements of section 345(b) and authorize the Debtor to maintain and continue using its prepetition accounts and cash management system.

117.    Alternatively, if any of the Debtor's accounts do not comply with section 345 of the Bankruptcy Code or any other requirements of the U.S. Trustee, and the Court is not inclined to grant the Debtor relief from its obligation to comply with section 345(b) of the Bankruptcy Code,  the Debtor requests that the Court grant the Debtor 20 days, without prejudice to seek an additional extension, to come into compliance with section 345(b) of the Bankruptcy Code and any of the U.S. Trustee's requirements or guidelines or to make such other arrangements as agreed to by the U.S. Trustee.

**Existing Business Forms and Checks**

118.    In the ordinary course of business, the Debtor uses numerous business forms, including, without limitation, checks, business cards, letterhead, purchase orders and invoices (the "Business Forms").  To minimize expense to its estate and avoid confusion on the part of employees, customers and suppliers, the Debtor respectfully requests that the Court authorize it to continue to use all correspondence and Business Forms, as such forms were in existence immediately prior to the Petition Date without reference to the Debtor's status as a debtor in possession; provided, however, that upon depletion of the Debtor's Business Forms stock, the Debtor will obtain new Business Forms reflecting its status as a debtor in possession, and, to the extent reasonably practicable, the Debtor will cause any checks electronically generated during this chapter 11 case to contain the designation "Debtor in Possession."  Such authorization will enable the Debtor to avoid the expense and delay of ordering new Business Forms.

**Bank Fees**

119.    In the ordinary course of business, the Debtor incurs and pays, honors, or allows to be deducted from the appropriate Bank Accounts certain monthly service fees and other charges, costs, and expenses charged by the Banks (collectively, the "Bank Fees").  The Debtor estimates that approximately $5,644 in monthly Bank Fees are due and owing as of the Petition Date.  To maintain the integrity of its Cash Management System, the Debtor respectfully requests authority to pay the full amount of the Bank Fees, including fees for prepetition transactions that are charged postpetition, and to continue to pay the Bank Fees in the ordinary course of business postpetition.

[SIGNATURE PAGE FOLLOWS]

Pursuant to 28 U.S.C. § 1746, I swear under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated: July 16, 2021 _/s/ Reverend Peter J. Langevin_____
Reverend Peter J. Langevin