**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF CONNECTICUT**
**HARTFORD DIVISION**

| | |
|---|---|
| In re:<br><br>THE NORWICH ROMAN CATHOLIC DIOCESAN CORPORATION,[1]<br><br>Debtor. | Chapter 11<br><br>Case No:  21-20687 (JJT)<br><br>July 16, 2021 |

**DEBTOR'S MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (I)**
**AUTHORIZING DEBTOR TO (A) PAY PREPETITION WAGES, SALARIES,**
**REIMBURSABLE EXPENSES, AND OTHER OBLIGATIONS ON ACCOUNT OF**
**COMPENSATION AND BENEFITS PROGRAMS AND (B) CONTINUE**
**COMPENSATION AND BENEFITS PROGRAMS;**
**AND (II) GRANTING RELATED RELIEF**
**(Emergency Determination Requested)**

TO THE HONORABLE JAMES J. TANCREDI
UNITED STATES BANKRUPTCY JUDGE

The Norwich Roman Catholic Diocesan Corporation, debtor and debtor-in-possession

in the above-captioned chapter 11 case (the "<u>Debtor</u>" or the "<u>Diocese</u>"), through the instant

motion (the "<u>Motion</u>") hereby moves the pursuant to sections 105(a), 363, 507(a)(4), 507(a)(5),

541(b)(7) and 541(d) of title 11 of the United States Code (the "<u>Bankruptcy Code</u>") and Rules

6003 and 6004 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>"), for the

entry of interim and final orders:  (a) authorizing, but not directing, the Debtor to pay and

honor, in the ordinary course of business, claims and obligations related to (i) Wages and

Benefits (as defined herein) owed to employees of the Diocese and Participating Employers (as

defined herein), (ii) unreimbursed and unpaid prepetition Business Expenses (as defined

---

[1] The Debtor in this chapter 11 case is The Norwich Roman Catholic Diocesan Corporation, a/k/a The Roman Catholic Diocese of Norwich.  The last four digits of the Debtor's federal tax identification number are 7373.

herein), and (iii) all prepetition costs and expenses incident to the foregoing payments and contributions, including payroll-related taxes and processing and administrative costs (items (i) through (iii) collectively, the "Employee Obligations"); (b) authorizing, but not directing, the Debtor to continue to provide administrative support for and participate in certain employee benefits programs; (c) authorizing, but not directing, the Debtor to continue to act as collection and paying agent for certain payroll and employee benefits programs shared with Participating Employers (as defined herein); and (d) granting related relief.  This Motion is supported by the *Declaration of Rev. Peter J. Langevin Regarding the Diocese's Assets and Operations and in Support of the Chapter 11 Petition and First Day Pleadings* (the "First Day Declaration"). Proposed forms of interim order (the "Proposed Interim Order") and final order (the "Proposed Final Order") granting this Motion are attached as **Exhibits A and B** hereto.  In further support of the Motion, the Debtor states as follows:

**INTRODUCTION**

1.        The Debtor is a Roman Catholic diocese in Connecticut and a small part of New York founded in 1953 by Pope Pius XII, encompassing Middlesex, New London, Windham and Tolland counties in Connecticut, as well as Fisher Island, New York.  The Most Reverend Michael R. Cote, D.D. has been the Bishop of the Diocese since May 14, 2003.  Monsignor Leszek T. Janik is the Diocese's Vicar General.

2.        On July 15, 2021 (the "Petition Date"), the Debtor commenced this case by filing a voluntary petition for relief under chapter 11 of the Bankruptcy Code.

3.        No trustee or examiner has been appointed and the Debtor continues to operate and manage its assets and affairs as a debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

4.      Information regarding the Debtor's history, business operations and structure, and the events leading up to this chapter 11 case is set forth in the First Day Declaration, which was filed on the Petition Date and is incorporated herein by reference.

## JURISDICTION

5.      This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157(b) and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b).

6.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

## BACKGROUND

### The Diocese and Its Mission

7.      The 51 parishes located within the Debtor's geographic region (the "Parishes") play a central role in the lives of Catholics by administering key aspects of the Catholic Faith, including: baptism, education, communion, Mass, confirmation, marriage, and bereavement, including last rites, funeral services, and support.  Each of the Parishes is a nonprofit organization separately incorporated under the laws of the State of Connecticut.  None of the Parishes are debtors herein. As more fully described below, the Debtor provides certain administrative services to the Parishes.

8.      The Debtor also provides services for three high schools within its geographic region:  Mercy High School Corporation; Xavier High School Corporation of Middletown; and Saint Bernard School of Montville, Incorporated (the "High Schools").  Each of the High Schools is a nonprofit organization separately incorporated under the laws of the State of Connecticut. None of the High Schools are debtors herein.

9.      And the Debtor provides services for several charitable organizations to further its pursuit of the Catholic mission to serve the poor, the hungry, those in need, and those that cannot help themselves (the "Other Catholic Entities"), which include The Annual Catholic Appeal, Inc.; St. Vincent de Paul Place, Norwich, Inc.; St. Vincent DePaul, Middletown, Inc.; Diocese Of

Norwich Outreach To Haiti, Inc.; Norwich Diocesan Cemetery Corporation; Catholic Charities, Diocese of Norwich, Incorporated; Holy Apostles College and Seminary, Inc.; Holy Family Home and Shelter, Inc.; St. Joseph's Living Center, Inc.; St. James School Associations, Inc.; and Saint John Paul II School. The Other Catholic Entities are not debtors herein.

10.     The Debtor, through its central administrative offices: (a) provides operational support certain of the Parishes within the Diocese, the High Schools, and the Other Catholic Entities (collectively, the "Participating Employers"); (b) maintains the properties on which the High Schools operate; (c) provides comprehensive risk management services to the Participating Employers; (d) administers employee benefits, including medical, insurance, and retirement benefits, for the clergy and lay employees of the Debtor (the "Diocesan Employees") and for employees of the Participating Employers (the "Non-Diocesan Employees"); (e) administers payroll for the Debtor and for certain of the Participating Employers; and (e) coordinates other administrative services as needed.

