## UNITED STATES BANKRUPTCY COURT
### DISTRICT OF CONNECTICUT
### HARTFORD DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| THE NORWICH ROMAN CATHOLIC DIOCESAN CORPORATION,[1] | Case No:  21-20687 (JJT) |
| Debtor. | July 16, 2021 |

## DEBTOR'S MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING THE CONTINUED USE OF THE DEBTOR'S CASH MANAGEMENT SYSTEM, BANK ACCOUNTS AND BUSINESS FORMS AND (II) GRANTING RELATED RELIEF
### (Emergency Determination Requested)

TO THE HONORABLE JAMES J. TANCREDI
UNITED STATES BANKRUPTCY JUDGE

The Norwich Roman Catholic Diocesan Corporation, debtor and debtor-in-possession in the above-captioned chapter 11 case (the "Debtor" or the "Diocese"), through the instant motion (the "Motion") hereby moves the pursuant to sections 345, 363, 364 and 503(b)(1) of title 11 of the United States Code (the "Bankruptcy Code") and Rules 6003 and 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), for the entry of interim and final orders:  (a) authorizing, but not directing, the Debtor to continue to use its cash management system, bank accounts and business forms as they existed immediately prior to the Petition Date (as defined herein); and (b) granting related relief.  This Motion is supported by the *Declaration of Rev. Peter J. Langevin Regarding the Diocese's Assets and Operations and in Support of the Chapter 11 Petition and First Day Pleadings* (the "First Day Declaration").

---

[1] The Debtor in this chapter 11 case is The Norwich Roman Catholic Diocesan Corporation, a/k/a The Roman Catholic Diocese of Norwich.  The last four digits of the Debtor's federal tax identification number are 7373.

Proposed forms of interim order (the "Proposed Interim Order") and final order (the "Proposed Final Order") granting this Motion are attached as **Exhibits A and B** hereto.  In further support of the Motion, the Debtor states as follows:

## INTRODUCTION

1.      The Debtor is a Roman Catholic diocese in Connecticut and a small part of New York founded in 1953 by Pope Pius XII, encompassing Middlesex, New London, Windham and Tolland counties in Connecticut, as well as Fisher Island, New York.  The Most Reverend Michael R. Cote, D.D. has been the Bishop of the Diocese since May 14, 2003.  Monsignor Leszek T. Janik is the Diocese's Vicar General.

2.      On July 15, 2021 (the "Petition Date"), the Debtor commenced this case by filing a voluntary petition for relief under chapter 11 of the Bankruptcy Code.

3.      No trustee or examiner has been appointed and the Debtor continues to operate and manage its assets and affairs as a debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

4.      Information regarding the Debtor's history, business operations and structure, and the events leading up to this chapter 11 case is set forth in the First Day Declaration, which was filed on the Petition Date and is incorporated herein by reference.

## JURISDICTION

5.      This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157(b) and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b).

6.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

## BACKGROUND

### The Diocese and Its Mission

7.      The 51 parishes located within the Debtor's geographic region (the "Parishes") play a central role in the lives of Catholics by administering key aspects of the Catholic Faith, including: baptism, education, communion, Mass, confirmation, marriage, and bereavement, including last rites, funeral services, and support.  Each of the Parishes is a nonprofit organization separately incorporated under the laws of the State of Connecticut.  None of the Parishes are debtors herein. As more fully described below, the Debtor provides certain administrative services to the Parishes.

8.      The Debtor also provides services for three high schools and a number of lower level schools within its geographic region (the "Schools").  The high schools include (the "High Schools"):  Mercy High School Corporation; Xavier High School Corporation of Middletown; and Saint Bernard School of Montville, Incorporated.  Each of the High Schools is a nonprofit organization separately incorporated under the laws of the State of Connecticut.  None of the Schools are debtors herein.

9.      And the Debtor provides services for several charitable organizations to further its pursuit of the Catholic mission to serve the poor, the hungry, those in need, and those that cannot help themselves (the "Other Catholic Entities"), including, among others, The Annual Catholic Appeal, Inc. (the "ACA"); St. Vincent de Paul Place, Norwich, Inc.; St. Vincent Depaul, Middletown, Inc.; Diocese Of Norwich Outreach To Haiti, Inc.; Norwich Diocesan Cemetery Corporation; and Catholic Charities, Diocese of Norwich, Incorporated; Holy Apostles College and Seminary, Inc.; Holy Family Home and Shelter, Inc.; St. Joseph's Living Center, Inc.; St. James School Associations, Inc.; and Saint John Paul II School.  The Other Catholic Entities are not debtors herein.

