UNITED STATES BANKRUPTCY COURT
DISTRICT OF CONNECTICUT
HARTFORD DIVISION

| | |
|---|---|
| In re: <br><br> THE NORWICH ROMAN CATHOLIC DIOCESAN CORPORATION,[1] <br><br> Debtor. | Chapter 11 <br><br> Case No:  21-20687 (JJT) <br><br> September 8, 2021 |

**DEBTOR'S BRIEF IN SUPPORT OF FIRST AND SECOND DAY MOTIONS AND IN REPLY TO UNITED STATES TRUSTEE'S OBJECTIONS THERETO**

The Norwich Roman Catholic Diocesan Corporation, debtor and debtor-in-possession in the above-captioned chapter 11 case (the "Debtor" or the "Diocese"), hereby files this reply brief (the "Reply") in support of (a) *Debtor's Motion for Entry of Interim and Final Orders Authorizing Debtor to (A) Pay Prepetition Wages, Salaries, and Reimbursable Expenses, and Other Obligations on Account of Compensation and Benefits Programs and (B) Continue Compensation and Benefits Programs; and (II) Granting Related Relief* [Dkt. No. 13]; (b) *Debtor's Motion for Entry of Interim and Final Orders (I) Authorizing the Continued Use of the Debtor's Cash Management System, Bank Accounts and Business Forms; and (II) Granting Related Relief* [Dkt. No. 14]; (c) *Debtor's Motion for Entry of Interim and Final Orders (I) Authorizing and Approving Special Noticing and Confidentiality Procedures; (II) Authorizing andApproving Procedures for Providing Notice of Commencement; and (III) Granting Related Relief* [Dkt. No. 15]; (d) *Debtor's Motion for Entry of Interim and Final Orders Authorizing Debtor to (I)Continue Insurance Coverage and Insurance Programs Entered Into Prepetition and Satisfy Prepetition*

---

[1] The Debtor in this chapter 11 case is The Norwich Roman Catholic Diocesan Corporation, a/k/a The Roman Catholic Diocese of Norwich.  The last four digits of the Debtor's federal tax identification number are 7373.

1

*Obligations Related Thereto; (II) Renew, Amend, Supplement, Extend, or Purchase Insurance Policies; and (III) Granting Related Relief* [Dkt. No. 18]; and (e) *Debtor's Motion for Entry of an Order (I) Approving Proposed Form of AdequateAssurance of Payment to Utility Providers; (II) Establishing Procedures for Determining Adequate Assurance of Payment for Future Utility Services; (III) Prohibiting Utility Providers from Altering, Refusing, or Discontinuing Utility Service; and (IV) Granting Related Relief* [Dkt. Entry No. 19] and in reply to (x) the United States Trustee's Omnibus Objection And Responses To Certain Of Debtor's "First Day Motions" [Dkt. No. 27] (the "Initial Objection"); (y) the United States Trustee's Response to the Utility Motion [Dkt. No. 105] (the "Utility Objection"); and (z) the United States Trustee's Supplemental Objection to Final Orders on Certain of Debtor's Motions Re: Use of Cash and Request for Waiver of Section 345(b) [Dkt. No. 195] (the "Supplemental Objection," and with the Initial UST Objection and the Utility Objection, the "Objections").  This Reply is supported by the *Declaration of Rev. Peter J. Langevin Regarding the Diocese's Assets and Operations and in Support of the Chapter 11 Petition and First Day Pleadings* (the "First Day Declaration") [Dkt. No. 12] filed with the Court on July 16, 2021, and the *Declaration of Wayne P. Weitz* (the "Weitz Declaration") filed contemporaneously herewith.  For its Reply, the Debtor states as follows:

## INTRODUCTION

1. The Debtor is a Roman Catholic diocese in Connecticut and a small part of New York founded in 1953 by Pope Pius XII, encompassing Middlesex, New London, Windham and Tolland counties in Connecticut, as well as Fisher Island, New York.

2. On July 15, 2021 (the "Petition Date"), the Debtor commenced this case by filing a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  Shortly thereafter, the Debtor filed its First Day Declaration and Motions in order to (i) disclose to the Court and parties-in-interest the Debtor's operations, (ii) obtain the authorizations necessary to continue operating

2

in Chapter 11, including making certain payments on account of prepetition debts; (iii) maintain the confidentiality of certain information due to the sensitive nature of this case and the issues therein; and (iv) establish procedures to ensure adequate notice to parties-in-interest, preserve parties' rights, prevent unexpected utility shut offs, and reduce administrative costs to the estate.

