**UNITED STATES BANKRUPTCY COURT
DISTRICT OF CONNECTICUT
HARTFORD DIVISION**

| | |
|---|---|
| In Re:<br><br>THE NORWICH ROMAN CATHOLIC DIOCESAN CORPORATION,<br><br>Debtor. | Chapter 11<br><br>Case No. 21-20687 (JJT) |

**OBJECTION OF THE OFFICIAL COMMITTEE OF UNSECURED
CREDITORS TO THE DEBTOR'S MOTION FOR ENTRY OF AN
ORDER EXTENDING ITS EXCLUSIVITY PERIOD FOR THE FILING
AND SOLICITATION OF ACCEPTANCE OF A CHAPTER 11 PLAN**

The Official Committee of Unsecured Creditors (the "Committee") in the above captioned bankruptcy case, by and through its undersigned counsel, Zeisler & Zeisler, P.C., hereby objects to the Debtor's Motion for Entry of an Order Extending Its Exclusivity Period for the Filing and Solicitation of Acceptance of a Chapter 11 Plan (ECF Doc. No. 330, the "Exclusivity Motion"). The Exclusivity Motion should be denied because the Norwich Roman Catholic Diocesan Corporation (the "Debtor") has grossly mismanaged, or simply failed to manage, its bankruptcy estate and this bankruptcy case, and such failure will be a major obstacle to a successful reorganization in this case. As further detailed below, the Debtor's professionals incurred almost $1.2 million in fees and expenses in the first eleven weeks of this bankruptcy case, an average of approximately $110,000 per week. Given the tasks accomplished through September 30 in the case, this seems impossible. In the First Monthly Statements (as defined below) filed on November 1 for certain of the Debtor's professionals, the Debtor indicates that it has no objection to the fees incurred by its professionals. Considering the amount of fees, the tasks accomplished and the period of time involved, this too seems impossible. Given the lack of objection by the Debtor, there is no reason

1

to believe that the Debtor intends to take action to curb the rate at which it's professionals are incurring fees. This is notwithstanding that (1) the Debtor has stated publicly and to this Court that it filed this case so that it could treat survivors of sexual abuse fairly, (2) the Debtor has stated to this Court and to the Committee that this is a "thin" case and (3) the Debtor's annual gross revenue and expenses are approximately $14.5 million, *i.e.*, this case will be paid for from assets that would otherwise be available to pay the claims of creditors. The Committee does not believe that the Debtor's professionals can or will change the way that they are staffing and working this case and assumes that the Debtor's professionals have incurred at least an additional $400,000 to $500,000 in fees since September 30. At the rate the Debtor's professionals are incurring fees, any potential distribution to creditors in this case—creditors who are almost exclusively survivors of sexual abuse when minors by agents of the Debtor—will be rapidly and massively diminished. This case needs to take a drastic turn to prevent that from happening. The Debtor's exclusivity should terminate on November 12, 2021, so that the Committee may quickly file and seek confirmation of a plan that will get this case and what assets remain out of the control of the Debtor. In support of its objection, the Committee respectfully states as follows:

1. On July 15, 2021 (the "Petition Date"), the Debtor commenced this case by filing a petition under Chapter 11 title 11 of the United States Code (the "Bankruptcy Code") with this Court.

2. The Debtor is a Roman Catholic diocese in Connecticut and a small part of New York founded in 1953 by Pope Pius XII, encompassing Middlesex, New London, Windham and Tolland counties in Connecticut, as well as Fisher Island, New York. The Most Reverend Michael R. Cote, D.D. has been the Bishop of the Diocese since May 14, 2003. There are fifty-one parishes within the Debtor's geographic territory, as well as three high schools and various other ministries.

The Debtor's gross revenue for the fiscal year ended June 30, 2020 was approximately $14,340,626.00, while expenses before taking into account certain non-recurring activity were approximately $14,155,607.00. *See* ECF Doc. No. 12, at ¶¶ 5, 15, 41, 42.

