## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF CONNECTICUT
## HARTFORD DIVISION

| | |
|---|---|
| In re:<br><br>THE NORWICH ROMAN CATHOLIC<br>DIOCESAN CORPORATION,[1]<br><br>          Debtor. | Chapter 11<br><br>Case No: 21-20687 (JJT)<br><br>December 13, 2021 |

### PRELIMINARY OMNIBUS REPLY OF DEBTOR'S PROFESSIONALS TO THE UNITED STATES TRUSTEE'S OMNIBUS OBJECTION TO THEIR FIRST INTERIM FEE APPLICATIONS

The Norwich Roman Catholic Diocesan Corporation, debtor and debtor-in-possession in the above-captioned chapter 11 case (the "Debtor" or the "Diocese"), along with Ice Miller LLP ("Ice Miller"), Robinson & Cole LLP ("R+C"), GlassRatner Advisory & Capital Group, LLC dba B. Riley Advisory Services ("B. Riley") and Brown Jacobson P.C. ("Brown Jacobson") (collectively, the "Debtor's Professionals") hereby file this preliminary omnibus reply (the "Reply") in support of their respective first interim fee applications [Dkt. Nos. 372, 373, 374 and 375] (the "First Interim Fee Applications"), and in reply to the U.S. Trustee's Omnibus Objection to the First Interim Fee Applications of Debtor's Professionals [Dkt. No. 393] (the "Omnibus Objection"). For their Reply, the Debtor's Professionals state as follows:

### PROCEDURAL BACKGROUND

1.  On October 18, 2021, the Court entered the *Order Granting Debtor's Motion for Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses for Professionals* [Dkt. No. 314] (the "Interim Fee Procedures Order").

---

[1] The Debtor in this chapter 11 case is The Norwich Roman Catholic Diocesan Corporation, a/k/a The Roman Catholic Diocese of Norwich. The last four digits of the Debtor's federal tax identification number are 7373.

2.     In the event that a monthly statement for professional services rendered and reimbursement of expenses (a "Statement" as defined in the Interim Fee Procedures Order) is not objected to, the Debtor would be "authorized and directed to pay the Retained Professionals an amount equal to 70 PERCENT (70%) of the fees and 100 percent (100%) of the expenses requested . . . ."  Interim Fee Procedures Order at 2, ¶ 2(d).  And in the event of an objection that could not be resolved between the objecting party and the Retained Professional (as defined therein), the matter could be brought before the Court or the Retained Professional could forego payment of the amount at dispute "until the next interim or final fee application hearing at which time the Court will consider the Objection, if requested by the parties."  Interim Fee Procedures Order at 2, ¶ 2(e).

3.     The Interim Fee Procedures Order also called for the first Interim Fee Applications (as defined therein) to be filed with the Court by November 15, 2021, covering "all fees incurred from the Petition Date through October 31, 2021."  Interim Fee Procedures Order at 3, ¶ 2(g).

4.     During the period from November 1 to 15, 2021, the Debtor's Professionals filed their: (a) First Monthly Statements [Dkt. Nos. 335, 336, 337, and 338, 352 and 367], each covering the period from July 15, 2021 (the "Petition Date") through September 30, 2021; (b) their Second Monthly Statements [Dkt. Nos. 368, 369, 370 and 371], each covering the period of October 1 through 31, 2021; and (c) their First Interim Fee Applications.

5.     On December 7, 2021, the U.S. Trustee filed the Omnibus Objection criticizing certain aspects of the Monthly Fee Statements and First Interim Fee Applications, but primarily objecting that the fees are disproportionate to the Diocese's "net income" for the same period.

6.     On December 8, 2021, the Official Committee of Unsecured Creditors (the "Committee") and Diocese filed the *Joint Statement of the Official Committee of Unsecured*

Error! Unknown document property name.

*Creditors and the Norwich Roman Catholic Diocesan Corporation Regarding Pending Interim Fee Applications* [Docket. No. 395] (the "Joint Statement"), which provides that rather than litigate the Committee's and Debtor's objections to each other's professionals' fees, and "in the hopes of resolving objections to fees in the context of an overall resolution of the issues presented in this case, while at the same time preserving each parties' various rights and interests," the Committee and Debtor "reached an agreement on an interim process" as set forth therein.  Joint Statement at 5, ¶ 8.

7.      On December 9, 2021, the Court entered a docket text Order on Interim Fee Applications [Dkt. No. 399], which provides that the hearings on December 15, 2021 at 2:00 p.m., on the various First Interim Fee Applications, "will proceed, at least on a preliminary basis, to consider the proposed protocol and requests of the Official Committee of Unsecured Creditors and to broadly address the questions of how can the Debtor pay or justifiably incur such fees and how might the case move forward constructively without substantial or disproportionate fees which may otherwise dissipate or dis-enable the Chapter 11 Estate."  The Order on Interim Fee Applications [Dkt. No. 399] further provides that "[s]ubstantive objections to such fee applications, not addressed at this preliminary hearing, will be reserved for a continued hearing."

