**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF CONNECTICUT**
**HARTFORD DIVISION**

| | |
|---|---|
| In re:<br><br>THE NORWICH ROMAN CATHOLIC<br>DIOCESAN CORPORATION,<br><br>    Debtor. | Chapter 11<br><br>Case No:  21-20687 (JJT) |

**THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS'**
**OMNIBUS OBJECTION TO THE FIRST INTERIM FEE APPLICATIONS FILED BY**
**ICE MILLER LLP, ROBINSON & COLE LLP, AND GLASSRATNER ADVISORY &**
**CAPITAL GROUP LLC D/B/A B. RILEY ADVISORY SERVICES**

The Official Committee of Unsecured Creditors (the "Committee"), by and through its

undersigned counsel, respectfully submits this omnibus objection (the "Objection") to the first

interim fee applications filed by the attorneys for the The Norwich Roman Catholic Diocesan

Corporation ("Debtor"), Ice Miller, LLP ("Ice Miller") and Robinson & Cole, LLP ("R&C"), and

the Debtor's financial advisor, GlassRatner Advisory & Capital Group LLC d/b/a B. Riley

Advisory Services ("B. Riley" and, jointly with Ice Miller and R&C, the "Debtor's Primary

Professionals"), for the period beginning July 15, 2021, and ending October 31, 2021 (the

"Compensation Period").[1] (ECF No. 372 (the "B. Riley Fee Application"); ECF No. 374 (the "Ice

Miller Fee Application"); ECF No. 375 (the "R&C Fee Application" and, jointly with the B. Riley

Fee Application, and the Ice Miller Fee Application, the "First Fee Applications"). For the

Compensation Period, the Debtor's Primary Professionals seek allowance of a total of

$1,220,048.00 in fees and $15,694.09 in expenses, which equates to over $80,000.00 *per week*.

Among other concerns with the First Fee Applications, given the tasks accomplished by the

---

[1] The Committee does not object to the second interim fee applications filed by the Debtor's Primary Professionals, covering the period beginning November 1, 2021, and ending January 31, 2022.

Debtor's Primary Professionals during the Compensation Period, the amount sought is excessive. For the reasons set forth herein, the Committee hereby objects to the allowance of the fees in the amounts sought. In support of its objection the Committee respectfully states as follows:

1.      On July 15, 2021 (the "Petition Date"), the Debtor filed a voluntary petition under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Connecticut. The Debtor continues to operate and manage its assets and affairs as a debtor-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

2.      The Debtor is a Roman Catholic diocese in Connecticut and a small part of New York founded in 1953 by Pope Pius XII, encompassing Middlesex, New London, Windham, and Tolland counties in Connecticut, as well as Fisher Island, New York. The Most Reverend Michael R. Cote, D.D. has been the Bishop of the Diocese since May 14, 2003. There are fifty-one parishes within the Debtor's geographic territory, as well as three high schools and various other ministries. The Debtor's gross revenue for the fiscal year ended June 30, 2020 was approximately $14,340,626.00, while expenses before taking into account certain non-recurring activity were approximately $14,155,607.00. As of the Petition Date, the Debtor employed thirty-two people and had a relatively simple capital structure. (*See* ECF Doc. No. 12, at ¶¶ 5, 12-13). Thus, from the perspective of revenue, expenses, employees, and capital structure, the Debtor is a relatively small business.

3.      In the year preceding the Petition Date, the Debtor paid Ice Miller more than $728,000 for legal services and paid R&C $50,000 for legal services. (ECF Doc. Nos. 111-1, at 4-5; 112, at 10).

4.      On November 15, 2021, the Debtor's Primary Professionals filed the First Fee Applications as directed by this Court's Order Granting Debtor's Motion for Order Establishing

Procedures for Interim Compensation and Reimbursement of Expenses for Professionals (ECF No. 314, the "Compensation Procedure Order"). The Ice Miller Fee Application seeks $629,920.00 in fees and reimbursement of $13,180.51 in expenses. (ECF No. 374, at 1). The R&C Fee Application seeks $203,279.00 in fees and reimbursement of $2,436.45 in expenses. (ECF No. 375, at 1). The B. Riley Fee Application seeks $386,849 in fees and $77.13 in expenses. (ECF No. 372, at 1).

