**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF CONNECTICUT**
**HARTFORD DIVISION**

| | |
|---|---|
| In re:<br><br>THE NORWICH ROMAN CATHOLIC DIOCESAN CORPORATION,[1]<br><br>                Debtor. | Chapter 11<br><br>Case No:  21-20687 (JJT) |

### DECLARATION OF KAREN HUFFER IN SUPPORT OF THE FIRST AND SECOND INTERIM FEE APPLICATIONS OF DEBTOR'S PROFESSIONALS

I, Karen Huffer, pursuant to 28 U.S.C. §1746, hereby submit this declaration under penalty of perjury under the law of the United States as follows:

1. I am over 18 years of age, of sound mind, and otherwise competent to make this declaration. All facts set forth herein are based on my personal knowledge.

2. I serve as Diocesan Financial Officer of the Norwich Roman Catholic Diocesan Corporation (the "Diocese"). I have been employed by the Diocese since March 30, 2003, and in my current role since May 1, 2016.

3. In February 2021, the Diocese retained GlassRatner Advisory & Capital Group LLC, d/b/a B. Riley Advisory Services ("B. Riley") to serve as financial advisor to the Diocese. I was involved in the decision to retain B. Riley and have worked closely with the B. Riley team since then.

4. Without B. Riley's expertise, guidance and efforts, the Diocese would be unable to meet the requirements of the chapter 11 process. B. Riley's work in this case has both relied on and often supplemented our otherwise limited professional staff.

---

[1] The Debtor in this chapter 11 case is The Norwich Roman Catholic Diocesan Corporation, a/k/a The Roman Catholic Diocese of Norwich. The last four digits of the Debtor's federal tax identification number are 7373.

5. Prior to the chapter 11 filing we maintained our books and records and conducted periodic closings and formal account reconciliations in a method that met the needs of the non-profit religious organization. On an annual basis our financial accounts, which were kept in accordance with GAAP, were subject to audit. Historically, however, our financial statements were audited and presented on a combined basis with the financial results of another non-debtor entity. Our accounting system and procedures served the purposes of the Diocese sufficiently for many years but required significant material modification to meet the requirements of the bankruptcy process.

6. Unlike a large organization with the luxury of redundancy, the Diocese has never had, and could not afford, a large staff. In fact, most of the time we have been understaffed. As a not-for-profit religious, mission-driven organization, we strive to minimize our administrative staff costs, including those of the financial and accounting organization in order to focus our resources on the mission.

7. In 2020, facing certain financial challenges, the Diocese staff took a 10% across-the-board pay cut in exchange for which the work week was reduced from 35 hours per week to 30 hours per week, thereby further reducing staff capacity.

8. In the current environment, moreover, the Diocese has lost employees for various reasons, and our attempts to find replacements, given the current tight labor market, the chapter 11 status of the Diocese, and other demographic factors, have been unsuccessful.

9. At the same time, even with a fully staffed department, we would not be staffed with the expertise or capacity to meet all the requirements presented by a chapter 11 filing. This includes statutory requirements, UST-driven filing and information production requirements, and production for other constituencies such as the Creditors' Committee. The Diocese simply could

not have responded to the UST or Committee demands for substantial information since the inception of the case, while continuing to operate *and* meet the additional statutory reporting requirements under the Bankruptcy Code, with only its staff.

10. Today five individuals help the Diocese carry out its financial duties. All are full-time (approximately 30 hours per week), but only a portion of their time is dedicated to accounting tasks, as follows:

   a. Full time Diocesan Financial Officer (me);

   b. One full-time Financial Analyst responsible for payroll, some bank reconciliations, and some journal entries (the "Analyst");

   c. A non-accountant Administrative Assistant who spends approximately 15 hours per week performing basic tasks including invoicing, reporting and remitting parish extra parochial collections, and other duties as needed;

   d. One full-time professional (the "Audit/HR Professional") who spends half of his time in the "internal audit" function (where he audits the financials of parishes), and the balance of his time on employee benefits and human resources administration, including, on-boarding, terminations, program enrollments, reporting and payments; and

   e. The Vicar General's Administrative Assistant, who is also the Vocation Director's Assistant, who spends approximately one-quarter (¼) of her time (approx. 7.5 hours per week) on accounts payable and limited billing runs.

11. Despite the descriptions above, in our organization these roles are not always clear-cut, and team members often help each other to complete the necessary work within the available time frames.

