**UNITED STATES BANKRUPTCY COURT
DISTRICT OF CONNECTICUT
HARTFORD DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| THE NORWICH ROMAN CATHOLIC DIOCESAN CORPORATION,[1] | Case No: 21-20687 (JJT) |
| Debtor. | |

> **THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PLAN. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT. THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT YET BEEN APPROVED BY THE COURT.**

**DISCLOSURE STATEMENT FOR CHAPTER 11 PLAN OF REORGANIZATION
PROPOSED BY OFFICIAL COMMITTEE OF UNSECURED CREDITORS
OF THE NORWICH ROMAN CATHOLIC DIOCESAN CORPORATION**

Eric A. Henzy (ct12849)
Stephen M. Kindseth (ct14640)
Daniel A. Byrd (ct31151)
ZEISLER & ZEISLER, P.C.
10 Middle Street, 15th floor
Bridgeport, CT 06605
Telephone: (203) 368-4234
Email: ehenzy@zeislaw.com
     skindseth@zeislaw.com
     dbyrd@zeislaw.com

*Attorneys for the Official Committee of
Unsecured Creditors*

---

[1] The Debtor in this chapter 11 case is The Norwich Roman Catholic Diocesan Corporation, a/k/a The Roman Catholic Diocese of Norwich. The last four digits of the Debtor's federal tax identification number are 7373.

i

The Official Committee of Unsecured Creditors (the "Committee") of The Norwich Roman Catholic Diocesan Corporation, the debtor and debtor in possession (the "Debtor" or "Diocese"), respectfully submits this disclosure statement (the "Committee Disclosure Statement") in support of the *Chapter 11 Plan of Reorganization Proposed by the Official Committee of Unsecured Creditors of the Roman Catholic Diocesan Corporation* [Dkt. No. __] as it may hereafter be amended or modified (the "Committee Plan"), a copy of which is attached to this disclosure statement as Exhibit 1.[2]

## I.        EXECUTIVE SUMMARY OF THE COMMITTEE PLAN

### A.        Introduction

On July 1, 2021, the Diocese filed a voluntary chapter 11 petition with the United States Bankruptcy Court for the District of Connecticut (the "Bankruptcy Court"). On July 29, 2021, the United States Trustee for Region 2 appointed the Committee to represent the Diocese's unsecured creditors under §1102(a)(1) of the Bankruptcy Code. The Committee consists of five individuals who hold claims against the Debtor based upon the sexual abuse they suffered as children inflicted upon them by perpetrators for whom the Diocese is responsible.

Since its appointment, the Committee and its professionals have conducted an extensive examination and analysis of the Diocese and its assets and liabilities, including insurance coverage and available causes of action against its Affiliates. In an effort to resolve this case in a manner that would provide meaningful financial compensation to the survivors of child sexual abuse and other creditors and some measure of accountability to those responsible parties while still enabling the Diocese to continue to operate and fulfill other portions of its mission, the Committee engaged in negotiations and mediations with the Diocese, certain of its Affiliates, including the parishes and three high schools, and the Diocese's primary insurer. Unfortunately, no agreement was achieved.

The Committee Plan provides the means for settling and paying all Claims asserted against the Debtor while providing for the Diocese's emergence from bankruptcy. The Committee Plan requires the Diocese to contribute certain assets to fund distributions to Abuse Claimants (significantly greater in amount than provided for in the Diocese Plan), and satisfy or otherwise leave unimpaired other creditors, while establishing a platform through which other potentially responsible parties, including certain parishes within the Diocese, and the Diocese's Insurers, may participate in the Committee Plan and resolve their liability with respect to the Abuse Claims.

Specifically, the Committee is receptive, generally, to the terms and conditions set forth in the Diocese Plan for the resolution of issues in this Bankruptcy Case related Saint Bernard School of Montville, Incorporated ("Saint Bernard School"), Xavier High School Corporation of Middletown ("Xavier High School"), and The Oceania Province of the Congregation of Christian Brothers f/k/a The St. Patrick's Province of the Christian Brothers. The Committee intends to seek and hopefully will accomplish the incorporation of similar provisions, on a consensual basis, into

---

[2] The definitions set forth in Section I of the Committee Plan apply to capitalized terms used, but not defined, in this Disclosure Statement. The rules of construction set forth in Section II of the Committee Plan apply to this Disclosure Statement.

the Committee Plan, through amendment(s), prior to the first hearing to consider the Committee Disclosure Statement.

With respect to the other primary parties to this Bankruptcy Case, unless substantial and meaningful compensation from the Diocese's Catholic Entities is provided, the Committee Plan will not grant releases or the benefit of injunctions to them, and, if confirmed, the Abuse Claimants can pursue their Abuse Claims against the Catholic Entities liable for such abuse. Similarly, the Committee insists that the Debtor's Insurers provide fair and reasonable settlement payments to the Estate to fund the Trust for the benefit of Abuse Claimants consistent with the terms and extent of coverage provided by the Insurance Policies purchased from them over decades by the Diocese and the Catholic Entities.

Because the Committee through the Committee Plan seeks to realize significantly greater value more consistent with the rights and interests of the Diocese, the Estate and its creditors including the Abuse Claimants, and for other reasons set forth herein and to be established at the Confirmation Hearing, the Committee Plan is in the best interests of, and provides the highest and most expeditious recoveries to all parties including Abuse Claimants who hold Claims against the Debtor.

**THE COMMITTEE RECOMMENDS THAT HOLDERS OF CLAIMS, INCLUDING HOLDERS OF ABUSE CLAIMS VOTE TO ACCEPT THE COMMITTEE PLAN**

This Disclosure Statement describes why Claims are placed into certain Classes, the relative allocations of property to the holders of such Claims, the manner by which the Diocese's Assets are to be distributed, the risks inherent in the Committee Plan, and the applicable bankruptcy and tax consequences of the Committee Plan. You are advised and encouraged to read this Disclosure Statement and the Committee Plan in their entirety before voting to accept or reject the Committee Plan.

The following table briefly summarizes the classification and treatment of Claims under the Committee Plan. For a more detailed description of the Committee Plan's classification and treatment of Claims, see Section VI below.

| CLASS | DESCRIPTION | IMPAIRMENT | VOTING | ESTIMATED RECOVERY |
|---|---|---|---|---|
| 1 | Other Priority Claims | Unimpaired | Deemed to Accept | 100% |
| 2 | Secured Claim of Citizens Bank, N.A. | Impaired | Yes | 100% |
| 3 | Secured Revolving Loan and Secured Guaranty Claims of M&T | Impaired | Yes | 100% |
| 4 | Abuse Claims Other Than Unknown Abuse Claims | Impaired | Yes | To Be Determined |
| 5 | Unknown Abuse Claims | Impaired | Yes | To Be Determined |
| 6 | General Unsecured Claims | Unimpaired | Deemed to Accept | 100% |
| 7 | Abuse Related Contribution Claims | Impaired | Deemed to Reject | No Recovery |

As provided by Section 1126 of the Bankruptcy Code, only classes of Claims that are both impaired under the Committee Plan and entitled to a recovery under the Committee Plan may vote to accept or reject the Committee Plan. Here, the only classes of Claims entitled to vote are Class 2 (Secured Claim of Citizens Bank, N.A.), Class 3 (Secured Revolving Loan and Secured Guaranty Claims of M&T), Class 4 (Abuse Claims other than Unknown Abuse Claims) and Class 5 (Unknown Abuse Claims) (collectively, the "Voting Classes").

**B.     Principal Terms of the Committee Plan**

This Section contains a summary of the principal terms of the Committee Plan. You should carefully review the Committee Plan in full before determining whether to vote to accept or reject the Committee Plan. To the extent that any provision of this Disclosure Statement conflicts with any term of the Committee Plan, the terms of the Committee Plan shall control.

**Platform for Reorganization, Further Negotiation, Litigation (If Necessary) and Recovery**

Through the Committee Plan, the Committee seeks to establish a platform for the Diocese to reorganize and continue its mission and support its ministries, and also to compel the Diocese to contribute a fair and equitable amount of its assets to fund distributions to Abuse Claimants. The rights of the holders of secured claims and general unsecured claims against the Diocese would not be impaired under the Committee's Plan. The expeditious reorganization of the Diocese would

also significantly reduce the further diminishment of the Diocese's resources to pay for fees and expenses incurred by Professionals employed in this case, and other bankruptcy related costs.

The Diocese's reorganization has been impeded, in large measure, by the inability to reach a compromise with Catholic Mutual Relief Society of America ("Catholic Mutual"), who provided general liability and other forms of insurance coverage to the Diocese in all years since July 1, 1977, and the Catholic Entities who seek certain releases and the benefit of the Channeling Injunction precluding Abuse Claimants from proceeding with litigation against them. The Committee proposes to break this stalemate through the Committee Plan which permits the Diocese to reorganize while transferring to the Trust the Trust Assets including the Transferred Real Estate, Transferred Causes of Action, Transferred Receivables and Transferred Insurance Interests. The Trustee would then, after the Diocese has reorganized, liquidate those assets and pursue those Causes of Action against parties other than the Diocese or resolve them through Settlement Agreements, for the benefit of Abuse Claimants.

The Catholic Entities, Non-Settling Insurers and other potentially responsible Persons would also have the ability through the Committee Plan to resolve Abuse Claims and Insurance Claims with the Trustee. The Abuse Claimant's ability to pursue the Catholic Entities, Non-Settling Insurers and other Co-Defendants would be preserved by the Committee Plan (subject to its terms and conditions) but such Catholic Entities, Non-Settling Insurers and other Co-Defendants would still, even after the Effective Date, have the ability to reach a Settlement Agreement with the Trustee, among others, and thereby, upon consummation of such settlement, receive the benefit of the releases and Channeling Injunction provided for in the Plan.

### Overview of the Treatment of Abuse Claims in Class 4 (Excluding Unknown Abuse Claims)

Excluding duplicative claims, approximately 143 individuals have filed Abuse Claims in Class 4 against the Debtor, including Late-Filed Abuse Claims, asserting claims resulting or arising in whole or in part, directly or indirectly from Abuse, and seeking monetary damages or any other relief, under any theory of liability, including vicarious liability, any negligence-based theory, contribution, indemnity, or any other theory based on any acts or failures to act by the Diocese or any other person or entity for whose acts or failures to act the Diocese is or was allegedly responsible.[3]

On the Confirmation Date, under the terms of the Committee Plan and Trust Documents, the Trust shall be created. On the Effective Date, the Trust will be funded by the Diocese with the following:

    (i)      no less than $1.3 million dollars of cash;

    (ii)    the Transferred Real Estate described in Committee Plan Section 7.1(a)4;

---

[3] "Abuse Claim" does not include any Abuse Related Contingent Claims, Extra-Contractual Claims, or Insurance Claims. To avoid doubt, Abuse Claim does not include any Claims first arising after the Petition Date or based only on conduct following the Petition Date. Abuse Claim also includes Late-Filed Abuse Claims and Unknown Abuse Claims.

(iii)     the Transferred Causes of Action including those identified in Section 7.1(a)5 of the Committee Plan;

(iv)     the Transferred Receivables itemized in <u>Exhibit I</u> to the Committee Plan; and

(v)     the Transferred Insurance Interests including the Insurance Claims against and Insurance Recoveries due from Catholic Mutual.

After the Effective Date, the Trust will also be funded through settlements reached, if any, between the Trustee and any Participating Parties and Settled Insurers. These settlement agreements (other than with respect to Transferred Receivables which will be address in accordance with the Trust Agreement) will be subject to Bankruptcy Court approval. In the event of such settlements, the Participating Parties' liabilities will be subject to the releases and Channeling Injunction provided for under the Committee Plan. Nothing in the Plan is intended to affect, diminish or impair a Class 4 Claimants rights against a Co-Defendant, including that Co-Defendant's joint and several liability for Abuse, unless and until such Co-Defendant becomes a Participating Party pursuant to the terms of the Committee Plan.

Additionally, as soon as possible after the Effective Date, and under the terms of the Committee Plan and the Trust Documents, the Trust shall make distributions to all Class 4 Claimants. The payment of the Class 4 Claims by the Trust is not a release, accord or novation of the Debtor's or the Participating Parties' liability because of the Class 4 Claims; provided, however, that the Debtor's liability because of the Class 4 Claims shall be discharged under Bankruptcy Code Section 1141(d), subject to Sections 5.4(f) and 13.1 of the Committee Plan.

Under no circumstance shall the Abuse Claims Reviewer's review of a Class 4 Claim affect the rights of a Non-Settling Insurer. Abuse Claimants in Class 4 shall have their Claims treated under the Trust Distribution Plan. Neither the Trust nor the Diocese have any obligation to take any action to enforce an Insurance Policy of a Non-Settling Insurer, including any obligation to commence and prosecute any action against any Non-Settling Insurer or to defend an action commenced by a Non-Settling Insurer, though the Trust (or the Diocese, as applicable), may do so.

The Non-Settling Insurers remain liable for their obligations related to the Class 4 Claims, and their obligations are not reduced by the Diocese being in bankruptcy or by the distributions Class 4 Claimants receive, or are entitled to receive, based on the Committee Plan. Determinations by the Abuse Claims Reviewer and/or any distributions entitled to be received from the Trust shall not constitute a determination of the Diocese's, any Participating Party's or any Non-Settling Insurer's liability or damages for Class 4 Claims.

### Overview of Treatment of Unknown Abuse Claims in Class 5

Unknown Abuse Claims in Class 5 are impaired under the Committee Plan. The Unknown Abuse Claims Trust will be funded by the Debtor and the Reorganized Debtor based, in part, upon the findings and recommendations of the Unknown Claims Representative and as determined by the Bankruptcy Court. As soon as possible after the Effective Date, and under the terms of the Committee Plan and the Unknown Abuse Claims Trust Documents, the Unknown Abuse Claims Trust shall pay all Class 5 Claimants. The payment of the Unknown Abuse Claims by the Unknown

Abuse Claims Trust is not a release, accord or novation of the Debtor's or the Participating Parties' liability because of the Unknown Abuse Claims; provided, however, that the Debtor's liability because of the Unknown Abuse Claims shall be discharged under Bankruptcy Code Section 1141(d), subject to Sections 5.5(g) and 13.1 of the Committee Plan and all of the Participating Parties' liabilities are subject to the Channeling Injunction and releases under the Committee Plan. Under no circumstance shall the Abuse Claims Reviewer's review of an Unknown Abuse Claim affect the rights of a Non-Settling Insurer. Unknown Abuse Claimants shall have their Claims treated under the Unknown Abuse Claims Trust Distribution Plan

### Overview of Treatment of Claims Other Than Abuse Claims

Claims against the Debtor that are not Abuse Claims are identified and described in full in Section VI of this Disclosure Statement. They will be treated as follows under the Committee Plan:

- Other Priority Claims in Class 1 is unimpaired under the Committee Plan and shall receive 100% recovery.

- The Citizens Secured Guaranty Claim in Class 2, and the M&T Secured Revolving Loan Claim and M&T Secured Guaranty Claim in Class 3 are impaired and shall retain the Liens securing such claims under the Committee Plan.

- General Unsecured Claims in Class 6 are unimpaired under the Committee Plan and shall receive 100% recovery.

- Abuse Related Contribution Claims in Class 7 are impaired under the Committee Plan and shall receive no recovery.

### Non-Monetary Commitments and Reforms

The Diocese has a long history of the sexual abuse of children by priests and lay people under the supervision and control of the Diocese or its Affiliates. To further efforts to prevent Abuse and other injury to children from occurring in the Diocese, the Committee requests the Diocese undertake the commitments in Exhibit G attached to the Committee Plan. The Diocese must inform the Committee which commitments it will adopt at least seven (7) days before the first date set for the hearing on approval of this Disclosure Statement.

**C.    Analysis of Amounts Available to Trust for Distribution to Abuse Claims under the Committee Plan**

Under the terms of the Committee Plan, the Diocese will transfer certain cash and assets to the Trust. The below chart estimates the amounts to be transferred to the Trust by the Diocese or to be recovered by the Trustee from the prosecution of Causes of Action, including actions against Non-Settling Insurers. **THE BELOW ESTIMATES ARE BASED ON THE COMMITTEE'S REVIEW AND ANALYSIS OF THE DIOCESE'S FINANCIAL INFORMATION TO DATE. THE ACTUAL AMOUNTS WILL DEPEND ON THE RESULT OF SALES OF CERTAIN ASSETS OR THE OUTCOME OF LITIGATION REGARDING CERTAIN**

**ASSETS. THUS, ANY ESTIMATED AMOUNT IS INHERENTLY UNCERTAIN AND THE ACTUAL AMOUNTS RECEIVED BY THE TRUST MAY DIFFER MATERIALLY.**

| DIOCESE ASSET | ESTIMATED VALUE |
|---|---|
| Cash | $1,300,000 |
| Real Estate | $17,319,000 |
| Causes of Action | To Be Determined |
| Receivables Due from Parishes and Other Catholic Entities | $7,700,000 |
| Debts Due from Mount Saint John Inc. | $4,500,000 |
| Insurance Interests | To Be Determined |

The funds and assets received by the Trust will be used for payment of expenses of the Trust and distribution to Abuse Claimants under the terms of the Trust Documents. Because of the uncertainty of the total amounts available to the Trust, the Committee cannot estimate the ultimate recoveries to Abuse Claimants. Notwithstanding this uncertainty, the Committee believes that those recoveries will be significantly greater than amounts to be distributed to Abuse Claimants under the Diocese Plan or that would be distributed to Abuse Claimants if the Diocese's Chapter 11 Case were converted to a case under Chapter 7 of the Bankruptcy Code.

The Unknown Abuse Claims Trust will be funded by the Debtor and the Reorganized Debtor based, in part, upon the findings and recommendations of the Unknown Claims Representative and as determined by the Bankruptcy Court.

Following confirmation of the Committee Plan, the Diocese's assets not contributed to the Trust or the Unknown Abuse Claims Trust will be revested in the Diocese. To facilitate the Diocese's reorganization and continued fulfillment of its mission and support of its ministries, the Committee Plan provides for the following assets, among others, to be retained by the Diocese:

- All personal property including all office equipment and books and records;
- All deposit and investment accounts with all financial institutions (other than the amount necessary to make the cash payment due on the Effective Date pursuant to the Committee Plan);
- The Chancery Office, 201 Broadway, Norwich, CT 06360;
- The Bishop's Residence, 274 Broadway Norwich, CT 06360.
- St Vincent De Paul Middletown, 613 Main St., Middletown, CT 06457; and
- Spanish Center New London, 60 Jay Street, New London, Ct 06320.

Based on the Diocese's operational history, the Committee believes that the Diocese will have sufficient funds to continue to execute its mission.

To confirm a plan, the Bankruptcy Code requires that a Bankruptcy Court find that confirmation of the plan is not likely to be followed by liquidation or the need to further financially reorganize the Debtor (the "Feasibility Test"). For a plan to meet this test, the Bankruptcy Court must determine there is a reasonable likelihood that the Reorganized Debtor will possess the working capital and other resources to meet its obligations under the Committee Plan. The Committee believes and will demonstrate at the Confirmation Hearing that the Reorganized Debtor can make all distributions required by the Committee Plan and to fund its operations going forward and, therefore, that confirmation of the Committee Plan is not likely to be followed by liquidation or the need for further reorganization.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

**DISCLAIMER**

THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF THE NORWICH ROMAN CATHOIC DIOCESAN CORPORATION, BELIEVES THAT THE CHAPTER 11 PLAN OF REORGANIZATION, ATTACHED AS EXHIBIT 1 TO THIS DISCLOSURE STATEMENT, IS IN THE BEST INTERESTS OF CREDITORS OF THE ABOVE CAPTIONED DEBTOR AND DEBTOR-IN POSSESSION AND URGES ALL HOLDERS OF CLAIMS ENTITLED TO VOTE TO ACCEPT THE COMMITTEE PLAN.

THIS ENTIRE DISCLOSURE STATEMENT AND ITS RELATED DOCUMENTS ARE THE ONLY DOCUMENTS APPROVED BY THE BANKRUPTCY COURT TO BE USED IN CONNECTION WITH THE SOLICITATION OF VOTES TO ACCEPT OR REJECT THE COMMITTEE PLAN.

THIS DISCLOSURE STATEMENT CONTAINS ONLY A SUMMARY OF THE COMMITTEE PLAN AND IS NOT INTENDED TO REPLACE A DETAILED REVIEW AND ANALYSIS OF THE COMMITTEE PLAN. ALL HOLDERS OF CLAIMS ARE ENCOURAGED TO REVIEW THE FULL TEXT OF THE COMMITTEE PLAN AND THE EXHIBITS TO THE COMMITTEE PLAN AND THIS ENTIRE DISCLOSURE STATEMENT CAREFULLY BEFORE DECIDING WHETHER TO VOTE TO ACCEPT OR REJECT THE COMMITTEE PLAN. IN THE EVENT OF A CONFLICT BETWEEN THE COMMITTEE PLAN AND THIS DISCLOSURE STATEMENT, THE PROVISIONS OF THE COMMITTEE PLAN WILL GOVERN.

THIS DISCLOSURE STATEMENT IS BASED ON THE FACTUAL INFORMATION AND THE FINANCIAL, BUSINESS, AND ACCOUNTING DATA PROVIDED BY THE DEBTOR, OR DATA OBTAINED FROM OTHER SOURCES CONSIDERED RELIABLE BY THE COMMITTEE. THE COMMITTEE'S PROFESSIONALS HAVE NOT INDEPENDENTLY VERIFIED THE FINANCIAL INFORMATION PROVIDED BY THE DEBTOR CONTAINED IN THIS DISCLOSURE STATEMENT AND MAKE NO REPRESENTATIONS OR WARRANTIES AS TO SUCH INFORMATION. THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS NOT BEEN SUBJECT TO A CERTIFIED AUDIT. THUS, THE COMMITTEE IS UNABLE TO WARRANT OR REPRESENT THAT THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS COMPLETE AND ACCURATE, ALTHOUGH REASONABLE EFFORT HAS BEEN MADE TO PRESENT COMPLETE AND ACCURATE INFORMATION BASED ON INFORMATION MADE AVAILABLE TO THE COMMITTEE AND THE COMMITTEE'S PROFESSIONALS.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND RULE 3016(b) OF THE BANKRUPTCY RULES AND NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAW OR OTHER NON-BANKRUPTCY LAW.

THIS DISCLOSURE STATEMENT MAY NOT BE RELIED ON FOR ANY PURPOSES OTHER THAN TO DETERMINE WHETHER TO VOTE TO ACCEPT OR REJECT THE COMMITTEE PLAN. NOTHING IN THIS DISCLOSURE STATEMENT IS, OR SHALL BE

DEEMED TO BE AN ADMISSION OR A DECLARATION AGAINST INTEREST BY THE
COMMITTEE (OR BY THE DEBTOR'S ESTATE TO THE EXTENT THAT THE COMITTEE
HAS, OR LATER COMES TO HAVE DERIVATIVE STANDING, TO PURSUE ESTATE
CLAIMS) FOR PURPOSES OF ANY EXISTING OR FUTURE LITIGATION AS TO
CONTESTED MATTERS, ADVERSARY PROCEEDINGS AND OTHER ACTIONS OR
THREATENED ACTIONS. THIS DISCLOSURE STATEMENT SHALL NOT CONSTITUTE
OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, STIPULATION,
OR WAIVER, BUT RATHER AS A STATEMENT MADE IN SETTLEMENT
NEGOTIATIONS. THE DISCLOSURE STATEMENT SHALL NOT BE ADMISSIBLE IN
ANY NON-BANKRUPTCY PROCEEDING NOR SHALL IT BE CONSTRUED TO BE
CONCLUSIVE ADVICE ON THE TAX OR OTHER LEGAL EFFECTS OF THE COMMITTEE
PLAN AS TO HOLDERS OF CLAIMS IN THIS CASE.

THIS DISCLOSURE STATEMENT CONTAINS STATEMENTS THAT ARE
FORWARD-LOOKING. FORWARD- LOOKING STATEMENTS ARE STATEMENTS OF
EXPECTATIONS, BELIEFS, PLANS, OBJECTIVES, ASSUMPTIONS, PROJECTIONS, AND
FUTURE EVENTS OF PERFORMANCE. AMONG OTHER THINGS, THIS DISCLOSURE
STATEMENT CONTAINS FORWARD-LOOKING STATEMENTS WITH RESPECT TO
ANTICIPATED FUTURE PERFORMANCE OF A TRUST TO BE CREATED FOR THE
BENEFIT OF HOLDERS OF ALLOWED CLAIMS, AS WELL AS ANTICIPATED FUTURE
DETERMINATION OF CLAIMS, DISTRIBUTIONS ON CLAIMS, AND RECOVERIES
UNDER INSURANCE POLICIES. THESE STATEMENTS, ESTIMATES, AND
PROJECTIONS MAY OR MAY NOT PROVE TO BE CORRECT. ACTUAL RESULTS
COULD DIFFER MATERIALLY FROM THOSE REFLECTED IN THESE FORWARD-
LOOKING STATEMENTS. FORWARD-LOOKING STATEMENTS ARE SUBJECT TO
INHERENT UNCERTAINTIES AND TO A WIDE VARIETY OF SIGNIFICANT BUSINESS,
ECONOMIC, AND COMPETITIVE RISKS, INCLUDING, AMONG OTHERS, THOSE
DESCRIBED IN THIS DISCLOSURE STATEMENT. THE COMMITTEE UNDERTAKES NO
OBLIGATION TO UPDATE ANY FORWARD-LOOKING STATEMENT. NEW FACTORS
EMERGE FROM TIME TO TIME AND IT IS NOT POSSIBLE TO PREDICT ALL SUCH
FACTORS, NOR CAN THE IMPACT OF ANY SUCH FACTORS BE ASSESSED.

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE
MADE AS OF THE DATE HEREOF. THE DELIVERY OF THIS DISCLOSURE STATEMENT
DOES NOT IMPLY THAT THE INFORMATION CONTAINED HEREIN IS CORRECT AT
ANY TIME AFTER THE DATE HEREOF, AND THE COMMITTEE DOES NOT ASSUME
ANY OBLIGATION TO UPDATE THIS DISCLOSURE STATEMENT FOR EVENTS OR
INFORMATION ARISING AFTER THE DATE HEREOF.

HOLDERS OF CLAIMS SHALL NOT CONSTRUE THIS DISCLOSURE
STATEMENT AS PROVIDING ANY LEGAL, FINANCIAL, OR TAX ADVICE. ALL
HOLDERS OF CLAIMS SHOULD CONSULT WITH THEIR OWN ADVISORS AS TO ANY
MATTERS CONCERNING THE COMMITTEE PLAN, ITS SOLICITATION, AND THE
TRANSACTIONS, TREATMENT, AND DISTRIBUTIONS CONTEMPLATED BY THE
COMMITTEE PLAN.

## TABLE OF CONTENTS

II.      REVIEW OF THE COMMITTEE PLAN AND THE DIOCESE PLAN ..........................3

    A.    The Committee Believes the Diocese Plan Offers Inadequate Compensation to Abuse Claimants and is Not Confirmable...................................................................................3

    B.    Analysis of Recoveries under Diocese Plan and Comparison with Recoveries Pursuant to Committee Plan ...............................................................................................7

    C.    The Committee Plan is in the Best Interests of Creditors.................................................9

    D.    Voting and Confirmation Procedures .............................................................................10

III.     QUESTIONS AND ANSWERS REGARDINGTHIS DISCLOSURE STATEMENT AND THE COMMITTEE PLAN .................................................................................11

IV.     OVERVIEW OF THE CHAPTER 11 PROCESS...........................................................15

    A.    A Chapter 11 Case .........................................................................................................15

    B.    A Chapter 11 Plan ..........................................................................................................16

    C.    Voting On a Chapter 11 Plan..........................................................................................16

    D.    Confirmation of a Chapter 11 Plan .................................................................................17

V.      THE DEBTOR, ITS OPERATIONS AND THE CHAPTER 11 CASE...........................18

    A.    Nature and History of the Diocese..................................................................................18

    B.    Operations of the Diocese...............................................................................................18

    C.    Mount St. John's School and its Relationship with Diocese .........................................19

    D.    Insurance Liability Coverage..........................................................................................20

    E.    Diocese Non-Abuse Related Liabilities..........................................................................23

    F.    Events Leading to the Chapter 11 Case ..........................................................................24

    G.    Events During the Chapter 11 Case ................................................................................25

VI.     KEY TERMS OF THE COMMITTEE PLAN .................................................................35

    A.    Treatment of Unclassified Claims ..................................................................................35

    B.    Treatment of Classified Claims ......................................................................................36

VII.    MEANS FOR IMPLEMENTATION OF THE COMMITTEE PLAN ............................45

    A.    Establishment Of Trust ...................................................................................................45

    B.    Liquidation And Payment of Abuse Claims ...................................................................48

    C.    Insurance Matters............................................................................................................51

    D.    Settled Insurers and Participating Parties ......................................................................56

    E.    Additional Means of Implementation of Committee Plan...............................................58

VIII.   CONDITIONS PRECEDENT ..........................................................................................62

    A.    Conditions to Effectiveness. ...........................................................................................62

IX.     TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES ..........62

X.      MISCELLANEOUS PROVISIONS..............................................................................63

   A.   Retention of Jurisdiction.....................................................................................63
   B.   Miscellaneous Provisions ....................................................................................64

XI.     EFFECTS OF PLAN CONFIRMATION AND DISCHARGE .......................................71

   A.   Discharge ..............................................................................................................71

XII.    BEST INTERESTS TEST ...........................................................................................79

XIII.   RISK FACTORS ........................................................................................................80

   A.   Parties in Interest May Object to the Committee's Classification of Claims ................80
   B.   The Committee May Not Be Able to Secure Confirmation of the Committee Plan .....80
   C.   The Debtor May Object to the Committee Plan .........................................................81
   D.   The Non-Settling Insurers May Object to the Committee Plan....................................81
   E.   Parties In Interest May Object To The Releases And Injunctions Contained In The
        Committee Plan........................................................................................................81
   F.   Nonconsensual Confirmation .................................................................................82
   G.   Non-Occurrence of the Effective Date ....................................................................82

XIV.    CERTAIN FEDERAL INCOME TAX CONSIDERATIONS.........................................82

   A.   Tax Consequences to Creditors ..............................................................................82
   B.   Tax Consequences to the Debtor.............................................................................83
   C.   Tax Consequences to the Trust................................................................................83

XV.     VOTING INSTRUCTIONS ........................................................................................84

XVI.    CONCLUSION AND RECOMMENDATION..............................................................84

## II.     REVIEW OF THE COMMITTEE PLAN AND THE DIOCESE PLAN

### A.     The Committee Believes the Diocese Plan Offers Inadequate Compensation to Abuse Claimants and is Not Confirmable

Without the support of the Committee, on January 17, 2023 the Diocese unilaterally filed its proposed *Chapter 11 Plan of Reorganization for The Norwich Roman Catholic Diocesan Corporation* [Dkt. No. 1042] (the "Diocese Plan"). In violation of Fed. R. Bankr. P. 3016(b), the Diocese failed to file its disclosure statement at the same time that it filed its Diocese Plan. Instead, the Diocese filed its proposed *Disclosure Statement for the Chapter 11 Plan of Reorganization Proposed by The Norwich Roman Catholic Diocesan Corporation* [Dkt. No. 1058] (the "Diocese Disclosure Statement"), ten days later, on January 27, 2023.

