**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF CONNECTICUT**
**HARTFORD DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| THE NORWICH ROMAN CATHOLIC DIOCESAN CORPORATION,[1] | Case No:  21-20687 (JJT) |
| Debtor. | |

---

> **THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PLAN. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT. THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT YET BEEN APPROVED BY THE COURT.**

**SIXTH AMENDED JOINT DISCLOSURE STATEMENT**
**FOR SIXTH AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION**
**PROPOSED BY THE NORWICH ROMAN CATHOLIC DIOCESAN**
**CORPORATION, THE OFFICIAL COMMITTEE OF UNSECURED**
**CREDITORS, THE CATHOLIC MUTUAL RELIEF SOCIETY OF AMERICA,**
**AND THE ASSOCIATION OF PARISHES OF THE ROMAN CATHOLIC**
**DIOCESE OF NORWICH, CONNECTICUT**

---

[1]   The Debtor in this chapter 11 case is The Norwich Roman Catholic Diocesan Corporation, a/k/a The Roman Catholic Diocese of Norwich. The last four digits of the Debtor's federal tax identification number are 7373.

**ZEISLER & ZEISLER P.C.**
Eric A. Henzy (ct12849)
Stephen M. Kindseth (ct14640)
Daniel A. Byrd (ct31151)
10 Middle Street, 15th Floor
Bridgeport, CT 06604
Telephone: (203) 368-4234
Facsimile: (203) 549-0903
E-mail: skindseth@zeislaw.com
        ehenzy@zeislaw.com
        dbyrd@zeislaw.com

*Attorneys for the Official Committee of*
*Unsecured Creditors*

**ROBINSON & COLE LLP**
Patrick M. Birney (ct19875)
Annecca H. Smith (ct31148)
280 Trumbull Street
Hartford, CT 06103
Telephone: (860) 275-8275
Facsimile: (860) 275-8299
E-mail:  pbirney@rc.com
        asmith@rc.com

 -and-

**ICE MILLER LLP**
Louis T. DeLucia (admitted *pro hac vice*)
Alyson M. Fiedler (admitted *pro hac vice*)
1500 Broadway, 29th Floor
New York, NY 10036
Telephone: (212) 824-4940
Facsimile: (212) 824-4982
E-Mail:  louis.delucia@icemiller.com
        alyson.fiedler@icemiller.com

*Attorneys for the Debtor*
*and Debtor-in-Possession*

**JONES WALKER LLP**
Mark A. Mintz (admitted *pro hac vice*)
Samantha A. Oppenheim (admitted *pro hac vice*)
201 St. Charles Avenue, 51st Floor
New Orleans, LA 70170
Telephone: (504) 582-8368 / (504) 582-8641
Facsimile: (504) 589-8368 / (504) 589-8641
Email: mmintz@joneswalker.com
        soppenheim@joneswalker.com

*Counsel for The Association of Parishes of the*
*Roman Catholic Diocese of Norwich, Connecticut*

**ARENTFOX SCHIFF LLP**
Everett J. Cygal (*admitted pro hac vice*)
David M. Spector (*admitted pro hac vice*)
J. Mark Fisher (*admitted pro hac vice*)
Jin Yan (*admitted pro hac vice*)
Daniel J. Schufreider (*admitted pro hac vice*)
ArentFox Schiff LLP
233 S. Wacker Dr., Suite 7100
Chicago, IL 60606
T: 312.258.5500
F: 312.258.5600
E: everett.cygal@afslaw.com
   david.spector@afslaw.com
   mark.fisher@afslaw.com
   jin.yan@afslaw.com
   daniel.schufreider@afslaw.com

 -and-

**GREEN & SKLARZ LLC**
Jeffrey M. Sklarz (ct20938)
One Audubon Street, Third Floor
New Haven, CT 06511
T: 203.285.8545
F: 203.823.4546
E: jsklarz@gs-lawfirm.com

*Counsel for The Catholic Mutual Relief Society of America*

Dated:  February 10, 2025

# TABLE OF CONTENTS

I.   EXECUTIVE SUMMARY OF THE PLAN ................................................................. 1

    A.   Introduction .......................................................................................................... 1
    B.   Classification of Claims ....................................................................................... 2
    C.   Principal Terms of the Plan .................................................................................. 3
    D.   The Reorganized Debtor ..................................................................................... 14
    E.   Disclaimer ........................................................................................................... 15
    F.   Voting and Confirmation Procedures ................................................................. 17

II.   OVERVIEW OF THE CHAPTER 11 PROCESS ....................................................... 18

    A.   A Chapter 11 Case .............................................................................................. 18
    B.   A Chapter 11 Plan .............................................................................................. 18
    C.   Voting On a Chapter 11 Plan ............................................................................. 18
    D.   Effect of Rejection Upon Confirmation of a Chapter 11 Plan ........................... 19

III.   THE DEBTOR, ITS OPERATIONS AND THE BANKRUPTCY CASE .................... 20

    A.   Nature and History of the Diocese ..................................................................... 20
    B.   Hierarchy of the Roman Catholic Church .......................................................... 21
    C.   Operations of the Diocese .................................................................................. 21
    D.   Mount St. John's School ..................................................................................... 22
    E.   Insurance Liability Coverage ............................................................................. 23
    F.   Events Leading to and During the Bankruptcy Case .......................................... 26

IV.   KEY TERMS OF THE PLAN ..................................................................................... 26

    A.   Treatment of Unclassified Claims ...................................................................... 26
    B.   Treatment of Classified Claims .......................................................................... 29

V.   TRUST AND UNKNOWN ABUSE CLAIMS TRUST ............................................. 39

    A.   Establishment of Trust ....................................................................................... 39
    B.   Liquidation And Payment of Abuse Claims ...................................................... 47
    C.   Insurance Matters Regarding Non-Settling Insurers .......................................... 50
    D.   Settled Insurers and Participating Parties ........................................................... 56
    E.   Means of Implementation of the Plan ................................................................ 63

VI.   CONDITIONS PRECEDENT ...................................................................................... 67

    A.   Conditions to Effectiveness ............................................................................... 67

VII.   TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES ........ 68

VIII.   MISCELLANEOUS PROVISIONS ................................................................................ 69

    A.    Retention of Jurisdiction ....................................................................... 69
    B.    Miscellaneous Provisions ...................................................................... 70

IX.    EFFECTS OF PLAN CONFIRMATION AND DISCHARGE ................................... 78

    A.    Discharge ............................................................................................... 78

X.     BEST INTERESTS TEST .................................................................................... 86

XI.    RISK FACTORS ................................................................................................. 87

    A.    Parties in Interest May Object to the Plan Proponents' Classification of
        Claims ................................................................................................... 87
    B.    The Plan Proponents May Not Be Able to Secure Confirmation of the
        Plan ....................................................................................................... 87
    C.    The Non-Settling Insurers May Object to the Plan .............................. 88
    D.    Nonconsensual Confirmation ................................................................ 88
    E.    Non-Occurrence of the Effective Date .................................................. 88
    F.    Tax Consequences to Creditors ............................................................. 89
    G.    Tax Consequences to the Debtor ........................................................... 89
    H.    Tax Consequences to the Trust .............................................................. 90

XII.   VOTING INSTRUCTIONS .................................................................................. 90

XIII.  CONCLUSION AND RECOMMENDATION ........................................................ 90

The Norwich Roman Catholic Diocesan Corporation, the debtor and debtor-in-possession in the above-captioned Bankruptcy Case (the "Debtor" or "Diocese"), the Official Committee of Unsecured Creditors appointed in this Bankruptcy Case (the "Committee"), the Catholic Mutual Relief Society of America ("Catholic Mutual"), and the Association of Parishes of the Roman Catholic Diocese of Norwich, Connecticut (the "Association of Parishes," and, collectively, the "Plan Proponents") jointly submit this sixth amended disclosure statement (the "Disclosure Statement") in support of the *Sixth Amended Joint Chapter 11 Plan of Reorganization Proposed by The Norwich Roman Catholic Diocesan Corporation, the Official Committee of Unsecured Creditors, the Catholic Mutual Relief Society of America, and the Association of Parishes of the Roman Catholic Diocese of Norwich, Connecticut* [Dkt. No.   ] as it may hereafter be amended or modified (the "Plan"), a copy of which is attached to this Disclosure Statement as **Exhibit 1**.[2]

## I.      EXECUTIVE SUMMARY OF THE PLAN

### A.      Introduction

On July 1, 2021, the Diocese filed a voluntary chapter 11 petition with the United States Bankruptcy Court for the District of Connecticut (the "Bankruptcy Court"), to address fully and fairly through the bankruptcy reorganization process the claims of sexual abuse made against it and certain other parties, while enabling the Diocese to continue to fulfill its Catholic mission and support its ministries. On July 29, 2021, the United States Trustee for Region 2 appointed the Committee to represent the Diocese's unsecured creditors under § 1102(a)(1) of the Bankruptcy Code. The Committee consists of five individuals who hold claims against the Debtor based upon the sexual abuse they suffered as children inflicted upon them by perpetrators for whom the Diocese is allegedly responsible.

Since its appointment, the Committee and its professionals have conducted an extensive examination and analysis of the Diocese and its assets and liabilities, including insurance coverage and available causes of action against certain other parties. The Committee and the Diocese sought to resolve this Bankruptcy Case in a manner that would provide meaningful financial compensation to the survivors of Abuse and some measure of accountability to those allegedly responsible parties while still permitting the Diocese to reorganize and pursue its religious, charitable, and educational mission.

Throughout this Bankruptcy Case, the Debtor, the Committee and the other major participants have endeavored to reach a global resolution of the Diocese's reorganization including by providing for the payment of reasonable compensation to the survivors of Abuse. The other major participants consisted of Catholic Mutual, the Association of Parishes, the Unknown Abuse Claims Representative, Mount Saint John, Inc., The Oceania Province of the Congregation of Christian Brothers f/k/a The St. Patrick's Province of the Christian Brothers, Xavier High School Corporation of Middletown, Mercy High School Corporation and Saint Bernard School of Montville, Incorporated (together with the Debtor and the Committee, collectively, the "Mediation Parties").

---

[2] The definitions set forth in Section I of the Plan apply to capitalized terms used, but not defined, in this Disclosure Statement. The rules of construction set forth in Section II of the Plan apply to this Disclosure Statement.

The Plan embodies the global resolution through the most recent mediation engaged in by the Mediation Parties. The Plan provides the means for settling and paying all Claims asserted against the Debtor while providing for the Debtor's emergence from bankruptcy to continue to serve its Catholic faithful. The Plan requires the Diocese, Catholic Mutual and the Participating Parties—including the Parishes, Mount St. John, Oceania, Xavier, Mercy and St. Bernard—to make substantial and reasonable settlement payments and contributions to fund the Trust and Unknown Abuse Claims Trust each created pursuant to the Plan to effectuate Distributions to Abuse Claimants. The Plan also appropriately treats other Claimants of the Diocese.

**The Plan Proponents estimate that the funding provided for in the Plan for the benefit of Abuse Claimants in Class 4 (all Abuse Claimants other than Unknown Abuse Claimants) shall ultimately exceed $31 million.**

Pursuant to the Plan and the Bankruptcy Code, the Diocese shall be discharged of all Claims. The Participating Parties shall be granted releases and the benefit of injunctions from Abuse Claims held by Abuse Claimants who voluntarily and affirmatively Opt-In to those provisions, as provided for in the Plan and certain other Plan Documents, in exchange for their contributions and settlement payments. Abuse Claimants who elect not to Opt-In to the Abuse Claim Release will be exempt from the third-party releases and Channeling Injunction contained in the Plan, and will only receive a Distribution from the Diocese's Contribution to the Trust, and will, in favor of Participating Parties, relinquish any Distribution from the other Contributions to the Trust.

Because the Plan realizes substantial and meaningful value consistent with the rights and interests of the Diocese, the estate, and its Claimants, including the Abuse Claimants, and for the other reasons set forth herein and to be established at the Confirmation Hearing, the Plan Proponents submit that the Plan is in the best interests of, and provides the highest and most expeditious recoveries to all Claimants including the Abuse Claimants.

**B.    Classification of Claims**

This Disclosure Statement describes why Claims are placed into certain classes, the relative allocations of property to the Holders of such Claims, the manner by which the Diocese's Assets are to be distributed, the risks inherent in the Plan, and the applicable bankruptcy and tax consequences of the Plan. You are advised and encouraged to read this Disclosure Statement and the Plan in their entirety before voting to accept or reject the Plan.

The following table briefly summarizes the classification and treatment of Claims under the Plan. For a more detailed description of the Plan's classification and treatment of Claims, see Section V below.

| CLASS | DESCRIPTION | IMPAIRMENT | VOTING | ESTIMATED RECOVERY |
|---|---|---|---|---|
| 1 | Other Priority Claims | Unimpaired | Deemed to Accept | 100% |

2

| 2 | Secured Claim of Citizens Bank, N.A. | Impaired | Yes | 100% |
| 3 | Secured Revolving Loan and Secured Guaranty Claims of M&T | Unimpaired | Deemed to Accept | 100% |
| 4 | Abuse Claims Other Than Unknown Abuse Claims | Impaired | Yes | To Be Determined |
| 5 | Unknown Abuse Claims | Impaired | Yes | To Be Determined |
| 6 | General Unsecured Claims | Unimpaired | Deemed to Accept | 100% |
| 7 | Abuse Related Contribution Claims | Impaired | Yes | To Be Determined |
| 8 | Claims Held by the Catholic Entities, Xavier and Oceania | Impaired | Yes | No Recovery Other Than Non-Monetary Settlement Terms |

As provided by § 1126 of the Bankruptcy Code, only classes of Claims that are both impaired under the Plan and entitled to a recovery under the Plan may vote to accept or reject the Plan. Here, the classes of Claims entitled to vote are Class 2 (Secured Claim of Citizens Bank, N.A.), Class 4 (Abuse Claims other than Unknown Abuse Claims), Class 5 (Unknown Abuse Claims, other than Post-Petition Abuse Claims), Class 7 (Abuse Related Contribution Claims) and Class 8 (Claims held by the Catholic Entities, Xavier and Oceania) (collectively, the "Voting Classes").

**THE COMMITTEE STRONGLY RECOMMENDS THAT HOLDERS OF CLAIMS, INCLUDING HOLDERS OF ABUSE CLAIMS, VOTE TO ACCEPT THE PLAN AND OPT-IN TO THE OPTIONAL THIRD-PARTY RELEASE.**

## C.    Principal Terms of the Plan

This Section contains a summary of the principal terms of the Plan. You should carefully review the Plan in full before determining whether to vote to accept or reject the Plan. To the extent that any provision of this Disclosure Statement conflicts with any term of the Plan, the terms of the Plan shall control.

### Reorganization and Recovery

Through the Plan, the Plan Proponents seek to establish a platform for the Debtor to reorganize and continue its Catholic mission and support its ministries, and to contribute a fair and equitable amount of its assets to fund Distributions to Abuse Claimants through the Trust and the Unknown Abuse Claims Trust. The rights of the Holders of secured Claims and general unsecured

Claims against the Diocese are treated under the Plan in a manner authorized by and consistent with the Bankruptcy Code. The reorganization of the Diocese would also significantly reduce the further diminishment of the Diocese's resources to pay for fees and expenses incurred by Professionals employed in this case, and other bankruptcy related costs. The Plan is also funded by Catholic Mutual and the Participating Parties who in exchange shall receive the benefit of the Abuse Claim Releases provided by the Opt-In Abuse Claimants, the Supplemental Catholic Mutual Injunction, and the Channeling Injunction provided for in the Plan precluding Opt-In Abuse Claimants from proceeding with litigation against them.

The Non-Settling Insurers and other potentially responsible Persons (referred to in the Plan as Co-Defendants) also have the ability through the Plan to resolve with the Trustee Abuse Claims and Insurance Claims. The Abuse Claimant's ability to pursue the Non-Settling Insurers and other Co-Defendants would be preserved by the Plan (subject to its terms and conditions) but such Non-Settling Insurers and other Co-Defendants would still, even after the Effective Date, have the ability to reach a Settlement Agreement with the Trustee, among others.

The funds and assets received by the Trust and the Unknown Abuse Claims Trust will be used for Distributions to Abuse Claimants, and will also be used for payment of expenses of each respective trust, under the terms of the Trust Documents and Unknown Abuse Claims Trust Documents. Notwithstanding the uncertainty concerning the precise total amount available to the Trust and the allocation to be determined by the Abuse Claims Reviewer, among other considerations, the Plan Proponents believe that recoveries under the Plan will be significantly greater than amounts to be distributed to Abuse Claimants if the Diocese or the Committee had proceeded unilaterally to attempt to confirm their own plan of reorganization or that would be distributed to Abuse Claimants in a hypothetical case under Chapter 7 of the Bankruptcy Code.

### Overview of the Treatment of Abuse Claims in Class 4

Class 4 consists entirely of Abuse Claims other than Unknown Abuse Claims. Such Abuse Claims resulted or arose, in whole or in part, directly or indirectly, from Abuse committed prior to the Petition Date, and seek monetary damages or any other relief based on any alleged acts or failures to act by the Debtor.[3] Abuse Claims also include Claims against a Participating Party for which the Debtor's conduct is a legal cause or a legally relevant factor.

Class 4 excludes Unknown Abuse Claims which are Abuse Claims where the Abuse Claimant did not file their Abuse Claim during the pendency of the Bankruptcy Case prior to the Effective Date of the Plan. Unknown Abuse Claims are classified in Class 5 of the Plan.

As explained more fully immediately below, each Abuse Claimant may voluntarily "Opt-In" to the Plan's releases and injunctions and, in exchange receive Full Distributions. If such Abuse Claimant elects not to Opt-In, they are referred to as an "Opt-Out Abuse Claimant" holding an "Opt-Out Abuse Claim." An Opt-Out Abuse Claimant will only receive Partial Distributions under

---

[3] "Abuse Claim" does not include any Abuse Related Contribution Claim or Related Insurance Claim. To avoid doubt, an Abuse Claim only includes those resulting or arising in whole or in part, directly or indirectly, from Abuse the first occurrence of which against such Abuse Claimant was committed by any Person before the Effective Date. Abuse Claims also include Late-Filed Abuse Claims and Unknown Abuse Claims.

the Plan.

Class 4 also includes all Late-Filed Abuse Claims. Pursuant to the Plan, a Late-Filed Abuse Claim is an Abuse Claim filed in the Bankruptcy Case after the Claims Bar Date (which was March 15, 2022). In order to provide a single expedited lump-sum payment option to Late-Filed Abuse Claimants, Class 4 is divided into two sub-classes: Class 4-A and Class 4-B (which is referred to as the "Convenience Class").

Excluding duplicative claims, approximately 157 individuals have filed Abuse Claims against the Debtor classified in Class 4, including Late-Filed Abuse Claims and Barred Abuse Claims. Of these, approximately 22 are Late-Filed Abuse Claims filed in this Bankruptcy Case.

### Opt-In Abuse Claims to Receive Full Distributions

"Opt-In" means the right conferred by the Plan for each Abuse Claimant holding an Allowed Abuse Claim to receive Full Distributions pursuant to the Plan and the Trust Distribution Plan in exchange for having voluntarily executed and delivered, in accordance with the terms and conditions of the Plan, the Abuse Claim Release releasing the Participating Parties and the Catholic Mutual Parties, and consenting to the Channeling Injunction and Supplemental Catholic Mutual Injunction. Full Distributions means all Distributions required by the Plan and the Trust Distribution Plan to be paid on account of an Allowed Opt-In Abuse Claim and, for those classified in Class 4, funded by the contributions made by the Debtor, Catholic Mutual and the Participating Parties (as provided for in the Plan and detailed below).

An Abuse Claimant classified in Class 4 may Opt-In by signing the Abuse Claim Release and delivering the original Abuse Claim Release to the Claims Agent by the Voting Deadline. An Abuse Claimant may also Opt-In after the Effective Date of the Plan by signing the Abuse Claims Release and delivering the original to the Trustee prior to the termination of the Opt-Out Abuse Claims Temporary Injunction applicable to such Abuse Claimant. **THE COMMITTEE STRONGLY RECOMMENDS THAT, REGARDLESS OF THEIR VOTE ON THE PLAN, THE HOLDERS OF ABUSE CLAIMS OPT-IN TO THE OPTIONAL THIRD-PARTY RELEASE TO OBTAIN THE MAXIMUM COMPENSATION FOR THEIR CLAIMS.**

### Opt-Out Abuse Claims to Receive Partial Distributions

As more fully set forth in the Plan and the Trust Distribution Plan, an Opt-Out Abuse Claimant is an Abuse Claimant who does not timely Opt-In. An Opt-Out Abuse Claimant shall only receive Partial Distributions on account of their Opt-Out Abuse Claim unless and until such Opt-Out Abuse Claimant exercises their right to Opt-In in accordance with the Plan and the Trust Distribution Plan. If such Opt-Out Abuse Claimant does not Opt-In prior to the termination of the Opt-Out Abuse Claims Temporary Injunction applicable to such Opt-Out Abuse Claimant, then such Opt-Out Abuse Claimant shall have waived, released and relinquished any right to receive any Distribution from the Trust other than the Partial Distributions.

Partial Distributions consist of those Distributions made only on account of the contributions to the Plan made by the Diocese. Partial Distributions do not include those contributions to the Plan made by the Participating Parties or Catholic Mutual. Partial Distributions

consist of only forty-three percent (43%) of the aggregate of Full Distributions made to Opt-In Abuse Claimants. If such Opt-Out Abuse Claimant does not Opt-In prior to the termination of the Opt-Out Abuse Claims Temporary Injunction applicable to such Opt-Out Abuse Claimant, then such Opt-Out Abuse Claimant shall have waived, released and relinquished any right to receive any Distributions from the Trust other than the Partial Distributions.

Pursuant to the Plan, all Opt-Out Abuse Claimants are subject to the Opt-Out Abuse Claims Temporary Injunction. The Opt-Out Abuse Claims Temporary Injunction precludes all Opt-Out Abuse Claimants from taking any action to enforce their Abuse Claims against any of the Participating Parties for the lesser of: (a) one (1) year after the Effective Date; or (b) the conclusion of the claims management activities in subsections 1 through 3 of Section 13.11 of the Plan. In summary, these claims management activities require that: (a) the Abuse Claim Reviewer has evaluated and assigned the Opt-Out Abuse Claim a value pursuant to the Trust Distribution Plan; (b) the Opt-Out Abuse Claimant has consulted with the appropriate parties; and (c) the Bankruptcy Court has both determined that the Opt-Out Abuse Claim is colorable and authorized the Opt-Out Abuse Claimant to bring its Opt-Out Abuse Claim against the applicable Participating Party.

### *Late-Filed Abuse Claims*

An Allowed Late-Filed Abuse Claim in Class 4-A may receive Distributions on the same terms and conditions as all other Allowed Abuse Claims in Class 4-A. However, a Late-Filed Abuse Claim may be Allowed as a Class 4-A Claim only upon motion by the Abuse Claimant and after due notice and a hearing where the Abuse Claimant establishes their excusable neglect under applicable law excusing the late filing of their Proof of Claim and the Bankruptcy Court orders that the Late-Filed Abuse Claim shall be treated as timely filed on or before the Claims Bar Date. Unless and until such motion is granted and the Late-Filed Abuse Claim is Allowed as a Class 4-A Claim by a Non-Appealable Order, no Distribution shall be paid on account of the Late-Filed Abuse Claim as a Class 4-A Claim pursuant to the Trust Distribution Plan.

The Holder of a Late-Filed Abuse Claim may, instead of being classified in Class 4-A, elect on their Ballot to be classified as holding a Convenience Claim classified in Class 4-B. Each Allowed Convenience Claim shall receive a single lump-sum Distribution within forty-five (45) days from the Effective Date, as follows:

- Unless also a Barred Abuse Claim, an Allowed Convenience Claim shall receive the amount of $50,000; and

- An Allowed Convenience Claim that is also a Barred Abuse Claim shall receive the amount of $20,000.

If the Convenience Claim election is made, such Holder of a Convenience Claim will not be permitted to attempt to establish their excusable neglect under applicable law to be Allowed as a Class 4-A Claimant.

**Compensation for Abuse Claims in Class 4**

*Contributions by the Diocese*

On the Effective Date, under the terms of the Plan and the Trust Documents, the Trust shall be created for the benefit of all Class 4 Claims including Late-Filed Abuse Claims. The Trust will be funded by the Debtor and/or the Reorganized Debtor with the following contributions:

(i)     $1,000,000 million of cash;

(ii)    $6.55 million realized from that certain Settlement Agreement by and between St. Bernard, the Debtor and the Committee that was negotiated through the mediation and is sought to be approved under the Plan in accordance with § 1123(b)(3) of the Bankruptcy Code (the "St. Bernard Settlement Agreement") and results in, among other things, the property on which St. Bernard operates (the "St Bernard Property") having been transferred pursuant to an Order of the Bankruptcy Court in exchange for $6.55 million;

(iii)   $627.663.24 in Net Proceeds realized from the sale of real estate sold by the Debtor during the Bankruptcy Case pursuant to various Orders by the Bankruptcy Court;

(iv)    An amount equal to the savings realized from the waiver of ten percent (10%) of the unpaid Professionals Claims accrued from October 1, 2023, through the Effective Date Allowed by the Bankruptcy Court; the Plan Proponents estimate that such contribution to the Trust shall equal approximately $400,000;

(v)     $2.5 million realized from that certain Settlement agreement by and between Xavier, the Debtor and the Committee that was negotiated through the mediation and is sought to be approved under the Plan in accordance with § 1123(b)(3) of the Bankruptcy Code (the "Xavier Settlement Agreement") and results in, among other things, the property on which Xavier currently operates, portions of which it does not currently own (the "Xavier Property") being transferred to Xavier pursuant to § 1123(a)(5)(D) of the Bankruptcy Code within thirty (30) days of the Effective Date of the Plan (the "Xavier Property Transfer") in exchange for $2.5 million;

(vi)    $1,730,000 due and payable by the Reorganized Debtor in two years from the Effective Date of the Plan, which debt shall be evidenced by a promissory note made payable to the Trust;

(vii)   The Transferred Real Estate owned by the Diocese described in Plan Section 7.1(a)4 or their Net Proceeds;

(viii)  The loan debt owed by Mount St. John in the approximate amount of $1.5 million and mortgage granted by Mount St. John to secure this amount;

(ix)    The Transferred Insurance Interests related to the Non-Settling Insurers including the Insurance Claims against and Insurance Recoveries due from such Non-Settling Insurers; and

(x)     $50,000 realized from that certain settlement agreement by and between Mercy, the Debtor and the Committee that was negotiated through the mediation and is sought to be approved under the Plan in accordance with § 1123(b)(3) of the Bankruptcy Code (the "Mercy Settlement Agreement").

### *Contributions by the Participating Parties and Catholic Mutual*

The Trust shall also be funded for the benefit of Class 4 Claims by the following transfers made by the corresponding Participating Party or Catholic Mutual as follows:

(i)    $7 million from Oceania paid before the Effective Date;

(ii)   $2.7 million from the Parishes paid before the Effective Date;

(iii)  $5.3 million from Catholic Mutual paid before the Effective Date;

(iv)   The subdivided portion of real estate known as 50-54 North Main Street, Jewett City (Griswold), Connecticut, consisting of approximately the 1.5 +/- acres of portion of the site and the former school building situated thereon, more fully described in Exhibit O appended hereto, or its Net Proceeds from St. Mary's Roman Catholic Church Corporation; and

(v)    The Net Proceeds realized from the sale of the real estate owned by Mount St. John or the transfer of such real estate to the Trust.

### *Estimated Net Proceeds for Transferred Real Estate*

With respect to the Transferred Real Estate, the Plan Proponents reasonably project, upon information and belief, that that the Transferred Real Estate should generate Net Proceeds in the following estimated amount:

| **Transferred Real Estate** | **Fair Market Value** |
|---|---|
| Moss Property, 7 Otis St. Norwich, CT 06360: | $   400,000[4] |
| St. Mary's School, subdivided portion of 50-54 North Main Street, Jewett City (Griswold), CT 06351: | $   400,000[5] |
| Total Gross Fair Market Value: | $   800,000 |
| Adjustment for Estimated Closing Costs (7% reduction): | ($   56,000) |
| Estimated Net Proceeds from Transferred Real Estate: | $   744,000 |

### *The Mount St. John Property*

The Net Proceeds to be realized from the real estate owned by Mount St. John is much more difficult to project. The property known as 135 Kirtland St. (the "Mount St. John Property") situated in Deep River, Connecticut, consists of approximately 74 acres (per the survey, the main parcel is 65.45 acres, and the two ancillary parcels are 5.96 and 2.73 acres, respectively) of land abutting the Connecticut River, the over 90,000 square foot former school building and multiple additional accessory buildings. Mount St. John originally listed the real estate through Cushman & Wakefield in August, 2019. After various unsuccessful attempts to reach an agreement with other potential buyers, Mount St. John negotiated and ultimately reached an agreement with a

---

[4] Based on current listing price.

[5] Based on that certain Real Estate Appraisal dated March 15, 2021, and prepared by Howard B. Russ, SRPA.

buyer to purchase the Mount St. John Property for an amount which is subject to a confidentiality provision preventing its public disclosure. The Committee knows the amount of this previously agreed to purchase price. The parties entered into their purchase and sale contract on June 10, 2022. The purchase and sale contract contained inspection, financing and permitting contingencies which Mount St. John believed as appropriate under the circumstances. After numerous extensions of various deadlines, the buyer timely exercised its right to terminate the purchase and sale contract on August 25, 2023.