11.     Additional information regarding the Debtor, its mission and operations, and the events and circumstances preceding the Petition Date is set forth the First Day Declaration.

## RELIEF REQUESTED

**Diocesan Employee Payroll**

12.     The Debtor currently employs and administers payroll for approximately 32 Diocesan Employees, 19 of whom are classified as lay employees, and 13 of whom are clergy. Of the lay employees, one is a part-time salaried employee; three are part-time hourly employees; one is a full-time hourly employee; and 14 are full-time salaried employees. Of the clergy, five are

full-time salaried employees, five are part-time salaried employees, and three are inactive.[2]  The Debtor also administers a retirement program for 21 retired priests as more fully described herein.

13.     The Debtor's average aggregate gross monthly payroll for Diocesan Employees for the preceding 12-month period (excluding, without limitation, the amounts owed in connection with Deductions, Payroll Taxes, Employee Benefits, and the Debtor's Workers' Compensation Program (each as defined below)) is approximately $75,538.00.  The Debtor's lay employees are paid on a bi-weekly basis, and clergy are paid monthly.

14.     On July 8, 2021, the Debtor issued payroll to its lay employees for the pay period ending June 26, 2021.  And on June 30, 2021, the Debtor issued payroll to its clergy for the month of June.  Since those dates and prior to the Petition Date, Diocesan Employees have continued to provide services for the Debtor and are thus entitled to receive their prepetition wages and benefits payable during that interim period prior to the Petition Date. Additionally, compensation may be due and owing as of the Petition Date because:

    a.   discrepancies may exist between the amounts paid and the amounts Diocesan Employees believe should have been paid, which, upon resolution, may reveal that additional amounts are owed to such employees; and

    b.   some payroll checks issued to Diocesan Employees prior to the Petition Date may not have been presented for payment or cleared the banking system and, accordingly, have not yet been honored and paid as of the Petition Date.

15.     As of the Petition Date, the aggregate amount of accrued wages, salaries, overtime pay, commissions, and other compensation (excluding, without limitation, the amounts owed in connection with Deductions, Payroll Taxes, Employee Benefits, and the Debtor's Workers' Compensation Program (each as defined below)) earned prior to the Petition Date that remains unpaid to Diocesan Employees is approximately $34,776.75 (the "Unpaid Compensation").

---

[2] Under canon law, the Diocese is required to pay priests even though they are inactive.  The aggregate gross amount paid to inactive priests is $2,525.00 per month.

16.     By this Motion, the Debtor requests authority to pay all such Unpaid Compensation to Diocesan Employees in the ordinary course of business in an amount not to exceed $34,776.75. The Debtor submits that no Diocesan Employee is owed more than $13,650 for Unpaid Compensation or Employee Benefits (as defined below).[3]

**Non-Diocesan Employee Payroll Processing and Administration**

17.     In addition to the Diocesan Employees, the Debtor administers payroll for approximately 52 Non-Diocesan Employees, which work at the following Participating Employers:  The Annual Catholic Appeal, Inc.; St. Vincent de Paul Place, Norwich, Inc.; St. Vincent DePaul, Middletown, Inc.; and Diocese Of Norwich Outreach To Haiti, Inc. (the "Non-Diocesan Payroll Entities").

18.     Paycor, Inc. (the "Payroll Processor" or "Paycor"), processes payroll for both the Diocesan Employees as well as the employees of the Non-Diocesan Payroll Entities.[4]  The Debtor and the Non-Diocesan Payroll Entities consolidate payroll funds into a single account in the Debtor's name, which Paycor then uses to fund employee payroll.[5]  By centralizing the payroll processing services and maintaining a single relationship with Paycor for payment of payroll, the

---

[3] To the extent that the Debtor discovers that an employee does have a section 507(a)(4) claim for Unpaid Compensation that exceeds the $13,650 cap, the Debtor, by this Motion, only seeks authority to honor such claim up to the $13,650 statutory cap.  However, the Debtor reserves the right to request authority to honor any such section 507(a)(4) claims that exceed the $13,650 cap after notice and a hearing.

[4] The Debtor's property director, a Diocesan Employee, also serves as the cemetery director for the Norwich Diocesan Cemetery Corporation, which reimburses the Debtor for a portion of the employee's salary.

[5] In order to disburse payroll to the Debtor's and the Non-Diocesan Payroll Entities' employees, the Diocese funds or causes to be funded payments to Paycor, which are then reimbursed to the Debtor by each of the Non-Diocesan Payroll Entities.  As a part of its administrative responsibilities pursuant to certain services agreements, Paycor makes payments to the employees on the Debtor's and the Non-Diocesan Payroll Entities' behalf using such funds.  While the Non-Diocesan Payroll Entities fund their own payroll, some receive subsidies from the Debtor as approved by its budget committee to facilitate those entities' and the Debtor's charitable missions, which may be netted against the amount collected from each such entity.  Prior to the Petition Date, the Debtor funded gross payroll of approximately $114,237.20 for the lay employees of the Debtor and the Non-Diocesan Payroll entities for the pay period ending July 10, 2021, which is scheduled to be paid to employees on July 22, 2021.

Diocese is able to provide a streamlined payment system for all wages as well as administrative cost savings to it and the Non-Diocesan Payroll Entities.

19.      The average aggregate gross monthly compensation for Non-Diocesan Employees (excluding, without limitation, amounts owed in connection with Deductions, Payroll Taxes, Employee Benefits, and the Debtor's Workers' Compensation Program (each as defined below)), is approximately $67,360.72.

20.      By this Motion, the Debtor seeks authority to continue providing payroll processing and administration services for the Non-Diocesan Payroll Entities during the pendency of this case in the ordinary course of business, including collecting funds from the Non-Diocesan Payroll Entities and transferring funds to Paycor[6] to pay the wages of the Non-Diocesan Payroll Entities' employees.