10.     Additional information regarding the Debtor, its mission and operations, and the events and circumstances preceding the Petition Date is set forth the First Day Declaration.

**The Debtor's Cash Management System**

11.     In the ordinary course of business, the Debtor utilizes a centralized cash management system (the "Cash Management System") to collect, manage, invest and disburse funds in support of its mission.  The Debtor holds accounts with a number of financial institutions (the "Banks") in order to facilitate the Cash Management System.  A list of the Debtor's bank accounts can be found attached hereto as **Exhibit C** (the "Bank Accounts").

12.     A diagram setting forth the flow of funds among the Bank Accounts and summarizing the Cash Management System, as it exists on the Petition Date, is attached hereto as **Exhibit D**.

A.     The Debtor's Accounts

13.     In the ordinary course of business, the Debtor maintains the Bank Accounts described herein to facilitate the financial operations of its central administrative offices.

14.     *The Main Bank Accounts*.  As of the Petition Date, the Debtor maintained the following accounts (the "Main Accounts"): (a) its primary operating account (the "General Fund") with People's Bank ("People's"), which is a non-interest-bearing account; (b) a non-interest-bearing deposit account (the "Deposit Account") with People's; (c) an interest-bearing account denominated as an "insurance reserve" (the "Insurance Reserve")[2] with Janney Montgomery Scott ("Janney"); (d) a medical account (the "Medical Account") with People's; (e) a payroll account

---

[2] The designation of the Insurance Reserve account as such is a misnomer, as that account is neither used to fund insurance premiums nor is it a reserve.  Rather, it is an unrestricted savings account that is not reserved for any specific purpose, insurance or otherwise.  This is a legacy account that historically had been used to fund insurance payments, but it has not been used for insurance purposes for some time and the nomenclature simply never changed.

(the "Payroll Account") with People's; and (f) a checking account[3] (the "Checking Account") with People's.  The General Fund acts as the Debtor's central repository of funds and is the primary payor account for substantially all of the Debtor's expenses.  All of the Main Accounts are maintained and controlled by the Debtor's Chief Financial Officer and its Bishop.

15.     *The General Fund*.  The General Fund is funded from multiple sources.  The ACA receives pledges which are deposited into an ACA (i.e., non-debtor) account at Dime Bank.  From that account, funds for ACA expenses are transferred to separate non-debtor accounts at Janney Montgomery Scott.  ACA pays some of its own expenses through those non-debtor accounts, while the Debtor pays certain ACA expenses, including payroll and benefits.  Funds to cover ACA's payroll and benefits are transferred further from those non-debtor accounts into the General Fund. In addition, checks and cash received by the Debtor are placed initially into the Deposit Account. Those funds are then transferred to the General Fund to cover Debtor expenses.

16.     *The Deposit Account*.  The Deposit Account acts as the account into which cash and checks collected by the Debtor are deposited.  Funds from the Deposit Account are regularly transferred to the General Account to cover the Debtor's expenses.

17.     *The Insurance Reserve*.  The Insurance Reserve is an interest-bearing savings account.  Funds are transferred between the Insurance Reserve and the General Fund as needed to cover expenses from the General Fund while maintaining a balance in the Insurance Reserve as much as possible in order to maximize interest income in that account.

18.     *The Medical Account*.  As is discussed in detail in *Debtor's Motion for Entry of Interim and Final Orders (I) Authorizing Debtor to (A) Pay Prepetition Wages, Salaries, Reimbursable Expenses, and Other Obligations on Account of Compensation and Benefits*

---

[3] Referenced on Exhibit C as the Business Advantage Account.

*Programs and (B) Continue Compensation and Benefits Programs; and (II) Granting Related Relief*, Debtor maintains a medical account at People's.  Employer-funded and employee-withheld health insurance premiums are deposited into this account for the benefit of Debtor's employees. In addition, the Debtor's third-party benefits administrator, Benefit Administrative Systems, LLC ("BAS"), collects premiums from certain of the Parishes within the Diocese, the High Schools, and the Other Catholic Entities (collectively, the "Participating Employers"), which are deposited into the Medical Account.  Debtor and non-debtor funds in the Medical Account are aggregated and used to pay healthcare premiums for both the Debtor's employees and the employees of Participating Employers whose healthcare premiums were funded through this account. Additional funds are transferred from the Medical Account to the General Fund (and ultimately into the Payroll Account) to cover benefits-related payroll costs.