3. Prior to the Petition Date, the Debtor reached out to the United States Trustee (the "U.S Trustee") to explain its operations and the relief it would be seeking in an effort to address any concerns and reduce the expense that would almost certainly result from contested hearings on the Debtor's Motions. The U.S. Trustee was unwilling to engage in substantive discussion until the Debtor first responded to requests for information and records (which in many instances required the Debtor and its professionals to create custom reports that a non-profit, and particularly a Roman Catholic Diocese, does not keep in the ordinary course of business). The Debtor diligently and expeditiously responded to the U.S. Trustee's requests, at great expense to the estate to the Debtor's estate, and its creditors.

4. Unfortunately, the U.S. Trustee still have not provide the Debtor with a meaningful opportunity to have an open, thoughtful discussion about its operations and to explain how key processes (like its cash management system) operate. Without the benefit of that discussion, the U.S. Trustee filed its Objections, which seek to change fundamental aspects of how the Debtor conducts its business. The Objections reflect a misunderstanding related to the Debtor's operations and seek to impose the U.S. Trustee's business judgment in place of the Debtor's, and if granted, will drastically increase the costs of administering this case.

5. Fortunately, the Official Committee of Unsecured Creditors (the "Committee") has been very receptive to understanding the Debtor's operations, its cash management system, and the fundamentals of this Chapter 11 case. The Debtor and the Committee have agreed to a

final form of proposed order (each a "Final Order") for each of the Motions, other than the Wages and Benefits Motion.[2]  A copy of each of the proposed Final Orders is attached to the Notice of Filing Proposed Orders on First and Second Day Motions (the "Notice of Proposed Orders") filed contemporaneously herewith.  These proposed Final Orders will permit the Debtor to maintain its operations during this Chapter 11 case while providing the Committee the information it needs to fulfill its oversight responsibilities.

6. For the reasons set forth herein, the Debtor respectfully requests that the Court overrule the U.S. Trustee's Objections and enter the proposed Final Orders.

### PROCEDURAL BACKGROUND

7. On July 15, 2021 (the "Petition Date"), the Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code.  The Debtor continues to operate and pursue its religious, non-profit mission and ministry, and manage its properties and affairs as a debtor in pos-session under sections 1107(a) and 1108 of the Bankruptcy Code.

8. On July 29, 2021, the Committee was appointed by the Office of the United States Trustee for the District of Connecticut pursuant to section 1102 of the Bankruptcy Code [Dkt. No. 90].  No trustee or examiner has been appointed.

9. Additional information regarding the Debtor, its mission and operations, and the events and circumstances preceding the Petition Date is set forth in the First Day Declaration.

10. On July 16, 2021, the Debtor filed the following motions:

   a. *Motion for Entry of Interim and Final Orders Authorizing Debtor to (A) Pay Prepetition Wages, Salaries, and Reimbursable Expenses, and Other Obligations on Account of Compensation and Benefits Programs and (B) Continue Compensation and Benefits Programs; and (II) Granting Related*

---

[2] The Debtor, the Committee, and the UST have agreed to a continuance of the hearing on and further interim relief for the Wages and Benefits Motion so that the Committee can review additional information related to that motion. A proposed Second Interim Order on the Wages and Benefits Motion is attached to the Notice of Proposed Orders filed contemporaneously herewith.

4

*Relief* [Dkt. No. 13] (the "Wages and Benefits Motion");

b. *Debtor's Motion for Entry of Interim and Final Orders (I) Authorizing the Continued Use of the Debtor's Cash Management System, Bank Accounts and Business Forms; and (II) Granting Related Relief* [Dkt. No. 14] (the "Cash Management Motion");

c. *Debtor's Motion for Entry of Interim and Final Orders (I) Authorizing and Approving Special Noticing and Confidentiality Procedures; (II) Authorizing and Approving Procedures for Providing Notice of Commencement; and (III) Granting Related Relief* [Dkt. No. 15] (the "Confidentiality Motion");

d. *Debtor's Motion for Entry of Interim and Final Orders Authorizing Debtor to (I) Continue Insurance Coverage and Insurance Programs Entered Into Prepetition and Satisfy Prepetition Obligations Related Thereto; (II) Renew, Amend, Supplement, Extend, or Purchase Insurance Policies; and (III) Granting Related Relief* [Dkt. No. 18] (the "Insurance Motion"); and