3.      The Debtor has asserted that it commenced this case because it was named as a defendant in approximately fifty-four lawsuits brought by former Mount Saint John Academy students alleging that they were sexually abused while attending the school.

4.      On the Petition Date, the Debtor issued a press release quoting Bishop Cote as stating: "A Chapter 11 bankruptcy will allow the Court to centralize these lawsuits, *as well as help the Diocese manage its litigation expenses* and preserve adequate financial resources for all essential ministries. *If the Diocese had not filed for bankruptcy, it would be unable to ensure that all of the individuals who file claims are treated fairly and have equal access to the funds available*." Press Release, The Roman Catholic Diocese of Norwich, Norwich Diocese Files Chapter 11 to Ensure Fairness and Equity for Abuse Survivors, Manage Litigation Expenses & Continue Essential Ministries (July 15, 2021), https://www.norwichdiocese.org/Portals/dioceseofnorwich/CMAdmin/DIOCESE%20FILES%20CHAPTER%2011%20Press%20Release%20July%2012%202021%20FINAL%202_1.pdf (emphasis added). In a declaration filed on July 16, 2021, Reverend Peter J. Langevin, the Chancellor of the Debtor, stated that "[t]he Diocese does not seek Chapter 11 relief to evade responsibility for any asserted abuse claims or for any decisions made by Diocesan authorities when addressing that misconduct." ECF Doc. No. 12, at ¶12.

5.      On August 20, 2021, the Court entered an order authorizing the Debtor to retain EPIQ Corporate Restructuring, LLC ("EPIQ"), as its claims and noticing agent. ECF Doc. No. 168. The order approving EPIQ's retention provides that the Debtor is authorized to pay EPIQ its monthly invoices without need for EPIQ to file fee applications or otherwise seek Court approval.

EPIQ is required to serve its monthly invoices on the US Trustee and the Committee, and has done so, albeit belatedly. EPIQ billed the Debtor $43,350.08 in fees for the two weeks of July, $31,276.25 in fees for August and $32,043.70 in fees for September, for a total of **$106,670.03** for the period from the Petition Date through September 30, 2021. Notwithstanding that EPIQ is a Retained Professional within the meaning of the Court's Monthly Fee Order (as defined below), to date EPIQ has not filed a Monthly Statement with the Court.

6.      On September 9, 2021, the Court held a hearing on, among other matters, the Debtor's applications to retain Ice Miller LLP ("Ice Miller") and Robinson & Cole LLP ("Robinson & Cole") as its attorneys and B. Riley Financial Advisory Services ("B. Riley") as its financial advisor. In the Debtor's application to retain Ice Miller it was disclosed that Ice Miller was paid **$337,848.50** prior to the Petition Date in contemplation of and in connection with preparation for the bankruptcy filing. In the Debtor's application to retain Robinson & Cole it was disclosed that Robinson & Cole was paid **$50,000.00** prior to the Petition Date in contemplation of and in connection with preparation for the bankruptcy filing. At the September 9 hearing, the Court made clear that it was concerned about the level of administrative expenses in this case and that it expected the Debtor's lead counsel to ensure that the Debtor's professionals are deployed in in a way to minimize the level of administrative expenses.

7.      On September 17, 2021, the Court entered orders approving the retention of Ice Miller as attorneys for the Debtor (ECF Doc. No. 272) and B. Riley as financial advisor to the Debtor (ECF Doc. No. 271). On October 25, 2021, the Court entered an order approving the retention of Robinson & Cole as attorneys for the Debtor (ECF Doc. No. 321).