## RESPONSES

### I.    Professional Fees in Diocesan Bankruptcies

8.      The economic "stakeholders" in this case, including the Committee, have agreed on a protocol for the handling of professional fees in this case—governing *outstanding* and *future* fees.  The U.S. Trustee, who has no financial stake in the outcome of the case, is the only party to object to the fees incurred by the Debtor's professionals (the parties agreed to reserve such rights to a later date as the case progresses).  While the U.S. Trustee certainly has some statutory "oversight" duties in chapter 11 cases (less so in cases like this one in which there is an active and

engaged Committee), the U.S. Trustee here is effectively "second guessing" the fiduciary discretion exercised by the Committee in agreeing to the protocol – despite having no stake in the outcome, and regardless of the time expended by all professionals in negotiating the protocol.

9.      In doing so, the U.S. Trustee largely relies upon an improper metric for evaluating whether to award professional fees—*i.e.*, comparing the Debtor's professional fees for the very *first* period of case with the Diocese's "net revenue" (disregarding that the Diocese is a **nonprofit** entity), creating the misimpression that the Diocese could face administrative insolvency (or is irresponsibly eroding the estate to the detriment of the estate's stakeholders—a fact plainly refuted by the protocol agreed to with the Committee). The U.S. Trustee is mistaken on this issue. Several points make this clear.

10.     First, the percentage of fees to net income is *not* a recognized or relevant metric, by itself, of the "reasonableness" of professional fees under 11 U.S.C. § 330(a)(1). Yet that is the implied assertion by the U.S. Trustee in its Omnibus Objection, even though the fees in this case are similar to other diocesan chapter 11 cases. Moreover, in two recent large chapter 11 cases filed in this jurisdiction, the debtor's professionals' fees <u>exceeded</u> the debtor's revenue during the *first* interim period, yet the U.S. Trustee did <u>not</u> object on those grounds in those cases.

11.     For instance, in *Carla's Pasta, Inc.*, the debtors' net income for the comparable period was -$3,911,458 yet this Court awarded professionals fees totaling $1,702,688.[2] The U.S. Trustee did not object to those monthly statements but did object to the final allowance of compensation. *See In re Carla's Pasta, Inc.*, Case No. 21-20111 (Bankr. D. Conn.), ECF No. 1136. However, its objection did not make any comparison between the fees requested and the debtors' net income.

---

[2] *See In re Carla's Pasta, Inc.*, Case No. 21-20111 (Jointly Administered) (Bankr. D. Conn.), ECF Nos. 524, 525, 534, 578, and 375, 415, 581, 393, 583, and 707.

4

12.    The same is true in the *O.W. Bunker Holding North America Inc.* case, where the debtors' net income was -$5,232,022, while the Court awarded fees of $2,549,559 without regard to the "net revenues" of the debtors.[3]

13.    And in other pending diocesan cases, the same is true.

14.    For example, in the *Rockville Center* case, the Debtor's "net receipts" were -$229,799 in the first interim period, but the total interim awarded Debtor's professional fees were $6,761,068.  In the *Catholic Diocese of Wilmington, Inc.* case, "net receipts" were $194,913, yet interim awarded Debtor's professional fees were $1,413,372.[4]

15.    Moreover, the U.S. Trustee compares "net" income, not overall total gross revenue, against the fees for the initial phase of this case, which are very often higher because of all the work required on the front-end of a chapter 11 filing.

16.    Second, given the non-profit nature of the Diocese, it is unavoidable that non-recurring professional fees, especially in the hectic on-set of a chapter 11 filing for a Diocese that has, essentially, a <u>one</u> person accounting staff, are going to exceed net income.  But this is not a persistent state of affairs and in no way equates to administrative insolvency; nor does it mean that a non-profit entity is not entitled to competent and experienced representation to shepherd it through the bankruptcy process.  **There is no known case or statutory basis to assert that professional fees may only be awarded, and are only "reasonable" if the debtor generates profit in excess of the fees that have been incurred—that is <u>not</u> the law.**

---

[3] *See In re O.W. Bunker Holding N. Am., Inc.*, Case No. 14-51720 (jointly administered) (Bankr. D. Conn.), ECF Nos. 547, 548, 549, and 589, 586, and 591.