5.      On December 15, 2021, this Court held a preliminary hearing to consider, *inter alia*, the First Fee Applications "and to broadly address the questions of how can the Debtor pay or justifiably incur such fees…." (Order, ECF No. 399). Thereafter, this Court adjourned the First Fee Applications to a date to be decided in the future, and scheduled a status conference on January 31, 2022, to consider scheduling a hearing to consider the First Fee Applications. (ECF No. 415, at 1). This Court explicitly reserved and preserved "[a]ll rights to object, oppose, or otherwise comment on" the First Fee Applications "until the interim and/or final hearing to consider" the same. (*Id*.). At the status conference on January 31, 2022, this Court further continued its consideration of the First Fee Applications. (See ECF No. 477). Ultimately, on April 7, 2022, this Court issued a Notice of Hearing to consider, *inter alia*, the First Fee Applications. (ECF No. 549). Pursuant to this Court's Order (ECF No. 584), the hearing to consider the First Fee Applications is scheduled for May 10, 2022.

6.      Except as stated in footnote 2, pursuant to the Compensation Procedure Order, the Debtor's Primary Professionals have already received 70% of their incurred fees and 100% of their incurred expenses for the Compensation Period.[2] (Third Monthly Summary Statement of Debtor Payments to Retained Professionals as of January 18, 2022, ECF No. 438, at 2).

---

[2] The Committee notes that there appears to be an inconsistency of $56.10 between the expenses that B. Riley seeks in the B. Riley Fee Application – totaling $77.13 – and the expenses paid by the Debtor as reflected in Third Monthly Summary Statement of Debtor Payments to Retained Professionals as of January 18, 2022 – totaling $21.03.

7.      Under section 330 of the Bankruptcy Code, this Court may award "reasonable compensation for actual, necessary services rendered." 11 U.S.C. § 330(a)(1)(A). Section 330 further provides that

> [i]n determining the amount of reasonable compensation to be awarded… the court shall consider the nature, the extent, and the value of such services, taking into account all relevant factors, including—
>
> (A) the time spent on such services;
>
> (B) the rates charged for such services;
>
> (C) whether the services were necessary to the administration of, or beneficial at the time at which the service was rendered toward the completion of, a case under this title;
>
> (D) whether the services were performed within a reasonable amount of time commensurate with the complexity, importance, and nature of the problem, issue, or task addressed;
>
> (E) with respect to a professional person, whether the person is board certified or otherwise has demonstrated skill and experience in the bankruptcy field; and
>
> (F) whether the compensation is reasonable based on the customary compensation charged by comparably skilled practitioners in cases other than cases under this title.

11 U.S.C. § 330(a)(3); *see also* Fed. R. Bankr. P. 2016(a) (implementing the standards set forth in section 330 of the bankruptcy code).

8.      "[T]he burden of proof to show entitlement to the fees requested in an application is on the applicant." *In re Buglione*, Docket Nos. 11-30512 (LMW), 63, 2013 Bankr. LEXIS 478, at *10 (Bankr. D. Conn. Feb. 6, 2013); *see also Zeisler & Zeisler, P.C. v. Prudential Ins. Co. (In re JLM, Inc.)*, 210 B.R. 19, 24 (2d Cir. B.A.P. 1997); *In re Northwest Airlines Corp.*, 382 B.R. 632, 645 (Bankr. S.D.N.Y. 2008); *In re Keene Corp.*, 205 B.R. 690, 695 (Bankr. S.D.N.Y. 1997).

"To satisfy this burden, a claimant must justify its charges with detailed, specific, itemized documentation." *In re Baker*, 374 B.R. 489, 494 (Bankr. E.D.N.Y. 2007). Furthermore,

> [i]n order to be compensated from the estate, the professional must demonstrate - not just recite - that the fees sought are reasonable, necessary, and of benefit to the estate and that the expenses sought to be reimbursed are actual and necessary and that no other reasonable, less expensive alternatives were available.

*In re Fibermark, Inc.*, 349 B.R. 385, 395 (Bankr. D. Vt. 2006). Of particular relevance here, while debtors which are relatively small as measured by revenue, expenses, and capital structure may choose professionals at the higher end of the market in terms of rates, implicit in a court's approval of such professionals "comes the [c]ourt's and creditors' expectation that such representation shall deliver cost-effective staffing which involves managed delegation and supervision, review and monitoring of the [d]ebtors' legal team of partners, associates and paralegals, appropriately tasked to the difficulty and complexity of the legal matters" involved. *In re Old CP, Inc.*, Case No. 21-20111, at 3 (Bankr. D. Conn. Oct. 7, 2021) (annexed hereto as **Exhibit A**).