12. Between July and October 2020, three members of my team resigned, as follows:

   a. Our part-time internal auditor left to go back to a prior job where she could work full-time, partially in the office and the remainder remote; this work was reallocated to the Audit/HR Professional described above, who was given a full-time status at that time.

   b. Our full-time medical, pension and human resources administration person took a job with a local town office; this work was assigned to a new part-time hire, a recent college graduate. As stated above, this employee is now a full-time staff member. The pension portion of this position has been outsourced, while the medical portion has been modified to allow locations access to enter information electronically (this reporting is necessary in order to comply with requirements of the Affordable Care Act).

   c. Our full-time accounting clerk left for a job with the State of Connecticut. She was replaced by a part-time college student who worked a flexible schedule reconciling investments and assisting parish personnel with accounting issues and other duties as needed. He completed his master's degree earlier than expected and left to join a CPA firm (a third departure). After his departure, the position was filled, but the new hire departed after only 10 days (a fourth departure).

13. We have reallocated and modified the work to the best of our abilities among the remaining staff, but we still have a staffing need. As a result, we have gone through three separate hiring initiatives both prior to and since we have been in chapter 11.

14. During our first effort, in July 2020, we advertised on Indeed, a popular online recruitment website. Through this effort we identified fifteen (15) candidates with sufficient skills on paper to merit an interview. We sent requests for 15 interviews. Six applicants didn't respond, one cancelled, and one didn't show up for the interview. Seven candidates were interviewed. Two were identified as qualified and the others were either not suitable or had inadequate experience. This included one candidate who arrived for his interview dressed in shorts and a baseball cap and presented very unprofessionally.

15. Of the 15 candidates, one was the part-time student described above, whom we hired and who subsequently left.

16. The same month, after the accounting clerk's departure, the full time Benefits Administrator left for a position with a local town office. As stated above, this position was filled on a part-time basis, by a candidate that was interviewed for the accounting clerk's position. As further stated above, this individual also took over the responsibilities of the part-time internal auditor after her departure.

17. In June 2021, we ran our second hiring effort for the accounting clerk position. This effort included Indeed, once again. This time, however, we received a disappointingly weak applicant pool that included nine applicants: one was unqualified, three cancelled their scheduled interview, and five applicants were interviewed. One person withdrew her candidacy stating that she had too much work at her current part-time job. Three interviewees were not qualified. The position was offered to one of the applicants and she began working for the Diocese. After approximately two weeks of working for the Diocese, she sent me an email stating that she didn't think she was a good fit and was concerned about the bankruptcy.

18. In July 2021, we began yet another search to fill the accounting clerk position. We advertised on Indeed, in the Four County Catholic newspaper, on the diocesan website, contacted Robert Half, and asked all the parishes in the Diocese to place the advertisement in their parish bulletins. We had eight applicants that were invited to interview. Two applicants withdrew their application. Two cancelled the morning of the interview. One of the candidates wanted to work remotely. One said that she already accepted another position. One cancelled saying that she was no longer interested. The remaining candidate was interviewed and offered the position. She accepted the position on August 13th and on August 15th she said she was no longer interested. Robert Half referred a candidate to interview. Shortly before the scheduled interview she withdrew her candidacy citing religious reasons.

19. In March 2022, we conducted yet another search for candidates for the accounting clerk position. We placed the ad in all the above listed sources. We received five applications with only four being somewhat qualified. We interviewed four candidates. After interviewing, it was apparent that one of the interviewees was not qualified. The position was offered to one of the candidates, who then informed us that she had accepted another position. The position was offered to another candidate, who stated that she thought the drive was too long and it would not work out. The last candidate (a Robert Half referral) was interviewed by phone. Unfortunately, she was not qualified.

20. In discussions with our relationship manager at Robert Half, I shared my view of the general dearth of and lack of professionalism and seriousness we have encountered among candidates. We were told that: (a) the labor pool is tight; and (b) many candidates are scheduling interviews solely to meet the "job search" requirements to receive continued unemployment benefits.

21.     Around January 2022, Robert Half introduced a candidate who appeared well-qualified on paper, but a simple background search identified prior disqualifying criminal activity and we elected not to proceed with an interview.

22.     I attribute the challenges we face in hiring to the generally low salaries that a small diocese such as ours can afford to pay; not having sufficient staff to "share the load," which can deter new hires; the general unattractiveness of Norwich, Connecticut as an ideal employment destination; and perhaps most importantly, we are in chapter 11, which presents the perception of potential job uncertainty.  With an abundance of alternative employment opportunities (as evidenced by the large number of open accounting positions in and around the area), to date we have been unsuccessful in our hiring efforts.

23.     As our financial advisor, B. Riley has performed all the tasks necessary to comply with the requirements of the bankruptcy process.  This includes preparation of schedules and statements, monthly operating reports, supplemental research, informational reporting, and providing general advice and guidance throughout the process.

24.     In order to carry out certain of its requirements, including preparation of monthly operating reports, B. Riley relies on me and my staff for financial information, account entries and historical context regarding relationships with and transactions between the Diocese and other Catholic organizations.

25.     Given the capacity and experience constraints of my staff, B. Riley assists us with compiling certain information they need to produce the requisite reports in support of our chapter 11 case.  Some of this work would not be done in the Diocese's ordinary business practice, but for the need to produce monthly operating reports and other cash flow reporting on a regular, timely

monthly basis. Outside of bankruptcy, and with a limited staff, certain of these analyses are luxuries that might or might not happen regularly. Inside of bankruptcy, we have no option.