**In the Committee's opinion, the Diocese Plan does not adequately compensate the Abuse Claimants for the release of their claims against the Diocese's Catholic Entities, including the Parishes.**

The Diocese Plan is premised on the release from all child sexual abuse liability and the imposition of related "Channeling Injunction" for the benefit of certain "Participating Parties". The Diocese defines the term "Participating Parties" in the Diocese Plan (1.1.106):

> Participating Parties means the Diocese Parties, MSJ Parties, Catholic Mutual Parties, Parish Parties, Catholic Entity Parties, School Parties, Other Insured Entities, and Christian Brothers Oceania, and, in their capacity as such, their respective predecessors, successors, and Representatives; *provided, however*, a Perpetrator is not a Participating Party.

With respect to the "Parish Parties," "Catholic Entity Parties" and "Other Insured Entities" included as Participating Parties, they are defined in the Diocese Plan as follows:

> Parish Parties means any Parish, including the members of the Association of Parishes of the Roman Catholic Diocese of Norwich, Connecticut, as well as (i) each of the past, present, and future parents, subsidiaries, merged companies, divisions, and acquired companies of the members; (ii) each of " foregoing Persons' respective past, present, and future parents, subsidiaries, merged companies, divisions and acquired companies; (iii) each of the foregoing Persons' respective predecessors, successors and assigns; and (iv) any and all past and present employees, officers, directors, shareholders, principals, teachers, staff, members, boards, administrators, priests, deacons, brothers, sisters, nuns, other clergy or religious, volunteers, agents, attorneys, and representatives of the Persons identified in the foregoing subsections (i)-(iii), in their capacity as such. Nothing in the foregoing is intended to suggest that such Persons are "employees" or agents of the members or subject to their control. For the avoidance of doubt, a Perpetrator is not a Parish or Parish Party.

> Catholic Entity Parties means the Catholic Entities as well as (i) each of the past, present, and future parents, subsidiaries, merged companies, divisions, and

acquired companies of the members; (ii) each of the foregoing Persons' respective past, present, and future parents, subsidiaries, merged companies, divisions and acquired companies; (iii) each of the foregoing Persons' respective predecessors, successors and assigns; and (iv) any and all past and present employees, officers, directors, shareholders, principals, teachers, staff, members, boards, administrators, priests, deacons, brothers, sisters, nuns, other clergy or religious, volunteers, agents, attorneys, and representatives of the Persons identified in the foregoing subsections (i)-(iii), in their capacity as such. Nothing in the foregoing is intended to suggest that such Persons are "employees" or agents of the members or subject to their control. For the avoidance of doubt, a Perpetrator is not a Catholic Entity Party.

<u>Other Insured Entities</u> means those Persons and Entities listed on Schedule 2 affixed to the Plan Supplement, insured or covered or allegedly insured or covered under a Catholic Mutual Certificate or Other Insurer Policy that was issued or allegedly issued to the Diocese, but only with respect to any Claim that would be covered or alleged to be covered under that Catholic Mutual Certificate or Other Insurer Policy but for the Committee Plan or any settlement or compromise with respect to any Other Insured Policy approved by the Bankruptcy Court, including Abuse Claims based on alleged Abuse that occurred in whole or in part during the effective periods of that Catholic Mutual Certificate or Other Insurer Policy.

(Diocese Plan 1.1.22, 1.1.99 & 1.1.104.) Based on the Diocese's definition of the above parties, the Committee believes that approximately 141 entities will be relieved of all Claims including all Abuse Claims as a result of these sweeping releases. The only "contributions" being made by these Catholic Entities total $3,150,000, at best.[4] (Diocese Disclosure Statement §§ 3.9 – 3.10.)

Under the Committee Plan, if these Catholic Entities do not agree on a substantial and meaningful contribution with the Committee or, after the Effective Date of the Plan, with the Trustee of the Trust established for the benefit of Abuse Claimants, Abuse Claimants remain free to pursue such Catholic Entities in civil actions seeking their full individual damages.

The Committee believes that the "contributions" being made by the Parishes and other Catholic Entities do not justify the releases being granted to them under the Debtor Plan. The Abuse Claimants should not (and, cannot) be forced to release the Parish Parties, Catholic Entity Parties and the Other Insured Entities (each as defined above in the Diocese Plan), and the Abuse Claimants should be able to maintain and pursue those Abuse Claims against such parties outside of this Bankruptcy.

The Parish Parties, Catholic Entity Parties and Other Insured Entities ***cannot*** be released by the Diocese Plan without a significant percentage of the Abuse Claimants voting to accept the Diocese Plan and therefore consenting to such third-party releases. *See In re Metromedia Fiber Network, Inc.*, 416 F.3d 136, 141-42 (2d Cir. 2005) (ruling that non-debtor releases may "be tolerated if the affected creditors consent," but such releases should be the exception rather than

---

[4] This amount includes the full appraised value, $400,000, of the real property to be sold or contributed, 50-54 North Main St., Jewett City, Connecticut. (*See* Debtor Plan § 1.1.104.) Even assuming a buyer willing to pay this price, the net proceeds realized by the Trust on account of this property will certainly be less.

the rule); *see also In re Aegean Marine Petroleum Network, Inc.*, 599 B.R. 717 (Bankr. S.D.N.Y. 2019) (denying confirmation of a chapter 11 plan containing non-consensual third party releases); *In re Dreier LLP*, 2010 WL 1707737 (Bankr. S.D.N.Y. Apr 28, 2010) (noting that the Second Circuit is skeptical about third party releases); *In re Master Mortg. Inv. Fund, Inc.*, 168 B.R. 930, 937 (Bankr. W.D. Mo. 1994) (ruling that creditor support for proposed releases is considered the "single most important factor"). Consistent with this view, many courts have premised their approval of third-party releases on the affirmative acceptance of affected creditors. *See, e.g., Matter of Specialty Equip. Co., Inc.*, 3 F.3d 1043 (7th Cir. 1993) (allowing release if those creditors who rejected the plan or abstained from voting could still pursue claims against third-parties); *In re Washington Mutual, Inc*., 442 B.R. 314, 354–55 (D. Del. 2011) ("[T]he court concludes that any third party release is effective only with respect to those who affirmatively consent to it by voting in favor of the Plan and not opting out of the third party releases."); *In re Digital Impact, Inc.*, 223 B.R. 1 (Bankr. N.D. Okla. 1998) (ruling that plan could not be confirmed if any party who would be bound by the release did not vote for the plan); *In re W. Coast Video Enters., Inc.*, 174 B.R. 906, 911 (Bankr. E.D. Pa. 1994) ("[E]ach creditor bound by the terms of the release must individually affirm same . . . ."); *Ocean Carriers Ltd.*, 251 B.R. 31, 43 (D. Del. 2000) (requiring that the affected class accept the plan by at least the percentages required by Section 1126 of the Bankruptcy Code); *In re Flintkote Co.,* 04-11300 (MFW), 2015 WL 4762580, at *10 (Bankr. Del. Aug. 12, 2015) (finding the plan was overwhelmingly accepted when between 94% and 99% of affected creditors voted for the Plan). The Second Circuit also requires that released parties substantially contribute to the estate and for the plan to "otherwise provide[] for the full payment of the enjoined claims." *Metromedia*, 416 F.3d at 142.

Critically, the law on channeling injunctions and third-party releases is in flux. On December 16, 2021, the United States District Court for the Southern District of New York in the Purdue Pharma bankruptcy reversed the bankruptcy court's order confirming a chapter 11 plan that had over 90% support from creditors affected by the releases the District Court found problematic. *In re Purdue Pharma, L.P.,* 635 B.R. 26 (S.D.N.Y. 2021). Specifically, the district court found that the bankruptcy court lacked subject matter jurisdiction to enter the releases. *Id.* The District Court's ruling is on appeal and the Second Circuit has yet to rule. But while the state of the law may be fluid, it is not trending toward ***broader*** releases or releases not sustained under the current law embodied in *Metromedia*. Thus, the Abuse Claimants cannot be forced to release the Parish Parties, Catholic Entity Parties and Other Insured Entities unless a significant percentage of the Abuse Claimants consent to granting such releases through the Diocese Plan.

And yet, the Parish Parties, Catholic Entity Parties and Other Insured Entities are making only limited contributions to the Diocese Plan. The Diocese provides no information on their potential exposure to Abuse Claims or any information about their available assets to pay such liabilities. The Committee has performed a detailed investigation examining the significant assets and exposure of these Catholic Entities, including the Parish Parties, and submits that the contributions being made are not substantial and are not meaningful.

The Committee fully understands that the vast majority of Abuse Claims filed in this Bankruptcy Case which directly implicate various Catholic Entities (in addition to the Diocese) raise an issue as to the applicability of Connecticut's statute of limitations, Conn. Gen. Stat. 52-577(d) (2018), because, for these Abuse Claims, the Abuse Claimants first commenced such claim

against the Diocese after they had reached the age of 48, and, upon information and belief, they have not commenced an action to assert such claims against the implicated Catholic Entity. But whether the statute of limitations precludes these child sexual abuse claims against such Catholic Entities has not been adjudicated and cannot be adjudicated in this Bankruptcy Case. The Catholic Entities elected not to file for bankruptcy relief and are not entitled to the benefits of a debtor in bankruptcy. Furthermore, as has occurred in many states throughout this country, Connecticut may at some point in the future pass legislation terminating such statute of limitations or creating a window through which such child sexual abuse claims may be timely commenced against the Catholic Entities.[5] The Diocese, Catholic Mutual and the Catholic Entities seek to foreclose that possibility through the Diocese Plan. To be perfectly clear, the Committee believes that this may be legitimately and equitably accomplished in bankruptcy through a plan of reorganization so long as the contributions made by the potentially responsible parties are meaningful and substantial, and receive overwhelming support from the affected Abuse Claimants. The Committee believes that such contributions proposed in the Diocese Plan are not substantial and meaningful in relation to the nature and number of Abuse Claims asserted against the Catholic Entities, and the Catholic Entities' available assets and ability to pay more. The Committee also believes that the Diocese Plan will not be supported by the Abuse Claimants.

If the Abuse Claimants reject the Diocese Plan, the third-party non-debtor releases embodied in the Diocese Plan cannot be granted. The Committee Plan does not provide a release of the Catholic Entities, including the parishes, unless such entities reach an agreement with the Committee upon their monetary contributions and such agreement is incorporated into the Committee Plan. In the absence of such an agreement with the Committee, pursuant to the Committee Plan, the Abuse Claimants will be free to pursue claims against the Catholic Entities in civil actions.

**In the Committee opinion, the Diocese Plan does not realize fair and reasonable value in exchange for the release of all Insurance Claims against Catholic Mutual.**

In exchange for $5 million, the Diocese proposes to fully and finally settle all Insurance Claims against Catholic Mutual on account of all approximately 100 known Abuse Claims and all Unknown Abuse Claims which implicate various policies provided by Catholic Mutual to the Diocese and the Diocese's Catholic Entities in all years from July 1, 1977, through the Diocese's bankruptcy filing and even to the effective date of the Diocese Plan. The Committee submits that no less than $60 million of insurance coverage provided by Catholic Mutual has been triggered by the known Abuse Claims filed in this Bankruptcy Case. Although the Committee fully understands that some disputed issues exist with respect to this insurance coverage, the $5 million offered by Catholic Mutual and advocated by the Diocese falls well below the reasonable range of compromise.

**THE COMMITTEE STRONGLY RECOMMENDS THAT THE HOLDERS OF ABUSE CLAIMS REJECT THE DIOCESE PLAN AND THEREBY REFUSE TO APPROVE**

---

[5] Such legislation has already been proposed in Connecticut during its current legislative session. *See* H.B. 6455 An Action Concerning Civil and Criminal Statutes of Limitations on Child Sexual Abuse Matter (2023).

**THE DIOCESE'S SETTLEMENT WITH CATHOLIC MUTUAL AND REFUSE TO GRANT THE RELEASES OF RELATED THIRD-PARTIES.**

**B.      Analysis of Recoveries under Diocese Plan and Comparison with Recoveries Pursuant to Committee Plan**

The Committee believes that the potential amounts to be paid to Abuse Claimants is far greater under the Committee Plan than the Diocese Plan.

**Contribution of Assets by the Diocese.**

The Diocese severely restricts the assets it contributes to the Diocese Plan Trust holding back substantial value that should be paid to the victims of sexual abuse.

The below chart compares the assets to be included in the respective Abuse Claimant Trusts under the Committee Plan as opposed to the Debtor Plan.

| DIOCESE ASSET | COMMITTEE PLAN | DIOCESE PLAN |
|---|---|---|
| Cash | $1,300,000 | $1,000,000 |
| Real Estate[6] | $16,850,000 | $8,746,000 |
| Causes of Action | Transferred To Trust To be Enforced | $0.00 |
| Receivables Due from Parishes and Other Catholic Entities | $7,700,000[7] | $0.00 |
| Debts Due from Mount Saint John Inc. | $4,500,000[8] | $4,396,000 |
| Insurance Interests | Transferred To Trust To be Enforced | $5 Million[9] |

[6] To fairly compare the Committee Plan versus the Diocese Plan, the amount was based on stated "appraised value" provided on current municipal records, except for the following: (i) 1740 Randolph Rd., Middletown, which was based on the formal appraisal report obtained by the Committee, and reduced by the current balance due on the mortgage against the real estate; (ii) 181 Randolph Rd., Middletown, which was based on the current proposed purchase price (subject to current encumbrances); and (iii) 1593 Route 32, Deep River, which was based on current proposed purchase price. Such estimated fair values were then further reduced by 7% for anticipated reasonable closing costs.

[7] Represents Diocese's stated balance due from parishes and other Catholic Entities (not including Mount Saint John Academy) on or about the Petition Date discounted by 30% due to estimated actual collection recovery.

[8] The Committee anticipates, based on its extensive investigation, that $4.5 million will be the minimum amount that should be received on account of the Trustee's enforcement of the Diocese's rights against and interests in Mount Saint John Inc.

[9] Under the Debtor Plan, this amount is paid by Catholic Mutual on account of the Diocese's and the Catholic Entities' interests the Insurance Policies provided by Catholic Mutual.

**Contribution of Assets by the Parishes and Other Catholic Entities.**

The Diocese Plan also provides for releases and the benefit of the Channeling Injunction to certain non-debtors in return for certain contributions to be made by those Catholic Entities, including the parishes and schools located within the Diocese, and MSJ.

The Committee Plan does not provide for releases to non-debtors. However, the Committee Plan expressly provides that the Trustee, after the Effective Date of the Committee Plan, may enter into Settlement Agreements which will confer upon any Participating Party or Settled Insurer the benefit of the releases provided for in the Committee Plan.

The below chart compares the amounts to be contributed by certain non-debtors under the Diocese and Committee Plans.

| NON-DEBTOR ENTITY | COMMITTEE PLAN | DIOCESE PLAN |
|---|---|---|
| Parishes | Amount Paid Upon Settlement with Trustee | $2,900,000[10] |
| Other Catholic Entities[11] | Amount Paid Upon Settlement with Trustee | $250,000 |

**Failure of the Diocese Plan to Satisfy the Best Interests Test**

The Diocese Disclosure Statement fails to establish that the Abuse Claimants will receive more under the Diocese Plan, including the loss of the claims against third-parties, than the Abuse Claimants would receive in a hypothetical liquidation in which survivors could pursue their claims against the Parish Parties, Catholic Entity Parties and the Other Insurance Entities, including the parishes. The Diocese claims that the Best Interests Test is "more readily satisfied" by not for-profit entities ("NFPs"). (Diocese Disclosure Statement § 19.2). The Diocese is wrong as a matter of law.

No court has ever held a NFP debtor is exempt from the traditional application of § 1129(a)(7). In most NFP cases, the court ruling on confirmation of a plan makes the finding that the best interests test has been met using traditional best interest test valuation.[12] The *Boy Scouts*

---

[10] This estimate assumes the amount of $400,000 will be received from the sale of the real property known as 50-54 North Main Street, Jewett City, Connecticut. The net proceeds from this sale will likely be substantially less.

[11] The Committee does not anticipate any further value being received from Mount Saint John, Inc. in addition to the amounts realized on account of the Diocese' contribution related to Mount Saint John, Inc., under either the Committee Plan or the Debtor Plan.

[12] *See, e.g.*, *In re Charles St. African Methodist Episcopal Church of Boston*, 499 B.R. 66, 107 (Bankr. D. Mass. 2013); *In re Mandalay Shores Cooperative Housing Assoc.*, 53 B.R. 609, 615 (Bankr. M.D. Fla. 1985); *Sec. Farms v. Gen. Teamsters, Warehousemen & Helpers Union, Local 890 (In re Gen. Teamsters, Warehousemen & Helpers Union, Local 890)*, 265 F.3d 869, 877 (9th Cir. 2001); *In re Wabash Valley Power Ass'n*, 1991 Bankr. LEXIS 2213, *155 (Bankr. S.D. Ind. August 7, 1991); *In re Albert Lindley Lee Mem. Hosp.*, 2010 Bankr. LEXIS 4148, *13 (Bankr. N.D.N.Y. July 15, 2010); *In re Oaks*, 2012 Bankr.

*of America* ("BSA") case specifically addressed the argument that the best interest test does not apply in NFP cases.[13] Judge Silverstein expressly dismissed the argument that the best interest test does not apply to NFPs because NFPs cannot be forced into chapter 7.[14] "Section 1129(a)(7) is a confirmation requirement and ***there is no exception for non-profits***. Even if one could look beyond the plain language of the statute, there is nothing illogical about requiring a non-profit to show that it can meet this requirement in order to obtain the benefits of a confirmed plan. A non-profit has options if it is in financial distress. It can voluntarily file a bankruptcy case under either chapter 11 or chapter 7 or it can look to its state law alternatives. ***But, to obtain a discharge in bankruptcy, it must meet all applicable requirements of § 1129.***"[15]

Ordinary principles of statutory construction support Judge Silverstein's decision. In 2005, Congress amended the Bankruptcy Code[16] to recognize and protect the rights of NFPs seeking bankruptcy protection as well as those of the persons served by the NFPs.[17] Given these changes, had Congress intended to exempt NFP chapter 11 debtors from the confirmation requirement of § 1129(a)(7), or impose a lesser standard, it would have expressly done so. The Best Interest Test, therefore, applies to the Diocese to the same extent as any other Chapter 11 debtor and it must satisfy that requirement as at least one Abuse Claimant will undoubtedly insist. In making a best interest determination with respect to the Diocese Plan, the Diocese must also factor in the potential recoveries to Abuse Claimants from the Diocese's Catholic Entities assessing both their potential liability and their ability to satisfy those liabilities.[18]

## C.      The Committee Plan is in the Best Interests of Creditors

As discussed in the unaudited Liquidation Analysis attached to this Disclosure Statement as Exhibit 2, the Committee estimates that recoveries under the Committee Plan for all holders of Allowed Claims will be greater than their recoveries in a liquidation under chapter 7 of the

---

LEXIS 5359, *31-32 (Bankr. N.D. Ill. November 15, 2012) (creditor plan); *In re Nat'l Heritage Found., Inc.*, 2009 Bankr. LEXIS 4928, *20-23 (Bankr. E.D. Va. October 16, 2009); *In re Save Our Springs (S.O.S.) Alliance, Inc.*, 388 B.R. 202, 239 (Bankr. W.D. Tex. 2008) (Court found that "considering the unique nature of the Debtor as a non-profit organization dependent on contributions that are voluntary and may be restricted, and of the [limited value of] Debtor's other assets," there was sufficient proof that the plan met the best interest test.).

[13] *In re BSA*, 642 B.R. 504 (Bankr. D. Del. 2022).

[14] *See* 11 U.S.C. § 1112(c).

[15] *Id.* at 662 (emphasis added).

[16] The Bankruptcy Abuse Prevention and Consumer Protection Act of 2005.

[17] *See* 11 U.S.C. §§363(d), 541(f) and 1129(a)(16).

[18] *In re Ditech Holding Corp.*, 606 B.R. 544, 614 (Bankr. S.D.N.Y. 2019); *see also Mercury Capital Corp. v. Milford Conn. Assocs.*, L.P., 354 B.R. 1, 9 (D.Conn.2006) ("[T]he best interests equation also properly mandates consideration of creditors' comparative recoveries on non-debtor claims, to the extent the plan is treating those non-debtor claims by release."); *In re Washington Mutual, Inc.*, 442 B.R. 314 (Bankr. D. Del. 2011) ("[I]n a case where claims are being released under the chapter 11 plan but would be available for recovery in a chapter 7 case, the released claims must be considered as part of the analysis in deciding whether creditors fare at lease as well under chapter 11 plan as they would in a chapter 7 liquidation"); *In re Quigley*, 437 B.R. 102 (Bankr. S.D.N.Y. 2010) ("[T]he critical question is whether I should consider the value of these derivative claims in deciding whether the Fourth Plan is in the 'best interest' of the dissenting Non-Settling Claimants. I conclude that I must.").

Bankruptcy Code or under the Diocese Plan. The Committee believes that the value that can be realized from the liquidation of the Debtor's assets will be less than those that will be realized through the monetization of those assets by the Diocese or the Trust, as applicable. The Liquidation Analysis does not include estimates of recovery from the Debtor's Insurance Policies. Such estimates would be inherently imprecise because, given insurer coverage defenses and defenses to Abuse Claims, the liquidation value of those policies cannot be determined with precision. Under the Committee Plans, the recoveries from the Debtor's Insurance Policies will be available to Abuse Claimants.

Any distributions in chapter 7 would also be reduced by the additional administrative expenses that a chapter 7 trustee (who must be appointed in any chapter 7 case) and the trustee's professionals would incur. Also, because a new deadline will be set for creditors to file claims against the Debtor's estate (including for creditors who did not file their claims), additional claims may be filed that reduce the amount for each allowed claims. Distributions in a chapter 7 case will then be delayed due to the time it will take the chapter 7 trustee to assess the Debtor's Assets, review and analyze claims filed against the Debtor, and liquidate the Debtor's property for distribution. Claimants entitled to vote to accept or reject the Committee Plan should review the Liquidation Analysis before casting their votes. Because the Committee Plan will provide a greater total amount of property to distribute to holders of Allowed Claims than would be the case in a liquidation under chapter 7, and because the Committee Plan would provide a greater ultimate return to the Abuse Claimants because, the Diocese's Catholic Entities will either have contributed to the Trust or, if they do not contribute, the Abuse Claimants will maintain their claims against and be able to pursue the Catholic Entities, the Committee submits that the Committee Plan is in the best interest of creditors and urges Claimants to vote for the Committee Plan.

## D.     Voting and Confirmation Procedures

By order dated _____ __, 2023 (the "Disclosure Statement Order"), the Bankruptcy Court approved this Disclosure Statement as containing adequate information of a kind and in sufficient detail to enable creditors of the Debtor to decide whether to accept the Committee Plan.

A copy of the Disclosure Statement Order is attached as Exhibit 3. The Bankruptcy Court's approval of the Disclosure Statement does not constitute a recommendation by the Bankruptcy Court to creditors they should vote to accept or to reject the Committee Plan. Holders of Allowed Claims in Voting Classes can find voting instructions in the Disclosure Statement Order and in the Ballots that accompany this Disclosure Statement. To vote only, each Abuse Claim in Class 4 will be valued at one dollar ($1.00). To vote only, the Unknown Claims Representative is deemed to have an Allowed Claim in the amount of one dollar ($1.00). To be counted, Ballots must be properly completed, executed, and actually received by the Debtor's claims agent (the "Claims Agent"), by 5:00 p.m. (prevailing Eastern time), on _____, 2023 (the "Voting Deadline").

The Bankruptcy Court has scheduled a hearing to consider confirmation of the Committee Plan to commence _____, 2023 at _____ (prevailing Eastern time) (the "Confirmation Hearing"), [location/zoom info]. This hearing may be adjourned occasionally, including without further notice other than by announcement in the Bankruptcy Court on the scheduled date of the Confirmation Hearing. At the Confirmation Hearing, the Bankruptcy Court will consider whether

the Committee Plan satisfies the Bankruptcy Code for confirmation. The Bankruptcy Court will also receive and consider a Ballot report prepared by the Debtor's Claims Agent tabulating the votes accepting and rejecting the Committee Plan.

[The Bankruptcy Court also approved the Diocese Disclosure Statement. The voting deadline regarding the Diocese Plan is the Voting Deadline. The Bankruptcy Court has scheduled the confirmation hearing regarding the Diocese Plan simultaneously with the Confirmation Hearing regarding the Committee Plan.]

## III.    QUESTIONS AND ANSWERS REGARDINGTHIS DISCLOSURE STATEMENT AND THE COMMITTEE PLAN

**Why is the Committee sending me this Disclosure Statement?**

The Committee is seeking Bankruptcy Court approval of the Committee Plan. This Disclosure Statement contains information about the Committee Plan. Section 1125 of the Bankruptcy Code requires the Committee to provide a Disclosure Statement approved by the Court with the Committee Plan to assist you in making an informed judgment about whether you will accept or reject the Committee Plan.

**What happens to my recovery if the Committee Plan is not confirmed, or does not go effective?**

If the Committee Plan is not confirmed, the Committee believes that recoveries for all claimants, including Abuse Claimants, will be materially reduced, including the recoveries to Abuse Claimants if the Diocese Plan is confirmed.

**If the Committee Plan provides that I get a distribution, do I get it upon Confirmation or when the Committee Plan goes effective, and what do you mean when you refer to "Confirmation" and "Effective Date"?**

"Confirmation" of the Committee Plan refers to the Bankruptcy Court approving the Committee Plan. Confirmation of the Committee Plan by a final order of the Bankruptcy Court will bind the Debtor, any person acquiring property under the Committee Plan, and any creditor, including Abuse Claimants, to the terms of the Committee Plan, in full satisfaction and compromise of any obligations that arose before this Case. Confirmation of the Committee Plan does not guarantee you will receive the distribution contemplated under the Committee Plan. After confirmation of the Committee Plan by the Bankruptcy Court, there are conditions that need to be satisfied or waived so the Committee Plan can be consummated and become effective on the "Effective Date." The "Effective Date" will occur when there is a final Bankruptcy Court order confirming the Committee Plan, the Trustee and the Reorganized Debtor sign the Trust Agreement, and all parties contributing to the Trust transfer their funds or related assets to the Trust. Distributions will be made after the Effective Date or as set forth in the Committee Plan to holders of Claims other than Abuse Claimants in Class 4 and Unknown Abuse Claimants in Class 5. Abuse Claimants in Class 4 will receive distributions under the terms of the Trust Agreement and the Trust Distribution Plan, and Unknown Abuse Claimants in Class 5 will receive distribution under

the terms of the Unknown Abuse Claims Trustee Agreement and Unknown Abuse Claims Trust Distribution Plan.

**Will there be any releases granted to parties other than the Debtor, or any injunctions entered as part of the Committee Plan?**

### Releases and Injunctions

Any of the Insurers, the Catholic Entities or other Person, including Oceania, may elect to compromise and settle with the Committee, at its sole and absolute discretion, any Claims against them related to Abuse, before the initial date set for the approval of the Disclosure Statement, and such agreement shall be incorporated into the Committee Plan by its amendment. Upon the Effective Date of the Committee Plan, the Insurers whose agreements have been incorporated into the Committee Plan shall become Settled Insurers, and the Catholic Entities and other Persons whose agreements have been incorporated into the Committee Plan shall become Participating Parties. As Settled Insurers and Participating Parties, they will be entitled to the benefits of the releases and Channeling Injunction provided for in the Committee Plan.

The Channeling Injunction prohibits any persons from asserting against any Participating Party or Settled Insurer any claim related to any Abuse Claim, any insurance policies issued by the Settled Insurers, or any claim against any Participating Party for contribution, indemnity, defense, subrogation, or similar relief.

To effectuate such agreements with the Committee, all Abuse Claimants may be required to execute a release of the Participating Parties and the Settled Insurers, and all known or unknown parties who may claim coverage under any insurance policy issued to the Debtor by a Settled Insurer of any Claims arising from or relating to Abuse Claims or Unknown Abuse Claims, in order to receive any distribution from the Trust. The release must be in form and substance acceptable to the Committee, the Diocese, the Participating Parties and the Settled Insurers. Notwithstanding the above, to preserve coverage under any Non-Settling Insurer's Insurance Policies, Class 4 and Class 5 Claimants specifically reserve, and do not release, any claims they may have against the Diocese, the Reorganized Debtor, or any other Participating Party that implicate coverage under any Non-Settling Insurer's Insurance Policies, but recourse is limited as described in greater detail below. (Collectively, all terms of release set forth in this paragraph, the "Release Terms.")

In the event no Insurer and no Catholic Entity enters into an agreement with the Committee to compromise and settle Claims related to Abuse, which agreement is incorporated into the Committee Plan, then no Catholic Entity and no Insurer will be released from any of their obligations or liabilities under the Committee Plan and there will be no Channeling Injunction on the Effective Date, and holders of Claims will maintain the right to litigate against them.

After the Effective Date of the Committee Plan, in the event any Person enters into a Settlement Agreement with the Trustee which is approved by the Bankruptcy Court, such Person will become entitled to the benefits of either a Participating Party or Settled Insurer under the Committee Plan. To effectuate such Settlement Agreement with the Trustee, all Abuse Claimants

may be required to execute a release of the Participating Parties and the Settled Insurers, subject to the Release Terms set forth above, in order to receive any distribution from the Trust.

### Debtor Discharge

Except as otherwise provided in the Committee Plan or in the Confirmation Order, on the Effective Date under Section 1141(d) of the Bankruptcy Code, the Diocese will be discharged from all liability for any Claims and Debts that occurred before confirmation of the Committee Plan, and Abuse Claimants will only be permitted to recover on their claims from the Debtor's Insurance Policies or from non-debtors also found to be liable for the Abuse Claims. Any claims that Abuse Claimants may have against non-debtors are unimpaired by the Committee Plan. Notwithstanding the above, to preserve coverage under any Non-Settling Insurer's Insurance Policies, Class 4 and Class 5 Claimants specifically reserve, and do not release, any claims they may have against the Diocese, the Reorganized Debtor, or any other Participating Party that implicate coverage under any Non-Settling Insurer's Insurance Policies, but recourse is limited to the proceeds of the Non-Settling Insurer's Insurance Policies and all other damages (including extra-contractual damages), awards, judgments over policy limits, penalties, punitive damages and attorney's fees and costs that may be recoverable against any Non-Settling Insurers because of their conduct about insurance coverage for, or defense or settlement of, any Abuse Claim. Any such judgments or awards will be handled under the Committee Plan and the Trust Distribution Plan. The Class 4 and Class 5 Claims will not be released or enjoined as against the Diocese, the Reorganized Debtor, or any other Participating Party for any Abuse that may be covered under any Non-Settling Insurer's Insurance Policies until such claims are settled with the Reorganized Debtor, any other Participating Party and such Non-Settling Insurer or are adjudicated, resolved, and subject to a Non-Appealable Order, but recourse is limited as described above.

### Discharge Injunction

If the Committee Plan is confirmed the Debtor will receive the benefit of a discharge injunction in Section 5.4(g) and 13.1 of the Committee Plan.