Pursuant to the Plan and the Settlement Agreement reached with Mount St. John, Mount St. John will, subject to the direction of the Trustee, attempt to sell the Mount St. John Property; the net proceeds from any sale of the Mount St. John Property will be paid to the Trust for the benefit of the Class 4 Claimants. During this period of time which may continue for up to a year from the Effective Date, the Trust shall advance to Mount St. John the reasonable and necessary expenses incurred to maintain and insure the Mount St. John Property as set forth in the Mount St. John Settlement Agreement. If the closing on the sale of the Mount St. John Property does not occur within one year of the Effective Date or if the Trustee requests in writing at an earlier date, Mount St. John is obligated to transfer by quitclaim deed the Mount St. John Property to the Trustee's designee. It is contemplated that the Trust will create a single purpose entity to own the Mount St. John Property (as the Trustee's designee) to insulate the Trust from any potential liabilities that may arise on account of the Mount St. John Property. Pursuant to the Plan, the Trustee may waive the Trusts' right to receive the transfer of the Mount St. John Property

The Trustee will then attempt to maximize the value realized from the Mount St. John Property for the benefit of the Class 4 Claimants. The Trustee may at any time prior to receiving the net proceeds of its sale or transfer of the Mount St. John Property waive and relinquish the Trust's right to receive such net proceeds or transfer. This option again protects the Trust from any potential liability arising on account of the Mount St. John Property.

In projecting the net proceeds to be realized from the sale of the Mount St. John Property, obviously, the purchase price is the most important component. The Plan Proponents believed and continue to believe that the previously agreed upon purchase price represents a close approximation to what should be realized from its sale. The actual purchase price agreed to by a ready, willing and able buyer will likely be impacted by the resolution of a significant issue with respect to access from the public street, Kirtland St., to the Mount St. John Property

Upon review of the land records and maps, it was discovered that the subject property did not include a right-of-way for the primary access driveway from Kirtland St. The original right-of-way reserved for the then owner of the Mount St. John Property in a deed dated October 10, 1889, was specific to the grantor only and did not include the grantor's heirs and assigns. Notwithstanding, upon information and belief, the driveway has been used continuously since to access the Mount St. John Property and specifically since the school's original establishment in 1904. After having reviewed the factual and legal grounds therefor, the Plan Proponents have concluded that a prescriptive easement may be established through a civil action against the owners of the real property used for the driveway to the Mount St. John Property. Additionally, although not ideal, the Mount St. John Property may be accessed from a separate public road, Winter Ave.

Other factors will significantly impact the net proceeds that may be realized by the Trust from the sale of the Mount St. John Property.

The amount of real property taxes owed to the Town of Deep River was the subject of two tax appeals based primarily on the applicability of the tax exemption for educational institutions (which the town disputed) and the town's valuation of the real estate (which Mount St. John disputed). Ultimately, the Town of Deep River and Mount St. John entered into a Stipulated Judgment which the Superior Court, State of Connecticut, Judicial District of New Britain, entered as a judgment on March 7, 2024. Mount St. John and the Town of Deep River stipulated to the following fair market values for the Mount St. John Property: (a) $15 million as of October 1, 2019; (b) $8.8 million as of October 1, 2020; (c) $7.5 million as of October 1, 2021; and (d) $6.5 million as of October 1, 2022. The parties further agreed that all real estate taxes due for these Grand List years as well as for the October 1, 2023 Grand List shall not accrue any interest if these amounts are paid on or before June 30, 2025. The amount of real estate taxes due through January 30, 2025, equals approximately $942,000.

In addition to the payment of real property taxes, the Committee agreed as part of the proposed settlement agreement with Mount St. John to other deductions from the purchase price before realizing the balance of net proceeds. These are set forth in Section 3.4 of the Mount Saint John Settlement Agreement appended to the Plan as Exhibit K. The Committee was compelled to compromise in this regard because either: (a) they already constituted appropriate deductions from the purchase price or encumbrances against the Mount St. John Property which would have to be paid from the sale regardless (escrows and credits due buyer, conveyance taxes, brokerage commissions, mortgage balances, and tax liens); or (b) the Committee concluded that their payment (unfunded pension benefit liability and attorneys' fees) was appropriate and necessary to reach a settlement with Mount St. John.

Notwithstanding these risks and uncertainties, the Committee concluded that either receiving the net proceeds from the sale of or obtaining title to the Mount St. John Property (through the Trust's designee) and agreeing to the payment of these specified amounts from the sale proceeds represented the best among any other alternative settlement structures and would, therefore, maximize value for the Trust and its beneficiaries, the Abuse Claimants. Upon information and belief, Mount St. John possesses no assets of any meaningful value other than the Mount St. John Property and so the Committee could not realize anything else of value from a settlement with Mount St. John. The Mount St. John Property has very significant inherent value that should be realized by the Trust. Unlike Mount St. John, the Trust, through its designee, will have the financial ability to fund (to a reasonable and cost-effective extent) any litigation necessary to establish the prescriptive easement for the right-of-way between Kirtland St. and the Mount St. John Property. Additionally, as a hedge against the risk that less is obtained for the Mount St. John Property than anticipated, the Committee negotiated with the Debtor for the Debtor, as part of the Plan, to assign its mortgage against the Mount St. John Property to the Trust. This mortgage secures approximately $1.5 million and is prior in right pursuant to the settlement agreement with Mount St. John to the unfunded pension benefit liability and attorney's fees. Thus, the Committee reasonably anticipates that the Trust will realize significant value from the settlement agreement with Mount St. John and, in particular, the recovery of the net proceeds of sale or the transfer of the Mount St. John Property to the Trust's designee.

### Other Potential Sources

After the Effective Date, the Trust will also be funded through settlements reached, if any, between the Trustee and any Non-Settling Insurers or Co-Defendants. These settlement

agreements will be subject to Bankruptcy Court approval. Nothing in the Plan is intended to affect, diminish or impair a Class 4 Claimant's rights against a Co-Defendant, including that Co-Defendant's joint and several liability for Abuse, unless and until such Co-Defendant becomes a Participating Party pursuant to the terms of the Plan. The Plan is further intended to preserve and protect a Class 4 Claimant's Claims and interests in any Non-Settling Insurer Policies and against any Non-Settling Insurer; again, unless and until such Non-Settling Insurer becomes a Settled Insurer.

### *Anticipated Distributions*

As soon as possible after the Effective Date, and under the terms of the Plan and the Trust Documents, the Trust shall make Distributions to Allowed Class 4 Claimants to the extent of available funds, taking into account necessary reserves.

Based upon these contributions, including the estimated amounts to be realized from currently unliquidated assets, and based further upon the terms and conditions set forth in the Trust Distribution Plan, the Plan Proponents reasonably project, upon information and belief, that the aggregate value to be contributed to the Trust should approximate $31 million. Based upon this total amount, the Plan Proponents further reasonably project, upon information and belief, that the following average amounts will be available for Distribution to Allowed Abuse Claimants:

| <u>Class 4-A</u> | <u>Estimated Average</u> |
|---|---|
| Opt-In Abuse Claimant (other than for Barred Abuse Claim): | $310,000 |
| Opt-In Abuse Claimant holding a Barred Abuse Claim: | $46,000 |
| Opt-Out Abuse Claimant (other than for Barred Abuse Claim): | $133,300 |
| Opt-Out Abuse Claimant holding Barred Abuse Claim: | $19,780 |
| <u>Class 4-B</u> | |
| Convenience Claimant (other than for a Barred Abuse Claim) | $50,000 |
| Convenience Claimant holding a Barred Abuse Claim | $20,000 |

**These amounts are estimates only based upon various projections and assumptions reasonably made by the Plan Proponents. They are also estimated averages based upon the anticipated amount of funds available and the projected number of Abuse Claimants in each category entitled to a Distribution pursuant to the Plan and the Trust Distribution Plan. The actual Distributions made to each Abuse Claimant in Class 4 will depend upon the actual amount realized by the Trust, the actual number of Abuse Claimants entitled to a Distribution, the number of Opt-Out Claimants, and the results of the claims review process implemented by the Abuse Claims Reviewer pursuant to the Trust Distribution Plan. Each Abuse Claimant in Class 4 may actually receive more in Distributions, if not significantly more, or less in Distributions, if not significantly less, than these estimated averages depending upon the Abuse Claims Reviewer's review of claims and application of the evaluation factors, additional factors and adjustments required by the Trust Distribution Plan among all of the Abuse Claimants in Class 4.**

**Overview of Treatment of Unknown Abuse Claims in Class 5**

Unknown Abuse Claims in Class 5 are impaired under the Plan. The Unknown Abuse Claims Representative has been appointed by the Bankruptcy Court to act in the Bankruptcy Case on behalf of the Unknown Abuse Claimants. Pursuant to the Plan, the Unknown Abuse Claims Representative shall cast a single vote, estimated at $1 for voting purposes only, to accept or reject the Plan on behalf of all Unknown Abuse Claimants.

The Unknown Abuse Claims Representative has determined to Opt-In under the Plan on behalf of all Unknown Abuse Claimants, and shall execute and deliver, in accordance with the terms and conditions of the Plan, the Abuse Claim Release on behalf of all Unknown Abuse Claimants thereby releasing the Participating Parties and the Catholic Mutual Parties, and consenting to the Channeling Injunction and Supplemental Catholic Mutual Injunction. By virtue of the Unknown Abuse Claims Representative electing to Opt-In, all Unknown Abuse Claimants shall be entitled to receive Full Distributions provided for under the Plan and the Unknown Abuse Claims Trust Distribution Plan.

The Unknown Abuse Claims Trust will be funded by the Debtor and the Reorganized Debtor based, in part, upon the findings and recommendations of the Unknown Abuse Claims Representative and as determined by the Bankruptcy Court. The Unknown Abuse Claims Representative has concluded that up to $1,800,000 should be contributed by the Debtor and/or Reorganized Debtor for Unknown Abuse Claims. As soon as possible after the Effective Date, and under the terms of the Plan and the Unknown Abuse Claims Trust Documents, the Unknown Abuse Claims Trust shall make Distributions to all Allowed Class 5 Claimants.

Subject to the terms and conditions of the Unknown Abuse Claims Trust Distribution Plan and notwithstanding the decision of the Unknown Abuse Claim's Representative to Opt-In for Unknown Abuse Claimants, any Unknown Abuse Claimant may exercise the right to be treated as an Opt-Out Abuse Claimant holding an Opt-Out Abuse Claim, provided that written notice of such election is received by the Reorganized Debtor and the Unknown Abuse Claim Trustee on or before the 540th day after the Effective Date (approximately 18 months).

No Unknown Abuse Claimant who timely exercises their right to be treated as an Opt-Out Abuse Claimant holding an Opt-Out Abuse Claim shall receive any Distribution from the Unknown Abuse Claims Trust in accordance with and under the Plan and Unknown Abuse Claims Trust Documents.

**Overview of Treatment of Claims Other Than Abuse Claims**

Claims against the Debtor that are not Abuse Claims are identified and described in full in Section VI of this Disclosure Statement. They will be treated as follows under the Plan:

- Other Priority Claims in Class 1 are Unimpaired under the Plan and shall receive 100% recovery.

- The Citizens Secured Guaranty Claim in Class 2 is impaired and upon the closing of the Xavier Property Transfer within thirty (30) days after the Effective Date pursuant the Xavier Settlement Agreement, Citizens shall fully, finally, and completely release and forever discharge the Diocese from any and all obligations arising under the Citizens Guaranty Agreement; *provided, however*, Citizens shall retain a Lien against the Xavier Property representing those certain loan agreements by and between Xavier and Citizens.

- The M&T Secured Revolving Loan Claim and M&T Secured Guaranty Claim in Class 3 are unimpaired and shall retain its Claims against the Reorganized Debtor and the Liens securing such Claims under the Plan.

- General Unsecured Claims in Class 6 are unimpaired under the Plan and shall receive 100% recovery.

- Abuse Related Contribution Claims in Class 7 are impaired under the Plan and shall be Disallowed and shall not receive any Distributions pursuant to the Plan; provided, however, that such shall not impact their right to receive their ratable portion of the defense reserve established and paid pursuant to the Defense Reserve Protocol.

- The Claims held by the Catholic Entities (which include Mercy, St. Bernard and Mount St. John), Xavier and Oceania classified in Class 8 are impaired under the Plan and the Catholic Entities, Xavier and Oceania have, as part of their settlement with the Diocese reflected in the Plan, waived the right to receive any Distribution under the Plan.

With respect to Class 7, the Plan Proponents are not aware of any Abuse Related Contribution Claims classified in Class 7 other than those asserted by some of the Plan Participants who have agreed to their classification and treatment in Class 7. The Plan Proponents proposed to separately classify this type of Claim given their unique legal distinctions, and the proposed treatment of no Distribution on account of their Abuse Related Contribution Claims; provided, however, that their right to receive their ratable portion of the defense reserve established and paid pursuant to the Defense Reserve Protocol is preserved.

Class 8 specifically includes all Claims (including Abuse Related Contribution Claims) against the Debtor held by the Catholic Entities (which include the Parishes, Mercy, St. Bernard and Mount St. John), Xavier and Oceania. These parties participated in the mediation to negotiate the terms of a plan of reorganization to be proposed by the Plan Proponents.

As set forth in the schedules filed by the Debtor shortly after the commencement of this Bankruptcy Case, the following Parishes and other Catholic Entities have each filed a Proof of Claim against the Debtor in the corresponding amounts:

| **Parish / Catholic Entity** | **Amount of Claim** |
|---|---|
| Norwich Diocesan Cemetery Corporation[6] | $  1,521,571.45 |
| Saint Mary's Church Corp | $       98,013.37 |
| St. John's Roman Catholic Cemetery Corporation | $      104,739.78 |
| St. John's Roman Catholic Church Montville | $      394,936.22 |
| St. Teresa of Calcutta Parish Corporation | $      101,381.71 |
| The St. Joseph's Church Corporation of New London | $       96,091.54 |
| The St. Paul Catholic Church Corporation[7] | $       50,000.00 |
| **Total:** | **$  2,366,734.07** |

These amounts reflect loans made or other consideration provided by the corresponding entities to the Diocese prior to the commencement of this Bankruptcy Case.

Additionally, Xavier, Mount St. John, Mercy, St. Bernard, the Association of Parishes on behalf of all Parishes, and Oceania all filed Proofs of Claim in this Bankruptcy Case asserting Claims for contribution, indemnification and other related Claims in connection with the Abuse Claims. Furthermore, on behalf of all Parishes, the Association of Parishes asserted Claims against the Debtor arising on account of applicable insurance policies in which a Parish is or is intended to be a covered party.

As part of the global resolution reached and set forth in the Plan, such Claimants classified in Class 8 shall not receive any Distribution on behalf of their Claims.

### Non-Monetary Commitments and Reforms

To further promote healing and reconciliation, and to continue its efforts to prevent Abuse and other injury to children from occurring in the Diocese in the future, the Diocese agrees that it will undertake and the Diocese shall comply with the Non-Monetary Commitments to Healing and Reconciliation in Exhibit G attached to the Plan.

### D.    The Reorganized Debtor

Following confirmation of the Plan, the Diocese's assets not contributed to the Trust or the Unknown Abuse Claims Trust will be revested in the Diocese. To facilitate the Diocese's

---

[6] In part, as successor in interest to St. Mary, New London Cemetery Corporation (in the amount of $471,852.66), St. Mary's and St. Joseph's Cemetery Corporation (in the amount of $795,574.55), and St. Patrick Cemetery Uncasville (in the amount of $184,137.31).

[7] On December 9, 2021, The St. Paul Catholic Church Corporation merged into The St Josephs Church Corporation of New London.  Therefore, Proof of Claim No. 10010 was filed by The St Josephs Church Corporation of New London (the surviving entity) on behalf of The St. Paul Catholic Church Corporation (the merged entity).

reorganization and continued fulfillment of its mission and support of its ministries, the Plan provides for the following assets, among others, to be retained by the Diocese:

- All personal property including all office equipment and books and records;

- All deposit and investment accounts with all financial institutions (other than the amount necessary to make the cash payment due on the Effective Date pursuant to the Plan);

- The Chancery Office, 201 Broadway, Norwich, CT 06360;

- The Bishop's Residence, 274 Broadway Norwich, CT 06360;

- Vacant Parcel, 7-9 Bath St., Norwich, CT 06360;

- St Vincent De Paul Middletown, 613 Main St., Middletown, CT 06457;

- The real property located at 1470 Randolph Road, Middletown, Connecticut and leased by the Debtor to Mercy; and

- Spanish Center New London, 60 Jay Street, New London, Ct 06320.

Based on the Diocese's operational history, the Diocese and the Committee submit that the Diocese will have sufficient funds to continue to execute its mission after the Effective Date of the Plan.

To confirm a plan, the Bankruptcy Code requires that a Bankruptcy Court find that confirmation of the plan is not likely to be followed by liquidation or the need to further financially reorganize the Debtor (the "Feasibility Test"). For a plan to meet this test, the Bankruptcy Court must determine there is a reasonable likelihood that the Reorganized Debtor will possess the working capital and other resources to meet its obligations under the Plan. The Debtor's cash flow projections for six months following the projected Plan confirmation date are attached hereto as **Exhibit 3.**

The Plan Proponents believe and will demonstrate at the Confirmation Hearing that the Reorganized Debtor can make all Distributions required by the Plan and to fund its operations going forward and, therefore, that confirmation of the Plan is not likely to be followed by liquidation or the need for further reorganization.

E.    **Disclaimer**

**The Plan Proponents believe that the Plan, attached as Exhibit 1 to this Disclosure Statement, is in the best interests of creditors of the above captioned Debtor and urge all Holders of Claims entitled to vote to accept the Plan.**

**This entire Disclosure Statement and its related documents are the only documents approved by the Bankruptcy Court to be used in connection with the solicitation of votes to accept or reject the Plan.**

**This Disclosure Statement contains only a summary of the Plan and is not intended to replace a detailed review and analysis of the Plan. All Holders of Claims are encouraged to review the full text of the Plan and the exhibits to the Plan and this entire Disclosure Statement carefully before deciding whether to vote to accept or reject the Plan. In the event**

of a conflict between the Plan and this Disclosure Statement, the provisions of the Plan will govern.

This Disclosure Statement is based on the factual information and the financial, business, and accounting data provided by the Debtor, or data obtained from other sources considered reliable by the Plan Proponents. The Committee's Professionals have not independently verified the financial information provided by the Debtor contained in this Disclosure Statement and make no representations or warranties as to such information. The information contained in this Disclosure Statement has not been subject to a certified audit. Thus, the Plan Proponents are unable to warrant or represent that the information contained in this Disclosure Statement is complete and accurate, although reasonable effort has been made to present complete and accurate information based on information made available to the Debtor, the Debtor's Professional's, the Committee and the Committee's Professionals.

This Disclosure Statement has been prepared in accordance with § 1125 of the Bankruptcy Code and Rule 3016(b) of the Bankruptcy Rules and not necessarily in accordance with federal or state securities law or other non-bankruptcy law.

This Disclosure Statement may not be relied on for any purposes other than to determine whether to vote to accept or reject the Plan. Nothing in this Disclosure Statement is, or shall be deemed to be an admission or a declaration against interest by the Plan Proponents for purposes of any existing or future litigation as to contested matters, adversary proceedings and other actions or threatened actions. This Disclosure Statement shall not constitute or be construed as an admission of any fact or liability, stipulation, or waiver, but rather as a statement made in settlement negotiations. The Disclosure Statement shall not be admissible in any non-bankruptcy proceeding nor shall it be construed to be conclusive advice on the tax or other legal effects of the plan as to Holders of Claims in this Bankruptcy Case.

This Disclosure Statement contains statements that are forward-looking. Forward-looking statements are statements of expectations, beliefs, plans, objectives, assumptions, projections, and future events of performance. Among other things, this Disclosure Statement contains forward-looking statements with respect to anticipated future performance of a trust to be created for the benefit of Holders of Allowed Claims, as well as anticipated future determination of Claims, Distributions on Claims, and recoveries under insurance policies. These statements, estimates, and projections may or may not prove to be correct. Actual results could differ materially from those reflected in these forward-looking statements. Forward-looking statements are subject to inherent uncertainties and to a wide variety of significant business, economic, and competitive risks, including, among others, those described in this Disclosure Statement. The Plan Proponents undertake no obligation to update any forward-looking statement. New factors emerge from time to time and it is not possible to predict all such factors, nor can the impact of any such factors be assessed.

The statements contained in this Disclosure Statement are made as of the date hereof. The delivery of this Disclosure Statement does not imply that the information contained herein is correct at any time after the date hereof, and the Plan Proponents do not assume

16

**any obligation to update this Disclosure Statement for events or information arising after the date hereof.**

**Holders of Claims shall not construe this Disclosure Statement as providing any legal, financial, or tax advice. All Holders of Claims should consult with their own advisors as to any matters concerning the Plan, its solicitation, and the transactions, treatment, and distributions contemplated by the Plan.**

### F.   Voting and Confirmation Procedures

By order dated _____ __, 2025 (the "Disclosure Statement Order"), the Bankruptcy Court approved this Disclosure Statement as containing adequate information of a kind and in sufficient detail to enable creditors of the Debtor to decide whether to accept the Plan. A copy of the Disclosure Statement Order is attached as **Exhibit 2**.

The Bankruptcy Court's approval of the Disclosure Statement does not constitute a recommendation by the Bankruptcy Court to creditors that they should vote to accept or to reject the Plan. Holders of Allowed Claims in Voting Classes can find voting instructions in the Disclosure Statement Order and in the Ballots that accompany this Disclosure Statement. Because the Abuse Claims have not been determined in a particular amount, each Abuse Claim in Class 4 is valued at one dollar ($1.00), for voting purposes only. Similarly, the Unknown Abuse Claims Representative is deemed to have an Allowed Claim in the amount of one dollar ($1.00). **To be counted, Ballots must be properly completed, executed, and actually received by the Debtor's claims agent (the "Claims Agent"), by 5:00 p.m. (prevailing Eastern time), on _____ ___, 2025 (the "Voting Deadline").**

Each Ballot also includes for Class 4 Claimants the Abuse Claim Release form. **As explained more fully above regarding each Abuse Claimant's right to Opt-In, in order to receive Full Distributions from the Trust, each Abuse Claimant must sign and return the Abuse Claim Release and there by voluntarily consent to the releases set forth in the Abuse Claim Release and the Channeling Injunction and Supplemental Catholic Mutual Injunction provided for in the Plan.** To effectively and efficiency accomplish this, the Abuse Claimant should return the signed Abuse Claim Release to the Claims Agent by the Voting Deadline.

**The Bankruptcy Court has scheduled a hearing to consider confirmation of the Plan to commence _____ ___, 2025, at __:__ _.m. (prevailing Eastern time) (the "Confirmation Hearing"), at the United States Bankruptcy Court, Abraham Ribicoff Federal Building, 450 Main Street, 7th Floor, Hartford, CT 06103.** This hearing may be adjourned occasionally, including without further notice other than by announcement in the Bankruptcy Court on the scheduled date of the Confirmation Hearing. At the Confirmation Hearing, the Bankruptcy Court will consider whether the Plan satisfies the Bankruptcy Code for confirmation. The Bankruptcy Court will also receive and consider a Ballot report prepared by the Debtor's Claims Agent tabulating the votes accepting and rejecting the Plan

## II.    OVERVIEW OF THE CHAPTER 11 PROCESS

### A.    A Chapter 11 Case

Chapter 11 of the Bankruptcy Code allows a debtor to reorganize its operations in an orderly fashion to benefit its creditors and other parties in interest.

The commencement of a chapter 11 case creates an estate comprising all the legal and equitable interests of the Debtor as of the date the petition is filed. Sections 1101, 1107, and 1108 of the Bankruptcy Code provide that a debtor may continue to operate and remain in possession of its property as a debtor-in-possession unless the Bankruptcy Court orders the appointment of a trustee. In the Debtor's case, there has been no request to appoint a trustee and the Debtor remains a debtor in possession.

Filing a petition under the Bankruptcy Code triggers the automatic stay provisions of the Bankruptcy Code. Section 362 of the Bankruptcy Code provides for an automatic stay of all attempts by individuals and entities to collect on pre-petition claims against a debtor, continue lawsuits against a debtor, or otherwise exercise control over or interfere with a debtor's property or operations. The automatic stay remains in full force and effect until the effective date of a confirmed chapter 11 plan, unless otherwise ordered by the Bankruptcy Court.

### B.    A Chapter 11 Plan

The formulation of a chapter 11 plan is the principal purpose of a chapter 11 case. A chapter 11 plan sets forth the means for satisfying the claims against in a debtor's estate. Once a plan is confirmed by a bankruptcy court, it becomes binding on a debtor and all of its creditors, and the prior obligations owed by a debtor to such parties are compromised and exchanged for the obligations specified in the Plan.

### C.    Voting On a Chapter 11 Plan

#### Court Approval Required

Before a debtor solicits votes to accept a proposed plan, § 1125 of the Bankruptcy Code requires a debtor to prepare and file a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment about whether to accept or reject the Plan. This Disclosure Statement is presented to Holders of Claims against the Debtor to satisfy the requirements of § 1125 of the Bankruptcy Code.

#### Impaired Classes with Recoveries Entitled to Vote

After the disclosure statement to a chapter 11 plan has been approved by a bankruptcy court, creditors whose claims against a debtor are impaired under a plan, and who may receive some recovery under the plan, may vote to accept or reject the plan. Section 1124 of the Bankruptcy Code provides that a claim is impaired if the legal, equitable, or contractual rights of the claim are altered. As an example, a claim is impaired if the time for the debtor to pay the amount due is extended beyond the time originally contemplated by the parties. A claim is also

18

impaired if the plan provides that a claimant may only pursue recovery on the claim against certain, rather than all, of the debtor's assets after the chapter 11 case.

Applying these rules, only certain classes of Claims against the Debtor are entitled to vote. Class 2 (Secured Claim of Citizens Bank, N.A.), Class 4 (Abuse Claims), Class 5 (Unknown Abuse Claims), Class 7 (Abuse Related Contribution Claims) and Class 8 (Claims Held by Catholic Entities, Xavier and Oceania) are each impaired under the Plan and are entitled to receive some property (Classes 4, 5 and 7), or waived rights to Distributions based on a settlement with the Debtor as set forth in the Plan (Class 8). As a result, each of these Voting Classes may vote to accept or reject the Plan.

Class 1 (Other Priority Claims), Class 3 (Secured Revolving Loan and Secured Guaranty Claims of M&T), and Class 6 (General Unsecured Claims) are each Unimpaired under the Plan and cannot vote because they are deemed to accept the Plan. Any Ballots cast by Holders of Claims in these classes will not be counted.

### Acceptance of a Chapter 11 Plan

Section 1126 of the Bankruptcy Code defines acceptance of a plan as votes for the plan by at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of the Holders of Allowed claims in each voting class who cast Ballots. Here, the Claims Agent will collect and tabulate all Ballots cast by the Voting Classes and report this information to the Bankruptcy Court.

In addition, under Bankruptcy Rule 3018(a), the Bankruptcy Court may temporarily allow any Claim in an amount that the Bankruptcy Court deems proper for the purpose of voting to accept or reject the Plan. In this Bankruptcy Case, the Abuse Claims in Class 4 are unliquidated. The amount of damages to which any Abuse Claimant is entitled, if any, has not yet been determined by any court or by any agreement between the Debtor, its insurers, and any Abuse Claimant.

Here, to determine if the required dollar amount of the Class 4 Abuse Claims voted for the Plan, each Claim in Class 4 will be allocated $1.00 for voting purposes only. If more than 2/3 of voting Class 4 Abuse Claimants vote for the Plan, Class 4 will have accepted the Plan.

### Voting by Disputed Claims

If any Claim in any class entitled to vote is Disputed by the Debtor, the individual holding that Disputed Claim is not entitled to vote on the Plan in the allocated amount of $1.00. A Claim is Disputed if it is subject to an objection timely filed and has neither been overruled nor denied by a final order and has not been withdrawn. A Claim is also Disputed if it is listed on the Debtor's Schedules as Disputed, unliquidated, or contingent, and regarding which a superseding proof of claim has not been filed. Holders of Disputed Claims may seek the Bankruptcy Court's approval to vote notwithstanding the dispute.

### D.     Effect of Rejection Upon Confirmation of a Chapter 11 Plan

The Bankruptcy Court may confirm the Plan even though a creditor class rejects the Plan (Class 7 is deemed to reject the Plan because Class 7 Claimants are not receiving anything on

account of Class 7 claims). In order for the Plan to be confirmed despite its rejection by a Class of impaired Claims, the Plan must be accepted by at least one class of impaired Claims (determined without counting the votes of "insiders") and the Plan Proponents must show that the Plan does not "discriminate unfairly" and that the Plan is "fair and equitable" regarding each Impaired Class of Claims that does not vote to accept the Plan.

Under § 1129(b) of the Bankruptcy Code, a plan is "fair and equitable" as to a rejecting class of claims or equity interests if the plan provides that: (a) each Holder of a secured claim will receive or retain because of its claim property with a value, as of the effective date of the plan, equal to the allowed amount of such claim or such other treatment as accepted by the Holder of such claim; and (b) each Holder of an unsecured claim junior to the claims of such class will not receive because of such junior claim any property unless the senior class is paid in full.

A plan does not "discriminate unfairly" against a rejecting class of claims if (a) the relative value of the recovery of such class under the plan does not differ materially from that of any class (or classes) of similarly situated claims, and (b) no senior class of claims is to receive over 100% of the claims in such class.

The Plan Proponents believe that the Plan will satisfy the foregoing requirements as to any rejecting class of Claims, and can, therefore, be confirmed.