**Deductions and Withholding**

21.      During each applicable pay period, the Debtor deducts certain amounts from the paychecks of its employees and of the employees of the Non-Diocesan Payroll Entities for which it administers payroll, including pre-tax and after-tax deductions attributable to certain Employee Benefits discussed herein (such as an employee's share of health or dental insurance premiums) and charitable contributions (collectively, the "Deductions") and forwards those amounts to various third-party recipients.   For the most recent pay period, these Deductions totaled approximately $12,803.00.  The Debtor believes that these Deductions were remitted to the various third-party recipients prior to the Petition Date; however, in the event that such amounts have not been remitted, the Debtor seeks authority to continue to forward these prepetition Deductions, in

---

[6] Paycor's services are crucial to the smooth functioning of the Debtor's payroll system and, therefore, to the Debtor's operations generally. As of the Petition Date, the Debtor believes that no amount is owed to Paycor. The Debtor requests authority to continue to pay Paycor or such other Payroll Processor as it may from time to time select in the ordinary course of business as routinely done prior to the Petition Date.

an amount not to exceed $12,803.00, to the applicable third-party recipients on a postpetition basis in the ordinary course of business, as was routinely done prior to the Petition Date. The Debtor also seeks authority to forward any Deductions that have accrued prior to the Petition Date, in an amount not to exceed $12,803.00, to the applicable third-party recipients in the ordinary course of business.

22.    Further, the Debtor and the Non-Diocesan Payroll Entities are required by law to withhold from an employee's wages amounts related to, among other things, federal, state and local income taxes, social security and Medicare taxes (collectively, the "Withheld Amounts") for remittance to the appropriate taxing authorities. The Debtor and the Non-Diocesan Payroll Entities must then make matching payments for social security and Medicare taxes (the "Employer Payroll Taxes," and together with the Withheld Amounts, the "Payroll Taxes"). The Payroll Taxes for the Debtor's and the Non-Diocesan Payroll Entities' employees for the most recent pay period ending July 10, 2021, totals approximately $29,318.73. The Debtor believes that these Payroll Taxes were remitted to the various taxing authorities before the Petition Date; however, in the event that such amounts were not remitted, the Debtor seeks authority to continue to forward these prepetition Payroll Taxes, in an amount not to exceed $29,318.73, to the applicable taxing authorities on a postpetition basis in the ordinary course of business, as was routinely done prior to the Petition Date.

23.    Between the pay period that ended June 26, 2021, and the Petition Date, the Debtor's and the Non-Diocesan Payroll Entities' employees have continued to provide services to their respective employers and are thus entitled to receive prepetition wages upon which Payroll Taxes have been withheld. As of the Petition Date, the accrued and outstanding prepetition obligations with respect to the Payroll Taxes on those wages are approximately $37,918.67, which

represents approximately 14 business days of accrued Payroll Taxes for lay employees and 12 business days of accrued Payroll Taxes for clergy.

24.    By this Motion, the Debtor seeks authority, in its sole discretion, to continue to honor and process the prepetition Payroll Taxes on a postpetition basis, including forwarding the Payroll Taxes to the appropriate taxing authorities on behalf of itself and of the Non-Diocesan Payroll Entities it administers payroll for in the ordinary course of business.

**Benefits Processing and Administration**

25.    Approximately 25 Diocesan Employees and 654 Non-Diocesan Employees are enrolled into consolidated benefit plans (as more fully described below) in order to take advantage of economies of scale (the "Employee Benefits").

26.    The Debtor and the Participating Employers use Reta Trust ("Reta"), a national nonprofit employer trust that purchases healthcare and other benefits for Catholic organizations, to purchase benefits for both Diocesan Employees and Non-Diocesan Employees.  The Debtor collects the premiums for all Non-Diocesan Employee benefits from the Participating Employers through a third-party vendor, Benefit Administrative Systems, LLC ("BAS"), which deposits those funds into a segregated medical account that the Debtor uses to pay the Employee Benefits of the Diocesan Employees and Non-Diocesan Employees.[7] [8]

---

[7] In order to ensure timely payment of premiums, the Debtor funds, or causes to be funded, payments to Reta, which are then reimbursed to the Debtor by each of the Participating Employers through BAS. While the Participating Employers fund their own employees' Employee Benefits, some receive subsidies from the Debtor as approved by its budget committee to facilitate those entities' and the Debtor's charitable missions, which may be netted against the amount collected from each such entity.

[8] BAS charges each of the Participating Employers its employees' share of applicable benefits premiums, along with an approximately 6% administrative fee (except that health insurance premiums for employees enrolled in the PPO option are not subject to the administrative fee), which is collected in the Debtor's segregated medical account.  If a Participating Employer fails to timely reimburse the diocese, a receivable is booked with respect to that employer. The administrative fee is utilized in part to offset delinquent reimbursements.  Historically, the administrative fee has been sufficient to ensure that outflows from the segregated medical account do not exceed inflows, thus preventing any accrued receivables from diluting the Debtor's estate.

27.     Currently, Diocesan Employees and Non-Diocesan Employees receive the following Employee Benefits:

a.  <u>Health, Dental, and Vision</u>.  Full time employees are eligible to receive health insurance, prescription drug coverage, and employee assistance programs through Blue Cross Blue Shield of California, and dental coverage through Delta Dental. The employer pays 100% of medical and dental coverage for covered employees. Employees have the ability to pay for additional coverage for family members. Employees also have the option to obtain vision coverage through Superior Vision, which is paid by the employee.

b.  <u>Life Insurance</u>.  Full time employees are eligible for term life insurance through The Hartford.  The employee pays 100% of the cost of insurance.

c.  <u>Disability</u>.  All employees are eligible to enroll in long term disability and accident insurance through AFLAC.  The employee pays 100% of the cost of these benefits.