19.     Prior to the Petition Date, People's placed an administrative freeze on the Medical Account to the extent of the amount People's asserts it is due under a certain prepetition credit agreement.  The Debtor disputes the appropriateness of People's freeze of the Medical Account. The Debtor and People's continue to work toward a consensual resolution to remove the freeze.

20.     *The Payroll Account*.  The Debtor maintains its payroll account at People's.  The payroll account is funded from the General Fund to satisfy the payroll obligations of the Debtor and ACA; St. Vincent de Paul Place, Norwich, Inc.; St. Vincent DePaul, Middletown, Inc.; and Diocese Of Norwich Outreach To Haiti, Inc. (the "Non-Diocesan Payroll Entities").  Payment of payroll for the Debtor and Non-Diocesan Payroll Entities is handled through a third-party payroll administrator, Paycor, Inc. ("Paycor").  In addition, funds from two non-debtor retirement accounts maintained for diocesan priests maintained at Janney for the benefit of diocesan priests are

transferred into the Payroll Account for disbursement through Paycor to retired priests in accordance with the Debtor's applicable retirement plan documents for retired priests.

21.      *The Checking Account*.  The sole purpose of the Checking Account is to have an account with a debit card used solely by the Bishop for discretionary expenses in support of the Debtor's mission.  As of July 13, 2021, the Checking Account had a balance of $8,697.39. Periodically, as the balance in the Checking Account dips below $5,000, the Debtor replenishes it up to approximately $10,000 by transferring funds from the General Fund.  The Checking Account is not used for any purpose other than the Bishop's use of the debit card tied to the Checking Account.

      B.      Restricted Donor Accounts

22.      The Debtor maintains four separate accounts to hold funds donated to the Debtor subject to donor-restrictions on their use (the "Donor Restricted Funds"): (a) The Dorothy H. Cooke Ecumenical Fund at Janney (investment account); (b) the Seminarian Education Fund at Janney (investment account); (c) a Gift Annuity account at Janney (investment account); and (d) a Mae-Lee Trust certificate of deposit account at People's.  No funds are transferred into or out of any of these restricted accounts.  Change in value in each of these accounts is recorded monthly but funds remain on deposit and may not be used for any purpose inconsistent with the intent of the donation.  The three Donor Restricted Funds that are investment accounts are self-directed accounts, not managed account.  Janney does not make transactions in these accounts other than at the Debtor's direction.  The Debtor's Chief Financial Officer makes all investment decisions, in consultation with the Debtor's Chancellor or Bishop, with respect to these accounts.

23.      As of July 13, 2021, the aggregate value of all donor-restricted accounts maintained by the Debtor was approximately $1.4 million.  However, two of the four donor-restricted accounts have balances less than $50,000.  The costs and administrative burden of moving the Donor

Restricted Funds to new accounts at banks that are authorized depositories under the U.S. Trustee Guidelines would be unreasonably high compared to the small balances that exist in half of these accounts.

C.    Unrestricted Investment Accounts

24.    The Debtor maintains seven separate unrestricted investment accounts (the "Unrestricted Investment Accounts"):

(i)    *Norwich Roman Catholic Diocesan Corp. Reserve Fund* held at Janney Montgomery Scott.  Funds in this account are invested in a diverse portfolio of mutual funds, bonds, exchange traded funds and unit investment trusts.

(ii)    *Priest Needs Account* held at Janney Montgomery Scott.  Funds in this account are invested in a diverse portfolio of mutual funds, bonds, exchange traded funds and unit investment trusts.

(iii)    *Priest Needs Account - Managed* held at Janney Montgomery Scott.  Funds in this account are invested in a diverse portfolio of stocks.

(iv)    *Norwich Roman Catholic Diocesan Corp SAM Account* held at Morgan Stanley. Funds in this account are invested in a diverse portfolio of stocks and bonds.

(v)    *The King Family Fund for Priests & Seminarians* held at Morgan Stanley.  Funds in this account are invested in a diverse portfolio of stocks and bonds.