e. *Debtor's Motion for Entry of an Order (I) Approving Proposed Form of Adequate Assurance of Payment to Utility Providers; (II) Establishing Procedures for Determining Adequate Assurance of Payment for Future Utility Services; (III) Prohibiting Utility Providers from Altering, Refusing, or Discontinuing Utility Service; and (IV) Granting Related Relief* [Dkt. No. 19] (the "Utility Motion," and with the Wages and Benefits Motion, the Cash Management Motion, the Confidentiality Motion, and the Insurance Motion, the "Motions").

11. On July 21, 2021, the Court held initial hearings on the Wages and Benefits Motion, the Cash Management Motion, and the Confidentiality Motion. After the hearings, the Court entered Interim Orders regarding the Wages and Benefits Motion [Dkt. No. 61], the Cash Management Motion [Dkt. No. 59], and the Confidentiality Motion [Dkt. No. 74].

12. On August 10, 2021, the Court held hearings on the Utilities Motion and the Insurance Motion. After the hearings, the Court entered an Interim Order on the Utilities Motion [Dkt. No. 74] and an Interim Order on the Insurance Motion [Dkt. No. 180].

13. On August 13, 2021, the Court entered an order continuing the hearings on each of the Motions to September 9, 2021 [Dkt. No. 149].

14. On August 30, 2021, the Court entered a Second Interim Order on the Utility

5

Motion [Dkt. No. 178], which embodies a resolution between the Debtor and the Norwich Department of Public Utilities ("NDPU") regarding an agreed form of adequate assurance of payment for NDPU and a withdrawal of NDPU's objection to the Utility Motion.

15. Contemporaneously with the filing of this Reply, the Debtor is filing a Notice of Proposed Orders, which contains each of the proposed orders referenced herein.

## DISCUSSION

### I. The Wages and Benefits Motion

16. The Debtor, the Committee, and the U.S. Trustee have consented to entry of a Second Interim Order on the Wages and Benefits Motion so that the parties can continue to work toward a consensual resolution. A copy of the proposed Second Interim Order is attached to the Debtor's Notice of Proposed Orders. The Committee reserves its right to file a reply in advance of a continued Final Hearing on the Wages and Benefits Motion.

### II. The Insurance Motion

17. Section 363(c)(1) of the Bankruptcy Code provides that, "[i]f the business of the debtor is authorized to be operated under section 721, 1108, 1183, 1184, 1203, 1204, or 1304 of this title and unless the court orders otherwise, [a debtor-in-possession] may enter into transactions . . . in the ordinary course of business, without notice or a hearing, and may use property of the estate in the ordinary course of business without notice or a hearing." 11 U.S.C. § 363(c)(1).

18. Section 363(b)(1) of the Bankruptcy Code provides that debtors "may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). In approving a transaction conducted pursuant to section 363(b)(1), courts consider whether the debtor exercised sound business judgment. *See In re Chateaugay Corp.*, 973 F.2d 141, 144–45 (2d Cir. 1992) (finding that section 363(b) was applicable because sound business

judgment supported the sale of assets); *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1072 (2d Cir. 1983).

19.     As is set forth in the Insurance Motion, the Debtor administers the Insurance Programs[3] for itself and certain non-debtors in the ordinary course of business. Insurance Motion at ¶ 24. Indeed, the Debtor has operated in this way for years. Weitz Declaration at ¶ 3.[4] As such, the Bankruptcy Code entitles the Debtor to continue operating in the ordinary course of business without court approval. *See, e.g., Armstrong World Indus., Inc. v. James A. Phillips, Inc.*, 29 B.R. 391, 395 n.2 (S.D.N.Y. 1983) ("Insofar as transactions are actually in the ordinary course, they are authorized automatically by § 363(c)(1) and § 1107(a), and do not require Bankruptcy Court approval.").

20.     The Insurance Motion also seeks authority to let the Debtor make certain payments outside of the ordinary course of business, primarily prepetition payments on account of the Insurance Programs, which this Court can approve under section 363(b). *See, e.g., In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 175, (Bankr. S.D.N.Y. 1989) (affirming lower court order authorizing payment of prepetition wages pursuant to section 363(b) of the Bankruptcy Code). In the Interim Order on the Insurance Motion, the Debtor was authorized to pay such prepetition debts and honor certain prepetition payments in the approximate amounts listed in those orders. The Debtor has paid and honored same in approximately the amounts set forth therein.