8.      On October 18, 2021, the Court entered its Order Granting Debtor's Motion for Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses for

Professionals (ECF Doc. No. 314, the "Monthly Fee Order"). Pursuant to the Monthly Fee Order, Retained Professionals (as defined in the motion seeking entry of the Monthly Fee Order) may file and serve a monthly statement for fees and expenses incurred in the prior month. The Monthly Fee Order provides that the first Monthly Statement (a "First Monthly Statement") shall cover the period from the Petition Date through September 30, 2021. A Retained Professional may be paid 70% of its fees and 100% of its expenses pursuant to a procedure set forth in the Monthly Fee Order, with the balance of the fees to be a holdback.

9.   On November 1, 2021, Ice Miller filed its First Monthly Statement. ECF Doc. ID #338. Ice Miller's First Monthly Statement indicates that Ice Miller incurred **$532,748.50** in fees from July 15, 2021, through September 30, 2021. The four largest categories in Ice Miller's First Monthly Statement are case administration for $282,235.00, first and second day motions for $135,135.00, responding to US Trustee requests for $48,459.00, and firm and other employment and fee applications for $32,660.00. Essentially all of the time in this last category was spent on retention applications, as no fee applications were filed during this period. In a statement attached to Ice Miller's First Monthly Statement, Karen Huff, a representative of the Debtor, states that she reviewed Ice Miller's First Monthly Statement and does not object to the fees set forth therein.

10.   On November 1, 2021, B. Riley filed its First Monthly Statement. ECF Doc. ID #337. B. Riley's First Monthly Statement indicates that B. Riley incurred **$342,916.50** in fees from July 15, 2021, through September 30, 2021. The five largest categories in B. Riley's First Monthly Statement are business analysis for $102,852.50, analysis on behalf of U.S. Trustee for $90,256.50, schedules and statements for $63,705.50, case administration for $29,657.00, and first- and second-day motions for $23,246.00. In a statement attached to B. Riley's First Monthly Statement,

Karen Huff, a representative of the Debtor, states that she reviewed B. Riley's First Monthly Statement and does not object to the fees set forth therein.

11. On November 1, 2021, Robinson & Cole filed its First Monthly Statement. ECF Doc. ID #335. Robinson & Cole's First Monthly Statement indicates that it incurred **$171,986.50** in fees from July 15, 2021, through September 30, 2021. The three largest categories in Robinson & Cole's First Monthly Statement are case administration for $37,906.00, first and second day motions for $29,972.50, and firm and other employment and fee applications for $57,893.50. As with Ice Miller, essentially all of the time in this last category was spent on retention applications, as no fee applications were filed during this period. In a statement attached to Robinson & Cole's First Monthly Statement, Karen Huff, a representative of the Debtor, states that she reviewed Robinson & Cole's First Monthly Statement and does not object to the fees set forth therein.

12. Together, in the first eleven weeks of this case, Ice Miller, B. Riley, EPIQ, and Robinson & Cole incurred fees of **$1,154,321**. Of this amount, **$349,798.00** was for case administration, **$93,063.50** was on retention applications, **$188,353.50** was on first- and second-day motions (excluding the retention applications), and **$202,421.00** was on completing schedules and responding to information requests from the U.S. Trustee.

13. On November 1, 2021, the Debtor filed the Exclusivity Motion, seeking a 120-day extension of its exclusive periods under Bankruptcy Code section 1121 to file and solicit acceptance of a plan. In the Exclusivity Motion, the Debtor states:

> Progress made by the Debtor to date includes, among other things: (i) obtaining vital first- and second-day relief to provide for a smooth transition into chapter 11 and establish procedures for the efficient administration of this chapter 11 case; (ii) completing and filing the Debtor's schedules of assets and liabilities and statement of financial affairs; (iii) participating in the meeting of creditors under section 341 of the Bankruptcy Code; (iv) completing and filing monthly operating and reconciliation reports and complying with UST and Committee requests for documents and information, including complying with ongoing Rule 2004

discovery propounded by the Committee; and (v) extensively negotiating the form, content and timing of a complex proof of claim bar date procedure. The Debtor accomplished a great deal in the first few months of this case and is well-positioned for the next phase of these proceedings.