[4] As evidenced by the chart that was previously attached as **Exhibit A** to the Debtor's *Brief in Support of First Motion to Extend its Exclusivity Period for the Filing and Solicitation of Acceptance of a Chapter 11 Plan and in Reply to the Objection of the Official Committee of Unsecured Creditors* [Dkt. No. 351], the fees incurred to-date in this case are commensurate with fees incurred for similar phases of similarly sized diocesan chapter 11 cases, especially the more recent filings in the Second Circuit (e.g., the *Buffalo, Rochester* and *Rockville* dioceses).  *See id.*

17.    The U.S. Trustee's argument is further refuted when other *facts*, known to the U.S. Trustee, are actually considered.    As the U.S. Trustee is aware, there is simply <u>no</u> risk of administrative insolvency as evidenced by the Debtor's balance sheet affixed to its Monthly Operating Report(s) ("<u>MORs</u>")—every month since filing.    The MORs disclose **assets** of approximately $25.5 million, and **liabilities** of $3.1 million (excluding contingent, unliquidated Survivor claims, represented by the Committee), of which only approximately $276,000 is secured debt.  [Docket Nos. 293, 313 and 389].  More than $11 million of the asset value is cash (some of which is donor restricted).

18.    Significantly, as demonstrated in the chart below, the Debtor's Professionals' fees have *decreased* since the filing of the case (and will likely continue to do so, until mediation or plan negotiations fully materialize)—evidencing that fees are <u>not</u> out-of-control, but are in line with how fees have been incurred in other cases, and are tempering over time.[5]



---

[5]  The Debtor understands that this is a principal reason the Committee agreed to the protocol and filed the Joint Statement—a recognition that the Debtor and its professionals are working to moderate expenses to the estate while pursuing their joint fiduciary duties to all stakeholders.

Error! Unknown document property name.

19.     Third, the U.S. Trustee's Objection attempts to paint a **false** picture of professionals out of control, which is simply not true.  Such arguments distract from the work needed to maximize creditor and Survivor recoveries and is simply counterproductive to the Diocese's goal of reorganizing under chapter 11.

20.     The Debtor's Professionals' retentions were approved, including the rates set forth in the retention agreements, albeit not without efforts to address a variety of objections by the U.S. Trustee (for which the U.S. Trustee now objects to a fee award for the time spent doing so). Nevertheless, as set forth in the recently filed Joint Statement, Ice Miller volunteered (it was <u>not</u> asked by the Committee or U.S. Trustee to do so), as part of a proposed protocol, to "discount *all* its fees by 10% for all services rendered to the Debtor in this bankruptcy case on and after December 1, 2021." *See* Joint Statement at 6, ¶ 8(g).[6]

21.     Fourth, the remainder of the Omnibus Objection asserts there are issues with particular details, such as the description of time-entry categories that reference efforts to respond to very detailed requests for information by the U.S. Trustee's Office, preparing schedules, the statement of financial affairs and monthly operating reports, along with other miscellaneous items. The Diocese and its professionals have an obligation to perform these services and have sought to do them as efficiently as possible under the circumstances; however, the Diocese having an in-house accounting staff of essentially one necessarily requires more work by the Debtor's Professionals.[7]  These particular items will be addressed, and perhaps for the benefit of the estate resolved consensually (should the U.S. Trustee entertain that approach), in the context of or in

---

[6]  Ice Miller LLP has no obligation to discount its rates here, but is doing so to benefit the estate, facilitate agreement with the Committee and Survivors on fees, and ultimately contribute directly to maximizing creditor and Survivor recoveries.  If the agreement reflected in the Joint Statement is disallowed, then so too is the discount.  It is hard to understand why the U.S. Trustee would risk the loss of such benefit to the estate and Survivors.

[7]  The Diocese is attempting to hire more staff, but is experiencing issues in hiring, not unlike many other segments of the economy at this time.

Error! Unknown document property name.

advance of a final hearing.[8]  But this does not mean that the Debtor's Professionals should await payment of fees, on an interim basis, in accordance with the procedures previously approved by this Court and the protocol agreed to with the Committee as set forth in the Joint Statement.

22.      Interim fees are routinely granted and expressly provided for by 11 U.S.C. § 331. Moreover, the very existence of section 331 in the Bankruptcy Code is Congressional acknowledgment that professionals, particularly the Debtor's Professionals, should not be put in the position of financing a reorganization—from becoming the "bank" for the estate—through deferrals of fee payments.  *See, e.g.*, *In re UNR Indus., Inc.*, 30 B.R. 613, 617 (Bankr. N.D. Ill. 1983) (noting that "the purpose of the interim compensation provision [section 331] is only to relieve attorneys from the economic burden of participating in lengthy and complex bankruptcy proceedings." (citing *In re Mansfield Tire & Rubber Co.*, 19 B.R. 125 (Bankr. N.D. Ohio 1981)). "[T]he goal is sustenance with the thought that final awards should reflect the Court's view of the overall value of the services."  *In re Pub. Serv. Co. of N.H.*, 93 B.R. 823, 827-28 (Bankr. D.N.H. 1988) (quoting *In re UNR Indus., Inc.*, 30 B.R. at 616-18)).