9.      "The court has an independent duty to review fee applications and evaluate the compensation requested. The court may reduce or disallow a request if the services provide no real benefit to the estate. The court may also reduce compensation if the request is based on incomplete or inaccurate time records." *In re Mesa Air Group, Inc.*, 449 B.R. 441, 444 (Bankr. S.D.N.Y. 2011) (citations omitted); *see also In re Keene Corp.*, 205 B.R. at 695 ("the bankruptcy court has an independent duty to review fee applications to protect the estate 'lest overreaching . . . professionals drain it of wealth which by right should inure to the benefit of unsecured creditors'"); *In re Robert Plan Corp.*, Docket Nos. 8-08-74573-reg, 8-08-74575-reg, 2018 Bankr. LEXIS 596, at *49 (Bankr. E.D.N.Y. Mar. 1, 2018) (if an applicant "fail[s] to meet its burden of proof regarding the reasonableness of the fees requested," the court may deny the request); *In re Waxman*, 148

B.R. 178, 183 (Bankr. E.D.N.Y. 1992) ("[a] court may reduce requested attorney fees when disproportionate to the benefit produced"). Additionally, section 330 mandates that courts must reject requests for compensation for services that "were not… reasonably likely to benefit the debtor's estate… or… necessary to the administration of the case." 11 U.S.C. §330(a)(4)(A). Fundamentally, "bankruptcy courts have wide discretion to determine reasonable professional fee awards…." *In re Frontier Communs. Corp.*, 623 B.R. 358, 366 (Bankr. S.D.N.Y. 2020).

10.    Among the largest categories in the Ice Miller Fee Application are case administration, which includes time on schedules and statement of financial affairs, for $304,965.00 (491.6 hours), first- and second-day motions for $116,458.50 (191.6 hours), firm and other employment and fee applications for $46,503.00 (69.6 hours), and responding to a subpoena from the Committee for $49,568.00 (90.5 hours). Among the largest categories in R&C Fee Application are case administration for $39,554.50 (73.8 hours), first- and second- day motions for $29,972.50 (70.3 hours), and firm and other employment and fee applications for $66,739.50 (167.8 hours). Among the largest categories in the B. Riley Fee Application are business analysis for $135,029.00 (345.1 hours), analysis on behalf of U.S. Trustee for $90,256.50 (210.9 hours), schedules and statements for $63,705.50 (147.4 hours), case administration for $31,170.50 (62 hours), and first- and second-day motions for $23,246.00 (46.3 hours). Together, in the first three and one-half months of this case, the Debtors' Primary Professionals incurred fees of **$1,220,048.00**. Of this amount, **$375,690.00 (627.4 hours)** was for case administration, **$122,361.00 (258.50 hours)** was on retention and fee applications, **$169,677.00 (308.2 hours)** was on first- and second-day motions (excluding the retention applications), and B. Riley *alone* spent **$288,991.00 (703.4 hours**—this does not include the Ice Miller time on schedules that it categorized under case administration) on completing schedules, performing business analysis and

responding to information requests from the U.S. Trustee.

11.     Under no conceivable standard of reasonableness can $1,220,048.00 in fees incurred over the course of three and one-half months be justified in a case of this size and complexity given what was accomplished during the Compensation Period. While this case is extraordinary, it is extraordinary primarily because of the nature of the Debtor and the Debtor's creditors, not because of the complexity of the Debtor's financial affairs or capital structure. This is not a large case as measured by size of "business"—as noted above, the Debtor's gross revenue and expenses are approximately $14.5 million.

12.     A substantial portion of the time incurred during the Compensation Period was on the following matters:

      a.     The Debtor was able to get five customary first day motions—wages, cash management, noticing procedures, insurance and utilities—granted, several pro hac vice motions granted, and the motion to approve the Monthly Fee Order filed. The problem is that the Debtor's professionals incurred approximately $170,000.00 in fees to accomplish this.

      b.     The Debtor was able to complete and file the Debtor's schedules of assets and liabilities and statement of financial affairs, participate in the meeting of creditors under section 341 of the Bankruptcy Code and comply with US Trustee requests for documents and information. The problem is that the Debtor's professionals incurred more than $200,000.00 in fees to accomplish that. Again, the Debtor's financial affairs are not complicated, and the Debtor's schedules are not overly complicated or complex. Further, this is not a case where a debtor's professionals were retained shortly before filing and needed to expend substantial time getting up to speed on the debtor's affairs after filing.