26. Each month my limited staff performs our regular accounting functions, including banking, collections, disbursements, payroll, employee benefit functions, and posting of accounts receivable and payable transactions. We also reconcile the bank statements each month. This is all work that was done prior to the filing and will continue to be done once we emerge from chapter 11.

27. At the same time, to fulfill the requirements of chapter 11, B. Riley starts with the information we provide, including bank reconciliations, and analyzes cash transactions so they can be presented in the form and format required by the U.S. Trustee and the Creditors' Committee. This is far from a "push a button" exercise given the complexity of our cash receipts and disbursements; B. Riley facilitates this reporting efficiently, and but for the bankruptcy we would not be performing this task.

28. For example, each month B. Riley prepares, at the request of the Creditors' Committee, a report that summarizes and reconciles receipts and disbursements on a monthly basis for 51 parishes and several other Catholic organizations. But for the chapter 11 case we would not be creating this analysis on a monthly basis or at the level of detail required by the chapter 11 case.

29. Furthermore, given B. Riley's involvement as our financial advisor, it is most efficient to leverage their knowledge and skills to gather certain of the underlying accounting information necessary for the bankruptcy reporting. Our accounting systems are not sophisticated and are neither set up to produce, nor capable of producing, the required bankruptcy information in an automated fashion.

30. Prior to hiring B. Riley, we discussed with our outside independent accountants whether they could do the work proposed to be done by B. Riley. They explained that the requirements of the bankruptcy process and the details of how we account internally were both beyond their capabilities.

31. Accordingly, we hired B Riley because they have the experience and professionalism to get the job done. If we hired an outside accountant, neither they, nor I, would have the knowledge or ability to perform this work.

32. From working with the B. Riley team, I can confirm that most of the work that they performed in this matter goes well beyond what the accounting staff in a diocesan office would be able to perform. While certain reconciliations and analyses could (and perhaps would in a normal labor market) be performed by additions to our staff, B. Riley does much more than this each month. For example, the Diocese acts as a payment conduit for commercial and health insurance for parishes and other Catholic-affiliated groups. B. Riley reconciles the amounts billed to, received from, and disbursed on behalf of these groups each month. I believe that B. Riley's historic and ongoing work as our financial advisor contributes significant value for the Diocese as we navigate the complexities of the chapter 11 process.

33. At the start of the case, with my assistance, B. Riley prepared the required Statements and Schedules, initial operating reports, and replied to many additional information requests from interested parties. This could only be accomplished through a joint effort between B. Riley's financial and technical bankruptcy skills, and my personal intimate knowledge of our historic accounting procedures and relationships. Simply adding additional account staff would not have made this process any more efficient or less costly.

34. Much of the work being done by B. Riley currently was not performed previously and may not be necessary once we emerge from chapter 11. Accordingly, and assuming a more receptive labor market, it still would not be appropriate to hire accounting staff beyond our "steady state" needs and only "for the time being" for both sound business and ethical reasons:

   a. The time and cost we would incur to train such employees, much of which would need to be done by B. Riley anyway, ultimately would not benefit the estate; and

   b. We are not able to pay wages for short-term hires that are materially above what others in our organization are paid without creating precedents that would have adverse long-term financial impacts throughout the Diocese.

35. I have also reviewed the time expended by the B. Riley professionals in performing the services they performed and was frequently required to work closely with them to complete the reporting, analysis and other tasks required by the Committee, UST and under the Bankruptcy Code, and I find the time and services rendered by B. Riley to be reasonable, necessary and substantially beneficial to the Diocese.

36. Finally, as reflected by my signature on the Statements of No Objection attached to the monthly fee statements of the professionals employed by the Diocese in this chapter 11 case, I have reviewed and have no objection to each of the monthly statements relating to the first and second interim fee periods, July 15, 2021 through January 31, 2022.

I hereby certify and declare under penalty of perjury that the foregoing statements made by me are true and correct, to the best of my knowledge.

Executed on: May 9, 2022            */s/ Karen Huffer*
                                     Karen Huffer

**CERTIFICATE OF SERVICE**

       I hereby certify that on May 9, 2022, a copy of the foregoing DECLARATION OF KAREN HUFFER IN SUPPORT OF THE FIRST AND SECOND INTERIM FEE APPLICATIONS OF DEBTOR'S PROFESSIONALS was filed electronically and shall be served as required by Local Bankruptcy Rule 9013-2(b), with notice of this filing being sent by email to all parties who received service of each filing by operation of the court's electronic filing system, or by First Class U.S. mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties in interest may access this document through the court's CM/ECF System.

                                                        */s/ Patrick M. Birney*
                                                        Patrick M. Birney