### Exculpation and Limitation of Liability

Certain Exculpated Parties will be protected from claims arising from or relating to any act or omission with this Bankruptcy Case, pursuing confirmation of the Committee Plan, or the administration of the Committee Plan, including the exercise of their business judgment and the performance of their fiduciary obligations. These Exculpated Parties are defined in Section 1.1 of the Committee Plan to include the Debtor, the Reorganized Debtor, the Committee and its members, the Committee's professionals, the Future Abuse Claims Representative, the Unknown Abuse Claims Representative's Professionals, and each of their respective predecessors, successors, assigns, past and present and former shareholders, affiliates, subsidiaries, employees, agents, officers, directors, trustees, partners, attorneys, financial advisors, accountants, and consultants, each in their capacities solely as such.

Protecting this exculpation and limitation of liability will not extend to any person who committed an act or acts of abuse resulting in a claim against the Debtor. The exculpation and limitation of liability will also not apply to any claims arising from willful misconduct or fraud.

**How do I vote for or against the Committee Plan?**

This Disclosure Statement is being distributed to the holders of Claims entitled to vote on the Committee Plan, along with Ballots to be used for voting on the Committee Plan. If you are a holder of a Claim in Class 2 (Secured Claim of Citizens Bank, N.A.), Class 3 (Secured Revolving Loan and Secured Guaranty Claims of M&T), Class 4 (Abuse Claims) or Class 5 (the Unknown Abuse Claims),[19] you may vote for or against the Committee Plan by completing your Ballot and by (a) mailing it to [NRCD-Committee Plan Ballot Processing, c/o _____] (the "Voting Agent"), or (b) sending a signed, scanned copy of the Ballot via email to [_____]. Do not send your Ballot to the Debtor, the Committee or to the Bankruptcy Court – it will not be counted.

**How do I vote for or against the Diocese Plan?**

The Diocese is also soliciting votes for the Diocese Plan. The Diocese has distributed the Diocese Disclosure Statement and Diocese Plan to holders of claims eligible to vote on its Plan.

Instructions for how to vote on the Diocese Plan are included in those materials. The Committee recommends that you vote to **REJECT** the Diocese Plan.

**What is the deadline to vote on the Committee Plan?**

All Ballots must be **actually received** by the Voting Agent (_____) by the Voting Deadline of 5:00 p.m. (prevailing Eastern time) on ____, 2023, via mail or email. If your Ballot is not received by the Debtor's Claims Agent by the Voting Deadline, and such deadline is not extended, your vote on the Committee Plan will not be counted. The same Voting Deadline applies to votes on the Diocese Plan.

**What is the Confirmation Hearing and when is it scheduled to occur?**

Section 1128(a) of the Bankruptcy Code requires that the Bankruptcy Court hold a hearing on confirmation of the Committee Plan. Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to confirmation of the Committee Plan. The standards for confirmation are set forth above and in Section 1129 of the Bankruptcy Code.

The Bankruptcy Court has scheduled the Confirmation Hearing to commence on _____, 2023 at [_____] (prevailing Eastern time) before the Honorable James J. Tancredi, United States Bankruptcy Judge for the Bankruptcy Court of the District of Connecticut, [location/zoom]. The Confirmation Hearing may be adjourned occasionally, including without further notice except for an announcement of the adjourned date made at the Confirmation Hearing.

---

[19] The Unknown Claims Representative will vote to accept or reject the Committee Plan on behalf of Unknown Abuse Claims.

Objections to Confirmation of the Committee Plan must be filed and served on the Notice Parties (defined below) **no later than _____, 2023, at 4:00 p.m.** (prevailing Eastern Time) under the notice of the Confirmation Hearing that accompanies this Disclosure Statement. Unless objections to the confirmation of the Committee Plan are timely filed and served, those objections might not be considered by the Bankruptcy Court.

**What role does the Bankruptcy Court play after the Confirmation Hearing?**

After the Committee Plan is confirmed, the Bankruptcy Court will still have exclusive jurisdiction over all matters arising under, in furtherance of, or in connection with, the Committee Plan. These matters include: (1) determining objections to disputed claims and requests for payment on administrative expense claims; (2) resolving controversies and disputes regarding interpretation and implementation of the Committee Plan and related documents; (3) entering orders to protect parties from actions prohibited under the Committee Plan; (4) approving amendments to and modifications of the Committee Plan; (5) determining any applications, adversary proceedings, and contested or litigated matters pending on the Effective Date; and (6) the closure of this chapter 11 case.

**Does the Committee recommend voting for the Committee Plan?**

Yes. The Committee recommends voting for the Committee Plan because the Committee Plan provides for a larger distribution to the Abuse Claimants than would otherwise occur under the Diocese Plan or result from liquidation.

**THE COMMITTEE RECOMMENDS THAT THE HOLDERS OF CLAIMS IN THE VOTING CLASSES VOTE TO ACCEPT THE COMMITTEE PLAN**.

## IV.    OVERVIEW OF THE CHAPTER 11 PROCESS

**A.    A Chapter 11 Case**

Chapter 11 of the Bankruptcy Code allows a debtor to reorganize its operations in an orderly fashion to benefit its creditors and other parties in interest.

The commencement of a chapter 11 case creates an estate comprising all the legal and equitable interests of the Debtor as of the date the petition is filed. Sections 1101, 1107, and 1108 of the Bankruptcy Code provide that a debtor may continue to operate and remain in possession of its property as a debtor in possession unless the Bankruptcy Court orders the appointment of a trustee. In the Debtor's case, there has been no request to appoint a trustee and the Debtor remains a debtor in possession.

Filing a petition under the Bankruptcy Code triggers the automatic stay provisions of the Bankruptcy Code. Section 362 of the Bankruptcy Code provides for an automatic stay of all attempts by individuals and entities to collect on pre-petition claims against a debtor, continue lawsuits against a debtor, or otherwise exercise control over or interfere with a debtor's property

or operations. The automatic stay remains in full force and effect until the effective date of a confirmed chapter 11 plan, unless otherwise ordered by the Bankruptcy Court.

**B.      A Chapter 11 Plan**

The formulation of a chapter 11 plan is the principal purpose of a chapter 11 case. A chapter 11 plan sets forth the means for satisfying the claims against in a debtor's estate. Once a plan is confirmed by a bankruptcy court, it becomes binding on a debtor and all of its creditors, and the prior obligations owed by a debtor to such parties are compromised and exchanged for the obligations specified in the Committee Plan.

**C.      Voting On a Chapter 11 Plan**

**Court Approval Required**

Before a debtor solicits votes to accept a proposed plan, Section 1125 of the Bankruptcy Code requires a debtor to prepare and file a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment about whether to accept or reject the Committee Plan. This Disclosure Statement is presented to holders of Claims against the Debtor to satisfy the requirements of Section 1125 of the Bankruptcy Code.

**Impaired Classes with Recoveries Entitled to Vote**

After the disclosure statement to a chapter 11 plan has been approved by a bankruptcy court, creditors whose claims against a debtor are impaired under a plan, and who may receive some recovery under the plan, may vote to accept or reject the plan. Section 1124 of the Bankruptcy Code provides that a claim is impaired if the legal, equitable, or contractual rights of the claim are altered. As an example, a claim is impaired if the time for the debtor to pay the amount due is extended beyond the time originally contemplated by the parties. A claim is also impaired if the plan provides that a claimant may only pursue recovery on the claim against certain, rather than all, of the debtor's assets after the chapter 11 case.

Applying these rules, only certain classes of Claims against the Debtor are entitled to vote. Class 2 (Secured Claim of Citizens Bank, N.A.), Class 3 (Secured Claims of M&T), Class 4 (Abuse Claims), and Class 5 (Unknown Abuse Claims) are each impaired but retain their Liens securing such claims (Classes 2 and 3) or entitled to receive some property (Classes 4 and 5) under the Committee Plan. As a result, each of these Voting Classes may vote to accept or reject the Committee Plan.

Class 1 (Other Priority Claims), and Class 6 (General Unsecured Claims) are each unimpaired under the Committee Plan and cannot vote because they are deemed to accept the Committee Plan. Relatedly, Class 7 (Abuse Related Contribution Claims) is impaired under the Committee Plan, may not receive any property, and is therefore deemed to reject the Committee Plan without voting. Any Ballots cast by holders of Claims in these Classes will not be counted.

### Acceptance of a Chapter 11 Plan

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan as votes for the plan by at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of the holders of allowed claims in each voting class who cast Ballots. Here, the Claims Agent will collect and tabulate all Ballots cast by the Voting Classes and report this information to the Bankruptcy Court.

In addition, under Bankruptcy Rule 3018(a), the Bankruptcy Court may temporarily allow any claim in an amount that the Court deems proper for the purpose of voting to accept or reject the Committee Plan. In this case, the Abuse Claims in Class 4 are unliquidated. The amount of damages to which any Abuse Claimant is entitled, if any, has not yet been determined by any court or by any agreement between the Debtor, its insurers, and any Abuse Claimant.

Here, to determine if the required dollar amount of the Class 4 Abuse Claims voted for the Committee Plan, each Claim in such Classes will be allocated $1.00 for voting purposes only. If more than 2/3 of voting Class 4 Abuse Claimants vote for the Committee Plan, Class 4 will have accepted the Committee Plan.

### Voting by Disputed Claims

If any Claim in any Class entitled to vote is disputed by the Debtor (a "Disputed Claim"), the individual holding that Disputed Claim is not entitled to vote on the Committee Plan in the allocated amount of $1.00. A Claim is disputed if it is subject to an objection timely filed and has neither been overruled nor denied by a final order and has not been withdrawn. A Claim is also disputed if it is listed on the Debtor's Schedules as disputed, unliquidated, or contingent, and regarding which a superseding proof of claim has not been filed. Holders of Disputed Claims may seek the Bankruptcy Court's approval to vote notwithstanding the dispute.

### D.    Confirmation of a Chapter 11 Plan

### Confirmation – Rejection by Certain Classes

The Bankruptcy Court may confirm the Committee Plan even though a creditor class rejects the Committee Plan (Class 7 is deemed to reject the Committee Plan because Class 7 creditors are not receiving anything on account of Class 7 claims). In order for the Committee Plan to be confirmed despite its rejection by a Class of impaired Claims, the Committee Plan must be accepted by at least one Class of impaired Claims (determined without counting the votes of "insiders") and the Committee must show that the Committee Plan does not "discriminate unfairly" and that the Committee Plan is "fair and equitable" regarding each Impaired Class of Claims that does not vote to accept the Committee Plan.

Under Section 1129(b) of the Bankruptcy Code, a plan is "fair and equitable" as to a rejecting class of claims or equity interests if the plan provides that: (a) each holder of a secured claim will receive or retain because of its claim property with a value, as of the effective date of the plan, equal to the allowed amount of such claim or such other treatment as accepted by the

holder of such claim; and (b) each holder of an unsecured claim junior to the claims of such class will not receive because of such junior claim any property unless the senior class is paid in full.

A plan does not "discriminate unfairly" against a rejecting class of claims if (a) the relative value of the recovery of such class under the plan does not differ materially from that of any class (or classes) of similarly situated claims, and (b) no senior class of claims is to receive over 100% of the claims in such class.

The Committee believes that the Committee Plan will satisfy the foregoing requirements as to any rejecting Class of Claims, and can therefore be confirmed.

## V.    THE DEBTOR, ITS OPERATIONS AND THE CHAPTER 11 CASE

### A.    Nature and History of the Diocese

The Roman Catholic Church is comprised of territories, known as dioceses, each of which is subject to the authority and control of a bishop. The Diocese is a Roman Catholic diocese in the eastern-half of Connecticut and a small part of New York founded in 1953 by Pope Pius XII, encompassing Middlesex, New London, Windham and Tolland counties in Connecticut, as well as Fisher Island, New York. Every Catholic entity, including the Diocese, is subject to church law also called Canon Law. The Diocese is structured and operates in accordance with Canon Law and is a juridic person under Canon Law.

The Most Reverend Michael R. Cote, D.D. (the "Bishop") has been the Bishop of the Diocese since May 14, 2003. Monsignor Leszek T. Janik is the Diocese's Vicar General. The Diocese serves various ministries, including Catholic Charities, Saint Vincent de Paul, Catholic Family Services, Campus Ministry, Ministry to the Sick, the Norwich Diocesan Council of Catholic Women.

The Diocese also owns multiple pieces of real estate.  In particular, the Diocese owns the real estate, including the buildings and improvements situated thereon, used by three separately incorporated non-profit schools operated by Mercy High School Corporation ("Mercy"), Xavier High School in Middletown, Connecticut and Saint Bernard School in Montville, Connecticut (collectively, the "High Schools").

Each of the parishes located within the Diocese's geographic region (the "Parishes") is a non-profit organization separately incorporated under the laws of the State of Connecticut. None of the Parishes are debtors in this Chapter 11 Case. Each Parish corporation owns various real and personal property that it uses in its ministry.

### B.    Operations of the Diocese

The Diocese, through its central administrative offices: (a) provides operational support to certain of the Parishes within the Diocese, and certain other Catholic Entities that operate within the territory of the Diocese (collectively, the "Participating Employers"); (b) maintains the properties it owns including those used by the High Schools; (c) provides comprehensive risk management services to the Participating Employers; (d) administers employee benefits, including

medical, insurance, and retirement benefits, for the clergy and lay employees of the Diocese (the "Diocesan Employees") and for employees of the Participating Employers (the "Non-Diocesan Employees"); (e) administers payroll for the Diocese and for certain of the Participating Employers; and (e) coordinates other administrative services as needed.  Each of the Parishes, High Schools, and other Catholic Entities are separately incorporated from the Diocese.

Further, the Diocese provides services for several charitable organizations, including the ACA; St. Vincent de Paul Place, Norwich, Inc.; St. Vincent DePaul, Middletown, Inc.; Diocese Of Norwich Outreach To Haiti, Inc.; Norwich Diocesan Cemetery Corporation; Catholic Charities, Diocese of Norwich, Incorporated; Holy Apostles College and Seminary, Inc.; Holy Family Home and Shelter, Inc.; St. Joseph's Living Center, Inc.; St. James School Associations, Inc.; and Saint John Paul II School. These parties are not debtors in the Chapter 11 Case.

## C.     Mount St. John's School and its Relationship with Diocese

Mount St. John's School was a Catholic residential school for disadvantaged and at-risk boys originally established in 1904. The Diocese operated the school by Diocesan authority until approximately 2013 when the residential program was closed. Although the legal entity, Mount St. John, Inc. ("MSJ") owned the school, the Diocese exercised significant, if not exclusive, control over its management, operations and affairs.

For example, MSJ's Bylaws adopted on April 13, 1984 (the "MSJ Bylaws"), provided that the members of the corporation shall be the persons who hold the offices, respectfully, of bishop (or administrator), vicar-general and chancellor within and for the Roman Catholic Diocese of Norwich." The members of MSJ elect the board of trustees at their annual meeting. The board of trustees managed the affairs of MSJ. The Bylaws required that permanent members of the board of trustees be held by those persons who held "the offices, respectfully, of bishop (or administrator), vicar-general and chancellor within and for the Roman Catholic Diocese of Norwich, and their successors in office."  While the board of trustees may choose officers of MSJ, the MSJ Bylaws provided that "the bishop and vicar-general, by virtue of holding the position of bishop and vicar-general, shall be the president and vice president, respectfully," of MSJ. Moreover, pursuant to the MSJ Bylaws:

> On any issue or question before the board of trustees, the bishop may determine, in his sole discretion, that it involves a matter of doctrine relating to the teachings or precepts of the Roman Catholic Church.  In such case, the board of trustees may not act further on the matter except with the approval of the bishop.

While some boys residing at Mount St. John's School had been sexual abused by priests and other clergy in the years prior, a significant number of such incidents of Abuse at issue in this Bankruptcy Case arose after the Diocese in 1989 appointed Br. Paul McGlade to serve as assistant to the Executive Director of the school. By letter dated March 9, 1989, the then Bishop of Norwich, the Most Reverend Bishop Daniel P. Reilly ("Bishop Reilly") wrote to the Very Reverend Brother Provincial of St. Patrick's Province of the Christian Brothers ("St. Patrick's Province," the predecessor to Oceania) to ask if he would consider lending Br. McGlade to the Diocese to prepare him and eventually to take over as Executive Director of Mount St. John's School. After further correspondence, arrangements were made and on October 11, 1989, Bishop Reilly entered into an agreement between the Diocese and St. Patrick's Province for Br. McGlade to serve first as assistant to the Executive Director for a period of twelve (12) months and then as Executive

19

Director for a period of three to five years. Br. McGlade ultimately served as Executive Director until 2002.

Under circumstances the Committee has been unable to discover, either through the Diocese or Oceania, on or about 1993, the St. Patrick's Province transferred Br. Donald Pascal Alford to the Diocese of Norwich and Mount St. John' School. Br. Alford served as a music teacher at the Mount St. John's School and the leader of its Boy Scout Troop.

In this bankruptcy case, approximately 68 Proofs of Claim have been filed against the Diocese by Abuse Claimants alleging that they had been sexually abused by Br. McGlade when they resided as children at Mount St. John's School, many of which involved rape or other acts of extreme violence, and occurred repeatedly and over significant periods of time. Similarly, approximately 16 Proofs of Claim have been filed against the Diocese involving acts of child sexual abuse committed by Br. Alford at Mount St. John's School. Abuse Claimants also filed approximately 22 Proofs of Claims against the Diocese for acts of child sexual abuse committed against them by distinct perpetrators at Mount St. John's School.

**D.     Insurance Liability Coverage**

To insure the Diocese's many activities, the Diocese maintained extensive insurance coverage over the course of decades. Specifically, the Diocese purchased and continues to purchase a broad range of primary commercial liability insurance and, at various times, excess and/or umbrella liability insurance policies to protect itself from a myriad of risks. These Insurance Policies provided and continue to provide substantial insurance coverage, including under the older policies, for claims arising out of sexual abuse or sexual misconduct. The Insurance Policies provide coverage to the Diocese and the incorporated parishes, schools, and other Catholic Entities within the Diocese's territory.

From 1957 to the present, the Diocese was insured for sexual abuse and sexual misconduct under Insurance Policies purchased from different insurance companies. The Schedule of Insurance Polices is appended as Exhibit C to the Committee Plan. These insurance policies can be broken down into three groups: the Aetna Casualty & Surety Co.[20] ("Aetna") years (from 1957 to 1974); the American Employers Insurance Company[21] ("American Employers") years (from 1974 to 1977); and the Catholic Mutual years (from 1977 to the present).[22]

**The Aetna Policies (1957 to 1974)**

---

[20] Upon information and belief, The Travelers Companies, Inc. is the successor to Aetna and obligated under the Aetna Policies purchased by the Diocese.

[21] Upon information and belief, Intact Financial Corporation is the successor to American Employers and obligated under the American Employers Policy.

[22] The descriptions provided in this Disclosure Statement are intended to provide an overview of the insurance coverage obtained by the Diocese. To the extent that the statements made in this Disclosure Statement in any way conflict with or are expanded upon by the Insurance Policies, the terms of and applicable law with respect to the Insurance Policies control. The rights of all parties are reserved. Furthermore, the Committee and its advisors have not yet been able to obtain copies of all relevant insurance policies and thus the descriptions provided in this Disclosure Statement may not encompass all of the Debtor's Insurance Policies.

With one possible exception,[23] effective from May 4, 1957, through June 1, 1974, the Diocese purchased primary insurance coverage (the "Aetna Policies") from Aetna. The Aetna Policies cover both the Diocese and, at various times, certain other Catholic Entities.

The Aetna Policies from May 4, 1957, through June 1, 1971, did not have any aggregate limits of liability. In certain periods within this time frame, the Aetna Policies contained per-person and per-occurrence limits of liability. Specifically, the Aetna Policy for the period from January 12, 1957, through January 12, 1961, imposed limits of $100,000 per-person and $300,000 per-accident. Each of the Aetna Policies for the three periods from June 1, 1968, through June 1, 1969, June 1, 1969, through June 1, 1970, and June 1, 1970, though June 1, 1971, imposed $500,000 per-person and $1,000,000 per-occurrence limits on liability coverage. All other Aetna Polices during this time frame contained no fixed dollar limits upon liability coverage.

The Aetna Policies for the period from June 1, 1972, through June 1, 1973, and June 1, 1973, through June 1, 1974, imposed an aggregate limit on liability in the amount of $1,000,000. They also each contained a per-person limit of $500,000 and a per-occurrence limit of $1,000,000.

Abuse Claimants have filed approximately 28 Abuse Claims in this Bankruptcy Case that may implicate these policy periods from 1957 to 1974. All of these claims may be subject to Connecticut's statute of limitations and, in particular, for claims of child sexual abuse, Conn. Gen. Stat. 52-577(d) (2018), since they apparently were first commenced when the Abuse Claimant was over 48 years of age.

### The American Employers Policy (1974 to 1977)

For the period from July 1, 1974, through July 1, 1977, the Diocese purchased primary insurance coverage (the "American Employers Policy") from American Employers. With respect to bodily injury liability, the American Employers Policy originally provided limits of liability of $500,000 per-occurrence and an aggregate limit of $500,000. However, by an endorsement effective April 3, 1975, the limits of liability were amended to increase the per-occurrence limit to $5,000,000 and the aggregate limit to $5,000,000.

Abuse Claimants have filed approximately 7 Abuse Claims in this Bankruptcy Case that may implicate this policy period from July 1, 1974 to July 1, 1977. All of these claims may be subject to Connecticut's statute of limitations and, in particular, for claim of child sexual abuse, Conn. Gen. Stat. 52-577(d) (2018), since they apparently were first commenced after the Abuse Claimant had reached 48 years of age.

### The Catholic Mutual Certificates (1977 to the Present)

Between July 1, 1977, to the present, the Diocese's longtime coverage provider—Catholic Mutual—issued more than forty (40) separate coverage certificates to the Diocese. Those certificates provide varying levels of sexual abuse coverage to the Diocese on varying terms. In general, the certificates fall into one of three categories based upon the nature and scope of

---

[23] It is unclear from the documents produced by the Diocese to the Committee whether the Diocese obtained insurance for the period from June 1, 1971 through June 1, 1972.

coverage provided: the occurrence-based certificates with no exclusion or limitation for sexual abuse claims (from 1977 to 1986); the occurrence-based certificates with specific limits for sexual abuse claims (from 1986 to 1990); and the claims-made certificates (from 1990 to the present).

For the period from July 1, 1977, through July 1, 1986,[24] the Diocese purchased five separate certificates providing primary liability insurance coverage. In particular, each of these policies contained a per-occurrence limit of $300,000 and an aggregate limit upon liability of $300,000. The Diocese also purchased from Catholic Mutual separate polices for each of these five policy periods providing $10,000,000 of umbrella excess liability coverage. None of these certificates provided any express limitation or exclusion for claims arising out of sexual abuse or sexual misconduct.

Abuse Claimants have filed approximately 13 Abuse Claims in this Bankruptcy Case that may implicate these policy periods from July 1, 1977 to July 1, 1986. All of these claims may be subject to Connecticut's statute of limitations and, in particular, for claim of child sexual abuse, Conn. Gen. Stat. 52-577(d) (2018), since they apparently were first commenced after the Abuse Claimant had reached 48 years of age.

Effective July 1, 1986, Catholic Mutual purported to alter the three-year term liability coverage provided by the last of these five certificates, for the period from July 1, 1985, to July 1, 1988 (the "July 1, 1985 Policy"). Catholic Mutual issued a new certificate and added an exclusion for "any and all liability resulting from any actual, attempted or alleged conduct or contact of a sexual nature, including negligent or intentional infliction of mental or emotional anguish, harm, injury or distress of any kind." The certificate issued for the July 1, 1986 through July 1, 1987 period provided separate "morality coverage," albeit with an aggregate limit of $100,000 including "payments for damages, legal fees and all other loss adjustment and defense costs." The Committee believes that Catholic Mutual had not, however, effectively cancelled the July 1, 1985 Policy as required by applicable law and the Connecticut Amendatory Endorsement included with the July 1, 1985 Policy. The endorsement required Catholic Mutual to provide not less than thirty (30) days written notice stating when such cancellation shall be effective. Despite extensive discovery conducted by the Committee, there is no evidence that such required written notice had been provided. There also is no evidence that Catholic Mutual cancelled the umbrella excess liability policy provided for this same three-year time period, which contained its own cancellation requirements.

Catholic Mutual issued similar one-year certificates for each of the years from July 1, 1987 through July 1, 1990. However, for each of these certificates, the morality coverage (for claims based on sexual abuse) increased with an annual aggregate liability limit of $250,000. By its coverage position letter dated June 22, 2022, Catholic Mutual acknowledged available coverage for Abuse Claims which arose during this period from July 1, 1986, through July 1, 1990, in the amount of nearly $570,000.

Commencing, July 1, 1990, Catholic Mutual issued annual certificates providing for liability coverage on a "claims-made" basis – meaning, coverage extended only to claims filed during the

---

[24] As explained further herein, the Committee disputes that Catholic Mutual effectively cancelled the certificate which initially had a term of July 1, 1986 through July 1, 1988. The Committee reserves all rights in this regard.

policy period. Coverage was further limited by the "retroactive date": the incident giving rise to the claim had to have occurred after a specific date to qualify for coverage. Catholic Mutual issued such certificates to the Diocese each year thereafter including on July 1, 2021 – days prior to the commencement of this bankruptcy case. Applying the retroactive dates provided in each of these policies, the annual aggregate limit provided for morality or sexual misconduct coverage ranged during this period (post-July 1, 1990) from $650,000 to $2 million.

Based on the Abuse Claims first asserted through the commencement of civil actions in 2014, and in 2017 through the Petition Date (July 15, 2021), combined with those first asserted through proofs of claim filed in this Bankruptcy Case by Abuse Claimants, the Committee believes that five separate claims-made policies provided by Catholic Mutual have been triggered. Even applying the applicable retroactive dates and corresponding annual aggregate limits, the Committee submits that an additional $10,000,000 of coverage is available for the Diocese and the Catholic Entities from Catholic Mutual.

Thus, it appears to the Committee that more than $60 million of insurance coverage may be available from Catholic Mutual on account of Abuse Claims filed in this Bankruptcy Case. The Committee acknowledges and cautions that coverage issues exist and that Catholic Mutual has repeatedly expressed its intent to defend against these Insurance Claims vigorously. The question posed by the Diocese Plan is whether $5 million is a fair and reasonable compromise of all of these Insurance Claims. The Committee submits that is it not fair and reasonable given the validity of its coverage analysis.

**E.    Diocese Non-Abuse Related Liabilities**

**Secured Debt**

M&T Bank Corporation (Manufacturers and Traders Trust Company) ("M&T") alleges to hold a Claim against the Diocese secured by a possessory Lien against the Diocese's post-petition deposit accounts for the approximate amount of $276,543.32.

Additionally, on February 26, 2016, the Diocese and M&T, as successor by merger of People's United Bank, National Association, executed that certain Limited Guaranty Agreement to secure the alleged indebtedness of Mercy High School to Farmington Bank, a Capital Stock Savings Bank, as M&T's predecessor in interest, as same may have been amended from time to time, secured by a certain mortgage granted on 1740 Randolph Rd., Middletown, Connecticut. M&T holds a secured guaranty claim in the approximate amount of $1,752,820.46 as of the Petition Date, arising as a result of the M&T Secured Guaranty Agreement (the "M&T Secured Guaranty Claim").

Lastly, on April 30, 1998, the Diocese and RBS Citizens, N.A. ("Citizens") executed that certain Limited Guaranty Agreement to secure the alleged indebtedness of Xavier High School to Citizens, as same may have been amended from time to time, secured by certain mortgages granted on 181 Randolph Road, Middletown, Connecticut (the "Citizens Secured Guaranty Claim"). Citizens holds a secured guaranty claim in the approximate amount of $5,046,752.32 as of the Petition Date as a result of the Citizens Secured Guaranty Claim.

**Unsecured Debt**

23

The Diocese owed its ordinary course vendors approximately $27,318.92 as of the Petition Date, for the delivery of goods and services to the Diocese, which are used in the operation of the Diocese's business, including providing support for its ministries and other outreach programs. These creditors are essential to the Diocese's operations, as they provide the items and services necessary to continue the Diocese's mission.

## F.      Events Leading to the Chapter 11 Case

Although the public generally would later learn of the systemic sexual abuse by clergy within Catholic institutions throughout much of the 20th century, widespread public attention to the issue within in the United States appears to have first occurred during the years 1984 and 1985 with the pervasive sexual abuse committed by Father Gilbert Gauthe in the Diocese of Lafayette, Louisiana. After the coverage of Gauthe's crimes subsided, the issue faded until the mid-1990s, when the issue was again brought to national attention after a number of books on the topic were published.

Then, in 2002, The Boston Globe's Pulitzer Prize-winning coverage of sexual abuse cases involving Catholic priests within the Roman Catholic Archdiocese of Boston drew the attention, first of the United States and ultimately the world, to the problem. Other victims began to come forward with their own allegations of abuse, resulting in more lawsuits and criminal cases. In the years that followed, the problem of clerical abuse of minors has received significantly more attention from the Church hierarchy, law enforcement agencies, government and the news media. Over the course of the following two decades, numerous dioceses have acknowledged their failures in addressing the pervasive child sexual abuse committed by clergy, and paid substantial amounts to childhood sexual abuse victims. Many dioceses have also resorted to bankruptcy to attempt address their obligation to compensate these survivors while seeking to reorganize so they may continue with their mission.

Sadly, the Diocese has also had its own history of priests and other clergy sexually abusing minors within their care. Perhaps the most notorious involved Fr. Thomas Shea who was accused of molesting at least sixteen (16) girls in eleven (11) different Parishes over a span of thirty years. His name is included in the List of Clergy with Allegations of Substance of Sexual Abuse of a Minor published by the Diocese in 2021, along with the names of thirty-one (31) other priests who served within the Diocese.

Over the course of many years, once asserted against the Diocese, the vast majority of these claims of child sexual abuse had been settled through substantial payments to the survivors. Then, the Diocese and its Insurer, Catholic Mutual, chose not to compensate a single survivor of child sexual abuse inflicted by Br. McGlade at Mount St. John's School, or any of the other survivors of child sexual abuse committed by distinct perpetrators at Mount St. John's School during this time frame from 1989 through 2002.

On or about July 11, 2014, the individual using the pseudonym, Hector Doe, commenced a civil action against MSJ, the Diocese and Bishop Reilly in the Superior Court, State of Connecticut, alleging their responsibility for the sexual abuse he suffered as a child committed by Br. McGlade when Hector Doe resided at Mount St. John's School. He was about 12 years old at the time of the abuse.

24

In 2017, two additional survivors commenced their civil actions against the Diocese, MSJ and Bishop Reilly, alleging child sexual abuse committed by Br. McGlade at Mount St. John's School. In 2018, survivors commenced an additional twenty (20) civil actions alleging acts of sexual abuse that had occurred at Mount St. John's School. Most of these claims asserted sexual abuse committed by Br. McGlade. Some survivors asserted that they had suffered sexual abuse committed by Br. Alford. While some survivors asserted that Br. Alford had acted together with Br. McGlade, some survivors alleged claims of sexual abuse solely against Br. Alford.