## III.    THE DEBTOR, ITS OPERATIONS AND THE BANKRUPTCY CASE

### A.    Nature and History of the Diocese

The Roman Catholic Church is comprised of territories, known as dioceses, each of which is subject to the authority and control of a bishop. The Diocese is a Roman Catholic diocese in the eastern half of Connecticut and a small part of New York founded in 1953 by Pope Pius XII, encompassing Middlesex, New London, Windham and Tolland counties in Connecticut, as well as Fisher Island, New York. Every Catholic entity, including the Diocese, is subject to church law also called Canon Law. The Diocese is structured and operates in accordance with Canon Law and is a juridic person under Canon Law.

Until September 4, 2024, the Most Reverend Michael R. Cote, D.D. was the bishop of the Diocese since May 14, 2003. Monsignor Leszek T. Janik is the Diocese's Vicar General. The Diocese serves various ministries, including Catholic Charities, Saint Vincent de Paul, Catholic Family Services, Campus Ministry, Ministry to the Sick, the Norwich Diocesan Council of Catholic Women. Following Bishop Cote's retirement, Archbishop Christopher J. Coyne, Archbishop of Hartford, was appointed Apostolic Administrator of the Diocese.

The Diocese also owns multiple pieces of real estate. In particular, the Diocese owns or formerly owned the real estate, including the buildings and improvements situated thereon, used by three separately incorporated non-profit schools operated by Xavier and Mercy in Middletown, Connecticut and St. Bernard in Montville, Connecticut (collectively, the "High Schools").

Each of the Parishes located within the Diocese's geographic region is a non-profit organization separately incorporated under the laws of the State of Connecticut. None of the

Parishes are debtors in this Bankruptcy Case. Each Parish corporation owns various real and personal property that it uses in its ministry.

## B.    Hierarchy of the Roman Catholic Church

The hierarchy of the Roman Catholic Church "above the Diocese" may be found at https://www.catholic-hierarchy.org/diocese/dhart.html. The governance and relationships by and amongst Catholic Entities are governed by *The Code of Canon Law* (Washington, DC: Canon Law Society of America, 1999). Each bishop is appointed to exercise authority over a particular territory called a *diocese*. Each bishop is truly to act as a shepherd for his diocese. With the assistance of priests and deacons, he exercises his pastoral office over the portion of the People of God assigned to him, regardless of age, condition, or nationality, or whether permanently or temporarily residing in the diocese. In overseeing his diocese, the bishop must insure the authentic teaching of the Catholic faith, the proper and regular celebration of the sacraments and other acts of devotion, the fostering of vocations to the priesthood and religious life, and the governing of the diocese.

An archdiocese also is called a *metropolitan see* or the "head" diocese of an *ecclesiastical province*. For example, the Archdiocese of Hartford is the metropolitan see for the ecclesiastical Province of Hartford, which includes the Archdiocese itself and the *suffragan* Dioceses of Norwich, and Bridgeport. (The term *suffragan* simply refers to those dioceses of a province under the leadership of the archdiocese.) The purpose of forming such a province is to foster cooperation and common pastoral action within a region. *Code of Canon Law*, § 434. The archbishop, while clearly holding an office with great prestige, has immediate jurisdiction only over his own diocese.

The Diocese is unaware of any connection or relationship between entities above the Diocese hierarchically and the allegations or claims of Abuse that have been made in this Bankruptcy Case.

## C.    Operations of the Diocese

The Diocese, through its central administrative offices: (a) provides operational support to certain of the Parishes within the Diocese, and certain other Catholic Entities that operate within the territory of the Diocese (collectively, the "Participating Employers"); (b) maintains the properties it owns including those used by the High Schools; (c) provides comprehensive risk management services to the Participating Employers; (d) administers employee benefits, including medical, insurance, and retirement benefits, for the clergy and lay employees of the Diocese (the "Diocesan Employees") and for employees of the Participating Employers (the "Non-Diocesan Employees"); (e) administers payroll for the Diocese and for certain of the Participating Employers; and (f) coordinates other administrative services as needed. Each of the Parishes, High Schools, and other Catholic Entities are separately incorporated from the Diocese.

Further, the Diocese provides services for several charitable organizations, including the ACA; St. Vincent de Paul Place, Norwich, Inc.; St. Vincent DePaul, Middletown, Inc.; Diocese Of Norwich Outreach To Haiti, Inc.; Norwich Diocesan Cemetery Corporation; Catholic Charities, Diocese of Norwich, Incorporated; Holy Apostles College and Seminary, Inc.; Holy Family Home

and Shelter, Inc.; St. Joseph's Living Center, Inc.; St. James School Associations, Inc.; and Saint John Paul II School. These parties are not debtors in the Bankruptcy Case.

In particular, the ACA (The Annual Catholic Appeal of the Diocese of Norwich, Inc.) is a separately incorporated, non-profit fund-raising entity that subsidizes over twenty-five vital charitable ministries and programs in communities throughout the Diocese. The mission of these ministries and programs is to provide food, clothing, shelter, and behavioral health needs to those that cannot provide for themselves.

The ACA's assets are comprised entirely of charitable donations given by parishioners to serve the ministries and programs the ACA supports. Connecticut state law provides for the preservation of charitable funds and restricts their use to the purpose for which they were given. *See* Conn. Gen. Stat. § 47-2 ("All estates granted for the maintenance of the ministry of the gospel, or of schools of learning, or for the relief of the poor, or for the preservation, care and maintenance of any cemetery, cemetery lot or monuments thereon, or for any other public and charitable use, shall forever remain to the uses to which they were granted, according to the true intent and meaning of the grantor, and to no other use whatever."). Accordingly, the Debtor submits that exposing the ACA's assets to payment of the Claims of the Diocese's creditors directly violates Conn. Gen. Stat. § 47-2.

## D.    Mount St. John's School

Mount St. John's School was a Catholic residential school for disadvantaged and at-risk boys originally established in 1904. The Diocese operated the school by Diocesan authority until approximately 2013 when the residential program was closed.

While some boys residing at Mount St. John's School had allegedly been sexually abused by priests and other clergy in the years prior, a significant number of such incidents of Abuse at issue in this Bankruptcy Case arose after the Diocese in 1989 appointed Br. Paul McGlade to serve as assistant to the Executive Director of the school. A total of 97 Abuse Claims have been asserted in this Bankruptcy Case related to Abuse which allegedly occurred while the Abuse Claimants attended Mount St. John. Of these claims, 15 related to Abuse that allegedly took place prior to the appointment of Br. Paul McGlade in 1989.

By letter dated March 9, 1989, the then Bishop of Norwich, the Most Reverend Bishop Daniel P. Reilly ("Bishop Reilly") wrote to the Very Reverend Brother Provincial of St. Patrick's Province of the Christian Brothers ("St. Patrick's Province," the predecessor to Oceania) to ask if he would consider lending Br. McGlade to the Diocese to prepare him and eventually to take over as Executive Director of Mount St. John's School. After further correspondence, arrangements were made and on October 11, 1989, Bishop Reilly entered into an agreement between the Diocese and St. Patrick's Province for Br. McGlade to serve first as assistant to the Executive Director for a period of twelve (12) months and then as Executive Director for a period of three to five years. Br. McGlade ultimately served as Executive Director until 2002.

On or about 1993, the St. Patrick's Province transferred Br. Donald Pascal Alford to the Diocese of Norwich and Mount St. John's School. Br. Alford served as a music teacher at the Mount St. John's School and the leader of its Boy Scout Troop.

In this Bankruptcy Case, approximately 74 Proofs of Claim have been filed against the Diocese by Abuse Claimants alleging that they had been sexually abused by Br. McGlade when they resided as children at Mount St. John's School. Approximately 20 Proofs of Claim have been filed against the Diocese involving acts of alleged Abuse committed by Br. Alford at Mount St. John's School. Abuse Claimants also filed approximately 30 Proofs of Claims against the Diocese for acts of alleged Abuse committed against them by distinct perpetrators at Mount St. John's School.

## E.   Insurance Liability Coverage

To insure the Diocese's many activities, the Diocese maintained extensive insurance coverage over the course of decades. Specifically, the Diocese purchased and continues to purchase a broad range of primary commercial liability insurance and, at various times, excess and/or umbrella liability insurance policies to protect itself from a myriad of risks. These Insurance Policies provided and continue to provide substantial insurance coverage, including under the older policies, for claims arising out of sexual abuse or sexual misconduct. The Insurance Policies provide coverage to the Diocese and the incorporated parishes, schools, and other Catholic Entities within the Diocese's territory.

From 1957 to the present, the Diocese was insured for sexual abuse and sexual misconduct under Insurance Policies purchased from different insurance companies. The Schedule of Insurance Polices is appended as <u>Exhibit C</u> to the Plan. These insurance policies can be broken down into three groups: the Aetna Casualty & Surety Co.[8] ("Aetna") years (from 1957 to 1974); the American Employers Insurance Company[9] ("American Employers") years (from 1974 to 1977); and the Catholic Mutual years (from 1977 to the present).  Except as settled by the Catholic Mutual Settlement Agreement and Plan with respect to the Settled Insurers and the Settled Insurer Policies, the rights of all parties under the Insurance Policies issued by these Insurance Companies are reserved and the Plan is "insurance neutral" with respect to all of the Non-Settling Insurance Companies.

### The Aetna Policies (1957 to 1974)

With one possible exception, effective from May 4, 1957, through June 1, 1974, the Diocese purchased primary insurance coverage (the "Aetna Policies") from Aetna. The Aetna Policies cover both the Diocese and, at various times, certain other Catholic Entities.

The Aetna Policies from May 4, 1957, through June 1, 1971, did not have any aggregate limits of liability. In certain periods within this time frame, the Aetna Policies contained per-person and per-occurrence limits of liability. Specifically, the Aetna Policy for the period from January 12, 1957, through January 12, 1961, imposed limits of $100,000 per-person and $300,000 per-accident. Each of the Aetna Policies for the three periods from June 1, 1968, through June 1, 1969, June 1, 1969, through June 1, 1970, and June 1, 1970, though June 1, 1971, imposed $500,000

---

[8] Upon information and belief, Travelers Casualty & Surety is the successor to Aetna and obligated under the Aetna Policies purchased by the Diocese.

[9] Upon information and belief, SPARTA Insurance is the successor to American Employers and obligated under the American Employers Policy.

per-person and $1,000,000 per-occurrence limits on liability coverage. All other Aetna Polices during this time frame contained no fixed dollar limits upon liability coverage.

The Aetna Policies for the period from June 1, 1972, through June 1, 1973, and June 1, 1973, through June 1, 1974, imposed an aggregate limit on liability in the amount of $1,000,000. They also each contained a per-person limit of $500,000 and a per-occurrence limit of $1,000,000.

Abuse Claimants have filed approximately 28 Abuse Claims in this Bankruptcy Case that may implicate these policy periods from 1957 to 1974. All of these claims may be subject to Connecticut's statute of limitations and, in particular, for claims of Abuse, Conn. Gen. Stat. 52-577(d) (2018), since they apparently were first commenced when the Abuse Claimant was over 48 years of age.

### The American Employers Policy (1974 to 1977)

For the period from July 1, 1974, through July 1, 1977, the Diocese purchased primary insurance coverage (the "American Employers Policy") from American Employers. With respect to bodily injury liability, the American Employers Policy originally provided limits of liability of $500,000 per-occurrence and an aggregate limit of $500,000. However, by an endorsement effective April 3, 1975, the limits of liability were amended to increase the per-occurrence limit to $5,000,000 and the aggregate limit to $5,000,000.

Abuse Claimants have filed approximately 7 Abuse Claims in this Bankruptcy Case that may implicate this policy period from July 1, 1974 to July 1, 1977. All of these claims may be subject to Connecticut's statute of limitations and, in particular, for claim of Abuse, Conn. Gen. Stat. 52-577(d) (2018), since they apparently were first commenced after the Abuse Claimant had reached 48 years of age.

### The Catholic Mutual Certificates (1977 to the Present)

The Plan and Catholic Mutual Settlement Agreement resolve coverage issues on the liability coverage provided by Catholic Mutual between July 1, 1977 to the present under more than forty (40) separate coverage certificates issued to the Diocese. Those certificates provide varying levels of sexual abuse coverage to the Diocese on varying terms. In general, the certificates fall into one of three categories based upon the nature and scope of coverage provided: the occurrence-based certificates with no exclusion or limitation for sexual abuse claims (from 1977 to 1986); the occurrence-based certificates with specific limits for sexual abuse claims (from 1986 to 1990); and the claims-made certificates (from 1990 to the present).

As detailed in Catholic Mutual's letters dated January 22, 2020, and June 22, 2022, to the Diocese, Catholic Mutual's asserted the coverage position with respect to Abuse Claims where the first incident of Abuse took place July 1, 1990 or later on a claims-made basis was that they were subject to: (a) a retroactive date of July 1, 1990; and (b) aggregate limits and sub-limits based on the dates of the underlying alleged incidents of Abuse.

As also explained in those letters, Catholic Mutual's claims made coverage includes a provision applicable when a member files for bankruptcy. This provision provides that any claims

filed during the course of an entity's Bankruptcy Case (i.e., between the Petition Date and plan Effective Date) shall be deemed to have been made on the first day of the Bankruptcy Case such that such claims will be subject to the terms, conditions, and limits of the certificate that was in force on the Petition Date. This provision thus limits coverage for all Abuse Claims filed during the course of the Diocese's Bankruptcy Case, including Post-Petition Abuse Claims, to a single $2,000,000 aggregate.

The Debtor and Committee acknowledge and caution that significant coverage issues exist and that Catholic Mutual has presented counter-arguments and repeatedly expressed its intent to defend against these Insurance Claims vigorously. Accordingly, the Debtor and the Committee have ultimately agreed to compromise and settle these Insurance Claims involving Catholic Mutual on the terms and conditions explained in this Disclosure Statement and set forth in the Plan. That settlement does not affect the Preserved Coverage that will remain in force after the Effective Date of the Plan occurs. The Debtor and the Committee respectfully submit that, given the circumstances presented and the many complex issues involved, such settlement is fair and reasonable and in the best interest of the Debtor, its estate and the Abuse Claimants. After the Effective Date, the coverage provided by Catholic Mutual to the Diocese with respect to Abuse Claims shall consist of claims-made coverage having the same terms, conditions, and limits as exist in the current certificate except that the applicable retroactive date will be amended to be the Effective Date. However, given the aggregate limit applicable to Abuse Claims filed during the bankruptcy proceedings, the amendment will not materially change the current coverage of the Diocese as to Abuse Claims.

Beyond coverage for Abuse Claims, Catholic Mutual also provided to the Diocese pre-Petition Date – and will continue to provide post-Effective Date – a number of other coverages, including property coverage, various general liability coverages, crime coverages, builders risk coverages, directors & officers coverage, priests/religious personal property and liability coverages, excess liability coverage, and equipment breakdown coverage. These various coverages are subject to the terms, conditions, exclusions, and limits set forth Catholic Mutual's certificates.

### Diocese Non-Abuse Related Liabilities

#### *Secured Debt*

M&T Bank Corporation (Manufacturers and Traders Trust Company) ("M&T") alleges to hold a Claim against the Diocese secured by a possessory Lien against the Diocese's post-petition deposit accounts for the approximate amount of $276,543.32.

Additionally, on February 26, 2016, the Diocese and M&T, as successor by merger of People's United Bank, National Association, executed that certain Limited Guaranty Agreement to secure the alleged indebtedness of Mercy High School to Farmington Bank, a Capital Stock Savings Bank, as M&T's predecessor in interest, as same may have been amended from time to time, secured by a certain mortgage granted on 1740 Randolph Rd., Middletown, Connecticut. M&T holds a secured guaranty claim in the approximate amount of $1,752,820.46 as of the Petition Date, arising as a result of the M&T Secured Guaranty Agreement (the "M&T Secured Guaranty Claim").

Lastly, on April 30, 1998, the Diocese and RBS Citizens, N.A. ("Citizens") executed that certain Limited Guaranty Agreement to secure the alleged indebtedness of Xavier High School to Citizens, as same may have been amended from time to time, secured by certain mortgages granted

on 181 Randolph Road, Middletown, Connecticut (the "Citizens Secured Guaranty Claim"). Citizens holds a secured guaranty claim in the approximate amount of $5,046,752.32 as of the Petition Date as a result of the Citizens Secured Guaranty Claim.

### Unsecured Debt Due Unrelated Parties

The Diocese owed its ordinary course vendors approximately $27,318.92 as of the Petition Date, for the delivery of goods and services to the Diocese, which are used in the operation of the Diocese's business, including providing support for its ministries and other outreach programs. These creditors are essential to the Diocese's operations, as they provide the items and services necessary to continue the Diocese's mission.

## F.    Events Leading to and During the Bankruptcy Case

A detailed narrative describing the major events leading up to the commencement of the Diocese's Bankruptcy Case and then occurring throughout this Bankruptcy is attached to this Disclosure Statement as **Exhibit 4** and incorporated herein by reference.

## IV.    KEY TERMS OF THE PLAN

The Plan Proponents propose the Plan in good faith and believe the Plan is feasible and in the best interest of the creditors of the Debtor. The Plan Proponents, therefore, recommend acceptance of the Plan by Holders of Claims in the Voting Classes, and recommend that the Abuse Claimants vote to accept the Plan. This Disclosure Statement summarizes key components of the Plan. To the extent of any inconsistencies between these summaries and the terms of the Plan, the Plan controls. To the extent the summaries omit any provisions of the Plan, such omission does not affect the enforceability of those provisions in the Plan. All Claimants are encouraged to carefully read the Plan before voting.

## A.    Treatment of Unclassified Claims

The following summarizes the treatment of Administrative Claims, Professional Claims, Post-Petition Abuse Claims, Priority Tax Claims, and U.S. Trustee Fees under the Plan. In accordance with § 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Professional Claims, Post-Petition Abuse Claims, Priority Tax Claims, and U.S. Trustee Fees have not been classified under the Plan. Section III of the Plan sets forth the treatment for each type of Claim. The Debtor anticipates that it will pay these unclassified claims, other than Post-Petition Abuse Claims, in full on the Effective Date.

### Administrative Claims

An Administrative Claim is a claim for payment of an administrative expense of a kind specified in Bankruptcy Code § 503(b) and referred to in Bankruptcy Code § 507(a)(2), including the actual and necessary costs and expenses of preserving the estate or operating the Debtor's businesses after the commencement of a chapter 11 case, and compensation for legal and other services and reimbursement of expenses awarded or allowed under Bankruptcy Code §§ 330(a), 331, or 503.

Generally, ordinary course post-petition administrative expenses have been paid by the Debtor in the ordinary course and as reflected in the monthly operating reports filed in this Bankruptcy Case by the Debtor. The amount outstanding as due in the ordinary course of the Debtor's operations is consistently under $10,000 to $15,000, which sum shall be paid when due in accordance with ordinary course business terms with each vendor.

The Plan provides that Holders of Administrative Claims (excluding Legally Excused Post-Petition Abuse Claims and Professional Claims) must file and serve any requests for allowance and payment no later than the Administrative Claims Filing Deadline. Such payment shall be made either (a) on the Effective Date, or, if later, the Allowance Date; or (b) upon such terms as agreed to in writing by the Administrative Claimant.

**Professional Claims**

The Plan sets forth the manner and timing in which Professionals must submit Professional Claims to be considered for payment. All Professionals or other Persons requesting compensation or reimbursement of expenses under any of §§ 327, 328, 330, 331, 503(b), and 1103 of the Bankruptcy Code for services rendered by the Effective Date (including any compensation requested by any Professional or any other Person for making a substantial contribution in the Bankruptcy Case) shall file and serve an application for final allowance of compensation and reimbursement of expenses accruing from the Petition Date to the Effective Date, no later than thirty (30) days after a notice of the Effective Date is filed. If there is a dispute over what amount of a Professional Fee Claim shall be Allowed the dispute shall be resolved by the Bankruptcy Court.

The estimated fees and expenses incurred but not yet paid in this Bankruptcy Case through and including December 31, 2024, is as follows:

Debtor's Professionals:
Ice Miller LLP                                    $1,737,134.00[10]
Robinson & Cole, LLP                             $551,902.74
Brown Jacobson PC                                 $37,500.00
B. Riley Advisory Services                       $271,583.40
Omni Agent Solutions                              $70,000.00

Committee's Professionals:
Zeisler & Zeisler, P.C.                          $738,002.54
Karp & Langerman, LLC                             $7,340.00

Mediators
JAMS                                              $82,483.68

---

[10] Includes $400,000 of services held back by Ice Miller billed during the Fifth Interim Fee Period (November 1, 2022 through September 30, 2023) to the category of Plan and Disclosure Statement.

Additionally, the Committee and Diocese stipulate and agree that the representation by Goldberg Kohn Ltd. of Mount St. John in this Bankruptcy Case and in connection with the proposed sale of property to fund the Plan has made a substantial contribution up to a cap of $100,000 which may only be satisfied from the proceeds of sale as provided in the Mount St. John Settlement Agreement; provided, however, that the allowance of such amount pursuant to § 503(b) is subject to the approval of the Bankruptcy Court upon motion and after due notice and a hearing.

**Post-Petition Abuse Claims**

Post-Petition Abuse Claims constitute Claims that resulted or arose from Abuse the first occurrence of which against such Abuse Claimant was committed by any Person after the Petition Date and before the Effective Date.

As of the date of filing of the Plan, no Post-Petition Abuse Claims have been filed or asserted. Any and all Post-Petition Abuse Claims shall be subject to the Post-Petition Abuse Claims Temporary Injunction set forth in Section 13.10 of the Plan, unless waived by the Reorganized Debtor after consultation with Catholic Mutual and any affected Parish or other Catholic Entity.

Any alleged Post-Petition Abuse Claim shall be Allowed or Disallowed as an Administrative Claim by the Bankruptcy Court following entry of a final, no longer appealable judgment or order of a Court of competent jurisdiction other than the Bankruptcy Court, as to the Debtor's alleged liability for any Post-Petition Abuse Claim. The Diocese hereby preserves all rights to object to and defend against liability for or the allowance of such alleged Post-Petition Abuse Claim.

**Administrative Filing Deadline.**

Except as otherwise set forth in the Plan, requests for allowance and payment of Administrative Claims (excluding Legally Excused Post-Petition Abuse Claims and Professional Claims) must be filed and served no later than the Administrative Claims Filing Deadline. Holders of Administrative Claims (excluding Holders of Legally Excused Post-Petition Abuse Claims and Professional Claims), that do not file a request for allowance and payment by the Administrative Claims Filing Deadline shall be forever barred from asserting such Claims against the Diocese, the Reorganized Debtor, the Trust, the Unknown Abuse Claims Trust, or any of their property. Administrative Claims representing obligations incurred by the Diocese after the Effective Date (including, without limitation, Claims for Professionals' fees and expenses) will not be subject to application to the Bankruptcy Court and may be paid by the Reorganized Debtor in the ordinary course of business and without Bankruptcy Court approval.  In addition, Holders of Administrative Claims representing trade debt incurred after the Petition Date in the ordinary course of Debtor's operations are not required to file requests for allowance of an Administrative Claim and will be paid by the Debtor in the ordinary course.

All objections to the allowance of Administrative Claims (excluding Legally Excused Post-Petition Abuse Claims and Professional Claims) must be served and filed by any parties-in-interest no later than fourteen (14) days after the Administrative Claim Filing Deadline (the "Administrative Claim Objection Deadline"). If no objection to the applicable Administrative Claim is filed on or before the Administrative Claim Objection Deadline, such Administrative

Claim will be deemed Allowed. For the avoidance of doubt, the Administrative Claim Objection Deadline established by the Bankruptcy Court shall control over any contrary deadline set forth in any requests for allowanced and payment of Administrative Claims.

### Priority Tax Claims

A Priority Tax Claim is an unsecured Claim of a governmental unit entitled to priority in payment under any provision of § 507(a)(8) of the Bankruptcy Code. As for any Allowed Priority Tax Claim not paid before the Effective Date, the Reorganized Debtor shall (a) pay such Claim on the Effective Date; or (b) provide such other treatment agreed to by the Holder of such Allowed Priority Tax Claim and the Debtor and the Estate (if before the Effective Date) or the Reorganized Debtor (on and after the Effective Date).

### U.S. Trustee Fees

All fees due and payable under 28 U.S.C. § 1930 and not paid before the Effective Date shall be paid on and after the Effective Date when due and payable to the extent due under applicable law. After the Effective Date, the Reorganized Debtor shall pay quarterly fees to the U.S. Trustee to the extent due under applicable law until the Bankruptcy Case is closed, and a Final Decree is entered. In addition, the Reorganized Debtor shall file post-Confirmation Date reports in conformance with the U.S. Trustee guidelines. The U.S. Trustee shall not be required to file a request for payment of its quarterly fees, which will be deemed Administrative Claims against the Diocese. The Trust and Unknown Abuse Claims Trust shall have no liability for U.S. Trustee fees.

## B.   Treatment of Classified Claims

The Plan does not treat each Claim identically; rather, the Plan categorizes Claims into Classes, consistent with the requirements in §§1122 and 1123(a)(1) of the Bankruptcy Code. That means that, under the Plan, some Holders of Claims will receive full satisfaction of their Claims, some will receive partial satisfaction, and some will receive nothing. In each instance, the Plan Proponents believe that Holders of Claims will receive at least as much value as they would receive if the Debtor's Assets were to be hypothetically liquidated under chapter 7 of the Bankruptcy Code and that impaired creditors will receive more than they would receive in a hypothetical chapter 7 liquidation. Regardless, it is important for Holders of Claims to read the Plan and this Disclosure Statement carefully to understand how they will be treated under the Plan.

The categories of Claims in the Plan and summarized below classify Claims for all purposes, including voting, confirmation, and distribution under the Plan and §§ 1122 and 1123(a)(1) of the Bankruptcy Code. A Claim shall be deemed classified in a particular Class only if the Claim qualifies within the description of that Class and shall be deemed classified in a different Class if any remainder of the Claim qualifies within the description of such different Class. A Claim is classified within a particular Class to receive Distributions only if such Claim is Allowed and has not already been satisfied before the Effective Date.

Except to the limited extent provided in the Plan with respect to Abuse Claims to preserve Claims and interests in connection with Non-Settling Insurer Policies and Non-Settling Insurers,

29

the treatment in the Plan is in complete satisfaction of the legal, contractual, and equitable rights that each Holder of a Claim may have against the Debtor or its property. This treatment supersedes and replaces any agreements or rights those Holders have in or against the Debtor or its property. All Distributions under the Plan will be tendered to the entity holding the Claim. **Except as set forth in the Plan, no Distributions will be made from and no rights will be retained against the Debtor or its property on account of any Claim that is not an Allowed Claim.**

### Class 1: Other Priority Claims

(a)  **Definition**. A "Class 1 Claim" means an Allowed Claim described in, and entitled to priority under, §§ 507(a) and 503(b)(9) of the Bankruptcy Code other than an Administrative Claim or a Priority Tax Claim.

(b)  **Unimpaired and Not Voting**. Class 1 is not impaired under the Plan. The Class 1 Claimants are conclusively presumed to have accepted and are not entitled to vote on the Plan.

(c)  **Treatment**. Unless the Holder of an Allowed Class 1 Claim and the Diocese or the Reorganized Debtor (as applicable) agree to a different treatment, the Reorganized Debtor shall pay each such Allowed Class 1 Claim in full, in cash, without interest, from ongoing operations on the later of the Effective Date and the date a Class 1 Claim becomes an Allowed Claim (or as soon thereafter as is practicable).

### Class 2 Citizens Bank, N.A.

(a)  **Class 2 Definition**. Class 2 consists of the Citizens Secured Guaranty Claim.

(b)  **Impaired and Voting**. Class 2 is impaired under the Plan. The Class 2 Claimant is entitled to vote on the Plan.

(c)  **Class 2 Treatment**. Upon the closing of the Xavier Property Transfer on or before the Effective Date pursuant to the Xavier Settlement Agreement, Citizens shall fully, finally, and completely release and forever discharge the Diocese from any and all obligations arising under the Citizens Guaranty Agreement; provided, however, Citizens shall retain a Lien against the Xavier Property representing those certain loan agreements by and between Xavier and Citizens.

### Class 3: M&T Bank Corporation

(a)  **Class 3 Definition**. Class 3 consists of all claims held by M&T. Class 3 is comprised of the following Sub-Classes:

  i.  Sub-Class 3-A consists of the M&T Secured Revolving Loan Claim; and

      ii.  Sub-Class 3-B consists of the M&T Secured Guaranty Claim.

(b)    **Unimpaired and Not Voting**. Class 3-A and Class 3-B are Unimpaired under the Plan. The Class 3 Claimant is deemed to accept and is not entitled to vote on the Plan.

(c)    **Class 3 Treatment**. The Holder of an Allowed M&T Secured Revolving Loan Claim and an Allowed M&T Secured Guaranty Claim against the Diocese shall receive the treatment set forth below:

      i.  Class 3-A: The collateral securing the M&T Secured Revolving Loan Claim shall upon the Effective Date vest in the Reorganized Debtor and the collateral shall continue to secure the M&T Secured Revolving Loan Claim. The security interest held by M&T to secure M&T Secured Revolving Loan Claim shall remain in place and M&T may exercise any and all rights and remedies against the collateral referenced in such security agreement, available to M&T. The Reorganized Debtor shall be liable to M&T on the M&T Secured Revolving Loan Claim to the same extent and validity as the Diocese immediately prior to the Petition Date.

      ii.  Class 3-B: The collateral securing the M&T Secured Guaranty Claim shall upon the Effective Date vest in the Reorganized Debtor and the collateral shall continue to secure the M&T Secured Guaranty Claim. The security interest held by M&T to secure M&T Secured Guaranty Claim shall remain in place and M&T may exercise any and all rights and remedies against the collateral referenced in such security agreement, available to M&T. The Reorganized Debtor shall be liable to M&T on the M&T Secured Guaranty Claim to the same extent and validity as the Diocese immediately prior to the Petition Date.