28.     By this Motion, the Debtor seeks authority to (a) continue administering the Employee Benefits for Diocesan Employees and Non-Diocesan Employees in the ordinary course of business; (b) continue making all contributions to such programs and, with respect to the employees of Participating Employers, receive reimbursement for such contributions; (c) continue to pay any claims and administrative fees related thereto, including to Reta and BAS; and (d) pay any and all such amounts to the extent that they remain unpaid on the Petition Date.

**Retirement Benefits**

29.     The Diocesan Employees and Non-Diocesan Employees are eligible to participate in various retirement plans (the "<u>Retirement Benefits</u>") based upon whether an employee is clergy or non-clergy.

30.     Non-clergy lay employees of the Diocese, the Parishes, and the Other Catholic Entities are required to participate in a defined-benefit plan (the "<u>Lay Employee Retirement Plan</u>"). The Lay Employee Retirement Plan is administered by Christian Brothers Services, Inc. ("<u>Christian Brothers</u>"), an independent entity that administers retirement and benefit programs for

charitable organizations throughout the country.  The Lay Employee Retirement Plan is a church plan exempt from ERISA.  The Debtor withholds retirement contributions from the payroll of lay employees of the Diocese and the Non-Diocesan Payroll Entities, which it then transfers to Christian Brothers.   Participating Employers other than the Non-Diocesan Payroll Entities withhold lay employee retirement contributions and pay those contributions directly to the plan administrator of the Lay Employee Retirement Plan.

31.     Lay employees are also eligible to participate in a 403(b) defined contribution plan administered by Pen ServPlan Services, Inc. (the "Optional 403(b) Plan").  Participation in this benefit is optional and paid for by the employee.

32.     Diocesan Employees and Non-Diocesan Employees that are clergy participate in a separate retirement plan, the Diocese of Norwich Retirement Plan for Priests (the "Priest Retirement Plan").  The Priest Retirement Plan is also a church plan exempt from ERISA.  Each employer contributes $1,500 per quarter per priest it employs to the Priest Retirement Plan, which is held in a trust account administered by the Debtor for the benefit of the plan beneficiaries.  There are currently 21 retired priests receiving retirement income from the Priest Retirement Plan.  The Diocese uses Paycor to distribute these payments.  Based on the most recent actuarial report, the Priest Retirement Plan is fully funded.  Retired priests also receive health insurance benefits through Reta, which are paid for by the Debtor.

33.     By this Motion, the Debtor seeks authority to (a) continue administering the Retirement Benefits for Diocesan Employees and Non-Diocesan Employees in the ordinary course of business; (b) continue making all contributions to such plans; (c) continue to pay any claims and administrative fees related thereto; and (d) pay any and all such amounts to the extent that they remain unpaid on the Petition Date.

**Reimbursement of Employee Expenses**

34.     In the ordinary course of business, the Debtor reimburses Diocesan Employees and for certain reasonable and customary expenses necessarily incurred in the scope of their service to the Diocese (collectively, the "Business Expenses").   To obtain reimbursement of Business Expenses, an employee is required to submit receipts to its respective ministry director, who then submits the expense for reimbursement to the employee through the Debtor's central administrative office.

35.     The Debtor's reimbursement of such ordinary course expenses is critical to the maintenance of employee morale, the efficient operation of the Diocese's ministries and fundraising, and thus the preservation of the Debtor's chapter 11 estate on a postpetition basis.

36.     Year to date, the Debtor has only incurred $45.07 in Business Expenses. Although the Debtor requests that employees submit reimbursement requests promptly, there is inevitably some lag time between the incurrence of a Business Expense and processing the Debtor's reimbursement thereof. The Debtor believes all Business Expenses have been reimbursed, but to the extent employees have incurred Business Expenses that have not been reimbursed, the Debtor wishes to reimburse those expenses.

37.     By this Motion, the Debtor is requesting authority to pay all prepetition Business Expenses in the ordinary course of its business.

**Other Employment-Related Benefits**

38.     The Debtor provides certain additional benefits and stipends to various individuals with respect to services they perform for the Diocese (the "Other Employment-Related Benefits").

39.     Certain diocesan priests are housed at various Parishes within the Diocese.  The Diocese pays a $250 per month stipend directly to each Parish housing a diocesan priest as rent. Currently, the Debtor provides such a stipend for three diocesan priests.

40.     In the ordinary course of its business and pursuant to its obligations under Canon Law, the Debtor maintains a residence on its campus that the bishop uses as lodging and for official fundraising and entertainment purposes.  The Debtor pays all maintenance, utilities, and expenses associated with the residence, which average approximately $1,527 per month.  The Debtor also pays various expenses the bishop incurs in the performance of his duties, which average approximately $800 per month.

41.     The Debtor is also responsible for the training and housing of seminarians in training to become priests.  The Debtor currently employs six full-time seminarians.[9]  In addition to payroll and benefits, the Diocese pays tuition for seminarians, which averages approximately $36,022.97 per seminarian per year.[10]

42.     Finally, consecrated brothers and sisters (the "Religious") of various Catholic orders and institutes (each an "Institute") provide services to the Diocese's various ministries. While Religious are compensated by their respective Institutes, the Diocese provides certain expenses and a stipend to compensate them for work performed for the Diocese.  The Debtor provides a monthly stipend of $2,340.78 per Religious.  The stipend is paid directly to each Religious' Institute.  The Debtor also pays for health insurance for each Religious, or if an Institute provides its own health insurance, the Debtor will reimburse the Institute for the cost of annual premiums (approximately $11,076 for the year ending June 30, 2021).  Religious also receive a

---

[9] The seminarians are considered lay employees until they are incardinated, at which point they become clergy.
[10] The seminarians attend Pope St. John XXIII National Seminary and Mount Saint Mary's Seminary.  Due to the pandemic, the seminarians were sent home.  The Debtor currently has a tuition credit that will be applied in the fall.

housing allowance of $250 per month unless they live in parish or diocesan housing.  And Religious can receive reimbursement for up to $5,000 per year annually for vehicle expenses, or if authorized to use a diocesan vehicle, up to $125 per month in gas expenses.  There are currently five Religious serving in the Diocese's various ministries.