(vi)    *Norwich Roman Catholic Diocesan Corp. Continuing Education* account held at Morgan Stanley.  Funds in this account are invested in a diverse portfolio of stocks and bonds.

(vii)    *Michael & Catherine King Vocation Fund* held at Morgan Stanley.  Funds in this account are invested in a diverse portfolio of stocks and bonds.

No funds are transferred into or out of any of these unrestricted accounts.  Change in value in each of these accounts is recorded monthly.  The Unrestricted Investment Accounts are self-directed accounts, not managed accounts.  Neither Janney nor Morgan Stanley makes transactions in any of these accounts other than at the Debtor's direction.  The Debtor's Chief Financial Officer makes all investment decisions, in consultation with the Debtor's Chancellor or Bishop, with respect to these accounts.

25.     As of July 13, 2021, the aggregate value of all unrestricted accounts maintained by the Debtor was approximately $7.66 million.  Because a number of these accounts are maintained at the same institution as the Donor Restricted Funds, as to which the Debtor seeks authority to continue to maintain those accounts at the same institution without having to incur the burden and expense of moving them to a depository authorized under the U.S. Trustee Guidelines (as defined below), it would be economical, efficient and appropriate to permit the Debtor to continue to maintain its unrestricted investment accounts at the same institution.  As to unrestricted investment accounts maintained at Morgan Stanley, the Debtor should not be required to bear the burden and expense of moving those accounts to an authorized depository because Morgan Stanley is a large, sophisticated and reputable national investment bank and advisory services firm.

**Compliance with U.S. Trustee Guidelines**

26.     The *Operating Guidelines and Reporting Requirements for Debtors in Possession and Trustees* (the "U.S. Trustee Guidelines") generally require chapter 11 debtors to, among other things, deposit all estate funds into an account with an authorized depository that agrees to comply with the requirements of the Office of the United States Trustee for the District of Connecticut (the "U.S. Trustee").  As of the Petition Date, all of the Main Accounts other than the Insurance Reserve were held with a bank (People's) that is an authorized depository under the U.S. Trustee Guidelines and is insured by the Federal Deposit Insurance Corporation.  Moreover, all of these accounts are located in the U.S.  Separately, with respect to the Insurance Reserve, Janney, where that account is maintained, is a large, sophisticated and reputable investment advisory services firm, and the Insurance Reserve is insured.  It would be disruptive to the Debtor's relationship with Janney, where it maintains other accounts, to transfer the Insurance Reserve to another institution, and given the limited benefit to doing so, on balance, it would be more economical and efficient – and in the best interests of the Debtor and its stakeholders – for the Debtor to continue to maintain the

Insurance Reserve at Janney as a debtor-in-possession account.  Accordingly, the Debtor submits that its accounts at People's are in compliance with the U.S. Trustee Guidelines and its accounts at Janney are consistent with the U.S. Trustee Guidelines, and the Debtor seeks authority to continue to maintain its accounts at those institutions as debtor-in-possession accounts.  With respect to accounts maintained at Janney which is not on the authorized depository list in this District, the Debtor submits that requiring the Debtor to move those accounts would impose an undue burden without significant benefit at a time when the Debtor and its key personnel must focus their efforts on other important tasks at the outset of this case geared toward a successful reorganization for the benefit of its stakeholders.  As such, the Debtor respectfully requests authority to continue to maintain at Janney those accounts that were housed there as of the Petition Date.

27.     In the event the Debtor's accounts are not in an account or financial institution that meets the requirements of the United States Trustee or section 345(b) of the Bankruptcy Code, for the reasons stated above, the Debtor respectfully requests that the Court relieve the Debtor of its obligation to comply with the requirements of section 345(b) and authorize the Debtor to maintain and continue using its prepetition accounts and cash management system.

28.     Alternatively, if any of the Debtor's accounts do not comply with section 345 of the Bankruptcy Code or any other requirements of the U.S. Trustee, and the Court is not inclined to grant the Debtor relief from its obligation to comply with section 345(b) of the Bankruptcy Code,  the Debtor requests that the Court grant the Debtor 20 days, without prejudice to seek an additional extension, to come into compliance with section 345(b) of the Bankruptcy Code and any of the U.S. Trustee's requirements or guidelines or to make such other arrangements as agreed to by the U.S. Trustee.