21.     As it relates to the Insurance Motion, the remaining objection in the U.S. Trustee's Supplemental Objection is to the Debtor's continued administration of the Insurance Programs

---

[3] Capitalized terms not otherwise defined herein shall have the same meaning as set forth in the Motions.
[4] Many Roman Catholic diocese operate insurance programs similar to those at issue here, and bankruptcy courts handling diocesan bankruptcy cases have repeatedly approved the continued administration of such programs. *See, e.g., In re Roman Catholic Diocese of Harrisburg*, No. 20-00599 (Bankr. M.D. Pa. March 16, 2020) [Dkt. No.118]; *In re The Roman Catholic Diocese of Rockville Centre, New York*, No. 20-12345 (Bankr. S.D.N.Y. Nov. 17, 2020) [Dkt. No. 165]; *In re The Roman Catholic Church of the Archdiocese of New Orleans*, No. 20-10846 (Bankr. E.D. La. June 22, 2020) [Dkt. No. 176].

for non-debtor Participating Entities. In support of its objection, the U.S. Trustee first states that the "[the Debtor's prepetition] conduct and choices are not automatically entitled to continue post-petition." Supplemental Objection at 5. This is incorrect. As set forth above, the Debtor has operated the Insurance Programs in the ordinary course of its business since long before the Petition Date. Operating the Insurance Programs is objectively an "ordinary course" transaction under section 363. As an ordinary course transaction, the Debtor is entitled to continue operating the Insurance Programs.

22. The U.S. Trustee also asserts that "[t]he Debtor has not demonstrated that there is no economic risk or harm to the estate and creditors if it continues funding the Benefits Funding/Administration and the Operating Insurance Costs." Supplemental Objection at 5. The U.S. Trustee is mistaken because the Debtor is not required to show that its conduct will present "no economic risk or harm to the estate and its creditors." In advancing this argument, and without legal citation, the U.S. Trustee requests that the Court employ a new legal standard—an "Economic Risk Standard"—to analyze and adjudicate the Insurance Motion. Again, the Debtor is operating in the ordinary course of business, which it may continue to do without court approval under section 363(c). However, even if it were not operating in the ordinary course of business, the Debtor can still obtain court approval to operate outside of the ordinary course of business, which is evaluated under the business judgment standard. *See Lionel*, 722 F.2d at 1072 (holding that the application of section 363(b) must be supported by "some articulated business justification, other than appeasement of major creditors"). The U.S. Trustee's attempt to hold the Debtor to a higher Economic Risk Standard is overreaching and not supported by case law.

23. Nonetheless, the Debtor can meet the U.S. Trustee's higher standard. In the most recent fiscal year that ended June 30, 2021, the Debtor's operation of the Insurance Programs has

been cash flow positive. After accounting for premium payments, deductible payments, and the mandatory Risk Management Fee, the Debtor's receipts from administer the Insurance Programs exceeded disbursements by over $250,000. *See* Weitz Declaration at ⁋ 4.

24. Finally, the U.S. Trustee asserts that "[t]he Debtor bears the burden to show that the consequences *for the Debtor* of a disruption of the funding for non-debtors outweighs the cost and potential harm to the estate of continuing to fund." Supplemental Objection at 5 (emphasis in original). This is not a correct statement of the applicable legal standard and is unsupported by case law. If the Debtor is operating the Insurance Programs in the ordinary course of business (which it is), then the Debtor bears no burden because the operation of section 363(c)(1) is automatic. *Armstrong World Indus.*, 29 B.R. at 395. If the Debtor is not operating in the ordinary course of business, the Debtor only bears a burden to show a valid exercise of business judgment, not to meet the test articulated by the U.S. Trustee. *Lionel*, 722 F.2d at 1072.

25. Yet, the Debtor would again meet the U.S. Trustee's preferred standard because, as noted above, the programs are cash flow positive. In fact, the consequences *for the Debtor* of a disruption would be far more costly than the consequences of continuing to fund the programs.