14. Bankruptcy Code section 1121 provides in relevant part:

(b) Except as otherwise provided in this section, only the debtor may file a plan until after 120 days after the date of the order for relief under this chapter.
(c) Any party in interest, including the debtor, the trustee, a creditors' committee, an equity security holders' committee, a creditor, an equity security holder, or any indenture trustee, may file a plan if and only if—
….
(2) the debtor has not filed a plan before 120 days after the date of the order for relief under this chapter; or
(3) the debtor has not filed a plan that has been accepted, before 180 days after the date of the order for relief under this chapter, by each class of claims or interests that is impaired under the plan.
(d)(1) Subject to paragraph (2), on request of a party in interest made within the respective periods specified in subsections (b) and (c) of this section and after notice and a hearing, the court may for cause reduce or increase the 120-day period or the 180-day period referred to in this section.

15. The party seeking an extension of exclusivity has the burden of proving cause. *E.g., In re Borders Group, Inc.*, 460 B.R. 818, 821 (Bankr. S.D.N.Y. 2011); *In re R.G. Pharmacy, Inc.*, 374 B.R. 484, 487 (Bankr. D. Conn. 2007). Courts have not hesitated to deny a first motion to extend exclusivity where the circumstances warrant. *E.g., In re Borders Group, Inc.*, 460 B.R. at 821 (granting extension but stating that "[a]lthough this is the Debtors' first request to extend their Exclusive Periods, that fact, by itself, does not constitute cause for an extension."); *In re Gen. Bearing Corp.*, 136 B.R. 361 (Bankr. S.D.N.Y. 1992); *In re All Season Indus., Inc.*, 121 B.R. 1002 (Bankr. N.D. Ind. 1990); *In re Am. Fed'n of Television & Radio Artists*, 30 B.R. 772 (Bankr. S.D.N.Y. 1983).

16. In determining whether there is cause to extend the exclusivity period, some courts have looked to the following nine factors: (1) the size and complexity of the case; (2) the necessity for sufficient time to permit the debtor to negotiate a plan of reorganization

and prepare adequate information; (3) the existence of good faith progress toward reorganization; (4) the fact that the debtor is paying its bills as they become due; (5) whether the debtor has demonstrated reasonable prospects for filing a viable plan; (6) whether the debtor has made progress in negotiations with its creditors; (7) the amount of time which has elapsed in the case; (8) whether the debtor is seeking an extension of exclusivity in order to pressure creditors to submit to the debtor's reorganization demands; and (9) whether an unresolved contingency exists. *E.g., In re Borders Group, Inc.*, 460 B.R. at 822; *In re Adelphia Communications Corp.*, 352 B.R. 578, 587 (Bankr. S.D.N.Y. 2006); *In re R.G. Pharmacy, Inc.*, 374 B.R. at 487; 7 Collier on Bankruptcy ¶ 1121.06[2], at 1121-11 (16th ed. 2020). Other courts have relied on the following four factors: (1) the debtor's use of the exclusivity period to force creditors to accept an unsatisfactory or unconfirmable plan; (2) the debtor's delay in filing a plan; (3) gross mismanagement of the debtor's operations; and (4) acrimonious relations between the debtor's principals. *In re Fansteel, Inc.*, 2017 Bankr.LEXIS 551, at [*3] (Bankr. S.D. Iowa, February 28, 2017); *In re Situation Management Systems, Inc.*, 252 B.R. 859, 863 (Bankr. D. Mass. 2000); *In re Texaco, Inc.*, 81 B.R. 806, 812 (Bankr. S.D.N.Y. 1988) ("[I]n those cases where the exclusivity periods were reduced, factors such as gross mismanagement of the debtor's operations … were major obstacles to a successful reorganization and were regarded as 'cause' for the reduction of the exclusivity periods."); 7 Collier on Bankruptcy ¶ 1121.06[2], at 1121-11 to 1121-12 (16th ed. 2020). Common in these lists of factors and relevant here, courts have found that an extension of exclusivity should not be granted, or that exclusivity should be terminated, where a debtor's mismanagement of its estate creates

a major obstacle to filing a viable plan and where a debtor is using exclusivity to pressure creditors to agree to an unsatisfactory plan.