23.      The best way to limit the overall fees and expenses incurred by the Diocese in this bankruptcy case is to move through it expediently; a task made more difficult when rather than engaging in dialogue with the Debtor's Professionals to attempt to resolve any fee objections (as the Committee is doing, as evidenced by the proposed protocol in the Joint Statement), the U.S. Trustee has pursued a litigation-only approach, notwithstanding offers to meet and discuss by the Debtor's Professionals.[9]

---

[8]  As admonished in The Diocese of Rochester bankruptcy, billing issues should typically be resolved informally, without burdening the Court.  *See, e.g.*, Supp. and Mod. to Admin. Order Establishing Procedures for Interim Comp. and Reimbursement of Exp. for Professionals and Members of Off. Comm., *In re The Diocese of Rochester*, Case No. 19-20905-PRW (Bankr. W.D.N.Y. May 12, 2020), ECF No. 545.

[9]  The Interim Fee Procedures Order [Dkt. No. 314] requires that "[i]f any Notice Party objects to a Retained Professional's Statement, the objecting party shall . . . serve a written notice upon the Retained Professional . . . setting forth the precise nature of the objection and the amount at issue.  Thereafter, the objecting party and the Retained

8

24.    Finally, the Diocese is in discussion with various parties in interest to confirm commitments to plan funding that could generate more than $18 million in third-party contributions to a settlement of Survivor claims.  The Debtor's professionals need to be allowed the room (time and the opportunity) to maximize recoveries for all stakeholders, especially Survivors.  Handcuffing those who lead the charge in generating those recoveries is self-defeating.

25.    Section 330(a)(4)(A) of the Bankruptcy Code sets forth certain limitations on the award of compensation with respect to services that were unnecessarily duplicative, not reasonably likely to benefit the estate, or unnecessary to administration of the estate.  The Diocese respectfully submits that none of these limitations are applicable to the fees sought in the Debtor's Professional's first interim fee applications; however, because the hearing scheduled for December 15, 2021 at 2:00 p.m. is moving forward on a preliminary basis, the Debtor's Professionals submit the preliminary responses herein and reserve any and all rights to further respond to the details of the challenges contained in the Omnibus Objection in a subsequent reply filed prior to the final hearing as well as at the final hearing.

## II.    Payment of Interim Fees

26.    The Interim Fee Procedures Order does not establish a holdback for fees that are approved on an interim basis pursuant to section 331 of the Bankruptcy Code.  And "[a] court may allow interim compensation under section 331 in an amount equal to the actual services rendered." 2 *Collier on Bankruptcy* ¶ 331.02[4][b].

27.    The period of fees currently at issue is the first interim period.  As noted in other cases, and as is the typical pattern of chapter 11 cases, these fees are usually substantial:

---

Professional *shall* attempt to resolve the objection on a consensual basis."  Interim Fee Procedures Order at 3, ¶ 2(e). **The U.S. Trustee never communicated with the Debtor's professionals regarding its "objections" before filing its Objection.  Nor would it engage in discussion regarding the protocol**.

9

> The comparison of the time period to the amount involved also has
> to take into consideration the typically heavy time involvement of
> all professionals at the beginning stages of a complex reorganization
> in just "getting up to speed" as to the pertinent factual and legal
> context in which the reorganization effort will be played out.
>
> *       *       *
>
> The amount of these applications also has to be considered
> in light of the issue and responsibilities devolving upon the
> professionals involved in this reorganization . . . .

*In re Pub. Serv. Co. of N.H.*, 93 B.R. at 831-32.

28.    The holdback proposed in the Joint Statement of 30%, is significantly *greater* than those typically set in chapter 11 cases, if any is set at all.  *See, e.g.*, *In re Pub. Serv. Co. of N.H.*, 93 B.R. 823, 827 (Bankr. D.N.H. 1988) (observing, in 1988, that "[i]n most cases, a hold-back of 25% of the interim fee as found to be reasonable will cover any changes occurring at the time of the review of the final fee application. . . .  "); *but see*, 2 *Collier on Bankruptcy* ¶ 331.02[6][a] (stating that "[a]lthough holdbacks were the norm in the early years after the Bankruptcy Code was adopted, in more recent years they are being used less frequently when interim compensation awards are entered by court order.  For example, the General Order of the bankruptcy court in the Southern District of New York . . . provides for a holdback only on the monthly fees paid before the interim fee application process, but does not provide any required holdback for the payment of fees and expenses after allowance in an interim fee application." (citing General Order M-388 (Bankr. S.D.N.Y., eff. Dec. 1, 2009))).