Ice Miller was retained by the Debtor approximately one year prior to the Petition Date and as noted above the Debtor's attorneys incurred hundreds of thousands of dollars in fees prior to the Petition Date, including for services in contemplation of and to prepare for the filing.

        c.      The Debtor was able to get five professional retention applications granted and file several monthly fee statements. The problem is that the Debtor's professionals incurred approximately $120,000.00 in fees to accomplish that.

13.      By way of comparison, the *In re Clinton Nurseries, Inc., et al.*, Case No. 17-31987, were cases that were before this Court that involved three operating debtors with approximately $35 million in revenue, more than 200 employees, leased and owned properties in three states, multiple levels of secured and unsecured debt, complex issues with suppliers and transportation, and difficult and exigent financing issues, including monthly sometimes contested cash collateral hearings and an emergency debtor-in-possession financing hearing. In the first five and one-half months of the sometimes heavily contested cases, debtors' counsel incurred a total of approximately $300,000 in fees and expenses. During that initial period, debtors' counsel incurred $17,894.00 in fees for 47.9 hours related to retention applications, including applications to retain counsel, an investment banker and two accounting firms. Seventy percent of that time was incurred by associates and paralegals billing at a blended rate of $329.61. The application to retain the investment banker required negotiations to resolve certain objections and a contested hearing on an objection by the U.S. Trustee. During that initial period, debtors' counsel incurred $30,461.50 in fees for 86.7 hours related to administrative matters during that initial period, which included schedules and first day motions. Sixty percent of that time was incurred by associates and paralegals billing at a blended rate of $285.03. *In re Clinton Nurseries, Inc.*, et al., Case No. 17-

31897, ECF No. 483.

14.     By way of a second comparison, the *In re Old CP, Inc., et al.*, Case No. 21-20111, were cases that were before this Court that involved a relatively large operating debtor with approximately $50 million in revenue, hundreds of employees and multiple levels of secured and unsecured debt. The debtors' large out of state law firm incurred $65,364.00 in fees for 98.4 hours related to employment applications and objections, including applications to retain counsel, an investment banker, financial advisors, and accountants. Debtors' counsel incurred $151,443.00 in fees for 219.3 hours related to case administration, which included first day motions and schedules, for the entire case.

15.     Specifically, the Committee seeks percentage reductions in the fees awarded to the Debtor's Primary Professionals as set forth below. *In re Navient Solutions, LLC*, 627 B.R. 581, 593 (Bankr. S.D.N.Y. 2021) ("A court may use a percentage deduction as a practical means of trimming fat from a fee application. A reduction may be applied for vagueness, inconsistencies, and other deficiencies in the bills.") (quotations and citations omitted).

### a. Ice Miller's Fee Application

| Objection Number | Committee's Objection | Amount Challenged | Reduction Requested |
|---|---|---|---|
| 1 | Ice Miller spent 43.3 hours and incurred $27,838.00 in fees on "services related the preparation and filing of Ice Miller's retention application, Ice Miller's fee statements and applications, and the Debtor's Motion for Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses for Professionals… and the Interim Compensation Procedures Order…." (ECF No. 374, at 10). This included a significant billing by Ice Miller partners that could have been performed by associates, thereby reducing the burden on the Debtor's estate. Furthermore, such billing includes entries such as Attorney Jason Torf's 7/29/21 entry | $27,838.00 | $8,351.40 |

| | | | |
|---|---|---|---|
| | for 2.7 hours, at a rate of $675/hour, for "[r]eview[ing] conflict results for Ice Miller retention application" when the Debtor retained Ice Miller prior to the petition date and thus conflict results would presumably have already been reviewed.<br><br>Accordingly, the Committee submits that the aggregate fees sought for retention and fee applications are unreasonable under section 330, particularly compared to the fees the Committee's counsel seeks for the same services during the same period, and thus the Committee seeks a 30% reduction. (*See* ECF No. 366-2, at 23-27 (showing $3,513 in fees incurred in sub-matter 10, counsel's own employment and fee applications). | | |
| 2 | Ice Miller spent 191.6 hours and incurred $116,458.50 in fees on first and second day motions. (ECF No. 374, at 12). As noted above, this is a relatively small bankruptcy case. Furthermore, only five first day motions were filed (wages, cash management, noticing procedures, insurance, and utilities) and only a limited number of second day motions were filed.<br><br>Examples of excessive billing include:<br><br>(i)    Attorney Jason Torf billing 12 hours between 9/5/21 and 9/9/21, at a rate of $675/hour, on preparing for and outlining the argument regarding the cash management motion, particularly when Attorney Torf does not appear to have attended the hearing;<br><br>(ii)    Paralegal John Acquaviva billing 5.6 hours at $270/hour to "[m]anage all first day motion documents" on 7/16/21, particularly when the hearings were conducted remotely;<br><br>(iii)    Attorney John Cannizzaro billing 8.6 hours at $455/hour between 9/4/21 and 9/7/21 in connection with the reply brief in support of the first and second day motions; and,<br><br>(iv)    Attorney Alyson Fiedler billing 2.9 hours on 9/7/21 at $795/hour for simply | $116,458.50 | $34,937.55 |