On January 28, 2019, Catholic Mutual apparently provided the Norwich Diocese with its first formal coverage position letter related to the claims of sexual abuse arising at Mt. St. John. Catholic Mutual asserted that all of approximately twenty-three (23) claims of sexual abuse were deemed to have been first made during the July 1, 2014, to July 1, 2015, policy period and, therefore, subject to the single annual aggregate limit of $2 million. At or about this time in early 2019, the Debtor retained Ice Miller LLP and, in particular, Louis T. DeLucia, who specializes in commercial bankruptcy and restructuring.

In the years that followed, numerous additional complaints had been filed against the Diocese, MSJ and Bishop Reilly asserting that the plaintiffs had been sexually abused as children residing at Mount St. John's School during the years from approximately 1989 through 2002, by Br. McGlade, Br. Alford, and multiple other distinct perpetrators. In total, approximately fifty-four (54) civil lawsuits had been commenced. As these lawsuits progressed, Hector Doe and the other survivors amended their complaints to assert related claims against Oceania for its role in transferring Br. McGlade and Br. Alford to Mount St. John's School.

Over these years since 2019 and before the Diocese filed bankruptcy, the attorneys for the survivors worked tirelessly to attempt to reach a fair and reasonable settlement with the Diocese and Catholic Mutual that would compensate the survivors for the severe harm they suffered and continue to suffer. They were unsuccessful. On July 15, 2021, the Diocese chose instead to file bankruptcy to attempt to use the bankruptcy process to address all of the Abuse Claims against it including those that arose at Mount St. John's School.

## G.    Events During the Chapter 11 Case

### Bankruptcy Filing and First Day Orders

The Diocese commenced the Chapter 11 Case on the Petition Date, by filing a voluntary petition under chapter 11 of the Bankruptcy Code [Dkt. No. 1]. The Diocese has continued in possession of its assets and the management of its business as debtor-in-possession, pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

Concurrently with the filing of its chapter 11 petition, the Diocese filed certain motions and proposed orders (collectively, the "First Day Orders"). A summary of the relief granted in the First Day Orders is set forth below:

- **Cash Management Motion.** On July 22, 2021, the Bankruptcy Court entered the *Interim Order (I) Authorizing the Continued Use of the Debtor's Cash Management System, Bank Accounts and Business Forms and (II) Granting Related Relief* [Dkt. No. 59] authorizing the Diocese to continue use of its cash management system,

bank accounts and business forms as they existed immediately prior to the Petition Date. On September 13, 2021, the Bankruptcy Court entered a final order granting such relief on a final basis. [Dkt No. 239]. On September 16, 2021, the Bankruptcy Court entered an amended final order grating such relief on a final basis. [Dkt. No. 266].

- **Wage and Benefits Motion.** On July 22, 2021, the Bankruptcy Court entered the *Interim Order (I) Authorizing the Debtor to (A) Pay Prepetition Wages, Salaries, Reimbursable Expenses, and Other Obligations on Account of Compensation and Benefits Programs and (B) Continue Compensation and Benefits Programs; and (II) Granting Related Relief* [Dkt. No. 61] authorizing the payment of certain pre- and post-petition wage, benefit, and expense obligations. On September 13, 2021, the Bankruptcy Court entered a second interim order granting such relief. [Dkt. No. 237]. On September 22, 2021, the Bankruptcy Court entered a final order granting such relief on a final basis. [Dkt. No. 286].

- **Motion to Seal.** On July 24, 2021, the Bankruptcy Court entered the *Interim Order on Debtor's Motion for Entry of Interim and Final Orders (I) Authorizing and Approving Special Noticing and Confidentiality Procedures; (II) Authorizing and Approving Procedures for Providing Notice of Commencement and (III) Granting Related Relief* [Dkt. No. 74] approving the Diocese's proposed procedures to protect the confidentiality of the identities and personal contact information of certain holders of Claims against the Diocese arising from allegations of Abuse. On September 16, 2021, the Bankruptcy Court entered a final order granting such relief on a final basis [Dkt. No. 265].

- **Utility Motion.** On August 10, 2021, the Bankruptcy Court entered the *Interim Order Granting Motion of Debtor for Entry of an Order (I) Approving Proposed Form of Adequate Assurance of Payment to Utility Providers; (II) Establishing Procedures for Determining Adequate Assurance of Payment for Future Utility Services; (III) Prohibiting Utility Providers from Altering, Refusing, or Discontinuing Utility Service; and (IV) Granting Related Relief* [Dkt. No. 128] approving the Diocese's proposed adequate assurance of future performance and related procedures, and barring utility providers from altering, refusing, or discontinuing service. On August 30, 2021, the Bankruptcy Court entered a second interim order granting such relief. [Dkt. No. 178]. On September 16, 2021, the Bankruptcy Court entered a final order granting such relief on a final basis. [Dkt. No. 264].

- **Insurance Motion.** On August 31, 2021, the Bankruptcy Court entered the *Interim Order Authorizing Debtor To (I) Continue Insurance Coverage and Insurance Programs Entered into Prepetition and Satisfy Prepetition Obligations Related Thereto and (II) Renew, Amend, Supplement, Extend, or Purchase Insurance Policies; and (III) Granting Related Relief* [Dkt. No. 180] authorizing the Diocese to continue their insurance program in the ordinary course of business and renew or extend insurance coverage with the written consent of the Committee. On

September 13, 2021, the Bankruptcy Court entered a final order granting such relief on a final basis [Dkt. No. 236].

### Retention and Employment of the Diocese's Professionals

During the Chapter 11 Case, the Bankruptcy Court approved the Diocese's retention and employment of the following professionals to assist in the administration of the Diocese's Chapter 11 Case: (1) Ice Miller LLP as bankruptcy co-counsel to the Diocese [Dkt. No. 272]; (2) Robinson & Cole LLP as bankruptcy co-counsel to the Diocese [Dkt. No. 321]; (3) Brown Jacobson PC as special counsel to the Diocese [Dkt. No. 234]; (4) Gellert Scali Busenkell & Brown, LLC as special counsel to the Diocese [Dkt. No. 482]; (5) GlassRatner Advisory & Capital Group, LLC d/b/a B. Riley Advisory Services as financial advisors to the Diocese [Dkt. No. 271]; (6) Epiq Corporate Restructuring, LLC as claims and noticing agent [Dkt. No. 168]; and (7) Hilco Real Estate Appraisal, LLC as real estate appraiser to the Diocese [Dkt. No. 483].

### Appointment of the Official Committee of Unsecured Creditors

On July 29, 2021, the Office of the United States Trustee appointed the Committee pursuant to Section 1102(a)(1) of the Bankruptcy Code [Dkt. No. 90]. On September 10, 2021, the Bankruptcy Court approved the Committee's retention of Zeisler & Zeisler, P.C. as counsel to the Committee [Dkt. No. 233]. During the Chapter 11 Case, the Bankruptcy Court also approved the Committee's retention and employment of the following professionals to assist in the administration of the Chapter 11 Case: (1) Wellspeak Dugas & Kane, L.L.C. as real estate appraiser to the Committee [Dkt. No. 448]; and (2) O'Sullivan McCormack Jensen & Bliss PC as special counsel to the Committee [Dkt. No. 551].

### Bar Date and Claims Process

By order dated November 19, 2021, the Bankruptcy Court set March 15, 2022 at 5:00 P.M. (prevailing Eastern time) (the "Claims Bar Date") as the last day for creditors, including Abuse Claimants, to file a proof of claim. Pursuant to both the Court's *Order Establishing March 15, 2022 Deadline for Filing Proofs of Claim and Approving the Form and Manner of Notice Thereof* (the "Bar Date Order") [Dkt. No. 386] and the Court's *Final Order on Debtor's Motion for Entry of Interim and Final Orders (I) Authorizing and Approving Special Noticing and Confidentiality Procedures; (II) Authorizing and Approving Procedures for Providing Notice of Commencement; and (III) Granting Related Relief* [Dkt. No. 265] notice of the Bar Date was published in a variety of both local and national publications.

### Committee's Objection to Proof of Claim Filed by Oceania

On March 15, 2022, Oceania filed its proof of claim in this case against the Debtor in an unspecified amount. Oceania asserted a claim for "indemnification, reimbursement and contribution and similar liability" arising from the "alleged sexual abuse by clergy or any other persons, or for negligence, negligent supervision, or other tort or breach of duty claims, under appliable common law or any statute." It also asserted "a claim against the Debtor for insurance coverage under any policies of insurance issued to or on behalf of the Debtor or others under which the [Oceania] may be entitled to insurance coverage or some other payment or benefit … ."

27

On May 2, 2022, the Committee filed *The Official Committee of Unsecured Creditors' Objection to Claim No. 10014 Filed by the Oceania Province of the Christian Brothers f/k/a The St. Patrick Province of the Christian Brothers* [Dkt. No. 588]. The Committee asserted that based on Oceania's knowledge and/or reckless conduct at the time of the transfer of Br. McGlade and Br. Alford, the Court should disallow Oceania's claim in its entirety.

The Committee ultimately elected not to prosecute its objection based first upon Oceania's willingness to mediate and, then, based upon the significant progress made in its settlement discussions with Oceania.

### Appointment of the Unknown Claims Representative

On July 18, 2022, the Diocese moved for the appointment of an unknown claims representative and applied to approve the employment of retired U.S. District Judge Michael R. Hogan as the "Unknown Claims Representative" (the "Application") [Dkt. No. 720] to represent the interests of persons who may have claims arising from sexual abuse experienced as minors, but who did not, as a result of a valid legal excuse, timely submit a Proof of Claim in this Chapter 11 Case against the Diocese (defined below as the Unknown Abuse Claimants). On August 4, 2022, an order was entered appointing an Unknown Claims Representative and approving the employment of Judge Hogan to serve in this role [Dkt. No. 753]. Pursuant to Sections 327 and 328 of the Bankruptcy Code, the Unknown Claims Representative is authorized to perform the services as the legal representative for the Unknown Abuse Claimants that are necessary and appropriate in connection with this Chapter 11 Case, including those described in the Application.

The Unknown Claims Representative is the legal representative for any Person with an Abuse Claim that occurred against such Person when that Person was a minor for which a Proof of Claim was not filed before the Claims Bar Date and such Person (a) was under a disability (such as minority, mental disability, or alienage) on the Petition Date, (b) neither discovered, nor reasonably should have discovered before the Claims Bar Date that their childhood injury was caused by an act of Abuse, or (c) such Claim was barred by the applicable statute of limitations as of the Claims Bar Date, but is no longer barred by the applicable statute of limitations for any reason.

The Unknown Claims Representative's responsibilities and duties include:

- Undertaking an investigation and analysis to assist the Court in determining the estimated number of Unknown Abuse Claimants and the estimated amounts of the Sexual Abuse Claims (Unknown Abuse Claims) held by the Unknown Abuse Claimants;

- Filing one or more Proofs of Claim on behalf of all Unknown Abuse Claimants by any (i) extension by consent of the Diocese, the Committee and the United States Trustee, or (ii) Court-ordered extension of the Bar Date and voting such Proofs of Claim to accept or reject a plan of reorganization;

- Negotiating, with the Diocese and other appropriate parties, the treatment of Unknown Abuse Claims through the provisions of a plan of reorganization for the

evaluation, determination, and number and amounts of Sexual Abuse Claims of Unknown Abuse Claimants;

- Advocating the legal positions of the Unknown Abuse Claimants before this Court, and if necessary, filing pleadings and presenting evidence on any issue affecting the claims of the Unknown Abuse Claimants;

- Taking all other legal actions reasonably necessary to represent the interests of the Unknown Abuse Claimants; and

- Serving as an independent fiduciary acting solely on behalf of all Unknown Abuse Claimants.

The Unknown Claims Representative has access to the confidential Abuse Claimants' Proofs of Claim, subject to the confidentiality protocol established in the Bar Date Order (the "Confidentiality Protocol") that applies to all Abuse Claimants' Proofs of Claim submitted to the Claims and Noticing Agent (but not those submitted to the Clerk of Court) and the *Confidentiality Agreement and Protective Order Between the Debtor and Official Committee of Unsecured Creditors* [Dkt. No. 276], entered on September 20, 2021.

The Unknown Claims Representative also has standing, pursuant to Section 1109(b) of the Bankruptcy Code, to raise and appear and be heard as a party in interest on any issue in this Chapter 11 Case. Additionally, the Unknown Claims Representative may employ attorneys and other professionals consistent with the applicable provisions of the Bankruptcy Code, Sections 105, 327, and 328, but only with prior approval of the Court.

### Committee's Motion for Derivative Standing to Assert Insurance Coverage Claims Against Catholic Mutual

On October 12, 2022, the Committee filed its *Motion by the Official Committee of Unsecured Creditors for Order Granting it Standing and Authorizing it to Prosecute and Settle Certain Insurance Coverage Claims Against the Catholic Mutual Relief Society of America on Behalf of the Debtor's Estate* ("Derivative Standing Motion") [Dkt. 854]. The Committee asserted that Catholic Mutual had taken multiple patently unsupportable positions to deny coverage to its insured, the Diocese, for the sexual abuse claims asserted before and during this bankruptcy case. Since the Diocese had unjustifiably failed to commence suit against Catholic Mutual to seek to enforce this available coverage, the Committee argued that it should be permitted to enforce the coverage afforded by the applicable certificates issued by Catholic Mutual.

The Committee filed the Derivative Standing Motion, in part, to clearly articulate for Catholic Mutual, the Diocese and the Parishes the legitimate grounds for the Committee to assert that significantly greater coverage was available pursuant to the insurance certificates provided by Catholic Mutual than Catholic Mutual had, to that point, acknowledged. As settlement negotiations continued, the Committee repeatedly elected to adjourn the Derivative Standing Motion to a later date. Then, on February 21, 2023, when the Bankruptcy Court decided to replace the existing mediator with a new mediator (as explained more fully below), the Committee elected again to

adjourn the Derivative Standing Motion to April 5, 2023, in the hopes the new mediator would facilitate a resolution of the coverage dispute between the Committee and Catholic Mutual.

### Committee Investigation and Discovery

The Committee has conducted an extensive investigation into the assets, liabilities and affairs of the Diocese. The Committee has focused, in particular, on attempting to recover the greatest value possible to enhance funds available to pay Creditors including Abuse Claimants. In furtherance of this investigation, the Committee has sought discovery over the course of this Bankruptcy Case. Below is a summary of the efforts made by the Committee to obtain discovery since its appointment by the U.S. Trustee on July 29, 2021.

The U.S. Trustee convened a meeting of creditors pursuant to 11 U.S.C. § 341(a) (the "341 Meeting") which took place over three dates between August and September 2021. The purpose of the 341 Meeting is to allow the U.S. Trustee and creditors, including the Committee, the opportunity to examine the Debtor on various topics. During the 341 Meeting counsel to the Committee examined a representative of the Debtor concerning, among other things, the Debtor's bankruptcy filing, the its ownership of real property, credibly accused clergy, and the sexual abuse claims made against the Debtor. The Committee also obtained documents that were produced to the U.S. Trustee in response to discovery requests including bank statements, investment account statements, lease documents, documents reflecting the Debtor's accounts receivable, and other financial information. On August 20, 2021, during the pendency of the 341 Meeting, the Committee also sent a letter to the Debtor with thirty-seven (37) discovery requests.

While the Debtor produced some documents that were responsive to the requests made on August 20, 2021, the Committee filed its *Motion for Order Authorizing Examination of the Debtor, The Norwich Roman Catholic Diocesan Corporation, Pursuant to Fed. R. Bankr. P. 2004* [Dkt. No. 242] on September 14, 2021 seeking to subpoena the Debtor to produce the documents that the Committee requested and the examination of the Debtor. The Court granted the Committee's motion [*see* Dkt. No. 290] on September 24, 2021. Thereafter, the Debtor produced nearly 16,000 pages of documents on November 8, 2021 (approximately 6,000 pages of which had already been produced). Accompanying that production, however, were broad objections to each and every request made by the Committee. Over the next several months, the Committee and Debtor attempted to resolve the objections. These efforts included a global settlement conference on January 18, 2022 wherein the Debtor and other parties, including Catholic Mutual and the Parishes, agreed to voluntarily produce to the Committee certain documents and information on a rolling basis. Between March 8, 2021 and July 22, 2022, the Debtor produced approximately 26,000 additional pages of documents. Additionally, on April 5, 2022, Catholic Mutual, at the request of the Debtor, produced to the Committee all insurance certificates issued to the Debtor between 1978 and 2021. However, the documents produced through July 22, 2022, did not satisfy all of the Committee's request.

In order to obtain the documents necessary for the Committee's investigation of various claims and other issues related to the Bankruptcy Case, the Committee sought production from other parties in addition to the Debtor. For example, because the Diocese had not provided the factual and legal basis for the Debtor's assertion that it does not own the buildings and improvements used by the High Schools, the Committee requested that same information from the

High Schools. The Committee also requested from Catholic Mutual communications between the Debtor and Catholic Mutual concerning insurance coverage (including any potential insurance coverage, any claim for insurance coverage, and any denial or limitation on insurance coverage) for sexual abuse claims asserted against the Debtor because the Debtor had not yet produced those communications. The Committee also requested from Catholic Mutual an updated coverage position letter which considered all sexual abuse claims made against the Debtor both before and after the Petition Date.

Despite these additional requests, the Committee did not receive extensive documents it believed were critical to its investigation. Accordingly, the Committee filed additional motions for examination pursuant to Fed. R. Bankr. P. 2004 as to Xavier High School [*see* Dkt. No. 589]; Saint Bernard School [*see* Dkt. No. 590]; and Mercy High School [*see* Dkt. No. 591]; and Catholic Mutual [*see* Dkt. No. 647]. The Court granted those motions on May 6, 2022 [*see* Dkt. Nos. 601 – 603] and June 3, 2022 [*see* Dkt. No. 648].

The High Schools collectively produced approximately 3,000 pages of documents between June 2, 2022, and June 13, 2022, which appeared to satisfy the Committee's discovery requests. This production included, among other things, the documents necessary for the Committee to investigate the validity of the High School's claimed ownership of certain buildings and improvements.

On June 22, 2022, Catholic Mutual sent the Debtor, with copy to the Committee, an updated coverage position letter and 31 additional pages of documents (including documents attached to the coverage position letter not previously produced to the Committee by Catholic Mutual). While this production did not satisfy the Committee's production requests, it did provide a basis upon which to further its investigation of the validity of Catholic Mutual's coverage positions.

On August 4, 2022, the Court entered an order requiring the parties (including the Committee, the Debtor, Catholic Mutual, the Parishes, the High Schools, and Oceania) to participate in mediation [Dkt. No. 752]. Prior to substantive mediation discussions, the mediation participants engaged in additional discovery and the Debtor and the Committee exchanged mediation statements outlining their respective positions on various issues. Between September 2022 and January 2023, the parties participated in six mediation sessions in an attempt to come to a global resolution and otherwise exchange information. While the parties engaged in mediation, the Committee separately sought to discover additional documents.

In addition to requesting documents from the Debtor and other parties, the Committee discovered crucial information that was publicly available. For example, in investigating the High School's position concerning the ownership of certain buildings and improvements, the Committee found documents concerning those properties filed on land records including deeds, mortgages, leases, and easements.

The Committee's extensive review of tens of thousands of pages of production and substantive conversations with various parties both in mediation and outside of mediation has allowed the Committee to conduct substantial investigation into the issues relevant to this case and

31

determine the existence and scope of claims against various parties all in an effort to maximize distributions to Creditors, including Abuse Claimants.

### Accounts Receivable and Other Debts Due Diocese from Catholic Entities

The Debtor, in its practice of serving essentially as a management company for the Catholic Entities, has amassed significant accounts receivable which represent a substantial portion of the value of the Debtor's Estate. The Debtor has acknowledged in sworn schedules and other filings in the Bankruptcy Case that the majority of these accounts receivable are collectible. For example, on September 21, 2021 filed sworn amended schedules (the "Amended Schedules") [Dkt. No. 277] and represented that the current (collectible) value of its accounts receivable, as of the Petition Date, is $9,345,528.01.[25] More recently, the Debtor represented in its monthly operating report for the month ending January 31, 2023 [Dkt. No. 1163] that its total accounts receivable "net of allowance" (meaning, excluding amounts representing doubtful or uncollectible accounts) is $12,243,315.

There are numerous bases upon which the accounts receivable can be collected. The Debtor holds breach of contract claims against each of the Catholic Entities owing money to the Debtor. In the alternative and to the extent that a contract, written or oral, does not exist between the Debtor and those certain Catholic Entities, the Debtor holds unjust enrichment claims and can recover the value of the benefits conferred upon those Catholic Entities by the Debtor. Furthermore, to the extent that the Debtor sent statements of the amounts due to Catholic Entities, as was the Debtor's practice, and those amounts were acknowledged by the Catholic Entities by either (1) failing to dispute or otherwise challenge the amounts due or (2) reflecting amounts payable or other similar liabilities owed to the Debtor on their balance sheets, the Debtor holds accounts stated claims against those Catholic Entities. Amounts recovered on these accounts receivable could be used to fund the Settlement Fund for the Trust, for the benefit of Abuse Claimants.

### Ability to Reach Assets of the Annual Catholic Appeal

Also based upon the Committee extensive investigation, the Committee has concluded that it may bring, derivatively on behalf of the Diocese and its Estate, claims against the ACA because its assets are, in law and fact, the Debtor's assets and, therefore, part of the Debtor's bankruptcy estate and available to fund distributions to creditors.

In 1997, the ACA, formerly known as the Annual Bishop's Appeal, was incorporated as the Annual Bishop's Appeal of the Diocese of Norwich, Inc. as a civil non-stock corporation under the Connecticut Revised Nonstock Corporation Act, Connecticut General Statutes §§ 33-1000 *et. seq.* On or about February 3, 2011, the ACA changed its name from the Annual Bishop's Appeal of the Diocese of Norwich, Inc. to the ACA. The Committee intends to allege that despite this purported separate incorporation, the Debtor has sole control over and uses the ACA and its assets for the Debtor's benefit and that the minimal corporate formalities in which the ACA engages are merely a façade. In particular, without limitation:

---

[25] The Debtor represented in the Amended Schedules that its total face value of its accounts receivable is $15,410,857.98, but that $6,065,329.97 are from "doubtful or uncollectible accounts."

- The Debtor and the ACA share the same members, directors, and officers: the Bishop of the Debtor, the Vicar-General of the Debtor, the Chancellor of the Debtor, and the Chief Financial Officer of the Debtor;

- The Diocesan Finance Council oversees and governs the finances of both the Debtor and the ACA;

- The ACA's principal office is 201 Broadway, Norwich, Connecticut, which is also the principal office of the Debtor;

- There are substantial transfers of funds between the Debtor and the ACA and the audited financial statements of the Debtor and ACA are consolidated and make no distinction between assets and liabilities of the Debtor and the ACA; and

- The ACA is operated by the employees of the Debtor out of the Debtor's Development Office;

As a result, the Committee intends to seek: (1) a declaration that the ACA is a mere instrumentality of the Debtor, (2) the substantive consolidation of the Debtor and the ACA; and (3) a declaration that the Debtor holds a beneficial ownership interest in the ACA's assets and that such beneficial ownership interest and the Debtor's control and authority over the ACA are property of the Debtor's Estate. If these claims are successful, the ACA's assets would be available to fund distributions to creditors, including the Settlement Fund for the Abuse Claimants.

### Settlement Negotiations and Mediation

To facilitate settlement negotiations, the Diocese and the Committee filed the *Joint Motion for Entry of an Order Referring Parties to Mediation and Appointing Mediator* [Dkt. No. 645] (the "Mediation Motion") seeking to submit several matters to negotiation and appointing Attorney Paul A. Finn as mediator. On August 4, 2022, the Court entered the *Order Referring Parties to Mediation and Appointing Mediator* [Dkt. No. 752] approving the relief sought in the Mediation Motion and appointing Attorney Paul A. Finn as mediator, with a term to serve for six months.

The Diocese, Committee, and other parties in interest including the certain School Parties, Christian Brothers Oceania, and the Association of Parishes (collectively, the "Mediation Parties"), subsequently participated in four in-person and two remote mediation sessions with Attorney Paul A. Finn. Two mediation sessions were held on September 14, 2022, and September 15, 2022, in New York, New York. Two additional mediation sessions took place on October 24, 2022, and October 25, 2022, also in New York, where all five members of the Committee, Bishop Michael R. Cote, D.D. and Monsignor Leszek T. Janik, JCL, were in attendance. Two additional remote mediation sessions were held on November 22, 2022 and January 20, 2023.

Near the end of Atty. Finn's sixth-month term to conduct the mediation, on January 20, 2023, the Diocese filed its *Motion to Extend the Term of Appointment of Paul A. Finn as Mediator* [Dkt. No. 1051].

From the Committee's perspective, the parties had reached an impasse in the mediation toward the end of January, 2023. The Committee, on January 26, 2023, demanded that the Diocese provide its "best and final" proposal and, in response, the Diocese on January 31, 2023, provided its "best and final plan funding proposal" which was not acceptable to the Committee. Accordingly, and for other reasons, on February 3, 2023, the Committee filed its *Objection of the Official Committee of Unsecured Creditors to the Debtor's Motion to Extend the Term of Appointment of Paul A. Finn as Mediator* [Dkt. No. 1075].

After considering the arguments of counsel at the hearing held on February 21, 2023, including those advanced by counsel for the Committee against continuing Atty. Finn's appointment, the Bankruptcy Court decided and, on February 24, 2023, entered its order appointing former Second Circuit Judge Christopher Droney to serve as mediator for a period of sixty (60) days pursuant to the same terms and provisions of the Bankruptcy Court's initial mediation order, and that the service period of Atty. Finn having expired, it was suspended until further order of the Bankruptcy Court [Dkt. No. 1167].

**Debtor's Plan Exclusivity and Committee's Competing Plan**

Pursuant to Section 1121 of the Bankruptcy Code, a debtor in possession is granted a 120-day period from the chapter 11 filing date to file a plan of reorganization. During such time, only a debtor can file a plan of reorganization. However, the Bankruptcy Code provides that the court can increase a debtor's exclusive period to file a plan of reorganization for cause shown but such period cannot be extended beyond eighteen (18) months after the commencement of the case.

During the pendency of the Diocese's Chapter 11 Case, the Diocese had requested and the Court has granted, seven (7) extensions of exclusivity [Dkt. Nos. 362, 480, 543, 665, 847, 912, and 1037] based upon the perceived progress made in the Bankruptcy Case including in settlement negotiations through the mediation. The 18-month deadline expired on January 17, 2023, and so the Diocese filed the Diocese Plan on that day. The Debtor is then provided an addition 60-day period to solicit and obtain the acceptances of each class of claims that is impaired under the Diocese Plan.

Considering, among other things, the impasse that had been reached and the Diocese Plan that had been filed, the Committee sought to file its own plan of reorganization to be considered by the Bankruptcy Court, the Diocese and all other parties-in-interest in this Bankruptcy Case including the Abuse Claimants. Accordingly, on February 3, 2023, the Committee filed *The Official Committee of Unsecured Creditors' Motion to Terminate Debtor's Exclusive Period to Solicit Acceptances of Chapter 11 Plan* [Dkt. No 1076]. After argument by counsel for the Diocese and counsel for the Committee, among others, and considering comments made by the Bankruptcy Court at the hearing held on February 21, 2023, the Diocese decided to consent to the termination of its exclusive period to solicit acceptance of the Diocese Plan. On February 24, 2023, the Bankruptcy Court entered its order [Dkt. 1164] granting the Committee's motion and terminating the Diocese's exclusive solicitation period. The Bankruptcy Court then entered a further order, consistent with the representation made by the Committee's counsel, that the Committee shall file its competing plan of reorganization by February 28, 2023 [Dkt. 1166].

34

## VI.   KEY TERMS OF THE COMMITTEE PLAN

The Committee proposes the Committee Plan in good faith and believes the Committee Plan is feasible and in the best interest of the creditors of the Debtor. The Committee, therefore, recommends acceptance of the Committee Plan by holders of Claims in the Voting Classes, and recommends that the Abuse Claimants vote to accept the Committee Plan. This Disclosure Statement summarizes key components of the Committee Plan. To the extent of any inconsistencies between these summaries and the terms of the Committee Plan, the Committee Plan controls. To the extent the summaries omit any provisions of the Committee Plan, such omission does not affect the enforceability of those provisions in the Committee Plan. All Claimants are encouraged to carefully read the Committee Plan before voting.

### A.   Treatment of Unclassified Claims

The following summarizes the treatment of Administrative Claims, Professional Claims, Priority Tax Claims, and U.S. Trustee Fees under the Committee Plan. In accordance with Section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Professional Claims, Priority Tax Claims, and U.S. Trustee Fees have not been classified under the Committee Plan. Section V of the Committee Plan sets forth the treatment for each type of Claim. The Committee anticipates that it will pay these unclassified claims in full on the Effective Date.

#### Administrative Claims

An Administrative Claim is a claim for payment of an administrative expense of a kind specified in Bankruptcy Code Section 503(b) and referred to in Bankruptcy Code Section 507(a)(2), including the actual and necessary costs and expenses of preserving the estate or operating the Debtor's businesses after the commencement of a chapter 11 case, and compensation for legal and other services and reimbursement of expenses awarded or allowed under Bankruptcy Code Sections 330(a), 331, or 503.

The Committee Plan provides that holders of Administrative Claims must file any requests for allowance and payment within thirty days after a notice of the Effective Date is filed with the Bankruptcy Court. Each Allowed Administrative Claim shall be paid in full in Cash under the Committee Plan unless otherwise agreed between the Reorganized Debtor and the holder of the Allowed Administrative Claim. Such payment shall be made either (a) on or as soon as practicable following the Effective Date, or, if later, the Allowance Date; or (b) upon such terms as agreed to in writing by the Administrative Claimant.

#### Professional Fee Claims

The Committee Plan sets forth the manner and timing in which Professionals must submit Professional Claims to be considered for payment. All Professionals or other Persons requesting compensation or reimbursement of expenses under any of Sections 327, 328, 330, 331, 503(b), and 1103 of the Bankruptcy Code for services rendered by the Effective Date (including any compensation requested by any Professional or any other Person for making a substantial contribution in the Chapter 11 Case) shall file and serve an application for final allowance of compensation and reimbursement of expenses accruing from the Petition Date to the Effective

35

Date, within 45 days of the Effective Date, or such later date as ordered by the Bankruptcy Court. If there is a dispute over what amount of a Professional Fee Claim shall be Allowed the dispute shall be resolved by the Bankruptcy Court.

### Priority Tax Claims

A Priority Tax Claim is an unsecured Claim of a governmental unit entitled to priority in payment under any provision of Section 507(a)(8) of the Bankruptcy Code. As for any Allowed Priority Tax Claim not paid before the Effective Date, the Reorganized Debtor shall (a) pay such Claim as soon as practicable after the Effective Date; or (b) provide such other treatment agreed to by the holder of such Allowed Priority Tax Claim and the Debtor and the Estate (if before the Effective Date) or the Reorganized Debtor (on and after the Effective Date).