**Class 4: Abuse Claims (Other Than Unknown Abuse Claims)**

(a)    **Definition**. A "Class 4 Claim" means an Abuse Claim other than an Unknown Abuse Claim. A "Class 4 Claimant" shall mean a Holder of a Class 4 Claim.

(b)    **Impaired and Voting**. Class 4 is impaired under the Plan. The Class 4 Claimants (including Late-Filed Abuse Claimants) are entitled to vote on the Plan. Only for purposes of voting, each Claim in Class 4 (those treated in either Clas 4-A or Class 4-B) is deemed to be Allowed in the amount of $1.00.

(c)    **Treatment of Class 4.**

      i.  On and after the Effective Date, and subject to the Plan provisions, the Trust shall pay all Abuse Claims (except Unknown Abuse Claims) in accordance with and under the Plan and Trust Documents. Class 4 Claimants shall have

their Abuse Claims treated and Allowed or Disallowed in accordance with the terms and conditions set forth in the Trust Distribution Plan.

ii. Class 4 shall vote as a single class but be divided into the following two (2) sub-classes based on the election of Late-Filed Abuse Claimants to have their Class 4 Claims receive treatment as Convenience Claims as provided in Class 4-B:

> **(a) Class 4-A**: Class 4-A consists of all Class 4 Claims (other than those Late-Filed Abuse Claims held by Late-Filed Abuse Claimants who (i) Opt-In and (ii) elect on their Ballots to have their Late-Filed Abuse Claims treated in Class 4-B as a Convenience Claim). A "Class 4-A Claim" means a Class 4 Claim classified in Class 4-A.

> **(b) Class 4-B, Convenience Class for Late-Filed Abuse Claims**:

>> (1)     A "Convenience Claim" means an Abuse Claim classified in this Class 4-B. A "Convenience Claimant" means the Holder of a Convenience Claim.

>> (2)     Class 4-B consists of all Late-Filed Abuse Claims held by Late-Filed Abuse Claimants who Opt-In, elect on their Ballots to have their Late-Filed Abuse Claims treated in Class 4-B as a Convenience Claim, and return their Ballots at any time on or before the deadline for the return of Ballots. As more fully set forth in the Trust Distribution Plan, a Convenience Claim shall receive the following Distributions:

>>> 1. Unless also a Barred Abuse Claim, a Convenience Claim shall receive a single, lump-sum Distribution from the Trustee in the amount of $50,000 paid within forty-five (45) days from the Effective Date; and

>>> 2. A Convenience Claim that is also a Barred Abuse Claim shall receive a single, lump-sum Distribution from the Trustee in the amount of $20,000 paid within forty-five (45) days from the Effective Date.

iii. Subject to the following terms and conditions, as well as the other applicable terms and conditions set forth in the Plan and the Trust Distribution Plan, all Class 4 Claimants may affirmatively and voluntarily elect to Opt-In to the release and injunction provisions set forth in the Abuse Claims Release and the Plan, or may elect not to Opt-In:

32

(a) An Abuse Claimant classified in Class 4 may Opt-In by signing the Abuse Claim Release and delivering the original Abuse Claim Release to the Claims Agent by the Voting Deadline. An Abuse Claimant may also Opt-In after the Effective Date of the Plan by signing the Abuse Claims Release and delivering the original Abuse Claim Release to the Trustee prior to the termination of the Opt-Out Abuse Claims Temporary Injunction applicable to such Abuse Claimant.

(b) An Opt-In Abuse Claimant holding an Allowed Abuse Claim shall receive Full Distributions on account of their Opt-In Abuse Claim.

(c) An Opt-Out Abuse Claimant holding an Allowed Abuse Claim shall only receive Partial Distributions on account of their Opt-Out Abuse Claim unless and until such Opt-Out Abuse Claimant exercises their right to Opt-In in accordance with the Plan and the Trust Distribution Plan. The Plan Proponents estimate that Partial Distributions will be approximately 43% of the Full Distributions payable to Opt-In Abuse Claimants.

(d) An Opt-Out Abuse Claimant shall be subject to the Opt-Out Abuse Claims Temporary Injunction provided for in Section 13.11 of the Plan.

(e) If such Opt-Out Abuse Claimant does not Opt-In prior to the termination of the Opt-Out Abuse Claims Temporary Injunction applicable to such Opt-Out Abuse Claimant, then: (1) such Opt-Out Abuse Claimant shall have waived, released and relinquished any right to receive any Distributions from the Trust other than the Partial Distributions; and (2) the Trustee shall pay to the Defense Reserve in accordance with the terms and conditions of the Trust Agreement the difference between the Full Distributions such Opt-Out Abuse Claimant would have received had they exercised their right to Opt-In, and the Partial Distributions such Opt-Out Abuse Claimant is entitled to receive.

(d) **Diocese Cooperation with Trustee and Abuse Claims Reviewer.** The Diocese shall reasonably cooperate with the Trustee and the Abuse Claims Reviewer with any inquiries by either in the administration of the Trust Distribution Plan.

(e) **Class 4 Claim Objections**.

   i. No Class 4 Claimant may challenge the merit, validity, or amount of any other Class 4 Claim.

   ii. Except for any objection to an Opt-In Abuse Claim filed by the Committee, any objection to an Opt-In Abuse Claim pending as of the Effective Date is deemed withdrawn. After the Effective Date, the Trustee has the exclusive right, after consultation with the Diocese, to object to an Opt-In Abuse Claim (including any Convenience Claim) and shall succeed to the rights of the Committee because of any Committee's objection to an Opt-In Abuse Claim.

None of the Reorganized Debtor, the Participating Parties or the Catholic Mutual Parties shall have the right to object to an Opt-In Abuse Claim.

iii.   For the avoidance of doubt, the Committee and the Trustee (as applicable), the Diocese, any affected Participating Party and, if alleged to fall within Catholic Mutual's coverage period, Catholic Mutual shall retain the right to object to any Opt-Out Abuse Claim (including any Barred Abuse Claim and any Late-Filed Abuse Claim) unless and until such Opt-Out Abuse Claimant exercises their right to Opt-In in accordance with the terms and conditions of the Plan and the Trust Distribution Plan.

(f)   **Abuse Claim Release**. Other than an Opt-Out Abuse Claimant who, pursuant to the Plan, is entitled to receive Partial Distributions, no Class 4 Claimant will receive any payment from the Trust in accordance with and under the Plan and Trust Documents unless and until such Class 4 Claimant has executed the Abuse Claim Release attached as <u>Exhibit L</u> to the Plan. The form of the Abuse Claim Release shall also be included for completion and execution in the Class 4 Ballot.

(g)   **Diocese Discharge of Class 4 Claim Liability.** The Debtor shall be discharged as set forth in Section 13.1 of the Plan of any liability because of all Class 4 Claims, even for a Class 4 Claimant that rejects the Plan.

(h)   **Late-Filed Abuse Claims.**

i.   Unless and until Disallowed by a Non-Appealable Order entered by this Court, each Late-Filed Abuse Claim shall be classified as a Class 4 Claim and entitled to vote on the Plan. For purposes of voting upon the Plan, the preceding determination shall be made as of the Voting Record Date as ordered by the Bankruptcy Court.

ii.   A Late-Filed Abuse Claim that is not subject to a timely election to be treated as a Convenience Claim in its Ballot shall only be entitled to pursue allowance of their Late-Filed Abuse Claim by the Bankruptcy Court as a Class 4 Claim classified in Class 4-A upon motion ("Excusable Neglect Motion") by the Abuse Claimant and after due notice and a hearing where the Abuse Claimant establishes their excusable neglect excusing the late filing of their Proof of Claim in accordance with applicable law and the Bankruptcy Court orders that the Late-Filed Abuse Claim shall be treated in Class 4-A as timely filed on or before the Claims Bar Date. Such Excusable Neglect Motion shall be filed with the Bankruptcy Court within thirty (30) days of the Effective Date or such corresponding Late-Filled Abuse Claim shall be automatically Disallowed and the Late-Filed Abuse Claimant shall be automatically barred from asserting such Late-Filed Abuse Claim. Unless and until such Excusable Neglect Motion is granted and the Late-Filed Abuse Claim is Allowed as a Class 4 Claim classified in Class 4-A by a Non-Appealable Order, no Distribution shall be paid on account of the Late-Filed Abuse Claim as a Class 4 Claim pursuant to

the Trust Distribution Plan. If the Excusable Neglect Motion is denied and the corresponding Late-Filed Abuse Claim is Disallowed, no Distributions shall be made on account of such Late-Filed Abuse Claim.

iii.    An Abuse Claimant holding a Late-Filed Abuse Claim may elect at their sole and absolute discretion to be treated exclusively as a Convenience Claimant by making such election upon their Ballot returned at any time on or before the deadline for the return of Ballots. In such event, such Late-Filed Abuse Claim shall be treated as a Convenience Claim in accordance with Class 4-B and the Trust Distribution Plan.

iv.    After the deadline for the return of Ballots, any Holder of a Late-Filed Abuse Claim that had not on their Ballot elected to be treated in Class 4-B as a Convenience Claimant shall be only entitled to pursue Allowance as a Class 4 Claim classified in Class 4-A based on their Late-Filed Abuse Claim in accordance with the terms of the Plan, and shall have waived and shall thereafter be barred from asserting a Convenience Claim.

v.    As provided in the Trust Distribution Plan, the Trustee may compromise and settle any Late-Filed Abuse Claim on terms and conditions acceptable to the Trustee subject to approval of the Bankruptcy Court upon motion and after due notice and a hearing.

(i)    **Barred Abuse Claims.** All Barred Abuse Claims classified in Class 4 constitute Class 4 Claims classified and treated in accordance with this Class 4 and the other terms of the Plan, the Confirmation Order and the Trust Distribution Plan, specifically, without limitation, Section 6.2 of the Trust Distribution Plan., which provides that the Abuse Claims Reviewer shall reduce the point total allocated for any Allowed Barred Abuse Claim pursuant to paragraph 5.2(c) of the Trust Distribution Plan by 85%. Each Barred Abuse Claim shall be entitled to vote for the Plan. Other than with respect to Opt-Out Abuse Claims as provided in subsection (e) above, a Class 4 Claim's qualification as a Barred Abuse Claim shall not constitute a basis for any party in interest, including the Trustee, to object to the Allowance of such Abuse Claim.

(j)    **Litigation of Class 4 Claims against Non-Settling Insurers.** A Class 4 Claimant may commence an action against the Diocese and, if applicable, one or more Participating Parties, solely for liquidating a Class 4 Claim in order to pursue Insurance Recoveries regarding such Class 4 Claim from Non-Settling Insurers; provided, however, that prior to the Trust Termination Date (as defined in the Trust), a Class 4 Claimant may only commence such an action with the consent of the Trustee and pursuant to the terms and conditions of the Trust Distribution Plan. Notwithstanding any provision in the Plan to the contrary, the Diocese will not have to expend any funds to defend against any action commenced by a Class 4 Claimant except to the extent required by the terms of any Insurance Policy issued

35

by a Non-Settling Insurer, and no Settling Insurer shall have any obligation to defend or indemnify against any such action commenced by a Class 4 Claimant. Consistent with the discharge provided for in Plan Section 13.1 and the rights of a Participating Party, any judgment obtained in such action may not be enforced against the Diocese, a Participating Party and/or any of the assets of the Diocese or such Participating Party (other than the Non-Settling Insurers' Insurance Policies and/or Non-Settling Insurers), including, but not limited to, the Revested Assets or any assets acquired by the Reorganized Debtor after the Effective Date, but any such judgment shall only be satisfied in accordance with the Plan and the Trust Distribution Plan and shall be fully enforceable against and paid by any Non-Settling Insurer including under the terms of that Non-Settling Insurer's Insurance Policy. Prior to the Trust Termination Date, any recovery from the prosecution of such an action is deemed assigned to and shall be paid to the Trust to the extent provided in the Plan, including as provided in the Trust Distribution Plan.

**Class 5: Unknown Abuse Claims (other than Post-Petition Abuse Claims)**

(a)     **Definition**. A "Class 5 Claim" means an Unknown Abuse Claim (other than a Post-Petition Abuse Claim). A "Class 5 Claimant" shall mean a Holder of a Class 5 Claim.

(b)     **Impaired and Voting**. Class 5 is impaired under the Plan. The Unknown Abuse Claims Representative is entitled to vote on the Plan on behalf of Class 5 Claimants. Only for purposes of voting, the Unknown Abuse Claims Representative is deemed to have a single Allowed Claim in the amount of $1.00.

(c)     **Treatment of Class 5**. The Unknown Abuse Claims Trust will be funded by the Debtor on the Effective Date pursuant to the provisions of the Plan. On and after the Effective Date, the Unknown Abuse Claims Trust shall pay all Class 5 Claims in accordance with and the Plan and Unknown Abuse Claims Trust Documents. Class 5 Claimants shall have their Abuse Claims treated and Allowed or Disallowed in accordance with the terms and conditions set forth in the Unknown Abuse Claims Trust Distribution Plan.

(d)     **Diocese Cooperation with Unknown Abuse Claims Trustee and Abuse Claims Reviewer.** The Diocese shall reasonably cooperate with the Unknown Abuse Claims Trustee and the Abuse Claims Reviewer with any inquiries by either in the administration of the Unknown Abuse Claims Trust Distribution Plan.

(e)     **Class 5 Claim Objections.**

    i.   No Class 5 Claimant may challenge the merit, validity, or amount of any other Class 5 Claim.

    ii.   Except as stated in the next sentence, the Unknown Abuse Claims Trustee has the exclusive right, after consultation with the Diocese, to object to an Unknown Abuse Claim that is also an Opt-In Abuse Claim and none of the Reorganized Debtor, the Participating Parties, nor Catholic Mutual shall have the right to object to that claim  The Diocese and, if alleged to fall within Catholic Mutual's coverage period, Catholic Mutual may object to an Opt-In Unknown Abuse Claim that is a Barred Abuse Claim.

    iii.   For the avoidance of doubt, the Unknown Abuse Claims Trustee, the Diocese, any affected Participating Party and, if alleged to fall within Catholic Mutual's coverage period, Catholic Mutual shall retain the right to object to any Unknown Abuse Claim that is also an Opt-Out Abuse Claim (including any Barred Abuse Claim) unless and until such Opt-Out Abuse Claimant exercises their right to Opt-In in accordance with the terms and conditions of the Plan and the Unknown Abuse Claims Trust Distribution Plan.

(f)    **Unknown Abuse Claimant's Election to Opt-Out Notwithstanding Opt-In by Unknown Abuse Claims Representative**

    i.   Subject to the terms and conditions of the Unknown Abuse Claims Trust Distribution Plan and notwithstanding the decision of the Unknown Abuse Claim's Representative to Opt-In for Class 5 Claims, any Unknown Abuse Claimant may exercise the right to be treated as an Opt-Out Abuse Claimant holding an Opt-Out Abuse Claim, provided that written notice of such election is received by the Reorganized Debtor and the Unknown Abuse Claim Trustee on or before the 540th day after the Effective Date.

    ii.   No Unknown Abuse Claimant who timely exercises their right to be treated as an Opt-Out Abuse Claimant holding an Opt-Out Abuse Claim shall receive any Distribution from the Unknown Abuse Claims Trust in accordance with and under the Plan and Unknown Abuse Claims Trust Documents.

(g)    **Diocese Discharge of Unknown Abuse Claim Liability.** The Debtor shall be discharged as set forth in Plan Section 13.1 of any liability for any and all Class 5 Claims, even if the Claimant rejects the Plan or is an Opt-Out Abuse Claimant.

**Class 6: General Unsecured Claims**

(a)    **Definition**. A "Class 6 Claim" or "General Unsecured Claim" means (i) any Claim arising out of the rejection of any Executory Contract, or (ii) any Unsecured Claim that is not included in another class under the Plan and is not listed as disputed, contingent or unliquidated on the Debtor's schedules filed in connection with this Bankruptcy Case ("Debtor's Schedules") or as to which the Holder of such Claim timely filed a Claim.

(b)     **Unimpaired and Not Voting**. Class 6 is Unimpaired under the Plan. The Class 6 Claimants are conclusively presumed to have accepted and entitled to vote on the Plan.

(c)     **Treatment**. Except to the extent that a Class 6 Claimant agrees to less favorable treatment of their Class 6 Claim, in exchange for full and final satisfaction of such Allowed General Unsecured Claim, at the sole option of the Reorganized Debtor: (a) each Class 6 Claimant shall receive payment in Cash in an amount equal to such Allowed General Unsecured Claim, payable on the last to occur of (i) the Effective Date, (ii) the date on which such General Unsecured Claim becomes an Allowed General Unsecured Claim, and (iii) the date on which the Class 6 Claimant and the Debtor or Reorganized Debtor, as applicable, shall otherwise agree in writing; or (b) satisfaction of such Allowed General Unsecured Claim in any other manner that renders the Allowed General Unsecured Claim Unimpaired, including reinstatement.

## Class 7: Abuse Related Contribution Claims

(a)     **Class 7 Definition**. A "Class 7 Claim" means all Abuse Related Contribution Claims. A "Class 7 Claimant" shall mean a Holder of a Class 7 Claim.

(b)     **Impaired and Voting**. Class 7 is impaired under the Plan. The Class 7 Claimants are entitled to vote on the Plan. Only for purposes of voting, each Claim in Class 7 is deemed to be Allowed in the amount of One Dollar ($1.00).

(c)     **Class 7 Treatment**. Class 7 Claims against the Debtor shall be Disallowed in accordance with § 502(e)(1) of the Bankruptcy Code, and Class 7 Claims will receive no Distribution under the Plan. Notwithstanding the disallowance of an Abuse Related Contribution Claim, an Abuse Claimant who liquidates their claim in an amount greater than $0, consents to application of its portion of the reserve established by the Trustee under the Trust Agreement to pay any Co-Defendant for its contribution, reimbursement, and/or indemnity claim, if any, against the Debtor. For the avoidance of doubt, nothing in this subsection (c) shall prevent or impair any Class 7 Claimant's right, if any, to receive its ratable portion of the defense reserve established and paid pursuant to the Defense Reserve Protocol.

## Class 8: Claims Held by Catholic Entities, Xavier and Oceania

(a)     **Class 8 Definition**. A "Class 8 Claim" means any Claim (including any Administrative Claim but excluding any Abuse Related Contribution Claim classified in Class 7) held by any of the Catholic Entities (which include Mercy, St. Bernard and Mount St. John), Xavier and Oceania. A "Class 8 Claimant" means a Holder of a Class 8 Claim.

(b)    **Impaired and Voting**. Class 8 is impaired under the Plan. The Class 8 Claimants are entitled to vote on the Plan. For the avoidance of doubt, only those Persons among the Catholic Entities (which include Mercy, St. Bernard and Mount St. John), Xavier and Oceania who actually hold Claims against the Debtor are entitled to vote. Only for purposes of voting, each Claim in Class 8 is deemed to be Allowed in the amount of One Dollar ($1.00).

(c)    **Class 8 Treatment**. The Diocese has reached a settlement with the Catholic Entities, Xavier and Oceania, which are embodied in the Plan (including the Xavier Settlement Agreement, the Mercy Settlement Agreement, the St. Bernard Settlement Agreement and the Mount St. John Settlement Agreement or that are (or will be) subject to certain Settlement Agreements that remain a matter of Bankruptcy Court approval pursuant to Bankruptcy Rule 9019. As one component of the settlement, and to maximize recovery for Abuse Claimants, the Catholic Entities, Xavier and Oceania have agreed to waive all rights to Distributions on account of their Class 8 Claims. Accordingly, there will be no Distribution to the Holders of any Class 8 Claims on account of such Class 8 Claims. On the Effective Date, any Claim against the Debtor held by the Catholic Entities, Xavier and Oceania shall be discharged. For the avoidance of doubt, nothing in this subsection (c) shall prevent or impair any Class 8 Claimant's right, if any, to receive its ratable portion of the defense reserve established and paid pursuant to the Defense Reserve Protocol.

## V.    TRUST AND UNKNOWN ABUSE CLAIMS TRUST

**A.    Establishment of Trust**

On the Effective Date, the Trust shall be established under the Trust Documents and the Unknown Abuse Claims Trust shall be established under the Unknown Abuse Claims Trust Documents. The Trust Documents and Unknown Abuse Claims Trust Documents, including the Trust Agreement and Unknown Abuse Claims Trust Agreement, are incorporated herein by reference.

**Funding of Trust**

The Trust will be funded as follows from the sources and in the manner set forth below:

•    **Cash Contributions**. The Debtor, the Participating Parties and Catholic Mutual shall make the following cash contributions to the Trustee for the benefit of the Trust, by delivering the following amounts to the Effective Date Escrow Agent (collectively, the "Cash Contributions"). The following Cash Contributions shall be delivered to the Effective Date Escrow Agent within thirty (30) calendar days of the entry of the Confirmation Order:

(i)    The Debtor shall transfer or cause to be transferred on its behalf by

wire transfer to the Effective Date Escrow Agent One Million ($1,000,000) Dollars in good and immediately available funds, which sum includes $500,000 that the ACA is paying to the Debtor on account of certain disputed sums due to the Debtor by the ACA in order to resolve such dispute.

(ii)   Pursuant to the St. Bernard Settlement Agreement, the Debtor shall transfer or cause to be transferred by wire transfer to the Effective Date Escrow Agent Six Million Five Hundred and Fifty Thousand ($6,550,000) Dollars plus interest accrued thereon through December 6, 2024, in good and immediately available funds representing (a) the Net Proceeds (subject to the provisions of this paragraph) realized from the St. Bernard Property Sale, and (b) the further consideration exchanged as more particularly described in the Plan and the St. Bernard Settlement Agreement.

(iii)   The Debtor shall transfer or cause to be transferred on its behalf by wire transfer to the Effective Date Escrow Agent all Net Proceeds realized from the sale of the corresponding real estate sold by the Diocese during the Bankruptcy Case, consisting in the following amounts (plus all interest accrued thereon):

| Real Estate | Amount |
| --- | --- |
| 31 Perkins Ave., Norwich | $ 136,935.80 |
| 25 Otis St., Norwich | $ 158,125.00 |
| 7-11 Bath St., Norwich | $ 177,080.84 |
| 17 Otis St., Norwich | $ 155,521.60 |
| TOTAL: | $ 627,663.24 |

(iv)   All Professionals have agreed to waive and shall not receive ten percent (10%) of their Professional Claims accrued and unpaid from October 1, 2023, through the Effective Date as Allowed by the Bankruptcy Court (expressly excluding the $400,000 holdback due the Debtor's Professional, Ice Miller LLP and withheld in 2023), and the Diocese shall contribute the aggregate of such savings to the Trustee contemporaneously with the payments made by the Diocese to the Professionals for the balance of their Allowed Professional Claims.

(v)   Oceania shall transfer or cause to be transferred on its behalf by wire transfer to the Effective Date Escrow Agent Seven Million ($7,000,000) Dollars in good and immediately available funds.

      (vi)    The Association of Parishes shall transfer or cause to be transferred on the collective behalf of the Parishes by wire transfer to the Effective Date Escrow Agent Two Million Seven Hundred Thousand ($2,700,000) Dollars in good and immediately available funds.

      (vii)   Subject to the satisfaction of the conditions set forth in Article III of the Catholic Mutual Settlement Agreement, Catholic Mutual shall pay to the Effective Date Escrow Agent the Catholic Mutual Contribution in the amount of Five Million, Three Hundred Thousand ($5,300,000) Dollars. Specifically, as provided in Article III of the Catholic Mutual Settlement Agreement, Catholic Mutual's obligation to pay this amount to the Effective Date Escrow Agent is conditioned upon the occurrence of the following unless waived by Catholic Mutual: (1) the due execution of the Catholic Mutual Settlement Agreement by all parties thereto; (2) the entry of the Approval Order authorizing and approving the Catholic Mutual Settlement Agreement and such Approval Order becoming a Non-Appealable Order; (3) the entry of an order approving the Disclosure Statement and such order becoming a Non-Appealable Order; and (4) the entry of the Confirmation Order approving the Plan consistent with the terms and conditions of the Catholic Mutual Settlement Agreement. Payment by Catholic Mutual is further conditioned upon Catholic Mutual having received written notice that the foregoing conditions ((1) through (4)) have been satisfied and appropriate instructions for the transmission of payment. Furthermore, the Effective Date cannot occur until Catholic Mutual, among others, has paid its contribution in the amount of Five Million Three Hundred Thousand ($5,300,000) Dollars to the Effective Date Escrow Agent.

      (viii)  Pursuant to the Mercy Settlement Agreement, Mercy shall transfer or cause to be transferred on its behalf by wire transfer to the Effective Date Escrow Agent Fifty Thousand ($50,000) Dollars in good and immediately available funds and the further consideration particularly described in the Plan and the Mercy Settlement Agreement.

- **Promissory Note.** Immediately after the Effective Date, the Reorganized Debtor shall execute and deliver to the Trustee a promissory note in the original principal amount of One Million Seven Hundred and Thirty Thousand dollars ($1,730,000) due and payable to the Trustee two years after the Effective Date, and shall provide collateral and shall execute and deliver documents to secure such debt. Said

promissory note and mortgage documents and/or security instruments shall contain ordinary and customary terms and conditions mutually acceptable to the Debtor and the Trustee including, but not limited to, interest at the rate of five percent (5%) per year accruing only on and after the due date, and costs of collection including reasonable attorneys' fees.

- **Transferred Real Estate.** Subject to the terms and conditions set forth in Section 7.3 of the Plan (including the timing of such transfers), the Diocese and St. Mary's Roman Catholic Church (as applicable, the "RE Owner") shall transfer by quitclaim deed to the Trust's designee each piece and parcel of Transferred Real Estate owned by them, respectively, or the Net Proceeds realized from the sale of such Transferred Real Estate if such sale closes on or before the Effective Date. The Transferred Real Estate consists of the following:

  (i)     Bath Street Office, 11 Bath St., Norwich, CT;
  (ii)    Moss Property, 7 Otis St., Norwich, CT 06360;
  (iii)   Tribunal, 17 Otis St., Norwich, CT 06360;
  (iv)    Diocesan School Office, 25 Otis St., Norwich, CT 06360;
  (v)     Vacant Office, 31 Perkins Ave., Norwich, CT 0604; and
  (vi)    St. Mary's School, 50-54 North Main Street, Jewett City (Griswold), CT 06351.

- **Transferred Insurance Interests.** As set forth and to the extent provided in Section IX of the Plan and the Confirmation Order, on the Effective Date, with no further act by any party, the Diocese and the Participating Parties shall be deemed to have assigned the Transferred Insurance Interests to the Trustee for the benefit of the Trust, and such assignment shall immediately be deemed effective. On the Effective Date, the Trustee will be empowered to receive assignment of Litigation Awards (as that term is defined in the Trust Distribution Plan) and to take all steps necessary to pursue recovery from Non-Settling Insurers.

- **Transfer of Mount St. John Settlement Agreement and Interests Thereunder, and Related Interests.** The Trustee  shall on the Effective Date succeed to all of the rights, interests and obligations set forth in the Mount St. John Settlement Agreement for the benefit of the Trust, including the right to receive the "Net Proceeds" (as defined therein) realized from the sale of or the transfer by quitclaim deed to the Trust's designee all of Mount St. John's right, title and interest in the Real Estate[11] known as 135 Kirtland Street, Deep River, Connecticut, more particularly described in <u>Exhibit A</u> appended to the Mount St. John Settlement Agreement, on the terms and conditions set forth in the Mount St. John Settlement

---

[11] Each of the capitalized terms "Real Estate," "MSJ Mortgage Documents," and "MSJ Debt" used in this paragraph and in the Plan (see Plan Section 13.12) shall have the meaning ascribed to them in the Mount St. John Settlement Agreement appended to the Plan as <u>Exhibit K</u>, which definitions are incorporated by reference.

Agreement and the Plan. Also pursuant to the Mount St. John Settlement Agreement, within ten (10) days of the Effective Date the Reorganized Debtor shall transfer to the Trust all of its right, title and interest in the MSJ Debt and the MSJ Mortgage Documents.

- **Transfer of Xavier Settlement Agreement and Interests Thereunder, and Related Interests.** The Trustee shall on the Effective Date succeed to all of the rights, interests and obligations set forth in the Xavier Settlement Agreement for the benefit of the Trust, including the right to receive within thirty (30) days of the Effective Date, Two Million, Five Hundred Thousand Dollars ($2,500,000) realized from the sale of all of the Debtor's right, title and interest in the Xavier Property known as 181 Randolph Rd., Middletown, Connecticut, to Xavier on the terms and conditions set forth in the Xavier Settlement Agreement and the Plan.

- **Vesting**. All Trust Assets required by the Plan and the Confirmation Order to be transferred to the Trustee for the benefit of the Trust on or before the Effective Date shall vest in the Trustee on the Effective Date, and the Diocese, Participating Parties and Settled Insurers shall be deemed for all purposes to have transferred all of their respective rights, title and interests in the Trust Assets to the Trustee.

- **Documentation.** The Diocese, the Participating Parties and the Settled Insurers, as applicable, shall take all actions reasonably necessary to transfer the Trust Assets to the Trustee including those reasonably requested by the Trustee including, but not limited to, execute documents separately documenting such transfers including deeds and assignments.