43.     By this Motion, the Debtor seeks authority to (a) continue administering the Other Employment-Related Benefits in the ordinary course of business; (b) continue making all payments on account of such benefits; (c) continue to pay any claims and administrative fees related thereto; and (d) pay any and all such amounts to the extent that they remain unpaid on the Petition Date.

**Paid Leave**

44.     Diocesan Employees are provided with paid time off ("PTO").  PTO encompasses holidays, vacation, sick leave, personal leave, court duty, bereavement, military leave, and office closure.

45.     Diocesan Employees are provided with approximately 21 paid holidays each year.

46.     The Debtor's vacation pay policy is based primarily on length of service. A Diocesan Employee must have one year of continuous service as a salaried employee before being entitled to use paid vacation.  Employees receive 10 days of paid vacation per year after one full year of employment, 15 days of paid vacation per year after 5 years of employment, and 20 days of paid vacation per year after 10 years of employment.  In most instances, an employee is entitled to receive compensation for unused vacation days upon termination up to a maximum of four weeks.

47.     Full-time and part-time employees accrue 10 sick days per year, up to a maximum of 60 sick days.  Unused sick days are not paid out upon an employee's resignation or termination.

48.    The Debtor's PTO costs are included in gross payroll.  Accordingly, and except for amounts owing in connection with accrued but unused vacation, all prepetition amounts related to PTO should be included in the aggregate amount of Unpaid Compensation.

49.    By this Motion, the Debtor requests authority to continue to honor its PTO policies in the ordinary course of business, and to honor and pay, in its sole discretion, any and all prepetition amounts related thereto subject to the statutory cap set forth in section 507(a)(4) of the Bankruptcy Code.

**Workers' Compensation Program**

50.    The Diocese carries workers' compensation coverage through The Travelers Indemnity Company ("Travelers") for itself and the Participating Employers (the "Workers' Compensation Program").  The Diocese pays the premiums for the Workers' Compensation Program, and Participating Employers are then billed for their respective share of premiums and reimburse the Diocese for same.  The premiums for the coverage year ending June 30, 2022 total $283,498.  For the two-year period ending April 1, 2021, the total amount paid for claims under the Workers' Compensation Program was approximately $98,098.

51.    By covering their employees under a single workers' compensation program, the Diocese and Participating Employers benefit from significant cost savings as a result of the pooled risk and the allocation of plan overhead.  Indeed, obtaining workers' compensation insurance for any one of these entities alone would be more expensive due to the small number of employees that would be covered.

52.    By this Motion, the Debtor seeks authority, to be exercised in its sole discretion, to continue to maintain its Workers' Compensation Program in the ordinary course of business and to pay any and all prepetition amounts related thereto including, without limitation, any payments

for workers' compensation claims, deductibles and fees owed for administrative costs, and other amounts required in connection with the Workers' Compensation Program, as such amounts become due in the ordinary course of the Debtor's business.

**Request for Authority for Banks to Honor and/or Reissue Checks**

53.    The Debtor also requests that the Court authorize the Debtor's banks and financial institutions (the "Banks"), when requested by the Debtor in the Debtor's sole discretion, to process, honor and pay any and all checks or electronic fund transfers drawn on the Debtor's bank accounts to pay all prepetition obligations described herein, whether such checks or other requests were submitted prior to or after the Petition Date.  A listing of the Debtor's relevant accounts is attached to the *Debtor's Motion for Entry of Interim and Final Orders (I) Authorizing the Continued Use of the Debtor's Cash Management System, Bank Accounts and Business Forms and (II) Granting Related Relief* filed contemporaneously herewith.

54.    Accordingly, by this Motion, the Debtor seeks (a) authorization for, and/or ratification of, its Banks' honoring of prepetition payroll and employee benefit checks and transfers on or after the Petition Date; (b) authorization for its Banks to process and honor all other checks issued for payments approved by this Motion; and (c) authorization for the Debtor to reissue checks for payments approved by this Motion where the applicable check is dishonored postpetition.

## BASIS FOR RELIEF REQUESTED

55.    The Diocesan Employees perform a variety of critical functions for the Debtor. They work in numerous ministries and other operations, providing ecclesiastical, managerial, financial, clerical, religious, and pastoral services to individuals and families living within the Debtor's territorial jurisdiction. Likewise, the Non-Diocesan Employees are critical to the

Participating Employers, all of which help the Debtor in carrying out its charitable mission.  These employees' knowledge, skills, and understanding of the Debtor's ministries, mission, business operations, and relationships are essential to the success of the Debtor and this chapter 11 case. Without the continued service and dedication of the employees, it will be difficult if not impossible to effectively implement the Debtor's chapter 11 reorganization.

56.    To successfully accomplish the foregoing, minimize the personal hardship that the employees—and ultimately, the beneficiaries of the services provided by the employees—will suffer if prepetition employee-related obligations are not paid when due or as otherwise expected, and to maintain employee morale and a focused workforce during this critical time, the Diocese believes it is necessary and in the best interest of its estate and all stakeholders to seek the relief requested herein.