**Existing Business Forms and Checks**

29.     In the ordinary course of business, the Debtor uses numerous business forms, including, without limitation, checks, business cards, letterhead, purchase orders and invoices (the "Business Forms").  To minimize expense to its estate and avoid confusion on the part of employees, customers and suppliers, the Debtor respectfully requests that the Court authorize it to continue to use all correspondence and Business Forms, as such forms were in existence immediately prior to the Petition Date without reference to the Debtor's status as a debtor in possession; provided, however, that upon depletion of the Debtor's Business Forms stock, the Debtor will obtain new Business Forms reflecting its status as a debtor in possession, and, to the extent reasonably practicable, the Debtor will cause any checks electronically generated during this chapter 11 case to contain the designation "Debtor in Possession."  Such authorization will enable the Debtor to avoid the expense and delay of ordering new Business Forms.

**Bank Fees**

30.     In the ordinary course of business, the Debtor incurs and pays, honors, or allows to be deducted from the appropriate Bank Accounts certain monthly service fees and other charges, costs, and expenses charged by the Banks (collectively, the "Bank Fees").  The Debtor estimates that approximately $5,644 in monthly Bank Fees are due and owing as of the Petition Date.  To maintain the integrity of its Cash Management System, the Debtor respectfully requests authority to pay the full amount of the Bank Fees, including fees for prepetition transactions that are charged postpetition, and to continue to pay the Bank Fees in the ordinary course of business postpetition.

## RELIEF REQUESTED

31.     Pursuant to sections 345, 363, 364 and 503(b)(1) of title 11 of the United States Code (the "Bankruptcy Code") and Rules 6003 and 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), the Debtor moves for the entry of an interim order (the

"Interim Order") in substantially the form attached hereto as Exhibit A and a final order (the "Final Order") in substantially the form attached hereto as Exhibit B:

(i)     authorizing the Debtor to continue to use its current Cash Management System, including to continue to receive and disburse funds held for non-debtor entities;

(ii)    authorizing the Debtor to continue to use (a) its existing Bank Accounts, including authorizing the Debtor to open and close bank accounts, and (b) its existing business forms and checks, as modified to the extent described herein; and

(iii)   authorizing the Banks to honor certain transfers and charge Bank Fees.

**BASIS FOR RELIEF**

II.     **The Continued Use of the Cash Management System, Bank Accounts and Business Forms Is Essential to the Debtor's Ongoing Operations and Is in the Best Interests of the Debtor's Estate and Creditors**

A.      The Debtor Should Be Permitted to Continue the Cash Management System and Bank Accounts

32.     The Debtor hereby seeks authority to continue the collection, concentration, disbursement and investment of cash pursuant to its Cash Management System.  Bankruptcy courts routinely permit chapter 11 debtors to continue using their existing cash management systems, generally treating requests for such relief as a relatively "simple matter."  *In re Baldwin United Corp.*, 79 B.R. 321, 327 (Bankr. S.D. Ohio 1987).  In addition, in granting such relief, courts recognize that an integrated cash management system "allows efficient utilization of cash resources and recognizes the impracticalities of maintaining separate cash accounts for the many different purposes that require cash."  *In re Columbia Gas Sys., Inc.*, 136 B.R. 930, 934 (Bankr. D. Del. 1992), *aff'd in relevant part*, 997 F.2d 1039, 1061 (3d Cir. 1993).  The requirement to maintain all accounts separately "would be a huge administrative burden and economically inefficient."  *Id.* at 1061; *see also In re Southmark Corp.*, 49 F.3d 1111, 1114 (5th Cir. 1995) (stating that a cash management system allows a debtor "to administer more efficiently and effectively its financial operations and assets"); *Charter Co. v. Prudential Ins. Co. of Am. (In re*

*Charter Co.)*, 778 F.2d 617, 621 (11th Cir. 1985) (holding that the debtors' postpetition use of their prepetition "routine cash management system" was "entirely consistent" with applicable provisions of the Bankruptcy Code).