26. Administering the Insurance Programs is not just a random business decision—it is part of the Debtor's core purpose. One of the Debtor's primary objectives, both as a matter of Canon law and as a non-profit charitable institution, is ensuring that the parishes and Catholic ministries within its geographic area are able to carry out the Catholic mission. To accomplish that objective, the Debtor provides operational support to the Catholic parishes, schools, and certain other Catholic entities that operate within its territory. Each of these entities is also a non-profit with goals aligned to that of the Debtor. The Debtor could not on its own do everything these non-debtor entities do to advance the Catholic mission.

27. The Debtor has a particular interest in ensuring that parishes thrive since parishes are both the focal point of the practice of the Catholic faith and the primary source of the income that the Debtor uses to operate. Disrupting the services that the Debtor provides would cause far more harm to the estate than operating them ever could. Not only would it decrease net positive cash flow, it would hurt the entities that the Debtor relies on for funding and significantly hinder the Debtor's goals of furthering the Catholic mission. All of this is in addition to the fact that terminating the Insurance Programs would profoundly impact the operations of dozens of non-debtor nonprofit entities—a fact this Court absolutely can and should account for in rendering any decision.

28. To the extent concerns remain regarding the continued operation of the Insurance Programs, the Debtor has, in consultation with the Committee, agreed to provide the Committee with periodic updates on how the Insurance Programs cash flow. *See* proposed Final Order on Cash Management Motion. In the event an issue were to arise, the Committee would be informed, have the ability to assess any risk to the estate, and be able to come to this Court for relief if appropriate. This should alleviate any concerns the U.S. Trustee has regarding risk. If for some reason it does not, this Court should decline to entertain the U.S. Trustee's speculative objections.

29. In short, the Debtor has met the applicable legal standard to continue its operations and the higher standards created by the U.S. Trustee. Accordingly, the Debtor respectfully requests that the Court overrule the U.S. Trustee's Objections as to the Insurance Motion and enter the proposed Final Order thereon.

## II.   The Cash Management Motion

30. As is set forth in the Cash Management Motion, the Debtor seeks entry of a Final Order authorizing it to maintain its existing Cash Management System, which includes allowing

the Debtor to continue receiving and disbursing funds for itself and various non-debtor entities and maintain its existing Bank Accounts, checks, and business forms, and authorizing the Bank to honor certain transfer and charge Bank fees.

31.     In the Interim Order on the Cash Management Motion, the Court authorized the Debtor to maintain its existing Bank Accounts and waived section 345(b) of the Bankruptcy Code pending a Final Hearing.

32.     In its Supplemental Objection, the U.S. Trustee first argues that the facts of this case do not support a waiver of section 345(b). As set forth in the Cash Management Motion, the Debtor seeks a waiver of section 345(b) to the extent any bank account fails to meet the requirements of that section, which in this case would be the Debtor's accounts at Janney and Morgan Stanley. Courts apply a totality of the circumstances when determining whether to waive section 345(b). In the *Service Merchandise* case, the court set forth a list of non-exclusive factors other courts might consider, including the strength of the financial institutions at issue, the benefits to the Debtor of a waiver, and the harm to the estate if a waiver is not granted. *In re Service Merchandise Co., Inc.*, 240 B.R. 894, 896 (Bankr. M.D. Tenn. 1999).

33.     Morgan Stanley is currently highly rated by Moody's and Standard and Poor, as is Janney's parent company Penn Mutual.[5] There is no evidence before this Court or otherwise that either of these institutions has any chance of suffering an institutional failure. Any suggestion by the UST to the contrary is speculative and simply without merit.

34.     Granting a waiver will provide clear benefits to the Debtor. The Debtor's investment accounts contain a diversified mix of securities that have historically provided a stable

---

[5] *See* https://www.morganstanley.com/about-us-ir/creditor-presentations#current=; https://www.janney.com/meet-janney/janney-strength-stability. The Court may take judicial notice of the Banks credit ratings. *See In re Ditech Holding Corp.*, 605 B.R. 10 (Bankr. S.D.N.Y. 2019).

return for the Debtor and should continue to do so for the estate. Weitz Declaration at ¶ 5. Requiring compliance with section 345(b) will, on the other hand, impose a significant hardship on the Debtor, requiring massive changes to the Debtor's current operations and further straining the Debtor's already overworked finance director or cause the incurrence of significant additional fees if these tasks are outsourced to one of the Debtor's professionals. Weitz Declaration at ¶ 6. Among other things, uprooting longstanding relationships with Janney and Morgan Stanley will likely be a bar to reentry into those relationships in the future, if the Debtor succeeds in confirming a Chapter 11 plan and is no longer subject to the requirements of the Bankruptcy Code. Moving to new institutions would require significant administrative work for the Debtor's thin staff when there are myriad important tasks to address in the early stages of this Chapter 11 case. And account and management fees at other institutions could be higher than those with respect to the existing Janney and Morgan Stanley accounts. Further, one of the accounts is a trust account for the Priest Retirement Plan. As such, this account would not be subject to section 345(b), and it would likely be a breach of the Debtor's fiduciary duty to the plan participants to close or alter the mix of investments in this account.