17. In defining a debtor in possession's obligation to properly manage its estate, the Supreme Court has held that "if a debtor remains in possession—that is, if a trustee is not appointed—the debtor's directors bear essentially the same fiduciary obligation to creditors … as would the trustee for a debtor out of possession." *Commodity Futures Trading Commission v. Weintraub*, 471 U.S. 343, 355 (1985).

> A debtor in possession owes the same fiduciary duty as a trustee to the creditors and the estate. The trustee's fiduciary obligations also fall upon the officers and managing employees who conduct the debtor in possession's affairs. Indeed, the willingness to leave the debtor in possession in charge of its assets rests upon the assurance that its managers will carry out these fiduciary responsibilities. *As fiduciaries, the debtor in possession and its managers are obligated to treat all parties to the case fairly, maximize the value of the estate, and protect and conserve the debtor's property. These duties parallel those imposed by [Bankruptcy Code] section 549: to avoid depletion of the estate.*

*In re Centennial Textiles*, 227 B.R. 606, 612 (Bankr. S.D.N.Y. 1998) (citations omitted, emphasis added). *See also In re Reynolds*, 2018 Bankr.LEXIS 1406, [*9] (Bankr. D. Utah May 9, 2018) ("The trustee has the ultimate responsibility to see that estates are economically administered for the benefit of unsecured creditors. This includes supervising and managing estate professionals to verify that their services are necessary and reasonably likely to benefit unsecured creditors."); *In re Abraham*, 163 B.R. 772, 779 (Bankr. W.D. Tex. 1994) ("There is one trustee 'duty' that can never be delegated, and for which the trustee must always be held accountable. … The trustee and only the trustee is ultimately responsible for the administration of the estate, including most significantly the safeguarding and responsible disposition of estate assets and their distribution to creditors. We expect the trustee to make sure that all those persons to whom duties have been delegated do their jobs right—or else.").

18.    Under no conceivable standard of reasonableness can $1,154,321 in fees incurred over the course of eleven weeks be justified in a case of this size and complexity given what has been accomplished to date. This is not a large case—as noted above, the Debtor's gross revenue and expenses are approximately $14.5 million. The Committee agrees with some of what the Debtor claims in the Exclusivity Motion has been accomplished in the case to date. The Debtor was able to get five first day motions—wages, cash management, noticing procedures, insurance and utilities—granted, several pro hac vice motions granted, four retention applications granted, and the motion to approve the Monthly Fee Order filed. The problem is that the Debtor's professionals incurred $281,417.00 in fees to accomplish these tasks. The Debtor was able to complete and file the Debtor's schedules of assets and liabilities and statement of financial affairs, participate in the meeting of creditors under section 341 of the Bankruptcy Code and comply with US Trustee requests for documents and information. The problem is that the Debtor's professionals incurred more than $200,000.00 in fees to accomplish that. This is not a case where a debtor's professionals were retained shortly before filing and needed to expend substantial time getting up to speed on the debtor's affairs after filing. Ice Miller was retained by the Debtor approximately one year prior to the Petition Date and as noted above the Debtor's attorneys incurred approximately $388,000 in fees prior to the Petition Date specifically in contemplation of and to prepare for the filing. In the undersigned's experience, in a case of this size, to get to the point that this case is at, Debtor's professional fees should be at a fraction (one-fifth or less) of what has been incurred here.