29.    In fact, a review of the interim fee procedures for six other recent diocesan chapter 11 bankruptcies reveals that in every one of those cases there was a **20%** holdback on payment of monthly fee statements, pending court-approval of interim fee applications – not 30%.  *See* Diocese of: (1) Rockville Centre, New York [Case No. 20-12345 (Bankr. S.D.N.Y.), ECF No. 129], (2) Rochester [Case No. 19-20905 (Bankr. W.D.N.Y.), ECF No. 318], (3) Camden, New

10

Jersey [Case No. 20-21257 (JNP) (Bankr. D.N.J.), ECF No. 129], (4) Buffalo, N.Y. [Case No. 20-10322 (CLB) (Bankr. W.D.N.Y.), ECF No. 362], (5) Rochester [Case No. 19-20905-PRW (Bankr. W.D.N.Y.), ECF No. 545], and (6) Syracuse, New York [Case No. 20-30663 (Bankr. N.D.N.Y.), ECF No. 117].   Accordingly, in none of the other diocesan cases reviewed was there a 30% holdback.[10]

30.    Only in circumstances in which a reorganization is not going forward, there are no unencumbered assets, or there will be insufficient assets to pay all administrative claims, have courts concluded that a holdback may not be sufficient.  *See, e.g.*, *In re Pub. Serv. Co. of N.H.*, 93 B.R. at 827 (citing *In re Codesco, Inc.*, 15 B.R. 354 (Bankr. S.D.N.Y. 1981) (refusing to allow interim fees to be paid because the reorganization was not going forward, a motion to convert had been filed, and "there were no unencumbered assets available for the payment of fees"), *and In re First Hartford Corp.*, 23 B.R. 729 (Bankr. S.D.N.Y. 1982) (refusing "to allow payment of any interim fees as there were no assets which were unencumbered")); *see also* 2 *Collier on Bankruptcy* ¶¶ 331.02[3] and 331.02[5].  As demonstrated above, that is not the case here.

31.    The 30% holdback on fees, proposed as part of the protocol set forth in the Joint Statement, in the context of this case—which is in its early stage and in which there are unencumbered assets—should be more than adequate to guard against the Debtor's Professionals receiving more than would be approved once the First Interim Fee Applications are ultimately decided.  In fact, the total amount at issue in the objections asserted by the U.S. Trustee totaling approximately $331,452 (comprised of $124,692.00 for Ice Miller (even the U.S. Trustee Objections states that its Objection could be less than this sum), $29,955.50 for R+C, $176,805.10

---

[10] The Debtor and the Committee agreed to a 20% holdback under the proposed Interim Compensation Order, but the Court here *sua sponte* modified the parties' agreement and imposed a 30% holdback.  In doing so, one must assume that the Court exercised its discretion and applied the holdback based on the facts of the case—which is the same holdback percentage the Committee and Debtor have now agreed to under the Joint Statement.

Error! Unknown document property name.

for B. Riley, and $0.00 for Brown Jacobson), is **less** than the 30% holdback on total fee applications

of approximately $367,000 (30% x $1,225,471 in billings, according to the U.S. Trustee).

## III.   Approval of Interim Fees

32.     With respect to certain of the objections raised by the U.S. Trustee in the Omnibus

Objection, while reserving all rights to address these matters more fully at and in advance of a final

hearing on the First Interim Fee Applications, as referenced in the Court's docket text Order on

Interim Fee Applications [Dkt. No. 399], each of the Debtor's Professionals responds as follows:

### A.     Ice Miller

33.     As it concerns the U.S. Trustee's objection to the amount of time spent on Ice

Miller's retention application (*see* Omnibus Obj. at 10-11), similar in nature to R+C's response

below, Ice Miller's application did comply with section 327(a) and Bankruptcy Rule 2014, and is

similar to applications filed and approved in other chapter 11 cases.  The additional time and

expense complained of is a result of the U.S. Trustee's approach and responding to its requests.

Similarly, the amount of time spent on the retention application for Brown Jacobson (*see* Omnibus

Obj. at 11-12) was, respectfully, not for corrective actions, but an effort to provide additional

information desired by the U.S. Trustee.

34.     As it concerns the time to amend schedules (*see* Omnibus Obj. at 18), this is a

common occurrence anticipated in bankruptcy (and specifically in the Bankruptcy Rules), done to

address both information (and corrections to information) discovered after the initial schedules

were filed, as well as further details on various items requested by the U.S. Trustee's Office.

35.     As it concerns administrative time (*see* Omnibus Obj. at 19), Ice Miller has

routinely written off entries that it deems to be "overhead."

36.     As it concerns the alleged issues of staffing, lumping and vagueness (*see* Omnibus

Obj. at 19-20), Ice Miller has the same professionals that it did when its retention application was

12

approved, which includes Of Counsel (located in Columbus, Ohio and Chicago, Illinois) and a Paralegal that bill at lower-than-partner level rates. So the complaint that "no IM associates billed time" rings hollow. With respect to the U.S. Trustee's charge of vagueness, Ice Miller submits that its time descriptions are detailed enough to know the topic-matter, but not so detailed as to reveal litigation strategy or attorney-client privileged specifics.