| | | | |
|---|---|---|---|
| | "[r]eview[ing] revised second day orders."<br><br>The Committee submits that incurring $116,458.50 in fees is connection with the first and second day motions is excessive, disproportionate, and unreasonable under section 330. Accordingly, the Committee seeks a 30% reduction. | | |
| 3 | Ice Miller spent 491.6 hours and incurred $304,965.00 in the "case administration" project category. However, many of the time entries included in the "case administration" project category are objectionable insofar as:<br><br>(i)   They seek compensation for unnecessary or duplicative activities (such as Paralegal John Acquaviva's repeated "organization" and "management" of e-filed documents and updating of calendars);<br>(ii)   Evidence inefficient staffing by Ice Miller (such as partner Attorney Alyson Fiedler "[w]ork[ing] on [the] creditors matrix" or Of Counsel Attorney John Cannizzaro "work[ing] on noticing issues");<br>(iii)   Reflect excessive time spent on certain activities (such as Attorney Jason Torf's 16 cumulative hours "[w]ork[ing] on [a] draft supplement to cash management motion" or the multiple hours, at a rate of $255/hour, law clerk Ryan Hibbard spent drafting a one-and-a-half-page demand letter seeking Fed. R. Bank. P. 2019 statements, particularly when a significant portion of the letter is copied verbatim from a Court order);<br>(iv)   Contain insufficient detail (such as Attorney Fiedler "[r]eview[ing] leases" or Attorney Cannizzaro "[w]ork[ing] on Catholic Mutual issues" and "[w]ork[ing] on proposed orders" or Attorney Michael Ott performing "[l]egal research regarding client question per DeLucia;"<br>(v)   Reflect duplicative efforts by multiple | $304,965.00 | $91,489.50 |

| | | | |
|---|---|---|---|
| | attorneys (such as Attorneys Cannizzaro, Fiedler, and DeLucia *all* reviewing the one-and-a-half-page Rule 2019 demand letter); and/or<br><br>(vi)    Contain an excessive amount of time at a cost of thousands of dollars for reviewing and preparing the Debtor's schedules and statement of financial affairs, on top of the tens of thousands of dollars that B. Riley billed for related activities.<br><br>Considering these and other deficiencies in the time entries contained in the "case administration" project category, the Committee submits that Ice Miller has failed to show its entitlement to the fees requested. In an effort to remedy these issues, the Committee submits that that this Court should reduce the fees awarded for this project category by 30%. | | |
| 4 | Ice Miller spent 69 hours and incurred $51,112.00 in fees responding to requests from the U.S. Trustee. (ECF No. 374, at 3). As highlighted by the U.S. Trustee, "[m]any of the entries in this category are for required chapter 11 events that all debtors" complete. (ECF No. 393, at 21). The Committee joins the U.S. Trustee's objection to this project category and seeks a 30% reduction in the fees. | $51,112.00 | $15,333.60 |
| 5 | Ice Miller spent 90.50 hours and incurred $49,568.00 in fees in connection with beginning to respond to the Committee's subpoena issued pursuant to Fed. R. Bankr. P. 2004 *in one month.* (ECF No. 374, at 3; ECF No. 374-1, at 57-61).<br><br>The Committee agrees with U.S. Trustee's concern regarding the vagueness of "[t]he vast majority of the time entries in this category," ECF No. 393, at 22, and as a result Ice Miller has not carried its burden to provide adequate time entries. (*See, e.g.,* ECF No. 374-1, at 58-61 (multiple entries by Attorney Alyson Fiedler for "work on discovery response" or similar)). Furthermore, in light of the largely disorganized and incomplete document productions made by the Debtor in response to the Committee's requests, the Committee submits that the time spent in this project category are disproportionate to the limited benefit provided to the Debtor's estate. | $49,568.00 | $14,870.40 |

| | Accordingly, the Committee seeks a 30% reduction in the fees associated with this project category. | | |
|---|---|---|---|

16.    To remedy the vague, excessive, and duplicative billing entries in Ice Miller's Fee Application, the Committee therefore respectfully requests that this Court reduce the amount awarded to Ice Miller by $164,982.45, which is a reduction of 26.2%.