### U.S. Trustee Fees

All fees due and payable under 28 U.S.C. § 1930 and not paid before the Effective Date shall be paid as soon as practicable after the Effective Date. After the Effective Date, the Reorganized Debtor shall pay quarterly fees to the U.S. Trustee until the Bankruptcy Case is closed, and a Final Decree is entered. In addition, the Reorganized Debtor shall file post-Confirmation Date reports in conformance with the U.S. Trustee guidelines. The U.S. Trustee shall not be required to file a request for payment of its quarterly fees, which will be deemed Administrative Claims against the Diocese. The Trust will have no liability for U.S. Trustee fees.

### B.    Treatment of Classified Claims

The Committee Plan does not treat each Claim identically; rather, the Committee Plan categorizes Claims into Classes, consistent with the requirements in Sections 1122 and 1123(a)(1) of the Bankruptcy Code. That means that, under the Committee Plan, some holders of Claims will receive full satisfaction of their Claims, some will receive partial satisfaction, and some will receive nothing. In each instance, the Committee believes that holders of Claims will receive at least as much value as they would receive if the Debtor's Assets were to be liquidated under chapter 7 of the Bankruptcy Code and that impaired creditors will receive more than they would receive in a chapter 7 liquidation. Regardless, it is important for holders of Claims to read the Committee Plan and this Disclosure Statement carefully to understand how they will be treated under the Committee Plan.

The categories of Claims in the Committee Plan and summarized below classify Claims for all purposes, including voting, confirmation, and distribution under the Committee Plan and Sections 1122 and 1123(a)(1) of the Bankruptcy Code. A Claim shall be deemed classified in a particular Class only if the Claim qualifies within the description of that Class and shall be deemed classified in a different Class if any remainder of the Claim qualifies within the description of such different Class. A Claim is classified within a particular Class to receive distributions only if such Claim is Allowed and has not already been satisfied before the Effective Date.

Except regarding Abuse Claims, the treatment in the Committee Plan is in complete satisfaction of the legal, contractual, and equitable rights that each holder of a Claim may have

against the Debtor or its property. This treatment supersedes and replaces any agreements or rights those holders have in or against the Debtor or its property. All Distributions under the Committee Plan will be tendered to the entity holding the Claim. EXCEPT AS SET FORTH IN THE COMMITTEE PLAN, NO DISTRIBUTIONS WILL BE MADE FROM AND NO RIGHTS WILL BE RETAINED AGAINST THE DEBTOR OR ITS PROPERTY ON ACCOUNT OF ANY CLAIM THAT IS NOT AN ALLOWED CLAIM.

### Class 1: Other Priority Claims

(a)     **Definition**. A "Class 1 Claim" means an Allowed Claim described in, and entitled to priority under Sections 507(a) and 503(b)(9) of the Bankruptcy Code other than an Administrative Claim or a Priority Tax Claim.

(b)     **Unimpaired and Not Voting**. Class 1 is not impaired under the Committee Plan. The Class 1 Claimants are conclusively presumed to have accepted not entitled to vote on the Committee Plan.

(c)     **Treatment**. Unless the holder of an Allowed Class 1 Claim and the Diocese or the Reorganized Debtor (as applicable) agree to a different treatment, the Reorganized Debtor shall pay each such Allowed Class 1 Claim in full, in cash, without interest, from ongoing operations on the later of the Effective Date (or as soon thereafter as is practicable) and the date a Class 1 Claim becomes an Allowed Claim (or as soon thereafter as is practicable).

### Class 2 Citizens Bank, N.A.

(a)     **Class 2 Definition**. Class 2 consists of the Citizens Secured Guaranty Claim.

(b)     **Impaired and Voting**. Class 2 is impaired under the Committee Plan. The Class 2 Claimant is entitled to vote on the Committee Plan.

(c)     **Class 2 Treatment**. The collateral securing the Citizens Secured Guaranty Claim shall upon the Effective Date be transferred to the Trust and the collateral shall continue to secure the Citizens Secured Guaranty Claim. The mortgage and security interest held by Citizens to secure Citizens Guaranty Claim shall remain in place, and the Citizens Secured Guaranty Claim shall be treated in accordance with the Trust Agreement consistent with the provisions of the Bankruptcy Code; provided, however, that the Trust shall have no obligation to pay or other liability on account of the Citizens Secured Guaranty Claim. The Reorganized Debtor shall be liable to Citizens on the Citizens Secured Guaranty Claim to the same extent and validity as the Diocese immediately prior to the Petition Date.

### Class 3: M&T Bank Corporation

(a)     **Class 3 Definition**. Class 3 consists of all claims held by M&T. Class 3 is comprised of the following Sub-Classes:

      i.   Sub-Class 3-A consists of the M&T Secured Revolving Loan Claim; and

      ii.   Sub-Class 3-B consists of the M&T Secured Guaranty Claim.

(b)     **Impaired and Voting**. Class 3-A is unimpaired under the Committee Plan. The Class 3-A Claimant is conclusively presumed to have accepted and not entitled to vote on the Plan. Class 3-B is impaired under the Committee Plan. The Class 3-B Claimant is entitled to vote on the Committee Plan.

(c)     **Class 3 Treatment**. The holder of Allowed M&T Secured Claim and Allowed M&T Secured Guaranty Claim against the Diocese shall receive the treatment set forth below:

      i.   Class 3-A: The collateral securing the M&T Secured Revolving Loan Claim shall upon the Effective Date vest in the Reorganized Debtor and the collateral shall continue to secure the M&T Revolving Loan Guaranty Claim. The security interest held by M&T to secure M&T Revolving Loan Claim shall remain in place and M&T may exercise any and all rights and remedies against the collateral referenced in such security agreement, available to M&T. The Reorganized Debtor shall be liable to M&T on the M&T Secured Revolving Loan Claim to the same extent and validity as the Diocese immediately prior to the Petition Date.

      ii.   Class 3-B: The collateral securing the M&T Secured Guaranty Claim shall upon the Effective Date be transferred to the Trust and the collateral shall continue to secure the M&T Secured Guaranty Claim. The mortgage and security interest held by M&T to secure M&T Secured Guaranty Claim shall remain in place, and the M&T Secured Guaranty Claim shall be treated in accordance with the Trust Agreement consistent with the provisions of the Bankruptcy Code; provided, however, that the Trust shall have no obligation to pay or other liability on account of the M&T Secured Guaranty Claim. The Reorganized Debtor shall be liable to M&T on the M&T Secured Guaranty Claim to the same extent and validity as the Diocese immediately prior to the Petition Date.

**Class 4: Abuse Claims (Other Than Unknown Abuse Claims)**

(a)     **Definition**. A "Class 4 Claim" means an Abuse Claim other than an Unknown Abuse Claim. A "Class 4 Claimant" shall mean a holder of a Class 4 Claim.

(b)     **Impaired and Voting**. Class 4 is impaired under the Plan. The Class 4 Claimants

are entitled to vote on the Plan. Only for purposes of voting, each Claim in Class 4 is deemed to be Allowed in the amount of $1.00.

(c)     **Treatment of Class 4.** On and after the Effective Date, and subject to the Plan provisions, the Trust shall pay all Abuse Claims (except Unknown Abuse Claims) in accordance with and under the Plan and Trust Documents. The payment of the Class 4 Claims by the Trust is not a release, accord or novation of the Debtor's or the Participating Parties' liability because of the Class 4 Claims; provided, however, that the Debtor's liability because of the Class 4 Claims shall be discharged under Bankruptcy Code Section 1141(d), subject to Sections 5.4(f) and 13.1 and all of the Participating Parties' liabilities are subject to the Channeling Injunction and releases under the Plan. Under no circumstance shall the Abuse Claims Reviewer's review of a Class 4 Claim affect the rights of a Non-Settling Insurer. Class 4 Claimants shall have their Claims treated under the Trust Distribution Plan. Neither the Trust nor the Diocese have any obligation to take any action to enforce an Insurance Policy of a Non-Settling Insurer, including any obligation to commence and prosecute any action against any Non-Settling Insurer or to defend an action commenced by a Non-Settling Insurer, though the Trust (or the Diocese, as applicable), may choose to do so.

The Non-Settling Insurers remain fully liable for their obligations related in any way to the Abuse Claims, and their obligations are not reduced by the Diocese being in bankruptcy or by the distributions Class 4 Claimants receive, or are entitled to receive, based on the Plan. For the avoidance of doubt, determinations by the Abuse Claims Reviewer and/or any distributions entitled to be received from the Trust shall not constitute a determination of the Diocese's or any Participating Party's liability or damages for Class 4 Claims.

(d)     **Diocese Cooperation with Trustee and Abuse Claims Reviewer.** The Diocese and its counsel shall reasonably cooperate with the Trustee and the Abuse Claims Reviewer with any inquiries by either in the administration of the Trust Distribution Plan.

(e)     **Class 4 Claim Objections**. No Class 4 Claimant may challenge the merit, validity, or amount of any other Class 4 Claim. Except for any objection to a Class 4 Claim filed by the Committee, any objection to a Class 4 Claim pending as of the Effective Date is deemed withdrawn with prejudice. The Trustee has the exclusive right to object to a Class 4 Claim and shall succeed to the rights of the Committee because of the Committee's objection to a Class 4 Claim. The Reorganized Debtor shall not have the right to object to a Class 4 Claim. The Trustee shall succeed the Debtor for any pending objections to Class 4 Claims.

(f)     **Diocese Discharge of Class 4 Claim Liability.** The Debtor shall be discharged as set forth in Section 13.1 of the Committee Plan of any liability because of all Class

4 Claims, even if the Claimant rejects the Plan. As provided in Bankruptcy Code § 524(e), unless otherwise provided in the Committee Plan, such discharge shall not affect the liability of any other Entity on, or the property of any other Entity for, the Class 4 Claims including the liability of any Co-Defendant or Non-Settling Insurer, which liability shall continue unaffected by the terms of the Committee Plan or the discharge granted to the Debtor or the Reorganized Debtor under the Committee Plan and Bankruptcy Code § 1141(d).

Notwithstanding such discharge, to preserve coverage under any Non-Settling Insurer's Insurance Policies, Class 4 Claimants specifically reserve, and do not release, any claims they may have against the Diocese, the Reorganized Debtor, or any Participating Party that implicate coverage under any Non-Settling Insurer's Insurance Policies, but recourse is limited to the proceeds of the Non-Settling Insurer's Insurance Policies and all other damages (including extra-contractual damages), awards, judgments in excess of policy limits, penalties, punitive damages and attorney's fees and costs that may be recoverable against any Non-Settling Insurers because of their conduct regarding insurance coverage for, or defense or settlement of, any Class 4 Claim, and any such judgments or awards will be handled under the Plan and the Trust Distribution Plan. The Class 4 Claims will not be released or enjoined as against the Diocese, the Reorganized Debtor, or any Participating Party for any Abuse that may be covered under any Non-Settling Insurer's Insurance Policies until such claims are settled with the Diocese, the Reorganized Debtor, any Participating Party and/or such Non-Settling Insurer or are fully adjudicated, resolved, and subject to a Non-Appealable Order, but recourse is limited as described above.

**NOTHING IN THE COMMITTEE PLAN IS INTENDED TO AFFECT, DIMINISH OR IMPAIR ANY CLASS 4 CLAIMANT'S RIGHTS AGAINST A CO-DEFENDANT, INCLUDING THAT CO-DEFENDANT'S JOINT AND SEVERAL LIABILITY FOR ABUSE UNLESS AND UNTIL THEY BECOME PARTICIPATING PARTIES OR SETTLED INSURERS PURSUANT TO THE TERMS OF THE COMMITTEE PLAN.**

(g)    **Remand of State Court Actions**. On the thirtieth (30th) day after the Effective Date, all actions related to Class 4 Claims removed to the Bankruptcy Court shall be remanded to the state courts where the actions originally were commenced; provided that an action shall not be remanded if the plaintiff files a written request to the contrary with the Bankruptcy Court prior thereto. The Bankruptcy Court shall enter an order in each of the removed actions remanding them under the Plan.

(h)    **Late-Filed Abuse Claims.**

1.    Unless and until Disallowed by a Non-Appealable Order entered by this Court, or classified as an Unknown Abuse Claim in accordance with the terms and conditions of the Committee Plan, each Late-Filed Abuse Claim

shall be classified as a Class 4 Claim. For purposes of voting upon the Plan, the preceding determination shall be made as of the deadline for the return of Ballots to vote for the Plan.

2. A Late-Filed Abuse Claim may be Allowed by the Bankruptcy Court as a Class 4 Claim upon motion by the Abuse Claimant and after due notice and a hearing where the Abuse Claimant establishes their excusable neglect excusing the late filing of their Proof of Claim and the Bankruptcy Court orders that the Late-Filed Abuse Claim shall be treated as timely filed on or before the Claims Bar Date. Unless and until such motion is granted and the Late-Filed Abuse Claim is Allowed as a Class 4 Claim by a Non-Appealable Order, no distribution shall be paid on account of the Late-Filed Abuse Claim as a Class 4 Claim pursuant to the Trust Distribution Plan.

3. An Abuse Claimant holding a Late-Filed Abuse Claim may elect at their sole and absolute discretion to be classified and treated as an Unknown Abuse Claimant by making such election upon their Ballot returned at any time on or before the deadline for the return of Ballots. In such event, such Late-Filed Abuse Claim shall be classified as a Class 5 Claim and treated in accordance with such Class 5 and the Unknown Abuse Claims Trust Distribution Plan.

4. After the deadline for the return of Ballots, any Late-Filed Abuse Claim that had not previously elected to be classified and treated as an Unknown Abuse Claimant may still make such election at their sole and absolute discretion upon providing the Trustee and the Unknown Abuse Claims Reviewer with written notice of such election in accordance with the Unknown Abuse Claims Trust Distribution Plan.

5. For the avoidance of doubt, the holder of a Late-Filed Abuse Claim Disallowed as a Class 4 Claim may still make the election to have their Late-Filed Abuse Claim treated as an Unknown Abuse Claim.

6. Any Abuse Claimant holding a Late-Filed Abuse Claim who, at any time, elects to be treated as holding an Unknown Abuse Claim, must still satisfy the requirements provided for in the Committee Plan and in the Unknown Abuse Claims Trust Distribution Plan to receive any distributions on account of such Unknown Abuse Claim; specifically, that the Late-Filed Abuse Claim constitutes a Claim for Abuse that occurred against a Person when that Person was a minor for which a Proof of Claim was not filed before the Claims Bar Date and such Person:

   a. was under a disability (such as minority, mental disability, or alienage)

41

at the time of the Petition Date;

    b.   neither discovered, nor reasonably should have discovered before the Claims Bar Date that their childhood injury was caused by an act of Abuse; or

    c.   such Claim was barred by the applicable statute of limitations as of the Claims Bar Date, but is no longer barred by the applicable statute of limitations for any reason.

(i)    **Barred Child Sexual Abuse Claims.** All Barred Child Sexual Abuse Claims constitute Class 4 Claims classified and treated in accordance with this Class 4 and the other terms of the Plan, the Confirmation Order and the Trust Distribution Plan, specifically, without limitation, Section 6.2 of the Trust Distribution Plan. A Class 4 Claim's qualification as a Barred Child Sexual Abuse Claim shall not constitute a basis for any party in interest, including the Trustee, to object to the Allowance of such Abuse Claim.

(j)    **Litigation of Class 4 Claims Against Non-Settling Insurers.** A Class 4 Claimant, with the consent of the Trustee and under the Trust Distribution Plan and Trust Agreement, may commence an action against the Diocese and, if applicable, one or more Participating Parties, solely for liquidating a Class 4 Claim in order to pursue Insurance Recoveries regarding such Class 4 Claim from Non-Settling Insurers. The Diocese will not have to expend any funds regarding such defense, except to the extent required by the terms of any Insurance Policy issued by a Non-Settling Insurer. Consistent with the discharge provided for in Committee Plan Section 13.1 and the rights of a Participating Party, any judgment obtained in such action may not be enforced against the Diocese, a Participating Party and/or any of the non-insurance assets of the Diocese or such Participating Party, including, but not limited to, the Revested Assets or any assets acquired by the Reorganized Debtor after the Effective Date, and such judgment shall be paid under the Plan and the Trust Distribution Plan and shall be fully enforceable solely against and paid by any Non-Settling Insurer under the terms of that Non-Settling Insurer's Insurance Policy. Any recovery from the prosecution of such an action is deemed assigned to the Trust to the extent provided in the Plan, including as provided in Trust Distribution Plan.

### Class 5: Unknown Abuse Claims

(a)    **Definition**. A Class 5 Claim means an Unknown Abuse Claim ("Class 5 Claim"). A "Class 5 Claimant" shall mean a holder of a Class 5 Claim.

(b)    **Impaired and Voting**. Class 5 is impaired under the Plan. The Unknown Claims Representative is entitled to vote on the Committee Plan on behalf of Class 5

42

Claimants. Only for purposes of voting, the Unknown Claims Representative is deemed to have an Allowed Claim in the amount of $1.00.

(c)     **Treatment**. The Unknown Abuse Claims Trust will be funded by the Debtor on the Effective Date pursuant to the provisions of the Committee Plan. On and after the Effective Date, the Unknown Abuse Claims Trust shall pay all Unknown Abuse Claims in accordance with and the Plan and Unknown Abuse Claims Trust Documents. The payment of the Unknown Abuse Claims by the Unknown Abuse Claims Trust is not a release, accord or novation of the Debtor's or the Participating Parties' liability because of the Unknown Abuse Claims; provided, however, that the Debtor's liability because of the Unknown Abuse Claims shall be discharged under Bankruptcy Code § 1141(d), subject to Committee Plan Sections 5.5(g) and 13.1 and all of the Participating Parties' liabilities are subject to the Channeling Injunction and releases under the Plan. Under no circumstance shall the Abuse Claims Reviewer's review of an Unknown Abuse Claim affect the rights of a Non-Settling Insurer. Unknown Abuse Claimants shall have their Claims treated under the Unknown Abuse Claims Trust Distribution Plan.

(d)     **Preservation of Liability of Non-Settling Insurers**. The Non-Settling Insurers remain fully liable for their obligations related in any way to the Unknown Abuse Claims, and their obligations are not reduced by the Diocese being in bankruptcy or by the distributions Unknown Abuse Claimants receive, or are entitled to receive, based on the Plan. For the avoidance of doubt, determinations by the Abuse Claims Reviewer and/or any distributions entitled to be received from the Unknown Abuse Claims Trust shall not constitute a determination of the Diocese's or any Participating Party's liability or damages for Unknown Abuse Claims.

(e)     **Diocese Cooperation with Unknown Abuse Claims Trustee and Abuse Claims Reviewer.** The Diocese and its counsel shall reasonably cooperate with the Unknown Abuse Claims Trustee and the Abuse Claims Reviewer with any inquiries by either in the administration of the Unknown Abuse Claims Trust Distribution Plan.

(f)     **Unknown Claim Objections.** No Class 5 Claimant may challenge the merit, validity, or amount of any other Class 5 Claim. Except for any objection to a Class 5 Claim filed by the Committee, any objection to a Class 5 Abuse Claim pending as of the Effective Date is deemed withdrawn with prejudice. The Unknown Abuse Claims Trustee has the exclusive right to object to a Class 5 Claim and shall succeed to the rights of the Committee because of the Committee's objection to a Class 5 Claim. The Reorganized Debtor shall not have the right to object to a Class 5 Claim.

(g)     **Diocese Discharge of Unknown Abuse Claim Liability.** The Debtor shall be

43

discharged as set forth in Committee Plan Section 13.1 of any liability because of all Class 5 Claims, even if the Claimant rejects the Plan. As provided in Bankruptcy Code § 524(e), unless otherwise provided in the Committee Plan, such discharge shall not affect the liability of any other Entity on, or the property of any other Entity for, the Unknown Abuse Claims including the liability of any Co-Defendant or Non-Settling Insurer, which liability shall continue unaffected by the terms of the Committee Plan or the discharge granted to the Debtor or the Reorganized Debtor under the Committee Plan and Bankruptcy Code § 1141(d).

Notwithstanding such discharge, to preserve coverage under any Non-Settling Insurer's Insurance Policies, Class 5 Claimants specifically reserve, and do not release, any claims they may have against the Diocese or any Participating Party that implicate coverage under any Non-Settling Insurer's Insurance Policies, but recourse is limited to the proceeds of the Non-Settling Insurer's Insurance Policies and all other damages (including extra-contractual damages), awards, judgments in excess of policy limits, penalties, punitive damages and attorney's fees and costs that may be recoverable against any Non-Settling Insurers because of their conduct regarding insurance coverage for, or defense or settlement of, any Unknown Abuse Claim, and any such judgments or awards will be handled under the Plan and the Trust Distribution Plan. The Class 5 Claims will not be released or enjoined as against the Diocese or any Participating Party for any Unknown Abuse Claim that may be covered under any Non-Settling Insurer's Insurance Policies until such claims are settled with the Diocese, the Reorganized Debtor, any Participating Party and such Non-Settling Insurer or are fully adjudicated, resolved, and subject to a Non-Appealable Order, but recourse is limited as described above.

**NOTHING IN THE COMMITTEE PLAN IS INTENDED TO AFFECT, DIMINISH OR IMPAIR ANY UNKNOWN ABUSE CLAIMANT'S RIGHTS AGAINST A CO-DEFENDANT, INCLUDING THAT CO-DEFENDANT'S JOINT AND SEVERAL LIABILITY FOR UNKNOWN ABUSE CLAIMS UNLESS AND UNTIL THEY BECOME PARTICIPATING PARTIES OR SETTLED INSURERS PURSUANT TO THE TERMS OF THE COMMITTEE PLAN.**

**Class 6: General Unsecured Claims**

(a)    **Definition**. A Class 6 Claim means (i) any Claim arising out of the rejection of any executory contract, or (ii) any Unsecured Claim that is not included in another class under the Plan and is not listed as disputed, contingent or unliquidated on the Debtor's schedules filed in connection with this Chapter 11 case ("Debtor's Schedules") or as to which the holder of such Claim timely filed a Claim.

(b)    **Impaired and Voting**. Class 6 is unimpaired under the Plan. The Class 6 Claimants are conclusively presumed to have accepted and entitled to vote on the Plan.

44

(c)    **Treatment**. Except to the extent that a Class 6 Claimant agrees to less favorable treatment of their Class 6 Claim, in exchange for full and final satisfaction of such Allowed General Unsecured Claim, at the sole option of the Reorganized Diocese: (a) each Class 6 Claimant shall receive payment in Cash in an amount equal to such Allowed General Unsecured Claim, payable on or as soon as reasonably practicable after the last to occur of (i) the Effective Date, (ii) the date on which such General Unsecured Claim becomes an Allowed General Unsecured Claim, and (iii) the date on which the Class 6 Claimant and the Diocese or Reorganized Diocese, as applicable, shall otherwise agree in writing; or (b) satisfaction of such Allowed General Unsecured Claim in any other manner that renders the Allowed General Unsecured Claim Unimpaired, including Reinstatement.

### Class 7: Abuse Related Contribution Claims

(a)    **Class 7 Definition**. A Class 7 Claim means all Abuse Related Contribution Claims.

(b)    **Impaired and Voting**. Class 7 is impaired under the Plan. The Class 7 Claimants are entitled to vote on the Plan.

(c)    **Class 7 Treatment**. Claims in Class 7 against the Debtor shall be disallowed in accordance with Section 502(e)(1) of the Bankruptcy Code, and Class 7 Claims will receive no distribution under the Plan. Notwithstanding the disallowance of an Abuse Related Contribution Claim, an Abuse Claimant who liquidates their claim in an amount greater than $0, consents to application of its portion of the reserve established by the Trustee under the Trust Agreement to pay any Co-Defendant for its contribution, reimbursement, and/or indemnity claim, if any, against the Debtor.

## VII.    MEANS FOR IMPLEMENTATION OF THE COMMITTEE PLAN

### A.    Establishment Of Trust

On the Confirmation Date, the Trust shall be established under the Trust Documents and the Unknown Abuse Claims Trust shall be established under the Unknown Abuse Claims Trust Documents. The Trust Documents and Unknown Abuse Claims Trust Documents, including the Trust Agreement and Unknown Abuse Claims Trust Agreement, are incorporated herein by reference.

### Funding of Trust

The Trust will be funded as follows:

•    **Transferred Cash**. On or before the Effective Date, the Debtor shall transfer or cause to be transferred on its behalf by wire transfer to the Trust $1.3 million in good and immediately available funds.

- **Transferred Real Estate.** The Debtor shall transfer to the Trust all pieces and parcels of Real Property described in subsection 4 of Section 7.1(a) of the Committee Plan, identified as follows:

  (i)     Vacant Land: 7-9 Bath St., Norwich, CT 06360;

  (ii)    Bath Street Office, 11 Bath St. Norwich, CT 06360;

  (iii)   Moss Property, 7 Otis St. Norwich, CT 06360;

  (iv)    Tribunal, 17 Otis St., Norwich, CT 06360;

  (v)     Diocesan School Office, 25 Otis St Norwich, CT 06360;

  (vi)    Vacant Office, 31 Perkins Ave., Norwich, CT 06704;

  (vii)   1740 Randolph Rd., Middletown, CT 06457-5155;

  (viii)  181 Randolph Rd., Middletown, Ct 06457-5155;

  (ix)    Newman Hall, 290 Prospect St., Willimantic, CT 06360; and

  (x)     1593 Route 32, Uncasville, CT, 06382.

- **Transferred Causes of Action.** The Causes of Action of the Diocese are automatically and without further act or deed assigned and transferred to the Trust on the Effective Date, and include the following Causes of Action against:

  (i)     The Catholic Entities for any accounts receivable, notes receivable or other receivables due, and any security therefor;

  (ii)    Mount St. John, Inc. for the note balance and all other amounts due, and any security therefor;

  (iii)   Mercy High School, Saint Bernard School and/or Xavier High School, to the extent liable pursuant to Bankruptcy Code §§ 544, 548 & 550, and pursuant to the Connecticut Uniform Fraudulent Transfer Act, Conn. Gen. Stat. §§ 52-552a – 52-552l ("CUFTA");

  (iv)    The ACA to the extent liable pursuant to Bankruptcy Code §§ 544, 548 & 550, and pursuant to CUFTA;

  (v)     The Catholic Foundation of the Diocese of Norwich, Inc. to the extent liable pursuant to Bankruptcy Code §§ 544, 548 & 550, and pursuant to CUFTA;

  (vi)    The Catholic Entities, other than Participating Parties, to the extent liable in connection with any Abuse Claim, for contribution, indemnity, equitable indemnity, subrogation, or equitable subrogation, or reimbursement, or any other indirect or derivative

46

recovery for the payment of money where the Diocese or any Participating Party has paid more than its equitable or proportionate share of an Abuse Claim against a Participating Party; and

(vii)   Officers and directors of the Debtor on account of any breach of fiduciary duty or other claim.

- **Transferred Receivables.** The Transferred Receivables of the Diocese are automatically and without further act or deed assigned and transferred to the Trust on the Effective Date, including, but not limited to, all receivables identified in Exhibit I to the Committee Plan.

- **Transferred Insurance Interests.** The Insurance Claims and the Insurance Recoveries against Non-Settling Insurers deemed assigned to the Trust pursuant to and to the extent provided by Section IX of the Committee Plan.

- **Settled Insurer and Participating Party Contributions**.

(i)    Any Settled Insurer and Participating Party shall pay to the Trust the sums set forth in their respective agreement within the time set forth in the such agreement. In addition, all rights to receive payment of the amounts to be paid under the agreement shall be assigned to the Trust.

(ii)   As set forth and to the extent provided in Section IX of the Committee Plan and the Confirmation Order, on the Effective Date, with no further act by any party, the Diocese and the Participating Parties shall be deemed to have assigned the Insurance Claims and the proceeds of such Insurance Claims to the Trust and such assignment shall immediately be deemed effective. On the Effective Date, the Trust will be empowered to receive assignment of Litigation Awards and to take all steps necessary to pursue recovery from Non-Settling Insurers.

### Vesting

All Trust Assets required by the Plan and the Confirmation Order to be transferred to the Trust on the Effective Date shall vest in the Trust on the Effective Date, and the Diocese, Participating Parties and Settled Insurers shall be deemed for all purposes to have transferred all of their respective Interests in the Trust Assets to the Trust. The Diocese, the Participating Parties and the Settled Insurers, as applicable, shall take all actions reasonably necessary to transfer the Trust Assets to the Trust. Upon the transfer of Trust Assets in accordance with this Section 7.1(a), the Diocese, the Participating Parties and the Settled Insurers shall have no further Interest in or with respect to the Trust Assets except as otherwise explicitly provided in the Committee Plan.

### Funding of Unknown Abuse Claims Trust

47

The Unknown Abuse Claims Trust shall be funded by the Debtor and the Reorganized Debtor by transferring to the Unknown Abuse Claims Trust the amounts directed and within the time frames required by the Unknown Claims Representative.

### Reserve Accounts

As set forth in the Trust Agreement and Unknown Abuse Claims Trust Agreements, the Trustee and Unknown Abuse Claims Trustee shall establish reserves for various purposes.

### No Execution

All funds held in the Trust will remain property of such Trust until the funds have been actually paid to and received by a Person entitled to receive payment under the Plan, Confirmation Order and Trust Documents. Except as provided in the Plan, Confirmation Order and the Trust Documents, the Trust shall not be responsible for any Claims against the Debtor. All funds held in the Unknown Abuse Claims Trust will remain property of the Unknown Abuse Claims Trust until the funds have been actually paid to and received by a Entity entitled to receive payment under the Plan, Confirmation Order and Unknown Abuse Claims Trust Documents. Except as provided in the Plan, Confirmation Order and the Unknown Abuse Claims Trust Documents, the Unknown Abuse Claims Trust shall not be responsible for any Claims against the Debtor.

### Payments Effective Upon Tender

Whenever the Plan requires payment to be made to a creditor, such payment will be deemed made and effective upon tender thereof by the Trustee, the Debtor, or the Reorganized Debtor to the creditor to whom payment isdue. If any creditor refuses a tender, the amount tendered and refused will be held by the Trust, the Debtor, or the Reorganized Debtor for the benefit of that creditor pending final adjudication of the dispute. However, when and if the dispute is finally adjudicated and the creditor receives the funds previously tendered and refused, the creditor will be obliged to apply the funds in accordance with the Plan as of the date of the tender; and while the dispute is pending and after adjudication thereof, the creditor will not have the right to claim interest or other charges or to exercise any other rights which would be enforceable by the creditor, if the Trust, the Debtor, or the Reorganized Debtor failed to pay the tendered payment.

### B.   Liquidation And Payment of Abuse Claims

The Trust and Unknown Abuse Claims Trust shall pay Abuse Claims under the terms of the Plan, Confirmation Order, the Trust Agreement, the Trust Distribution Plan, the Unknown Abuse Claims Trust Agreement, and the Unknown Abuse Claims Trust Distribution Plan, as applicable.