- **Extinguishment of Interests.** Upon the transfer of Trust Assets in accordance with Section 7.1(a) of the Plan, the Diocese, the Participating Parties and the Settled Insurers shall have no further rights, title or interests in or with respect to the Trust Assets except as otherwise explicitly provided in the Plan and the Effective Date Escrow Agent Agreement in the event of a Termination of the Plan.

**Contribution of Funds to Unknown Abuse Claims Trust on the Effective Date.**

The Unknown Abuse Claims Trust shall be funded exclusively by the Debtor and the Reorganized Debtor by transferring to the Unknown Abuse Claims Trust up to One Million Eight Hundred Thousand Dollars ($1,800,000), with the first installment of such funding in the amount of one hundred thousand ($100,000) Dollars paid by the Debtor to the Unknown Abuse Claims Trust within thirty (30) calendar days of the Effective Date, and the balance of such funding to be paid by the Reorganized Debtor in accordance with the terms and conditions of Section 3.4(a)of the Unknown Abuse Claims Trust Agreement for the benefit of Unknown Abuse Claims other than Post-Petition Abuse Claims, which transfer shall not be deemed to include any funding from the Catholic Mutual Contribution. In the event funds remain in the Unknown Abuse Claims Trust at the time of the expiration of the Unknown Abuse Claims Trust, such funds shall revert and be

paid to the Reorganized Debtor.

**Reserve Accounts**.

As set forth in the Trust Agreement and Unknown Abuse Claims Trust Agreements, the Trustee and Unknown Abuse Claims Trustee shall establish reserves for various purposes.

**No Execution.**

All funds held by the Trustee will remain property of such Trust until the funds have been actually paid to and received by a Person entitled to receive payment under the Plan, Confirmation Order and Trust Documents. Except as provided in the Plan, Confirmation Order and the Trust Documents, the Trustee and Trust shall not be responsible for any Claims against the Debtor. All funds held by the Unknown Abuse Claims Trustee will remain property of the Unknown Abuse Claims Trust until the funds have been actually paid to and received by a Person entitled to receive payment under the Plan, Confirmation Order and Unknown Abuse Claims Trust Documents. Except as provided in the Plan, Confirmation Order and the Unknown Abuse Claims Trust Documents, the Unknown Abuse Claims Trustee and the Unknown Abuse Claims Trust shall not be responsible for any Claims against the Debtor.

**Payments Effective Upon Tender**

Whenever the Plan requires payment to be made to a creditor, such payment will be deemed made and effective upon tender thereof by the Trustee, the Debtor, or the Reorganized Debtor to the creditor to whom payment isdue. If any creditor refuses a tender, the amount tendered and refused will be held by the Trust, the Debtor, or the Reorganized Debtor for the benefit of that creditor pending final adjudication of the dispute. However, when and if the dispute is finally adjudicated and the creditor receives the funds previously tendered and refused, the creditor will be obliged to apply the funds in accordance with the Plan as of the date of the tender; and while the dispute is pending and after adjudication thereof, the creditor will not have the right to claim interest or other charges or to exercise any other rights which would be enforceable by the creditor, if the Trust, the Debtor, or the Reorganized Debtor failed to pay the tendered payment.

**Sale or Transfer of Transferred Real Estate**

For a period of time not to exceed sixty (60) days following the Effective Date (the "Real Estate Sale Period"), the RE Owner shall retain title to and exclusive possession of the Transferred Real Estate and shall reasonably cooperate, in good faith, in the Trustee's efforts to sell the Transferred Real Estate. The Trustee shall determine all manner and methods of the sale process for the Transferred Real Estate, and all terms and conditions of the sale for the Transferred Real Estate, at his sole and absolute discretion; provided, however, that such shall not materially prejudice the RE Owner without its written consent, which shall not be unreasonably withheld. During the Real Estate Sale Period, the RE Owner's reasonable cooperation as provided herein shall include, but shall not be limited to, the following: (i) providing a copy of all documents requested by the Trustee concerning the Transferred Real Estate (including all Permits and Plans); (ii) permitting reasonable access to the Transferred Real Estate including for inspections by the Trustee's professionals; (iii) providing its written agreement, authorization or affirmation in

44

furtherance of such sale process; and (iv) executing all customary closing documents including the deed, title affidavit, conveyance tax forms, closing statement, and such other documents reasonably necessary or required by a purchaser's title insurance company to effectuate the transfer of the subject Transferred Real Estate.

During the Real Estate Sale Period, the RE Owner shall continue to maintain and keep the Transferred Real Estate in substantially the same condition as in existence as of the date of the Plan, including the mowing of lawns, the raking of fallen leaves, the removal of fallen trees and large branches (except in uncultivated areas), and the removal of snow and ice from walks and driveways, and the RE Owner agrees not to commit or permit waste upon the Transferred Real Estate, or to remove or permit the removal of anything from the Transferred Real Estate without the written consent of the Trustee.

During the Real Estate Sale Period, the RE Owner shall obtain and maintain insurance on the Transferred Real Estate (including the Improvements) in amounts and coverages substantially identical to what had been obtained and maintained on or about the date of the Plan, and will pay promptly, when due, any premiums on such insurance; provided, however, that the RE Owner shall obtain and maintain for the duration of the Real Estate Sale Period a loss payee endorsement for the Trustee for all insurance coverage provided on account of the Real Estate (including all Improvements). In the event of loss to the Transferred Real Estate, the RE Owner will give immediate written notice to the Trustee. In case of loss and payment by any insurance company on account of a loss to the Transferred Real Estate, the insurance proceeds received, after deducting all costs of collection, including reasonable attorney's fees, shall be paid to the Trustee. The RE Owner hereby agrees and consents to permit the Trustee to negotiate with any insurance company following a loss to the Transferred Real Estate to ensure an equitable settlement. The RE Owner agrees that any sums which may become payable under such insurance shall name on the payment the RE Owner and the Trustee. The RE Owner will require all insurance policies on the Transferred Real Estate to provide the Trustee with at least ten (10) days prior written notice to Trustee of cancellation or modification. At the Trustee's request, the RE Owner will deliver to him certified copies of all of these insurance policies, binders or certificates applicable to the Transferred Real Estate during the Real Estate Sale Period.

At the closing of any sale of Transferred Real Estate during the Real Estate Sale Period (the "Closing"), the RE Owner shall deliver to the Trustee the Net Proceeds of the sale of such Transferred Real Estate.

Immediately after the end of the Real Estate Sale Period, the RE Owner shall promptly transfer by quitclaim deed to the Trustee's designee in accordance with Section 7.1(a)5 above any and all pieces and parcels of the Transferred Real Estate that it had not sold in accordance with Section VII of the Plan, unless Trustee provides advance written notice waiving the Trust's right to acquire title to such Transferred Real Estate.

The RE Owner, to induce the Committee to propose jointly with the RE Owner the Plan which provides for, inter alia, the sale or transfer of the Transferred Real Estate as provided hereunder, make the representations, warranties and covenants to the Committee (and to the

Trustee upon the Effective Date and at all time through the Real Estate Sale Period, such representations, warranties and covenants shall survive the termination of the Real Estate Sale Period) as set forth in Exhibit M to the Plan.

### Bond Requirement

As provided in each of the Trust Agreement and the Unknown Abuse Claims Trust Agreement, each of the Trustee and Unknown Abuse Claims Trustee shall post a bond or other form of surety or security on such terms and conditions as ordered by the Bankruptcy Court in the Confirmation Order.

### Identity of Proposed Trustee and Maintenance of Trust Assets

The Court has previously authorized the appointment of Craig R. Jalbert on a preliminary basis to serve as the Trustee of the Trust.  Mr. Jalbert is presently and has been since 1987 a principal of Verdolino & Lowey, P.C., Foxboro, Massachusetts. The Plan Proponents shall jointly seek at Confirmation the Bankruptcy Court's final approval of Mr. Jalbert's appointment as the Trustee of the Trust. The replacement of the Trustee, if and when necessary, shall be subject to Bankruptcy Court approval and otherwise shall be effectuated as provided in the Trust Documents.

The Trustee shall be compensated by the Trust for their reasonable and necessary fees and expenses incurred in connection with the fulfillment of their services performed pursuant to the Trust. The Trustee may employ other professionals and paraprofessionals to assist in the fulfillment of their duties under the Trust, and the Trust shall also compensate for such reasonable and necessary services in accordance with the Trust Agreement. If Mr. Jalbert's final appointment is approved by the Bankruptcy Court, Mr. Jalbert shall be compensated at his ordinary and customary hourly rate of $540, less a ten percent (10%) public interest discount agreed to by Mr. Jalbert. Any professionals and paraprofessionals that the Trustee engages shall also be compensated at their ordinary and customary hourly rate less the 10% public interest discount.

The Trustee shall post and at all times while so serving maintain a bond or other form of surety or security as ordered by the Bankruptcy Court in the Confirmation Order or otherwise. Typically, the bond ordered and issued is in an amount equal to One Hundred Fifty Percent (150%) of the value of the trust assets. In addition, the Trustee and his firm maintain their own errors and omissions insurance coverage up to One Million Dollars ($1,000,000).

Until distributed to Abuse Claimants, the Trustee shall maintain the liquid Trust Assets as cash and cash equivalents; cash equivalents shall include time deposits, certificates of deposit, money market funds, U.S. Treasury bills having a maturity date of three months or less and similar temporary investments that are (i) readily convertible to known amounts of cash and (ii) so near their maturity that they present insignificant risk of changes in value because of changes in interest rates. The Trustee is not authorized to make and is expressly precluded from making any other type of investment with the liquid Trust Assets. The Trustee intends to maintain the Trust's financial accounts with Citizens Bank with whom the Trustee has a preexisting relationship for when he has served as a fiduciary in other matters.

**B.     Liquidation And Payment of Abuse Claims**

The Trustee and Trust and Unknown Abuse Claims Trustee and Unknown Abuse Claims Trust, respectively, shall pay Abuse Claims under the terms of the Plan, Confirmation Order, the Trust Agreement, the Trust Distribution Plan, the Unknown Abuse Claims Trust Agreement, and the Unknown Abuse Claims Trust Distribution Plan, as applicable.

The Abuse Claims Reviewer's determinations shall not be a finding or fixing of the fact or liability or the amount payable for any Abuse Claim with any binding legal effect, other than for distribution purposes by the Trust under the Trust Distribution Plan or the Unknown Abuse Claims Trust under the Unknown Abuse Claims Trust Distribution Plan. The Trustee's, Unknown Abuse Claims Trustee's or Abuse Claims Reviewer's determination of qualification of an Abuse Claim, payment on account of an Abuse Claim or reserve for payment on account of an Abuse Claim is not an admission of liability by the Debtor, a Participating Party, the Trust, or the Unknown Abuse Claims Trust regarding any Abuse Claims, to establish the Diocese's and/or a Participating Party's liability on the Abuse Claim, but any such judgment awarded to an Abuse Claimant will be reduced by the Trust Distributions or Unknown Abuse Claims Trust Distributions already paid by the Trust or Unknown Abuse Claims Trust to such Abuse Claimant on their Abuse Claim(s).

**Identity of Proposed Abuse Claims Reviewer**

The Court has previously authorized the appointment of the Honorable Salvatore C. Agati (Ret.) on a preliminary basis to serve as the Abuse Claims Reviewer for both the Trust Distribution Plan and Unknown Abuse Claims Trust Distribution Plan. The Debtor and the Committee have already obtained through a separate motion the Bankruptcy Court's approval of Judge Agati's appointment as the Abuse Claims Reviewer for the fifth amended Joint Plan and, more specifically, for the implementation of the Trust Distribution Plan and the Unknown Abuse Claims Trust Distribution Plan. The Debtor and the Committee intend to request that such approval apply also to Judge Agati's appointment as the Abuse Claims Reviewer with respect the subject Plan (and as such may be modified or amended thereafter).

Judge Agati attended college and obtained his Bachelor of Arts degree in 1979 from Fairfield University, and his Juris Doctor degree from Temple University in 1982. Judge Agati began his legal career as a Superior Court Law Clerk in 1982 and served in private practice in Waterbury for seventeen years from 1983 to 2000. At the time of his appointment, Judge Agati was a partner at the law firm of Rinaldi, Zipoli, Bruno & Agati, P.C.

The Abuse Claims Reviewer shall be compensated by the Trust for his reasonable and necessary fees and expenses incurred in connection with the fulfillment of his services performed pursuant to the Trust Distribution Plan. The Abuse Claims Reviewer shall be compensated by the Reorganized Debtor for his reasonable and necessary fees and expenses incurred in connection with the fulfillment of his services performed pursuant to the Unknown Abuse Claims Trust Distribution Plan. The Abuse Claims Reviewer's compensation may include the reasonable and necessary services provided by other professionals and paraprofessionals to assist in the fulfillment of their duties under the distribution plans. If his final appointment is approved by the Bankruptcy

Court, Judge Agati shall be compensated at his ordinary and customary hourly rate of $600, less a ten percent (10%) public interest discount agreed to by Judge Agati, and any professionals and paraprofessionals that he engages shall be compensated at their ordinary and customary hourly rate (less the 10% public interest discount).

**Catholic Mutual Defense and Indemnification Limitation.**

After the Effective Date and notwithstanding any provision of the Confirmation Order, the Plan, the Trust Documents or the Unknown Abuse Claims Trust Documents to the contrary, none of the Catholic Mutual Parties shall have any duty or obligation (i) under any Sold Certificate, or (ii) to participate in, defend, indemnify, provide coverage, make any payment or incur any liability or cost in connection with any suit against any Participating Party for the purpose of the liquidation of any Channeled Claim, the recovery on Transferred Insurance Interests from any Non-Settling Insurer or the payment of any Distribution with respect to an Abuse Claim.

**Scope of Damages and Effect of No Award on Abuse Claims**

As provided in Section 3.3 of the Trust Distribution Plan, in determining the distribution to any Abuse Claimant, punitive damages and damages that can be classified as economic damages that do not compensate the Abuse Claimant for bodily injury and/or emotional distress or mental anguish attributable to their bodily injury shall not be considered or allowed, even if these damages could have been considered or allowed under applicable non-bankruptcy law. Any Distribution to an Abuse Claimant shall be solely because of bodily injury and/or emotional distress or mental anguish attributable to the bodily injury to such Abuse Claimant.

If an Abuse Claim is denied payment under the Trust Distribution Plan or Unknown Abuse Claims Trust Distribution Plan, the Holder of such Abuse Claim will have no further rights against the Diocese, the Trust, Trustee, Unknown Abuse Claims Trust, or Unknown Abuse Claims Trustee relating to such Abuse Claim and any Opt-In Abuse Claim will remain subject to the Channeling Injunction and Supplemental Catholic Mutual Injunction under the Plan.

**Treatment of Punitive Damages**

Claims for punitive or exemplary damages in connection with any of the Claims will receive no Distribution under the Plan and shall be discharged to the extent provided by Section 13.1 of the Plan.

**Withdrawal of Abuse Claims**

An Abuse Claimant may withdraw an Abuse Claim at any time on written notice to the Trustee or Unknown Abuse Claims Trustee, as applicable. If withdrawn, the Abuse Claim will be withdrawn with prejudice as to and may not be reasserted against the Diocese Parties, the Reorganized Debtor, the Trust or Unknown Abuse Claims Trust, as applicable, but any Opt-In Abuse Claim will remain subject to the Channeling Injunction and Supplemental Catholic Mutual Injunction under the Plan..

**Medicare Reimbursement and Reporting Obligations**

The Trust and Unknown Abuse Claims Trust shall register as a Responsible Reporting Entities ("RRE") under the reporting provisions of Section 111 of MMSEA.

The Trust and Unknown Abuse Claims Trust shall timely submit all reports required under MMSEA because of any claims settled, resolved, paid, or otherwise liquidated by the Trust or Unknown Abuse Claims Trust. The Trust or the Unknown Abuse Claims Trust, as an RRE, shall follow all applicable guidance published by the Centers for Medicare & Medicaid Services of the United States Department of Health and Human Services and/or any other agency or successor entity charged with responsibility for tracking, assessing, or receiving reports made under MMSEA (collectively, "CMS") to determine whether, and, if so, how, to report to CMS under MMSEA.

For Abuse Claims that occurred after December 5, 1980, before remitting funds to Claimants' counsel, or to the Claimant if such Claimant is acting pro se, regarding any Abuse Claim, the Trustee or Unknown Abuse Claims Trustee shall obtain (i) a certification that said Claimant (or such Claimant's authorized representative) has provided or will provide for the payment and/or resolution of any obligations owing or potentially owing under 42 U.S.C. § 1395y(b), or any related rules, regulations, or guidance, in connection with, or relating to, such Abuse Claim and (ii) that the Claimants' counsel or Claimant (if Claimant is acting pro se) indemnifies the Trust for any such obligations.

**No Admission**

Section 8.5 of the Plan does not imply, and shall not be an admission that the Debtor, any Participating Party or any Settled Insurer are "applicable plans" within the meaning of Medicare, Medicaid and SCHIP Extension Act of 2007, or that they have any legal obligation to report any actions undertaken by the Trust or Unknown Abuse Claims Trust or contributions to the Trust or Unknown Abuse Claims Trust under Medicare, Medicaid and SCHIP Extension Act of 2007 or any other statute or regulation.

**Delay Regarding Failure to Comply**

The failure by one or more Medicare Beneficiaries or other Abuse Claimants to follow these provisions shall not delay or impair the payment by the Trustee or Unknown Abuse Claims Trustee to any other Medicare Beneficiary or other Abuse Claimant following these provisions.

### Documentation by Estate of Abuse Claimant

If the Abuse Claimant is the estate of an Abuse Claimant, then the letters or documentation required under Section 8.5 of the Plan need not be dated within 120 days of payment by the Trustee or the Unknown Abuse Claims Trustee to such Claimant.

## C.    Insurance Matters Regarding Non-Settling Insurers

### Transfer of Insurance Interests

On the Effective Date, and with no further action by any party, but subject to the Plan, the Diocese and each of the Participating Parties will be deemed to have assigned to the Trust the Diocese's and the Participating Parties' Transferred Insurance Interests. The Transferred Insurance Interests shall be effective to the maximum extent permissible under applicable law and shall not be construed: (i) as an assignment of the Non-Settling Insurer Policies issued by the Non-Settling Insurers or (ii) to entitle any Person to Insurance Coverage other than those Persons or entities entitled to such coverage under the terms of the Non-Settling Insurer Policies. The determination of whether the assignment of Transferred Insurance Interests provided for in this section is valid, and does not defeat, diminish or impair the Transferred Insurance Interests shall be made by the Bankruptcy Court at the Confirmation Hearing.

If a party in interest fails to timely file an objection to the proposed assignment by the deadline for filing objections to confirmation of the Plan, that party in interest shall be deemed to have irrevocably consented to the assignment and will be forever barred from asserting that the assignment affects the ability of the Trust to pursue Transferred Insurance Interests against the Non-Settling Insurers.

If the Bankruptcy Court determines that the assignment of the Transferred Insurance Interests is valid and does not defeat, diminish or impair the Insurance Coverage, following the Effective Date, the Trust shall assume responsibility for, and be bound by, only such obligations of the Diocese or the Participating Parties under the Non-Settling Insurer Policies as are necessary to enforce the Transferred Insurance Interests; provided, however, that the Trust's assumption of such responsibility shall not relieve the Diocese or the Participating Parties from any duty that such entities may have under the Non-Settling Insurer Policies.

### Appointment of Trustee as the Estate Representative to Enforce Insurance Interests and Obtain Insurance Recoveries

Under § 1123(b)(3)(B) of the Bankruptcy Code, the Trustee is appointed as the representative of the Diocese and Participating Parties to retain and enforce the Diocese's and Participating Parties' Insurance Coverage and for Insurance Claims regarding the Abuse Claims against the Diocese and Participating Parties for any Insurance Claims transferred to the Trust.

Neither the Trust nor the Diocese shall have any obligation to take any action to enforce

an Insurance Policy of a Non-Settling Insurer, including any obligation to commence and prosecute any action against any Non-Settling Insurer or to defend an action commenced by a Non-Settling Insurer, though the Trust (or the Diocese, as applicable), may choose to do so.

The determination of whether the appointment of the Trust as the Debtor's and the Debtor's Estate's representative provided for in Plan Section 9.2(a) is valid and does not defeat, diminish or impair the Insurance Coverage, shall be made by the Bankruptcy Court at the Confirmation Hearing. If a party in interest fails to timely file an objection to the proposed appointment by the deadline for filing objections to confirmation of the Plan, that party in interest shall be deemed to have irrevocably consented to the appointment and will be forever barred from asserting that the appointment in any way affects the ability of the Trust to pursue the Insurance Coverage, Insurance Claims and/or Insurance Recoveries from the Non-Settling Insurers.

If the Bankruptcy Court determines that the appointment is valid and does not defeat, diminish or impair the Insurance Coverage, following the Effective Date, the Trust shall assume responsibility for, and be bound by, only such obligations of the Diocese or the Participating Parties under the Non-Settling Insurer Policies as are necessary to enforce the Insurance Coverage, the Insurance Claims and/or Insurance Recoveries; provided, however, that the Trust's appointment shall not relieve the Diocese or the Participating Parties from any duty that such entities may have under the Non-Settling Insurer Policies.

**Consequences of Determination that Assignment or Appointment is Invalid**

If a Non-Appealable Order is entered holding that the assignment of Transferred Insurance Interests provided for in Section 9.1 of the Plan, or that the appointment of the Trust as the Diocese's and Participating Parties' representative provided for in Plan Section 9.2, is invalid or would defeat, diminish or impair the Transferred Insurance Interests regarding a Non-Settling Insurer Policy, as to such Non-Settling Insurer Policy, the assignment and/or appointment, as the case may be, will be deemed not to have been made. If the assignment and appointment are not deemed to have been made, the Diocese and each of the Participating Parties will retain the Insurance Claims under such Non-Settling Insurer Policy, and the following shall apply to such retained Insurance Claims:

- The Trust, the Reorganized Debtor, and any Participating Parties shall enter into a common interest agreement related to pursuing the Insurance Claims.

- The Reorganized Debtor and the Participating Parties will assert their Insurance Claims to the extent requested by the Trust against any Non-Settling Insurer. All Insurance Recoveries identified as transferred to the Trust under Plan Section 9.1 above received by the Reorganized Debtor and the Participating Parties will be immediately paid to the Trust. The Reorganized Debtor and Participating Parties will select and retain counsel to pursue their Insurance Claims under Plan Section

51

IX, subject to the Trustee's approval, which approval shall not be unreasonably withheld.

- The Reorganized Debtor and Participating Parties shall cooperate with the Trust regarding the Insurance Claims, including that the Reorganized Debtor and Participating Parties will provide the Trustee and its counsel with all discovery requests, pleadings, moving documents and other papers that the Reorganized Debtor or Participating Parties intend to make or file regarding the Insurance Claims and any related counterclaims against the Non-Settling Insurers before making such requests or filing. The Reorganized Debtor and Participating Parties shall keep the Trustee advised of any settlement discussions regarding any litigation against a Non-Settling Insurer and will involve the Trust's counsel in all settlement discussions with any Non-Settling Insurer.

- The Trust shall pay the reasonable attorneys' fees, costs and expenses allowed by the Bankruptcy Court incurred by the Reorganized Debtor and Participating Parties in pursuing the Insurance Claims under Section 9.3 of the Plan, subject to a reasonable monthly cap to be established from time-to-time and in good faith by the Trustee in agreement with the Reorganized Debtor and Participating Parties and, in the event such parties cannot agree, as established by the Bankruptcy Court upon motion and after due notice and a hearing.

- The Trust shall, in addition to reasonable attorneys' fees, costs and expenses provided for in Plan Section 9.3(a)4, reimburse the Reorganized Debtor and Participating Parties for any reasonable out of pocket costs and expenses it incurs as a direct consequence of pursuing such Insurance Claims, but will not compensate the Reorganized Debtor and Participating Parties for any time any of its employees spends. All Insurance Recoveries received by the Reorganized Debtor or Participating Parties on account of such Insurance Claims shall be held in trust to benefit the Trust and shall be immediately remitted by the Reorganized Debtor or Participating Parties to the Trust.

### Preservation of Insurance Rights

Nothing in the Plan or any of the other Plan Documents, including, without limitation, any discharge, release, covenant not to sue or injunction protecting the Debtor, any Settled Insurer Party or any Participating Party, or any release provided by a Class 4 Claimant or Class 5 Claimant, or any determination with respect to a Class 4 Claim under the Trust Documents or any determination with respect to Class 5 Claim under the Unknown Abuse Claim Trust Document, shall impair or diminish any Non-Settling Insurer's obligations under or related to the Non-Settling Insurer Policies including, but not limited to, pursuant to the doctrines of *res judicata*, collateral estoppel, admission, accord and satisfaction, novation or waiver. No provision of the Plan or any of the other Plan Documents shall impair or diminish any Insurance Claims or Insurance Recoveries, including any Non-Settling Insurer's legal, equitable, or contractual obligations

arising out of or relating to the Non-Settling Insurer Policies or the Insurance Claims, against the Non-Settling Insurers. Under no circumstance shall the review or determination of an Abuse Claim by the Abuse Claims Reviewer, Trustee or Unknown Abuse Claims Trustee affect the rights or obligations of a Non-Settling Insurer. If any court determines that any provision of the Plan impairs or diminishes any Non-Settling Insurer's obligation regarding any Insurance Claims or Insurance Recoveries, including any Non-Settling Insurer's obligations arising out of or relating to the Transferred Insurance Interests, such provision shall be given effect only if it shall not cause such impairment or diminishment.

### Effect of Discharge, Injunctions and Releases.

Notwithstanding any provision of the Plan or any other Plan Document, including the discharge provided by Section 13.1 of the Plan, the injunctions provided by Sections 13.6 and 13.9 of the Plan, and the releases provided in and pursuant to the Plan and the other Plan Documents, to preserve coverage under any Non-Settling Insurer Policy and to preserve all Insurance Claims and all Insurance Recoveries, including the Transferred Insurance Interests, the Abuse Claimants specifically reserve, and do not release, and are not enjoined or otherwise precluded from asserting and litigating through any form of legal proceeding any Claims they may have against the Diocese, the Reorganized Debtor, or any Participating Party solely for the purpose of asserting those Claims to recover on Insurance Coverage under any Non-Settling Insurer Policy, or any Insurance Claims or Insurance Recoveries, and recourse is limited to the proceeds of such Non-Settling Insurer Policy and all Insurance Claims and Insurance Recoveries that may be recoverable against any Non-Settling Insurer; and may not be recovered from or against any other property or assets of the Reorganized Debtor or Participating Parties, and any such judgments or awards shall be handled pursuant to the Plan and the Trust Distribution Plan.

### Post-Judgment Actions against Non-Settling Insurers

If the Trust or any Abuse Claimant obtains a judgment against the Reorganized Debtor or Participating Parties, as provided in Section 9.5 of the Plan, the Reorganized Debtor or Participating Parties will cooperate with the Trust or Abuse Claimant in the pursuit of any action brought by the Trust or Abuse Claimant against a Non-Settling Insurer that may, based upon allegations made in good faith, provide Insurance Coverage applicable to such judgment. The Reorganized Debtor and/or Participating Parties will provide the Trust or Abuse Claimant with any non-privileged and relevant documents and information reasonably requested by the Trust or Abuse Claimant in pursuit of such an action. The Reorganized Debtor shall be reimbursed for any legal fees and costs incurred by the Reorganized Debtor to comply with this section as provided in Section 9.3(a)(4) of the Plan.

### Settlement with Non-Settling Insurers

Following the Effective Date and prior to the Trust Termination Date (as defined in the Trust), the Reorganized Debtor and the Participating Parties shall not enter into an agreement

affecting any Non-Settling Insurer Policies or any Insurance Claims against or any Insurance Recoveries from any Non-Settling Insurer without the express written consent of the Trustee, which consent may be granted or withheld at the Trustee's sole and absolute discretion. Following the Effective Date and prior to the Trust Termination Date (as defined in the Trust), the Trust shall exclusively act on the Reorganized Debtor's and Participating Parties' behalf to negotiate a settlement with any Non-Settling Insurer because of such Transferred Insurance Interests, unless Section 9.3 of the Plan applies. Such settlements may provide for the Non-Settling Insurer to become a Settled Insurer.

### Cooperation with Non-Settling Insurer in Defense of Claims

Without limiting the Diocese's and/or Participating Party's obligations under Section IX of the Plan, if any Abuse Claimant prosecutes an action against the Diocese and/or Participating Party, the Diocese and/or Participating Party will cooperate, under the terms of any applicable Non-Settling Insurer Policy, with a Non-Settling Insurer providing a defense to such a Claim. The Reorganized Debtor shall be reimbursed for any legal fees and costs incurred by the Reorganized Debtor to comply with this section as provided in Section 9.3 (a)(4) of the Plan.

### Insurance Neutrality

Other than as expressly provided in Section IX of the Plan, no provision of the Plan shall diminish or impair the right of any Insurer to assert any defense to any Insurance Claim. That the Trust is liquidating and paying/reserving monies because of the Abuse Claims shall not be construed to diminish any duty of any Insurer under any Insurance Policy to provide Insurance Coverage to the Diocese or the Participating Parties for Abuse Claims. The duties and obligations, if any, of the Non-Settling Insurers under each Non-Settling Insurer's Insurance Policy shall not be impaired, altered, reduced or diminished by: (a) the discharge granted to the Debtor under the Plan under § 1141(d) of the Bankruptcy Code, (b) the exonerations, exculpations and releases in the Plan or the other Plan Documents or (c) the Channeling Injunction and the Supplemental Catholic Mutual Insurer Injunction.