## I.    Payment of the Prepetition Employee Wages and Benefits is Necessary and Appropriate under the Bankruptcy Code

57.    Courts generally acknowledge that it is appropriate to authorize the payment or other special treatment of prepetition obligations in appropriate circumstances, such as when necessary to preserve the going concern value of a debtor's business, thus facilitating its reorganization. *See, e.g., In re Lehigh & New England Ry. Co.,* 657 F.2d 570, 581 (3d Cir. 1981) (noting that the "'necessity of payment' doctrine . . . permit[s] immediate payment of claims of creditors where those creditors will not supply services or material essential to the conduct of the business until their pre-reorganization claims shall have been paid") (citations and internal quotations omitted); *In re Chateaugay Corp.,* 80 B.R. 279, 285–87 (S.D.N.Y. 1987) (finding that a court's equitable powers include the authority to authorize a debtor to pay prepetition debts). In authorizing payments of certain prepetition obligations, courts rely on several legal theories rooted in sections 1107(a), 1108, 363(b), and 105(a) of the Bankruptcy Code.  *See Czyzewski v. Jevic Holding*

*Corp.*, 137 S. Ct. 973, 985 (2017) (noting that courts have routinely approved orders that allow payment of prepetition debt, which is necessary for the debtors to reorganize and restructure their debts and maximize the value of the bankruptcy estate); *In re Columbia Gas Sys., Inc.*, 171 B.R. 189, 191–92 (Bankr. D. Del. 1994) (finding that a debtor is entitled to pay certain prepetition creditors upon a showing that the payment is "essential to the continued operation of the business") (citations omitted); *In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989) (authority to pay prepetition wages); *Armstrong World Indus., Inc. v. James A. Phillips, Inc., (In re James A. Phillips, Inc.)*, 29 B.R. 391, 398 (S.D.N.Y. 1983) (authority to pay prepetition claims of suppliers); *see also In re CoServ, L.L.C.*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002).

58.    The Debtor believes that payment of the wages, benefits, and other amounts described in this Motion (the "Wages and Benefits") is critical to the ongoing operation of the Debtor's business and the continuation of its charitable mission.

59.    If the Wages and Benefits are not paid, the Debtor will risk tangible and intangible loss of the value of the Debtor's business, including, among other things, losses relating to the cost of replacing Diocesan Employees who seek alternative employment and losses related to the disruption of, and lower productivity in, the Debtor's business operations resulting from low employee morale and high turnover.

60.    Further, if Wages and Benefits for employees of Participating Employers are not made, those Participating Employers will similarly suffer, and as a result, the Diocese will be less able to fulfill its charitable mission and reorganize.

## II.    A Significant Portion of the Employee Wages and Benefits are Entitled to Priority Treatment

61.    Sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code entitle the majority of the unpaid Diocesan Employee Wages and Benefits to priority treatment.  To confirm a chapter 11

plan, the Debtor must pay priority claims in full.  *See* 11 U.S.C. § 1129(a)(9)(B) (requiring payment of certain allowed unsecured claims for (a) wages, salaries, commissions, including vacation, severance and sick leave pay earned by an individual and (b) contributions to an employee benefit plan). Thus, granting the vast majority of the relief sought in this Motion only affects the timing of payments to Diocesan Employees, and does not negatively impact recoveries for general unsecured creditors.  Indeed, the Debtor submits that payment of Diocesan Employee Wages and Benefits at this time enhances value for the benefit of the creditors and all interested parties.

62.     Amounts that are paid on account of priority claims for Diocesan Employee Wages and Benefits would not otherwise be available for distribution to unsecured creditors. Therefore, no prejudice would be caused to the Debtor's unsecured creditors by permitting priority obligations to be satisfied in the ordinary course of business during the chapter 11 case rather than at the conclusion of the case pursuant to a plan of reorganization.

## III.    Payment of Certain Employee Wages and Benefits is Required by Law

63.     The Debtor also seeks authority to pay the Deductions and Payroll Taxes to the appropriate entities. These amounts principally represent employees' earnings that governments, the employees, and judicial authorities have designated for deduction from the employees' paychecks. Indeed, certain deductions and withheld taxes are not property of the Debtor's estate, because the Debtor has withheld such amounts from employees' paychecks on another party's behalf. *See* 11 U.S.C. § 541; *Begier v. Internal Revenue Serv.*, 496 U.S. 53, 59 (1990) ("Because the debtor does not own an equitable interest in property he holds in trust for another, that interest is not 'property of the estate.'"); *City of Farrell v. Sharon Steel Corp.*, 41 F.3d 92, 95 (3d Cir. 1994) (withheld taxes were subject to a trust); *see generally In re Columbia Gas Sys. Inc.*, 997

F.2d 1039, 1060 (3d Cir. 1993) (indicating that even if a statute does not establish an express trust, a constructive trust may be found). Because the Deductions and Payroll Taxes are not property of the Debtor's estate, the Debtor requests that the Court authorize the Debtor to transmit these amounts to the appropriate parties in the ordinary course of business.

IV. **The Court May Authorize Payment of the Employee Wages and Benefits Pursuant to Section 363 of the Bankruptcy Code.**

64.     The Court may grant the relief requested herein pursuant to section 363 of the Bankruptcy Code. Section 363(b) of the Bankruptcy Code provides, in pertinent part, that "[t]he [debtor], after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b). Under this section, a court may authorize a debtor to pay certain prepetition claims. *See In re Ionosphere Clubs, Inc.,* 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989) (affirming lower court order authorizing payment of prepetition wages pursuant to section 363(b) of the Bankruptcy Code). In addition, section 363(c) allows a debtor in possession to enter into transactions involving property of the estate in the ordinary course of business without an order of the court. *See, e.g., Armstrong World Indus., Inc. v. James A. Phillips, Inc.,* 29 B.R. 391, 395 n.2 (S.D.N.Y. 1983) ("Insofar as transactions are actually in the ordinary course, they are authorized automatically by § 363(c)(1) and § 1107(a), and do not require Bankruptcy Court approval.").

65.     The majority of the Debtor's and the Participating Employers' employees rely exclusively on their compensation, benefits, and reimbursement of expenses to satisfy their daily living expenses and maintain their health and well-being. Consequently, these employees will be exposed to significant financial difficulties if the Debtor is not permitted to honor obligations for unpaid Wages and Benefits. Moreover, if the Debtor is unable to satisfy such obligations, employee morale and loyalty would be jeopardized at a time when employee support is critical.