33.     In addition, section 363(c)(1) of the Bankruptcy Code authorizes a debtor in possession to "use property of the estate in the ordinary course of business without notice or a hearing." 11 U.S.C. § 363(c)(1). The purpose of section 363(c)(1) of the Bankruptcy Code is to provide a debtor in possession with the flexibility to engage in those transactions that make up the bulk of its day-to-day operations without incurring the excessive monitoring costs that would result from the need to provide notice of, and obtain approval for, such ordinary course activities. *See, e.g., Medical Malpractice Ins. Ass'n v. Hirsch (In re Lavigne)*, 114 F.3d 379, 384 (2d Cir. 1997); *In re Enron Corp.*, No. 01-16034 (ALG), 2003 WL 1562202, at *15 (Bankr. S.D.N.Y. Mar. 21, 2003); *Chaney v. Official Comm. of Unsecured Creditors (In re Crystal Apparel, Inc.)*, 207 B.R. 406, 409 (S.D.N.Y. 1997). Within the purview of section 363(c) of the Bankruptcy Code, a debtor in possession is authorized to continue the "routine transactions" associated with its cash management system. *Amdura Nat'l Distrib. Co. v. Amdura Corp. (In re Amdura Corp.)*, 75 F.3d 1447, 1453 (10th Cir. 1996). Accordingly, the Debtor seeks authority under section 363(c)(1) of the Bankruptcy Code to continue the collection, concentration, investment and disbursement of cash pursuant to the Cash Management System, including its collection of funds and processing of payments for non-debtor entities through the various Bank Accounts.

34.     The Cash Management System constitutes an ordinary course and essential business practice of the Debtor. It provides significant benefits to the Debtor's estate including, among other things, the ability to (a) control and monitor funds, (b) invest idle cash, (c) ensure the maximum availability of funds when and where necessary and (d) reduce costs and administrative

expenses by facilitating the movement of funds and the development of timely and accurate account balance and presentment information.   The Debtor's continued smooth financial operations requires the continuation of the Cash Management System during the pendency of this chapter 11 case.

35.     Moreover, as a practical matter, it would be difficult, expensive, disruptive and administratively burdensome to require the Debtor to close all of its existing Bank Accounts and open new, segmented debtor-in-possession bank accounts at the very outset of these bankruptcy cases as required by the U.S. Trustee Guidelines or to separate the flow of funds of, and on behalf of, non-debtor entities which historically have flowed through various of the Bank Accounts.  The U.S. Trustee Guidelines aim to ensure that there exists a clear distinction between prepetition and postpetition claims and payments and prevent the inadvertent payment of prepetition claims.  The Debtor has determined that closing the Bank Accounts that comprise its Cash Management System and replacing each with a new debtor-in-possession account, or to segregate the flow of funds of non-debtor entities which historically have flowed through various of the Bank Accounts, would require a large expenditure of the Debtor's limited administrative and financial resources and provide little, if any, benefit with respect to the aims of the U.S. Trustee Guidelines.  This is so, in particular, because the Debtor has the capacity to draw the necessary distinctions between prepetition and postpetition obligations and payments without closing all of its Bank Accounts and opening new ones.  To protect against the possible inadvertent payment of prepetition claims, the Debtor immediately will advise the Banks not to honor checks issued prior to the Petition Date, except as otherwise expressly permitted by an order of the Court and directed by the Debtor.

36.     In addition, preserving a "business as usual" atmosphere and avoiding the unnecessary distractions that inevitably would be associated with any substantial disruption of the

Cash Management System will (a) facilitate the Debtor's stabilization of its postpetition operations and (b) maximize value for stakeholders by allowing the Debtor to continue its operations without disruption. Accordingly, maintaining the existing Cash Management System is not only essential, but is in the best interest of creditors and other parties in interest.

37.     Bankruptcy courts in this and other districts have regularly waived certain U.S. Trustee Guidelines and allowed the continued use of cash management systems and prepetition bank accounts in the ordinary course of a debtor's prepetition business. *See, e.g., In re Carla's Pasta Inc. and Suri Realty Inc.,* 21-20111-JJT (Bankr. Conn. Feb. 28, 2021) [Dkt. No. 71]; *In re The Roman Catholic Diocese of Rockville Centre, New York*, 20-12345 (SCC) (Bankr. S.D.N.Y. Dec. 10, 2020) (allowing debtors to continue using their cash management system); *In re Windstream Holdings, Inc*., 19-22312 (RDD) (Bankr. S.D.N.Y. Apr. 22, 2019) (same); *In re Aegean Marine Petrol. Network Inc*., No. 18-13374 (MEW) (Bankr. S.D.N.Y. Dec. 17, 2018) (same); *In re Nine West Holdings, Inc*., No. 18-10947 (SCC) (Bankr. S.D.N.Y. June 26, 2018) (same). The Debtor respectfully submits that the present circumstances warrant similar relief in this chapter 11 case.