35. In support of its Supplemental Objection, the U.S. Trustee cites to the case of *In re Ditech Holding Corp.*, 605 B.R. 10 (Bankr. S.D.N.Y. 2019). That case, however, is distinguishable on its face. The debtor in *Ditech* was a large financial services holding company with almost $100 million dollars in its accounts on daily basis. *Id.* at 21. The debtor's banking institution offered to collateralize the Debtor's accounts. *Id.* At a cost of $80,000 per month to collateralize, the debtor could afford to pay using interest earned on the account balances alone. *Id.* at 22–23. Further, the debtor expected to only be in bankruptcy a few months, limiting the total cost to $200,000, a fraction of its available cash. Here, the Banks have not offered to

collateralize the Debtor's Bank Accounts.  But even if they had, doing so would not be cash flow neutral to the estate as it was in *Ditech*.  And as optimistic as the Debtor is about emerging from bankruptcy, it will likely take more than two or three months to do so.  Accordingly, this case is much more akin to *Service Merchandise*, where the court approved a section 345(b) waiver.

36.     The U.S. Trustee also asserts that the Debtor has not shared with it the mix of investments in its various accounts.  This is incorrect.  On July 29, 2021, the Debtor's professionals uploaded documentation for all investment accounts for each month of 2021 to the document portal shared with the U.S. Trustee.  Weitz Declaration at ¶ 5.

37.     The Committee was given access to the same information as the U.S. Trustee and has agreed that a waiver of section 345(b) is appropriate given the circumstances of this case.  As an estate fiduciary, the Committee's consent should be given substantial weight.  The proposed Final Order on the Cash Management Motion reflects an agreement between the Debtor and the Committee to provide the Committee with detailed information regarding the Debtor's Cash Management System.  As with insurance, if an issue with the Debtor's bank accounts were to arise, the Committee will be in a position to address it, mitigating any risk to the estate.

38.     Finally, the U.S. Trustee has noted that it has yet to receive confirmation from People's United Bank, N.A. ("PUB") that the Debtor's accounts have been designated as debtor-in-possession accounts.  PUB's counsel advised counsel for the Debtor by email that its accounts have been designated as debtor-in-possession accounts.  This email confirmation alone appears to be insufficient for the U.S. Trustee.  While counsel for PUB's indicated that PUB had so designate the accounts, it has thus far not provided the Debtor with any additional evidence of same, despite multiple requests.  PUB's lack of responsiveness, however, is not grounds to deny the Cash Management Motion.  And the Debtor is amenable to including language in the Final

Order requiring PUB to provide proof of such designation to the U.S. Trustee.

39. For the reasons set forth herein, the Court should overrule the U.S. Trustee's Objections and enter the proposed Final Order on the Cash Management Motion.

### III. The Utility Motion

40. The Utility Motion seeks to implement procedures to protect the Debtor from a major disruption in its ability to reorganize while preserving the rights of Utility Providers to seek adequate assurance of payment under section 366.

41. At the original hearing on the Utility Motion, the Court questioned whether all Utility Providers had received notice of the Motion. The Debtor has confirmed that it did serve the Utility Motion on all Utility Providers that it is obligated to pay for Utility Services. Based on the Court's comments, the Debtor and its professionals identified all Utility Providers that may provide service to real estate owned by the Debtor, even if the Debtor isn't obligated to pay for the Utility Services provided. *See* Exhibit C to Notice of Entry of Second Interim Utility Order [Dkt. No. 181-1]. Those additional Utility Providers have been served with the Utility Motion and notice of the continued hearing.