19.    That the Debtor does not object to the fees incurred by its professionals through September indicates that (a) the Debtor does not understand what is going on, (b) the Debtor does not understand that it has a fiduciary obligation to minimize the fees incurred in the case, (c) the

Debtor does not care what level of professional fees is incurred because it understands that the money being spent would otherwise go to creditors, (d) the Debtor consciously wants its professional fees to be as high as they are in order to pressure creditors to quickly agree to a plan or face the risk that a substantial portion of the assets available to pay claims will be eaten up by professional fees, or (e) a combination of the forgoing. It simply is not possible that the Debtor would support incurring $110,000.00 per week in professional fees unless one or a combination of the foregoing was not true.

20. As noted above, the Debtor essentially breaks even on an annual basis, so that a distribution from the Debtor to creditors in this case will come in large part if not entirely from the Debtor's available assets. At the rate that the Debtor's professionals are incurring fees, the Debtor's available assets will rapidly be diminished and the accrual of administrative expenses will quickly become a major obstacle to a fair plan in this case. Given the level of fees relative to the tasks accomplished thus far, the Committee does not trust the Debtor and its professionals to formulate and seek confirmation of a plan without incurring another seven-figure sum of fees in doing so, a multiple of what is necessary and appropriate in a case of this size.

21. Notwithstanding the Debtor's public statements that it is not trying to evade responsibility for abuse claims and that it wants to treat survivors of abuse fairly, the Debtor is rapidly spending for its own benefit and purposes money that should be available to sexual abuse survivors. The Committee submits that the Debtor is seeking to improperly use exclusivity to pressure creditors to agree to less than what is fair in the facts and circumstances. Essentially, if creditors do not quickly reach a deal, they face the risk that the Debtor's professionals will rapidly consume a very large portion of what is available to pay them.

22.     Given the rate at which the Debtor's professionals are consuming assets, this case and the Debtor's assets must be taken out of the hands of the Debtor as soon as possible. The case is at a critical point. Based on the Debtor's massive failure to properly manage this case and the Debtor's assets, the Committee may consider seeking the appointment of a trustee, but is concerned that, *inter alia*, at the rate that the Debtor's professionals incur fees, litigation on a motion to appoint a trustee could cost hundreds of thousands of dollars. Thus, the Committee is objecting to an extension of exclusivity so that it may quickly and efficiently seek confirmation of a plan that will place the Debtor's available assets in a trust-type entity and lodge with that entity the responsibility to *efficiently* resolve claims and pursue and liquidate assets, including insurance coverage. Given the rate at which the Debtor's professionals are consuming assets, this cannot wait until a proof of claim bar date has passed.

23.     The Debtor's failure to manage its professional fees, and failure to object to the professional fees detailed in the First Monthly Statements filed by the Debtor's professionals, constitutes a breach by the Debtor of one of the chief among a debtor in possession's fiduciary obligations: to manage its assets in a way that maximizes their value. The Debtor appears to have simply abdicated that duty or is consciously pursuing a strategy of running up administrative expenses for the purpose of pressuring creditors to accept less than they should. Given that failure to properly manage this case and the conscious improper purposes, there is no way that the Debtor can meet its burden of demonstrating that it should be granted an extension of its time to file and seek confirmation of a plan.

**WHEREFORE**, the Committee respectfully requests that this Court sustain this objection, deny the Exclusivity Motion, and grant the Committee such other relief as is just.

Dated this 5th day of November, 2021.

        THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS FOR THE NORWICH ROMAN CATHOLIC DIOCESAN CORPORATION

By: */s/ Eric Henzy*
    Eric Henzy (ct12849)
    Stephen M. Kindseth (ct14640)
    Christopher H. Blau (ct30120)
    ZEISLER & ZEISLER, P.C.
    10 Middle Street, 15th floor
    Bridgeport, CT 06605
    Telephone: (203) 368-4234
    Email: ehenzy@zeislaw.com
           skindseth@zeislaw.com
           cblau@zeislaw.com