37.     As it concerns what is described as "UST" issues (*see* Omnibus Obj. at 21-22), whether the work was performed in order to comply with requirements of the U.S. Bankruptcy Code or the U.S. Trustee, the result is the same, which is that it was work the Debtor's Professionals needed to perform to represent the Diocese. And the assertion that all the information requested by the U.S. Trustee could just be provided by pushing a button to run a new report evidences a lack of understanding of the Diocese's finances by the U.S. Trustee. The Debtor was asked to create custom account receivable and aging reports for the various parishes and other Catholic entities that the Debtor provides payroll and benefit administration services for. These were not reports that the Diocese creates in the ordinary course of business and not something the Diocese's finance director could easily create on her own. Further, to allay the U.S. Trustee's concerns about providing payroll and benefit administration services, the Diocese agreed to provide monthly reports on how these programs are cash flowing. These are custom reports that B. Riley must build from data manually—not something the Diocese can easily generate.

38.     As it concerns the "Committee Discovery Requests" category, they all fall under the umbrella of providing documents to the Committee in response to its Rule 2004 requests, which were voluminous.

Error! Unknown document property name.

39.     With respect to the U.S. Trustee's concerns regarding the time expended to draft the application to retain local Delaware counsel, the application has been prepared but Ice Miller will discuss withdrawing a request for compensation for this time with the U.S. Trustee.

40.     As it concerns the Utilities Motion (*see* Omnibus Obj. at 23-24), this is common practice in a chapter 11, which avoids more costly issues later on by proactively establishing the procedures up-front.  Given the less than clear nature of section 366, making sure a procedure is in place to avoid utilities cutting off service was definitely beneficial to the estate.  Moreover, the Utilities Motion provided for substantially the same procedures that were used in the *Carla's Pasta* case, except that a deposit reserve was not proposed given the very small amount of deposit at issue.  The Debtor did not expect any objection, but quickly resolved the objection of the only utility provider to have an issue.  The bulk of time was spent responding to (1) the U.S. Trustee's objections and (2) the objections of a utility provider that does not provide utility service to the Debtor.  Those objections were ultimately overruled.

41.     With respect to the Rule 2019 Motion, the parties agreed to carry that Motion to a later date, and because fees relating to such services will also be deferred to a later date, there is no reason to object or respond to any objection for such fees at this time.

42.     As it concerns the expense reimbursements for corporate records from the Connecticut Secretary of State (*see* Omnibus Obj. at 24), the organizational structure of the Diocese and individual parishes has been a key issue, as it has been in virtually every other diocesan bankruptcy case.  The Debtor's Professionals needed to confirm the organizational structure in order to perform its duties as counsel and to provide information to other parties in interest, which the Diocese later did (the organizational documents were specifically requested in the Committee's Rule 2004 subpoena).

Error! Unknown document property name.

**B.      R+C**

43.      There are two broad categories of R+C's time with which the U.S. Trustee takes issue in the Omnibus Objection, which are preliminarily addressed as follows:

### 1.      R+C's Work Performed on Its Retention Application

44.      In the Omnibus Objection, the U.S. Trustee implies that R+C's original retention application and disclosures were "broken" and seeks a reduction of $22,897.50 related to efforts undertaken to "fix" (or "cure") certain issues.  *See* Omnibus Obj. at 11.  However, the original application [Dkt. No. 112] and original Birney Declaration [Dkt. No. 112-1] disclosed R+C's connections with the Debtor's creditors and other parties in interest, including Mount Saint John School, People's Bank and Bishop Reilly, and concluded after the disclosures that it was disinterested and did not hold or represent an interest adverse to the Debtor and its estate.  R+C maintains that it met the requirements of section 327(a) when it filed its initial retention application based upon the plain language of the Bankruptcy Code and decisional law interpreting the relevant provisions of section 327(a), including *In re AroChem Corp.*, 176 F.3d 610, 623 (2d Cir. 1999) ("The test is not retrospective; courts only examine present interests when determining whether a party has an adverse interest") and *In re Angelika Films 57th, Inc.*, 227 B.R. 29, 38 (Bankr. S.D.N.Y. 1998) (concluding that to represent an adverse interest under § 327 an estate professional must continue "to serve as agent or attorney for any individual or entity holding such an adverse interest.").

45.      Despite R+C's position, the U.S. Trustee sought additional information and objected to R+C's retention, enforcing its admittedly rigid policy related to professional retention, which is to "start and stop with a textual reading and strict application of the Code and Rules." *Disclosures and Conflicts: The USTP's Perspective on Professional Employment*, By Clifford J. White III, Director, EOUST ABI Journal (Vol. XL, No. 8, August 2021).

Error! Unknown document property name.