### b. R&C Fee Application

| Objection Number | Committee's Objection | Amount Challenged | Reduction Requested |
|---|---|---|---|
| 1 | R&C spent 73.8 hours and incurred $39,554.50 in fees on "case administration." (ECF No. 375, at 6). The entries in this project category reflect a duplication of efforts between R&C and Ice Miller on some matters. For example, Attorney Patrick Birney billed 4.8 hours at $695/hour to attend the section 341 meeting on August 16, 2021. (ECF No. 375-1, at 12). Meanwhile, Attorney Louis DeLucia and Attorney Alyson Fiedler each also billed 3.3 hours for attending the same section 341 meeting at $835/hour and $795/hour respectively. (ECF No. 374-1, at 13, 42). Similarly, Attorney Birney, Attorney DeLucia, and Attorney John Cannizzaro billed a collective $307.50 for dealing with the same correspondence from a United States Attorney requesting to be removed from the service list. (*See* ECF Doc. Nos. 374-1, at 14; 375-1, at 12). The First Fee Applications do not explain the benefits, if any do exist, of multiple senior partners from different firms attending the same section 341 meeting and addressing service requests.<br><br>While some duplication of effort may be unavoidable, particularly when the Debtor is represented by two separate firms, the Committee submits that duplication of the kind evidenced by the foregoing is not "necessary to the administration of," or beneficial to, the Debtor's estate. 11 U.S.C. § 330(a)(3). The Committee submits that the fees sought by R&C in the "case administration" category should be reduced by 10% to address such | $39,554.50 | $3,955.45 |

| | | | |
|---|---|---|---|
| | duplicative efforts. | | |
| 2 | R&C spent 86.3 hours and incurred $34,807.50 in fees on "preparing R+C's employment, interim fee statement, and fee application filed during the application period." (ECF No. 375, at 6). As exemplified by the samples below, such considerable fees are unreasonable and disproportionate to the benefit provided to the Debtor's estate. Examples include:<br><br>   (i)  Attorney Andrew DePeau Attorney Annecca Smith cumulatively billing dozens of hours of the at $340/hour and $300/hour respectively to prepare R&C's retention application and exhibits thereto and respond to objections to R&C's retention application (ECF No. 375-1, at 14-17); and,<br><br>   (ii)  Attorney Patrick Birney and Attorney Smith cumulatively billing 8.9 hours at $695/hour and $300/hour respectively to draft a five-page supplemental declaration and assemble related exhibits (ECF No. 375-1, at 36; ECF No. 310).<br><br>Accordingly, the Committee seeks a 30% reduction in R&C's fees arising out of its "employment, interim fee statement, and fee application filed during the application period." (ECF No. 375, at 6). | $34,807.50 | $10,442.25 |
| 3 | R&C spent 81.5 hours and incurred $31,932.00 in fees for preparing "employment applications and supporting documents for [B. Riley], and Brown Jacobson P.C…." and "reviewing and revising the employment applications and supporting documents for Ice Miller…." (ECF No. 375, at 6-7).<br><br>In addition to likely duplication of efforts between R&C and other professionals retained by the Debtor[3] | $31,932.00 | $9,579.60 |

---

[3] Indeed, in addition to the $31,932.00 that R&C incurred addressing the employment applications of third parties, Ice Miller incurred $27,838.00 and B. Riley incurred $9,118.50 on their respective employment and fee applications. (ECF No. 372, at 2; 374, at 3). It is a virtual certainty that there are instances of duplicative efforts between these three highly-qualified firms. The degree to which R&C worked on the employment applications of third parties is particularly notable as Ice Miller explained that it, not R&C, had been "designated by the Court as 'the captain of the ship,'" and thus it "review[ed] and revis[ed] as