The Abuse Claims Reviewer's determinations shall not be a finding or fixing of the fact or liability or the amount payable for any Abuse Claim with any binding legal effect, other than for distribution purposes by the Trust under the Trust Distribution Plan or the Unknown Abuse Claims Trust under the Unknown Abuse Claims Trust Distribution Plan. The Trustee's, Unknown Abuse Claims Trustee's or Abuse Claims Reviewer's determination of qualification of an Abuse Claim, payment on account of an Abuse Claim or reserve for payment on account of an Abuse Claim is

not an admission of liability by the Debtor, a Participating Party, the Trust, or the Unknown Abuse Claims Trust regarding any Abuse Claims and has no *res judicata* or collateral estoppel effect on the Debtor, any Participating Party, the Trust, the Unknown Abuse Claims Trust, any Non-Settling Insurer or Settled Insurer. Trust and Unknown Abuse Claims Trust distributions do not release the Debtor or any Participating Party nor are Trust Distributions or Unknown Abuse Claims Trust Distributions an agreement or novation of the Debtor's or Participating Party's liability because of the Abuse Claims. The Trust's or Unknown Abuse Claims Trust's act of making a distribution is immaterial to, and shall not be construed as, a determination or admission of the Diocese's or any Participating Party's liability for, or damages regarding, any Abuse Claim. The determination of qualification, estimation of Abuse Claims, and payment of distributions is not a settlement, release, accord, or novation of any Abuse Claims and cannot be used by any joint tortfeasor as a defense to any alleged joint liability. The Trustee's, Unknown Abuse Claims Trustee's or Abuse Claims Reviewer's determination of qualification of an Abuse Claim, payment on account of an Abuse Claim or reserve for payment on account of an Abuse Claim does not impair an Abuse Claimant's rights to obtain a judgment, including a judgment based on joint and several liability, against the Diocese, a Participating Party, or any Non-Settling Insurer, to establish the Diocese's and/or a Participating Party's liability on the Abuse Claim, but any such judgment awarded to an Abuse Claimant will be reduced by the Trust Distributions or Unknown Abuse Claims Trust Distributions already paid by the Trust or Unknown Abuse Claims Trust to such Abuse Claimant on their Abuse Claim(s).

Nothing in the Trust Documents or Unknown Abuse Claims Trust Documents shall (i) impose any costs, directly or indirectly, upon the Estate, any Participating Party or any Settled Insurer relating to the treatment of Abuse Claims or (ii) otherwise modify the rights or obligations of the Estate, any Participating Party or Settled Insurer as otherwise in the Plan.

Neither the Debtor's or the Participating Parties' obligations to Abuse Claimants shall be deemed to have been paid in full, nor their liability to Abuse Claimants satisfied, because of reserves for, distributions because of or payments received by Abuse Claimants from the Trust or Unknown Abuse Claims Trust, except as modified by the discharge provisions in Section XIII. The Trust, Unknown Abuse Claims Trust or the Diocese and Participating Parties may continue efforts to obtain recoveries from Non-Settling Insurers related to the Abuse Claims. In addition, the Non-Settling Insurers remain fully liable for their obligations related to the Abuse Claims, and their obligations are not reduced by the Diocese being in bankruptcy or by the amount of distributions Abuse Claimants receive, or are entitled to receive, based on the Plan. For the avoidance of doubt, determinations by the Abuse Claims Reviewer and/or any distributions entitled to be received from the Trust or Unknown Abuse Claims Trust shall not constitute a determination of the Diocese's or any Participating Party's liability or damages for Abuse Claims.

**Effect of No Award on Abuse Claims**

If an Abuse Claim is denied payment under the Trust Distribution Plan or Unknown Abuse Claims Trust Distribution Plan, the holder of such Abuse Claim will have no further rights against

the Diocese, Participating Parties, the Trust, Trustee, Unknown Abuse Claims Trust, or Unknown Abuse Claims Trustee relating to such Abuse Claim.

### Treatment of Punitive Damages

Claims for punitive or exemplary damages in connection with any of the Claims will receive no distribution under the Plan.

### Withdrawal of Abuse Claims

An Abuse Claimant may withdraw an Abuse Claim at any time on written notice to the Trustee or Unknown Abuse Claims Trustee, as applicable. If withdrawn, the Claim will be withdrawn with prejudice and may not be reasserted.

### Medicare Reimbursement and Reporting Obligations

The Trust and Unknown Abuse Claims Trust shall register as a Responsible Reporting Entities ("RRE") under the reporting provisions of Section 111 of MMSEA.

The Trust and Unknown Abuse Claims Trust shall timely submit all reports required under MMSEA because of any claims settled, resolved, paid, or otherwise liquidated by the Trust or Unknown Abuse Claims Trust. The Trust or the Unknown Abuse Claims Trust, as an RRE, shall follow all applicable guidance published by the Centers for Medicare & Medicaid Services of the United States Department of Health and Human Services and/or any other agency or successor entity charged with responsibility for tracking, assessing, or receiving reports made under MMSEA (collectively, "CMS") to determine whether, and, if so, how, to report to CMS under MMSEA.

For Abuse Claims that occurred after December 5, 1980, before remitting funds to Claimants' counsel, or to the Claimant if such Claimant is acting pro se, regarding any Abuse Claim, the Trustee or Unknown Abuse Claims Trustee shall obtain (i) a certification that said Claimant (or such Claimant's authorized representative) has provided or will provide for the payment and/or resolution of any obligations owing or potentially owing under 42 U.S.C. § 1395y(b), or any related rules, regulations, or guidance, in connection with, or relating to, such Abuse Claim and (ii) that the Claimants' counsel or Claimant (if Claimant is acting pro se) indemnifies the Trust for any such obligations.

### No Admission

Section 8.5 of the Committee Plan does not imply, and shall not be an admission that the Debtor, any Participating Party or any Settled Insurer are "applicable plans" within the meaning of Medicare, Medicaid and SCHIP Extension Act of 2007, or that they have any legal obligation to report any actions undertaken by the Trust or Unknown Abuse Claims Trust or contributions to

the Trust or Unknown Abuse Claims Trust under Medicare, Medicaid and SCHIP Extension Act of 2007 or any other statute or regulation.

### Delay Regarding Failure to Comply

The failure by one or more Medicare Beneficiaries or other Abuse Claimants to follow these provisions shall not delay or impair the payment by the Trustee or Unknown Abuse Claims Trustee to any other Medicare Beneficiary or other Abuse Claimant following these provisions.

### Documentation By Estate of Abuse Claimant

If the Abuse Claimant is the estate of an Abuse Claimant, then the letters or documentation required under Committee Plan Section 8.5 need not be dated within 120 days of payment by the Trustee or the Unknown Abuse Claims Trustee to such Claimant.

### C.    Insurance Matters

### Transfer Of Insurance Interests

On the Effective Date, and with no further action by any party, but subject to the Committee Plan, the Diocese and each of the Participating Parties will be deemed to have assigned to the Trust the Diocese's and the Participating Parties' rights to all Insurance Claims and Insurance Recoveries against the Non-Settling Insurers (the "Transferred Insurance Claims"). The Transferred Insurance Claims shall be effective to the maximum extent permissible under applicable law and the terms of the Insurance Policies and shall not be construed: (i) as an assignment of the Insurance Policies or (ii) to entitle any Person to Insurance Coverage other than those Persons or entities entitled to such coverage under the terms of the Insurance Policies. The determination of whether the assignment of Insurance Claims and Insurance Recoveries provided for in this Section is valid, and does not defeat or impair the Insurance Coverage shall be made by the Bankruptcy Court at the Confirmation Hearing.

If a party in interest fails to timely file an objection to the proposed assignment by the deadline for filing objections to confirmation of the Committee Plan, that party in interest shall be deemed to have irrevocably consented to the assignment and will be forever barred from asserting that the assignment affects the ability of the Trust to pursue Insurance Claims, Insurance Coverage, and/or Insurance Recoveries from the Non-Settling Insurers.

If the Bankruptcy Court determines that the assignment of the Insurance Claims and Insurance Recoveries is valid and does not defeat or impair the Insurance Coverage, following the Effective Date, the Trust shall assume responsibility for, and be bound by, only such obligations of the Diocese or the Participating Parties under the Non-Settling Insurer Insurance Policies as are necessary to enforce the Transferred Insurance Claims; provided, however, that the Trust's assumption of such responsibility shall not relieve the Diocese or the Participating

Parties from any duty that such entities may have under the Non-Settling Insurer Policies.

### Appointment Of Trustee as Estate Representative to Enforce Insurance Interests and Obtain Insurance Recoveries

Under Section 1123(b)(3)(B) of the Bankruptcy Code, the Trustee is appointed as the representative of the Diocese and Participating Parties to retain and enforce the Diocese's and Participating Parties' Insurance Coverage and for Insurance Claims regarding the Abuse Claims against the Diocese and Participating Parties for any Insurance Claims transferred to the Trust.

The determination of whether the appointment of the Trust as the Debtor's and the Debtor's Estate's representative provided for in Committee Plan Section 9.2(a) is valid and does not defeat or impair the Insurance Coverage, shall be made by the Bankruptcy Court at the Confirmation Hearing. If a party in interest fails to timely file an objection to the proposed appointment by the deadline for filing objections to confirmation of the Committee Plan, that party in interest shall be deemed to have irrevocably consented to the appointment and will be forever barred from asserting that the appointment in any way affects the ability of the Trust to pursue the Transferred Insurance Claims, the Insurance Coverage, and/or Insurance Recoveries related to Transferred Insurance Claims from the Non-Settling Insurers.

If the Bankruptcy Court determines that the appointment is valid and does not defeat or impair the Insurance Coverage, following the Effective Date, the Trust shall assume responsibility for, and be bound by, only such obligations of the Diocese or the Participating Parties under the Non-Settling Insurer Insurance Policies as are necessary to enforce the Transferred Insurance Claims; provided, however, that the Trust's appointment shall not relieve the Diocese or the Participating Parties from any duty that such entities may have under the Non-Settling Insurer Insurance Policies.

### Consequences of Determination That Assignment or Appointment Is Invalid

If a Non-Appealable Order is entered holding that the assignment of Insurance Claims provided for in Committee Plan Section 9.1, or that the appointment of the Trust as the Diocese's and Participating Parties' representative provided for in Committee Plan Section 9.2, is invalid or would defeat or impair the Insurance Coverage regarding an Insurance Policy, as to such Insurance Policy, the assignment and/or appointment, as the case may be, will be deemed not to have been made. If the assignment and/or appointment is not deemed to have been made, the Diocese and each of the Participating Parties will retain the Insurance Claims under such Insurance Policy, and the following shall apply:

- The Trust, the Reorganized Debtor, and any Participating Parties shall enter into a common interest agreement related to pursuing any Transferred Insurance Claims.

- The Reorganized Debtor and the Participating Parties will assert their Insurance Claims to the extent requested by the Trust against any Non-Settling Insurer. All Insurance Recoveries identified as transferred to the Trust under Committee Plan Section 9.1 above received by the Reorganized Debtor and the Participating Parties will be immediately paid to the Trust. The Reorganized Debtor and Participating Parties will select and retain counsel to pursue their Insurance Claims under Committee Plan Section IX, subject to the Trustee's approval, which approval shall not be unreasonably withheld.

- The Reorganized Debtor and Participating Parties shall cooperate with the Trust regarding the Transferred Insurance Claims, including that the Reorganized Debtor and Participating Parties will provide the Trustee and its counsel with all discovery requests, pleadings, moving documents and other papers that the Reorganized Debtor or Participating Parties intend to make or file regarding the Transferred Insurance Claims and any related counterclaims against the Non-Settling Insurers before making such requests or filing. The Reorganized Debtor and Participating Parties shall keep the Trustee advised of any settlement discussions regarding any litigation against a Non-Settling Insurer and will involve the Trust's counsel in all settlement discussions with any Non-Settling Insurer.

- The Trust shall pay the reasonable attorneys' fees, costs and expenses allowed by the Bankruptcy Court incurred by the Reorganized Debtor and Participating Parties in pursuing the Transferred Insurance Claims under Committee Plan Section 9.1, subject to a monthly cap to be established by the Trustee, in consultation with the Reorganized Debtor and Participating Parties.

- The Trust shall, in addition to reasonable attorneys' fees, costs and expenses provided for in Committee Plan Section 9.3(a)4, reimburse the Reorganized Debtor and Participating Parties for any reasonable out of pocket costs and expenses it incurs as a direct consequence of pursuing such Transferred Insurance Claims, but will not compensate the Reorganized Debtor and Participating Parties for any time any of its employees spends. All Insurance Recoveries received by the Reorganized Debtor or Participating Parties because of such Transferred Insurance Claims shall be held in trust to benefit the Trust and shall be immediately remitted by the Reorganized Debtor or Participating Parties to the Trust.

**Preservation of Insurance Rights**

Nothing in the Committee Plan shall be construed to impair or diminish any Non-Settling Insurer's obligations under any Insurance Policy. No provision of the Committee Plan shall impair or diminish any Non-Settling Insurer's legal, equitable, or contractual obligations relating to the Insurance Policies issued by the Non-Settling Insurers or the Insurance Claims against the Non-Settling Insurers. If any court determines that any provision of the Committee Plan impairs or

diminishes any Non-Settling Insurer's obligations regarding the Insurance Claims or Insurance Recoveries, such provision shall be given effect only if it shall not cause such impairment or diminishment.

### Post-Judgment Actions Against Non-Settling Insurers

If the Trust or any Abuse Claimant obtains a judgment against the Reorganized Debtor or Participating Parties, the Reorganized Debtor or Participating Parties will cooperate with the Trust or Abuse Claimant in the pursuit of any action brought by the Trust or Abuse Claimant against a Non-Settling Insurer that the Trust contends provides Insurance Coverage for such judgment. The Reorganized Debtor and/or Participating Parties will provide the Trust or Abuse Claimant with any non-privileged and relevant documents and information reasonably requested by the Trust or Abuse Claimant in pursuit of such an action. The Trust will reimburse the Reorganized Debtor and Participating Parties for any reasonable out of pocket costs they incur, including attorneys' fees, as a direct consequence of such cooperation, but will not compensate the Reorganized Debtor and Participating Parties for any time their employees spend.

### Settlement with Non-Settling Insurers

Following the Effective Date, the Reorganized Debtor and the Participating Parties shall not enter into an agreement affecting any Insurance Policy with any Non-Settling Insurer without the express written consent of the Trustee, which consent may be granted or withheld at the Trustee's sole and absolute discretion. Following the Effective Date, the Trust shall exclusively act on the Reorganized Debtor's and Participating Parties' behalf to negotiate a settlement with any Non-Settling Insurer because of such Insurance Claims, unless Committee Plan Section 9.3 applies. Such settlements may provide for the Non-Settling Insurer to become a Settling Insurer.

### Cooperation with Non-Settling Insurer in Defense of Claims

Without limiting the Diocese and/or Participating Party's obligations under this Section IX of the Committee Plan, if any Abuse Claimant prosecutes an action against the Diocese and/or Participating Party, the Diocese and/or Participating Party will cooperate, under the terms of any applicable Insurance Policy, with a Non-Settling Insurer providing a defense to such a Claim. The Trust will reimburse the Reorganized Debtor and/or the Participating Party the reasonable attorneys' fees, costs and expenses allowed by the Bankruptcy Court incurred as a direct consequence of such cooperation, subject to a monthly cap to be established by the Trustee, in consultation with the Reorganized Debtor and Participating Parties, but the Trust will not compensate the Reorganized Debtor or Participating Parties for any time their employees spend. To the extent a Non-Settling Insurer has refused to defend an Abuse Claim, the Reorganized Debtor and/or Participating Party will not cooperate with such Insurer and may enter into stipulated judgments with the Abuse Claimant or the Trustee. The Trust will not reimburse the Reorganized Debtor or Participating Party for any out-of-pocket costs if the Non-Settling Insurer has refused to defend the Abuse Claim. If the Trust asserts any claim that the Diocese has breached such duties

or obligations under the Non-Settling Insurer Insurance Policies causing a loss of coverage, it shall give the Diocese notice and an opportunity to cure any alleged breach, and the Diocese shall not be liable for any alleged breach causing a loss of coverage except when (i) the breach relates to post-Effective Date conduct of the Diocese, and (ii) the Diocese willfully or intentionally violates its continuing obligations under the Non-Settling Insurer Insurance Policies. In addition, any such claim will not be automatically allowed; the Diocese may defend against such claim.

### Insurance Neutrality

Other than as expressly provided in Committee Plan Section IX, no provision of the Committee Plan shall diminish or impair the right of any Insurer to assert any defense to any Insurance Claim. That the Trust is liquidating and paying/reserving monies because of the Abuse Claims shall not be construed to diminish any duty of any Insurer under any Insurance Policy to provide Insurance Coverage to the Diocese for Abuse Claims. The duties and obligations, if any, of the Non-Settling Insurers under each Non-Settling Insurer's Insurance Policy shall not be impaired, altered, reduced or diminished by: (a) the discharge granted to the Debtor under the Plan under Section 1141(d) of the Bankruptcy Code, (b) the exonerations, exculpations and releases in the Plan or (c) the Channeling Injunction.

### Judgment Reduction

In connection to any action by the Trust to enforce Insurance Claims regarding an Insurance Policy issued by a Non-Settling Insurer, if any Insurer obtains a judicial determination or binding arbitration award that, it would be entitled to obtain a sum certain from a Settled Insurer because of a claim for contribution, subrogation, indemnification, or other similar claim against a Settled Insurer for such Settled Insurer's alleged share or equitable share, or to enforce subrogation rights, if any, of the defense and/or indemnity obligation of such Settled Insurer for any Claims released or resolved under any Settlement Agreement with a Settled Insurer, the Diocese, the Trustee or Participating Party, as applicable, shall be deemed to have reduced its judgment or Claim against, or settlement with, such other Insurer to the extent necessary to satisfy such contribution, subrogation, indemnification, or other claims against such Settled Insurer. To make sure such a reduction is accomplished, such Settled Insurer shall be entitled to assert Committee Plan Section IX as a defense to any action against it brought by any other Insurer for any such portion of the judgment or Claim and shall be entitled to request that the court or appropriate tribunal issue such orders as are necessary to effectuate the reduction to protect such Settled Insurer and the Released Parties under a Settlement Agreement with a Settled Insurer from any liability for the judgment or Claim. If a Non-Settling Insurer asserts that it has a Claim for contribution, indemnity, subrogation, or similar relief against a Settled Insurer, such Claim may be asserted as a defense against the Trust or Diocese in any litigation of Insurance Claims (and the Trust or Diocese may assert the legal and equitable rights of such Settled Insurer in response thereto); and to the extent such a Claim is found to be valid by the court presiding over such action, the liability of such Non-Settling Insurer to the Trust, the Diocese or Participating Party shall be reduced dollar for dollar by the amount so determined. The Bankruptcy Court shall retain nonexclusive

jurisdiction to determine the amount, if any, of any judgment reduction under Committee Plan Section IX. In addition, any court of competent jurisdiction may determine the amount, if any, of any judgment reduction under Committee Plan Section IX.

**D.     Settled Insurers and Participating Parties**

### Settlement Agreements

Each Settlement Agreement shall comply and be consistent with the provisions of the Committee Plan and, in particular, without limitation, the provisions of this Section IX. Upon satisfaction of the conditions precedent to any Settlement Agreement becoming effective, including the Confirmation Order and the order approving the Settlement Agreement becoming a Non-Appealable Order, any Settlement Agreement will be fully binding on the Settled Party, the Trust, the Unknown Abuse Claims Trust, the Participating Parties, the Reorganized Debtor, the Committee, the Abuse Claimants, and parties in interest, and any of the foregoing Persons' successors.

### Settlement Payments

Each Participating Party and Settled Insurer will pay to the Trust the sums set forth in each applicable Settlement Agreement within the time set forth in such Settlement Agreement.

### Effect Under Non-Settling Insurer Insurance Policies

The Debtor's and Participating Party's contributions are being made in respect of the uninsured or underinsured exposure of the Debtor and the Participating Parties for Abuse Claims and, to the extent required under applicable law, to satisfy self-insured retentions or deductibles under Non-Settling Insurer Insurance Policies.

### Post-Effective Date Approval

After the Effective Date, upon consent of the Trustee, a Person may become a Settled Insurer or a Participating Party if the Bankruptcy Court, after notice and hearing, approves the Settlement Agreement between, *inter alia*, the Person and the Trustee. After the Effective Date, the Trustee shall have the exclusive authority to seek approval of such a Settlement Agreement. Upon the Bankruptcy Court's entry of a Non-Appealable Order approving such Settlement Agreement, Exhibit E and/or Exhibit F, as appropriate, shall be amended by the Trustee to include such Person. The Bankruptcy Court's retained jurisdiction to approve an agreement under Committee Plan Section X shall include jurisdiction to determine the adequacy of notice of a motion to approve such an agreement.

### Effect of Post-Effective Date Settlement Agreements

Any Person that enters into a Settlement Agreement with the Trustee after the Effective

56

Date which has been approved by a Non-Appealable Order shall have all of the rights, remedies and duties of a Participating Party or a Settled Insurer under the Committee Plan notwithstanding that such Person originally may have been a Non-Settling Insurer or may not have been a Participating Party under any provision of the Plan on the Effective Date. Such rights, remedies and duties shall include the terms and conditions of the Committee Plan including the Channeling Injunction provided for in Committee Plan Section XIII.

### Debtor and Trust Waiver and Release of Estate's Causes of Action Against Participating Parties and Settled Insurers

In consideration of the contributions and other consideration to be provided by each Participating Party and Settled Insurer, the Debtor and Trust, as applicable, irrevocably and unconditionally, without limitation, shall release, acquit, and forever discharge such Participating Party and Settled Insurer from any Causes of Action of the Estate against any Participating Party or Settled Insurer, or the property thereof, such release to be effective upon the Effective Date. Notwithstanding the above**,** to preserve coverage under any Non-Settling Insurer's Insurance Policies, Abuse Claimants specifically reserve, and do not release, any claims they may have against the Diocese, the Reorganized Debtor, or any Participating Party that implicate coverage under any Non-Settling Insurer's Insurance Policies, but recourse is limited to the proceeds of the Non-Settling Insurer's Insurance Policies and all other damages (including extracontractual damages), awards, judgments in excess of policy limits, penalties, punitive damages and attorney's fees and costs that may be recoverable against any Non-Settling Insurers because of their conduct concerning insurance coverage for, or defense or settlement of, any Abuse Claim, and any such judgments or awards will be handled under the Plan and the Trust Distribution Plan. The Abuse Claims will not be released or enjoined as against the Diocese, the Reorganized Debtor, or any Participating Party for any Abuse that may be covered under any Non-Settling Insurer's Insurance Policies until such claims are settled with the Diocese, the Reorganized Debtor, any Participating Party and/or any Settled Insurer or are fully adjudicated, resolved, and subject to a Non-Appealable Order, but recourse is limited as described above.

### Additional Documentation; Non-Material Modifications

From and after the Effective Date, the Trustee, the Unknown Abuse Claims Trustee, the Reorganized Debtor, and the Participating Parties are authorized to enter into, execute, adopt, deliver and/or implement all contracts, leases, instruments, releases, and other agreements or documents necessary to effectuate or memorialize the settlements in the Committee Plan without further Order of the Bankruptcy Court. Also, the Trustee, the Reorganized Debtor, and the Participating Parties may make technical and/or immaterial alterations, amendments, modifications or supplements to the terms of any settlement in the Committee Plan, without Bankruptcy Court approval, provided that the amendment or modification does not materially and adversely change the treatment of any holder of a Class 4 Claim without the prior written agreement of such holder. A Class of Claims that has accepted the Plan shall be deemed to have accepted the Plan, as altered, amended, modified or supplemented under Committee Plan Section

X, if the proposed alteration, amendment, modification or supplement does not materially and adversely change the treatment of the Claims within such Class. An Order of the Bankruptcy Court approving any amendment or modification made under Committee Plan Section X shall constitute an Order in aid of consummation of the Plan and shall not require the re-solicitation of votes on the Plan.

### Non-Settling Insurers Unaffected

The rights and obligations of Non-Settling Insurers and Co-Defendants shall be unaffected by Committee Plan Section X.

### E.  Additional Means of Implementation of Committee Plan

#### Debtor's Funding of Plan

On the Effective Date, the Debtor shall make all payments and effectuate all transfers required to be performed on the Effective Date pursuant to the Committee Plan, including by transferring the Trust Assets due on the Effective Date to the Trust on the Effective Date.

#### Transfer of Real Property and Reversionary Interests

On the Effective Date, the Debtor shall take all steps necessary to effectuate transfer of ownership to the Trust of all Transferred Real Estate. On the Effective Date, the Diocese shall also take all steps necessary to effectuate transfer of all reversionary interests in the Transferred Real Estate if any portion of the properties are leased, sold, or subject to an option for lease or sale on or before the Trust Termination Date (as that term is defined in the Trust Documents).

#### Preservation of Causes of Action

The Trustee, on behalf of the Trust, shall retain the Trust's Causes of Action, whether arising before or after the Petition Date, in any court or other tribunal, including, without limitation, the Bankruptcy Court. The Trustee, on behalf of the Trust, shall have the exclusive right, authority, and discretion to institute, prosecute, abandon, settle, or compromise any such Causes of Action, subject to the requirements of the Bankruptcy Code. To the extent the Committee is the named plaintiff in any Cause of Action vested in the Trust, the Trustee may be substituted as the named plaintiff without additional notice to the parties in such Cause of Action.

#### Reorganized Debtor's Officers, Directors and Senior Management

In accordance with § 1129(a)(5) of the Bankruptcy Code, the identities and affiliations of the persons proposed to serve as the officers, directors and senior management of the Reorganized Debtor on and after the Effective Date are set forth on Exhibit H.

#### Closing

Closing will be conducted at the offices of Zeisler & Zeisler, P.C., or at such other location designated by the Committee, including remotely, as soon as reasonably practicable following the Effective Date for the Diocese and the Participating Parties to execute and deliver the Plan Documents and completing those actions necessary for the Reorganized Debtor and the Participating Parties to establish and fund the Trust and make other distributions required to be made upon, or promptly following, the Effective Date. As soon as practicable after conditions in Section 12.1 have been satisfied or waived under Section 12.2, the Diocese shall file notice of the Closing and the occurrence of the Effective Date.

### Obligations of the Reorganized Debtor and Participating Parties

The Reorganized Debtor and the Participating Parties will:

(a)    In the exercise of their respective business judgment, review all Claims filed against the Estate except for Abuse Claims and, if advisable, object to such Claims;

(b)    After the Effective Date, not object to any Abuse Claims. Despite the foregoing, the Reorganized Debtor shall timely provide the Abuse Claims Reviewer with information regarding Abuse Claims as may be requested by the Abuse Claims Reviewer;

(c)    Fulfill the Diocese's obligations under the Insurance Policies issued by the Non-Settling Insurers and under applicable non-bankruptcy law, with the Diocese's reasonable attorneys' fees, costs and expenses, if any, incurred in doing so to be paid by the Non-Settling Insurers and/or the Trust, as provided under the Insurance Policies, the Committee Plan, or the Trust Documents, as applicable;

(d)    Honor the Diocese's obligations arising under any settlement agreement approved by the Bankruptcy Court; and,

(e)    Perform all of their obligations under the Committee Plan and Plan Documents, in each case, as and when the same become due or are to be performed.

### Objections to Claims

Objections to a Claim (except for Abuse Claims) as to which no objection is pending as of the Effective Date, must be filed by the Claims Objection Deadline, provided that the Reorganized Debtor may request extensions of the Claims Objection Deadline, or of any Bankruptcy Court approved extensions thereof, by Filing a motion with the Bankruptcy Court. A motion seeking to extend the deadline to object to any Claim is not an amendment to the Plan. No party in interest other than the Trustee may object to a Class 4 Claim. No party in interest other than the Unknown Abuse Claims Trustee may object to a Class 5 Claim. The process and deadlines for any objections

to Abuse Claims are as set forth in the Trust Distribution Plan or the Unknown Abuse Claims Trust Distribution Plan.

### Reservation of Rights to Object to Claims Other Than Abuse Claims

Unless a Claim is expressly described as an Allowed Claim under the Plan, or otherwise becomes an Allowed Claim before the Effective Date, upon the Effective Date, the Reorganized Debtor shall be deemed to have a reservation of any rights, interests and objections of the Debtor to any Claims and motions or requests for the payment of or because of Claims, whether administrative expense, priority, secured or unsecured (but not Abuse Claims), whether under the Bankruptcy Code, other applicable law or contract. Subject to the Claims Objection Deadline, the Debtor's failure to object to any Claim in the Case shall be without prejudice to the Reorganized Debtor's rights to contest or otherwise defend against such Claim in the Bankruptcy Court in Committee Plan Section XI when and if such Claim is sought to be enforced by the holder of such Claim.

### Service of Objections

An objection to a Claim shall be deemed properly served on the holder of such Claim if the objector effects service by any of the following methods: (i) under Rule 4 of the Federal Rules of Civil Procedure, as modified and made applicable by Bankruptcy Rule 7004; (ii) to the extent counsel for such holder is unknown, by first class mail, postage prepaid, on the signatory on the Proof of Claim or other representative identified on the Proof of Claim or any attachment thereto; or (iii) by first class mail, postage prepaid, on any counsel that has appeared on the behalf of such holder in the Case.

### Determination of Claims

From and after the Effective Date, any Claim (except for Abuse Claims) as to which a Proof of Claim or motion or request for payment was timely filed in the Case or deemed timely filed by Order of the Bankruptcy Court, may be determined and (so long as such determination has not been stayed, reversed or amended and as to which determination (or any revision, modification or amendment thereof) the time to appeal or seek review or rehearing has expired and as to which no appeal or petition for review or rehearing was filed or, if filed, remains pending) liquidated under (i) an Order of the Bankruptcy Court, (ii) applicable bankruptcy law, (iii) agreement of the parties with no Bankruptcy Court approval, (iv) applicable non-bankruptcy law or (v) the lack of (a) an objection to such Claim, (b) an application to equitably subordinate such Claim and (c) an application to otherwise limit recovery regarding such Claim, filed by the Diocese or any other party in interest on or before any applicable deadline for Filing such objection or application regarding such Claim. Any such Claim so determined and liquidated shall be deemed to be an Allowed Claim for such liquidated amount and shall be satisfied under the Plan. Nothing in Committee Plan Section XI shall be or be deemed a waiver of any Claims, rights, interests or Causes of Action that the Diocese may have against any Person in connection with or arising out

of any Claim or Claims, including any rights under 28 U.S.C. § 157. Notwithstanding the foregoing, no party in interest other than the Trustee or Unknown Abuse Claim Trustee, as applicable, may object to an Abuse Claim.

### No Distributions Pending Allowance

No payments or distributions will be made regarding all or any part of a Disputed Claim unless and until all objections to such Disputed Claim have been settled or withdrawn or have been determined by a Non-Appealable Order, and the Disputed Claim has become an Allowed Claim; provided, however, that if only a portion of such Claim is an Allowed Claim, the Reorganized Debtor may, in their discretion, make a distribution because of the part of such Claim that is an Allowed Claim.

### Claim Estimation

To effectuate distributions under the Plan and avoid undue delay in the administration of the Case, the Diocese, after notice and a hearing (which notice may be limited to the holder of such Disputed Claim), shall have the right to seek an Order of the Bankruptcy Court or the District Court under Section 502(c) of the Bankruptcy Code, estimating or limiting, because of a Disputed Claim, the amount of (i) property that must be withheld from or reserved for distribution purposes because of such Disputed Claim(s), (ii) such Claim for allowance or disallowance purposes, or (iii) such Claim for any other purpose allowed under the Bankruptcy Code; provided, however, that the Bankruptcy Court or the District Court, as applicable, shall determine (i) whether such Claims are subject to estimation under Section 502(c) of the Bankruptcy Code and (ii) the timing and procedures for such estimation proceedings, if any, such matters being beyond the scope of the Plan. Notwithstanding the foregoing, no party in interest except the Trustee may seek to estimate a Class 4 or Class 5 Claim and no party in interest except the Unknown Abuse Claim Trustee may seek to estimate an Unknown Abuse Claim.