### Judgment Reduction

In connection to any action by the Trust to enforce Insurance Claims regarding a Non-Settling Insurer Policy, if any Non-Settling Insurer obtains a judicial determination or binding arbitration award that, it would be entitled to obtain a sum certain from a Settled Insurer because of a claim for contribution, subrogation, indemnification, or other similar claim against a Settled Insurer for such Settled Insurer's alleged share or equitable share, or to enforce subrogation rights, if any, of the defense and/or indemnity obligation of such Settled Insurer for any Claims released or resolved under any Settlement Agreement with a Settled Insurer, the Diocese, the Trustee or Participating Party, as applicable, shall be deemed to have reduced its judgment or Claim against, or settlement with, such other Insurer to the extent necessary to satisfy such contribution, subrogation, indemnification, or other claims against such Settled Insurer. To make sure such a

reduction is accomplished, such Settled Insurer shall be entitled to assert Plan Section IX as a defense to any action against it brought by any other Insurer for any such portion of the judgment or Claim and shall be entitled to request that the court or appropriate tribunal issue such orders as are necessary to effectuate the reduction to protect such Settled Insurer or any released parties under a Settlement Agreement with a Settled Insurer from any liability for the judgment or Claim. If a Non-Settling Insurer asserts that it has a Claim for contribution, indemnity, subrogation, or similar relief against a Settled Insurer, such Claim may be asserted as a defense against the Trust, the Diocese or any Participating Party in any litigation of Insurance Claims (and the Trust, the Diocese and the Participating Party may assert the legal and equitable rights of such Settled Insurer in response thereto); and to the extent such a Claim is found to be valid by the court presiding over such action, the liability of such Non-Settling Insurer to the Trust, the Diocese or Participating Party shall be reduced dollar for dollar by the amount so determined. The Bankruptcy Court shall retain nonexclusive jurisdiction to determine the amount, if any, of any judgment reduction under Plan Section IX. In addition, any court of competent jurisdiction may determine the amount, if any, of any judgment reduction under Plan Section IX.

### No Duty of Diocese or Trust to Prosecute Insurance Claims

Neither the Trust nor the Diocese have any obligation to take any action to enforce any Non-Settling Insurer Policy or any Insurance Claims against any Non-Settling Insurer (for the Trust, pursuant to the rights and interests conferred pursuant to Sections 9.1 through 9.3 of the Plan), including any obligation to commence and prosecute any action against any Non-Settling Insurer or to defend an action commenced by a Non-Settling Insurer, though the Trust (or the Diocese, as applicable), may choose to do so. **Notwithstanding and for the avoidance of doubt, pursuant to the Plan and specifically Section 9.4 and 9.5, and subject to the provisions of Section 10 of the Trust Distribution Plan, each Class 4 Claimant retains the right to assert and litigate through any form of legal proceeding any Claims they may have against the Diocese, the Reorganized Debtor, or any Participating Party solely for the purpose of asserting those Claims to recover on Insurance Coverage under any Non-Settling Insurer Policy, or any Insurance Claims or Insurance Recoveries.**

### Effect Under Non-Settling Insurer Policies

The Debtor's and Participating Party's contributions are being made in respect of the uninsured or underinsured exposure of the Debtor and the Participating Parties for Abuse Claims and, to the extent required under applicable law, to satisfy self-insured retentions or deductibles under Non-Settling Insurer Policies.

### D&O Coverage

The Catholic Mutual Certificates include coverage for the defense and indemnification of the Diocese's officers, employees and directors subject to the terms, conditions, exclusions and limits contained therein ("D&O Coverage") during the Bankruptcy Case and, except for the Sold

Certificates, will continue provide D&O Coverage as part of the Preserved Coverage of the Reorganized Debtor after the Effective Date notwithstanding the provisions of the Plan.

**D.     Settled Insurers and Participating Parties**

**Settlement Agreements**

Each Settlement Agreement shall comply and be consistent with the provisions of the Plan and, in particular, without limitation, the provisions of Section X of the Plan. Upon satisfaction of the conditions precedent to any Settlement Agreement becoming effective, including the Confirmation Order, and the order approving the Settlement Agreement becoming a Non-Appealable Order (only if such Settlement Agreement contemplates or the Bankruptcy Court requires a separate order), any Settlement Agreement will be fully binding on the Settled Insurer Parties, the Trust, the Unknown Abuse Claims Trust, the Participating Parties, the Reorganized Debtor, the Committee, the Abuse Claimants, and parties in interest, and any of the foregoing Persons' successors.

**Settlement Payments; Escrow**

Each Participating Party and Settled Insurer will pay to the Trust the sums set forth in each applicable Settlement Agreement on the terms and subject to the conditions set forth in such Settlement Agreement including within the time set forth in such Settlement Agreement. In the event that a payment by a Participating Party or a Settled Insurer is made prior to the Effective Date, it shall be paid to the Effective Date Escrow Agent and held in escrow and delivered to the Trust or returned promptly in accordance with the Confirmation Order and the Effective Date Escrow Agreement.

**Post-Effective Date Approval**

After the Effective Date, upon consent of the Trustee, a Person may become a Settled Insurer or a Participating Party if the Bankruptcy Court, after notice and hearing, approves the Settlement Agreement between, *inter alia*, the Person and the Trustee. After the Effective Date, the Trustee shall have the exclusive authority to seek approval of such a Settlement Agreement. Such approval shall be subject to the same standards of law applicable to the approval of a compromise or settlement pursuant to Fed. R. Bankr. P. 9019(a). Upon the Bankruptcy Court's entry of a Non-Appealable Order approving such Settlement Agreement, if required by such Settlement Agreement, the definition of Participating Parties and/or Settled Insurers in the Plan, and the list of Participating Parties and/or Settled Insurers set forth in <u>Exhibit E</u> and/or <u>Exhibit F</u> to the Plan, as appropriate, shall be amended by the Trustee to include such Person. The Bankruptcy Court's retained jurisdiction to approve an agreement under Plan Section X shall include jurisdiction to determine the adequacy of notice of a motion to approve such an agreement.

**Effect of Post-Effective Date Settlement Agreements**

Any Person that enters into a Settlement Agreement with the Trustee after the Effective Date which has been approved by a Non-Appealable Order shall, if required by such Settlement Agreement, have all of the rights, remedies and duties of a Participating Party or a Settled Insurer under the Plan notwithstanding that such Person originally may have been a Non-Settling Insurer or may not have been a Participating Party under any provision of the Plan on the Effective Date. Such rights, remedies and duties may include the terms and conditions of the Plan including the Channeling Injunction provided for in Section XIII of the Plan.

**Debtor and Trustee Waiver and Release of Estate's Claims and Causes of Action against Participating Parties and Settled Insurers**

In consideration of the contributions and other consideration to be provided by each Participating Party and Settled Insurer Party, and conditioned upon the occurrence of and effective upon the Effective Date, the Debtor and Trust, as applicable, irrevocably and unconditionally, without limitation, hereby waive, release, acquit, and forever discharge such Participating Party and Settled Insurer Party of and from any and all Claims and Causes of Action of the Estate against any Participating Party or Settled Insurer, or the property thereof; provided, however, that notwithstanding the foregoing, the foregoing release is subject to all exclusions and limitations set forth in the Plan applicable to releases provided in or pursuant to the Plan, and does not waive, release, acquit or forever discharge the Participating Parties' and Settled Insurer Parties' rights and obligations provided in or pursuant to the Plan.

**Additional Documentation; Non-Material Modifications**

From and after the Effective Date, the Trustee, the Unknown Abuse Claims Trustee, the Reorganized Debtor, and the Participating Parties are authorized to enter into, execute, adopt, deliver and/or implement all contracts, notices, security documents, leases, instruments, releases, and other agreements or documents necessary to effectuate or memorialize the settlements in the Plan without further Order of the Bankruptcy Court. Also, the Trustee, the Unknown Abuse Claims Trustee, the Reorganized Debtor, and the Participating Parties may make technical and/or immaterial alterations, amendments, modifications or supplements to the terms of any settlement in the Plan and/or Settlement Agreements, without Bankruptcy Court approval, provided that such change does not materially and adversely change the treatment of any Claim. A Class of Claims that has accepted the Plan shall be deemed to have accepted the Plan, as altered, amended, modified or supplemented under Plan Section X, if the proposed alteration, amendment, modification or supplement does not materially and adversely change the treatment of the Claims within such class. An Order of the Bankruptcy Court approving any amendment or modification made under Plan Section X shall constitute an Order in aid of consummation of the Plan and shall not require the re-solicitation of votes on the Plan.

### Mercy Settlement Agreement

The Mercy Settlement Agreement shall be effective and binding on all parties in interest in this Bankruptcy Case and any of their respective successors and assigns, upon entry of the Confirmation Order and the satisfaction of all conditions set forth in the Mercy Settlement Agreement. The rights of the parties under the Mercy Settlement Agreement shall be determined exclusively under the Mercy Settlement Agreement, those provisions of the Confirmation Order approving such Mercy Settlement Agreement and the Plan. The Mercy Settlement Agreement is incorporated into the Plan by reference and shall survive the confirmation, effectiveness, and consummation of the Plan.

### St. Bernard Settlement Agreement

The St. Bernard Settlement Agreement shall be effective and binding on all parties in interest in this Bankruptcy Case and any of their respective successors and assigns, upon entry of the Confirmation Order and the satisfaction of all conditions set forth in the St. Bernard Settlement Agreement. The rights of the parties under the St. Bernard Settlement Agreement shall be determined exclusively under the St. Bernard Settlement Agreement, those provisions of the Confirmation Order approving such St. Bernard Settlement Agreement and the Plan.  The St. Bernard Settlement Agreement is incorporated into the Plan by reference and shall survive the confirmation, effectiveness, and consummation of the Plan.

### Xavier Settlement Agreement

The Xavier Settlement Agreement shall be effective and binding on all parties in interest in this Bankruptcy Case and any of their respective successors and assigns, upon entry of the Confirmation Order and the satisfaction of all conditions set forth in the Xavier Settlement Agreement. The rights of the parties under the Xavier Settlement Agreement shall be determined exclusively under the Xavier Settlement Agreement, those provisions of the Confirmation Order approving such Xavier Settlement Agreement and the Plan.  The Xavier Settlement Agreement is incorporated into the Plan by reference and shall survive the confirmation, effectiveness, and consummation of the Plan.

### Mount St. John Settlement Agreement

The Mount St. John Settlement Agreement shall be effective and binding on all parties in interest in this Bankruptcy Case and any of their respective successors and assigns, upon entry of the Confirmation Order and the satisfaction of all conditions set forth in the Mount St. John Settlement Agreement.  The rights of the parties under the Mount St. John Settlement Agreement shall be determined exclusively under the Mount St. John Settlement Agreement, those provisions of the Confirmation Order approving such Mount St. John Settlement Agreement and the Plan. The Mount St. John Settlement Agreement is incorporated into the Plan by reference and shall survive the confirmation, effectiveness, and consummation of the Plan.

### Catholic Mutual Settlement

The Catholic Mutual Settlement Agreement, and all releases, amendments, and indemnifications contained therein shall be effective and binding on all parties in interest in this Bankruptcy Case including the Trust, the Diocese Parties, the Catholic Entity Parties, Xavier, Oceania, the Claimants and Catholic Mutual, and any of their respective successors and assigns, upon entry of an Approval Order with respect to the Catholic Mutual Settlement Agreement, and the satisfaction of all conditions set forth in the Catholic Mutual Settlement Agreement. The rights of the parties under the Catholic Mutual Settlement Agreement shall be determined exclusively under the Catholic Mutual Settlement Agreement, those provisions of the Approval Order approving such Catholic Mutual Settlement Agreement, the Plan and the Confirmation Order. The Catholic Mutual Settlement Agreement is incorporated into the Plan by reference and shall survive the confirmation, effectiveness, and consummation of the Plan.

### Sale of Sold Certificates, Free and Clear of Liens, Claims and Interests

Pursuant to and solely to the extent provided in the Approval Order authorizing and approving the Catholic Mutual Settlement Agreement and the Confirmation Order, effective on the date set forth in the Catholic Mutual Settlement Agreement, each and every Sold Certificate shall be sold to Catholic Mutual, pursuant to §§ 105, 363, and 1123 of the Bankruptcy Code, free and clear of all Liens, Claims and interests of all Persons, including, without limitation, the Diocese Parties, the Catholic Entity Parties, Xavier and Oceania, and Catholic Mutual shall be a good faith purchaser thereof entitled to all of the benefits of § 363(m) of the Bankruptcy Code.

### Full Payment by Catholic Mutual for Settlement

Catholic Mutual shall pay the Catholic Mutual Contribution to the Effective Date Escrow Agent subject to the terms and conditions of the Catholic Mutual Settlement Agreement, the Plan and the Confirmation Order. The Effective Date Escrow Agent shall hold the Catholic Mutual Contribution as escrowee and return such contribution to Catholic Mutual in the event of termination as provided in Section 5.1 of the Catholic Mutual Settlement Agreement. In the absence of such termination, the Catholic Mutual Contribution is the total amount the Catholic Mutual Parties are and shall ever be obligated to pay on account of any and all Channeled Claims or on account of any Claims or interests relating to the Sold Certificates. The consideration to be provided by the Catholic Mutual Parties pursuant to the Plan (including the Catholic Mutual Contribution) constitutes a fair and reasonable exchange for (i) the consideration granted by the Estate to the Catholic Mutual Parties in the Plan, the Sold Certificates and the Catholic Mutual Settlement Agreement (including the releases, Channeling Injunction and the Supplemental Catholic Mutual Injunction), and (ii) the consideration to be provided by the Diocese Parties and the Catholic Entity Parties to the Catholic Mutual Parties pursuant to the Plan (including the releases and injunctions therein). The Catholic Mutual Parties are not acting as volunteers in paying the Catholic Mutual Contribution, which is in settlement of liability under the Catholic

Mutual Certificates and the Catholic Mutual Parties' liability thereunder (other than the Preserved Coverage).

### Continuation of Preserved Coverage, as Amended

The Preserved Coverage under the Catholic Mutual Certificates and any other Insurance Policies issued by any other Person ("Other Insurance Policy"), shall either be deemed assumed by the Reorganized Debtor pursuant to §§ 365, 1123(a)(5)(A), and 1123(b)(2) of the Bankruptcy Code, to the extent such Other Insurance Policy or certificate is or was an Executory Contract of the Diocese, or continued in accordance with its terms pursuant to § 1123(a)(5)(A) of the Bankruptcy Code, to the extent such Other Insurance Policy or certificate is not an Executory Contract of the Diocese, such that each of the parties' contractual, legal, and equitable rights under each such Other Insurance Policy shall continue. To the extent that any or all such Other Insurance Policies and certificates are considered to be Executory Contracts, then the Plan shall constitute a motion to assume such Other Insurance Policies in connection with the Plan. The Diocese shall not have any responsibility to pay any cure costs in connection with the assumption of the Preserved Coverage or any Insurance Policies issued by the Non-Settling Insurers, and confirmation of the Plan shall constitute a finding of adequate assurances of performance by the Diocese with respect to such Preserved Coverage and Insurance Policies under applicable law. Subject to the occurrence of the Effective Date, the Confirmation Order shall approve such assumption pursuant to §§ 365(a), 1123(a)(5)(A), and 1123(b)(2) of the Bankruptcy Code and include a finding by the Bankruptcy Court that each such assumption is in the best interest of the Diocese, the Estate, and all parties in interest in this Bankruptcy Case. For the avoidance of doubt, the Plan and Catholic Mutual Settlement Agreement do not affect the Preserved Coverage under the Catholic Mutual Certificates under which Catholic Mutual has provided coverage to the Diocese and the Catholic Entities during the Bankruptcy Case, as amended by the Plan and Catholic Mutual Settlement Agreement. Unless otherwise determined by the Bankruptcy Court pursuant to an order which becomes a Non-Appealable Order or agreed to by the parties thereto prior to the Effective Date, no payments are required to cure any defaults of the Diocese existing as of the Effective Date with respect to any Other Insurance Policy or certificate.

### Catholic Mutual Consent to Amendments

The Confirmation Order and any subsequent modifications or amendments to the Plan shall be in all respects acceptable to Catholic Mutual and shall not deprive the Catholic Mutual Parties of any right or benefit under the Plan or Catholic Mutual Settlement Agreement or otherwise adversely affect the rights and interests of the Catholic Mutual Parties pursuant to the Plan; provided, however, that nothing herein shall preclude the filing of a competing or alternative plan by the Debtor or other parties in interest which might be adverse to Catholic Mutual.

**Further Assurances; Non-Material Modifications**

From and after the Effective Date, the Reorganized Debtor, Catholic Mutual, the Participating Parties and the Trustee shall be authorized to enter into, execute, adopt, deliver, or implement all notes, contracts, security agreements, instruments, releases, and other agreements or documents necessary to effectuate or memorialize the settlements contained in Section X of the Plan without further order of the Bankruptcy Court. The Reorganized Debtor, Catholic Mutual and the Trustee may make technical or immaterial alterations, amendments, modifications, waivers, or supplements to the terms of the Catholic Mutual Settlement Agreement and/or the Plan, subject to the requirements of such agreement. A class of Claims that has accepted the Plan shall be deemed to have accepted the Plan, as altered, amended, modified, or supplemented under Section 10.12 of the Plan, if the proposed alteration, amendment, modification, or supplement does not materially and adversely change the treatment of the Claims within such class. An order of the Bankruptcy Court approving any amendment or modification made pursuant to Section 10.12 of the Plan shall constitute an order in aid of consummation of the Plan and shall not require the re-solicitation of votes on the Plan.

**Indemnification Obligations of Trust and Reorganized Debtor**

From and after the Effective Date, the Trust shall defend, indemnify, and hold harmless the Catholic Mutual Parties with respect to any and all Opt-In Abuse Claims classified in Class 4 and all Medicare Claims and Related Insurance Claims arising on account of, in connection with or related to such Opt-In Abuse Claims, including: all such Claims made by (i) any Person claiming to be covered (as a protected party or otherwise) under any Catholic Mutual Certificates; (ii) any Person who has made, will make, or can make an Abuse Claim or Related Insurance Claim; and (iii) any Person who has actually or allegedly acquired or been assigned the right to make a Claim under any Catholic Mutual Certificates; provided, however, that the Catholic Mutual Parties shall not seek to recover from an Opt-In Abuse Claimant classified in Class 4 or any transferee of an Opt-In Abuse Claimant classified in Class 4 any property distributed or to be distributed after the Effective Date by the Trust in accordance with the confirmed Plan and neither the Trust nor the Reorganized Debtor shall have any liability from a breach of this proviso. The Reorganized Debtor shall defend, indemnify, and hold harmless the Catholic Mutual Parties with respect to any and all Opt-In Abuse Claims and all Related Insurance Claims arising on account of, in connection with or related to such Opt-In Abuse Claims made by (i) any Person claiming to be covered (as a protected party or otherwise) under any Catholic Mutual Certificates; (ii) any Person who has made, will make, or can make an Abuse Claim or Related Insurance Claim; and (iii) any Person who has actually or allegedly acquired or been assigned the right to make a Claim under any Catholic Mutual Certificates subject to the limitations set forth in any other Settlement Agreement with an Insurer that has been approved by the Bankruptcy Court. The Catholic Mutual Parties shall have the right to defend any Claims identified in this section and shall do so in good faith.

The indemnification obligations of the Trust and the Reorganized Debtor provided for in

61

foregoing Section 10.16(a) include Opt-In Abuse Claims made by Persons over whom the Diocese or Parishes do not have control, including any other Person who asserts Opt-In Abuse Claims (for the Trust, other than Unknown Abuse Claims) against or right to coverage under the Catholic Mutual Certificates. The Catholic Mutual Parties may, but are not obligated to undertake the defense of any Claim on receipt of such Claim and their choice to defend or not shall not affect the indemnification obligations of the Trust and Reorganized Debtor. The Catholic Mutual Parties shall notify the Trust or the Reorganized Debtor, as applicable, as soon as practicable (but, in no case, later 30 dates after receipt) of any Claims subject to indemnification pursuant to this section and of their choice of counsel. The Trust or Reorganized Debtor, as applicable, is not obligated to indemnify the Catholic Mutual Parties for Claims that are or may be made against the Catholic Mutual Parties by other insurers. The obligation of the Trust or Reorganized Debtor, as applicable, to indemnify the Catholic Mutual Parties under Section 10.16 of the Plan shall not exceed in the aggregate dollar amount the amount of the Catholic Mutual Contribution set forth herein, which shall be deemed to be distributed to Abuse Claimants pro rata with other contributions to the Trust. Subject to the limitations above concerning the maximum amounts the indemnifying party must pay, the Trust shall reimburse all reasonable and necessary attorneys' fees, expenses, costs, and amounts incurred by the Catholic Mutual Parties in defending such indemnified Claims (other than Unknown Abuse Claims), and the Reorganized Debtor shall reimburse all reasonable and necessary attorney's fees, expenses, costs and amounts incurred by the Catholic Mutual Parties in defending such indemnified Claims. In defense of any such indemnified Claims, the Catholic Mutual Parties may settle or otherwise resolve a Claim consistent with the terms of the Plan and with the prior consent of the indemnifying party, which consent shall not be unreasonably withheld.

The indemnification obligations of the Trust set forth in Section 10.17 of the Plan may give rise to a liability on the part of the Trust but shall not create any right on the part of Catholic Mutual to "claw back" or otherwise recover any specifically identifiable proceeds of the contribution paid to the Trust by Catholic Mutual, or any interest therein.

Any dispute with respect to the indemnification obligations set forth in Section 10.17 of the Plan, including any attorneys' fees, expenses, costs, or other amounts allegedly incurred by the Catholic Mutual Parties and subject to reimbursement by the Trust or the Reorganized Debtor, shall be adjudicated and finally determined by the Bankruptcy Court.

### Waivers and Releases by Diocese Parties and Catholic Entity Parties

- Subject to the occurrence of the Effective Date, in consideration of the releases and Channeling Injunction, the Supplemental Catholic Mutual Injunction, and other covenants set forth herein, each of the Diocese Parties and the Catholic Entity Parties irrevocably and unconditionally, without limitation, releases, acquit, forever discharge, and waive any Claims and/or interests they have or might have now or in the future have against the Participating Parties and the Reorganized Debtor with respect to any and all Related Insurance Claims, any contribution, subrogation, indemnification,

or other similar Claim arising from or relating to Abuse Claims, and any Catholic Mutual Certificates.

- Nothing in the Plan shall be construed to bar either (a) a Claim based on Abuse against a Person who is not a Participating Party or (b) a Claim by such Person for Insurance Coverage in connection with a Claim described in the foregoing subsection (a) under an insurance policy or other form of indemnification against loss other than the Settled Insurer Policies including the Catholic Mutual Certificates.

### Rights under Catholic Mutual Settlement Agreement

The rights of the parties under the Catholic Mutual Settlement Agreement shall be determined exclusively under the Catholic Mutual Settlement Agreement and those provisions of the Approval Order approving such Catholic Mutual Settlement Agreement, the Plan and the Confirmation Order.

### E.    Means of Implementation of the Plan

#### Funding of Plan

On the Effective Date, the Debtor shall make all payments and effectuate all transfers required to be performed on the Effective Date pursuant to the Plan, including by transferring any Trust Assets due on the Effective Date to the Trust on the Effective Date. On or immediately after the Effective Date, the Effective Date Escrow Agent shall transfer to the Trustee, for the benefit of the Trust, in accordance with the Plan and the Effective Date Escrow Agreement, all Cash Contributions received by the Effective Date Escrow Agent in accordance with Section 7.1(a)3 of the Plan.

#### Transfer of Real Estate and Reversionary Interests

Subject to Section 7.3 of the Plan, on and after the Effective Date, the Debtor shall take all steps necessary to effectuate transfer of ownership to the Trust of all Transferred Real Estate. On and after the Effective Date, the Diocese shall also take all steps necessary to effectuate transfer of all reversionary interests in the Transferred Real Estate if any portion of the properties are leased, sold, or subject to an option for lease or sale on or before the Trust Termination Date (as that term is defined in the Trust Documents).

#### Preservation of Causes of Action

The Trustee, on behalf of the Trust, shall retain the Trust's Causes of Action, whether arising before or after the Petition Date, in any court or other tribunal, including, without limitation, the Bankruptcy Court. The Trustee, on behalf of the Trust, shall have the exclusive right, authority, and discretion to institute, prosecute, abandon, settle, or compromise any such Causes of Action,

subject to the requirements of the Bankruptcy Code. To the extent the Committee is the named plaintiff in any Cause of Action vested in the Trust, the Trustee may be substituted as the named plaintiff without additional notice to the parties in such Cause of Action. For the avoidance of doubt, nothing in this paragraph modifies the scope of the waiver, release and discharge of Claims provided for in Section 13.14 of the Plan by and between the Participating Parties and the Catholic Mutual Parties.

### Reorganized Debtor's Officers, Directors and Senior Management

In accordance with § 1129(a)(5) of the Bankruptcy Code, the identities and affiliations of the persons proposed to serve as the officers, directors and senior management of the Reorganized Debtor on and after the Effective Date are set forth on <u>Exhibit H</u> to the Plan. Pursuant to § 1129(a)(5)(B) of the Bankruptcy Code, Exhibit H further discloses the nature of compensation to be paid by the Reorganized Debtor to each of the Reorganized Debtor's insiders (the Bishop and the named officers).

### Closing

Closing will be conducted at the offices of Zeisler & Zeisler, P.C., or at such other location designated by the Committee, including remotely, as soon as reasonably practicable following the Effective Date for the Diocese and the Participating Parties to execute and deliver the Plan Documents and completing those actions necessary for the Reorganized Debtor and the Participating Parties to establish and fund the Trust and make other Distributions required to be made upon, or promptly following, the Effective Date. As soon as practicable after conditions in Section 12.1 of the Plan have been satisfied or waived under Section 12.2 of the Plan, the Diocese shall file notice of the Closing and the occurrence of the Effective Date.

### Obligations of the Reorganized Debtor and the Implicated Participating Parties

The Reorganized Debtor and any implicated Participating Parties will:

(a)     In the exercise of their respective business judgment, review all Claims filed against the Estate (except for Opt-In Abuse Claims) and, if advisable, object to such Claims;

(b)     Not object to any Opt-In Abuse Claims. Despite the foregoing, the Reorganized Debtor and any implicated Participating Parties shall timely provide the Abuse Claims Reviewer or Trustee, as applicable, with information regarding Abuse Claims as may be requested by the Trustee or Abuse Claims Reviewer;

(c)     Fulfill the Diocese's obligations under the Insurance Policies issued by the Non-Settling Insurers and under applicable non-bankruptcy law;

(d)     Honor the Diocese's obligations arising under any Settlement Agreement approved by the Bankruptcy Court; and,

(e)     Perform all of their obligations under the Plan and Plan Documents, in each case, as and when the same become due.

### Objections to Claims

Objections to a Claim (except for Opt-In Abuse Claims) as to which no objection is pending as of the Effective Date, must be filed by the Claims Objection Deadline, provided that the Reorganized Debtor may request extensions of the Claims Objection Deadline, or of any Bankruptcy Court approved extensions thereof, by filing a motion with the Bankruptcy Court. A motion seeking to extend the deadline to object to any Claim is not an amendment to the Plan. No party in interest other than the Trustee may object to an Opt-In Abuse Claim classified in Class 4. No party in interest other than the Unknown Abuse Claims Trustee may object to a Class 5 Claim.

### Reservation of Rights to Object to Claims Other Than Opt-In Abuse Claims

Unless a Claim is expressly described as an Allowed Claim under the Plan, or otherwise becomes an Allowed Claim before the Effective Date, upon the Effective Date, the Reorganized Debtor shall be deemed to have a reservation of any rights, interests and objections of the Debtor to any Claims and motions or requests for the payment of or because of Claims, whether administrative expense, priority, secured or unsecured (but not Opt-In Abuse Claims), whether under the Bankruptcy Code, other applicable law or contract. Subject to the Claims Objection Deadline, the Debtor's failure to object to any Claim in the Case shall be without prejudice to the Reorganized Debtor's rights, and if such Claim (other than an Opt-In Abuse Claim) is alleged to fall within Catholic Mutual's coverage period, Catholic Mutual's rights to contest or otherwise defend against such Claim in the Bankruptcy Court in Plan Section XI when and if such Claim is sought to be enforced by the Holder of such Claim.

### Service of Objections

An objection to a Claim shall be deemed properly served on the Holder of such Claim if the objector effects service by any of the following methods: (i) under Rule 4 of the Federal Rules of Civil Procedure, as modified and made applicable by Bankruptcy Rule 7004; (ii) to the extent counsel for such Holder is unknown, by first class mail, postage prepaid, on the signatory on the Proof of Claim or other representative identified on the Proof of Claim or any attachment thereto; or (iii) by first class mail, postage prepaid, on any counsel that has appeared on the behalf of such Holder in the Case.

### Determination of Claims

From and after the Effective Date, any Claim (except for Abuse Claims) as to which a Proof of Claim or motion or request for payment was timely filed in the Case or deemed timely filed by Order of the Bankruptcy Court, may be determined and (so long as such determination has not been stayed, reversed or amended and as to which determination (or any revision, modification or amendment thereof) the time to appeal or seek review or rehearing has expired and as to which no appeal or petition for review or rehearing was filed or, if filed, remains pending) liquidated under (i) an Order of the Bankruptcy Court, (ii) applicable bankruptcy law, (iii) agreement of the parties with no Bankruptcy Court approval, (iv) applicable non-bankruptcy law or (v) the lack of (a) an objection to such Claim, (b) an application to equitably subordinate such Claim and (c) an application to otherwise limit recovery regarding such Claim, filed by the Diocese or any other party in interest on or before any applicable deadline for Filing such objection or application regarding such Claim. Any such Claim so determined and liquidated shall be deemed to be an Allowed Claim for such liquidated amount and shall be satisfied under the Plan. Nothing in Plan Section XI shall be or be deemed a waiver of any Claims, rights, interests or Causes of Action that the Diocese may have against any Person in connection with or arising out of any Claim or Claims, including any rights under 28 U.S.C. § 157. Notwithstanding the foregoing, no party in interest other than the Trustee or Unknown Abuse Claim Trustee, as applicable, may object to an Abuse Claim.