Furthermore, if the Court does not authorize the Debtor to honor the various Employee Benefit obligations, the employees' health coverage could be threatened, potentially burdening individual employees with the costs of health care. At minimum, the loss of health care coverage, or uncertainty regarding coverage, would result in considerable anxiety for Employees at a time when the Debtor needs their Employees to perform their jobs at peak efficiency.

66.    For all of the foregoing reasons, a sound business purpose exists to pay the Wages and Benefits. In the absence of such payments, the Debtor believes that employees may seek alternative employment opportunities.  Such a development would deplete the Debtor's and the Participating Employers' workforces, hinder the Debtor's ability to meet its obligations, and likely diminish creditors' confidence in the Debtor.  Moreover, the loss of valuable employees and the recruiting efforts that would be required to replace such employees would be a massive and costly distraction at a time when the Debtor should be focusing on successfully exiting this chapter 11 case. Accordingly, the Debtor must be able to pursue all reasonable measures to retain the employees by, among other things, continuing to honor all wages, benefits, and related obligations, including those that accrued prior to the Petition Date.

67.    In addition, because the Debtor pays Wages and Benefits in the ordinary course of business, the Debtor submits that Court approval to continue existing policies, programs, and related payments postpetition is not necessary because of the authority granted by section 363(c) of the Bankruptcy Code.  Nonetheless, out of an abundance of caution, the Debtor requests that the Court grant the relief requested in this Motion and enter an order authorizing payment of the Wages and Benefits, as consistent with the Debtor's compensation and other benefit policies and plans, and to permit, but not require, the Debtor, in its discretion, to continue the Debtor's practices, programs, policies, and plans for Diocesan Employees and Non-Diocesan Employees as those

practices, programs, policies, and plans were in effect as of the Petition Date, as may be modified, terminated, amended, or supplemented from time to time hereafter.

## V.    The Court May Authorize Payment of the Employee Wages and Benefits  Pursuant to Section 105(a) of the Bankruptcy Code and the Doctrine of Necessity

68.     The Debtor's proposed payment of Wages and Benefits should also be authorized pursuant to section 105(a) of the Bankruptcy Code and the "doctrine of necessity."  Section 105(a) of the Bankruptcy Code, which codifies the inherent equitable powers of the bankruptcy court, empowers the Court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). A bankruptcy court may use of its equitable powers to "authorize the payment of pre-petition debt when such payment is needed to facilitate the rehabilitation of the debtor is not a novel concept." *In re Ionosphere Clubs,* 98 B.R. at 175. "Under [section] 105 the court can permit pre-plan payment of a prepetition obligation when essential to the continued operation of the debtor." *In re NVR L.P.,* 147 B.R. 126, 127 (Bankr. E.D. Va. 1992) (citing *Ionosphere Clubs,* 98 B.R. at 177)*; accord In re Just for Feet, Inc.,* 242 B.R. 821, 826 (D. Del. 1999) ("To invoke the necessity of payment doctrine, a debtor must show that payment of the pre-petition claims is 'critical to the debtor's reorganization.'") (quoting *In re Fin. News Network, Inc.,* 134 B.R. 732, 736 (Bankr. S.D.N.Y. 1991)); *see also In re Eagle-Picher Indus., Inc.,* 124 B.R. 1021, 1023 (Bankr. S.D. Ohio 1991) ("[T]o justify payment of a pre-petition unsecured creditor, a debtor must show that the payment is necessary to avert a serious threat to the Chapter 11 process."); *In re Chateaugay Corp.,* 80 B.R. at 279 (approving lower court order authorizing payment of prepetition wages, salaries, expenses, and benefits).

69.     The "doctrine of necessity" or the "necessity of payment" doctrine functions in a chapter 11 case as a mechanism by which the bankruptcy court can exercise its equitable power to allow payment of critical prepetition claims not explicitly authorized by the Bankruptcy Code and

further supports the relief requested in this Motion. *See In re Lehigh & New England Ry. Co.,* 657 F.2d at 581 (holding that a court may authorize payment of prepetition claims if such payment is essential to continued operation of debtor); *In re Just for Feet,* 242 B.R. at 824 ("[C]ourts have used their equitable power under section 105(a) of the Code to authorize the payment of prepetition claims when such payment is deemed necessary to the survival of a debtor in a chapter 11 reorganization."). The doctrine is frequently invoked early in a vhapter 11 case.

70.     Taken together, the nature of the Wages and Benefits, the substantial harm to the Debtor's operations that would be caused if those obligations are not honored, the related potential for loss of value in the Debtor's estate, and the fact that a significant portion of the obligations in question relates either to priority wage claims or to funds held in trust for the benefit of employees or taxing authorities, lead to the conclusion that the Wages and Benefits fall well within the scope of obligations whose payments may be authorized pursuant to the doctrine of necessity.

71.     Courts have routinely approved the payment of prepetition claims of employee wages, salaries, expenses, and benefits in various chapter 11 cases. *See, e.g., In re the Archdiocese of Saint Paul and Minneapolis*, Case No. 15-30125 (Bankr. D. Minn. 2015) [Dkt. No. 47] (order authorizing the debtors to pay prepetition wages and compensation and to maintain and continue benefits in the ordinary course); *In re Catholic Diocese of Wilmington, Inc.*, Case No. 09-13560 (Bankr. D. Del. 2009) [Dkt. No. 4] (same); *see generally, In re Advanced Elecs., Inc.,* 107 B.R. 503 (Bankr. M.D. Pa. 1989) (authorizing the payment of wages for employees operating in the ordinary course of business).