B.     <u>The Debtor Should Be Permitted to Continue Using Its Existing Business Forms</u>

38.     As described above, in the ordinary course of business, the Debtor uses numerous varieties of Business Forms. To minimize expenses to its chapter 11 estate, the Debtor requests authority to continue to use all Business Forms as such forms were in existence immediately before the Petition Date, without reference to the Debtor's status as a debtor in possession. The Debtor also requests authorization to use its existing check stock without the "debtor in possession" label for checks that it manually writes until such check stock runs out. As soon as practicable after the Petition Date, the Debtor will include "debtor in possession" on the checks it prints electronically.

Upon depletion of the Debtor's Business Forms, the Debtor will obtain new Business Forms stock reflecting its status as a debtor in possession.

39.      In other chapter 11 cases, courts in this district have allowed debtors to use their prepetition business forms without the "debtor in possession" label.  *See, e.g., In re Carla's Pasta Inc. and Suri Realty Inc.,* 21-20111-JJT (Bankr. Conn. Feb. 28, 2021) [Dkt. No. 71]; *In re The Roman Catholic Diocese of Rockville Centre, New York*, 20-12345 (SCC) (Bankr. S.D.N.Y. Dec. 10, 2020) (authorizing use of existing business forms); *In re Windstream Holdings, Inc*., 19-22312 (RDD) (Bankr. S.D.N.Y. Apr. 22, 2019) (same); *In re Aegean Marine Petrol. Network Inc*., No. 18-13374 (MEW) (Bankr. S.D.N.Y. Dec. 17, 2018) (same); *In re Nine West Holdings, Inc*., No. 18-10947 (SCC) (Bankr. S.D.N.Y. June 26, 2018) (same).  The Debtor respectfully submits that the present circumstances warrant similar relief in this chapter 11 case.

## III.     The Court Should Authorize Banks Participating in the Cash Management System to Honor Certain Transfers

40.      Concurrently with the filing of this Motion, the Debtor has filed motions requesting authority to pay, in its sole discretion and in the ordinary course of its business, certain prepetition obligations to employees, insurers and other entities.  With respect to some of this debt, prior to the Petition Date, the Debtor issued checks or initiated drafts, wires or ACH transfers that may have yet to clear the banking system.  In other cases, the Debtor would issue the relevant checks or authorize the transfers postpetition on account of such prepetition debt once the Court entered an order permitting the Debtor to do so.  The Debtor intends to inform the Banks which prepetition checks, drafts, wires or ACH transfers should be honored pursuant to orders of the Court authorizing such payment.

41.      As a result of the foregoing, the Debtor requests the Banks be authorized to accept and honor all representations from the Debtor as to which checks, drafts, wires or ACH transfers

should be honored or dishonored consistent with any order(s) of this Court and governing law, whether such checks, drafts, wires or ACH transfers are dated prior to, on or subsequent to the Petition Date.  Pursuant to the relief requested in this Motion, the Banks shall not be liable to any party on account of (a) following the Debtor's instructions or representations as to any order of this Court; (b) the honoring of any prepetition check or item in a good faith belief that the Court has authorized such prepetition check or item to be honored; or (c) an innocent mistake made despite implementation of reasonable item handling procedures.  Such relief is reasonable and appropriate because the Banks are not in a position to independently verify or audit whether a particular item may be paid in accordance with the Court's order or otherwise.

**THE REQUIREMENTS OF BANKRUPTCY RULE 6003 ARE SATISFIED**

42.     Rule 6003 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>") empowers the Court to grant the relief requested in this Motion within the first twenty-one days after the Petition Date "to the extent that relief is necessary to avoid immediate and irreparable harm."  Fed. R. Bankr. P. 6003.

43.     As set forth above, the immediate continued use of the Bank Accounts, Cash Management System and Business Forms and related relief is essential to prevent immediate and potentially irreparable damage to the Debtor's operations.  Accordingly, the Debtor submits that ample cause exists to justify immediate payment of any claims as set forth in this Motion under Bankruptcy Rule 6003.