42. Only one Utility Provider initially objected to the Utility Motion, but after working out a different form of adequate assurance, that objection was withdrawn. The U.S. Trustee also filed its Utility Objection, which it has declined to withdraw notwithstanding the facts that the only objecting Utility Provider has consented to the relief sought in the Motion and the proposed procedures are essentially identical to those previously approved by this Court. After supplemental service of the Utility Motion, the Connecticut Light and Power Company d/b/a/ Eversource ("Eversource") filed an objection to the form of Final Order. It its objection, Eversource notes that the Debtor is not currently its customer. Eversource has asked that the

14

proposed order provide that the Utility Service List can only be amended with Court approval after the filing of a noticed motion. The Debtor and the Committee have agreed to this revision, which is reflected in the proposed Final Order.

43. In its Utility Objection, the U.S. Trustee argues that the proposed procedures supplant the right of Utility Providers under section 366 to make an initial demand for their version of adequate assurance. That is not accurate and is also not what is required under section 366. Section 366(b) and (c)(2) require only that the Debtor furnish a form of adequate assurance—it does not specify how a utility provider can object to the proposed adequate assurance or what is to happen if it finds the proposed adequate assurance unacceptable. In this case, the Utility Motion details the proposed adequate assurance of payment put forward by the Debtor and gives each Utility Provider the opportunity to assert what it may think a more appropriate form is. As is set forth in the Utility Motion, courts around the country have determined they have authority to enter such procedures and have in fact entered procedures like the ones proposed by the Debtor. Utility Motion at ¶ 33. The U.S. Trustee's reading of section 366 is at odds with the vast majority of courts that have addressed this issue (and the U.S. Trustee did not cite any cases prohibiting the entry of procedures such as the ones set forth herein).

44. The procedures originally described in the Utility Motion were based upon procedures approved by this Court in the *Carla's Pasta* case over the objection of creditors. Utility Motion at ¶ 33; *In re Carla's Pasta, Inc.*, No. 21-20111-JJT (Bankr. D. Conn. March 1, 2021) [ECF No. 190] (approving procedures substantially similar to those proposed herein with an adequate assurance deposit based on partial month's estimated utilities). The Debtor chose these procedures specifically to avoid objections and expensive litigation over what it believed would be an unobjectionable motion that would meet the approval of both the Court and the UST.

45. The only substantive difference between the procedures approved in *Carla's Pasta* and those set forth in the Utility Motion is the default form of adequate assurance proposed. In *Carla's Pasta*, this default adequate assurance took the form of payment of prepetition amounts due and owing to utility providers and the creation of an adequate assurance reserve account funded with approximately two weeks' worth of service charges per utility provider. In this case, because of small number of Utility Providers identified and the de minimis reserve that would be required, the only form of adequate assurance proposed by the Debtor was the payment of prepetition amounts, including any Gap Period Obligations owed. All other procedures remained the same—the intent being that a Utility Provider's substantive right to adequate assurance of payment would not be impaired. The Utility Motion puts a process in place for Utility Providers and the Debtor to work out appropriate adequate assurance, or if necessary, bring the issue before the Court, all while avoiding the draconian impact that a sudden utility shut off might have.

46. Based on the concerns raised by the Court at the original hearing on the Utility Motion, and in consultation with the Committee, the Debtor has made several revisions to the adequate assurance procedures, which are reflected in the proposed Final Order on the Utility Motion. First, the Debtor has incorporated the adequate assurance reserve account provisions from the *Carla's Pasta* case and is prepared to deposit approximately $2,400 into a segregated account, which represents two weeks' worth of utility charges (this amount excludes NDPU, which has been provided its own adequate assurance deposit based upon the parties' resolution of the NDPU objection). Second, the Debtor has capped the amount of prepetition debt that will be paid to each Utility Provider at one month's average service charges. The exact amounts of the deposit and the cap for each Utility Provider are set forth in the Utility Service List attached to the Final Order on the Utility Motion, which is attached to the the Notice of Proposed Orders

filed contemporaneously herewith. And third, the Debtor made changes to the procedures themselves to further clarify that they are intended only to implement section 366 and not to alter a Utility Provider's right to adequate assurance of payment.

47. Based on the above, the Debtor respectfully requests that the Court enter the proposed Final Order on the Utility Motion.

### IV. The Confidentiality Motion

48. In the Interim Order on the Confidentiality Motion, the Court authorized and directed the Debtor to implement certain Confidentiality Procedures, serve the Notice of Commencement on parties-in-interest, and publish the Notice of Commencement.