46.     In response to the U.S. Trustee's objection, R+C prepared and filed the Omnibus Reply [Dkt. No. 210] and Supplemental Birney Declaration [Dkt. No. 211].  These supplemental documents were not intended to "fix" any failures or inadequacies in R+C's initial papers; rather, it was a response to the objections lodged by the U.S. Trustee.   Indeed, R+C argued in the Omnibus Reply that (1) any conflicts regarding R+C's prior representations of Mount Saint John and Bishop Reilly were "hypothetical conflicts," not actual conflicts—a point that R+C maintains today; and (2) even if such a conflict arose in the future, it could easily be addressed through the use of "conflicts counsel," which is a common practice used within the district (*See O.W. Bunker*, Case No. 14-51720).  As Judge Shiff stated in *In re Stamford Color Photo, Inc.*, "hypothesizing that conflicts may arise is not a sufficient basis to warrant the disqualification."  98 B.R. 135, 138 (Bankr. D. Conn. 1989).

47.     In many ways, the U.S. Trustee highlighted on the record at the September 9, 2021 hearing that the biggest conflict was not an actual "conflict of interest," but a conflict between the U.S. Trustee's policies related to professional retention and practice as born-out by retention orders and decisional law interpreting section 327(a):

> I want to commend [Debtor's counsel] for the Omnibus Reply because frankly it is an incredibly organized piece of work.  It does address really all of the points that the U.S. Trustee brought up.  And While Mr. Birney and I may very well disagree on the conclusions he makes, certainly the information that he provides there—and that he addresses in a very concise manner—really made it easier for me to deal with this in a short time.  And that goes for all of this.

[Tr. 132: 24-25; 133: 1-7, Sept. 9, 2021]

48.     Faced with the U.S. Trustee's objections and arguments on the record, R+C worked as diligently and as efficiently as possible to obtain the necessary waivers and to withdraw its representation of the co-defendants (Mount Saint John and Bishop Reilly) in the Survivor Lawsuits.

Error! Unknown document property name.

49.     Having endeavored to produce the information requested and meet the heightened requirements demanded by the U.S. Trustee and ordered by the Court, R+C should be compensated for the reasonable fees incurred for such efforts.

50.     It is also unclear from where the U.S. Trustee is identifying a total amount of $22,897.50.  In this regard, R+C billed the following:

     a.    $10,836.00 between 7/19 - 8/6 (date the retention application was filed);

     b.    $11,987.50 between 8/7 - 9/9 (date of the initial hearing);

         i.    These fees were incurred responding to U.S. Trustee requests for additional information, reviewing and responding to the U.S. Trustee's objection, and preparing for and attending the hearing on 9/9.

     c.    $9,060.00 between 9/10 - 10/13 (date of final retention order);

         i.    This time was spent addressing the purported conflict concerns of the U.S. Trustee, including withdrawing from the Survivor Lawsuits, obtaining conflict waivers, and filing a supplemental declaration regarding these issues.

         ii.    Additionally, R+C wrote off the vast majority of fees related to withdrawing from the Survivor Lawsuits and obtaining the necessary waivers from the co-defendants.  *See* "No Charge" entries on the Fee Statements for 9/8, 9/10, and 9/13 (6 time entries over the course of these three days).

### 2.     R+C and Ice Miller's Work on the Utilities Motion

51.     The U.S. Trustee argues that fees incurred on the Utilities Motion issues are not compensable because of a lack of meaningful benefit to the estate.  *See* Omnibus Obj. at 23.  The Utilities Motion, however, provided meaningful value to the estate by establishing procedures to prevent utility providers from terminating essential power, water, internet, and telecom services, and is standard practice in chapter 11 cases.

52.     While the Diocese was up-to-date on payments to its utility providers, it was not clear at the time whether the Debtor had any outstanding bills with utility providers for amounts not yet billed, billed but not yet due, or paid with checks that had not yet cleared by the Petition

Date (defined in the Utilities Motion as the "Gap Period Obligation"). Utility providers could have refused service on the basis of these unpaid amounts, and any such refusal of electricity, water, internet, or telecom services would have impaired the Debtor's ability to continue its operations and reorganize.

53.    R+C specifically incurred fees related to addressing and resolving two objections filed by the Norwich Public Utility and the U.S. Trustee. Both objections addressed the substance of the proposed order and the amount of adequate assurance, not whether or not such relief was necessary in the first instance. *See* Objection of Norwich Public Utility [Dkt. No. 104]; Objection of U.S. Trustee [Dkt. No. 105].

54.    R+C also incurred fees related to addressing an objection asserted by Eversource, which is a non-Utility provider of the Debtor. Eversource was not even a creditor of the Debtor; it was a creditor of a Parish of the Debtor. Notwithstanding the fact that the Debtor was not a customer of Eversource, Eversource lodged an objection and demanded that certain changes be made to the proposed order. Rather than expend time and incurring additional fees to contest Eversource's objection (substantively and on standing grounds), the Debtor's counsel determined it was more efficient to simply address Eversource's concerns.