| | | | |
|---|---|---|---|
| | on matters relating to such third parties' employment applications, which standing alone would necessitate a reduction in fees, there are instances of excessive and duplicative billing *within* R&C's own time entries in this project category. For example, as reflected at ECF No. 375-1, at 17-21:<br><br>    (i)    Attorneys Patrick Birney, Andrew DePeau, and Annecca Smith collectively billed more than 17 hours on matters relating to B. Riley's retention, at $695/hour, $340/hour, and $300/hour respectively; and,<br>    (ii)    Attorneys Birney, DePeau, and Smith collectively billed more than 17 hours on matters relating to Brown Jacobson, P.C.'s retention, at $695/hour, $340/hour, and $300/hour respectively; and,<br>    (iii)    Multiple[4] hours that attorneys and staff at R&C spent on Ice Miller's retention, which is particularly troublesome as Ice Miller itself spent "at least 13.6 hours at a cost of $9,412.00 preparing its retention application." (ECF No. 393, at 10).<br><br>The R&C Fee Application does not explain the reason for these seemingly excessive and duplicative billing entries. In the absence of such explanation and because the "the time spent on such services" appears excessive, the Committee submits that this Court should reduce R&C's fee award for this project category by 30%. 11 U.S.C. § 330(a)(3); *see also In re Fibermark, Inc.,* 349 B.R. at 395 (requiring the professional seeking fees to "demonstrate – not just recite – that the fees sought are reasonable, necessary, and of benefit to the estate"). | | |
| 4 | R&C spent 70.3 hours and incurred $29,972.50 in fees in connection with first and second day | $29,972.50 | $8,991.75 |

necessary the applications and statements of other professionals to assure compliance with the Bankruptcy Code and preventing duplication of services…." (ECF No. 374, at 10).

[4] In multiple instances, counsel's time entries are combined in a manner that makes determining how much time was spent on a specific task impossible.

| | | | |
|---|---|---|---|
| | motions. (ECF No. 375, at 8). This is in addition to the $116,458.50 the Ice Miller incurred in connection with these same motions.<br><br>As stated above, this is a relatively small bankruptcy case. Furthermore, only five first day motions were filed (wages, cash management, noticing procedures, insurance, and utilities) and only a limited number of second day motions were filed. Therefore, it appears that the time R&C "spent on such services" to be unreasonable, particularly against the backdrop of Ice Miller's considerable efforts. 11 U.S.C. § 330(a)(3).<br><br>Therefore, the Committee submits that this Court should reduce R&C fee award for this project category by 30%, consistent with the Committee's request as to the fees incurred by Ice Miller concerning first and second day motions. | | |

17.    Therefore, Committee therefore respectfully requests that this Court reduce the amount awarded to R&C by $32,969.05, which is a reduction of 16.2%.

### c.  B. Riley Fee Application

| Objection Number | Committee's Objection | Amount Challenged | Reduction Requested |
|---|---|---|---|
| 1 | B. Riley spent 147.4 hours and incurred $63,705.50 in fees "gathering, reviewing and assembling the necessary information to prepare the Debtor's Statement of Financial Affairs[,]… Schedules of Assets and Liabilities" and amending the same. (ECF No. 372, at 6). The Committee agrees with the U.S. Trustee's statement that "such an amount appears to be disproportionate to the overall size and complexity of the Debtor's assets and debts." (ECF No. 393, at 12). This is particularly true in light of how much time Ice Miller spent on related tasks.<br><br>Therefore, the Committee seeks a 50% reduction in the fees awarded to B. Riley for its work related to the Debtor's schedules and statement of financial affairs. | $63,705.50 | $31,852.75 |

| 2 | B. Riley spent 210.9 hours and incurred $90,256.50 in fees conducting what it asserts to be "[a]nalysis on behalf of" the U.S. Trustee. (ECF No. 372, at 6). The Committee agrees with the U.S. Trustee that "many of the entries do not describe what documents or information is being reviewed, gathered, organized or analyzed." (ECF No. 393, at 13). In the absence of such information, it is difficult to fully evaluate the reasonableness of the fees. Furthermore, an excessive number of the time entries in this project category reflect either inter-office meetings or meetings where multiple B. Riley representatives participated without explaining the reason for such participation. In the Committee's view, this evidences inefficient staffing by B. Riley such that the fees incurred are disproportionate to the value created for the Debtor's estate.[5]<br><br>To address this vague and/or excessive billing, the Committee seeks a 50% reduction in the fees awarded to B. Riley for its work in this project category. | $90,256.50 | $45,128.25 |
| 3 | B. Riley spent 345.1 hours and incurred $135,029.00 in fees on "business analysis," which it reports "includes time spent by [B. Riley] analyzing the Debtor's financial and banking information" and "preparing the monthly operating reports" ("MORs"). (ECF No. 372, at 7).<br><br>The Committee concurs with the U.S. Trustee that B. Riley's fees for the MORs are unreasonable. (ECF No. 393, at 17-18). Furthermore, in the Committee's view, spending hundreds of hours and incurring more than $100,000 in fees "analyzing the Debtor's financial and banking information," when the Debtor itself appears to have a staffed finance office, does not appear reasonable or beneficial to the Debtor's estate, particularly considering the | $135,029.00 | $40,508.70 |