### Closing of the Case

As soon as practicable after the Effective Date, when the Diocese deems appropriate, the Diocese will seek authority from the Bankruptcy Court to close the Case under the Bankruptcy Code and the Bankruptcy Rules; provided, however, that entry of a final decree closing the Case shall, whether or not specified therein, be without prejudice to the right of the Diocese, the Trustee, Unknown Abuse Claim Trustee, or any other party in interest to reopen the Case for any matter over which the Bankruptcy Court or the U.S. District Court for the District of Connecticut has retained jurisdiction under the Committee Plan. Any order closing this Case will provide that the Bankruptcy Court or the U.S. District Court for the District of Connecticut, as appropriate, will retain (a) jurisdiction to enforce, by injunctive relief or otherwise, the Confirmation Order, any other orders entered in this Case, and the obligations created by the Committee Plan and the Plan Documents; and (b) all other jurisdiction and authority granted to it under the Committee Plan and the Plan Documents.

## VIII.   CONDITIONS PRECEDENT

**A.    Conditions to Effectiveness.**

The Effective Date will occur when each of the following conditions have been satisfied or waived under Section 12.2:

- The Bankruptcy Court shall have entered a Non-Appealable or Non-Appealable Orders approving all settlement agreements involving the Participating Parties and Settled Insurers (for agreements executed before the Confirmation Date) and any appropriate judgments consistent therewith, in form and substance reasonably acceptable to each party, and no stay of such Orders shall be in effect;

- the Bankruptcy Court shall have entered the Confirmation Order in form and Substance reasonably acceptable to the Committee and no stay of such Order shall be in effect;

- The Unknown Abuse Claims Trustee and Debtor have signed the Unknown Abuse Claims Trust Agreement;

- The Trustee and Debtor have signed the Trust Agreement; and

- The Debtor, the Participating Parties (if applicable), and the Settled Insurers (if applicable) have made the transfers to the Trust described in Section X and XI.

**Waiver of Conditions**

Any condition in Committee Plan Section 12.1 may be waived by the mutual written consent of the Committee, the Debtor and the Participating Parties.

**Non-Occurrence of Effective Date**

Subject to further order of the Bankruptcy Court, if the Effective Date does not occur within ninety (90) days of entry of a Non-Appealable Order confirming the Plan, the Plan shall become null and void. A statement shall be filed with the Court within three (3) Business Days after either the Effective Date or the occurrence of any event that renders the Plan null and void.

## IX.    TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

**Assumed Employee and Retiree Benefit Plans**

To the extent not previously assumed, all employee and retiree benefit plans to which the Debtor are a party will be deemed assumed by the Reorganized Debtor on the Effective Date.

### General; Assumed if Not Rejected

Subject to the requirements of Section 365 of the Bankruptcy Code, all executory contracts and unexpired leases of the Debtor not rejected by order of the Bankruptcy Court or are not the subject of a motion to reject pending on the Confirmation Date will be deemed assumed by the Reorganized Debtor on the Effective Date. If any party to an executory contract or unexpired lease that is being assumed objects to such assumption, the Bankruptcy Court may conduct a hearing on such objection on any date that is either mutually agreeable to the parties or fixed by the Bankruptcy Court. All payments to cure defaults that may be required under Section 365(b)(1) of the Bankruptcy Code will be made by the Reorganized Debtor. In the event of a dispute regarding the amount of any such payments, or the ability of the Debtor to provide adequate assurance of future performance, the Reorganized Debtor will make any payments required by Section 365(b)(1) of the Bankruptcy Code after the entry of the Non-Appealable Order resolving such dispute.

### Claims for Contract Rejection

All proofs of claim regarding Claims arising from the rejection of executory contracts or unexpired leases must be filed with the Bankruptcy Court within 30 days after the Effective Date or such Claims will be forever barred. If any order providing for the rejection of an executory contract or unexpired lease did not provide a deadline for filing Claims arising from such rejection, proofs of Claim with respect thereto must be filed within 30 days after the later to occur of (a) the Effective Date or, (b) if the order is entered after the Effective Date, the date such order becomes a Non-Appealable Order, or such Claims will be forever barred.

## X.   MISCELLANEOUS PROVISIONS

### A.   Retention of Jurisdiction

Except as otherwise stated in the Committee Plan or in the Confirmation Order, the Bankruptcy Court will retain jurisdiction over all matters arising under, to further, or in connection with the Committee Plan, including the following:

(i)   The determination of objections to Disputed Claims; the determination of requests for payment of Claims entitled to priority under Section 507 of the Bankruptcy Code, including compensation of and reimbursement of expenses of parties entitled thereto;

(ii)   The resolution of controversies and disputes regarding interpretation and implementation of the Committee Plan and the Plan Documents;

(iii)   The compelling of the Diocese and/or a Participating Party to cooperate with the Trust as required under the Committee Plan;

(iv)   The granting of relief in aid of the Committee Plan and the Plan Documents including the entry of appropriate orders (which may include removal of actions in non-Bankruptcy Court forums to the Bankruptcy Court, contempt or other sanctions) to protect the Reorganized Debtor, the Participating Parties, the Settled Insurers, and the Released Parties from actions prohibited under the Committee Plan or the Plan Documents;

(v)   Amendments to and modifications of the Committee Plan;

(vi)   Subject to the limitations and exclusions described above, the determination of any and all applications, adversary proceedings, and contested or litigated matters pending on the Effective Date;

(vii)   Allowance of post-confirmation fees provided for in the Plan;

(viii)   The approval of a settlement agreement whereby a Person, including a Non-Settling Insurer, may become a Participating Party or Settled Insurer and whereby the Bankruptcy Court may appoint a future claims representative and provide for treatment of unknown claims; and

(ix)   The closing of this Case.

## B.  Miscellaneous Provisions

### Remand of Removed Actions and Relief from Automatic Stay/Discharge

On the Effective Date and without further order of the Bankruptcy Court or the District Court, (a) all actions removed by the Debtor or any other Co-Defendant during the Case are remanded to the Court from which they were removed and (b) such actions are not subject to the automatic stay or the injunction in Bankruptcy Code § 524(a)(2). Nothing herein is intended to affect, diminish or impair those provisions of the Committee Plan that prohibit execution of any judgment against the Reorganized Debtor's Revested Assets or assets the Reorganized Debtor acquire after the Effective Date.

### Modification of Plan

The Committee reserves the right, under the Bankruptcy Code, to amend, modify or withdraw the Committee Plan prior to the entry of the Confirmation Order. After the entry of the Confirmation Order, the Committee may, upon order, amend or modify the Committee Plan under Section 1127(b) of the Bankruptcy Code, or remedy any defect or omission or reconcile any

inconsistency in the Committee Plan in such manner as may be necessary to carry out the purpose and intent of the Committee Plan.

### Severability

If, before confirmation, the Bankruptcy Court holds that any Plan term or provision is invalid, void, or unenforceable, the Bankruptcy Court may alter or interpret that term or provision so it is valid and enforceable to the maximum extent possible consistent with the original purpose of that term or provision. That term or provision will then be applicable as altered or interpreted, unless such term or provision is inconsistent with the intent of the Committee, in which case the Plan may be unilaterally withdrawn by the Committee. Notwithstanding any such holding, alteration, or interpretation, the Plan's remaining terms and provisions will remain in full force and effect and will in no way be affected, impaired, or invalidated. The Confirmation Order will constitute a judicial determination providing that each Plan term and provision, as it may have been altered or interpreted under Committee Plan Section XVI, is valid and enforceable under its terms. In the event of a successful collateral attack on any provision of the Committee Plan (*i.e.*, an attack other than through a direct appeal of the Confirmation Order), the remaining provisions of the Committee Plan will remain binding on the Diocese, the Participating Parties, the Settled Insurers, the Non-Settling Insurers, the Trustee, the Unknown Abuse Claims Trustee, the Committee, all Claimants, all Creditors, and all other parties in interest.

### Notices

All notices or requests to the Debtor or the Reorganized Debtor in connection with the Committee Plan shall be in writing and served either by (i) United States mail, postage prepaid, (ii) hand delivery, or (iii) reputable overnight delivery service, all charges prepaid, and shall be deemed given when received by the following parties:

If to the Debtor or Reorganized Debtor:

> Rev. Peter J. Langevin, S.T.B., Ph.L.
> Chancellor
> Diocese of Norwich
> The Chancery
> 201 Broadway
> Norwich, CT 06360
> (860) 887-9294 x235

With a copy to:

> Ice Miller LLP
> 1500 Braodway, Suite 2900
> Attn:   Louis T. DeLucia
>         Alyson M. Fiedler

65

Telephone: (212) 835-6312
Email: Louis.DeLucia@icemiller.com
       Alyson.Fiedler@icemiller.com

*-and-*

Robinson & Cole LLP
280 Trumbull Street
Hartford, CT 06103
Attn:   Patrick M. Birney
        Andrew A. DePeau
        Annecca H. Smith
Telephone: (860) 275-8275
Email:  pbirney@rc.com
       adepeau@rc.com
       asmith@rc.com

If to the Trustee:

With a copy to:

If to the Unknown Abuse Claims Trustee:

With a copy to:

## Notices to Claimants

All notices and requests to a Entity holding any Claim will be sent to them at the last known address listed for such Entity with the Bankruptcy Court or with the Debtor's Claims Agent, or to the last known address of their attorney of record. The holder of a Claim may designate in writing any other address, which designation will be effective upon actual receipt by the Reorganized Debtor, the Trustee, and the Unknown Abuse Claims Trustee. Any Entity entitled to receive notice under the Committee Plan will have the obligation to provide the Reorganized Debtor, the Trustee, and the Unknown Abuse Claims Trustee with such Person's or Entity's current address for notice purposes. The Reorganized Debtor, the Trustee, and the Unknown Abuse Claims Trustee will have no obligation to attempt to locate a more current address if any notice proves to be undeliverable

66

to the most recent address provided to the Reorganized Debtor, the Trustee, and the Unknown Abuse Claims Trustee.

### Post-Confirmation Court Approval

Any action requiring Bankruptcy Court, U.S. District Court or state court approval after the Effective Date will require the Entity seeking such approval to file an application, motion, or other request with the Bankruptcy Court, U.S. District Court, or state court, as applicable, and obtain a Non-Appealable Order approving such action before the requested action may be taken. The Entity filing such application, motion, or other request shall serve such application, motion, or other request, together with a notice setting forth the time in which objections must be filed with the court, on the Reorganized Debtor, the Committee, the Trustee, and the Unknown Abuse Claims Trustee by first-class mail, electronic mail, ECF, overnight courier, facsimile, or hand delivery. Unless the court orders otherwise, all notices shall provide the recipients at least 21 days in which to file an objection to the application, motion, or other request. If no objection is timely filed, the court may authorize the proposed action without further notice or a hearing. If an objection is timely filed, the court will determine whether to conduct a hearing, or to require the submission of further documentation, prior to ruling on the application, motion, or other request.

### Election Under Section 1129(b) of the Bankruptcy Code

The Committee requests confirmation of the Plan under Section 1129(b) of the Bankruptcy Code if the requirements of all provisions of Section 1129(a) of the Bankruptcy Code, except Section (a)(8) thereof, are met regarding the Plan. In determining whether the requirements of Section 1129(a)(8) of the Bankruptcy Code have been met, any Class that does not have as an element of it an Allowed Claim or a Claim temporarily allowed under Bankruptcy Rule 3018 as of the date fixed by the Bankruptcy Court for filing acceptances or rejections of the Committee Plan shall be deemed deleted from the Committee Plan for purposes of voting to accept or reject the Committee Plan and for purposes of determining acceptance or rejection of the Committee Plan by such Class.

### Consummation of the Plan

The Committee reserves the right to request that the Confirmation Order include a finding by the Bankruptcy Court that Bankruptcy Rule 3020(e) shall not apply to the Confirmation Order.

### Exemption from Transfer Taxes

Under Section 1146(a) of the Bankruptcy Code, Trustee's, Debtor's or Reorganized Debtor's delivery of any deed or other instrument of transfer under, in furtherance of, or in connection with the Committee Plan, whether occurring before or after the Confirmation Date , including any deeds, bills of sale or assignments executed with any sale or disposition of assets

contemplated by the Committee Plan (*i.e.*, the Properties), shall not be subject to any stamp tax, real estate transfer tax, excise tax, sales tax, use tax or other similar tax.

### Waivers

Except as otherwise provided in the Plan or in the Confirmation Order, any term of the Plan may be waived by the party benefited by the term to be waived.

### Setoffs, Recoupments, and Defenses

Except for the Sections of the Plan about the Abuse Claims, nothing in the Plan shall constitute a waiver or release by the Debtor, Reorganized Debtor, Participating Parties, the Trustee, or the Unknown Abuse Claims Trustee of any rights of setoff or recoupment, or of any defense, they may have regarding any Claim (including rights under Section 502(d) of the Bankruptcy Code). Except as otherwise provided in the Plan or in the Confirmation Order or in agreements previously approved by a Non-Appealable Order, the Debtor, Reorganized Debtor, Participating Parties, the Trustee, or the Unknown Abuse Claims Trustee may, but will not be required to, set off against any Claim or any distributions regarding such Claim, any of the Claims, rights and Causes of Action of any nature that the Debtor, the Reorganized Debtor, Participating Parties, the Trustee, or the Unknown Abuse Claims Trustee, as applicable, may hold against the holder of such Claim; provided, however, that neither the failure to effect such a setoff, the allowance of any Claim hereunder, the payment of any distribution hereunder or any other action or omission of the Debtor, Reorganized Debtor, Participating Parties, the Trustee, or the Unknown Abuse Claims Trustee, nor any provision of the Plan, shall constitute a waiver or release by the Debtor, the Reorganized Debtor, Participating Parties, the Trustee, or the Unknown Abuse Claims Trustee, as applicable, of any such Claims, rights and Causes of Action that the Debtor, the Reorganized Debtor, Participating Parties, the Trustee, or the Unknown Abuse Claims Trustee, as applicable, may possess against such holder.

### Compromise of Controversies

(a) **Bankruptcy Court Approval of Settlements**. In consideration for the classification, distributions and other benefits provided under the Plan, the Plan shall constitute a good faith compromise and settlement of all Claims or controversies resolved under the Plan. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of each compromise and settlement provided for in the Plan, and the Bankruptcy Court's findings shall constitute its determination under the standards of Bankruptcy Rule 9019 that such compromises and settlements are in the best interests of the Debtor and the Estates.

(b) **Settlement with Participating Parties and Settled Insurers.** Specifically included within the Bankruptcy Court's approval of compromises and settlements of Claims and controversies is the Bankruptcy Court's approval of the agreements

with Participating Parties and Settled Insurers. If a conflict exists between the Plan and such agreements, the agreements control such conflict. Such agreements contain the protections and benefits afforded the Participating Party and Settled Insurer, as well as the rights and obligations of the parties thereto, to the extent of any conflict with the Plan. Such agreements bind the Trust.

### Withdrawal or Revocation of the Plan.

The Committee reserves the right to revoke or withdraw the Plan prior to the Confirmation Date. If the Plan is revoked or withdrawn, or if the Confirmation Date does not occur, the Plan shall have no force and effect and in such event nothing herein shall be deemed to constitute a waiver or release of any Claims by or against the Estate or any other Entity, or to prejudice in any other manner the rights of the Committee, whether one or more, or any other entity in further proceedings involving the Committee and specifically shall not modify or affect the rights of any party under any prior orders of the Bankruptcy Court.

### Default

Except as otherwise provided in the Plan or in the Confirmation Order, if the Reorganized Debtor, a Participating Party, a Settled Insurer, or the Trustee shall default in the performance of any of their respective obligations under the Plan or under the Plan Documents and shall not have cured such a default within any applicable cure period (or, if no cure period is specified in the Plan or Plan Documents or in any instrument issued to or retained by a Claimant under the Plan, then within 30 days after receipt of written notice of default), then the entity to whom the performance is due may pursue such remedies as are available at law or in equity. An event of default occurring with respect to one Claim shall not be an event of default regarding any other Claim.

### Governing Law

Except when federal law (including the Bankruptcy Code or Bankruptcy Rules) is applicable, the rights and obligations arising under the Plan or under the Plan Documents shall be governed by and construed and enforced under the laws of the State of Connecticut without giving effect to the principles of conflicts of laws.

### Reservation of Rights

If the Plan is not confirmed by a Non-Appealable Order, or if the Plan is confirmed and the Effective Date does not occur, the rights of all parties in interest in the Case are and will be reserved in full. Any concessions or settlement reflected, if any, are made for purposes of the Plan only, and if the Plan does not become effective, no party in interest in the Case shall be bound or deemed prejudiced by any such concession or settlement.

### Controlling Documents

To the extent any provision of a settlement agreement with a Participating Party or Settled Insurer is inconsistent with the Committee Plan, such settlement agreement, as applicable, shall control.

### Successors and Assigns

The Plan shall be binding upon and inure to the benefit of the Debtor, the Reorganized Debtor, all Claimants and all other parties in interest affected thereby and their respective successors, heirs, legal representatives and assigns.

### Direction to a Party

On and after the Effective Date, the Trust, the Unknown Abuse Claims Trust or the Reorganized Debtor, as applicable, may apply to the Bankruptcy Court for entry of an Order directing any Person to execute or deliver or to join in the execution or delivery of any instrument or document reasonably necessary or reasonably appropriate to effect a transfer of properties dealt with by the Plan, and to perform any other act (including satisfaction of any Lien or security interest) that is reasonably necessary or reasonably appropriate for the consummation of the Plan.

### Certain Actions

By reason of entry of the Confirmation Order, prior to, on or after the Effective Date (as appropriate), all matters provided for under the Plan that would otherwise require approval of the officers of the Debtor under the Plan, including (a) the adoption, execution, delivery, and implementation of all contracts, leases, instruments, releases, and other agreements or documents related to the Plan, and (b) the adoption, execution, and implementation of other matters provided for under the Plan involving the Debtor or organizational structure of the Debtor, shall be deemed to have occurred and shall be in effect prior to, on or after the Effective Date (as appropriate), under applicable non-bankruptcy law, with no requirement of further action by the officers of the Debtor.

### Dissolution of the Committee

On the Effective Date, the Committee shall dissolve automatically, whereupon its members, Professionals and agents shall be released from any further duties and responsibilities in the Case and under the Bankruptcy Code, except that such parties shall continue to be bound by any obligations arising under confidentiality agreements, joint defense/common interest agreements (whether formal or informal), and protective Orders entered during the Case, which shall remain in full force and effect according to their terms, provided that such parties shall have a right to be heard regarding any (i) applications for Professional Claims and (ii) requests for compensation and reimbursement of expenses under Section 503(b) of the Bankruptcy Code for making a substantial contribution in the Case.

## XI.    EFFECTS OF PLAN CONFIRMATION AND DISCHARGE

### A.    Discharge

Except as otherwise expressly provided in the Plan or in the Confirmation Order, on the Effective Date under Section 1141(d) of the Bankruptcy Code, the Diocese will be discharged from all liability for any and all Claims and Debts, known or unknown, whether or not giving rise to a right to payment or an equitable remedy, that arose, directly or indirectly, from any action, inaction, event, conduct, circumstance, happening, occurrence, agreement, or obligation of the Debtor, or the Debtor's Representatives before the Confirmation Date, or that otherwise arose before the Confirmation Date, including all interest, if any, on any such Claims and Debts, whether such interest accrued before or after the date of commencement of this Case, and including all Claims and Debts based upon or arising out of an Abuse Claim and from any liability of the kind specified in Sections 502(g), 502(h), and 502(i) of the Bankruptcy Code, whether or not (a) a proof of claim is filed or is deemed filed under Section 501 of the Bankruptcy Code; (b) such Claim is Allowed under the Committee Plan; or (c) the holder of such Claim has accepted the Committee Plan.

Abuse Claimants specifically reserve, and do not release, any claims they may have against the Diocese or any Participating Party that implicate coverage under any Non-Settling Insurer's Insurance Policies, but recourse is limited to the proceeds of the Non-Settling Insurer's Insurance Policies and all other damages (including extra-contractual damages), awards, judgments in excess of policy limits, penalties, punitive damages and attorney's fees and costs that may be recoverable against any Non-Settling Insurers because of their conduct regarding insurance coverage for, or defense or settlement of, any Abuse Claim, and any such judgments or awards will be handled under the Plan and the Trust Distribution Plan. The Abuse Claims will not be released or enjoined as against the Diocese or any Participating Party for any Abuse that may be covered under any Non-Settling Insurer's Insurance Policies until such claims are settled with the Diocese, any Participating Party and such Non-Settling Insurer or are fully adjudicated, resolved, and subject to a Non-Appealable Order, but recourse is limited as described above.

Abuse Claimants and the Trust shall be permitted to name the Diocese or any Participating Party in any proceeding to resolve whether the Diocese or any Participating Party has liability for Abuse Claims and the amount of any such liability, solely for the purpose of obtaining insurance coverage from Non-Settling Insurers. The discharge hereunder does not apply to, and shall not limit in any way the obligations of Non-Settling Insurers to defend and pay, the Diocese's or any Participating Party's liability for Abuse Claims under Non-Settling Insurer Insurance Policies.

**NOTHING CONTAINED IN THE COMMITTEE PLAN SHALL CONSTITUTE A RELEASE OF ANY ABUSE CLAIM AGAINST A PERSON HAVING PERSONALLY COMMITTED AN ACT OR ACTS OF ABUSE RESULTING IN A CLAIM AGAINST THE DEBTOR, A PARTICIPATING PARTY OR A SETTLED INSURER; A SUCCESSOR OR PREDECESSOR OF THE DEBTOR TO THE EXTENT OF SUCH**

**SUCCESSOR'S OR PREDECESSOR'S INDEPENDENT LIABILITY FOR AN ACT OR ACTS OF ABUSE; AND THE HOLY SEE.**

**FOR AVOIDANCE OF DOUBT, EXCEPT AS REQUIRED BY THE INSURANCE POLICIES OF NON-SETTLING INSURERS, THE DEBTOR MAY ELECT NOT TO DEFEND ANY ABUSE LITIGATION THAT IS AUTHORIZED TO BE PROSECUTED AGAINST THE DEBTOR PURSUANT TO THE COMMITTEE PLAN AND NO JUDGMENT OBTAINED AGAINST THE DEBTOR IN SUCH ABUSE LITIGATION CAN BE EXECUTED AGAINST THE REVESTED ASSETS OR FROM ANY ASSSETS ACQUIRED BY THE REORGANIZED DEBTOR SUBSEQUENT TO THE EFFECTIVE DATE.**

### SCOPE OF DISCHARGE.

**SECTION 12.1 DOES NOT APPLY TO (A) THE OBLIGATIONS OF ANY NON-SETTLING INSURERS FOR ANY CLAIMS; (B) THE OBLIGATIONS ARISING UNDER ANY SETTLEMENT AGREEMENT BETWEEN THE DEBTOR, ANY PARTICIPATING PARTY OR ANY SETTLED INSURER APPROVED BY THE BANKRUPTCY COURT (INCLUDING THE DEBTOR'S INDEMNIFICATION OBLIGATIONS, IF ANY), WHICH ARE NOT AND WILL NOT BE DISCHARGED; (C) THE PERFORMANCE BY THE REORGANIZED DEBTOR OF ANY AND ALL OBLIGATIONS DUE TO THE NON-SETTLING INSURERS UNDER THEIR INSURANCE POLICIES WITH RESPECT TO ANY ABUSE CLAIM; (D) A PERSON HAVING PERSONALLY COMMITTED AN ACT OR ACTS OF ABUSE RESULTING IN A CLAIM AGAINST THE DEBTOR, A PARTICIPATING PARTY OR A SETTLED INSURER; (E) A SUCCESSOR OR PREDECESSOR OF THE DEBTOR TO THE EXTENT OF SUCH SUCCESSOR'S OR PREDECESSOR'S INDEPENDENT LIABILITY FOR AN ACT OR ACTS OF ABUSE; AND (F) THE HOLY SEE.**

### POSTPETITION ABUSE CLAIMS.

**EXCEPT TO THE EXTENT PROVIDED FOR IN A SETTLEMENT AGREEMENT WITH A PARTICIPATING PARTY OR A SETTLED INSURER, ABUSE CLAIMS ARISING OR OCCURRING AFTER THE PETITION DATE WILL NOT BE DISCHARGED, RELEASED, IMPAIRED AGAINST THE DEBTOR OR A PARTICIPATING PARTY, OR THE SUBJECT OF THE CHANNELING INJUNCTION OR SETTLED INSURER INJUNCTION.**

### Assets Vest Free and Clear

Under Sections 1141 and 1123(a)(5) of the Bankruptcy Code, and except as otherwise provided in the Plan or the Confirmation Order, the Revested Assets on the Effective Date shall be free and clear of all Liens, Claims, and interests of Creditors, including successor liability Claims. On and after the Effective Date, the Reorganized Debtor may operate and manage its affairs and may use, acquire and dispose of property without notice to any Person, and without

72

supervision or approval by the Bankruptcy Court and free of any restrictions imposed by the Bankruptcy Code, Bankruptcy Rules, or the Bankruptcy Court, other than those restrictions imposed by the Plan or the Confirmation Order.

### Continued Existence of Reorganized Debtor

The Debtor will, as the Reorganized Debtor, continue to exist after the Effective Date as separate entities under the applicable laws of the State of Connecticut, with all the powers of a not for-profit, non-stock member corporation having tax-exempt status under 26 U.S.C. § 501(c)(3) under applicable law and without prejudice to any right to alter or terminate such existence under applicable state law, except as such rights may be limited and conditioned by the Plan and the documents and instruments executed and delivered in connection therewith.

### EXCULPATION AND LIMITATION OF LIABILITY

**EXCEPT AS EXPRESSLY PROVIDED IN THE COMMITTEE PLAN, NONE OF THE EXCULPATED PARTIES WILL HAVE OR INCUR ANY LIABILITY TO, OR BE SUBJECT TO ANY RIGHT OF ACTION BY, ANY HOLDER OF A CLAIM, ANY OTHER PARTY IN INTEREST, OR ANY OF THEIR RELATED PARTIES, FOR ANY ACT OR OMISSION IN CONNECTION WITH, RELATING TO, OR ARISING OUT OF THE CASE, INCLUDING THE EXERCISE OF THEIR RESPECTIVE BUSINESS JUDGMENT AND THE PERFORMANCE OF THEIR RESPECTIVE FIDUCIARY OBLIGATIONS, THE PURSUIT OF CONFIRMATION OF THE PLAN, OR THE ADMINISTRATION OF THE PLAN, THE TRUST OR THE UNKNOWN ABUSE CLAIMS TRUST, EXCEPT LIABILITY FOR THEIR WILLFUL MISCONDUCT OR GROSS NEGLIGENCE (PROVIDED HOWEVER THE DIOCESE WILL BE DISCHARGED FROM ANY SUCH LIABILITY FOR SUCH ACTS OR OMISSIONS OCCURRING PRIOR TO THE CONFIRMATION DATE) OR, EXECEPT AS PROVIDED BELOW, ANY CAUSES OF ACTION ARISING FROM OR RELATED TO DENIALS OF COVERAGE OR COVERAGE DEFENSES RAISED BY NON-SETTLING INSURERS, AND IN ALL RESPECTS, SUCH PARTIES WILL BE ENTITLED TO REASONABLY RELY UPON THE ADVICE OF COUNSEL WITH RESPECT TO THEIR DUTIES AND RESPONSIBILITIES UNDER THE PLAN OR IN THE CONTEXT OF THE CASE. FOR THE AVOIDANCE OF DOUBT, COMMITTEE PLAN SECTION XIII AND THE DEFINITION OF "EXCULPATED PARTIES" SHALL NOT, DIRECTLY OR INDIRECTLY, INURE TO OR FOR THE BENEFIT OF (I) A PERSON OR PERSONS HAVING PERSONALLY COMMITTED AN ACT OR ACTS OF ABUSE RESULTING IN A CLAIM AGAINST THE DEBTOR, A PARTICIPATING PARTY OR A SETTLED INSURER, (II) A SUCCESSOR OR PREDECESSOR OF THE DEBTOR TO THE EXTENT OF SUCH SUCCESSOR'S OR PREDECESSOR'S INDEPENDENT LIABILITY FOR AN ACT OR ACTS OF ABUSE, (III) THE HOLY SEE, OR (IV) ANY NON-SETTLING INSURER. IF THE TRUST ASSERTS ANY CLAIM THAT THE DIOCESE HAS BREACHED DUTIES OR OBLIGATIONS UNDER ANY NON-SETTLING INSURER INSURANCE POLICIES RESULTING IN A LOSS OF COVERAGE, IT SHALL GIVE THE DIOCESE NOTICE AND AN OPPORTUNITY TO CURE ANY**

ALLEGED BREACH, AND IN ANY EVENT, THE DIOCESE SHALL NOT BE LIABLE FOR ANY ALLEGED BREACH RESULTING IN A LOSS OF COVERAGE EXCEPT TO THE EXTENT THAT (I) THE BREACH RELATES TO POST-EFFECTIVE DATE CONDUCT OF THE DIOCESE, AND (II) THE DIOCESE WILLFULLY OR INTENTIONALLY FAILS TO COMPLY WITH ITS CONTINUING OBLIGATIONS UNDER THE NON-SETTLING INSURER INSURANCE POLICIES. IN ADDITION, ANY SUCH CLAIM WILL NOT BE AUTOMATICALLY ALLOWED; THE DIOCESE WILL HAVE THE RIGHT TO DEFEND AGAINST SUCH CLAIM. PARTICIPATING PARTIES, SETTLED INSURERS, THE REORGANIZED DEBTOR, THE TRUST, THE TRUSTEE, THE UNKNOWN ABUSE CLAIMS TRUST, THE UNKNOWN ABUSE CLAIMS TRUSTEE, THE FUTURE CLAIMANT REPRESENTATIVE, THE MEDIATOR, THE SPECIAL MEDIATOR AND PROFESSIONALS EMPLOYED BY THE FOREGOING SHALL NOT HAVE ANY LIABILITY TO ANY GOVERNMENTAL ENTITY OR INSURER ON ACCOUNT OF PAYMENTS MADE TO AN ABUSE CLAIMANT, INCLUDING BUT NOT LIMITED TO LIABILITY UNDER THE MEDICARE SECONDARY PAYER ACT.

### EFFECTIVE DATE INJUNCTIONS

ON THE EFFECTIVE DATE, THE INJUNCTIONS PROVIDED FOR IN THE COMMITTEE PLAN SHALL BE DEEMED ISSUED, ENTERED, VALID AND ENFORCEABLE ACCORDING TO THEIR TERMS. THE INJUNCTIONS SHALL BE PERMANENT AND IRREVOCABLE AND MAY ONLY BE MODIFIED BY THE BANKRUPTCY COURT.