### No Distributions Pending Allowance

No payments or Distributions will be made regarding all or any part of a Disputed Claim unless and until all objections to such Disputed Claim have been settled or withdrawn or have been determined by a Non-Appealable Order, and the Disputed Claim has become an Allowed Claim; provided, however, that if only a portion of such Claim is an Allowed Claim, the Reorganized Debtor may, in their discretion, make a Distribution because of the part of such Claim that is an Allowed Claim.

### Claim Estimation

To effectuate Distributions under the Plan and avoid undue delay in the administration of the Case, the Diocese, after notice and a hearing (which notice may be limited to the Holder of such Disputed Claim), shall have the right to seek an Order of the Bankruptcy Court or the District Court under § 502(c) of the Bankruptcy Code, estimating or limiting, because of a Disputed Claim, the amount of (i) property that must be withheld from or reserved for distribution purposes because of such Disputed Claim(s), (ii) such Claim for allowance or disallowance purposes, or (iii) such Claim for any other purpose allowed under the Bankruptcy Code; provided, however, that the Bankruptcy Court or the District Court, as applicable, shall determine (i) whether such Claims are subject to estimation under § 502(c) of the Bankruptcy Code and (ii) the timing and procedures for such estimation proceedings, if any, such matters being beyond the scope of the Plan. Notwithstanding the foregoing, no party in interest except the Trustee may seek to estimate a Class

4 or Class 5 Claim and no party in interest except the Unknown Abuse Claim Trustee may seek to estimate an Unknown Abuse Claim.

### Post-Confirmation Reports

After the Effective Date and until the Bankruptcy Case is closed, the Reorganized Debtor, Trustee and Unknown Abuse Claims Trustee shall timely file the Post-Confirmation Reports as required by United States Trustee Program's rule entitled Uniform Periodic Reports in Cases Filed Under Chapter 11 of Title 11, published at 28 C.F.R. § 58.8.

### Closing of the Case

As soon as practicable after the Effective Date, when the Diocese deems appropriate, the Diocese will seek authority from the Bankruptcy Court to close the Bankruptcy Case under the Bankruptcy Code and the Bankruptcy Rules; provided, however, that entry of a final decree closing the Bankruptcy Case shall, whether or not specified therein, be without prejudice to the right of the Diocese, the Trustee, Unknown Abuse Claim Trustee, or any other party in interest to reopen the Case for any matter over which the Bankruptcy Court or the District Court has retained jurisdiction under the Plan. Any order closing the Bankruptcy Case will provide that the Bankruptcy Court or the District Court, as appropriate, will retain (a) jurisdiction to enforce, by injunctive relief or otherwise, the Confirmation Order, any other orders entered in the Bankruptcy Case, and the obligations created by the Plan and the Plan Documents; and (b) all other jurisdiction and authority granted to it under the Plan and the Plan Documents.

## VI.    CONDITIONS PRECEDENT

### A.    Conditions to Effectiveness

The Effective Date shall occur when each of the following conditions have been satisfied or, as to those certain specific conditions only, waived under Section 12.2 of the Plan:

- All Approval Orders authorizing and approving all Settlement Agreements involving the Participating Parties and Settled Insurers (for agreements executed before the Confirmation Date) and any appropriate judgments consistent therewith, shall have been entered by a court of competent jurisdiction in form and substance reasonably acceptable to each party and such orders shall have become Non-Appealable Orders, and no stay of such Orders shall be in effect;

- The Confirmation Order shall have been entered by a court of competent jurisdiction in form and substance reasonably acceptable to the Plan Proponents, and no stay of such Confirmation Order shall be in effect;

- The Trustee and Debtor shall have signed the Trust Agreement;

- The Bankruptcy Court shall have approved the Effective Date Escrow Agreement;

- The Unknown Abuse Claims Trustee and Debtor have signed the Unknown Abuse Claims Trust Agreement; and

- The Debtor, the Participating Parties, and Catholic Mutual have each delivered to the Effective Date Escrow Agent under and in accordance with the terms of the Effective Date Escrow Agreement, all of the Cash Contribution described in Section 7.1(a)3 of the Plan, in good and immediately available funds.

### Waiver of Conditions

The condition in Plan Section 12.1(a) and (b) requiring Non-Appealable Orders may be waived by the mutual written consent of the Committee, the Debtor, Catholic Mutual, the Association of Parishes, Xavier, Mercy St. Bernard, Oceania and the ACA.

### Notice of Occurrence of Effective Date.

Within three (3) Business Days after the occurrence of the Effective Date, the Diocese shall file with the Bankruptcy Court a notice thereof.

### Non-Occurrence of Effective Date

In the absence of an order of the Bankruptcy Court providing otherwise, if the Effective Date does not occur within ninety (90) calendar days of entry of the entry of the Confirmation Order, within three (3) Business Days after the expiration of said ninety (90) calendar day period, either the Debtor or the Committee shall file a notice of termination with the Bankruptcy Court.

### Termination Following Non-Occurrence of Effective Date.

In the absence of an order of the Bankruptcy Court providing otherwise, upon the filing of a notice of termination with the Bankruptcy Court by either the Diocese or the Committee as required by Section 12.4 of the Plan, the Plan shall become null and void and all contributions theretofore received by the Effective Date Escrow Agent shall be returned to their contributor, with accrued interest.

## VII.   TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

### Assumed Employee and Retiree Benefit Plans

To the extent not previously assumed, all employee and retiree benefit plans to which the Debtor are a party will be deemed assumed by the Reorganized Debtor on the Effective Date.

68

### General; Assumed if Not Rejected

Subject to the requirements of § 365 of the Bankruptcy Code, all Executory Contracts of the Debtor not rejected by order of the Bankruptcy Court or are not the subject of a motion to reject pending on the Confirmation Date will be deemed assumed by the Reorganized Debtor on the Effective Date. If any party to an Executory Contract that is being assumed objects to such assumption, the Bankruptcy Court may conduct a hearing on such objection on any date that is either mutually agreeable to the parties or fixed by the Bankruptcy Court. All payments to cure defaults that may be required under § 365(b)(1) of the Bankruptcy Code will be made by the Reorganized Debtor. In the event of a dispute regarding the amount of any such payments, or the ability of the Debtor to provide adequate assurance of future performance, the Reorganized Debtor will make any payments required by § 365(b)(1) of the Bankruptcy Code after the entry of the Non-Appealable Order resolving such dispute.

### Claims for Contract Rejection

All proofs of claim regarding Claims arising from the rejection of Executory Contracts must be filed with the Bankruptcy Court within thirty (30) days after the Effective Date or such Claims will be forever barred as against the Reorganized Debtor. If any order providing for the rejection of an Executory Contract did not provide a deadline for filing Claims arising from such rejection, proofs of Claim with respect thereto must be filed within thirty (30) days after the later to occur of (a) the Effective Date or, (b) if the order is entered after the Effective Date, the date such order becomes a Non-Appealable Order, or such Claims will be forever barred as against the Reorganized Debtor.

## VIII.   MISCELLANEOUS PROVISIONS

### A.   Retention of Jurisdiction

Notwithstanding entry of the Confirmation Order or the occurrence of the Effective Date, except as otherwise stated in the Plan or in the Confirmation Order, the Bankruptcy Court will retain jurisdiction over all matters arising under, to further, or in connection with the Plan, including the following:

(i)    The determination of objections to Disputed Claims; the determination of requests for payment of Claims entitled to priority under § 507 of the Bankruptcy Code, including compensation of and reimbursement of expenses of parties entitled thereto;

(ii)   The resolution of controversies and disputes regarding interpretation and implementation of the Plan and the Plan Documents;

(iii)  The compelling of the Diocese and/or a Participating Party to cooperate with the Trust as required under the Plan;

(iv)    The granting of relief in aid of the Plan and the Plan Documents including the entry of appropriate orders (which may include removal of actions in non-Bankruptcy Court forums to the Bankruptcy Court, contempt or other sanctions) to protect the Reorganized Debtor, the Participating Parties, and the Settled Insurer Parties from actions prohibited under the Plan or the Plan Documents;

(v)    Amendments to and modifications of the Plan;

(vi)    Subject to the limitations and exclusions described above, the determination of any and all applications, adversary proceedings, and contested or litigated matters pending on the Effective Date;

(vii)    Allowance or Disallowance of Administrative Claims including Professional Claims and Post-Petition Abuse Claims (following entry of a final, no longer appealable judgment or order of a court of competent jurisdiction as to such Post-Petition Abuse Claim), and post-confirmation fees provided for in the Plan;

(viii)    The approval of a Settlement Agreement whereby a Person, including a Non-Settling Insurer, may become a Participating Party or Settled Insurer and whereby the Bankruptcy Court may appoint a future claims representative and provide for treatment of future claims;

(ix)    The enforcement of all injunctions provided for in the Plan; and

(x)    The closing of this Case.

## B.    Miscellaneous Provisions

### Modification of Plan

The Plan Proponents jointly reserve the right, under the Bankruptcy Code, to amend, modify or withdraw the Plan prior to the entry of the Confirmation Order. After the entry of the Confirmation Order, the Plan Proponents may, jointly, upon order, amend or modify the Plan under § 1127(b) of the Bankruptcy Code, or remedy any defect or omission or reconcile any inconsistency in the Plan in such manner as may be necessary to carry out the purpose and intent of the Plan.

### Severability

If, before confirmation, the Bankruptcy Court holds that any Plan term or provision is invalid, void, or unenforceable, the Bankruptcy Court may alter or interpret that term or provision so it is valid and enforceable to the maximum extent possible consistent with the original purpose

of that term or provision. That term or provision will then be applicable as altered or interpreted, unless such term or provision is inconsistent with the intent of the Plan Proponents, in which case the Plan may be jointly withdrawn by the Plan Proponents. Notwithstanding any such holding, alteration, or interpretation, the Plan's remaining terms and provisions will remain in full force and effect and will in no way be affected, impaired, or invalidated. The Confirmation Order will constitute a judicial determination providing that each Plan term and provision, as it may have been altered or interpreted under Plan Section XVI, is valid and enforceable under its terms. In the event of a successful collateral attack on any provision of the Plan (*i.e.*, an attack other than through a direct appeal of the Confirmation Order), the remaining provisions of the Plan will remain binding on the Diocese, the Participating Parties, the Settled Insurer Parties, the Non-Settling Insurers, the Trustee, the Unknown Abuse Claims Trustee, the Committee, all Claimants, all Creditors, and all other parties in interest.

### Notices

All notices or requests in connection with the Plan shall be in writing and served either by (i) United States mail, postage prepaid, (ii) hand delivery, or (iii) reputable overnight delivery service, all charges prepaid, and shall be deemed given when received by the following parties:

If to the Debtor or Reorganized Debtor:

> Rev. Peter J. Langevin, S.T.B., Ph.L.
> Chancellor
> Diocese of Norwich
> The Chancery
> 201 Broadway
> Norwich, CT 06360
> (860) 887-9294 x235

With a copy to:

> Ice Miller LLP
> 1500 Broadway, Suite 2900
> Attn:   Louis T. DeLucia
>          Alyson M. Fiedler
> Telephone: (212) 835-6312
> Email: Louis.DeLucia@icemiller.com
>          Alyson.Fiedler@icemiller.com

> *-and-*

Robinson & Cole LLP
One State Street
Hartford, CT 06103
Attn:    Patrick M. Birney
           Annecca H. Smith
Telephone: (860) 275-8275
Email:  pbirney@rc.com
           asmith@rc.com

If to the Trustee:


Craig R. Jalbert, CIRA
Verdolino & Lowey, P.C.
124 Washington Street, Suite 101
Foxboro, MA  02035
Telephone: (508)-543-1720
Email: cjalbert@vlpc.com

With a copy to:


Zeisler & Zeisler, P.C.
10 Middle St., 15th Fl.
Bridgeport, CT 06525
Attn:    Stephen M. Kindseth, Esq.
           Telephone: (203) 368-5487
Email:  skindseth@zeislaw.com

If to the Unknown Abuse Claims Trustee:

Kara S. Rescia
Rescia Law, P.C.
5104 Bigelow Cmns.
Enfield, CT 06082
Telephone: (860) 452-0052
Email:  kara@ctmalaw.com

With a copy to:

Rescia Law, P.C.
5104 Bigelow Cmns.
Enfield, CT 06082
Attn.:  Paige M. Vaillancourt, Esq.
Telephone: (860) 452-0052
Email:  paige@ctmalaw.com

If to Catholic Mutual:

>Michael Lee
>Catholic Mutual Group
>Director of Specialty Claims
>10843 Old Mill Road
>Omaha, NE 68154
>Telephone: (402) 514-2412
>mlee@catholicmutual.org

with a copy to:

>Everett J. Cygal
>ArentFox Schiff LLP
>233 S. Wacker Drive, Suite 7100
>Chicago, IL 60606
>Telephone: (312)258-5783
>everett.cygal@afslaw.com

If to the Office of the United States Trustee:

>Holley L. Claiborn
>Trial Attorney
>Office of the United States Trustee
>Giaimo Federal Building
>150 Court Street, Room 302
>New Haven, CT 06510
>Telephone: (203) 773.5504
>Email:  Holley.L.Claiborn@usdoj.gov

**Notices to Claimants**

All notices and requests to a Person holding any Claim will be sent to them at the last known address listed for such Person with the Bankruptcy Court or with the Debtor's Claims Agent, or to the last known address of their attorney of record. The Holder of a Claim may designate in writing any other address, which designation will be effective upon actual receipt by the Reorganized Debtor, the Trustee, and the Unknown Abuse Claims Trustee. Any Person entitled to receive notice under the Plan will have the obligation to provide the Reorganized Debtor, the Trustee, and the Unknown Abuse Claims Trustee with such Person's current address for notice purposes. The Reorganized Debtor, the Trustee, and the Unknown Abuse Claims Trustee will have no obligation to attempt to locate a more current address if any notice proves to be undeliverable to the most recent address provided to the Reorganized Debtor, the Trustee, and the Unknown Abuse Claims Trustee.

### Post-Confirmation Court Approval

Any action requiring Bankruptcy Court, District Court or state court approval after the Effective Date will require the Person seeking such approval to file an application, motion, or other request with the Bankruptcy Court, District Court, or state court, as applicable, and obtain a Non-Appealable Order approving such action before the requested action may be taken. The Person filing such application, motion, or other request shall serve such application, motion, or other request, together with a notice setting forth the time in which objections must be filed with the court, on the Reorganized Debtor, the Committee, the Trustee, and the Unknown Abuse Claims Trustee by first-class mail, electronic mail, ECF, overnight courier, facsimile, or hand delivery. Unless the court orders otherwise, all notices shall provide the recipients at least twenty-one (21) days in which to file an objection to the application, motion, or other request. If no objection is timely filed, the court may authorize the proposed action without further notice or a hearing. If an objection is timely filed, the court will determine whether to conduct a hearing, or to require the submission of further documentation, prior to ruling on the application, motion, or other request.

### Election under § 1129(b) of the Bankruptcy Code

The Plan Proponents request confirmation of the Plan under § 1129(b) of the Bankruptcy Code if the requirements of all provisions of § 1129(a) of the Bankruptcy Code, except subsection (a)(8) thereof, are met regarding the Plan. In determining whether the requirements of § 1129(a)(8) of the Bankruptcy Code have been met, any Class that does not have as an element of it an Allowed Claim or a Claim temporarily allowed under Bankruptcy Rule 3018 as of the date fixed by the Bankruptcy Court for filing acceptances or rejections of the Plan shall be deemed deleted from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class.

### Consummation of the Plan

The Plan Proponents reserve the right to request that the Confirmation Order include a finding by the Bankruptcy Court that Bankruptcy Rule 3020(e) shall not apply to the Confirmation Order.

### Exemption from Transfer Taxes

Under § 1146(a) of the Bankruptcy Code, after due notice to the relevant taxing authorities (state and local), Trustee's, Debtor's or Reorganized Debtor's delivery of any deed or other instrument of transfer under, in furtherance of, or in connection with the Plan, whether occurring before or after the Confirmation Date , including any deeds, bills of sale or assignments executed with any sale or disposition of assets and/or properties contemplated by the Plan, shall not be subject to any stamp tax, real estate transfer tax, excise tax, sales tax, use tax or other similar tax.

### Setoffs, Recoupments, and Defenses

Except for the Sections of the Plan about the Abuse Claims, nothing in the Plan shall constitute a waiver or release by the Debtor, Reorganized Debtor, Participating Parties, the Trustee, or the Unknown Abuse Claims Trustee of any rights of setoff or recoupment, or of any defense, they may have regarding any Claim (including rights under § 502(d) of the Bankruptcy Code), or a waiver or release by any Claimant of any rights of setoff or recoupment, or any defense, they may have regarding any Cause of Action against such Claimant provided such Claimant timely filed a Proof of Claim asserting such right of setoff or recoupment. Except as otherwise provided in the Plan or in the Confirmation Order or in agreements previously approved by a Non-Appealable Order, the Debtor, Reorganized Debtor, Participating Parties, the Trustee, or the Unknown Abuse Claims Trustee may, but will not be required to, set off against any Claim or any Distributions regarding such Claim, any of the claims, rights and Causes of Action of any nature that the Debtor, the Reorganized Debtor, Participating Parties, the Trustee, or the Unknown Abuse Claims Trustee, as applicable, may hold against the Holder of such Claim; provided, however, that neither the failure to effect such a setoff, the allowance of any Claim hereunder, the payment of any Distribution hereunder or any other action or omission of the Debtor, Reorganized Debtor, Participating Parties, the Trustee, or the Unknown Abuse Claims Trustee, nor any provision of the Plan, shall constitute a waiver or release by the Debtor, the Reorganized Debtor, Participating Parties, the Trustee, or the Unknown Abuse Claims Trustee, as applicable, of any such claims, rights and Causes of Action that the Debtor, the Reorganized Debtor, Participating Parties, the Trustee, or the Unknown Abuse Claims Trustee, as applicable, may possess against such Holder.

### Compromise of Controversies

(a) **Bankruptcy Court Approval of Settlements**. In consideration for the classification, Distributions and other benefits provided under the Plan, the Plan shall constitute a good faith compromise and settlement of all Claims or controversies resolved under the Plan. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of each compromise and settlement provided for in the Plan, and the Bankruptcy Court's findings shall constitute its determination under the standards of Bankruptcy Rule 9019 that such compromises and settlements are in the best interests of the Debtor and the Estates.

(b) **Settlement with Participating Parties and Settled Insurer Parties.** Specifically included within the Bankruptcy Court's approval of compromises and settlements of Claims and controversies is the Bankruptcy Court's approval of the agreements with Participating Parties and Settled Insurers. Such agreements also bind the Trust.

### Withdrawal or Revocation of the Plan.

The Plan Proponents reserve the right, jointly and severally, to revoke or withdraw the Plan prior to the Confirmation Date. If the Plan is revoked or withdrawn, or if the Confirmation Date

does not occur, the Plan, and any agreements embodied therein shall have no force and effect and in such event nothing herein shall be deemed to constitute a waiver or release of any Claims by or against the Estate or any other Person, or to prejudice in any other manner the rights of the Plan Proponents, whether one or more, or any other Person in further proceedings involving the Plan Proponents and specifically shall not modify or affect the rights of any party under any prior orders of the Bankruptcy Court.

### Default

Except as otherwise provided in the Plan or in the Confirmation Order, if the Reorganized Debtor, a Participating Party, a Settled Insurer, the Trustee or the Unknown Abuse Claims Trustee shall default in the performance of any of their respective obligations under the Plan or under the Plan Documents and shall not have cured such a default within any applicable cure period (or, if no cure period is specified in the Plan or Plan Documents or in any instrument issued to or retained by a Claimant under the Plan, then within thirty (30) days after receipt of written notice of default), then the Person to whom the performance is due may pursue such remedies as are available at law or in equity. An event of default occurring with respect to one Claim shall not be an event of default regarding any other Claim.

### Governing Law

Except when federal law (including the Bankruptcy Code or Bankruptcy Rules) is applicable, the rights and obligations arising under the Plan or under the Plan Documents shall be governed by and construed and enforced under the laws of the State of Connecticut without giving effect to the principles of conflicts of laws.

### Reservation of Rights

If the Plan is not confirmed by a Non-Appealable Order, or if the Plan is confirmed and the Effective Date does not occur, the rights of all parties in interest in the Case are and will be reserved in full. Any concessions or settlement reflected, if any, are made for purposes of the Plan only, and if the Plan does not become effective, no party in interest in the Case shall be bound or deemed prejudiced by any such concession or settlement.

### Controlling Documents

To the extent any provision of a Settlement Agreement with a Participating Party or Settled Insurer is inconsistent with the Plan or the Confirmation Order, the terms of the Plan and the Confirmation Order shall control, and to the extent any provision of the Confirmation Order is inconsistent with the Plan, the Confirmation Order shall control.

### Successors and Assigns

The Plan shall be binding upon and inure to the benefit of the Debtor, the Reorganized Debtor, all Claimants and all other parties in interest affected thereby and their respective successors, heirs, legal representatives and assigns.

### Direction to a Party

On and after the Effective Date, the Trust, the Unknown Abuse Claims Trust or the Reorganized Debtor, as applicable, may apply to the Bankruptcy Court for entry of an Order directing any Person to execute or deliver or to join in the execution or delivery of any instrument or document reasonably necessary or reasonably appropriate to effect a transfer of properties dealt with by the Plan, and to perform any other act (including satisfaction of any Lien or security interest) that is reasonably necessary or reasonably appropriate for the consummation of the Plan.

### Certain Actions

By reason of entry of the Confirmation Order, prior to, on or after the Effective Date (as appropriate), all matters provided for under the Plan that would otherwise require approval of the officers of the Debtor under the Plan, including (a) the adoption, execution, delivery, and implementation of all contracts, leases, instruments, releases, and other agreements or documents related to the Plan, and (b) the adoption, execution, and implementation of other matters provided for under the Plan involving the Debtor or organizational structure of the Debtor, shall be deemed to have occurred and shall be in effect prior to, on or after the Effective Date (as appropriate), under applicable non-bankruptcy law, with no requirement of further action by the officers of the Debtor.

### Dissolution of the Committee

On the Effective Date, the Committee shall dissolve automatically, whereupon its members, Professionals and agents shall be released from any further duties and responsibilities in the Case and under the Bankruptcy Code, except that such parties shall continue to be bound by any obligations arising under confidentiality agreements, joint defense/common interest agreements (whether formal or informal), and protective Orders entered during the Case, which shall remain in full force and effect according to their terms, provided that such parties shall have a right to be heard regarding any (i) applications for Professional Claims and (ii) requests for compensation and reimbursement of expenses under § 503(b) of the Bankruptcy Code for making a substantial contribution in the Case.

## IX.   EFFECTS OF PLAN CONFIRMATION AND DISCHARGE

### A.   Discharge

Except as expressly provided in the Plan or in the Confirmation Order, on the Effective Date, under § 1141(d) of the Bankruptcy Code, the Diocese will be discharged from all liability for any and all Claims (expressly including all Opt-Out Abuse Claims and Unknown Abuse Claims) and debts, known or unknown, whether or not giving rise to a right to payment or an equitable remedy, that arose, directly or indirectly, from any action, inaction, event, conduct, circumstance, happening, occurrence, agreement, or obligation of the Debtor before the Confirmation Date, or that otherwise arose before the Confirmation Date, including all interest, if any, on any such Claims and debts, whether such interest accrued before or after the date of commencement of this Case, and including all Claims and debts based upon or arising out of an Abuse Claim or alleged Abuse Claim (including any Opt-Out Abuse Claim) and from any liability of the kind specified in §§ 502(g), 502(h), and 502(i) of the Bankruptcy Code, whether or not (a) a proof of claim is filed or is deemed filed under § 501 of the Bankruptcy Code; (b) such Claim is Allowed under the Plan; (c) the Holder of such Claim has accepted the Plan; and/or (d) the Holder of such Claim has elected to not Opt-In and is not, therefore, the holder of a Channeled Claim.

The discharge provided for in Bankruptcy Code § 1141(d), Section 13.1 of the Plan and otherwise in the Plan and the Confirmation Order shall not in any way affect any Abuse Claim against the Debtor solely to the extent necessary for the Trust or an Abuse Claimant to enforce against Non-Settling Insurers or under any Non-Settling Insurer's Insurance Policies and thereby recover upon Insurance Coverage, Insurance Claims, and/or Insurance Recoveries, provided, however, that any such non-discharged Abuse Claim shall be nonrecourse to the Reorganized Debtor and its assets, including the Revested Assets and recourse is limited to the recoveries from the Trust, the proceeds of the Non-Settling Insurer's Insurance Policies and all other damages (including extra-contractual damages), awards, judgments in excess of policy limits, penalties, punitive damages and attorney's fees and costs that may be recoverable against any Non-Settling Insurers, and any such judgments or awards will be handled under the Plan and the Trust Distribution Plan, if applicable.

As provided in Bankruptcy Code § 524(e), unless otherwise provided in the Plan, the discharge as provided in Section 13.1 shall not apply to and shall not affect the liability of any other Person on, or the property of any other Person for, Abuse Claims including the liability of against a Perpetrator, which liability shall continue unaffected by the terms of the Plan or the discharge granted to the Debtor or the Reorganized Debtor under the Plan and Bankruptcy Code § 1141(d).

Abuse Claimants and the Trust shall be permitted to name the Diocese or any Participating Party in any proceeding to resolve whether the Diocese or any Participating Party has liability for Abuse Claims and the amount of any such liability, solely for the purposes permitted by Section 13.1 of the Plan. The discharge hereunder does not apply to and shall not limit in any way the obligations of Non-Settling Insurers to defend and pay, the Diocese's or any Participating Party's liability for Abuse Claims under Non-Settling Insurer Insurance Policies.

This discharge provided for in Bankruptcy Code § 1141(d), Section 13.1 of the Plan and otherwise in the Plan and the Confirmation Order shall not apply to and shall not affect the obligations arising under any (i) Settlement Agreement that is approved by the Bankruptcy Court, or (ii) Non-Settling Insurer's Insurance Policies, which are not and will not be discharged.

### Revested Assets

Pursuant to § 1141 of the Bankruptcy Code, and except as otherwise provided in the Plan, the Confirmation Order or in subsections 1141(d)(2) and (d)(3) of the Bankruptcy Code, on the Effective Date, all of the Revested Assets shall vest in the Reorganized Debtor free and clear of all Claims, and interests of Claimants. On and after the Effective Date, the Reorganized Debtor may operate and manage its affairs and may use, acquire and dispose of property without notice to any Person, and without supervision or approval by the Bankruptcy Court and free of any restrictions imposed by the Bankruptcy Code, Bankruptcy Rules, or the Bankruptcy Court, other than those restrictions imposed by the Plan or the Confirmation Order.

### Continued Existence of Reorganized Debtor

The Debtor will, as the Reorganized Debtor, continue to exist after the Effective Date under the applicable laws of the State of Connecticut, with all the powers of a not for-profit, non-stock member corporation having tax-exempt status under 26 U.S.C. § 501(c)(3) under applicable law and without prejudice to any right to alter or terminate such existence under applicable state law, except as such rights may be limited and conditioned by the Plan and the documents and instruments executed and delivered in connection therewith.

### Exculpation and Limitation of Liability

**Except as expressly provided in the Plan, on and after the Effective Date, none of the Exculpated Parties will have or incur any liability to, or be subject to any right of action by, any Holder of a Claim, any other party in interest, or any of their related parties, for any act or omission occurring between the Petition Date and the Effective Date in connection with or relating to this Bankruptcy Case, including the exercise of their respective business judgment and the performance of their respective fiduciary obligations, the negotiation of any settlement, the pursuit of confirmation of the Plan, or the negotiation of the Disclosure Statement, the Plan and related settlement agreements. For the avoidance of doubt, (a) this section shall not exculpate any Claim for any act or omission that is determined by a Non-Appealable Order to have constituted actual fraud, willful misconduct, criminal conduct, gross negligence, or professional malpractice of an Exculpated Party or any Causes of Action arising from or related to denials of coverage or coverage defenses raised by Non-Settling Insurers, and (b) the definition of "Exculpated Parties" shall not, directly or indirectly, inure to or for the benefit of (i) a Perpetrator, or (ii) the Holy See.**

**Effective Date Injunctions**

On the Effective Date, the injunctions provided for in the Plan shall be deemed issued, entered, valid and enforceable according to their terms. The injunctions shall be permanent and irrevocable and may only be modified by the Bankruptcy Court.

**Channeling Injunction Preventing Prosecution of Channeled Claims Against Participating Parties and Settled Insurers**

**Applicability.** Section 13.10 of the Plan is only applicable to Participating Parties and Settled Insurers and is effective on and after the Effective Date.