## VI.     The Court Should Authorize the Debtor's Banks to Honor and Pay Checks and Make Other Transfers to Pay the Employee Wages and Benefits

72.     In connection with the relief requested in this Motion, the Debtor requests that the Court authorize: (a) the Banks to receive, process, honor, and pay all checks and transfers issued

by the Debtor in connection with payment of the claims the Debtor requests authority to pay in this Motion, without regard to whether any check or transfer was issued before or after the Petition Date; (b) the Banks to rely on the representations of the Debtor with respect to whether any check or transfer issued or made by the Debtor before the Petition Date should be honored pursuant to this Motion, and that the its Banks shall not have any liability to any party for relying on such representations by the Debtor; and (c) the Debtor to issue replacement checks or transfers, to the extent any check or transfer in relation to the claims the Debtor requests authority to pay in this Motion is dishonored or rejected by the Banks.

## VII.    The Requested Relief Satisfies Bankruptcy Rule 6003

73.     Rule 6003(b) provides that, to the extent relief is necessary to avoid immediate and irreparable harm, a bankruptcy court may issue an order granting "a motion to use, sell, lease, or otherwise incur an obligation regarding property of the estate, including a motion to pay all or part of a claim that arose before the filing of the petition" before 21 days after filing of the petition. Fed. R. Bankr. P. 6003(b). Local Bankruptcy Rule 9013-2 similarly provides that requests for relief made "with less than seven (7) days' notice and prior to the earlier of the creditors' committee formation meeting or the Section 341 meeting of creditors" are "confined to matters required to avoid irreparable harm to the assets of the estate and to maintain ongoing business operations and such other matters as the Court may deem appropriate." D. Conn. Bankr. L. R. 9013-2(a).

74.     For the reasons set forth above and in the First Day Declaration, the relief requested is necessary for the Debtor to continue to operate in the ordinary course and maximize the value of its estate for the benefit of all stakeholders.  Further, any delay in granting the relief requested herein may cause immediate and irreparable harm.  Accordingly, Bankruptcy Rule 6003 and Local Bankruptcy Rule 9013-2 are satisfied.

## VIII.  Cause Exists to Waive the Requirements of Bankruptcy Rule 6004(a) and (h)

75.     To implement the foregoing immediately, the Debtor respectfully requests a waiver of the requirements of Bankruptcy Rule 6004(a) and (h).  Under Bankruptcy Rule 2002(a), notice of a proposed use, sale, or lease of property, other than cash collateral, not in the ordinary course of business shall be given pursuant to Rule 2002(a)(2), (c)(1), (i), and (k) and, if applicable, in accordance with section 363(b)(2) of the Bankruptcy Code.  Pursuant to Bankruptcy Rule 6004(h), any "order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise."  As set forth above, the immediate payment of Wages and Benefits is essential to prevent potentially irreparable damage to the Debtor's operations, value, and ability to reorganize.  Accordingly, the Debtor submits that ample cause exists to justify a waiver of the notice requirements of Rule 6004(a) and the 14-day stay imposed by Bankruptcy Rule 6004(h).

## RESERVATION OF RIGHTS

76.     Nothing contained herein is intended or shall be construed as (a) an admission as to the validity of any claim against the Debtor; (b) a waiver of the Debtor's or any appropriate party in interest's rights to dispute the amount of, basis for, or validity of any claim against the Debtor; (c) a waiver of any claims or causes of action which may exist against any creditor or interest holder; or (d) an approval, assumption, adoption, or rejection of any agreement, contract, lease, program, or policy between the Debtor and any third party under section 365 of the Bankruptcy Code.  Likewise, if the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended to be and should not be construed as an admission to the validity of any claim or a waiver of the Debtor's rights to dispute such claim subsequently.

## NOTICE

77.     Notice of this Motion will be provided to (a) the Office of the United States Trustee; (b) the holders of the 20 largest unsecured claims against the Debtor's estate; (c) the Internal Revenue Service; (d) the Connecticut Department of Revenue Services; (e) the Participating Employers; and (f) any other party that has requested service pursuant to Bankruptcy Rule 2002 as of the time of filing of this Motion (collectively, the "Notice Parties"). A copy of this Motion and any orders approving it will also be made available on the Debtor's Case Information Website located at https://dm.epiq11.com/RCDNorwich. The Debtor submits that, in light of the nature of the relief requested, no other or further notice need be given.

## NO PRIOR REQUEST

78.     No previous request for the relief sought herein has been made by the Debtor to this or any other court.

*(Signature Page Follows)*

**WHEREFORE,** the Debtor respectfully requests that the Court enter the Interim Order, and after a final hearing, the Final Order granting the relief requested herein and such other and further relief as the Court may deem just and appropriate.

Dated: Hartford, CT
July 16, 2021

/s/  Patrick M. Birney
Patrick M. Birney (CT No. 19875)
Andrew A. DePeau (CT No. 30051)
Annecca H. Smith (*pro hac vice* pending)
**ROBINSON & COLE LLP**
280 Trumbull Street
Hartford, CT 06103
Telephone:  (860) 275-8275
Facsimile:  (860) 275-8299
E-mail:  pbirney@rc.com
adepeau@rc.com
asmith@rc.com

-and-

Louis T. DeLucia (*pro hac vice* pending)
Alyson M. Fiedler (*pro hac vice* pending)
**ICE MILLER LLP**
1500 Broadway, 29th Floor
New York, NY 10036
Telephone: (212) 824-4940
Facsimile: (212) 824-4982
E-Mail:  louis.delucia@icemiller.com
alyson.fiedler@icemiller.com

*Proposed Counsel to the Debtor
and Debtor-in-Possession*

## CERTIFICATE OF SERVICE

I hereby certify that on July 16, 2021, a copy of the foregoing motion and the exhibits thereto were filed electronically and shall be served as required by Local Bankruptcy Rule 9013-2(b), with notice of this filing being sent by email to all Notice Parties by operation of the court's electronic filing system or by First Class U.S. mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties in interest may access this document through the court's CM/ECF System.

*/s/ Patrick M. Birney*
Patrick M. Birney