**WAIVER OF BANKRUPTCY RULES 6004(A) AND 6004(H)**

44.     Pursuant to Bankruptcy Rules 2002(a)(2), 6004(a) and 6004(h), the Debtor also seeks, to the extent they apply, (a) a waiver of the notice requirements under Bankruptcy Rules 2002(a)(2) and 6004(a) and (b) a waiver of any stay of the effectiveness of the Interim Order and the Final Order under Bankruptcy Rule 6004(h).

45.     Bankruptcy Rules 2002(a)(2) and 6004(a) require twenty-one days' notice by mail of the proposed use of property outside the ordinary course of business, unless the Court orders otherwise for cause shown.  Bankruptcy Rule 6004(h) provides that "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise."  As set forth above, any disruption to the Cash Management System likely would cause irreparable harm to the Debtor's estate. Accordingly, the Debtor submits that ample cause exists to justify: (a) shortened and limited notice of the Motion with respect to the relief to be granted by the Interim Order; (b) the immediate entry of the Interim Order granting certain of the relief sought herein pursuant to Bankruptcy Rule 6003(b); and (c) a waiver of the fourteen-day stay imposed by Bankruptcy Rule 6004(h), to the extent that it applies, with respect to both the Interim Order and the Final Order.

## RESERVATION OF RIGHTS

46.     Nothing contained herein is intended or shall be construed as (a) an admission as to the validity of any claim against the Debtor; (b) a waiver of the Debtor's or any appropriate party in interest's rights to dispute the amount of, basis for, or validity of any claim against the Debtor; (c) a waiver of any claims or causes of action which may exist against any creditor or interest holder; or (d) an approval, assumption, adoption, or rejection of any agreement, contract, lease, program, or policy between the Debtor and any third party under section 365 of the Bankruptcy Code.  Likewise, if the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended to be and should not be construed as an admission to the validity of any claim or a waiver of the Debtor's rights to dispute such claim subsequently.

## NOTICE

47.     Notice of this Motion will be provided to (a) the Office of the United States Trustee; (b) the holders of the 20 largest unsecured claims against the Debtor's estate; (c) the Internal

Revenue Service; (d) the Connecticut Department of Revenue Services; (e) the Banks; and (f) any other party that has requested service pursuant to Bankruptcy Rule 2002 as of the time of filing of this Motion (collectively, the "Notice Parties"). A copy of this Motion and any orders approving it will also be made available on the Debtor's Case Information Website located at https://dm.epiq11.com/RCDNorwich. The Debtor submits that, in light of the nature of the relief requested, no other or further notice need be given.

<div align="center">**NO PRIOR REQUEST**</div>

48.      No previous request for the relief sought herein has been made by the Debtor to this or any other court.

<div align="center">*(Signature Page Follows)*</div>

**WHEREFORE,** the Debtor respectfully requests that the Court enter the Interim Order, and after a final hearing, the Final Order granting the relief requested herein and such other and further relief as the Court may deem just and appropriate.

Dated: Hartford, CT
      July 16, 2021

<div style="margin-left:40%">

/s/  Patrick M. Birney
Patrick M. Birney (CT No. 19875)
Andrew A. DePeau (CT No. 30051)
Annecca H. Smith (*pro hac vice* pending)
**ROBINSON & COLE LLP**
280 Trumbull Street
Hartford, CT 06103
Telephone:  (860) 275-8275
Facsimile:  (860) 275-8299
E-mail:  pbirney@rc.com
       adepeau@rc.com
       asmith@rc.com

-and-

Louis T. DeLucia (*pro hac vice* pending)
Alyson M. Fiedler (*pro hac vice* pending)
**ICE MILLER LLP**
1500 Broadway, 29th Floor
New York, NY 10036
Telephone: (212) 824-4940
Facsimile: (212) 824-4982
E-Mail:  louis.delucia@icemiller.com
       alyson.fiedler@icemiller.com

*Proposed Counsel to the Debtor*
*and Debtor-in-Possession*

</div>

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 16, 2021, a copy of the foregoing motion and the exhibits thereto were filed electronically and shall be served as required by Local Bankruptcy Rule 9013-2(b), with notice of this filing being sent by email to all Notice Parties by operation of the court's electronic filing system or by First Class U.S. mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties in interest may access this document through the court's CM/ECF System.

.

*/s/ Patrick M. Birney*
Patrick M. Birney