49. In accordance with that Interim Order, the Debtor has complied with the Confidentiality Procedures, providing unredacted copies of redacted filings when required. The Debtor has also served and published the Notice of Commencement as required.

50. Based upon the Court's comments at the initial hearing on the Confidentiality Motion the Debtor took some additional steps beyond those required by the Interim Order to ensure all parties in interest receive proper notice. For example, the Debtor obtained the services of a translator to translate the Notice of Commencement into Spanish. The Hispanic Ministry has posted this on their webpage (https://es.hispanicministrynorwich.com/) and shared it with the priests, deacons, and sisters of the parishes that serve the Spanish speaking population, including:

   a. Sagrado Corazon Windham CT;
   b. St. Francis of Middletown CT;
   c. St. Mary Star of the Sea New London CT;
   d. St. Mary of the Visitation Clinton CT; and
   e. St. Mary of Norwich CT.

51. In accordance with the Interim Order on the Confidentiality Motion, the Notice of Commencement was published in the following publications on the following dates:

      a. USA Today – 8/5/2021
      b. The Norwich Bulletin – 8/5/2021
      c. New Haven Register – 8/5/2021
      d. Hartford Courant – 8/5/2021
      e. The Day – 8/5/2021
      f. National Catholic Register – 8/29/2021 (only tear sheet available at time of filing – awaiting on affidavit of publication)
      g. National Catholic Reporter – 9/3/2021 (scheduled date – Epiq is still waiting on confirmation that this publication ran)

*See* Proofs of Publication filed August 23, 2021 [Dkt. No. 169] and September 1, 2021 [Dkt. No. 186].

52. In addition to the publications listed above, the Debtor and the Committee have agreed (as is reflected in the proposed Final Order) to publish the Notice of Commencement in three additional publications: the Manchester Journal-Inquirer, the Middletown Press, and the Willimantic Chronicle.

53. In addition to publishing the Notice of Commencement in various publications and on the Diocese's website, social medial, and Case Website, the Diocese also published information about the Chapter 11 case, including a link to the Case Website, in its *Four County Catholic* newsletter, which reaches approximately 15,000 homes, and its email newsletter, which reaches 5,000.

54. Based upon the information provided above, the Debtor asserts that it has met the requirements for entry of a Final Order on the Confidentiality Motion.

55. Accordingly, the Debtor respectfully requests that the Court enter the proposed Final Order on the Confidentiality Motion.

## CONCLUSION

56. The Debtor has met its burden with respect to each element of the relief sought in each of the Motions, and the proposed Final Orders, which have the support of the Committee, are necessary to insure a successful reorganization. Accordingly, the Debtor respectfully requests

that the Court grant the Motions, overrule all Objections, and enter the Final Orders.

| | |
|---|---|
| Dated: Hartford, CT<br>September 8, 2021 | */s/  Patrick M. Birney*<br>Patrick M. Birney (CT No. 19875)<br>Andrew A. DePeau (CT No. 30051)<br>Annecca H. Smith (admitted *pro hac vice*)<br>**ROBINSON & COLE LLP**<br>280 Trumbull Street<br>Hartford, CT 06103<br>Telephone:  (860) 275-8275<br>Facsimile:  (860) 275-8299<br>E-mail:  pbirney@rc.com<br>           adepeau@rc.com<br>           asmith@rc.com<br><br>-and-<br><br>Louis T. DeLucia (admitted *pro hac vice*)<br>Alyson M. Fiedler (admitted *pro hac vice*)<br>**ICE MILLER LLP**<br>1500 Broadway, 29th Floor<br>New York, NY 10036<br>Telephone: (212) 824-4940<br>Facsimile: (212) 824-4982<br>E-Mail:  louis.delucia@icemiller.com<br>            alyson.fiedler@icemiller.com<br><br>*Proposed Counsel to the Debtor*<br>*and Debtor-in-Possession* |

## **CERTIFICATE OF SERVICE**

I hereby certify that on September 8, 2021, a copy of the foregoing motion and the exhibits thereto were filed electronically and shall be served as required by Local Bankruptcy Rule 9013-2(b), with notice of this filing being sent by email to all parties who received service of each Motion by operation of the court's electronic filing system or by First Class U.S. mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties in interest may access this document through the court's CM/ECF System.

*/s/ Patrick M. Birney*
Patrick M. Birney