**C.    B. Riley**

55.    In general, the U.S. Trustee's Omnibus Objection does not account for or factor in: (a) the limitations of the Debtor's accounting staff; (b) the way the Debtor accounted historically for itself and other non-Debtor assets; (c) the existence of joint bank accounts; and (d) the complexity of the billing/reimbursement system. B. Riley attempted to have discussions with the U.S. Trustee about these issues at the very beginning of the case but was rebuffed.

56.    With regard to the "UST Fee Category" addressed in the Omnibus Objection (*see* p. 13-15), B. Riley created this category so that the Diocese, all constituents, and the Court would

18

understand the amount of additional effort expended to provide the U.S. Trustee with the level of detailed information above and beyond what was provided for in the required filings.  And in this regard, B. Riley can, and reserves the right to, provide specific detail as to exactly which request was being address in each time entry.

57.     With respect to the U.S. Trustee's assertion that the Utilities Motion added no meaningful benefit (*see* Omnibus Obj. at 23-24), B. Riley performed extensive investigation and analysis, including property and utility account matching, in support of this motion and in response to the U.S. Trustee's objection to the motion, which motion was ultimately granted.

58.     With respect to the Monthly Operating Reports (*see* Omnibus Obj. at 17-18), this was the first time using the new U.S. Trustee forms.  Combined with a slim accounting staff of essentially one person at the Diocese, the time required to complete the first Monthly Operating Report was material.  But since the first one was completed, the time spend for each subsequent month has decreased.

59.     With respect to the objection to multiple staff at meetings and hearings (*see* Omnibus Obj. at 15-17), each of the B. Riley professionals focuses on different aspects--Mr. Prager, financial analysis; Mr. Beresin, accounting; and Mr. Weitz, on oversight, strategy and review.  Ultimately, it is more efficient to have all three professionals participate in the hearings than to later relay information requests that have arisen during the proceedings (341 meetings, hearings, etc.).

60.     B. Riley needed to disaggregate historical and financial accounting records in order to report financials in the form required for the various case filings and reports.  B. Riley's efforts have resulted in providing all case constituents with financial statements reflecting

Error! Unknown document property name.

information specific to the Debtor.  And B. Riley has taken on responsibility for creating custom reports for the Committee on a monthly basis.

61.     The estate and all of its constituents have benefitted from the investment of time and efforts by B. Riley at the outset of this case (the first few months), which time has now decreased (as have the time spent by the other Debtor's Professionals) in each subsequent month as reflected in ¶ 18 above.

<strong><u>CONCLUSION</u></strong>

62.     The Debtor's Professionals submit that the protocol set forth in the Joint Statement, including but not limited to the 30% holdback and 10% discount on Ice Miller's fees going forward, will be sufficient assurance, in light of the unencumbered assets and trajectory of fees in this case to ensure, that the intent and purpose of section 331 is satisfied and that payment of interim fees will be appropriate.  Accordingly, the Debtor's Professionals respectfully request that the Court approve the protocol and allow for payment of fees on the Monthly Statements, as provided in the protocol set forth in the Joint Statement.

Error! Unknown document property name.

Dated: Hartford, CT  
December 13, 2021

*/s/ Patrick M. Birney*  
Patrick M. Birney (CT No. 19875)  
Andrew A. DePeau (CT No. 30051)  
Annecca H. Smith (admitted *pro hac vice*)  
**ROBINSON & COLE LLP**  
280 Trumbull Street  
Hartford, CT 06103  
Telephone:  (860) 275-8275  
Facsimile:  (860) 275-8299  
E-mail:  pbirney@rc.com  
        adepeau@rc.com  
        asmith@rc.com

-and-

Louis T. DeLucia (admitted *pro hac vice*)  
Alyson M. Fiedler (admitted *pro hac vice*)  
**ICE MILLER LLP**  
1500 Broadway, 29th Floor  
New York, NY 10036  
Telephone: (212) 824-4940  
Facsimile: (212) 824-4982  
E-Mail:  louis.delucia@icemiller.com  
        alyson.fiedler@icemiller.com

*Counsel to the Debtor*  
*and Debtor-in-Possession*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on December 13, 2021, a copy of the foregoing *Preliminary Omnibus Reply of Debtor's Professionals to the United States Trustee's Omnibus Objection to their First Interim Fee Applications* was filed electronically and shall be served as required by Local Bankruptcy Rule 9013-2(b), with notice of this filing being sent by email to all parties who received service of each filing by operation of the court's electronic filing system, or by First Class U.S. mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties in interest may access this document through the court's CM/ECF System.


*/s/ Patrick M. Birney*
Patrick M. Birney

**Error! Unknown document property name.**