[5] The Committee acknowledges B. Riley's assertions that "each of the B. Riley professionals focuses on different aspects" but the time entries in this project category do not contain sufficient detail to evaluate whether such multi-pronged expertise were needed in such instances. (ECF No. 401, at 19). Furthermore, though B. Riley asserts that "it is more efficient to have all three professionals participate in the hearings [and presumably meetings] than to later relay information requests that have arisen during the proceedings," the time entries in this project category contain multiple instances of inter-office meetings anyway, undercutting B. Riley's argument. (*Id.*).

| | | | |
|---|---|---|---|
| | Debtor's relatively modest size. (*See* https://www.norwichdiocese.org/Find/DiocesanOffices/Diocesan-Finance-Office). Under such circumstances, the Committee requests a 30% reduction in B. Riley's fees for this project category. | | |
| 4 | B. Riley spent 27.7 hours and incurred $13,385.00 in fees when multiple professionals attended and/or participated in various hearings during the Compensation Period. (ECF No. 372-1, at 4, 7). Again, the Committee views this as evidence of inefficient staffing by B. Riley and, therefore, the fees incurred are disproportionate to the benefit created to the Debtor's estate. Accordingly, the Committee seeks a 30% reduction in B. Riley's fees for these activities. | $13,385.00 | $4,015.50 |
| 5 | B. Riley spent 58.1 hours on the "case administration" project category, incurring $29,324.50 in fees as a result.[6] (ECF Doc. Nos. 372, at 5; 372-1, at 4-5).<br><br>Certain time entries in this project category are vague or incomplete. For example, Todd Beresin's July 27, 2021, entry reads "[r]eview email correspondence, document drafts" for .9 hours, without identifying the individual(s) with whom he was corresponding, the documents he reviewed, or the purpose of these activities. Likewise, Mr. Beresin's July 23, 2021, entry reads "[r]eview and organize documents received from" for .4 hours without identifying the source of the documents or the purpose of the review. (ECF No. 372-1, at 4). Together, these entries total $513.50. The Committee submits that B. Riley has not carried its burden of showing entitlement to such fees based on these entries.<br><br>Additionally, as highlighted by the U.S. Trustee, professionals at B. Riley spent 22.2 hours and incurred $10,508 in fees participating in the section 341 meetings. (*Id.*, at 4-5). Additionally, professionals at B. Riley spent 4.3 hours, incurring | $29,324.50 | $6,734.75 |

---

[6] These figures exclude the 3.9 hours and $1,846 in fees reported in the "case administration" project category for participating in a July 30, 2021, hearing. The Committee addressed its concerns regarding such fees in objection number 4, *supra*.

| | | | |
|---|---|---|---|
| | $1,934.50 in fees, on calls related to the section 341 meetings in which multiple B. Riley professionals participated. (*Id.*). Again, the Committee views this as evidence of inefficient staffing by B. Riley and, therefore, the fees incurred are disproportionate to the benefit created to the Debtor's estate.<br><br>Accordingly, the Committee seeks (i) 100% reduction in the vague and/or incomplete time entries referenced above and (ii) a 50% reduction in the fees awarded to B. Riley for participating in section 341 meetings and calls related to the same, for a total reduction of $6,734.75. | | |

18.     Therefore, Committee therefore respectfully requests that this Court reduce the amount awarded to B. Riley by $128,374.95, which is a reduction of 33.2%.

WHEREFORE, for the reasons set forth above, the Committee respectfully requests that this Court (i) sustain this Objection; (ii) reduce the fees awarded pursuant to the Ice Miller Fee Application by $164.982.45; (iii) reduce the fees awarded pursuant to the R&C Fee Application by $32,969.05; (iv) reduce the fees awarded pursuant to the B. Riley Fee Application by $128,374.95; and, (v) grant such other and further relief as this Court deems just and proper.

Dated this 2nd day of May, 2022.

THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS FOR THE NORWICH ROMAN CATHOLIC DIOCESAN CORPORATION

By:    */s/ Eric Henzy*
Stephen M. Kindseth (ct14640)
Eric Henzy (ct12849)
Christopher H. Blau (ct30120)
ZEISLER & ZEISLER, P.C.
10 Middle Street, 15th floor
Bridgeport, CT 06605
Telephone: (203) 368-4234
Email: skindseth@zeislaw.com
        ehenzy@zeislaw.com
        cblau@zeislaw.com