#### CHANNELING INJUNCTION PREVENTING PROSECUTION OF ABUSE CLAIMS AGAINST PARTICIPATING PARTIES AND SETTLED INSURERS

APPLICABILITY. THIS SECTION 13.10 IS ONLY APPLICABLE TO PARTICIPATING PARTIES AND SETTLED INSURERS.

IN CONSIDERATION OF THE UNDERTAKINGS OF THE PARTICIPATING PARTIES AND SETTLED INSURERS, PURSUANT TO THEIR RESPECTIVE SETTLEMENTS WITH THE DEBTOR OR THE TRUSTEE, THE FUNDING OF THE TRUST, OTHER CONSIDERATION, AND TO FURTHER PRESERVE AND PROMOTE THE AGREEMENTS BETWEEN AND AMONG THE PARTICIPATING PARTIES, SETTLED INSURERS AND THE DEBTOR OR THE TRUSTEE, AND THE PROTECTIONS AFFORDED THE PARTICIPATING PARTIES AND SETTLED INSURERS, AND PURSUANT TO SECTIONS 105, 363 AND 1123 OF THE BANKRUPTCY CODE AND SUBJECT TO THE PROVISIONS OF THE PLAN AND EXCEPT AS OTHERWISE PROVIDED IN THE PLAN:

- ANY AND ALL CHANNELED CLAIMS ARE CHANNELED INTO THE TRUST; AND

- **ALL PERSONS OR ENTITIES THAT HAVE HELD OR ASSERTED, HOLD OR ASSERT, OR MAY IN THE FUTURE HOLD OR ASSERT, ANY CHANNELED CLAIM (INCLUDING ALL DEBT HOLDERS, GOVERNMENTAL, TAX AND REGULATORY AUTHORITIES, LENDERS, TRADE AND OTHER CREDITORS, ABUSE CLAIMANTS, OTHER INSURERS, AND ALL OTHERS HOLDING CLAIMS OR INTERESTS OF ANY KIND OR NATURE WHATSOEVER) ARE HEREBY PERMANENTLY STAYED, ENJOINED, BARRED AND RESTRAINED FROM TAKING ANY ACTION, DIRECTLY OR INDIRECTLY, FOR THE PURPOSES OF ASSERTING, ENFORCING, OR ATTEMPTING TO ASSERT OR ENFORCE ANY CHANNELED CLAIM, INCLUDING:**

  (i) **COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND WITH RESPECT TO ANY CHANNELED CLAIM AGAINST ANY PARTICIPATING PARTY, SETTLED INSURERS THEIR RESPECTIVE PREDECESSORS, SUCCESSORS, AND ASSIGNS, OR THEIR RESPECTIVE EMPLOYEES, OFFICERS, AND DIRECTORS, OR AGAINST THE PROPERTY OF ANY PARTICIPATING PARTY OR SETTLED INSURER;**

  (ii) **ENFORCING, ATTACHING, COLLECTING OR RECOVERING, BY ANY MANNER OR MEANS, FROM ANY PARTICIPATING PARTY OR SETTLED INSURER OR FROM THE PROPERTY OF ANY PARTICIPATING PARTY OR SETTLED INSURER, WITH RESPECT TO ANY SUCH CHANNELED CLAIM, ANY JUDGMENT, AWARD, DECREE, OR ORDER AGAINST ANY PARTICIPATING PARTY OR SETTLED INSURER;**

  (iii) **CREATING, PERFECTING OR ENFORCING ANY LIEN OF ANY KIND AGAINST ANY PARTICIPATING PARTY, OR SETTLED INSURER OR THE PROPERTY OF ANY PARTICIPATING PARTY OR SETTLED INSURER WITH RESPECT TO ANY SUCH CHANNELED CLAIM (EXCEPT AS PROVIDED IN THE PLAN; AND**

  (iv) **ASSERTING, IMPLEMENTING OR EFFECTUATING ANY CHANNELED CLAIM OF ANY KIND AGAINST: (1) ANY OBLIGATION DUE ANY PARTICIPATING PARTY OR SETTLED INSURER; (2) ANY PARTICIPATING PARTY OR SETTLED INSURER; OR (3) THE PROPERTY OF ANY**

75

PARTICIPATING PARTY OR SETTLED INSURER WITH RESPECT TO ANY SUCH CHANNELED CLAIM.

ANY INJUNCTION CONTAINED IN A BANKRUPTCY COURT APPROVED AGREEMENT WITH A PARTICIPATING PARTY OR SETTLED INSURER IS INCORPORATED INTO THE PLAN BY REFERENCE, IS DEEMED FULLY SET FORTH IN THE COMMITTEE PLAN AND IS IN ADDITION TO THE CHANNELING INJUNCTION. ANY DIFFERENCES BETWEEN THE CHANNELING INJUNCTION IN SECTION 13.10 AND THE INJUNCTION(S) DEEMED SET FORTH BY THIS SUBPARAGRAPH ARE NOT INTENDED TO AFFECT, DIMINISH OR IMPAIR THE INJUNCTION(S) INCORPORATED HEREIN AND CONTAINED IN SUCH AGREEMENT.

NOTWITHSTANDING ANY PROVISION OF THE COMMITTEE PLAN, THE FOREGOING "CHANNELING INJUNCTION PREVENTING PROSECUTION OF ABUSE CLAIMS AGAINST PARTICIPATING PARTIES OR SETTLED INSURERS" PROVIDES ABSOLUTELY NO PROTECTION TO (I) A PERSON HAVING PERSONALLY COMMITTED AN ACT OR ACTS OF ABUSE RESULTING IN A CLAIM AGAINST THE DEBTOR, A PARTICIPATING PARTY OR A SETTLED INSURER, (II) THE HOLY SEE; (III) ANY ENTITY ON ACCOUNT OF CLAIMS EXCEPTED FROM THE EXCULPATION UNDER SECTION 13.8; AND (IV) ANY NON-SETTLING INSURER.

TO THE EXTENT NOT OTHERWISE ENJOINED IN SECTION 13.10, ASSERTION AND ENFORCEMENT OF CHANNELED CLAIMS, AND ANY ATTEMPT TO ASSERT OR ENFORCE SUCH CLAIMS, BY ANY ENTITY, AGAINST A PARTICIPATING PARTY OR SETTLING INSURER IS HEREBY PERMANENTLY STAYED, ENJOINED, BARRED, AND RESTRAINED.

NOTWITHSTANDING ANY PROVISION OF THE COMMITTEE PLAN, THE FOREGOING "CHANNELING INJUNCTION PREVENTING  PROSECUTION OF ABUSE CLAIMS AGAINST PARTICIPATING PARTIES AND SETTLED INSURERS" IS NOT INTENDED TO AFFECT, DIMINISH OR IMPAIR THE RIGHTS OF ANY ABUSE CLAIMANT TO COMMENCE OR PROSECUTE AN ABUSE CLAIM AGAINST THE DEBTOR OR A PARTICIPATING PARTY PROVIDED THAT SUCH COMMENCEMENT OR PROSECUTION IS SUBJECT TO THE TERMS AND CONDITIONS OF THE DEBTOR'S DISCHARGE, THE TRUST AGREEMENT, THE TRUST DISTRIBUTION PLAN, THE UNKNOWN ABUSE CLAIM TRUST AGREEMENT, AND THE UNKNOWN ABUSE CLAIM TRUST DISTRIBUTION PLAN.

ABUSE CLAIMANTS SPECIFICALLY RESERVE, AND DO NOT RELEASE, ANY AND ALL CLAIMS THAT THEY MAY HAVE AGAINST THE DIOCESE OR ANY PARTICIPATING PARTY THAT IMPLICATE COVERAGE UNDER ANY NON-

SETTLING INSURER'S INSURANCE POLICIES, BUT RECOURSE IS LIMITED TO THE PROCEEDS OF THE NON-SETTLING INSURER'S INSURANCE POLICIES AND ALL OTHER DAMAGES (INCLUDING EXTRA-CONTRACTUAL DAMAGES), AWARDS, JUDGMENTS IN EXCESS OF POLICY LIMITS, PENALTIES, PUNITIVE DAMAGES AND ATTORNEY'S FEES AND COSTS THAT MAY BE RECOVERABLE AGAINST ANY NON-SETTLING INSURERS BECAUSE OF THEIR CONDUCT CONCERNING INSURANCE COVERAGE FOR, OR DEFENSE OR SETTLEMENT OF, ANY ABUSE CLAIM, AND ANY SUCH JUDGMENTS OR AWARDS WILL BE HANDLED IN ACCORDANCE WITH THE PLAN AND THE TRUST DISTRIBUTION PLAN. THE ABUSE CLAIMS WILL NOT BE RELEASED OR ENJOINED AS AGAINST THE DIOCESE OR ANY PARTICIPATING PARTY FOR ANY ABUSE THAT MAY BE COVERED UNDER ANY NON-SETTLING INSURER'S INSURANCE POLICIES UNTIL SUCH CLAIMS ARE SETTLED WITH THE DIOCESE, ANY PARTICIPATING PARTY AND SUCH NON-SETTLING INSURER OR ARE FULLY ADJUDICATED, RESOLVED, AND SUBJECT TO A NON-APPEALABLE ORDER, BUT RECOURSE IS LIMITED AS DESCRIBED ABOVE.

ABUSE CLAIMANTS AND THE TRUST SHALL BE PERMITTED TO NAME THE DIOCESE OR ANY PARTICIPATING PARTY IN ANY PROCEEDING TO RESOLVE WHETHER THE DIOCESE OR ANY PARTICIPATING PARTY HAS LIABILITY FOR ABUSE CLAIMS AND THE AMOUNT OF ANY SUCH LIABILITY, SOLELY FOR THE PURPOSE OF OBTAINING INSURANCE COVERAGE FROM NON-SETTLING INSURERS. THE DISCHARGE HEREUNDER DOES NOT APPLY TO, AND SHALL NOT LIMIT IN ANY WAY THE OBLIGATIONS OF NON-SETTLING INSURERS TO DEFEND AND PAY, THE DIOCESE'S OR ANY PARTICIPATING PARTY'S LIABILITY FOR ABUSE CLAIMS UNDER NON-SETTLING INSURER INSURANCE POLICIES.

## SETTLED INSURER INJUNCTION

IN CONSIDERATION OF THE UNDERTAKINGS OF THE SETTLED INSURERS, PURSUANT TO THEIR RESPECTIVE SETTLEMENTS WITH THE DEBTOR OR THE TRUSTEE, THE FUNDING OF THE TRUST, OTHER CONSIDERATION, AND TO FURTHER PRESERVE AND PROMOTE THE AGREEMENTS BETWEEN AND AMONG THE SETTLED INSURERS AND THE DEBTOR OR THE TRUSTEE, AND THE PROTECTIONS AFFORDED THE SETTLED INSURERS, AND PURSUANT TO SECTIONS 105, 363 AND 1123 OF THE BANKRUPTCY CODE, AND EXCEPT AS OTHERWISE PROVIDED IN THE PLAN, ANY AND ALL PERSONS OR ENTITIES (INCLUDING, WITHOUT LIMITATION, ALL DEBT HOLDERS, ALL EQUITY HOLDERS, GOVERNMENTAL, TAX, AND REGULATORY AUTHORITIES, LENDERS, TRADE AND OTHER CREDITORS, ABUSE CLAIM HOLDERS, OTHER INSURERS, AND ALL OTHERS HOLDING CLAIMS OR INTERESTS) ARE PERMANENTLY ENJOINED AND BARRED FROM ASSERTING AGAINST A SETTLED INSURER ANY CLAIM (INCLUDING, WITHOUT LIMITATION, ANY INSURANCE COVERAGE CLAIM OR EXTRACONTRACTUAL CLAIM) OR INTEREST OF ANY KIND OR NATURE WHATSOEVER ARISING FROM

**OR RELATING IN ANY WAY TO (i) ANY ABUSE CLAIM OR (ii) ANY OF THE SETTLED INSURER POLICIES OR (iii) ANY CLAIM AGAINST ANY SETTLED INSURER FOR CONTRIBUTION, INDEMNITY, DEFENSE, SUBROGATION, OR SIMILAR RELIEF THAT ARISES DIRECTLY OR INDIRECTLY FROM ANY CLAIM AGAINST THE DEBTOR OR ANY PARTICIPATING PARTY.**

**NOTHING CONTAINED IN COMMITTEE PLAN SECTION XIII IS INTENDED TO AFFECT, DIMINISH OR IMPAIR ANY INJUNCTIONS CONTAINED IN AN AGREEMENT BETWEEN THE DEBTOR OR THE TRUSTEE AND ANY SETTLED INSURER. SUCH INJUNCTIONS ARE INCORPORATED HEREIN BY REFERENCE AND ARE DEEMED FULLY SET FORTH HEREIN.**

**TERM OF INJUNCTIONS OR STAYS AND CONFIRMATION OF SETTLEMENTS WITH PARTICIPATING PARTIES AND SETTLED INSURERS**

**ALL INJUNCTIONS AND/OR STAYS PROVIDED FOR IN THE COMMITTEE PLAN, THE INJUNCTIVE PROVISIONS OF SECTIONS 524 AND 1141 OF THE BANKRUPTCY CODE, AND ALL INJUNCTIONS OR STAYS PROTECTING PARTICIPATING PARTIES AND ANY SETTLED INSURER THAT HAS PURCHASED ITS INSURANCE POLICY OR POLICIES IN A SECTION 363 SALE, ARE PERMANENT AND WILL REMAIN IN FULL FORCE AND EFFECT FOLLOWING THE EFFECTIVE DATE AND ARE NOT SUBJECT TO BEING VACATED OR MODIFIED. DEBTOR'S SETTLEMENT AGREEMENTS, IF ANY, WITH THE SETTLED INSURERS, AND THE PARTICIPATING PARTIES PREVIOUSLY AUTHORIZED BY THE BANKRUPTCY COURT ARE HEREBY AFFIRMED AND ANY OBLIGATIONS OF DEBTOR WITH RESPECT TO SUCH SETTLEMENT AGREEMENTS ARE EXCEPTED FROM THE DEBTOR'S DISCHARGE AND SHALL BE ASSUMED BY THE REORGANIZED DEBTOR AND TRUSTEE, AS APPLICABLE, ON THE EFFECTIVE DATE.**

**RELEASE OF AVOIDANCE RIGHTS AGAINST PARTICIPATING PARTIES AND SETTLED INSURERS**

**ON THE EFFECTIVE DATE, ALL AVOIDANCE RIGHTS, INCLUDING THOSE ARISING UNDER SECTIONS 544, 547, 548, 549, 550, AND 553 OF THE BANKRUPTCY CODE, AGAINST EACH OF THE PARTICIPATING PARTIES AND SETTLED INSURERS AND THE DEBTOR AND REORGANIZED DEBTOR SHALL BE DEEMED SETTLED, COMPROMISED, AND RELEASED BY THE COMMITTEE PLAN.**

**RELEASE OF CLAIMS AGAINST PARTICIPATING PARTY OR SETTING INSURER**

**EXCEPT FOR OBLIGATIONS ARISING UNDER ANY EXECUTORY CONTRACT ASSUMED BY THE REORGANIZED DEBTOR PURSUANT TO SECTION XIV, OBLIGATIONS UNDER ANY SETTLEMENT AGREEMENT AND CLAIMS**

**EXCEPTED FROM EXCULPATION AND DISCHARGE UNDER SECTION 13.2 AND 13.8, AS OF THE EFFECTIVE DATE, THE DEBTOR, REORGANIZED DEBTOR AND THE ESTATE WAIVE, RELEASE AND DISCHARGE ANY AND ALL CLAIMS OR CAUSES OF ACTION OF EVERY KIND AND NATURE THAT DEBTOR, REORGANIZED DEBTOR, OR THE ESTATE HAVE OR MAY HAVE AGAINST A PARTICIPATING PARTY OR SETTLED INSURER, INCLUDING AVOIDANCE RIGHTS, AND ANY CLAIM THAT SUCH PARTICIPATING PARTY OR SETTLED INSURER OR ITS ASSETS ARE A PART OF OR OWNED BY THE DEBTOR OR THE ESTATE. NO SUCH CLAIM WILL SURVIVE THE EFFECTIVE DATE OR BE DEEMED TO BE ASSIGNED TO THE TRUST. WITH RESPECT TO ANY RELEASES IN A BANKRUPTCY COURT-APPROVED AGREEMENT WITH A PARTICIPATING PARTY OR SETTLED INSURER, NOTHING CONTAINED IN THE COMMITTEE PLAN IS INTENDED TO AFFECT, DIMINISH OR IMPAIR SUCH RELEASES.**

### Pension Plan

No provision in the Plan, Confirmation Order, the Bankruptcy Code (including Section 1141 of the Bankruptcy Code), or any other document filed or order entered in the Chapter 11 Cases shall be construed to exculpate, discharge, release or relieve the Debtor, the Catholic Entities, or any other party, in any capacity, from any liability or responsibility to any Person regarding the Pension Plans under any law, governmental policy, or regulatory provision. The Pension Plans shall not be enjoined or precluded from enforcing any such liability or responsibility because of the provisions of the Plan (including those provisions providing for exculpation, satisfaction, release and discharge of Claims against the Debtor), the Confirmation Order, the Bankruptcy Code (including Section 1141 of the Bankruptcy Code), or any other document filed or order entered in the Chapter 11 Case. The Trust shall not have any liability to any Person on account of the Pension Plans, including liability as a member of a "Controlled Group" as defined in 29 U.S.C. § 1301(a)(14)(A) or on any other basis.

As of the Effective Date, the Reorganized Debtor shall assume and continue the Pension Plans to the extent of its obligations under the Pension Plans and applicable law. Notwithstanding the foregoing, the Reorganized Debtor reserves all of its rights under the Pension Plan. For the avoidance of doubt, any claims asserted by any beneficiary of the Pension Plan shall be reinstated and shall remain with the same priority and validity as before the Petition Date.

## XII.   BEST INTERESTS TEST

Under Section 1129(a)(7) of the Bankruptcy Code, often called the "best interests test," holders of impaired allowed claims must either (i) accept the plan of reorganization, or (ii) receive or retain under the plan property of a value, as of the plan's assumed effective date, that is not less than the value such rejecting claimants would receive or retain if the Debtor was liquidated under chapter 7 of the Bankruptcy Code on such date.

The Committee believes that the Committee Plan provides the same or a greater recovery for claimants holding Allowed Claims as would be achieved in a liquidation under chapter 7 of the

Bankruptcy Code. This belief is based on several considerations, including: (i) the additional administrative claims generated by conversion to a chapter 7 case; (ii) the administrative costs of liquidation and associated delays with a chapter 7 liquidation; and (iii) the lack of value ascribed to the Debtor's insurance recoveries because liquidation value of those policies is highly uncertain.

The Committee has prepared an unaudited Liquidation Analysis, <u>Exhibit 2</u>, to assist claimants holding Allowed Claims in evaluating the Committee Plan. The Liquidation Analysis compares the projected creditor recoveries that would result from the liquidation of the Debtor in a hypothetical case under chapter 7 of the Bankruptcy Code with the estimated distributions to claimants holding Allowed Claims under the Committee Plan. The Liquidation Analysis is based on the value of the Debtor's assets and liabilities as of a certain date and incorporates various estimates and assumptions, including a hypothetical conversion to a chapter 7 liquidation as of a certain date. Further, the analysis is subject to potentially material changes, including regarding economic and business conditions and legal rulings. The actual liquidation value of the Debtor could vary materially from the estimate provided in the Liquidation Analysis. Finally, the Liquidation Analysis does not include a liquidation analysis of the Debtor's Insurance Policies. This is so because, given insurer coverage defenses and defenses to Abuse Claims, the liquidation value of those policies is highly uncertain.

## XIII.   RISK FACTORS

In evaluating whether to vote to accept or to reject the Committee Plan, all Claimants holding Allowed Claims and all Abuse Claimants in the Voting Classes should carefully read and consider the risk factors set forth below, which describe how the anticipated distributions and treatments under the Committee Plan rely on uncertain assumptions and are not guaranteed. These disclosures are not intended to be inclusive and should be read in connection with the other disclosures in this Disclosure Statement and the exhibits attached. You should consult with your legal, financial, and tax advisors regarding the risks associated with the plan and distributions you may receive.

**A.      Parties in Interest May Object to the Committee's Classification of Claims**

Section 1122 of the Bankruptcy Code provides that a plan of reorganization may place a claim or an equity interest in a particular class only if such claim is substantially similar to the other claims in such class. The Committee believes that the classification of claims under the Committee Plan complies with the requirements in the Bankruptcy Code because the Committee created classes of claims that only encompass claims substantially similar to the other claims in such class. Still, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

**B.      The Committee May Not Be Able to Secure Confirmation of the Committee Plan**

Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a chapter 11 plan, and requires findings by the bankruptcy court that: (i) such plan "does not unfairly discriminate" and is "fair and equitable" regarding any rejecting classes; (ii) confirmation of such plan is not likely to be followed by a liquidation or a need for further financial reorganization

unless such liquidation or reorganization is contemplated by the Committee Plan; and (iii) the value of distributions to rejecting holders of claims and equity interests within a particular class under such plan will not be less than the value of distributions such holders would receive if the Debtor was liquidated under chapter 7 of the Bankruptcy Code.

There can be no assurance that the Bankruptcy Court will confirm the Committee Plan. The Bankruptcy Court could decline to confirm the Committee Plan if it found that the statutory requirements for confirmation had not been met, including the requirement that the terms of the Committee Plan do not "unfairly discriminate" and are "fair and equitable" to rejecting Classes. If the Committee Plan is not confirmed, it is unclear what distributions that claimants holding Allowed Claims will receive regarding their Allowed Claims, or the timing of receipt of such distributions, as it is unclear whether a confirmable alternative plan can be proposed by any other party in this chapter 11 case.

## C.    The Debtor May Object to the Committee Plan

The Diocese has not agreed to the terms of the Committee Plan. Nor has the Diocese agreed to voluntarily contribute to the Trust provided for in the Committee Plan. The Diocese may oppose confirmation of the Committee Plan arguing it is unconfirmable on the bases, among others, that (i) the Diocese cannot be compelled to contribute assets to the Trust, (ii) the Committee Plan is not feasible as it does not leave the Diocese with sufficient resources to maintain its mission, and (iii) the Diocese Plan is superior to the Committee Plan. Even if the Bankruptcy Court confirmed the Committee Plan over the objections of the Diocese, the Diocese may appeal the confirmation order increasing administrative expenses, delaying resolution, and delaying the occurrence Effective Date of the Committee Plan even if such appeal failed.

## D.    The Non-Settling Insurers May Object to the Committee Plan

The Non-Settling Insurers may object to the Committee Plan. The Non-Settling Insurers may argue that the provisions relating to the assignment and/or enforcement of the Debtor's Insurance Policies are not enforceable and violate the terms of those policies. In other Diocesan cases, non-settling insurers have heavily litigated the confirmation of proposed reorganization plans. If those objections have been overruled, the non-settling insurers have appealed those decisions. Thus, even if the Bankruptcy Court confirmed the Committee Plan over the objections of Non-Settling Insurers, such Non-Settling Insurers may appeal the confirmation order increasing administrative expenses, delaying resolution and the Effective Date of the Committee Plan even if such appeal failed.

## E.    Parties In Interest May Object To The Releases And Injunctions Contained In The Committee Plan

Confirmation is also subject to the Bankruptcy Court's approval of the releases, injunction, and discharge and related provisions described in the Committee Plan under the Full or Partial Settlement Alternatives. Certain parties in interest may assert that the Committee cannot demonstrate that the Committee Plan meets the standards for approval of releases, injunctions, and exculpations under applicable law. Even if the Bankruptcy Court confirmed the Committee Plan

81

over such objections, such objectors may appeal the confirmation order increasing administrative expenses, delaying resolution and the Effective Date of the Committee Plan even if such appeal failed.

**F.      Nonconsensual Confirmation**

The Committee believes that the Committee Plan satisfies the requirements of Section 1129(b) of the Bankruptcy Code to seek a nonconsensual confirmation of the Committee Plan if necessary unless the holders of Abuse Claims vote to reject the Committee Plan. However, there is no assurance that the Bankruptcy Court will conclude this, in which case the Committee Plan may not be confirmed.

**G.      Non-Occurrence of the Effective Date**

The Effective Date is subject to the conditions precedent in the Committee Plan. There can be no assurance that the conditions necessary for the Committee Plan to become effective will be met, in which case distributions will be delayed.

## XIV.    CERTAIN FEDERAL INCOME TAX CONSIDERATIONS[26]

THE FEDERAL, STATE, LOCAL, AND FOREIGN TAX CONSEQUENCES OF THE COMMITTEE PLAN ARE COMPLEX AND, IN MANY AREAS, UNCERTAIN. ALL HOLDERS OF CLAIMS ARE STRONGLY URGED TO CONSULT THEIR TAX ADVISORS WITH SPECIFIC REFERENCE TO THE FEDERAL, STATE, AND LOCAL TAX CONSEQUENCES OF THE COMMITTEE PLAN. NEITHER THE DEBTOR NOR THE DEBTOR'S COUNSEL MAKE ANY REPRESENTATIONS REGARDING THE PARTICULAR TAX CONSEQUENCES OF CONFIRMATION AND CONSUMMATION OF THE COMMITTEE PLAN AS TO THE DEBTOR OR ANY CREDITOR.

The following summary is a general discussion of certain potential Federal income tax consequences of the Committee Plan. The summary is based upon relevant provisions of the Internal Revenue Code of 1986, as amended (the "Tax Code"), the applicable Treasury Regulations promulgated (the "Treasury Regulations"), judicial authority, published rulings, and such other authorities considered relevant now in effect, which are subject to change.

The federal income tax consequences to any particular creditor may be affected by matters not discussed below. The summary does not address all categories of Creditors, some of which may be subject to special rules not addressed herein. There also may be state, local, or foreign tax considerations applicable to each Creditor or the Debtor.

**A.      Tax Consequences to Creditors**

A creditor that receives a distribution to satisfy its Claim will generally recognize a gain or loss equal to the difference between (i) the amount of cash received by such creditor regarding its Claim (excluding any cash received regarding a Claim for accrued interest) and (ii) the creditor's

---

[26] Subject to review by tax counsel.

tax basis in its Claim. The character of any gain or loss recognized as long-term or short-term capital gain or loss or as ordinary income or loss will be determined by several factors, including the tax status of the creditor, whether the Claim constitutes a capital asset in the hands of the creditor, whether the Claim has been held for more than one year, and whether and to what extent the creditor has claimed a bad debt deduction (or charged a reserve for bad debts) regarding the Claim.

For example, if a distribution is made to satisfy a receivable acquired in the ordinary course of the Claimant's trade or business, and the Claimant had previously included the amount of such receivable Distribution in their gross income under their method of accounting, and had not previously claimed a loss or bad debt deduction for that amount, the receipt of the distribution should not result in additional income to the Claimant but may, result in a loss. Conversely, had the Claimant previously claimed a loss or bad debt deduction regarding the item previously included in income, the Claimant generally would have to include the amount of the distribution in income when received.

The Committee anticipates that distributions to satisfy Abuse Claims will, in all instances, constitute damages, other than punitive damages, because of personal physical injuries and/or physical sickness, within the meaning of Section 104(a)(2) of Tax Code. The Committee has not, however, analyzed such tax issues and cannot (and does not) make any assurances or representations regarding the anticipated tax treatment of Abuse Claims.

THERE ARE MANY FACTORS THAT WILL DETERMINE THE TAX CONSEQUENCE TO EACH HOLDER OF AN UNSECURED CLAIM. THE TAX CONSEQUENCES OF THE COMMITTEE PLAN ARE COMPLEX, AND IN SOME CASES, UNCERTAIN. THEREFORE, IT IS IMPORTANT THAT EACH HOLDER OF AN UNSECURED CLAIM OBTAIN HIS, HER, OR ITS OWN PROFESSIONAL TAX ADVICE REGARDING THE TAX CONSEQUENCES TO SUCH HOLDER OF AN UNSECURED CLAIM AS A RESULT OF THE COMMITTEE PLAN.

## B.    Tax Consequences to the Debtor

The Debtor is a non-profit, non-stock member corporation having tax-exempt status under 26 U.S.C. § 501I(3). Due to the Debtor's status as a non-profit corporation, the Debtor does not expect that the Committee Plan will result in any significant federal income tax consequences to the Debtor.

Under the Internal Revenue Code of 1986, as amended (the "Code"), there may be significant federal income tax issues arising under the Committee Plan described in this Disclosure Statement that affect creditors in this chapter 11 case.

## C.    Tax Consequences to the Trust

The Trust may satisfy the requirements of a designated settlement fund under § 468B of the Tax Code or a qualified settlement fund under Regulation 1.468B-1 of the Treasury Regulations. There are certain tax consequences associated with the characterization of the Trust

as a designated settlement fund or a qualified settlement fund ("**QSF**"). The Committee expresses no opinion on whether the Internal Revenue Service would conclude that the Trust is a designated settlement fund or a QSF. The Debtor has not requested a ruling from the Internal Revenue Service or an opinion of counsel regarding whether the Trust is a designated settlement fund or a qualified settlement fund. Each creditor is urged to consult its own tax advisor regarding the characterization of the Trust and the tax consequences of such characterization.

The federal income tax consequences to a holder of a Claim receiving, or entitled to receive, a distribution in partial or total satisfaction of a Claim may depend on several factors, including the Claim, the Claimants' method of accounting, and their own particular tax situation. Because each Claimant's tax situation differs, Claimants should consult their own tax advisors to determine how the Committee Plan affects them for federal, state, and local tax purposes, based on its particular tax situations.

## XV.    VOTING INSTRUCTIONS

The Committee's Claims Agent will send to all Claimants entitled to vote on the Committee Plan: (i) the Disclosure Statement Order, (ii) a notice of the Confirmation Hearing, (iii) the Disclosure Statement, as approved by the Bankruptcy Court and together with the Committee Plan attached as an exhibit, and (iv) a Ballot (collectively, the "Solicitation Packages"). The Solicitation Packages will also describe the procedures and deadline for submitting Ballots to the Committee's Claims Agent.

## XVI.    CONCLUSION AND RECOMMENDATION

The Committee believes that confirmation and implementation of the Committee Plan is preferable to any other alternative. The Committee urges all claimants entitled to vote to accept the Committee Plan, and urges Abuse Claimants to vote to accept the Committee Plan by so indicating on their ballots and returning them as specified in the instructions in the Solicitation Packages.

[*Signature Page Follows*]

Dated at Bridgeport, Connecticut, this 28th day of February, 2023.

THE OFFICIAL COMMITTEE OF
UNSECUREDCREDITORS FOR THE
NORWICH ROMAN CATHOLIC DIOCESAN
CORPORATION


By:  */s/ Stephen M. Kindseth*
Eric A. Henzy (ct12849)
Stephen M. Kindseth (ct14640)
Daniel A. Byrd (ct31151)
ZEISLER & ZEISLER, P.C.
10 Middle Street, 15th floor
Bridgeport, CT 06605
Telephone: (203) 368-4234
Email: ehenzy@zeislaw.com
      skindseth@zeislaw.com
      dbyrd@zeislaw.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 28th day of February, 2023, a copy of foregoing was filed electronically. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice ofElectronic Filing. Parties may access this filing through the Court's CM/ECF System.

*/s/ Stephen M. Kindseth*
Stephen M. Kindseth (ct14640)

86