In consideration of the undertakings of the Participating Parties and Settled Insurer Parties, pursuant the Plan and their respective settlements with the Debtor or the Trustee, the funding of the Trust, other consideration, and to further preserve and promote the agreements between and among the Participating Parties, Settled Insurer Parties and the Debtor or the Trustee, and the protections afforded the Participating Parties and Settled Insurer Parties, and pursuant, *inter alia*, to §§ 105, 363, 1123, and 1141 of the Bankruptcy Code and subject to the provisions of the Plan and except as otherwise provided in the Plan:

- Any and all Channeled Claims (other than Unknown Abuse Claims and their associated Related Insurance Claims) are channeled into the Trust and Unknown Abuse Claims and their associated Related Insurance Claims are channeled to the Unknown Abuse Claims Trust;

- Persons that have held or asserted, hold or assert, or may hold or assert, any Channeled Claim (including all debt holders, governmental, tax and regulatory authorities, lenders, trade and other creditors, Abuse Claimants, other Insurers, and all others holding Claims of any kind or nature whatsoever) are hereby permanently stayed, enjoined, barred and restrained from taking any action, directly or indirectly, for the purposes of asserting, enforcing, or attempting to assert or enforce any Channeled Claim, including:

  (i) Commencing or continuing in any manner any action or other proceeding of any kind with respect to any Channeled Claim against any Participating Party, Settled Insurer Parties, and any such person's respective predecessors, successors, and assigns, or their respective employees, officers, and directors, or against the property of any Participating Party or Settled Insurer Party;

  (ii) Enforcing, attaching, collecting or recovering, by any manner or means, from any Participating Party or Settled Insurer Party or from the property of any Participating Party or Settled Insurer Party, with respect to any such Channeled Claim, any judgment,

**award, decree, or order against any Participating Party or Settled Insurer Party;**

 (iii) **Creating, perfecting or enforcing any Lien of any kind against any Participating Party, or Settled Insurer Party or the property of any Participating Party or Settled Insurer Party with respect to any such Channeled Claim (except as provided in the Plan); and**

 (iv) **Asserting, implementing or effectuating any Channeled Claim of any kind against: (1) any obligation due any Participating Party or Settled Insurer Party; (2) any Participating Party or Settled Insurer Party; or (3) the property of any Participating Party or Settled Insurer Party with respect to any such Channeled Claim.**

  **Specific Channeling Injunction Exclusions**

 **Notwithstanding any provision of the Plan, the foregoing Channeling Injunction provides absolutely no protection to: (i) a Perpetrator, (ii) the Holy See; (iii) a Non-Settling Insurer; or (iv) any person or Claims expressly excepted from the exculpation as set forth in Section 13.4 (and identified in subclauses (a) and (b)) of the Plan.**

  **Supplemental Catholic Mutual Injunction**

 **On and after the Effective Date, in consideration of the undertakings of the Catholic Mutual Parties (including, but not limited to, the undertakings of Catholic Mutual pursuant to the Catholic Mutual Settlement Agreement and specifically including, without limitation, Catholic Mutual's purchase of the Sold Certificates free and clear of all Liens, Claims and interests pursuant to §§ 363(f) and 1123 of the Bankruptcy Code), pursuant to their respective settlements with the Debtor or the Trustee, the funding of the Trust, other consideration, and to further preserve and promote the agreements between and among the Catholic Mutual Parties and the Debtor or the Trustee, and the protections afforded the Catholic Mutual Parties, and pursuant to §§ 105, 363 and 1123 of the Bankruptcy Code, and except as otherwise provided in the Plan, including, but not limited to Sections 9.4 and 9.5, each and every Opt-In Abuse Claimant is permanently enjoined and barred from asserting against a Catholic Mutual Party any Claim (including, without limitation, any Channeled Claim) or interest of any kind or nature whatsoever arising from or relating in any way to (i) any Channeled Claim or (ii) any of the Catholic Mutual Certificates) or (iii) any and all other Claims relating to the payment of any of the claims identified in clauses (i) and (ii) which, directly or indirectly, relate to any and all Catholic Mutual Certificates or any Abuse Claims that are covered or may be covered under the Catholic Mutual Certificates), or (v) any released Catholic Mutual Claims, including from:**

  • **Commencing or continuing in any manner any action or other proceeding, whether legal, equitable or otherwise, against the Catholic Mutual Party or the property of the Catholic Mutual Party;**

- **Enforcing, attaching, collecting, or recovering, or seeking to do any of the preceding, by any manner or means, any judgment, award, decree or order against the Catholic Mutual Party or the property of the Catholic Mutual Party;**

- **Creating, perfecting, or enforcing, or seeking to do any of the preceding, any Lien of any kind against the Catholic Mutual Party or the property of the Catholic Mutual Party;**

- **Asserting or accomplishing any setoff, right of indemnity, subrogation, contribution, or recoupment of any kind against any obligation due to the Catholic Mutual Party or the property of the Catholic Mutual Party; and**

- **Taking any act, in any manner, in any place whatsoever, that does not conform to, or comply with, the provisions of the Plan.**

**This Supplemental Catholic Mutual Injunction is an integral part of the Plan and is essential to the Plan's consummation and implementation. It is intended that the Supplemental Catholic Mutual Injunction shall be in addition to channeling of the Channeled Claims as provided in Section 13.8 of the Plan and shall inure to the benefit of the Catholic Mutual Parties. In a successful action to enforce the injunctive provisions of Section 13.8 of the Plan in response to a willful violation thereof, the moving party may seek an award of costs (including reasonable attorneys' fees) against the non-moving party, and such other legal or equitable remedies as are just and proper, after notice and a hearing.**

**This Supplemental Catholic Mutual Injunction will be effective with respect to any Catholic Mutual Party only as of the date that the Effective Date Escrow Agent or Trust, as applicable, receives the settlement amount required by such Catholic Mutual Settlement Agreement and the Plan. Nothing in this Supplemental Catholic Mutual Injunction shall limit, or be deemed or otherwise interpreted to limit, the scope of the discharge or Channeling Injunction in favor of the Participating Parties or to limit the Preserved Coverage. The foregoing injunctive provisions are an integral part of the Plan and are essential to its implementation.**

> **Term of Channeling Injunction and Supplemental Catholic Mutual Injunction and Confirmation of Settlements with Participating Parties and Catholic Mutual Parties.**

**The Channeling Injunction and the Supplemental Catholic Mutual Injunction provided for in the Plan, and the injunctive provisions of §§ 524 and 1141 of the Bankruptcy Code are permanent and will remain in full force and effect on and after the Effective Date and are not subject to being vacated or modified. Debtor's Settlement Agreements, if any, with the Catholic Mutual Parties and the Participating Parties previously authorized by the Bankruptcy Court prior to the Confirmation Date, if any, are hereby affirmed and any obligations of Debtor with respect to such Settlement Agreements are excepted from the Debtor's discharge and shall be assumed by the Reorganized Debtor and Trustee, as applicable, on the Effective Date.**

Post-Petition Abuse Claims Temporary Injunction and Gatekeeping Provisions.

Effective immediately upon the Effective Date, all Post-Petition Abuse Claimants are temporarily enjoined and barred (the "Post-Petition Abuse Claims Temporary Injunction") from taking any action, directly or indirectly, for the purposes of asserting, enforcing, or attempting to assert or enforce their Post-Petition Abuse Claim against the Diocese for the lesser of (a) one (1) year after the Effective Date or (b) the conclusion of the claims management activities in subsections 1 and 2 below, during which period no Post-Petition Abuse Claimant can take any action for the purposes of asserting, enforcing or attempting to assert or enforce the Post-Petition Abuse Claim against the Reorganized Debtor unless and until:

- The Post-Petition Abuse Claimant has notified the Reorganized Debtor, the Abuse Claim Reviewer, and Catholic Mutual, and to the extent applicable, the Parish and Catholic Entity (if any) implicated by such Post-Petition Abuse Claim of their Post-Petition Abuse Claim, and consulted with them; and

- If, after notifying and consulting with the appropriate parties as set forth immediately above, unless the Post-Petition Abuse Claim has been resolved or the Diocese has waived the following requirement, the Post-Petition Abuse Claimant, by motion, and after notice and hearing, must obtain an order from the Bankruptcy Court that (i) determines that their Post-Petition Abuse Claim constitutes an Administrative Claim entitled to Administrative Claim priority under the Bankruptcy Code and the Plan, and (ii) specifically authorizes such Post-Petition Abuse Claimant to bring their Post-Petition Abuse Claim against the Diocese. The Bankruptcy Court will have sole and exclusive jurisdiction to determine whether any Post-Petition Abuse Claim constitutes an Administrative Claim entitled to administrative claim priority under the Bankruptcy Code and the Plan. Upon obtaining such an order from the Bankruptcy Court (ordering both (i) and (ii) above), the Post-Petition Abuse Claims Temporary Injunction shall terminate automatically as to such Post-Petition Abuse Claimant who may then proceed to assert, enforce and litigate their Post-Petition Abuse Claim against the Diocese before the appropriate court of competent jurisdiction, other than the Bankruptcy Court.

For the avoidance of doubt, nothing in Section 13.10 of the Plan is intended to limit the Discharge of the Debtor in Section 13.1 of the Plan, Exculpations in Section 13.4 of the Plan, or the releases and injunctions in Sections 13.12, 13.13, and 13.14 of the Plan.

Opt-Out Abuse Claims Temporary Injunction and Gatekeeping Provisions.

**Effective immediately upon the Effective Date, all Opt-Out Abuse Claimants are temporarily enjoined and barred (the "Opt-Out Abuse Claims Temporary Injunction") from taking any action, directly or indirectly, for the purposes of asserting, enforcing, or attempting to assert or enforce their Opt-Out Abuse Claim against any Participating Party for the lesser of (a) one (1) year after the Effective Date or (b) the conclusion of the claims management activities in subsections 1 through 3 below, during which period no Opt-Out Abuse Claimant can take any action for the purposes of asserting, enforcing or attempting to assert or enforce the Abuse Claim against any Participating Party unless and until:**

- **The Abuse Claims Reviewer has evaluated and assigned the Opt-Out Abuse Claim a value pursuant to the Trust Distribution Plan;**

- **The Opt-Out Abuse Claimant has consulted with the Reorganized Debtor, Trustee, the Unknown Abuse Claims Trustee, and Catholic Mutual, if such Claim is alleged to fall within its coverage period, to assess whether their Opt-Out Abuse Claim is a Barred Abuse Claim or Late-Filed Abuse Claim, subject to objection and/or Disallowance; and**

- **If, after notifying and consulting with the appropriate parties as set forth immediately above, unless the Opt-Out Abuse Claim has been resolved or the Diocese has waived the following requirement, the Opt-Out Abuse Claimant, by motion, and after notice and hearing, must obtain an order by the Bankruptcy Court that represents a colorable claim of any kind against the applicable Participating Party, and (ii) specifically authorizes such Opt-Out Abuse Claimant to bring its Opt-Out Abuse Claim against the applicable Participating. The Bankruptcy Court will have sole and exclusive jurisdiction to determine whether any Opt-Out Abuse Claim is colorable. Upon obtaining such an order from the Bankruptcy Court (ordering both (i) and (ii) above), the Post-Petition Opt-Out Abuse Claims Temporary Injunction shall terminate automatically as to such Opt-Out Abuse Claimant who may then proceed to assert, enforce and litigate their Post-Petition Abuse Claim against the applicable Participating Party before the appropriate court of competent jurisdiction.**

**For the avoidance of doubt, nothing in Section 13.11 of the Plan is intended to limit the discharge of the Debtor under Section 13.1 of the Plan, Exculpations as set forth in Section 13.4 of the Plan, or the releases and injunctions in Sections 13.10, 13.12, 13.13, and 13.14 of the Plan.**

**Release of Avoidance Rights against Participating Parties and Catholic Mutual Parties**

**On and after the Effective Date, all avoidance rights, including those arising under §§ 544, 547, 548, 549, 550, and 553 of the Bankruptcy Code, against each of the Participating Parties and Catholic Mutual Parties and the Debtor and Reorganized Debtor shall be deemed settled, compromised, and released by the Plan.**

84

**Release by Debtor, Reorganized Debtor and Estate Of Claims against Each and Every Participating Party or Catholic Mutual Party**

**Effective on and after the Effective Date, except for obligations arising under any executory contract assumed by the Reorganized Debtor pursuant to Section XIV of the Plan, the obligations under any Settlement Agreement, Claims excepted from exculpation and discharge under Section 13.1 and 13.4 of the Plan and except as otherwise provided in the Plan, as of the Effective Date, the Debtor, Reorganized Debtor and the Estate waive, release and discharge any and all Claims or Causes of Action of every kind and nature that Debtor, Reorganized Debtor, or the Estate have or may have against a Participating Party or Catholic Mutual Party, including avoidance rights, and any Claim that such Participating Party or Catholic Mutual Party or its assets are a part of or owned by the Debtor or the Estate. No Claim subject to this Release will survive the Effective Date or be deemed to be assigned to the Trust.**

**Release of Claims between Each and Every Participating Party and Settled Insurer Party**

**Effective on and after the Effective Date, each of the Participating Parties and each of the Catholic Mutual Parties waive, release and discharge any and all Claims or Causes of Action of every kind and nature arising on account of, in connection with or related to an Abuse Claim, that (i) the Participating Parties have or may have against any other Participating Parties or the Catholic Mutual Parties and (ii) that the Catholic Mutual Parties have against any other Catholic Mutual Parties or the Participating Parties, in each case that arise from, relate to or arise in connection with Abuse Claims or the Catholic Mutual Policies; provided that such release shall not release the obligations of the Participating Parties and Catholic Mutual under the Preserved Coverage, the Plan or any Settlement Agreement. No Claim subject to this release will survive the Effective Date or be deemed to be assigned to the Trust. This release is in addition to any releases in a Bankruptcy Court-approved Settlement Agreement with a Participating Party or Catholic Mutual.**

**Pension Plan**

No provision in the Plan, Confirmation Order, the Bankruptcy Code (including § 1141 of the Bankruptcy Code), or any other document filed or order entered in the Bankruptcy Case shall be construed to exculpate, discharge, release or relieve the Debtor, the Catholic Entities, or any other party, in any capacity, from any liability or responsibility to any Person regarding the Pension Plans under any law, governmental policy, or regulatory provision. The Pension Plans shall not be enjoined or precluded from enforcing any such liability or responsibility because of the provisions of the Plan (including those provisions providing for exculpation, satisfaction, release and discharge of Claims against the Debtor), the Confirmation Order, the Bankruptcy Code (including § 1141 of the Bankruptcy Code), or any other document filed or order entered in the Bankruptcy Case. The Trust shall not have any liability to any Person on account of the Pension Plans,

85

including liability as a member of a "Controlled Group" as defined in 29 U.S.C. § 1301(a)(14)(A) or on any other basis.

As of the Effective Date, the Reorganized Debtor shall assume and continue the Pension Plans to the extent of its obligations under the Pension Plans and applicable law. Notwithstanding the foregoing, the Reorganized Debtor reserves all of its rights under the Pension Plan. For the avoidance of doubt, any claims asserted by any beneficiary of the Pension Plan shall be reinstated and shall remain with the same priority and validity as before the Petition Date.

### Police Power

No provision in the Plan, the Confirmation Order, the Bankruptcy Code (including § 1141 of the Bankruptcy Code), or any other document filed or order entered in the Chapter 11 Bankruptcy Case (including the discharge, releases and injunctions set forth in Section XIII of the Plan), shall be construed to exculpate, discharge, release or relieve the Debtor, the other Participating Parties, or any other Person, in any capacity, for their liability or responsibility with respect to any criminal action or proceeding or any action or proceeding by a governmental unit to enforce such governmental unit's police and regulatory power.

## X.     BEST INTERESTS TEST

Under § 1129(a)(7) of the Bankruptcy Code, often called the "best interests test," Holders of impaired allowed claims must either (i) accept the plan of reorganization, or (ii) receive or retain under the plan property of a value, as of the plan's assumed effective date, that is not less than the value such rejecting claimants would receive or retain if the Debtor was liquidated under chapter 7 of the Bankruptcy Code on such date.

The Plan Proponents believe that the Plan provides the same or a greater recovery for claimants holding Allowed Claims as would be achieved in a liquidation under chapter 7 of the Bankruptcy Code. This belief is based on several considerations, including: (i) the additional administrative claims generated by conversion to a chapter 7 case; (ii) the administrative costs of liquidation and associated delays with a chapter 7 liquidation; (iii) the enhanced challenges in recovering upon the Debtor's Insurance Policies in connection with the Abuse Claims; (iv) the inability to force a non-profit religious debtor to liquidate in a chapter 7; and (v) the alleged inability to sell or lease assets of a non-profit religious corporation contrary to either Connecticut law or the laws and discipline of the Roman Catholic Church.

Moreover, any limitations inherent on what can be done with the Diocese's property under the Bankruptcy Code, applicable state law, and the laws and discipline of the Roman Catholic Church may affect the market value of those properties and therefore result in a lower liquidation value for the purposes of the best interests of creditors test under § 1129(a)(7)(A)(ii) of the Bankruptcy Code, such that it is more easily satisfied, to the extent applicable.

The Plan Proponents have prepared an unaudited Liquidation Analysis, **Exhibit 5**, to assist claimants holding Allowed Claims in evaluating the Plan. The Liquidation Analysis compares the projected creditor recoveries that would result from the liquidation of the Debtor in a hypothetical

case under chapter 7 of the Bankruptcy Code with the estimated Distributions to Claimants holding Allowed Claims under the Plan. The Liquidation Analysis is based on the value of the Debtor's assets and liabilities as of a certain date and incorporates various estimates and assumptions, including a hypothetical conversion to a chapter 7 liquidation as of a certain date. While the liquidation analysis includes the liquidation of the Diocese's real and personal property, it is purely hypothetical as the Bankruptcy Code, the Religious Freedom Restoration Act, the First Amendment, and applicable state law preclude the forced sale of the Diocese's property and preclude the possibility of a chapter 7 liquidation.. The inclusion of this property in the liquidation analysis shall not be deemed or constitute an admission by the Diocese that the property is capable of liquidation. Further, the analysis is subject to potentially material changes, including regarding economic and business conditions and legal rulings. The actual liquidation value of the Debtor could vary materially from the estimate provided in the Liquidation Analysis. Finally, the Liquidation Analysis does not include a liquidation analysis of the Debtor's Insurance Policies. This is so because, given insurer coverage defenses and defenses to Abuse Claims, the liquidation value of those policies is highly uncertain.

## XI.    RISK FACTORS

In evaluating whether to vote to accept or to reject the Plan, all Claimants holding Allowed Claims and all Abuse Claimants in the Voting Classes should carefully read and consider the risk factors set forth below, which describe how the anticipated Distributions and treatments under the Plan rely on uncertain assumptions and are not guaranteed. These disclosures are not intended to be inclusive and should be read in connection with the other disclosures in this Disclosure Statement and the exhibits attached. You should consult with your legal, financial, and tax advisors regarding the risks associated with the plan and Distributions you may receive.

### A.    Parties in Interest May Object to the Plan Proponents' Classification of Claims

Section 1122 of the Bankruptcy Code provides that a plan of reorganization may place a claim or an equity interest in a particular class only if such claim is substantially similar to the other claims in such class. The Plan Proponents believe that the classification of Claims under the Plan complies with the requirements in the Bankruptcy Code because they created classes of Claims that only encompass Claims substantially similar to the other Claims in such class. Still, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

### B.    The Plan Proponents May Not Be Able to Secure Confirmation of the Plan

Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a chapter 11 plan, and requires findings by the bankruptcy court that: (a) such plan "does not unfairly discriminate" and is "fair and equitable" regarding any rejecting classes; (b) confirmation of such plan is not likely to be followed by a liquidation or a need for further financial reorganization unless such liquidation or reorganization is contemplated by the Plan; and (c) the value of distributions to rejecting Holders of claims and equity interests within a particular class under such plan will not be less than the value of distributions such Holders would receive if the Debtor was liquidated under chapter 7 of the Bankruptcy Code.

There can be no assurance that the Bankruptcy Court will confirm the Plan. The Bankruptcy Court could decline to confirm the Plan if it found that the statutory requirements for confirmation had not been met, including the requirement that the terms of the Plan do not "unfairly discriminate" and are "fair and equitable" to rejecting Classes. If the Plan is not confirmed, it is unclear what distributions that claimants holding Allowed Claims will receive regarding their Allowed Claims, or the timing of receipt of such distributions, as it is unclear whether a confirmable alternative plan can be proposed by any other party in this chapter 11 case.

## C.     The Non-Settling Insurers May Object to the Plan

The Non-Settling Insurers may object to the Plan. The Non-Settling Insurers may argue that the provisions relating to the assignment and/or enforcement of the Debtor's Insurance Policies related to the Non-Settling Insurers are not enforceable and violate the terms of those policies. In other Diocesan cases, non-settling insurers have heavily litigated the confirmation of proposed reorganization plans. If those objections have been overruled, the non-settling insurers have appealed those decisions. Thus, even if the Bankruptcy Court confirmed the Plan over the objections of Non-Settling Insurers, such Non-Settling Insurers may appeal the confirmation order increasing administrative expenses, delaying resolution and the Effective Date of the Plan even if such appeal failed.

## D.     Nonconsensual Confirmation

The Plan Proponents believe that the Plan satisfies the requirements of § 1129(b) of the Bankruptcy Code to seek a nonconsensual confirmation of the Plan if necessary unless the Holders of Abuse Claims vote to reject the Plan. However, there is no assurance that the Bankruptcy Court will conclude this, in which case the Plan may not be confirmed.

## E.     Non-Occurrence of the Effective Date

The Effective Date is subject to the conditions precedent in the Plan. There can be no assurance that the conditions necessary for the Plan to become effective will be met, in which case Distributions will be delayed.

## CERTAIN FEDERAL INCOME TAX CONSIDERATIONS[12]

**The federal, state, local, and foreign tax consequences of the Plan are complex and, in many areas, uncertain. All Holders of Claims are strongly urged to consult their tax advisors with specific reference to the federal, state, and local tax consequences of the Plan. Neither the Debtor and its counsel and other retained professionals, nor the Committee and its counsel make any representations regarding the particular tax consequences of confirmation and consummation of the Plan as to the Debtor or any creditor.**

The following summary is a general discussion of certain potential Federal income tax consequences of the Plan. The summary is based upon relevant provisions of the Internal Revenue Code of 1986, as amended (the "Tax Code"), the applicable Treasury Regulations promulgated

---

[12] Subject to review by tax counsel.

(the "Treasury Regulations"), judicial authority, published rulings, and such other authorities considered relevant now in effect, which are subject to change.

The federal income tax consequences to any particular creditor may be affected by matters not discussed below. The summary does not address all categories of Creditors, some of which may be subject to special rules not addressed herein. There also may be state, local, or foreign tax considerations applicable to each Creditor or the Debtor.

## F.    Tax Consequences to Creditors

A creditor that receives a Distribution to satisfy its Claim will generally recognize a gain or loss equal to the difference between (i) the amount of cash received by such creditor regarding its Claim (excluding any cash received regarding a Claim for accrued interest) and (ii) the creditor's tax basis in its Claim. The character of any gain or loss recognized as long-term or short-term capital gain or loss or as ordinary income or loss will be determined by several factors, including the tax status of the creditor, whether the Claim constitutes a capital asset in the hands of the creditor, whether the Claim has been held for more than one year, and whether and to what extent the creditor has claimed a bad debt deduction (or charged a reserve for bad debts) regarding the Claim.

For example, if a Distribution is made to satisfy a receivable acquired in the ordinary course of the Claimant's trade or business, and the Claimant had previously included the amount of such receivable Distribution in their gross income under their method of accounting, and had not previously claimed a loss or bad debt deduction for that amount, the receipt of the distribution should not result in additional income to the Claimant but may, result in a loss. Conversely, had the Claimant previously claimed a loss or bad debt deduction regarding the item previously included in income, the Claimant generally would have to include the amount of the distribution in income when received.

The Plan Proponents anticipate that Distributions to satisfy Abuse Claims will, in all instances, constitute damages, other than punitive damages, because of personal physical injuries and/or physical sickness, within the meaning of § 104(a)(2) of Tax Code. The Plan Proponents have not, however, analyzed such tax issues and cannot (and do not) make any assurances or representations regarding the anticipated tax treatment of Abuse Claims.

**There are many factors that will determine the tax consequence to each Holder of an Unsecured Claim. The tax consequences of the Plan are complex, and in some cases, uncertain. Therefore, it is important that each Holder of an Unsecured Claim obtain his, her, or its own professional tax advice regarding the tax consequences to such Holder of an Unsecured Claim as a result of the Plan.**

## G.    Tax Consequences to the Debtor

The Debtor is a non-profit, non-stock member corporation having tax-exempt status under 26 U.S.C. § 501I(3). Due to the Debtor's status as a non-profit corporation, the Debtor does not expect that the Plan will result in any significant federal income tax consequences to the Debtor.

Under the Internal Revenue Code of 1986, as amended (the "Code"), there may be significant federal income tax issues arising under the Plan described in this Disclosure Statement that affect creditors in this chapter 11 case.

## H.      Tax Consequences to the Trust

The Trust may satisfy the requirements of a designated settlement fund under § 468B of the Tax Code or a qualified settlement fund under Regulation 1.468B-1 of the Treasury Regulations. There are certain tax consequences associated with the characterization of the Trust as a designated settlement fund or a qualified settlement fund ("QSF"). The Plan Proponents express no opinion on whether the Internal Revenue Service would conclude that the Trust is a designated settlement fund or a QSF. The Debtor has not requested a ruling from the Internal Revenue Service or an opinion of counsel regarding whether the Trust is a designated settlement fund or a qualified settlement fund. Each creditor is urged to consult its own tax advisor regarding the characterization of the Trust and the tax consequences of such characterization.

The federal income tax consequences to a Holder of a Claim receiving, or entitled to receive, a Distribution in partial or total satisfaction of a Claim may depend on several factors, including the Claim, the Claimants' method of accounting, and their own particular tax situation. Because each Claimant's tax situation differs, Claimants should consult their own tax advisors to determine how the Plan affects them for federal, state, and local tax purposes, based on its particular tax situations.

## XII.      VOTING INSTRUCTIONS

The Claims Agent will send to all Claimants entitled to vote on the Plan: (a) the Disclosure Statement Order; (b) a notice of the Confirmation Hearing; (c) the Disclosure Statement; as approved by the Bankruptcy Court and together with the Plan attached as an exhibit; and (d) a Ballot (collectively, the "Solicitation Packages"). The Solicitation Packages will also describe the procedures and deadline for submitting Ballots to the Claims Agent.

## XIII.      CONCLUSION AND RECOMMENDATION

The Plan Proponents believe that confirmation and implementation of the Plan is preferable to any other alternative. The Plan Proponents urge all claimants entitled to vote to accept the Plan, and urge Abuse Claimants to vote to accept the Plan by so indicating on their Ballots and returning them as specified in the instructions in the Solicitation Packages.

*[Signature Page Follows]*

Dated at Hartford, Connecticut, this 10th day of February, 2025.

By: */s/ Stephen M. Kindseth*
**ZEISLER & ZEISLER P.C.**
Eric A. Henzy (ct12849)
Stephen M. Kindseth (ct14640)
Daniel A. Byrd (ct31151)
10 Middle Street, 15th Floor
Bridgeport, CT 06604
Telephone: (203) 368-4234
Facsimile: (203) 549-0903
E-mail: skindseth@zeislaw.com
          ehenzy@zeislaw.com
          dbyrd@zeislaw.com

*Attorneys for the Official Committee of
Unsecured Creditors*

By: */s/ Patrick M. Birney*
**ROBINSON & COLE LLP**
Patrick M. Birney (ct19875)
Annecca H. Smith (ct31148)
280 Trumbull Street
Hartford, CT 06103
Telephone: (860) 275-8275
Facsimile: (860) 275-8299
E-mail: pbirney@rc.com
          asmith@rc.com

  - and -

**ICE MILLER LLP**
Louis T. DeLucia (admitted *pro hac vice*)
Alyson M. Fiedler (admitted *pro hac vice*)
1500 Broadway, 29th Floor
New York, NY 10036
Telephone: (212) 824-4940
Facsimile: (212) 824-4982
E-Mail: louis.delucia@icemiller.com
          alyson.fiedler@icemiller.com

*Attorneys for the Debtor
and Debtor-in-Possession*

By: */s/ Mark A. Mintz*
**JONES WALKER LLP**
Mark A. Mintz (admitted *pro hac vice*)
Samantha A. Oppenheim (admitted *pro hac vice*)
201 St. Charles Avenue, 51st Floor
New Orleans, LA 70170
Telephone: (504) 582-8368 / (504) 582-8641
Facsimile: (504) 589-8368 / (504) 589-8641
Email: mmintz@joneswalker.com
          soppenheim@joneswalker.com

*Counsel for The Association of Parishes of the
Roman Catholic Diocese of Norwich, Connecticut*

By: */s/ Everett J. Cygal*
**ARENTFOX SCHIFF LLP**
Everett J. Cygal (*admitted pro hac vice*)
David M. Spector (*admitted pro hac vice*)
J. Mark Fisher (*admitted pro hac vice*)
Jin Yan (*admitted pro hac vice*)
Daniel J. Schufreider (*admitted pro hac vice*)
ArentFox Schiff LLP
233 S. Wacker Dr., Suite 7100
Chicago, IL 60606
T: 312.258.5500
F: 312.258.5600
E: everett.cygal@afslaw.com
    david.spector@afslaw.com
    mark.fisher@afslaw.com
    jin.yan@afslaw.com
    daniel.schufreider@afslaw.com

  - and -

91

**GREEN & SKLARZ LLC**
Jeffrey M. Sklarz (ct20938)
One Audubon Street, Third Floor
New Haven, CT 06511
T: 203.285.8545
F: 203.823.4546
E: jsklarz@gs-lawfirm.com

*Counsel for The Catholic Mutual Relief Society of America*