**<u>Exhibit 1</u>**

Sixth Amended Joint Plan of Reorganization

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF CONNECTICUT
## HARTFORD DIVISION

|  |  |
|---|---|
| In re: | Chapter 11 |
| THE NORWICH ROMAN CATHOLIC DIOCESAN CORPORATION,[1] | Case No. 21-20687 (JJT) |
| Debtor. |  |

**SIXTH AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION PROPOSED BY THE NORWICH ROMAN CATHOLIC DIOCESAN CORPORATION, THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS, THE CATHOLIC MUTUAL RELIEF SOCIETY OF AMERICA, AND THE ASSOCIATION OF PARISHES OF THE ROMAN CATHOLIC DIOCESE OF NORWICH, CONNECTICUT**

---

[1]   The Debtor in this chapter 11 case is The Norwich Roman Catholic Diocesan Corporation, a/k/a The Roman Catholic Diocese of Norwich.  The last four digits of the Debtor's federal tax identification number are 7373.

i

**ZEISLER & ZEISLER P.C.**
Eric A. Henzy (ct12849)
Stephen M. Kindseth (ct14640)
Daniel A. Byrd (ct31151)
10 Middle Street, 15th Floor
Bridgeport, CT 06604
Telephone: (203) 368-4234
Facsimile: (203) 549-0903
E-mail: skindseth@zeislaw.com
          ehenzy@zeislaw.com
          dbyrd@zeislaw.com

*Attorneys for the Official Committee of Unsecured Creditors*

**ROBINSON & COLE LLP**
Patrick M. Birney (ct19875)
Annecca H. Smith (ct31148)
One State Street
Hartford, CT 06103
Telephone: (860) 275-8275
Facsimile: (860) 275-8299
E-mail: pbirney@rc.com
          asmith@rc.com

- and –

**ICE MILLER LLP**
Louis T. DeLucia (admitted *pro hac vice*)
Alyson M. Fiedler (admitted *pro hac vice*)
1500 Broadway, 29th Floor
New York, NY 10036
Telephone: (212) 824-4940
Facsimile: (212) 824-4982
E-Mail: louis.delucia@icemiller.com
          alyson.fiedler@icemiller.com

*Attorneys for the Debtor and Debtor-in-Possession*

**JONES WALKER LLP**
Mark A. Mintz (admitted *pro hac vice*)
Samantha A. Oppenheim (admitted *pro hac vice*)
201 St. Charles Avenue, 51st Floor
New Orleans, LA 70170
Telephone: (504) 582-8368 / (504) 582-8641
Facsimile: (504) 589-8368 / (504) 589-8641
Email: mmintz@joneswalker.com
          soppenheim@joneswalker.com

*Counsel for The Association of Parishes of the Roman Catholic Diocese of Norwich, Connecticut*

**ARENTFOX SCHIFF LLP**
Everett J. Cygal (admitted *pro hac vice*)
David M. Spector (admitted *pro hac vice*)
J. Mark Fisher (admitted *pro hac vice*)
Jin Yan (admitted *pro hac vice*)
Daniel J. Schufreider (admitted *pro hac vice*)
ArentFox Schiff LLP
233 S. Wacker Dr., Suite 7100
Chicago, IL 60606
T: 312.258.5500
F: 312.258.5600
E: everett.cygal@afslaw.com
   david.spector@afslaw.com
   mark.fisher@afslaw.com
   jin.yan@afslaw.com
   daniel.schufreider@afslaw.com

- and -

**GREEN & SKLARZ LLC**
Jeffrey M. Sklarz (ct20938)
One Audubon Street, Third Floor
New Haven, CT 06511
T: 203.285.8545
F: 203.823.4546
E: jsklarz@gs-lawfirm.com

*Counsel for The Catholic Mutual Relief
Society of America*

Dated:  February 10, 2025

## <u>TABLE OF CONTENTS</u>

INTRODUCTION .................................................................................................................. 1

SECTION I DEFINITIONS AND INTERPRETATION ................................................................ 1
1.1.    Defined Terms ................................................................................................ 1
1.2.    Interpretation ................................................................................................ 20
1.3.    Time Periods .................................................................................................. 21
1.4.    Exhibits and Schedules ................................................................................. 21

SECTION II PLAN OBJECTIVES AND MEANS OF FUNDING .............................................. 21

SECTION III TREATMENT OF UNCLASSIFIED CLAIMS ...................................................... 23
3.1.    Administrative Claims ................................................................................... 23
3.2.    Priority Tax Claims ....................................................................................... 25
3.3.    U.S. Trustee Fees .......................................................................................... 25

SECTION IV CLASSIFICATION OF CLAIMS ...................................................................... 25
Summary ................................................................................................................ 25
4.1.    Classification and Voting .............................................................................. 25

SECTION V TREATMENT OF CLASSIFIED CLAIMS .......................................................... 26
5.1.    Class 1: Other Priority Claims ...................................................................... 26
5.2.    Class 2 Citizens Bank, N.A. .......................................................................... 26
5.3.    Class 3: M&T Bank Corporation .................................................................. 26
5.4.    Class 4: Abuse Claims (Other Than Unknown Abuse Claims) ..................... 27
5.5.    Class 5: Unknown Abuse Claims (other than Post-Petition Abuse Claims) .................. 32
5.6.    Class 6: General Unsecured Claims .............................................................. 34
5.7.    Class 7: Abuse Related Contribution Claims ................................................ 35
5.8.    Class 8: Claims Held by Catholic Entities, Xavier and Oceania .................. 35

SECTION VI ACCEPTANCE OR REJECTION OF PLAN ...................................................... 36
6.1.    Impaired Classes to Vote .............................................................................. 36
6.2.    Acceptance by Class of Claimants ................................................................ 36

SECTION VII TRUST AND UNKNOWN ABUSE CLAIMS TRUST ....................................... 36
7.1.    Establishment of Trust .................................................................................. 36
7.2.    Payments Effective Upon Tender .................................................................. 41
7.3.    Sale or Transfer of Transferred Real Estate .................................................. 41
7.4     Bond Requirement ........................................................................................ 43

i

SECTION VIII LIQUIDATION AND PAYMENT OF ABUSE CLAIMS ................................ 43
8.1.    Liquidation and Payment of Abuse Claims ......................................................... 43
8.2.    Scope of Damages and Effect of No Award on Abuse Claims ........................... 44
8.3.    Treatment of Punitive Damages .......................................................................... 44
8.4.    Withdrawal of Abuse Claims ............................................................................... 44
8.5.    Medicare Reimbursement and Reporting Obligations ......................................... 45
8.6.    No Admission ....................................................................................................... 45
8.7.    Delay Regarding Failure to Comply .................................................................... 45
8.8.    Documentation by Estate of Abuse Claimant ...................................................... 45

SECTION IX INSURANCE MATTERS REGARDING NON-SETTLING INSURERS ......... 46
9.1.    Transfer of Insurance Interests ............................................................................. 46
9.2.    Appointment of Trustee as the Estate Representative to Enforce Insurance Interests and
        Obtain Insurance Recoveries. .............................................................................. 46
9.3.    Consequences of Determination that Assignment or Appointment is Invalid ................. 47
9.4.    Preservation of Insurance Rights ......................................................................... 48
9.5.    Effect of Discharge, Injunctions and Releases .................................................... 49
9.6.    Post-Judgment Actions against Non-Settling Insurers ........................................ 49
9.7.    Settlement with Non-Settling Insurers ................................................................. 49
9.8.    Cooperation with Non-Settling Insurer in Defense of Claims ............................. 50
9.9.    Insurance Neutrality ............................................................................................. 50
9.10.   Judgment Reduction ............................................................................................. 50
9.11.   No Duty of Diocese or Trust to Prosecute Insurance Claims .............................. 50
9.12.   Effect Under Non-Settling Insurer Policies ......................................................... 51
9.13.   D&O Coverage. .................................................................................................... 51

SECTION X SETTLED INSURERS AND PARTICIPATING PARTIES ................................ 51
10.1.   Settlement Agreements ......................................................................................... 51
10.2.   Settlement Payments; Escrow .............................................................................. 51
10.3.   Post-Effective Date Approval .............................................................................. 52
10.4.   Effect of Post-Effective Date Settlement Agreements ........................................ 52
10.5.   Debtor and Trustee Waiver and Release of Estate's Claims and Causes of Action against
        Participating Parties and Settled Insurers ........................................................... 52
10.6.   Additional Documentation; Non-Material Modifications .................................... 52
10.7.   Mercy Settlement Agreement .............................................................................. 53
10.8.   St. Bernard Settlement Agreement ...................................................................... 53
10.9.   Xavier Settlement Agreement. ............................................................................. 53
10.10.  Mount St. John Settlement Agreement ................................................................ 53
10.11.  Catholic Mutual Settlement .................................................................................. 53
10.12.  Sale of Sold Certificates, Free and Clear of Liens, Claims and Interests ........... 54
10.13.   Full Payment by Catholic Mutual for Settlement .............................................. 54
10.14.  Continuation of Preserved Coverage, as Amended ............................................. 54
10.15.  Catholic Mutual Consent to Amendments. .......................................................... 55

10.16. Indemnification Obligations of Trust and Reorganized Debtor ........................................ 55
10.17. Rights under Catholic Mutual Settlement Agreement ....................................................... 57

SECTION XI MEANS FOR IMPLEMENTATION OF THE PLAN ........................................... 57
11.1. Funding of Plan ................................................................................................................. 57
11.2. Transfer of Real Estate and Reversionary Interests ......................................................... 57
11.3. Preservation of Causes of Action ...................................................................................... 57
11.4. Reorganized Debtor's Officers, Directors and Senior Management ................................. 57
11.5. Closing .............................................................................................................................. 58
11.6. Obligations of the Reorganized Debtor and the Implicated Participating Parties ........... 58
11.7. Objections to Claims ......................................................................................................... 58
11.8. Provisions Governing Distributions .................................................................................. 59
11.9. Reservation of Rights to Object to Claims Other Than Opt-In Abuse Claims ................. 60
11.10. Service of Objections ........................................................................................................ 60
11.11. Determination of Claims ................................................................................................... 61
11.12. No Distributions Pending Allowance ................................................................................ 61
11.13. Claim Estimation .............................................................................................................. 61
11.14. Setoffs ............................................................................................................................... 61
11.15. No Interest on Claims ........................................................................................................ 62
11.16. Withholding Taxes ............................................................................................................ 62
11.17. Post-Confirmation Reports ............................................................................................... 62
11.18. Closing of the Case ........................................................................................................... 62
11.19. No De Minimis Distributions ............................................................................................ 62
11.20. Manner of Cash Payments ................................................................................................ 63

SECTION XII CONDITIONS PRECEDENT .......................................................................... 63
12.1. Conditions to Effectiveness .............................................................................................. 63
12.2. Waiver of Conditions ........................................................................................................ 63
12.3. Notice of Occurrence of Effective Date ............................................................................ 64
12.4. Non-Occurrence of Effective Date .................................................................................... 64
12.5. Termination Following Non-Occurrence of Effective Date .............................................. 64

SECTION XIII EFFECTS OF PLAN CONFIRMATION AND DISCHARGE ......................... 64
13.1. Discharge ........................................................................................................................... 64
13.2. Revested Assets ................................................................................................................. 65
13.3. Continued Existence of Reorganized Debtor ..................................................................... 65
13.4. Exculpation and Limitation of Liability ............................................................................ 66
13.5. Effective Date Injunctions ................................................................................................. 66
13.6. Channeling Injunction Preventing Prosecution of Channeled Claims against Participating
Parties and Settled Insurer Parties ..................................................................................... 66
13.7. Specific Channeling Injunction Exclusions ....................................................................... 67
13.8. Supplemental Catholic Mutual Injunction ........................................................................ 67

13.9.   Term of Channeling Injunction and Supplemental Catholic Mutual Injunction and Confirmation of Settlements with Participating Parties and Catholic Mutual Parties ...... 69

13.10.  Post-Petition Abuse Claims Temporary Injunction and Gatekeeping Provisions ............ 69

13.11.  Opt-Out Abuse Claims Temporary Injunction and Gatekeeping Provisions................... 70

13.12.  Release of Avoidance Rights against Participating Parties and Catholic Mutual Parties ................................................................................................................................ 71

13.13.  Release by Debtor, Reorganized Debtor and Estate of Claims against Each and Every Participating Party or Catholic Mutual Party ...................................................... 71

13.14.  Release of Claims between Each and Every Participating Party and Catholic Mutual Party ..................................................................................................................... 71

13.15.  Pension Plan .................................................................................................................. 71

13.16.  Police Power ................................................................................................................. 72

SECTION XIV TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES ...................................................................................................................... 72

14.1.   Assumed Employee and Retiree Benefit Plans............................................................. 72

14.2.   General; Assumed if Not Rejected ............................................................................... 72

14.3.   Claims for Contract Rejection ...................................................................................... 72

SECTION XV NON-MONETARY COMMITMENTS ................................................................ 73

15.1.   Non-Monetary Commitment to Healing and Reconciliation.......................................... 73

SECTION XVI MISCELLANEOUS PROVISIONS .................................................................... 73

16.1.   Retention of Jurisdiction ............................................................................................... 73

16.2.   Modification of Plan ...................................................................................................... 74

16.3.   Severability .................................................................................................................... 74

16.4.   Headings ........................................................................................................................ 74

16.5.   Notices ........................................................................................................................... 74

16.6.   Notices to Claimants ..................................................................................................... 77

16.7.   Post-Confirmation Court Approval............................................................................... 77

16.8.   Election under § 1129(b) of the Bankruptcy Code ....................................................... 77

16.9.   Consummation of the Plan............................................................................................. 78

16.10.  Exemption from Transfer Taxes .................................................................................... 78

16.11.  Setoffs, Recoupments, and Defenses ............................................................................ 78

16.12.  Compromise of Controversies ...................................................................................... 78

16.13.  Withdrawal or Revocation of the Plan .......................................................................... 79

16.14.  Default............................................................................................................................ 79

16.15.  Governing Law .............................................................................................................. 79

16.16.  Reservation of Rights..................................................................................................... 79

16.17.  Controlling Documents.................................................................................................. 79

16.18.  Successors and Assigns.................................................................................................. 80

16.19.  Direction to a Party. ....................................................................................................... 80

16.20.   Certain Actions ........................................................................................................... 80
16.21.   Rounding of Fractional Numbers.................................................................................. 80
16.22.   Dissolution of the Committee ....................................................................................... 80
16.23.   Saturday, Sunday or Legal Holiday ............................................................................. 80

SECTION XVII RECOMMENDATIONS AND CONCLUSION ............................................. 81

# INTRODUCTION

The Norwich Roman Catholic Diocesan Corporation, the debtor and debtor-in-possession in the above captioned Bankruptcy Case, the Official Committee of Unsecured Creditors appointed in this Bankruptcy Case, the Catholic Mutual Relief Society of America ("Catholic Mutual"), and the Association of Parishes of the Roman Catholic Diocese of Norwich, Connecticut (the "Association of Parishes") (collectively, the "Plan Proponents") jointly propose this plan of reorganization (the "Plan") pursuant to the provisions of the Bankruptcy Code. All Claimants are encouraged to consult the disclosure statement for the Plan (the "Disclosure Statement") before voting to accept or reject this Plan. Among other information, the Disclosure Statement contains discussions of the events involving The Norwich Roman Catholic Diocesan Corporation prior to and during this Bankruptcy Case, and a summary and analysis of the Plan. No solicitation materials, other than the Disclosure Statement, have been authorized by the Bankruptcy Court for use in soliciting acceptances or rejections of the Plan.

## SECTION I
## DEFINITIONS AND INTERPRETATION

**1.1.    Defined Terms**. For the purposes of the Plan, except as expressly provided otherwise, all capitalized terms have the meanings ascribed to them below:

1.      "Abuse" means any actual or alleged (i) sexual conduct, misconduct, abuse, or molestation as defined in any statute or common law; (ii) indecent assault or battery, rape, lascivious behavior, undue familiarity, pedophilia, ephebophilia, or sexually-related physical, psychological, or emotional harm; (iii) contacts or interactions of a sexual nature; or (iv) assault, battery, corporal punishment, or other act of physical, psychological, or emotional abuse, humiliation, intimidation, or misconduct, or as such term is otherwise defined at https://portal.ct.gov/DCF/1-DCF/Child-Abuse-and-Neglect-Definitions. Abuse may occur whether or not this activity involves explicit force, whether or not it involves genital or other physical contact, and whether or not there is physical, psychological, or emotional harm to the Person.

2.      "Abuse Claim" means any Claim, including, but not limited to, any Barred Abuse Claim, any Late-Filed Abuse Claim and any Unknown Abuse Claim, against the Debtor or against any Participating Party for which the Debtor's conduct is a legal cause or a legally relevant factor, resulting or arising in whole or in part, directly or indirectly, from Abuse, the first occurrence of which was committed by any Person against such Abuse Claimant before the Petition Date, and seeking monetary damages or any other relief, under any theory of liability, including vicarious liability, any negligence-based theory, contribution, indemnity, or any other theory based on any acts or failures to act by the Debtor, a Participating Party or any other Person, regardless of whether such Abuse Claim has been asserted prior to the Petition Date. "Abuse Claim" does not include any Related Insurance Claims or Medicare Claims.

3.      "Abuse Claimant" means the Holder of an Abuse Claim.

1

4.      "Abuse Claim Release" means the release in the form attached as **Exhibit L** to the Plan to be executed by the Holder of an Abuse Claim as a precondition to receiving a Full Distribution pursuant to the Plan; which Abuse Claim Release shall be conditioned upon the occurrence of the Effective Date of the Plan, and upon such Effective Date each Abuse Claim Release shall be valid and fully enforceable.

5.      "Abuse Claims Reviewer" means The Honorable Salvatore C. Agati (Ret.), the Person, including the designee of such Person, who will assess Class 4 and Class 5 Claims under the Trust Distribution Plan and the Unknown Abuse Claims Trust Distribution Plan, or any successor appointed in accordance with the terms of the Plan, Confirmation order, and the Trust Agreement.

6.      "Abuse Related Contribution Claim" means any Person's Claim against any other Person for contribution, indemnity, equitable indemnity, subrogation, or equitable subrogation, or reimbursement, or any other indirect or derivative recovery, arising because of such Person having paid or defended against any Abuse Claim including but not limited to a joint tortfeasor or the like. To avoid doubt, an Abuse Related Contribution Claim is not an Abuse Claim.

7.      "ACA" means The Annual Catholic Appeal, Inc., a civil non-stock corporation organized under the law of the State of Connecticut, and is a non-profit fund-raising entity that subsidizes over twenty-five Catholic charitable ministries and programs in communities throughout the territory of the Diocese.

8.      "Administrative Claim" means a Claim for payment of an administrative expense of a kind specified in § 503(b) and referred to in § 507(a)(2) of the Bankruptcy Code, including the actual, necessary costs and expenses of preserving the Estate, any actual, necessary costs and expenses of operating the business of the Debtor, all Professional Claims, any fees or charges assessed against the Estate under 28 U.S.C. § 1930, and any Post-Petition Abuse Claims entitled to administrative claim status as determined by the Bankruptcy Court pursuant to section 13.10 of this Plan.

9.      "Administrative Claims Filing Deadline" means the deadline established by the Bankruptcy Court by which any request for allowance and payment of an Administrative Claim (but expressly excluding Legally Excused Post-Petition Abuse Claims and Professional Claims) must be filed in the Bankruptcy Case and duly served, or be barred in accordance with Section 3.1(d) of this Plan. The Administrative Claims Filing Deadline shall be fourteen (14) days prior to the Confirmation Hearing or such other date as ordered by the Bankruptcy Court.

10.      "Affiliates" means all Persons that control, are controlled by, or are under common control with, another Person, including parents and subsidiaries. For the avoidance of doubt, the following are not Affiliates of any of the Participating Parties: (i) the Non-Settling Insurers; (ii) a Perpetrator; and (iii) the Holy See.

11.      "Allowed" means a Claim or part of it: (a) that has been allowed by a Non-Appealable Order; (b) that has been scheduled by the Debtor as not disputed, not contingent and not unliquidated, for which no Proof of Claim has been timely filed and as to which no objection has been filed by the Claims Objection Deadline; (c) as to which a Proof of Claim in a liquidated

and non-contingent amount has been timely filed and as to which no objection has been filed by the Claims Objection Deadline or any objection has been settled or withdrawn, or has been denied by a Non-Appealable Order; (d) that is expressly allowed by the terms of this Plan; or (e) that is deemed allowed under the Trust Distribution Plan.

12.     "Allowed Professional Claim" means a Professional Claim for which the Bankruptcy Court has entered an Order including, if applicable, an order determining, after notice and a hearing, that a professional has established that it has made a substantial contribution in this Bankruptcy Case within the meaning of § 503(b)(3) of the Bankruptcy Code, which has become a Non-Appealable Order allowing the relevant Fee Application.

13.     "Approval Order" means either: (i) an order of the Bankruptcy Court authorizing and approving a Settlement Agreement, which may include the Confirmation Order; or (ii) in the case of proposed findings of fact and conclusions of law with respect to the authorization and approval of a Settlement Agreement entered and submitted by the Bankruptcy Court to the District Court, the order of the District Court authorizing and approving the Settlement Agreement; and no stay pending appeal has entered or, if entered, no stay pending appeal continues in effect.

14.     "Assets" of the Diocese or the Estate means, collectively, all property of the Diocese or the Estate, respectively, of every kind and character, wherever located, whether real or personal, tangible or intangible, and specifically including cash (including the residual balance of any reserves established under the Plan, but not the Trust) and Causes of Action.

15.     "Association of Parishes" means The Association of Parishes of the Roman Catholic Diocese of Norwich.

16.     "Ballot" means the ballot, the form of which has been approved by the Bankruptcy Court, accompanying the Disclosure Statement provided to each Holder of a Claim entitled to vote to accept or reject the Plan.

17.     "Bankruptcy Case" means this bankruptcy case captioned, *In re: The Norwich Roman Catholic Diocesan Corporation*, bearing Case No: 21-20687 (JJT) pending before the Bankruptcy Court.

18.     "Bankruptcy Code" means the Bankruptcy Reform Act of 1978, as amended and codified in Title 11 of the United States Code, 11 U.S.C. §§ 101 – 1532.

19.     "Bankruptcy Court" means the United States Bankruptcy Court for the District of Connecticut, Hartford Division.

20.     "Bankruptcy Rules" means the Federal Rules of Bankruptcy Procedure as currently promulgated, Fed. R. Bankr. P. 1001–9037, the Local Rules of Bankruptcy Procedure of the Bankruptcy Court, and the Judicial Practices and Procedures of the Bankruptcy Court, in each case as amended from time to time and as applicable to the Bankruptcy Case.

21.    "Barred Abuse Claim" means either:

(a) an Abuse Claim arising from sexual abuse, sexual exploitation or sexual assault at a time when the Abuse Claimant was under the age of eighteen (18), and where both: (i) no civil action had been commenced and remained pending on the Petition Date to recover upon such Abuse Claim within thirty (30) years from the date such Abuse Claimant attained the age of eighteen (18), or if such date occurred on or after March 19, 1990, thirty (30) years and 347 days from such date; and (ii) the Petition Date occurred more than thirty (30) years from the date such Abuse Claimant attained the age of eighteen (18), or if such date occurred on or after March 19, 1990, thirty (30) years and 347 days from such date; or

(b) an Abuse Claim arising from sexual abuse, sexual exploitation or sexual assault at a time when the Abuse Claimant was at least eighteen (18) years old, or an Abuse Claim not arising from sexual abuse, sexual exploitation or sexual assault, where both: (i) no civil action had been commenced and remained pending on the Petition Date to recover upon such Abuse Claim within three (3) years from the date of the act which gave rise to the Abuse Claim, or if such act occurred on or after March 19, 2017, three (3) years and 347 days from the date of such act; and (ii) the Petition Date occurred more than three (3) years from the date of the act which gave rise to the Abuse Claim, or if such act occurred on or after March 19, 2017, three (3) years and 347 days from the date of such act.

22.    "Business Day" means any day other than a Saturday, Sunday or a "legal holiday" (as defined by Bankruptcy Rule 9006(a)).

23.    "Canon Law" means the Code of Canon Law of the Roman Catholic Church, as codified in 1983 and as may hereafter be amended, and all binding universal and particular laws of the Roman Catholic Church.

24.    "Cash" means the equivalent of legal tender of the United States of America, however paid or transmitted.

25.    "Cash Contributions" shall have the meaning ascribed to it in Section 7.1(a)(3) of the Plan.

26.    "Catholic Entities" means those Persons specifically identified on **Exhibit D** and their respective predecessors-in-interest, including such Person's present and former Parishes, schools (including Mount St. John) and certain other Catholic entities specifically identified in **Exhibit D**. All Catholic Entities operate or operated within the geographical territory of the Diocese and are insured or allegedly insured or covered under an Insurance Policy. A Catholic Entity does not include a Perpetrator.

27.    "Catholic Entity Parties" means the Catholic Entities and, solely in the capacity as such: (i) each of their past and present parents, subsidiaries, merged companies, and divisions; (ii) any and all past and present employees, officers, directors, shareholders, principals, teachers, staff, members, boards, administrators, bishops, priests, deacons, brothers, sisters, nuns, other clergy or

4

religious, volunteers, agents, attorneys, and representatives of the foregoing Persons in their capacity as such; and (iii) each of the foregoing Persons' respective predecessors, heirs, successors and assigns. Nothing in the foregoing is intended to suggest that such Persons are "employees" or agents of the members or subject to their control. A "Catholic Entity Party" does not include a Perpetrator.

28.     "Catholic Mutual" means The Catholic Mutual Relief Society of America.

29.     "Catholic Mutual Certificates" means all binders, certificates, or other evidence of coverage issued or allegedly issued by Catholic Mutual to the Diocese and certain other Persons including, at various times, the Catholic Entities. All Catholic Mutual Certificates are identified in **Exhibit C** appended hereto.

30.     "Catholic Mutual Defense and Indemnification Limitation" has the meaning set forth in Section 8.1(c), below.

31.     "Catholic Mutual Parties" means Catholic Mutual and, solely in the capacity as such, (i) each of its past and present parents, subsidiaries, Affiliates, holding companies, merged companies, related companies, reinsurers, retrocessionaires and divisions; (ii) each of the foregoing Persons' respective past and present, directors, officers, shareholders, employees, subrogees, partners, principals, agents, attorneys, joint ventures, joint venturers, representatives, and claims handling administrators in their capacity as such; and (iii) each of the foregoing Person's respective predecessors, heirs, successors, assignors, and assigns, whether known or unknown, and all Persons acting on behalf of, by, through or in concert with them. A "Catholic Mutual Party" does not include a Perpetrator.

32.     "Catholic Mutual Contribution" means the sum of $5,300,000 to be paid by Catholic Mutual to the Trust after satisfaction of all conditions set forth in the Catholic Mutual Settlement Agreement affixed hereto as **Exhibit J**.

33.     "Catholic Mutual Settlement Agreement" means the Settlement Agreement by and amongst the Diocese Parties, the Catholic Entity Parties and Catholic Mutual affixed hereto as **Exhibit J** which shall be approved by an Approval Order.

34.     "Cause of Action" or "Causes of Action" means, except as provided otherwise in the Plan, the Confirmation Order, or any document, instrument, release, or other agreement entered into in connection with the Plan, all Claims, actions, causes of action, suits, debts, dues, sums of money, accounts, reckonings, bonds, bills, specialties, controversies, variances, trespasses, damages, judgments, third-party Claims, counterclaims, and cross claims of the Diocese or its Estate, the Committees, or the Trust (as successor to the Diocese or its Estate), whether or not pending on the Effective Date against any Person based on law or equity (in each case, in respect of a Cause of Action that arose before the Effective Date), including under the Bankruptcy Code, whether direct, indirect, derivative, or otherwise and whether asserted or unasserted, known or unknown, any action brought pursuant to §§ 522, 541–45, 547–51, and 553 of the Bankruptcy Code; provided, however, that any affirmative defense or crossclaim asserted with respect to a Claim shall not be deemed a Cause of Action to the extent that it seeks to disallow or reduce, or is offset against, such Claim.

5

35.     "Channeled Claim" means any Opt-In Abuse Claim and/or any Claim against a Participating Party, any Catholic Mutual Party or any of the Catholic Mutual Certificates arising from, in connection with, or related to an Opt-In Abuse Claim, including any Related Insurance Claim; provided, however, that a "Channeled Claim" does not include any Abuse Claim against: (i) a Perpetrator; (ii) any religious order, diocese or archdiocese other than Participating Parties, or (iii) the Holy See.  For the avoidance of doubt "Channeled Claim" includes any Barred Abuse Claim, any Late-Filed Abuse Claim and any Unknown Abuse Claim that qualifies as an Opt-In Abuse Claim.

36.     "Channeling Injunction" means the injunction imposed pursuant to Section 13.6 of the Plan, the Confirmation Order and any such channeling injunction provided for in, or required by this Plan including any Settlement Agreement with a Participating Party or a Catholic Mutual Party.

37.     "Citizens" means RBS Citizens, N.A., as successor in interest to Citizens Bank of Connecticut.

38.     "Citizens Secured Guaranty Claim" means the general, contingent, unliquidated claim alleged by Citizens in the approximate amount of $5,046,752.32 as of the Petition Date, arising out of those certain pre-petition Limited Guaranty Agreements, dated April 30, 1998, as same may have been amended from time to time (collectively, the "Citizens Guaranty Agreement"), made by the Diocese to Citizens to with respect to alleged indebtedness of Xavier to Citizens, as secured by certain mortgages granted on the 181 Randolph Rd. Property.

39.     "Claim" shall have the meaning as that term is defined in § 101(5) of the Bankruptcy Code, and regardless of the application of any statute of limitations defense.

40.     "Claimant" means the Holder of a Claim.

41.     "Claims Bar Date" means March 15, 2022.

42.     "Claims Objection Deadline" means, unless extended by the Bankruptcy Court, the first Business Day that follows the sixtieth (60th) day after the Effective Date, by which any objection to a Claim (excluding Class 4 Claims and Class 5 Claims) must be filed with the Bankruptcy Court or such objection will be forever barred.

43.     "Class 4 Ballot" means the Ballot that the Holders of Class 4 Claims will use to accept or reject the Plan and includes the Abuse Claim Release (in the form attached hereto as **Exhibit L**) required to be completed and executed by each Class 4 Claimant pursuant to the Plan, the Confirmation Order, and the Trust, as a condition to receive Full Distributions from the Trust.

44.     "CMS" means the Centers for Medicare and Medicaid Services of the United States Department of Health and Human Services, located at 7500 Security Boulevard, Baltimore, MD 21244-1850 and/or any Representative or successor Person charged with responsibility for monitoring, assessing, or receiving reports made under MMSEA for reimbursement of Medicare Claims.

45.     "Co-Defendant" means either (i) a defendant in a lawsuit in which the Debtor is also named as a defendant and which lawsuit alleges an Abuse Claim against the defendant and the Debtor, and/or (ii) a Person who may be fully or partially responsible with the Debtor for conduct giving rise to an Abuse Claim, whether or not asserted prior to the Effective Date. A Participating Party or Settled Insurer Party is not a Co-Defendant.

46.     "Committee" means the Official Committee of Unsecured Creditors appointed in this Bankruptcy Case, as such committee may be constituted from time to time.

47.     "Confirmation Date" means the date on which the Confirmation Order is entered by a court having jurisdiction.

48.     "Confirmation Order" means either: (i) the order entered by the Bankruptcy Court confirming the Plan pursuant to § 1129 of the Bankruptcy Code; or (ii) in the case of proposed findings of fact and conclusions of law with respect to confirmation of the Plan entered by the Bankruptcy Court and submitted to the District Court, the order of the District Court confirming the Plan pursuant to § 1129 of the Bankruptcy Code; and no stay pending appeal has entered or, if entered, no stay pending appeal continues in effect.

49.     "Convenience Claim" shall have the meaning set forth in Section 5.4(c)(ii) of the Plan.

50.     "Convenience Claimant" means the Holder of a Convenience Claim.

51.     "D&O Coverage" shall have the meaning set forth in Section 9.13 of the Plan.

52.     "Debtor" means the Diocese as debtor in possession pursuant to § 1107(a) of the Bankruptcy Code in this above-captioned Bankruptcy Case.

53.     "Defense Reserve Protocol" means the process set forth in Section 11 of the Trust Agreement for the ratable use by any Participating Party alleged to be liable on an Opt-Out Abuse Claim of that portion of the contributions made by the Participating Parties and Catholic Mutual to the Trust that would have been distributed pursuant to the Trust Distribution Plan to an Opt-Out Abuse Claimant in Class 4 had such Opt-Out Abuse Claimant exercised their right to Opt-In in accordance with the Plan.

54.     "Diocese" means The Norwich Roman Catholic Diocesan Corporation, which is the diocesan corporation formed under applicable Connecticut law, and includes the Debtor and/or Reorganized Debtor.

55.     "Diocese Parties" means collectively the Diocese and Reorganized Debtor, as now constituted or as it may have been constituted, and, solely in their capacity as such: (i) each of their past and present parents, subsidiaries, merged companies and divisions; (ii) any and all past and present employees, officers, directors, shareholders, principals, teachers, staff, members, boards, administrators, bishops, priests, deacons, brothers, sisters, nuns, other clergy or religious, volunteers, agents, attorneys, and representatives of the foregoing Persons in their capacity as such; and (iii) each of the foregoing Persons' respective predecessors, heirs, successors and assigns. Nothing in the foregoing is intended to suggest that such Persons are "employees" or agents of the

Diocese or subject to its control. A "Diocese Party" does not include either: (i) a Perpetrator; or (ii) Epiq and its Affiliates.

56.     "Direct Action Claims" means the same as "Abuse Claims", except that they are asserted against any Settled Insurer Party, instead of any Participating Party or the Trust, for the recovery of insurance proceeds.

57.     "Disallowed" means (i) a Claim, or any part of it, that has been disallowed by Non-Appealable Order; (ii) a Claim which has been scheduled by the Debtor at zero or as contingent, disputed, or unliquidated and as to which no Proof of Claim has been timely filed or deemed timely filed with the Bankruptcy Court under the Bankruptcy Code, a Non-Appealable Order, or other applicable law; or (iii) a Claim not listed in the schedules filed by the Debtor and as to which no Proof of Claim has been timely filed or deemed timely filed with the Bankruptcy Court under the Bankruptcy Code or a Non-Appealable Order.

58.     "Disputed" when used with respect to a Claim against the Diocese or property of the Diocese, means a Claim: (i) designated as disputed, contingent, or unliquidated in the Debtor's Schedules; (ii) which is the subject of an objection, appeal, or motion to estimate that has been or will be timely filed by a party in interest and which objection, appeal, or motion has not been determined by a Non-Appealable Order; or (iii) which during the period prior to the deadline fixed by the Plan or the Bankruptcy Court for objecting to such Claim, is in excess of the amount scheduled as other than disputed, unliquidated, or contingent. In the event that any part of a Claim is Disputed, such Claim in its entirety shall be deemed to constitute a Disputed Claim for purposes of distribution under the Plan unless the Debtor or the Reorganized Debtor, as applicable, and the Holder thereof, agree otherwise. To the extent the term "Disputed" is used in the Plan with respect to a specified class of Claims or an unclassified category of Claims (i.e., "Disputed [class designation/unclassified Claim category] Claim"), the resulting phrase shall mean a Disputed Claim of the specified class or unclassified category of Claims. The processes for handling "Disputed Claims" do not apply to Opt-In Abuse Claims classified in Class 4 and/or Class 5. The Diocese, the Participating Parties and the Settled Insurers shall not have and have waived and relinquished the ability to object to any Opt-In Abuse Claims. The process for Disputed Opt-In Abuse Claims in Class 4 and Class 5 will be governed by the Trust Agreement and Unknown Abuse Claims Trust Agreement, respectively.

59.     "Distribution" means any payment of Cash or property to any Holder of an Allowed Claim as provided in the Plan.

60.     "Distribution Date" means each date determined by the Trustee or the Unknown Abuse Claims Trustee in their sole discretion on which Distributions will be made from the Trust or the Unknown Abuse Claims Trust, as applicable, to Holders of allowed Claims classified in Class 4 or Class 5, respectively, and in accordance with the Plan, the Confirmation Order, the Trust Distribution Plan and the Unknown Abuse Claims Trust Distribution Plan, as applicable.

61.     "District Court" means the United States District Court for the District of Connecticut.

62. "Effective Date" means the date upon which the conditions in Section XII of the Plan have been satisfied.

63. "Effective Date Escrow Agent" means Zeisler & Zeisler, P.C., in its capacity as the escrow agent pursuant to the Plan, the Confirmation Order and the Effective Date Escrow Agent Agreement.

64. "Effective Date Escrow Agent Agreement" means that certain Effective Date Escrow Agreement in the form appended to the Plan as **Exhibit N**.

65. "Epiq" means Epiq Corporate Restructuring, LLC.

66. "Estate" means the bankruptcy estate created upon the commencement of this Bankruptcy Case pursuant to § 541 of the Bankruptcy Code.

67. "Exculpated Parties" means collectively, the Debtor, the Catholic Mutual Parties, the Committee and the Committee's members (solely in their representative capacity), and the Association of Parishes, and each of their respective officers, directors, attorneys, employees, financial advisors, accountants, and other duly authorized employed professionals in this Bankruptcy Case, including the Mediators and the Unknown Abuse Claims Representative. An "Exculpated Party" shall not include a Perpetrator.

68. "Executory Contracts" means all contracts or unexpired leases entered into before the Petition Date between the Diocese and any other Person or Persons, pursuant to which parties to both sides of the contract or lease have remaining material duties such that the breach by one party would excuse the performance by the other parties thereto. Executory Contracts are attached hereto as **Exhibit P**.

69. "Extra-Contractual Claims" means any Claim against the Insurers seeking any type of relief in connection with any alleged obligations of the Insurers to the Participating Parties (including compensatory, exemplary, or punitive damages, or attorneys' fees, interest, costs or any other type of relief) alleging any of the following: bad faith; failure to provide insurance coverage under any Insurance Policy; failure or refusal to compromise and settle any Claim insured under any Insurance Policy; failure to act in good faith; violation of any covenant or duty of good faith and fair dealing; violation of any state insurance codes, state surplus lines statutes or similar codes or statutes; violation of any unfair claims practices act or similar statute, regulation or code; any type of misconduct or any other act or omission of any type for which the claimant seeks relief other than coverage or benefits under an Insurance Policy. The term "Extra-Contractual Claims" includes all Claims relating to the Insurers' (i) handling of any request for insurance coverage for any Claim under the Insurance Policies; (ii) conduct relating to the negotiation of the Insurance Settlement Agreements; and (iii) conduct relating to the settlement of any Insurance Coverage concerning the Insurance Policies.

70. "Fee Application" means an application filed with the Bankruptcy Court in accordance with the Bankruptcy Code and Bankruptcy Rules for payment of a Professional Claim.

71. "Final Decree" means the decree contemplated under Bankruptcy Rule 3022.

9

72. "Full Distributions" means all Distributions required by the Trust Distribution Plan to be paid on account of an Allowed Opt-In Abuse Claim classified in Class 4 and funded by the contributions from the Debtor, Catholic Mutual and the Participating Parties.

73. "Holder" means a Person holding a Claim.

74. "Insurance Claims" means all Claims against any Non-Settling Insurer whether sounding in contract, tort, statute or otherwise, including equity and bad faith, held by:

    a.     the Debtor related to an Abuse Claim including those for: (i) Insurance Coverage, (ii) the interpretation or enforcement of the terms of any Insurance Policy; and/or (iii) an Extra-Contractual Insurance Claim; or

    b.     the Participating Parties related to an Abuse Claim against the Participating Party, whether independently or jointly liable with the Debtor on such Abuse Claim, including (i) Insurance Coverage; (ii) the interpretation or enforcement of the terms of any Insurance Policy; and/or (iii) an Extra-Contractual Insurance Claim.

    c.     The term "Insurance Claims" includes any Claim against a Non-Settling Insurer for reimbursement of defense costs or related expenses under any Non-Settling Insurer's Insurance Policy incurred by the Debtor or a Participating Party through or after the Effective Date.

75. "Insurance Coverage" means insurance or other form of indemnification against loss, available under any Insurance Policy, whether known or unknown to the Debtor or the Committee, to indemnify and/or defend all or any part of an Abuse Claim asserted against (a) the Debtor and/or (b) a Participating Party.

76. "Insurance Litigation" means any actual or potential litigation as to any recoveries from any Non-Settling Insurer or any rights under any Non-Settling Insurer Policies.

77. "Insurance Policies" mean any and all policies, certificates and other contracts providing Insurance Coverage, including without limitation, those listed on **Exhibit C**.

78. "Insurance Recoveries" means the rights to any proceeds, including any interest or income earned thereon, and other relief, from (a) any award, judgment, relief, or other determination entered or made as to any Insurance Claims, including regarding any Causes of Action related to or arising in connection with any Insurance Claims; (b) any amounts payable by an Insurer under any Settlement Agreement with the Debtor, a Participating Party or a Settled Insurer regarding Insurance Claims; and (c) any proceeds of any Insurance Policy paid or payable to the Debtor, a Participating Party or a Settled Insurer regarding Insurance Claims. Insurance Recoveries do not include any recoveries of a Settled Insurer under any agreement or contract providing reinsurance to the Settled Insurer.

79. "Insurance Settlement Agreement" means, collectively or separately, any agreements between the Debtor and/or the Trustee and Catholic Mutual or any other Settled Insurer with respect to Insurance Coverage or Related Insurance Claims.

80. "Insurer" means a Person (including all of its Affiliates, successors, and assigns) that has, or is alleged to have, issued, subscribed any interest in, assumed any liability for, or underwritten any risk in, any Insurance Policy.

81. "Late-Filed Abuse Claim" means an Abuse Claim for which the Abuse Claimant filed a Proof of Claim in the Bankruptcy Case after the Claims Bar Date and before the Effective Date.

82. "Late-Filed Abuse Claimant" means the Holder of a Late-Filed Abuse Claim.

83. "Legally Excused" means at least one of the following conditions were in effect with respect to a Abuse Claimant: (a) the Abuse Claimant was below the age of 18; (b) the Abuse Claimant was unable to file a timely Abuse Claim because the Abuse Claimant was in the active military service of the United States, or otherwise entitled to the protections of the Soldiers' and Sailors' Relief Act of 1940, or the Servicemembers' Civil Relief Act of 2003 (whether in or out of the United States, and whether in or out of a combat zone); or (c) the Abuse Claimant was unable to file a timely claim because the Abuse Claimant was (i) legally incompetent to sue or assert a claim such that his or her access to the courts was impaired, or (ii) the Abuse Claimant was prevented from pursuing his or her remedies by the tortious or illegal acts of a Person; provided that the Abuse Claimant's request for a finding of a valid legal excuse under subsection (c) must be: (A) recognized, as a basis for relief from the statute of limitations, under the law of the jurisdiction in which the Abuse Claimant's injury was suffered; and (B) supported in the same manner as required under the law of the jurisdiction in which the Abuse Claimant's injury was suffered (or to the extent that state's law is silent on the matter, (i) by the sworn statement of the Abuse Claimant, describing, in detail, the Abuse Claimant's impairment, and why, as a result, the Abuse Claimant could not file a timely claim; and (ii) supported by the expert report or sworn statement of a psychiatrist, psychologist or treating physician (in each case, with an expertise in the area) explaining why the Abuse Claimant could not file a timely claim).

84. "Legally Excused Post-Petition Abuse Claim" means a Post-Petition Abuse Claim that arises from the Abuse of a Post-Petition Abuse Claimant when such Post-Petition Abuse Claimant was Legally Excused as of the Administrative Claims Filing Deadline for which a request for allowance and payment was not filed before the Administrative Claims Filing Deadline.

85. "Lien" means any charge against or interest in property to secure payment of a debt or performance of an obligation as provided by § 101(37) of the Bankruptcy Code.

86. "Mediators" means, individually and collectively, Paul A Finn, Commonwealth and Conciliation, Inc., the Honorable Christopher F. Droney (Ret.), Droney Law, LLC, and the Honorable Joan N. Feeney (Ret.), JAMS.

87. "Medicare Claims" means any and all Claims by CMS against the Trust, any Settled Insurer, or any Participating Party, under MMSEA and under MSP, that relate to any payments in respect of any Abuse Claims, including Claims for reimbursement of payments made to Abuse Claimants who recover or receive any Distribution from the Trust and Claims by CMS relating to reporting obligations.

88.     "Medicare Trust Fund" means a U.S. Treasury-held trust fund account from which Medicare is funded or from which Medicare disbursements are paid, including the Hospital Insurance Trust Fund and the Supplementary Medical Insurance (SMI) Trust Fund.

89.     "Mercy" means Mercy High School Corporation, a Connecticut nonprofit corporation, located at 1740 Randolph Rd., Middletown, Connecticut.

90.     "Mercy Settlement Agreement" means the Settlement Agreement by and among Mercy, the Diocese, and the Committee subject to approval pursuant to the Plan.

91.     "Mount St. John" means Mount Saint John, Inc., a Connecticut nonprofit corporation, located at 135 Kirtland Street, Deep River, Connecticut.

92.     "Mount St. John Parties" means collectively Mount St. John and: (i) each of the past and present parents, subsidiaries, merged companies and divisions; (ii) any named covered party, covered party and additional covered party of Mount St. John under the Catholic Mutual Certificates; (iii) any and all past and present employees, officers, directors, shareholders, principals, teachers, staff, members, members of boards, administrators, bishops, priests, deacons, brothers, sisters, nuns, other clergy or religious personnel, volunteers, agents, attorneys, and representatives of Mount St. John and/or for the Persons in their capacity as such; and (iv) each of the foregoing Persons' respective predecessors, heirs, successors and assigns.  Nothing in the foregoing is intended to suggest that such Persons are "employees" or agents of Mount St. John or subject to its control.

93.     "Mount St. John Settlement Agreement" means the Settlement Agreement by and among Mount St. John, Inc., the Diocese, and the Committee.

94.     "MMSEA" means § 111 of the Medicare, Medicaid, and SCHIP Extension Act of 2007 (P.L. 110-173), which imposes reporting obligations on those Persons with payment obligations under the MSPA.

95.     "MSPA" means 42 U.S.C. § 1395y *et seq.*, or any other similar statute or regulation, and any related rules, regulations, or guidance issued in connection therewith or amendments thereto.

96.     "M&T" means M&T Bank Corporation (Manufacturers and Traders Trust Company), and all of its successors by merger and predecessors in interest, including, but not limited to, as successor by merger of People's United Bank, National Association, as successor by merger of Farmington Bank.

97.     "M&T Guaranty Agreement" means that certain Limited Guaranty Agreement executed by the Diocese to Farmington Bank on February 26, 2016, to secure the alleged indebtedness of Mercy to Farmington Bank, M&T's predecessor in interest.

98.     "M&T Secured Guaranty Claim" means that certain general, contingent, unliquidated claim alleged by M&T in the approximate amount of $1,687,541.00 as of March 31, 2023, arising as a result of the M&T Guaranty Agreement, and allegedly secured by that certain Open-End Mortgage Deed, Security Agreement and Fixture Filing granted upon the 1740

Randolph Rd. Property by the Diocese to Farmington Bank, M&T's predecessor in interest, on February 26, 2016, and recorded at Volume 1861, Page 407, of the Middletown Land Records.

99.     "M&T Secured Revolving Loan Claim" means the amount of $276,543.32, alleged by M&T to be due and owing under that certain Commercial Note and Revolving Loan Agreement, dated September 7, 1994 by and between the Diocese and M&T, as successor to People's United Bank, National Association, and alleged by M&T to be secured by certain of the Diocese's deposit accounts held at M&T. The M&T Secured Claim is subject to the rights of the Diocese under the Interim Order and Stipulation Authorizing Use of Cash Collateral of, and Granting Adequate Protection to, Peoples United Bank, National Association [Dkt. No. 154].

100.     "Net Proceeds" means the gross consideration paid by the purchaser(s) less state and local conveyance taxes, recording fees, and the real estate agent commission due by seller. Net Proceeds shall not include any interest accrued thereon.

101.     "Non-Appealable Order" means an order, judgment, or other decree (including any modification or amendment thereof) that remains in effect and is final and has not been reversed, withdrawn, vacated, or stayed, and as to which the time to appeal or seek review, rehearing, or writ of certiorari has expired and as to which no appeal, petition for certiorari, or other proceedings for reargument or rehearing shall then be pending or as to which, if such an appeal, writ of certiorari, review, reargument, or rehearing has been timely sought, then no order, judgment, or other decree is a Non-Appealable Order until (a) such appeal, certiorari, review, reargument, or rehearing has been denied or dismissed and the time to take any further appeal or petition for certiorari, review, reargument, or rehearing has expired; or (b) such order has been affirmed by the highest court to or in which such order was appealed, reviewed, reargued, or reheard, or that granted certiorari, and the time to take any further appeal or petition for certiorari, review, reargument, or rehearing has expired; provided, however, that the possibility that a motion under Rule 59 or Rule 60 of the Federal Rules of Civil Procedure or any analogous rule under the Bankruptcy Rules may be filed with respect to such order shall not cause such order not to be a "Non-Appealable Order." For the avoidance of doubt, if applicable, the order entered by the District Court upon the proposed findings of fact and conclusions of law submitted by the Bankruptcy Court (rather than such proposed findings of fact and conclusions of law) shall be the order, judgment or decree referred to in this definition.

102.     "Non-Settling Insurer Policies" means the known or unknown contracts, binders, certificates, or policies of insurance that any Non-Settling Insurer issued, subscribed in any interest in, or has underwritten any risk in, in effect on or before the Effective Date, and that were issued to, allegedly issued to, or for the benefit of, or that otherwise actually, allegedly, or potentially insure, the Diocese, the Participating Parties or any of their predecessors in interest, successors, or assigns, and that actually, allegedly or could potentially afford coverage with respect to any Abuse Claim.

103.     "Non-Settling Insurer(s)" means any Insurer that is not a Settled Insurer by the Effective Date; provided, however, that after the Effective Date a Non-Settling Insurer may become and may be treated as a Settled Insurer in accordance with the terms of this Plan including, without limitation, pursuant to Section X of the Plan.

104.     "Oceania" means The Oceania Province of the Congregation of Christian Brothers

f/k/a The St. Patrick's Province of the Christian Brothers. For the avoidance of doubt, "Oceania" does not include the Congregation of Christian Brothers (a/k/a *Congregatio Fratrum Christianorum*, Irish Christian Brothers, or the Edmund Rice Christian Brothers) and any of its subdivisions, subsidiaries, and Affiliates, including but not limited to the North American Province of Christian Brothers, other than Oceania.

105.    "Opt-In" means the right conferred pursuant to this Plan for each Abuse Claimant or the Unknown Abuse Claims Representative to execute and deliver, in accordance with the terms and conditions of this Plan, the Abuse Claim Release releasing the Participating Parties and Catholic Mutual Parties, and consenting to the Channeling Injunction and Supplemental Catholic Mutual Injunction, or otherwise to provide their consent to the Abuse Claim Release, Channeling Injunction and Supplemental Catholic Mutual Injunction, and, in exchange, to receive the treatment of their Abuse Claim as provided for in this Plan and the Trust Distribution Plan or the Unknown Abuse Claims Trust Distribution Plan, including Full Distributions and other benefits as provided for therein for Opt-In Abuse Claims of that class.

106.    "Opt-In Abuse Claim" means an Abuse Claim held by an Opt-In Abuse Claimant.

107.    "Opt-In Abuse Claimant" means any Abuse Claimant who has exercised their right to Opt-In, or for whom the Unknown Abuse Claims Representative has exercised the right to Opt-In on their behalf.

108.    "Opt-Out Abuse Claim" means an Abuse Claim held by an Opt-Out Abuse Claimant.

109.    "Opt-Out Abuse Claims Temporary Injunction" has the meaning set forth in Section 13.11 of the Plan.

110.    "Opt-Out Abuse Claimant" means any Abuse Claimant who, on and after the time provided by this Plan to Opt-In, has ***not*** exercised their right to Opt-In, or for whom the Unknown Abuse Claims Representative has ***not*** exercised the right to Opt-In on their behalf or an Unknown Abuse Claimant who has timely elected not to be bound by the Unknown Abuse Claims Representative's Opt-In in accordance with Section 5.5(f)(i) of the Plan.

111.    "Other Insurance Policy" has the meaning set forth in Section 10.10 of the Plan.

112.    "Parishes" means each and every parish of or in the geographical region of the Diocese specifically listed in **Exhibit F** appended hereto.

113.    "Partial Distributions" means the Distributions required by the Trust Distribution Plan to be paid from the Trust on account of an Allowed Opt-Out Abuse Claim classified in Class 4 and funded by the Debtor's contribution.

114.    "Participating Party" means any Person providing consideration in exchange for: (a) the release of any Abuse Related Contribution Claim by the Debtor against such Participating Party; (b) the benefit of the Channeling Injunction; and/or (c) any other benefits for Participating Parties under the Plan. For clarity, the Persons listed on **Exhibit F**, as may be amended from time to time—including, but not limited to, the Diocese Parties, the Catholic Entity Parties, the ACA,

14

Xavier and Oceania—are Participating Parties, and (i) each of their respective past and present, subsidiaries, Affiliates, holding companies, merged companies, related companies and divisions; (ii) each of the foregoing Persons' respective past and present, directors, officers, shareholders, employees, subrogees, partners, principals, agents, attorneys, joint ventures, joint venturers, representatives in their capacity as such; and (iii) each of the foregoing Person's respective predecessors, successors, assignors, and assigns, whether known or unknown, and all Persons acting on behalf of, by, through or in concert with them. Upon the consent of the Trustee, at his sole and absolute discretion, a Person may become a Participating Party after the Effective Date if the Bankruptcy Court approves the agreement between the Person and the Trustee under its retained jurisdiction. Upon the Bankruptcy Court's final approval of such an agreement, **Exhibit F** will be amended by the Trustee to include such Person. For the purposes of defining a Participating Party, the Persons on **Exhibit F** shall include their respective predecessors, successors, assigns, employees, officers, agents, attorneys, representatives, and directors. A Participating Party does not include any Settled Insurer Parties, the Holy See or any Perpetrator.

115. "Perpetrator" means a Person having personally committed an act or acts of Abuse resulting in a Claim against the Debtor, a Participating Party and/or a Settled Insurer Party.

116. "Person" means any individual or entity, including any corporation, limited liability company, partnership, general partnership, limited partnership, limited liability partnership, limited liability limited partnership, proprietorship, association, joint stock company, joint venture, estate, trust, trustee, personal executor or personal representative, unincorporated association, or other entity, of any nature and wherever located, including any federal, international, foreign, state, or local governmental or quasi-governmental entity, body, or political subdivision or any agency or instrumentality thereof and any other individual or entity within the definition of (i) "person" in § 101(41) of the Bankruptcy Code; or (ii) "entity" in § 101(15) of the Bankruptcy Code.

117. "Petition Date" means July 15, 2021, the date on which the Diocese commenced the Bankruptcy Case.

118. "Plan" means this plan of reorganization proposed pursuant to Chapter 11 of the Bankruptcy Code, either in its present form or as it may be altered, amended, or modified from time to time with the consent of the Plan Proponents, the Settling Insurers, and the Participating Parties, in accordance with the provisions of the Bankruptcy Code and the Bankruptcy Rules.

119. "Plan Proponents" shall have the meaning set forth in the "Introduction" paragraph of the Plan.

120. "Post-Petition Abuse Claim" means any Claim arising from Abuse that first occurred after the Petition Date and before the Effective Date for which the Debtor is determined to be legally responsible.

121. "Post-Petition Abuse Claimant" means the Holder of a Post-Petition Abuse Claim.

122. "Post-Petition Abuse Claims Temporary Injunction" shall have the meaning set forth in Section 13.10 of the Plan.

123. "Preserved Coverage" means coverage of the Diocese Parties and the Catholic

15

Entity Parties referred to in the Catholic Mutual Certificates (or the "Ledgers" incorporated therein) including coverage for Post-Petition Abuse Claims, subject to the limits, declarations, terms and conditions of the Catholic Mutual Certificates, as amended by the Catholic Mutual Settlement Agreement; provided, however, that Preserved Coverage shall not include: (a) coverage under the Sold Certificates or (b) coverage for: (i) any and all Direct Action Claims or Abuse Claims, or (ii) any and all other Channeled Claims, which coverage under clauses (a) and (b) hereof is settled, extinguished and excluded by the Catholic Mutual Settlement Agreement and this Plan.

124. "Priority Tax Claim" means a Claim of a governmental unit of the kind specified in § 507(a)(8) of the Bankruptcy Code.

125. "Professional" means any professional employed or to be compensated pursuant to §§ 327, 328, 330, 331, 503(b), or 1103 of the Bankruptcy Code.

126. "Professional Claim" means a Claim for compensation for services and/or reimbursement of expenses pursuant to §§ 327, 328, 330, 331, or 503(b) of the Bankruptcy Code in connection with an application made to the Bankruptcy Court in the Bankruptcy Case.

127. "Proof of Claim" means a proof of Claim filed in the Bankruptcy Case pursuant to § 501 of the Bankruptcy Code and/or pursuant to any order of the Bankruptcy Court, together with supporting documents.

128. "Related Insurance Claim" means (i) any Claim against any Settled Insurer for defense, indemnity, reimbursement, contribution, subrogation, or similar relief that, directly or indirectly, relates to an Abuse Claim; (ii) any Extra-Contractual Claim that, directly or indirectly, relates to any Abuse Claim; (iii) any Direct Action Claim; (iv) any Medicare Claim; and (v) any Abuse Related Contribution Claim.

129. "Released Catholic Mutual Claims" means any Claims against Catholic Mutual that are released under the Catholic Mutual Settlement Agreement or this Plan.

130. "Reorganized Debtor" means the Diocese, on and after the Effective Date. Unless otherwise expressly stated or the context otherwise requires, references to the "Diocese" and the "Reorganized Debtor" throughout various provisions of the Plan are an effort to anticipate whether an event may occur before or after the Effective Date. In this regard, and generally for purposes of the Plan, any written agreement signed after the Petition Date made by the Diocese as part of the Plan before the Effective Date (unless otherwise provided) will survive the Confirmation Date and the Effective Date and will bind the Reorganized Debtor and every other party to such agreement (including, but not limited to, the provisions of the Plan if confirmed). For the avoidance of doubt, the use of the term "Diocese" or "Debtor" instead of "Reorganized Debtor" shall not limit the rights of the Diocese as Reorganized Debtor under this Plan.

131. "Revested Assets" means all Assets owned by the Debtor as of the Effective Date that are not transferred to the Trust under the Plan effective as of the Effective Date.

132. "Settled Insurer" means Catholic Mutual and: (a) each of those Insurers on **Exhibit E** to the Plan, as amended by order of the Bankruptcy Court. Upon the consent of the Trustee, at his sole and absolute discretion, a Person may become a Settled Insurer after the Effective Date if

16

the Bankruptcy Court approves the Settlement Agreement between the Person and the Trustee under its retained jurisdiction. Upon the Bankruptcy Court's approval of such an agreement by a Non-Appealable Order, **Exhibit E** will be amended by the Trustee to include such Person.

133.    "Settled Insurer Parties" means each and every Settled Insurer and, solely in the capacity as such, (i) each of its past and present parents, subsidiaries, Affiliates, holding companies, merged companies, related companies, reinsurers, retrocessionaires, and divisions; (ii) each of the foregoing Persons' respective past and present, directors, officers, shareholders, employees, subrogees, partners, principals, agents, attorneys, joint ventures, joint venturers, representatives, and claims handling administrators in their capacity as such; and (iii) each of the foregoing Person's respective predecessors, heirs, successors, assignors, and assigns, whether known or unknown, and all Persons acting on behalf of, by, through or in concert with them. A "Settled Insurer Party" does not include a Perpetrator.

134.    "Settled Insurer Policies" means, collectively, all Insurance Policies that are the subject of an Insurance Settlement Agreement(s) with the Settled Insurers.

135.    "Settlement Agreement" means any compromise or settlement of controversy or other agreement by and between the Committee and/or Trustee, on the one hand, and, *inter alia*, the Diocese, Catholic Mutual, any other Settled Insurer, any Participating Party, and/or any other Person, on the other, memorializing any settlement or compromise or resolving any Abuse Claim, claim for Insurance Coverage and/or any Insurance Claim, and includes for avoidance of doubt any Insurance Settlement Agreement, the Mercy Settlement Agreement, St. Bernard Settlement Agreement, Xavier Settlement Agreement, and the Mount St. John Settlement Agreement.

136.    "Sold Certificates" means all Certificates of coverage issued by Catholic Mutual for coverage before July 1, 1990, and specifically identified in **Exhibit C** appended hereto, that are to be sold free and clear of Liens and interests pursuant to the Approval Order authorizing and approving the Catholic Mutual Settlement Agreement and the Plan.

137.    "St. Bernard" means Saint Bernard School of Montville, Incorporated, a Connecticut nonprofit corporation, located at 1593 Route 32, Montville, Connecticut.

138.    "St. Bernard Property" means that certain piece and parcel of real property, and all buildings and improvements thereon, known 593 Route 32, Montville, Connecticut, and comprised of approximately a 113-acre site, and previously owned by the Diocese.

139.    "St. Bernard Property Sale" means the sale of the St. Bernard Property in accordance with the *Order Approving the Sale of Certain Property, Including All Improvements Thereon in Montville, Connecticut and Granting Certain Related Relief* entered on June 20, 2023 [Dkt. No. 1344].

140.    "St. Bernard Settlement Agreement" means the Settlement Agreement by and among St. Bernard, the Diocese, and the Committee subject to approval pursuant to the Plan.

141.    "Supplemental Plan Documents" means, collectively, the documents included (or to be included) in the supplemental appendix to the Plan and filed with the Bankruptcy Court at least 14 days prior to the Confirmation Hearing, and shall include the form of the promissory note

required by Section 7.1(a)5.

142.   "Supplemental Catholic Mutual Injunction" means the injunction set forth in Section 13.9 of the Plan and which has also been incorporated into the Confirmation Order.

143.   "Transferred Cash" means all the right, title and interest of the Debtor in any and all cash and cash equivalents, marketable securities and all other accounts, and their proceeds, identified in subsection 3 of Section 7.1(a) of this Plan.

144.   "Transferred Insurance Interests" means the Insurance Claims and Insurance Recoveries against Non-Settling Insurers deemed assigned to the Trust pursuant to and to the extent provided by Section VIII of the Plan, as of the Effective Date, and Insurance Claims and Insurance Recoveries transferred after the Effective Date pursuant to any Settlement Agreement approved by a Non-Appealable Order, identified in subsection 7 of Section 7.1(a).

145.   "Transferred Real Estate" means all the right, title and interest of the Debtor and St. Mary's Roman Catholic Church, as applicable, in any and all Real Estate (including all Land and Improvements) (as each such term "Real Estate," "Land" and "Improvements" are defined in **Exhibit O** of this Plan, which definitions are incorporated herein by reference), and their proceeds, identified in **Exhibit O** of this Plan.

146.   "Trust" means the trust created for the benefit of certain Abuse Claimants in accordance with the Plan and Confirmation Order and the Trust Agreement.

147.   "Trust Agreement" or "Trust Documents" shall mean the trust agreement establishing the Trust, as it may be amended, together with such additional document as may be executed in connection with the Trust Agreement, including the Trust Distribution Plan.

148.   "Trust Assets" means the Transferred Cash, the Transferred Insurance Interests, the Transferred Real Estate and the other assets and rights to be transferred to the Trust under Section VII of the Plan or otherwise pursuant to the Plan.

149.   "Trust Distribution Plan" means the Trust Distribution Plan established under the Trust Agreement.

150.   "Trustee" means Craig R. Jalbert, the trustee of the Trust in accordance with the terms of the Plan, the Confirmation Order, and the Trust Agreement, or any successor appointed in accordance with the terms of the Plan, Confirmation Order, and the Trust Agreement.

151.   "Unimpaired" means, with respect to a class of Claims, that such class is not impaired.

152.   "Unknown Abuse Claim" means any Abuse Claim that arises from the Abuse of an Abuse Claimant provided such Abuse Claimant was Legally Excused as of the Petition Date. For the avoidance of doubt, an Unknown Abuse Claim does not include any Late-Filed Abuse Claim.

153.   "Unknown Abuse Claimant" means the Holder of an Unknown Abuse Claim, the legal representative of the Holder of an Unknown Abuse Claim, such as a trustee, the estate of a

deceased individual who held an Unknown Abuse Claim, or the personal executor or personal representative of the estate of a deceased individual who held an Unknown Abuse Claim, as the case may be.

154. "Unknown Abuse Claims Representative" means Michael R. Hogan, in his role as Unknown Abuse Claims Representative in accordance with the *Order on Debtor's (I) Motion to Appoint an Unknown Abuse Claims Representative and (II) Application to Employ Michael R. Hogan as the Unknown Abuse Claims Representative* [Dkt. No. 753], or such other individual who may be appointed to succeed Michael R. Hogan.

155. "Unknown Abuse Claims Trust" means the trust to be established under the Plan and the Unknown Abuse Claims Trust Agreement. For the avoidance of doubt, "Unknown Abuse Claims Trust" does not include the Trust.

156. "Unknown Abuse Claims Trust Agreement" means the agreement attached as **Exhibit B** to the Plan.

157. "Unknown Abuse Claims Trust Distribution Plan" means the protocol for the allocation, treatment and Distribution of Unknown Abuse Claims Trust Assets substantially in the form attached as **Exhibit B** to the Plan.

158. "Unknown Abuse Claims Trust Assets" means all property funded to the Unknown Abuse Claims Trust under the Plan.

159. "Unknown Abuse Claims Trust Documents" means the Unknown Abuse Claims Trust Agreement, the Unknown Abuse Claims Trust Distribution Plan, and other documents defined as "Unknown Abuse Claims Trust Documents" in the Unknown Abuse Claims Trust Agreement and shall include any documents reasonably necessary or desirable to implement the Plan that relate to the creation, administration, operation and funding of the Unknown Abuse Claims Trust, as any of the same may be amended, modified, or supplemented.

160. "Unknown Abuse Claims Trustee" means Kara S. Rescia, Rescia Law, P.C., the trustee of the Unknown Abuse Claims Trust in accordance with the terms of the Plan, the Confirmation Order, and the Unknown Abuse Claims Trust Agreement, and any successor trustee appointed under the Unknown Abuse Claims Trust Agreement.

161. "Unsecured Claims" means Claims against the Debtor which are not secured by any property of the Debtor's Estate and which are not part of any other class defined in this Plan.

162. "U.S. Trustee" means the Office of the United States Trustee for Region 2, which includes the District of Connecticut.

163. "Voting Deadline" means the deadline to accept or reject the Plan, as established by the Bankruptcy Court in the order approving the Disclosure Statement.

164. "Xavier" means Xavier High School Corporation of Middletown, a Connecticut nonprofit corporation, located at 181 Randolph Rd, Middletown, CT 06457.

165.  "Xavier Property" means those certain pieces and parcels of real property, and all buildings and improvements thereon, collectively known as 181 Randolph Road, Middletown, Connecticut, and collectively comprised of approximately a 56.96 acre parcel.

166.  "Xavier Property Transfer" means the transfer of the Xavier Property by the Diocese to Xavier (or its designee) pursuant to § 1123(a)(5)(D) of the Bankruptcy Code on or before the Effective Date and pursuant to the Plan, yielding the $2.5 million contribution of proceeds of the sale by the Diocese to the Trustee, and after satisfaction of all other conditions set forth in Xavier Settlement Agreement.

167.  "Xavier Settlement Agreement" means the Settlement Agreement by and among Xavier, the Diocese, and the Committee subject to approval pursuant to the Plan.

**1.2.  Interpretation**. For purposes of the Plan:

(a)  any term that is not defined herein, but that is used in the Bankruptcy Code or the Bankruptcy Rules, shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as applicable;

(b)  the terms "including" or "include(s)" are intended to be illustrative  and not exhaustive, and shall be construed as "including, but not limited to" or "include(s), but is not limited to";

(c)  whenever the context requires, terms shall include the plural as well as the singular number, and the masculine gender shall include the feminine gender and the feminine gender shall include the masculine;

(d)  the rules of construction set forth in § 102 of the Bankruptcy Code and in the Bankruptcy Rules shall apply;

(e)  unless the context should otherwise require, all references to documents to be filed shall refer to filing with the Bankruptcy Court in accordance with the Bankruptcy Code and Bankruptcy Rules;

(f)  any reference in the Plan to a contract, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions;

(g)  any reference in the Plan to an existing document or exhibit filed or to be filed means such document or exhibit, as it may have been or may be amended, modified or supplemented;

(h)  unless otherwise specified, all references in the Plan to "Schedules" and "Exhibits" are references to Sections, Schedules and Exhibits of or to the Plan;

(i)  the words "herein," "hereof," and "hereto" refer to the Plan in its entirety rather than to a particular portion of the Plan;

20

(j) captions and headings to Sections are inserted for ease of reference only and shall not be considered a part of the Plan or otherwise affect the interpretation of the Plan; and

(k) the Plan supersedes all prior drafts of the Plan, and all prior negotiations, agreements, and understandings with respect to the Plan, evidence of which shall not affect the interpretation of any provision of the Plan.

**1.3.    Time Periods.** In computing any period of time prescribed or allowed by the Plan, unless otherwise expressly provided, the provisions of Bankruptcy Rule 9006(a) shall apply. Enlargement of any period of time prescribed or allowed by the Plan shall be governed by the provisions of Bankruptcy Rule 9006(b).

**1.4.    Exhibits and Schedules.** All exhibits to the Plan (including any Supplemental Plan Documents) (with the Plan, the "Plan Documents") are hereby incorporated by reference and made part of the Plan as if set forth fully herein. The exhibits to the Plan include the following:

| | |
|---|---|
| Exhibit A: | Trust Agreement and Trust Distribution Plan |
| Exhibit B: | Unknown Abuse Claim Trust Agreement and Unknown Abuse Claim Trust Distribution Plan |
| Exhibit C: | Schedule of Insurance Polices |
| Exhibit D: | Schedule of Catholic Entities |
| Exhibit E: | Schedule of Settled Insurers |
| Exhibit F: | Schedule of Participating Parties |
| Exhibit G: | Non-Monetary Commitments to Healing and Reconciliation |
| Exhibit H: | Officers and Directors of Reorganized Debtor |
| Exhibit I: | List of Allegedly Barred Abuse Claims |
| Exhibit J: | Catholic Mutual Settlement Agreement |
| Exhibit K: | Mount St. John Settlement Agreement |
| Exhibit L: | Abuse Claim Release |
| Exhibit M: | Real Estate Representations and Warranties |
| Exhibit N: | Effective Date Escrow Agent Agreement |
| Exhibit O: | Transferred Real Estate |
| Exhibit P: | Schedule of Executory Contracts |
| Exhibit Q: | Mercy Settlement Agreement |
| Exhibit R: | St. Bernard Settlement Agreement |
| Exhibit S: | Xavier Settlement Agreement |

## SECTION II
## PLAN OBJECTIVES AND MEANS OF FUNDING

This Plan provides for:

(a) The Diocese to make meaningful and substantial contributions to fund, through the Trust and Unknown Abuse Claims Trust, Distributions to Abuse Claimants holding Allowed Abuse Claims, while also satisfying or, at least, fairly and equitably

21

treating the other Claims against the Diocese;

(b)     The Diocese to reorganize expeditiously on terms and conditions acceptable to the Diocese and the Committee and in the best interests of all Claimants including the Abuse Claimants; and

(c)     Catholic Mutual, the Catholic Entities (which includes Mercy and St. Bernard's), Mount St. John, Xavier and Oceania to make fair and reasonable contributions to fund, through the Trust, Distributions to Abuse Claimants in exchange for the benefits conferred upon them pursuant to this Plan including the releases, Channeling Injunction and Supplemental Catholic Mutual Injunction.

Upon the Effective Date, Catholic Mutual—who entered into the Catholic Mutual Settlement Agreement which has been incorporated into this Plan—shall become a Settled Insurer. Also on the Effective Date the Catholic Entities (including Mount St. John), Xavier and Oceania shall become Participating Parties. The Catholic Mutual Settlement Agreement, Mercy Settlement Agreement, Mount St. John Settlement Agreement, and Xavier Settlement Agreement shall each be incorporated by reference into the Plan and approved by the Confirmation Order. The Diocese's and the Participating Parties' Transferred Insurance Interests against any Non-Settling Insurer shall be transferred to the Trust and shall be a Trust Asset. The Trust Assets shall include, among other assets, contributions from the Diocese, the Participating Parties, and Catholic Mutual, and the Transferred Insurance Interests. Trust Assets will fund Distributions to Abuse Claimants under the Trust Distribution Plan.

Abuse Claimants whose Claims occurred during the coverage period of a Non-Settling Insurers' Insurance Policy may, subject to the Trustee's consent and the Trust Documents, pursue their Abuse Claims in a court of competent jurisdiction against the Debtor and any other defendant; *provided, however*, that any such Claims are subject to the terms of this Plan and that Claims against the Debtor or a Participating Party may be paid only from the proceeds of an Insurance Policy issued by a Non-Settling Insurer.

Abuse Claimants may also become entitled to receive Full Distributions pursuant to this Plan and the Trust Distribution Plan by entering into and returning the Abuse Claims Release in accordance with the terms and conditions of the Plan. The Abuse Claims Release provides for the release of the Participating Parties and the Catholic Mutual Parties in exchange for their substantial contributions to the Trust that funds Full Distributions to Abuse Claimants. The Plan defines this right as to "Opt-In." Abuse Claimants who do not Opt-In are referred to as "Opt-Out Abuse Claimants," each of whom hold "Opt-Out Abuse Claims." Opt-Out Abuse Claimants will only receive Partial Distributions on account of their Opt-Out Abuse Claims pursuant to this Plan and the Trust Distribution Plan.

The Diocese, each Participating Party, and Catholic Mutual will receive the benefit of releases and injunctions provided under this Plan. Nothing in this Plan is intended to replace and does not affect, diminish, or impair the liabilities of any Non-Settling Insurer or any Person that is not a Participating Party under applicable non-bankruptcy law, including the law governing joint and several liabilities.

## SECTION III
## TREATMENT OF UNCLASSIFIED CLAIMS

**3.1.    Administrative Claims.**

    (a)    **Allowed Administrative Claims (other than Professional Claims)**. Each Holder of an Allowed Administrative Claim, excluding Professional Claims, against the Diocese shall receive, in full satisfaction, settlement, release, and extinguishment of such Claim, an amount from the Reorganized Debtor equal to the Allowed amount of such Administrative Claim, unless the Holder agrees in writing to other treatment of such Claim. Such payment shall be made either (a) on the Effective Date, or, if later, the Allowance Date; or (b) upon such terms as agreed to in writing by the Administrative Claimant and Diocese.

    (b)    **Allowed Professional Claims**. Each Holder of an Allowed Professional Claim shall receive, in full satisfaction, settlement, release, and extinguishment of such Claim, an amount from the Reorganized Debtor equal to the Allowed amount of such Professional Claim, unless the Holder agrees in writing to other treatment of such Claim. The representation by Goldberg Kohn Ltd. ("GK") of Mount St. John in this Bankruptcy Case and in connection with the proposed sale of property to fund the Plan has made a substantial contribution up to a cap of $175,000, $100,000 of which may only be satisfied from the proceeds of sale as provided in the Mount St. John Settlement Agreement; provided, however, that the allowance of such amount pursuant to § 503(b) of the Bankruptcy Code is subject to the approval of the Bankruptcy Court upon motion and after due notice and a hearing.

    (c)    **Post-Petition Abuse Claims**.

    1.    As of the date of filing of this Plan, no Post-Petition Abuse Claim has been filed or asserted. Any and all Post-Petition Abuse Claims shall be subject to the Post-Petition Abuse Claims Temporary Injunction set forth in Section 13.10 of this Plan, unless waived by the Reorganized Debtor after consultation with Catholic Mutual and any affected Parish or Catholic Entity.

    2.    The Diocese and Catholic Mutual preserve all rights to object to and defend against liability for or the allowance of such alleged Post-Petition Abuse Claim.

    (d)    **Administrative Filing Deadline**.

    1.    Except as otherwise set forth in this Plan, requests for allowance and payment of Administrative Claims (excluding Legally Excused Post-

Petition Abuse Claims and Professional Claims) must be filed and served no later than the Administrative Claims Filing Deadline. Administrative Claims Holders (excluding Holders of Legally Excused Post-Petition Abuse Claims and Professional Claims), that do not file a request for allowance and payment by the Administrative Claims Filing Deadline shall be forever barred from asserting such Claims against the Diocese, the Reorganized Debtor, the Trust, the Unknown Abuse Claims Trust, or any of their property. Administrative Claims representing obligations incurred by the Diocese after the Effective Date (including, without limitation, Claims for Professionals' fees and expenses) will not be subject to application to the Bankruptcy Court and may be paid by the Reorganized Debtor in the ordinary course of business and without Bankruptcy Court approval. In addition, Holders    of Administrative Claims representing trade debt incurred after the Petition Date in the ordinary course of Debtor's operations are not required to file requests for allowance of an Administrative Claim and will be paid by the Debtor in the ordinary course.

2.    All objections to the allowance of Administrative Claims (excluding Legally Excused Post-Petition Abuse Claims and Professional Claims) must be served and filed by any parties-in-interest no later than fourteen (14) days after the Administrative Claim Filing Deadline (the "Administrative Claim Objection Deadline"). If no objection to the applicable Administrative Claim is filed on or before the Administrative Claim Objection Deadline, such Administrative Claim will be deemed Allowed. For the avoidance of doubt, the Administrative Claim Objection Deadline established by the Bankruptcy Court shall control over any contrary deadline set forth in any requests for allowanced and payment of Administrative Claims.

(e)    **Professional Claim Filing Deadline**. All Professionals or other Persons holding a Professional Claim for services rendered on or before the Effective Date (including, among other things, any compensation requested by any Professional or any other Person for making a substantial contribution in the Bankruptcy Case) shall file and serve an application for final allowance of compensation and reimbursement of expenses accruing from the Petition Date to the Effective Date, no later than thirty (30) days after a notice of the Effective Date is filed (the "Professional Claim Filing Deadline").

(f)    **Payment of Allowed Professional Claims**. The Reorganized Debtor shall pay all unpaid Allowed Professional Claims accruing through the Effective Date, (i) within seven (7) days after the later of the Effective Date or the Bankruptcy Court's order on such Claims, or (ii) upon such terms as may exist pursuant to an agreement between such holder of an Allowed Professional Claim and the Debtor.

**3.2.    Priority Tax Claims**. A Priority Tax Claim is an unsecured Claim of a governmental unit entitled to priority in payment under any provision of § 507(a)(8) of the Bankruptcy Code. As for any Allowed Priority Tax Claim not paid before the Effective Date, the Reorganized Debtor shall (a) pay such Claim on the Effective Date; or (b) provide such other treatment agreed to by the Holder of such Allowed Priority Tax Claim and the Debtor and the Estate (if before the Effective Date) or the Reorganized Debtor (on and after the Effective Date).

**3.3.    U.S. Trustee Fees**. All fees due and payable under 28 U.S.C. § 1930 and not paid before the Effective Date shall be paid on and after the Effective Date when due and payable to the extent due under applicable law. After the Effective Date, the Reorganized Debtor shall pay quarterly fees to the U.S. Trustee to the extent due under applicable law until the Bankruptcy Case is closed, and a Final Decree is entered. In addition, the Reorganized Debtor shall file post-Confirmation Date reports in conformance with the U.S. Trustee guidelines. The U.S. Trustee shall not be required to file a request for payment of its quarterly fees, which will be deemed Administrative Claims against the Diocese. The Trust and the Unknown Abuse Claims Trust shall have no liability for U.S. Trustee fees.

## SECTION IV
## CLASSIFICATION OF CLAIMS

**Summary**. The categories of Claims listed below classify Claims (except for Administrative Claims and Priority Tax Claims) for all purposes, including voting, confirmation of the Plan, and distribution pursuant to the Plan:

| CLASS | DESCRIPTION | IMPAIRMENT | VOTING |
|---|---|---|---|
| 1 | Other Priority Claims | Unimpaired | Deemed to Accept |
| 2 | Secured Claim of Citizens Bank, N.A. | Impaired | Yes |
| 3 | Secured Revolving Loan and Secured Guaranty Claims of M&T | Unimpaired | No |
| 4 | Abuse Claims Other Than Unknown Abuse Claims | Impaired | Yes |
| 5 | Unknown Abuse Claims | Impaired | Yes |
| 6 | General Unsecured Claims | Unimpaired | Deemed to Accept |
| 7 | Abuse Related Contribution Claims | Impaired | Yes |
| 8 | Claims Held by the Catholic Entities, Xavier, and Oceania | Impaired | Yes |

**4.1.    Classification and Voting.** The Claims against the Debtor shall be classified as specified above (other than Administrative Claims and Priority Tax Claims, which shall be unclassified and treated in accordance with Section III). Consistent with § 1122 of the Bankruptcy Code, a Claim is classified by the Plan in a particular class only to the extent the Claim is within

the description of the class, and a Claim is classified in a different class to the extent it is within
the description of that different class.

## SECTION V
## TREATMENT OF CLASSIFIED CLAIMS

**5.1.**   **Class 1: Other Priority Claims.**

(a)   **Definition**. A "Class 1 Claim" means an Allowed Claim described in, and entitled
to priority under § 507(a) of the Bankruptcy Code other than an Administrative
Claim or a Priority Tax Claim.

(b)   **Unimpaired and Not Voting**. Class 1 is not impaired under the Plan. The Class 1
Claimants are conclusively presumed to have accepted and not entitled to vote on
the Plan.

(c)   **Treatment**. Unless the Holder of an Allowed Class 1 Claim and the Diocese or the
Reorganized Debtor (as applicable) agree to a different treatment, the Reorganized
Debtor shall pay each such Allowed Class 1 Claim in full, in cash, without interest,
from ongoing operations on the later of the Effective Date and the date a Class 1
Claim becomes an Allowed Claim (or as soon thereafter as is practicable).

**5.2.**   **Class 2 Citizens Bank, N.A.**

(a)   **Class 2 Definition**. Class 2 consists of the Citizens Secured Guaranty Claim.

(b)   **Impaired and Voting**. Class 2 is impaired under the Plan. The Class 2 Claimant is
entitled to vote on the Plan.

(c)   **Class 2 Treatment**. Upon the closing of the Xavier Property Transfer on or before
the Effective Date pursuant to the Xavier Settlement Agreement, Citizens shall
fully, finally, and completely release and forever discharge the Diocese from any
and all obligations arising under the Citizens Guaranty Agreement; *provided,
however*, Citizens shall retain a lien against the Xavier Property representing those
certain loan agreements by and between Xavier and Citizens.

**5.3.**   **Class 3: M&T Bank Corporation.**

(a)   **Class 3 Definition**. Class 3 consists of all claims held by M&T. Class 3 is
comprised of the following Sub-Classes:

i.   Sub-Class 3-A consists of the M&T Secured Revolving Loan Claim; and

ii.   Sub-Class 3-B consists of the M&T Secured Guaranty Claim.

(b)   **Unimpaired and Not Voting**. Class 3-A and Class 3-B are Unimpaired under the

26

Plan. The Class 3 Claimant is not entitled to vote on the Plan.

(c) **Class 3 Treatment**. The Holder of an Allowed M&T Secured Revolving Loan Claim and an Allowed M&T Secured Guaranty Claim against the Diocese shall receive the treatment set forth below:

    i. **Class 3-A**: The collateral securing the M&T Secured Revolving Loan Claim shall upon the Effective Date vest in the Reorganized Debtor and the collateral shall continue to secure the M&T Secured Revolving Loan Claim. The security interest held by M&T to secure M&T Secured Revolving Loan Claim shall remain in place and M&T may exercise any and all rights and remedies against the collateral referenced in such security agreement, available to M&T. The Reorganized Debtor shall be liable to M&T on the M&T Secured Revolving Loan Claim to the same extent and validity as the Diocese immediately prior to the Petition Date.

    ii. **Class 3-B**: The collateral securing the M&T Secured Guaranty Claim shall upon the Effective Date vest in the Reorganized Debtor and the collateral shall continue to secure the M&T Secured Guaranty Claim. The security interest held by M&T to secure M&T Secured Guaranty Claim shall remain in place and M&T may exercise any and all rights and remedies against the collateral referenced in such security agreement, available to M&T. The Reorganized Debtor shall be liable to M&T on the M&T Secured Guaranty Claim to the same extent and validity as the Diocese immediately prior to the Petition Date.

**5.4.** **Class 4: Abuse Claims (Other Than Unknown Abuse Claims).**

(a) **Definition**. A "Class 4 Claim" means an Abuse Claim other than an Unknown Abuse Claim. A "Class 4 Claimant" shall mean a Holder of a Class 4 Claim.

(b) **Impaired and Voting**. Class 4 is impaired under the Plan. The Class 4 Claimants (including Late-Filed Abuse Claimants) are entitled to vote on the Plan. Only for purposes of voting, each Claim in Class 4 (those treated in either Class 4-A or Class 4-B) is deemed to be Allowed in the amount of $1.00.

(c) **Treatment of Class 4.**
    i. On and after the Effective Date, and subject to the Plan provisions, the Trust shall pay all Abuse Claims (except Unknown Abuse Claims) in accordance with and under the Plan and Trust Documents. Class 4 Claimants shall have their Abuse Claims treated and Allowed or Disallowed in accordance with the terms and conditions set forth in the Trust Distribution Plan.

ii.  Class 4 shall vote as a single class but be divided into the following two (2) sub-classes based on the election of Late-Filed Abuse Claimants to have their Class 4 Claims receive treatment as Convenience Claims as provided in Class 4-B:

   (a)  **Class 4-A**: Class 4-A consists of all Class 4 Claims (other than those Late-Filed Abuse Claims held by Late-Filed Abuse Claimants who (i) Opt-In and (ii) elect on their Ballots to have their Late-Filed Abuse Claims treated in Class 4-B as a Convenience Claim). A "Class 4-A Claim" means a Class 4 Claim classified in Class 4-A.

   (b)  **Class 4-B, Convenience Class for Late-Filed Abuse Claims**:

      (1)  A "Convenience Claim" means an Abuse Claim classified in this Class 4-B. A "Convenience Claimant" means the Holder of a Convenience Claim.

      (2)  Class 4-B consists of all Late-Filed Abuse Claims held by Late-Filed Abuse Claimants who Opt-In, elect on their Ballots to have their Late-Filed Abuse Claims treated in Class 4-B as a Convenience Claim, and return their Ballots at any time on or before the deadline for the return of Ballots. As more fully set forth in the Trust Distribution Plan, an Allowed Convenience Claim shall receive the following Distributions:

         1.  Unless also a Barred Abuse Claim, an Allowed Convenience Claim shall receive a single, lump-sum Distribution from the Trustee in the amount of $50,000 paid within forty-five (45) days from the Effective Date; and

         2.  An Allowed Convenience Claim that is also a Barred Abuse Claim shall receive a single, lump-sum Distribution from the Trustee in the amount of $20,000 paid within forty-five (45) days from the Effective Date.

iii.  Subject to the following terms and conditions, as well as the other applicable terms and conditions set forth in this Plan and the Trust Distribution Plan, all Class 4 Claimants may affirmatively and voluntarily elect to Opt-In to the release and injunction provisions set forth in the Abuse Claims Release and this Plan, or may elect not to Opt-In:

   (a)  An Abuse Claimant classified in Class 4 may Opt-In by signing the Abuse Claim Release and delivering the original Abuse Claim

28

Release to the Claims Agent by the Voting Deadline. An Abuse Claimant may also Opt-In after the Effective Date of the Plan by signing the Abuse Claims Release and delivering the original Abuse Claim Release to the Trustee prior to the termination of the Opt-Out Abuse Claims Temporary Injunction applicable to such Abuse Claimant.

(b) An Opt-In Abuse Claimant holding an Allowed Abuse Claim shall receive Full Distributions on account of their Opt-In Abuse Claim.

(c) An Abuse Claimant classified in Class 4 that does not Opt-In and deliver the original Abuse Claim Release to the Claims Agent by the Voting Deadline, shall be deemed an Opt-Out Abuse Claimant. An Opt-Out Abuse Claimant shall only receive Partial Distributions on account of their Allowed Opt-Out Abuse Claim unless and until such Opt-Out Abuse Claimant exercises their right to Opt-In in accordance with this Plan and the Trust Distribution Plan.

(d) An Opt-Out Abuse Claimant shall be subject to the Opt-Out Abuse Claims Temporary Injunction provided for in Section 13.11 of this Plan.

(e) If such Opt-Out Abuse Claimant does not Opt-In prior to the termination of the Opt-Out Abuse Claims Temporary Injunction applicable to such Opt-Out Abuse Claimant, then: (1) such Opt-Out Abuse Claimant shall have waived, released and relinquished any right to receive any Distributions from the Trust other than the Partial Distributions; and (2) the Trustee shall pay to the Defense Reserve in accordance with the terms and conditions of the Trust Agreement the difference between the Full Distributions such Opt-Out Abuse Claimant would have received had they exercised their right to Opt-In, and the Partial Distributions such Opt-Out Abuse Claimant is entitled to receive.

(d) **Diocese Cooperation with Trustee and Abuse Claims Reviewer.** The Diocese shall reasonably cooperate with the Trustee and the Abuse Claims Reviewer with any inquiries by either in the administration of the Trust Distribution Plan.

(e) **Class 4 Claim Objections**.

i. No Class 4 Claimant may challenge the merit, validity, or amount of any other Class 4 Claim.

ii. Except for any objection to an Opt-In Abuse Claim filed by the Committee, any objection to an Opt-In Abuse Claim pending as of the Effective Date is deemed withdrawn. After the Effective Date, the

29

Trustee has the exclusive right, after consultation with the Diocese, to object to an Opt-In Abuse Claim (including any Convenience Claim) and shall succeed to the rights of the Committee because of any Committee's objection to an Opt-In Abuse Claim. None of the Reorganized Debtor, the Participating Parties or the Catholic Mutual Parties shall have the right to object to an Opt-In Abuse Claim.

iii. For the avoidance of doubt, the Committee and the Trustee (as applicable), the Diocese, any affected Participating Party and, if alleged to fall within Catholic Mutual's coverage period, Catholic Mutual shall retain the right to object to any Opt-Out Abuse Claim (including any Barred Abuse Claim and any Late-Filed Abuse Claim) unless and until such Opt-Out Abuse Claimant exercises their right to Opt-In in accordance with the terms and conditions of this Plan and the Trust Distribution Plan.

(f)    **Abuse Claim Release**. Other than an Opt-Out Abuse Claimant who, pursuant to the Plan, is entitled to receive Partial Distributions, no Class 4 Claimant will receive any payment from the Trust in accordance with and under the Plan and Trust Documents unless and until such Class 4 Claimant has executed the Abuse Claim Release attached as **Exhibit L** to the Plan. The form of the Abuse Claim Release shall also be included for completion and execution in the Class 4 Ballot.

(g)    **Diocese Discharge of Class 4 Claim Liability.** The Debtor shall be discharged as set forth in Section 13.1 herein of any liability for Class 4 Claims, even for a Class 4 Claimant that rejects the Plan.

(h)    **Late-Filed Abuse Claims.**

i. Unless and until Disallowed by a Non-Appealable Order entered by this Court, each Late-Filed Abuse Claim shall be classified as a Class 4 Claim and entitled to vote on the Plan. For purposes of voting upon the Plan, the preceding determination shall be made as of the Voting Record Date as ordered by the Bankruptcy Court.

ii. A Late-Filed Abuse Claimant that has not timely elected to be treated as a Convenience Claim in its Ballot shall only be entitled to pursue allowance of a Late-Filed Abuse Claim as a Class 4-A Claim if the Late-Filed Abuse Claimant files a motion ("Excusable Neglect Motion") with notice and requesting a hearing. with the Bankruptcy Court. At the hearing on the Excusable Neglect Motion, the Abuse Claimant must establish its excusable neglect in failing to timely file its Proof of Claim in accordance with applicable law and the Bankruptcy Court orders in order for the Late-Filed Abuse Claim to be treated in Class 4-A as timely filed on or before the Claims Bar Date. Such Excusable Neglect Motion shall be filed with the Bankruptcy Court within thirty (30) days of the

Effective Date or such corresponding Late-Filled Abuse Claim shall be automatically Disallowed and the Late-Filed Abuse Claimant shall be automatically barred from asserting such Late-Filed Abuse Claim. Unless and until such Excusable Neglect Motion is granted and the Late-Filed Abuse Claim is Allowed as a Class 4 Claim classified in Class 4-A by a Non-Appealable Order, no Distribution shall be paid on account of the Late-Filed Abuse Claim as a Class 4 Claim pursuant to the Trust Distribution Plan. If the Excusable Neglect Motion is denied and the corresponding Late-Filed Abuse Claim is Disallowed, no Distributions shall be made on account of such Late-Filed Abuse Claim.

iii. An Abuse Claimant holding a Late-Filed Abuse Claim may elect at their sole and absolute discretion to be treated exclusively as a Convenience Claimant by making such election upon their Ballot returned at any time on or before the Voting Deadline. In such event, such Late-Filed Abuse Claim shall be treated as a Convenience Claim in accordance with Class 4-B and the Trust Distribution Plan.

iv. After the Voting Deadline, any Holder of a Late-Filed Abuse Claim that had not on their Ballot elected to be treated in Class 4-B as a Convenience Claimant shall be only entitled to pursue Allowance as a Class 4 Claim classified in Class 4-A based on their Late-Filed Abuse Claim in accordance with the terms of this Plan, and shall have waived and shall thereafter be barred from asserting a Convenience Claim.

v. As provided in the Trust Distribution Plan, the Trustee may compromise and settle any Late-Filed Abuse Claim on terms and conditions acceptable to the Trustee subject to approval of the Bankruptcy Court upon motion and after due notice and a hearing.

(i) **Barred Abuse Claims.** All Barred Abuse Claims classified in Class 4 constitute Class 4 Claims classified and treated in accordance with this Class 4 and the other terms of the Plan, the Confirmation Order and the Trust Distribution Plan, specifically, without limitation, Section 6.2 of the Trust Distribution Plan, which provides that the Abuse Claims Reviewer shall reduce the point total allocated for any Allowed Barred Abuse Claim pursuant to paragraph 5.2(c) of the Trust Distribution Plan by 85%. Each Barred Abuse Claim shall be entitled to vote for the Plan. Other than with respect to Opt-Out Abuse Claims as provided in subsection (e) above, a Class 4 Claim's qualification as a Barred Abuse Claim shall not constitute a basis for any party in interest, including the Trustee, to object to the Allowance of such Abuse Claim.

(j) **Litigation of Class 4 Claims against Non-Settling Insurers.** A Class 4 Claimant may commence an action against the Diocese and, if applicable, one or more Participating Parties, solely for liquidating a Class 4 Claim in

order to pursue Insurance Recoveries regarding such Class 4 Claim from Non-Settling Insurers; provided, however, that prior to the Trust Termination Date (as defined in the Trust), a Class 4 Claimant may only commence such an action with the consent of the Trustee and pursuant to the terms and conditions of the Trust Distribution Plan. Notwithstanding any provision in this Plan to the contrary, the Diocese will not have to expend any funds to defend against any action commenced by a Class 4 Claimant except to the extent required by the terms of any Insurance Policy issued by a Non-Settling Insurer, and no Settling Insurer shall have any obligation to defend or indemnify against any such action commenced by a Class 4 Claimant. Consistent with the discharge provided for in Section 13.1 and the rights of a Participating Party, any judgment obtained in such action may not be enforced against the Diocese, a Participating Party and/or any of assets of the Diocese or such Participating Party (other than the Non-Settling Insurers' Insurance Policies and/or the Non-Settling Insurers), including, but not limited to, the Revested Assets or any assets acquired by the Reorganized Debtor after the Effective Date, but any such judgment shall only be satisfied in accordance with the Plan and the Trust Distribution Plan and shall be fully enforceable against and paid by any Non-Settling Insurer including under the terms of that Non-Settling Insurer's Insurance Policy. Prior to the Trust Termination Date, any recovery from the prosecution of such an action is deemed assigned to and shall be paid to the Trust to the extent provided in the Plan, including as provided in the Trust Distribution Plan.

**5.5.**    **Class 5: Unknown Abuse Claims (other than Post-Petition Abuse Claims).**

(a)    **Definition**. A "Class 5 Claim" means an Unknown Abuse Claim (other than a Post-Petition Abuse Claim). A "Class 5 Claimant" shall mean a Holder of a Class 5 Claim.

(b)    **Impaired and Voting**. Class 5 is impaired under the Plan. The Unknown Abuse Claims Representative is entitled to vote on this Plan on behalf of Class 5 Claimants. Only for purposes of voting, the Unknown Abuse Claims Representative is deemed to have a single Allowed Claim in the amount of $1.00.

(c)    **Treatment of Class 5**.

i. The Unknown Abuse Claims Representative has determined to Opt-In under the Plan on behalf of all Unknown Abuse Claimants. The Unknown Abuse Claims Representative shall execute and deliver to the Claims Agent by the Voting Deadline, in accordance with the terms and conditions of the Plan, the Abuse Claim Release on behalf of all Unknown Abuse Claimants, thereby releasing the Participating Parties and the Catholic Mutual Parties, and consenting to the Channeling Injunction and Supplemental Catholic

32

Mutual Injunction.

ii. By virtue of the Unknown Abuse Claims Representative electing to Opt-In, all Unknown Abuse Claimants shall be entitled to receive Distributions provided for under the Plan and the Unknown Abuse Claims Trust Distribution Plan.

iii. The Unknown Abuse Claims Trust will be funded by the Debtor on the Effective Date pursuant to the provisions of this Plan. On and after the Effective Date, the Unknown Abuse Claims Trust shall pay all Class 5 Claims in accordance with and the Plan and Unknown Abuse Claims Trust Documents. Class 5 Claimants shall have their Abuse Claims treated and Allowed or Disallowed in accordance with the terms and conditions set forth in the Unknown Abuse Claims Trust Distribution Plan.

(d) **Diocese Cooperation with Unknown Abuse Claims Trustee and Abuse Claims Reviewer.** The Diocese shall reasonably cooperate with the Unknown Abuse Claims Trustee and the Abuse Claims Reviewer with any inquiries by either in the administration of the Unknown Abuse Claims Trust Distribution Plan.

(e) **Class 5 Claim Objections.**

i. No Class 5 Claimant may challenge the merit, validity, or amount of any other Class 5 Claim.

ii. The Unknown Abuse Claims Trustee has the exclusive right, after consultation with the Diocese, to object to an Unknown Abuse Claim (other than a Barred Abuse Claim that also constitutes an Unknown Abuse Claim, to which the Diocese may object, and if alleged to fall within Catholic Mutual's coverage period, Catholic Mutual may also object) that is also an Opt-In Abuse Claim. Neither the Reorganized Debtor, the Participating Parties, nor Catholic Mutual shall have the right to object to an Unknown Abuse Claim (other than a Barred Abuse Claim) that is also an Opt-In Abuse Claim.

iii. For the avoidance of doubt, the Unknown Abuse Claims Trustee, the Diocese, any affected Participating Party and, if alleged to fall within Catholic Mutual's coverage period, Catholic Mutual shall retain the right to object to any Unknown Abuse Claim that is also an Opt-Out Abuse Claim (including any Barred Abuse Claim) unless and until such Opt-Out Abuse Claimant exercises their right to Opt-In in accordance with the terms and conditions of this Plan and the Unknown Abuse Claims Trust Distribution Plan.

      (f)     **Unknown Abuse Claimant's Election to Opt-Out Notwithstanding Opt-In by Unknown Abuse Claims Representative**

            i.     Subject to the terms and conditions of the Unknown Abuse Claims Trust Distribution Plan and notwithstanding the decision of the Unknown Abuse Claim's Representative to Opt-In for Class 5 Claims, any Unknown Abuse Claimant may exercise the right to be treated as an Opt-Out Abuse Claimant holding an Opt-Out Abuse Claim, provided that written notice of such election is received by the Reorganized Debtor and the Unknown Abuse Claim Trustee on or before the 540th day after the Effective Date.

            ii.    No Unknown Abuse Claimant who timely exercises their right to be treated as an Opt-Out Abuse Claimant holding an Opt-Out Abuse Claim shall receive any Distribution from the Unknown Abuse Claims Trust in accordance with and under the Plan and Unknown Abuse Claims Trust Documents.

      (g)     **Diocese Discharge of Unknown Abuse Claim Liability.** The Debtor shall be discharged as set forth in Section 13.1 herein of any liability for any and all Class 5 Claims, even if the Claimant rejects the Plan or is an Opt-Out Abuse Claimant.

**5.6.**    **Class 6: General Unsecured Claims.**

      (a)     **Definition**. A "Class 6 Claim" or "General Unsecured Claim" means (i) any Claim arising out of the rejection of any Executory Contract, or (ii) any Unsecured Claim that is not included in another class under the Plan and is not listed as disputed, contingent or unliquidated on the Debtor's schedules filed in connection with this Bankruptcy Case ("Debtor's Schedules") or as to which the Holder of such Claim timely filed a Claim.

      (b)     **Unimpaired and Not Voting**. Class 6 is Unimpaired under the Plan. The Class 6 Claimants are conclusively presumed to have accepted and not entitled to vote on the Plan.

      (c)     **Treatment**. Except to the extent that a Class 6 Claimant agrees to less favorable treatment of their Class 6 Claim, in exchange for full and final satisfaction of such Allowed General Unsecured Claim, at the sole option of the Reorganized Debtor: (a) each Class 6 Claimant shall receive payment in Cash in an amount equal to such Allowed General Unsecured Claim, payable on last to occur of (i) the Effective Date, (ii) the date on which such General Unsecured Claim becomes an Allowed General Unsecured Claim, and (iii) the date on which the Class 6 Claimant and the Debtor or Reorganized Debtor, as applicable, shall otherwise agree in writing; or (b) satisfaction of such Allowed General Unsecured Claim in any other manner

that renders the Allowed General Unsecured Claim Unimpaired, including reinstatement.

**5.7.    Class 7: Abuse Related Contribution Claims.**

(a)    **Class 7 Definition**. A "Class 7 Claim" means all Abuse Related Contribution Claims. A "Class 7 Claimant" shall mean a Holder of a Class 7 Claim.

(b)    **Impaired and Voting**. Class 7 is impaired under the Plan. The Class 7 Claimants are entitled to vote on the Plan. Only for purposes of voting, each Claim in Class 7 is deemed to be Allowed in the amount of One Dollar ($1.00).

(c)    **Class 7 Treatment**. Class 7 Claims against the Debtor shall be Disallowed in accordance with § 502(e)(1) of the Bankruptcy Code, and Class 7 Claims will receive no Distribution under the Plan. Notwithstanding the disallowance of an Abuse Related Contribution Claim, an Abuse Claimant who liquidates their claim in an amount greater than $0, consents to application of its portion of the reserve established by the Trustee under the Trust Agreement to pay any Co-Defendant for its contribution, reimbursement, and/or indemnity claim, if any, against the Debtor. For the avoidance of doubt, nothing in this subsection (c) shall prevent or impair any Class 7 Claimant's right, if any, to receive its ratable portion of the defense reserve established and paid pursuant to the Defense Reserve Protocol.

**5.8.    Class 8: Claims Held by Catholic Entities, Xavier and Oceania**

(a)    **Class 8 Definition**. A "Class 8 Claim" means any Claim (including any Administrative Claim but excluding any Abuse Related Contribution Claim classified in Class 7) held by any of the Catholic Entities (which include Mercy, St. Bernard and Mount St. John), Xavier and Oceania. A "Class 8 Claimant" means a Holder of a Class 8 Claim.

(b)    **Impaired and Voting**. Class 8 is impaired under the Plan. The Class 8 Claimants are entitled to vote on the Plan. For the avoidance of doubt, only those Persons among the Catholic Entities (which include Mercy, St. Bernard and Mount St. John), Xavier and Oceania who actually hold Claims against the Debtor are entitled to vote. Only for purposes of voting, each Claim in Class 8 is deemed to be Allowed in the amount of One Dollar ($1.00).

(c)    **Class 8 Treatment**. The Diocese has reached a settlement with the Catholic Entities, Xavier and Oceania, which are embodied in the Plan (including the Xavier Settlement Agreement, the Mercy Settlement Agreement, the St.

Bernard Settlement Agreement and the Mount St. John Settlement Agreement) or that are (or will be) subject to certain Settlement Agreements that remain a matter of Bankruptcy Court approval pursuant to Bankruptcy Rule 9019. As one component of the settlement, and to maximize recovery for Abuse Claimants, the Catholic Entities, Xavier and Oceania have agreed to waive all rights to Distributions on account of their Class 8 Claims. Accordingly, there will be no Distribution to the Holders of any Class 8 Claims on account of such Class 8 Claims. On the Effective Date, any Claim against the Debtor held by the Catholic Entities, Xavier and Oceania shall be discharged. For the avoidance of doubt, nothing in this subsection (c) shall prevent or impair any Class 8 Claimant's right, if any, to receive its ratable portion of the defense reserve established and paid pursuant to the Defense Reserve Protocol.

## SECTION VI
## ACCEPTANCE OR REJECTION OF PLAN

**6.1.    Impaired Classes to Vote.** Each holder of a Claim in an impaired Class shall be entitled to vote separately to accept or reject the Plan. Class 2, Class 4, Class 5, Class 7, and Class 8 are impaired under the Plan.

**6.2.    Acceptance by Class of Claimants**. An impaired Class shall have accepted the Plan if the Plan is accepted by at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of the Allowed Claims of such Class that have voted to accept or reject the Plan.

## SECTION VII
## TRUST AND UNKNOWN ABUSE CLAIMS TRUST

**7.1.    Establishment of Trust.** On the Effective Date, the Trust shall be established under the Trust Documents and the Unknown Abuse Claims Trust shall be established under the Unknown Abuse Claims Trust Documents. The Trust Documents and Unknown Abuse Claims Trust Documents, including the Trust Agreement and Unknown Abuse Claims Trust Agreement, are incorporated herein by reference.

(a)    **Funding of Trust**.

1.    **Summary**. The Trust will be funded from the sources and in the manner set forth in this Section.

2.    **Contributions**. The Debtor, the Participating Parties and Settled Insurers shall convey, transfer, assign and deliver to the Trustee for the benefit of the Trust, and the Trustee will accept from the Debtor, the Participating Parties and Catholic Mutual, all of their respective right, title and interest in and to the assets, properties and rights described in this Section, all as in accordance with this Plan.

3. **Cash Contributions**. The Debtor, the Participating Parties and Catholic Mutual shall make the following cash contributions to the Trustee for the benefit of the Trust, by delivering the following amounts to the Effective Date Escrow Agent (collectively, the "Cash Contributions"). The following Cash Contributions shall be delivered to the Effective Date Escrow Agent within thirty (30) calendar days of the entry of the Confirmation Order:

(i) The Debtor shall transfer or cause to be transferred on its behalf by wire transfer to the Effective Date Escrow Agent One Million ($1,000,000) Dollars in good and immediately available funds, which sum includes $500,000 that the ACA is paying to the Debtor on account of certain disputed sums due to the Debtor by the ACA in order to resolve such dispute.

(ii) Pursuant to the St. Bernard Settlement Agreement, the Debtor shall transfer or cause to be transferred by wire transfer to the Effective Date Escrow Agent Six Million Five Hundred and Fifty Thousand ($6,550,000) Dollars plus interest accrued thereon through December 6, 2024, in good and immediately available funds representing (a) the Net Proceeds (subject to the provisions of this paragraph) realized from the St. Bernard Property Sale, and (b) the further consideration exchanged as more particularly described in the Plan and the St. Bernard Settlement Agreement.

(iii) The Debtor shall transfer or cause to be transferred on its behalf by wire transfer to the Effective Date Escrow Agent all Net Proceeds realized from the sale of the corresponding real estate sold by the Diocese during the Bankruptcy Case, consisting in the following amounts (plus all interest accrued thereon):

| Real Estate | Amount |
|---|---|
| 31 Perkins Ave., Norwich | $ 136,935.80 |
| 25 Otis St., Norwich | $ 158,125.00 |
| 7-11 Bath St., Norwich | $ 177,080.84 |
| 17 Otis St., Norwich | $ 155,521.60 |
| TOTAL: | $ 627,663.24 |

(iv) Oceania shall transfer or cause to be transferred on its behalf by wire transfer to the Effective Date Escrow Agent Seven Million ($7,000,000) in good and immediately available funds.

(v) The Association of Parishes shall transfer or cause to be transferred on the collective behalf of the Parishes to the Effective Date Escrow

37

Agent Two Million Seven Hundred Thousand ($2,700,000) Dollars in good and immediately available funds.

(vi)    Subject to the satisfaction of the conditions set forth in Article III of the Catholic Mutual Settlement Agreement, Catholic Mutual shall pay to the Effective Date Escrow Agent the Catholic Mutual Contribution in the amount of Five Million, Three Hundred Thousand ($5,300,000) Dollars. Specifically, as provided in Article III of the Catholic Mutual Settlement Agreement, Catholic Mutual's obligation to pay this amount to the Effective Date Escrow Agent is conditioned upon the occurrence of the following unless waived by Catholic Mutual: (1) the due execution of the Catholic Mutual Settlement Agreement by all parties thereto; (2) the entry of the Approval Order authorizing and approving the Catholic Mutual Settlement Agreement and such Approval Order becoming a Non-Appealable Order; (3) the entry of an order approving the Disclosure Statement and such order becoming a Non-Appealable Order; and (4) the entry of the Confirmation Order approving the Plan consistent with the terms and conditions of the Catholic Mutual Settlement Agreement. Payment by Catholic Mutual is further conditioned upon Catholic Mutual having received written notice that the foregoing conditions ((1) through (4)) have been satisfied and appropriate instructions for the transmission of payment. Furthermore, the Effective Date cannot occur until Catholic Mutual, among others, has paid its contribution in the amount of Five Million Three Hundred Thousand ($5,300,000) Dollars to the Effective Date Escrow Agent.

(vii)    Pursuant to the Mercy Settlement Agreement, Mercy shall transfer or cause to be transferred on its behalf by wire transfer to the Effective Date Escrow Agent Fifty Thousand ($50,000) Dollars in good and immediately available funds and the further consideration particularly described in the Plan and the Mercy Settlement Agreement.

4.    **Professionals Fees Waiver and Contribution**.  All Professionals and the Honorable Joan M. Feeney (Ret.) as Mediator have agreed to waive and shall not receive ten percent (10%) of their Professional Claims accrued and unpaid from October 1, 2023 through the Effective Date as Allowed by the Bankruptcy Court (expressly excluding the $400,000 holdback due the Debtor's Professional Ice Miller LLP and withheld in 2023), and the Diocese shall contribute the aggregate of such savings to the Trustee contemporaneously with the payments made by the Diocese to the Professionals for the balance of their Allowed Professional Claims.

38

5.  **Secured Promissory Note**. Immediately after the Effective Date, the Reorganized Debtor shall execute and deliver to the Trustee a promissory note in the original principal amount of One Million Seven Hundred and Thirty Thousand ($1,730,000) Dollars due and payable to the Trustee two years after the Effective Date, and shall provide collateral and shall execute and deliver documents necessary to secure such debt. Said promissory note and mortgage documents and/or security instruments shall contain ordinary and customary terms and conditions mutually acceptable to the Debtor and the Trustee including, but not limited to, interest at the rate of five percent (5%) per year accruing only after the two year anniversary of the Effective Date, and costs of collection including reasonable attorneys' fees.

6.  **Transferred Real Estate.**  Subject to the terms and conditions set forth in Section 7.3 below (including the timing of such transfers), the Diocese and St. Mary's Roman Catholic Church (as applicable, the "RE Owner") shall transfer by quitclaim deed to the Trust's designee each piece and parcel of Transferred Real Estate owned by them, respectively, or the Net Proceeds realized from the sale of such Transferred Real Estate if such sale closes on or before the Effective Date.

7.  **Transferred Insurance Interests.** As set forth and to the extent provided in Section IX of the Plan and the Confirmation Order, on the Effective Date, with no further act by any party, the Diocese and the Participating Parties shall be deemed to have assigned the Transferred Insurance Interests to the Trustee for the benefit of the Trust, and such assignment shall immediately be deemed effective. On the Effective Date, the Trustee will be empowered to receive assignment of Litigation Awards (as that term is defined in the Trust Distribution Plan) and to take all steps necessary to pursue recovery from Non-Settling Insurers.

8.  **Transfer of Mount St. John Settlement Agreement and Interests Thereunder, and Related Interests.**  The Trustee shall on the Effective Date succeed to all of the rights, interests and obligations set forth in the Mount St. John Settlement Agreement for the benefit of the Trust, including the right to receive  the "Net Proceeds" (as defined therein) realized from the sale of or the transfer by quitclaim deed to the Trust's designee all of Mount St. John's right, title and interest in the Real Estate[2] known as 135 Kirtland Street, Deep River, Connecticut, more particularly described in **Exhibit A** appended to the Mount St. John Settlement Agreement, on the terms and conditions set forth in the Mount St. John Settlement Agreement

---

[2] Each of the capitalized terms "Real Estate," "MSJ Mortgage Documents," and "MSJ Debt" used in this paragraph shall have the meaning ascribed to them in the Mount St. John Settlement Agreement appended hereto as **Exhibit K**, which definitions are incorporated by reference.

and this Plan. Also pursuant to the Mount St. John Settlement Agreement, within ten (10) days of the Effective Date, the Reorganized Debtor shall transfer to the Trust all of its right, title and interest in the MSJ Debt and the MSJ Mortgage Documents.

9. **Transfer of Xavier Settlement Agreement and Interests Thereunder, and Related Interests.** The Trustee shall on the Effective Date succeed to all of the rights, interests and obligations set forth in the Xavier Settlement Agreement for the benefit of the Trust, including the right to receive within thirty (30) days of the Effective Date, Two Million, Five Hundred Thousand ($2,500,000) Dollars realized from the sale of all of the Debtor's right, title and interest in the Xavier Property known as 181 Randolph Rd., Middletown, Connecticut, to Xavier on the terms and conditions set forth in the Xavier Settlement Agreement and this Plan.

10. **Vesting**. All Trust Assets required by the Plan and the Confirmation Order to be transferred to the Trustee for the benefit of the Trust on or before the Effective Date shall vest in the Trustee on the Effective Date, and the Diocese, Participating Parties and Settled Insurers shall be deemed for all purposes to have transferred all of their respective rights, title and interests in the Trust Assets to the Trustee.

11. **Documentation**. The Diocese, the Participating Parties and the Settled Insurers, as applicable, shall take all actions reasonably necessary to transfer the Trust Assets to the Trustee including those reasonably requested by the Trustee including, but not limited to, execute documents separately documenting such transfers including deeds and assignments.

12. **Extinguishment of Interests**. Upon the transfer of Trust Assets in accordance with this Section 7.1(a), the Diocese, the Participating Parties and the Settled Insurers shall have no further rights, title or interests in or with respect to the Trust Assets except as otherwise explicitly provided in this Plan and the Effective Date Escrow Agent Agreement in the event of a Termination of the Plan.

(b) **Contribution of Funds to Unknown Abuse Claims Trust on the Effective Date.** The Unknown Abuse Claims Trust shall be funded exclusively by the Debtor and the Reorganized Debtor by transferring to the Unknown Abuse Claims Trust up to One Million Eight Hundred Thousand ($1,800,000) Dollars, with the first installment of such funding in the amount of One Hundred Thousand ($100,000) Dollars paid by the Debtor to the Unknown Abuse Claims Trust within thirty (30) calendar days of the Effective Date, and the balance of such funding to be paid by the Reorganized Debtor in accordance with the terms and conditions of Section 3.4(a) of the Unknown Abuse Claims Trust Agreement for the benefit of Unknown Abuse Claims other than Post-Petition Abuse Claims, which transfer shall not be deemed to include any funding from the Catholic Mutual Contribution. In the event

funds remain in the Unknown Abuse Claims Trust at the time of the expiration of the Unknown Abuse Claims Trust, such funds shall revert and be paid to the Reorganized Debtor.

(c)     **Reserve Accounts.** As set forth in the Trust Agreement and Unknown Abuse Claims Trust Agreements, the Trustee and Unknown Abuse Claims Trustee shall establish reserves for various purposes.

(d)     **No Execution**. All funds held by the Trustee will remain property of such Trust until the funds have been actually paid to and received by a Person entitled to receive payment under the Plan, Confirmation Order and Trust Documents. Except as provided in the Plan, Confirmation Order and the Trust Documents, the Trustee and Trust shall not be responsible for any Claims against the Debtor. All funds held by the Unknown Abuse Claims Trustee will remain property of the Unknown Abuse Claims Trust until the funds have been actually paid to and received by a Person entitled to receive payment under the Plan, Confirmation Order and Unknown Abuse Claims Trust Documents. Except as provided in the Plan, Confirmation Order and the Unknown Abuse Claims Trust Documents, the Unknown Abuse Claims Trustee and the Unknown Abuse Claims Trust shall not be responsible for any Claims against the Debtor.

   **7.2.    Payments Effective Upon Tender.** Whenever the Plan requires payment to be made to a creditor, such payment will be deemed made and effective upon tender thereof by the Trustee, the Debtor, or the Reorganized Debtor to the creditor to whom payment isdue. If any creditor refuses a tender, the amount tendered and refused will be held by the Trust, the Debtor, or the Reorganized Debtor for the benefit of that creditor pending final adjudication of the dispute. However, when and if the dispute is finally adjudicated and the creditor receives the funds previously tendered and refused, the creditor will be obliged to apply the funds in accordance with the Plan as of the date of the tender; and while the dispute is pending and after adjudication thereof, the creditor will not have the right to claim interest or other charges or to exercise any other rights which would be enforceable by the creditor, if the Trust, the Debtor, or the Reorganized Debtor failed to pay the tendered payment.

   **7.3.    Sale or Transfer of Transferred Real Estate.**

(a)     For a period of time not to exceed sixty (60) days following the Effective Date (the "Real Estate Sale Period"), the RE Owner shall retain title to and exclusive possession of the Transferred Real Estate and shall reasonably cooperate, in good faith, in the Trustee's efforts to sell the Transferred Real Estate. The Trustee shall determine all manner and methods of the sale process for the Transferred Real Estate, and all terms and conditions of the sale for the Transferred Real Estate, at his sole and absolute discretion; provided, however, that such shall not materially prejudice the RE Owner without its written consent, which shall not be unreasonably withheld. During the Real Estate Sale Period, the RE Owner's reasonable cooperation as provided herein shall include, but shall not be limited to, the following: (i) providing a copy of all documents

41

requested by the Trustee concerning the Transferred Real Estate (including all Permits and Plans); (ii) permitting reasonable access to the Transferred Real Estate including for inspections by the Trustee's professionals; (iii) providing its written agreement, authorization or affirmation in furtherance of such sale process; and (iv) executing all customary closing documents including the deed, title affidavit, conveyance tax forms, closing statement, and such other documents reasonably necessary or required by a purchaser's title insurance company to effectuate the transfer of the subject Transferred Real Estate.

(b)     During the Real Estate Sale Period, the RE Owner shall continue to maintain and keep the Transferred Real Estate in substantially the same condition as in existence as of the date of this Plan, including the mowing of lawns, the raking of fallen leaves, the removal of fallen trees and large branches (except in uncultivated areas), and the removal of snow and ice from walks and driveways, and the RE Owner agrees not to commit or permit waste upon the Transferred Real Estate, or to remove or permit the removal of anything from the Transferred Real Estate without the written consent of the Trustee.

(c)     During the Real Estate Sale Period, the RE Owner shall obtain and maintain insurance on the Transferred Real Estate (including the Improvements) in amounts and coverages substantially identical to what had been obtained and maintained on or about the date of this Plan, and will pay promptly, when due, any premiums on such insurance; provided, however, that the RE Owner shall obtain and maintain for the duration of the Real Estate Sale Period a loss payee endorsement for the Trustee for all insurance coverage provided on account of the Real Estate (including all Improvements). In the event of loss to the Transferred Real Estate, the RE Owner will give immediate written notice to the Trustee. In case of loss and payment by any insurance company on account of a loss to the Transferred Real Estate, the insurance proceeds received, after deducting all costs of collection, including reasonable attorney's fees, shall be paid to the Trustee. The RE Owner hereby agrees and consents to permit the Trustee to negotiate with any insurance company following a loss to the Transferred Real Estate to ensure an equitable settlement. The RE Owner agrees that any sums which may become payable under such insurance shall name on the payment the RE Owner and the Trustee.  The RE Owner will require all insurance policies on the Transferred Real Estate to provide the Trustee with at least ten (10) days prior written notice to Trustee of cancellation or modification. At the Trustee's request, the RE Owner will deliver to him certified copies of all of these insurance policies, binders or certificates applicable to the Transferred Real Estate during the Real Estate Sale Period.

(d)    At the closing of any sale of Transferred Real Estate during the Real Estate Sale Period (the "Closing"), the RE Owner shall deliver to the Trustee the Net Proceeds of the sale of such Transferred Real Estate.

(e)    Immediately after the end of the Real Estate Sale Period, the RE Owner shall promptly transfer by quitclaim deed to the Trustee's designee in accordance with Section 7.1(a)5 above any and all pieces and parcels of the Transferred Real Estate that it had not sold in accordance with this Section VII, unless Trustee provides advance written notice waiving the Trust's right to acquire title to such Transferred Real Estate.

(f)    The RE Owner, to induce the Committee to propose jointly with the RE Owner this Plan which provides for, *inter alia*, the sale or transfer of the Transferred Real Estate as provided hereunder, make the representations, warranties and covenants to the Committee (and to the Trustee upon the Effective Date and at all time through the Real Estate Sale Period, such representations, warranties and covenants shall survive the termination of the Real Estate Sale Period) as set forth in **Exhibit M** which are incorporated herein by reference.

**7.4**    **Bond Requirement.** As provided in each of the Trust Agreement and the Unknown Abuse Claims Trust Agreement, each of the Trustee and Unknown Abuse Claims Trustee shall post a bond or other form of surety or security on such terms and conditions as ordered by the Bankruptcy Court in the Confirmation Order.

## SECTION VIII
## LIQUIDATION AND PAYMENT OF ABUSE CLAIMS

**8.1.**    **Liquidation and Payment of Abuse Claims.**

(a)    The Trustee and Trust and Unknown Abuse Claims Trustee and Unknown Abuse Claims Trust, respectively, shall pay Abuse Claims under the terms of the Plan, Confirmation Order, the Trust Agreement, the Trust Distribution Plan, the Unknown Abuse Claims Trust Agreement, and the Unknown Abuse Claims Trust Distribution Plan, as applicable.

(b)    The Abuse Claims Reviewer's determinations shall not be a finding or fixing of the fact or liability or the amount payable for any Abuse Claim with any binding legal effect, other than for distribution purposes by the Trust under the Trust Distribution Plan or the Unknown Abuse Claims Trust under the Unknown Abuse Claims Trust Distribution Plan. The Trustee's, Unknown Abuse Claims Trustee's or Abuse Claims Reviewer's determination of qualification of an Abuse Claim, payment on account of an Abuse Claim or reserve for payment on account of an Abuse Claim is not an admission of liability by the Debtor, a Participating Party, the Trust, or the Unknown Abuse Claims Trust regarding any Abuse Claims, to establish the

43

Diocese's and/or a Participating Party's liability on the Abuse Claim, but any such judgment awarded to an Abuse Claimant will be reduced by the Trust Distributions or Unknown Abuse Claims Trust Distributions already paid by the Trust or Unknown Abuse Claims Trust to such Abuse Claimant on their Abuse Claim(s).

(c) **Catholic Mutual Defense and Indemnification Limitation.** After the Effective Date and notwithstanding any provision of this Confirmation Order, the Plan, the Trust Documents or the Unknown Abuse Claims Trust Documents to the contrary, none of the Catholic Mutual Parties shall have any duty or obligation (i) under any Sold Certificate, or (ii) to participate in, defend, indemnify, provide coverage, make any payment or incur any liability or cost in connection with any suit against any Participating Party for the purpose of liquidation of any Channeled Claim, the recovery on Transferred Insurance Interests from any Non-Settling Insurer or the payment of any distribution with respect to an Abuse Claim.

**8.2.    Scope of Damages and Effect of No Award on Abuse Claims.**

(a) As provided in Section 3.3 of the Trust Distribution Plan, in determining the distribution to any Abuse Claimant, punitive damages and damages that can be classified as economic damages that do not compensate the Abuse Claimant for bodily injury and/or emotional distress or mental anguish attributable to their bodily injury shall not be considered or allowed, even if these damages could have been considered or allowed under applicable non-bankruptcy law. Any Distribution to an Abuse Claimant shall be solely because of bodily injury and/or emotional distress or mental anguish attributable to the bodily injury to such Abuse Claimant.

(b) If an Abuse Claim is denied payment under the Trust Distribution Plan or Unknown Abuse Claims Trust Distribution Plan, the Holder of such Abuse Claim will have no further rights against the Diocese, the Trust, Trustee, Unknown Abuse Claims Trust, or Unknown Abuse Claims Trustee relating to such Abuse Claim and any Opt-In Abuse Claim will remain subject to the Channeling Injunction and Supplemental Catholic Mutual Injunction under the Plan.

**8.3.    Treatment of Punitive Damages.** Claims for punitive or exemplary damages in connection with any of the Claims will receive no Distribution under the Plan and shall be discharged to the extent provided by Section 13.1 of the Plan.

**8.4.    Withdrawal of Abuse Claims.** An Abuse Claimant may withdraw an Abuse Claim at any time on written notice to the Trustee or Unknown Abuse Claims Trustee, as applicable. If withdrawn, the Abuse Claim will be withdrawn with prejudice as to and may not be reasserted against the Diocese Parties, the Reorganized Debtor, the Trust or Unknown Abuse Claims Trust, as applicable, but any Opt-In Abuse Claim will remain subject to the Channeling Injunction and Supplemental Catholic Mutual Injunction under the Plan.

**8.5.**    **Medicare Reimbursement and Reporting Obligations.**

(a)    The Trust and Unknown Abuse Claims Trust shall register as Responsible Reporting Entities ("RRE") under the reporting provisions of Section 111 of MMSEA

(b)    The Trust and Unknown Abuse Claims Trust shall timely submit all reports required under MMSEA because of any claims settled, resolved, paid, or otherwise liquidated by the Trust or Unknown Abuse Claims Trust. The Trust or the Unknown Abuse Claims Trust, as an RRE, shall follow all applicable guidance published by the Centers for Medicare & Medicaid Services of the United States Department of Health and Human Services and/or any other agency or successor entity charged with responsibility for tracking, assessing, or receiving reports made under MMSEA (collectively, "CMS") to determine whether, and, if so, how, to report to CMS under MMSEA

(c)    For Abuse Claims that occurred after December 5, 1980, before remitting funds to Claimants' counsel, or to the Claimant if such Claimant is acting pro se, regarding any Abuse Claim, the Trustee or Unknown Abuse Claims Trustee shall obtain (i) a certification that said Claimant (or such Claimant's authorized representative) has provided or will provide for the payment and/or resolution of any obligations owing or potentially owing under 42 U.S.C. § 1395y(b), or any related rules, regulations, or guidance, in connection with, or relating to, such Abuse Claim and (ii) that the Claimants' counsel or Claimant (if Claimant is acting pro se) indemnifies the Trust for any such obligations

**8.6.**    **No Admission.** Section 8.5 does not imply, and shall not be an admission that the Debtor, any Participating Party or any Settled Insurer are "applicable plans" within the meaning of Medicare, Medicaid and SCHIP Extension Act of 2007, or that they have any legal obligation to report any actions undertaken by the Trust or Unknown Abuse Claims Trust or contributions to the Trust or Unknown Abuse Claims Trust under Medicare, Medicaid and SCHIP Extension Act of 2007 or any other statute or regulation.

**8.7.**    **Delay Regarding Failure to Comply**. The failure by one or more Medicare Beneficiaries or other Abuse Claimants to follow these provisions shall not delay or impair the payment by the Trustee or Unknown Abuse Claims Trustee to any other Medicare Beneficiary or other Abuse Claimant following these provisions.

**8.8.**    **Documentation by Estate of Abuse Claimant.** If the Abuse Claimant is the estate of an Abuse Claimant, then the letters or documentation required under Section 8.5 need not be dated within 120 days of payment by the Trustee or the Unknown Abuse Claims Trustee to such Claimant.

## SECTION IX
## INSURANCE MATTERS REGARDING NON-SETTLING INSURERS

**9.1.    Transfer of Insurance Interests.**

(a)      On the Effective Date, and with no further action by any party, but subject to this Plan, the Diocese and each of the Participating Parties will be deemed to have assigned to the Trust the Diocese's and the Participating Parties' Transferred Insurance Interests. The Transferred Insurance Interests shall be effective to the maximum extent permissible under applicable law and shall not be construed: (i) as an assignment of the Non-Settling Insurer Policies issued by the Non-Settling Insurers or (ii) to entitle any Person to Insurance Coverage other than those Persons or entities entitled to such coverage under the terms of the Non-Settling Insurer Policies. The determination of whether the assignment of Transferred Insurance Interests provided for in this Section is valid, and does not defeat, diminish or impair the Transferred Insurance Interests shall be made by the Bankruptcy Court at the Confirmation Hearing.

(b)      If a party in interest fails to timely file an objection to the proposed assignment by the deadline for filing objections to confirmation of this Plan, that party in interest shall be deemed to have irrevocably consented to the assignment and will be forever barred from asserting that the assignment affects the ability of the Trust to pursue Transferred Insurance Interests against the Non-Settling Insurers.

(c)      If the Bankruptcy Court determines that the assignment of the Transferred Insurance Interests is valid and does not defeat, diminish or impair the Insurance Coverage, following the Effective Date, the Trust shall assume responsibility for, and be bound by, only such obligations of the Diocese or the Participating Parties under the Non-Settling Insurer Policies as are necessary to enforce the Transferred Insurance Interests; provided, however, that the Trust's assumption of such responsibility shall not relieve the Diocese or the Participating Parties from any duty that such entities may have under the Non-Settling Insurer Policies.

**9.2.    Appointment of Trustee as the Estate Representative to Enforce Insurance Interests and Obtain Insurance Recoveries.**

(a)      Under § 1123(b)(3)(B) of the Bankruptcy Code, the Trustee is appointed as the representative of the Diocese and Participating Parties to retain and enforce the Diocese's and Participating Parties' Insurance Coverage and for Insurance Claims regarding the Abuse Claims against the Diocese and Participating Parties for any Insurance Claims transferred to the Trust.

(b)      Neither the Trust nor the Diocese shall have any obligation to take any action to enforce an Insurance Policy of a Non-Settling Insurer, including any obligation to commence and prosecute any action against any Non-Settling Insurer or to defend an action commenced by a Non-Settling Insurer, though the Trust (or the Diocese,

46

as applicable), may choose to do so.

(c)     The determination of whether the appointment of the Trust as the Debtor's and the Debtor's Estate's representative provided for in Section 9.2(a) is valid and does not defeat, diminish or impair the Insurance Coverage, shall be made by the Bankruptcy Court at the Confirmation Hearing. If a party in interest fails to timely file an objection to the proposed appointment by the deadline for filing objections to confirmation of this Plan, that party in interest shall be deemed to have irrevocably consented to the appointment and will be forever barred from asserting that the appointment in any way affects the ability of the Trust to pursue the Insurance Coverage, Insurance Claims and/or Insurance Recoveries from the Non-Settling Insurers.

(d)     If the Bankruptcy Court determines that the appointment is valid and does not defeat, diminish or impair the Insurance Coverage, following the Effective Date, the Trust shall assume responsibility for, and be bound by, only such obligations of the Diocese or the Participating Parties under the Non-Settling Insurer Policies as are necessary to enforce the Insurance Coverage, the Insurance Claims and/or Insurance Recoveries; provided, however, that the Trust's appointment shall not relieve the Diocese or the Participating Parties from any duty that such entities may have under the Non-Settling Insurer Policies.

**9.3.    Consequences of Determination that Assignment or Appointment is Invalid.**

(a)     If a Non-Appealable Order is entered holding that the assignment of Transferred Insurance Interests provided for in Section 9.1 above, or that the appointment of the Trust as the Diocese's and Participating Parties' representative provided for in Section 9.2 above, is invalid or would defeat, diminish or impair the Transferred Insurance Interests regarding a Non-Settling Insurer Policy, as to such Non-Settling Insurer Policy, the assignment and/or appointment, as the case may be, will be deemed not to have been made. If the assignment and appointment are not deemed to have been made, the Diocese and each of the Participating Parties will retain the Insurance Claims under such Non-Settling Insurer Policy, and the following shall apply to such retained Insurance Claims:

1.     The Trust, the Reorganized Debtor, and any Participating Parties shall enter into a common interest agreement related to pursuing the Insurance Claims.

2.     The Reorganized Debtor and the Participating Parties will assert their Insurance Claims to the extent requested by the Trust against any Non-Settling Insurer. All Insurance Recoveries identified as transferred to the Trust under Section 9.1 above received by the Reorganized Debtor and the Participating Parties will be immediately paid to the Trust. The Reorganized Debtor and Participating Parties will select and retain counsel to pursue their Insurance Claims under this Section, subject to the Trustee's approval, which approval shall not be unreasonably withheld.

47

3.      The Reorganized Debtor and Participating Parties shall cooperate with the Trust regarding the Insurance Claims, including that the Reorganized Debtor and Participating Parties will provide the Trustee and its counsel with all discovery requests, pleadings, moving documents and other papers that the Reorganized Debtor or Participating Parties intend to make or file regarding the Insurance Claims and any related counterclaims against the Non-Settling Insurers before making such requests or filing. The Reorganized Debtor and Participating Parties shall keep the Trustee advised of any settlement discussions regarding any litigation against a Non-Settling Insurer and will involve the Trust's counsel in all settlement discussions with any Non-Settling Insurer.

4.      The Trust shall pay the reasonable attorneys' fees, costs and expenses allowed by the Bankruptcy Court incurred by the Reorganized Debtor and Participating Parties in pursuing the Insurance Claims under this Section 9.3, subject to a reasonable monthly cap to be established from time-to-time and in good faith by the Trustee, in agreement with the Reorganized Debtor and Participating Parties and, in the event such parties cannot agree, as established by the Bankruptcy Court upon motion and after due notice and a hearing.

**5.**      The Trust shall, in addition to reasonable attorneys' fees, costs and expenses provided for in Section 9.3(a)4, reimburse the Reorganized Debtor and Participating Parties for any reasonable out of pocket costs and expenses it incurs as a direct consequence of pursuing such Insurance Claims, but will not compensate the Reorganized Debtor and Participating Parties for any time any of its employees spends. All Insurance Recoveries received by the Reorganized Debtor or Participating Parties on account of such Insurance Claims shall be held in trust to benefit the Trust and shall be immediately remitted by the Reorganized Debtor or Participating Parties to the Trust.

**9.4.      Preservation of Insurance Rights. Nothing in this Plan or any of the other Plan Documents, including, without limitation, any discharge, release, covenant not to sue or injunction protecting the Debtor, any Settled Insurer Party or any Participating Party, or any release provided by a Class 4 Claimant or Class 5 Claimant, or any determination with respect to a Class 4 Claim under the Trust Documents or any determination with respect to Class 5 Claim under the Unknown Abuse Claim Trust Document, shall impair or diminish any Non-Settling Insurer's obligations under or related to the Non-Settling Insurer Policies including, but not limited to, pursuant to the doctrines of *res judicata*, collateral estoppel, admission, accord and satisfaction, novation or waiver. No provision of this Plan or any of the other Plan Documents shall impair or diminish any Insurance Claims or Insurance Recoveries, including any Non-Settling Insurer's legal, equitable, or contractual obligations arising out of or relating to the Non-Settling Insurer Policies or the Insurance Claims, against the Non-Settling Insurers. Under no circumstance shall the review or determination of an Abuse Claim by the Abuse Claims Reviewer, Trustee or Unknown Abuse Claims Trustee**

48

affect the rights or obligations of a Non-Settling Insurer. If any court determines that any provision of this Plan impairs or diminishes any Non-Settling Insurer's obligation regarding any Insurance Claims or Insurance Recoveries, including any Non-Settling Insurer's obligations arising out of or relating to the Transferred Insurance Interests, such provision shall be given effect only if it shall not cause such impairment or diminishment.

9.5. **Effect of Discharge, Injunctions and Releases.** Notwithstanding any provision of this Plan or any other Plan Document, including the discharge provided by Section 13.1, the injunctions provided by Sections 13.6 and 13.9 of the Plan, and the releases provided in and pursuant to this Plan and the other Plan Documents, to preserve coverage under any Non-Settling Insurer Policy and to preserve all Insurance Claims and all Insurance Recoveries, including the Transferred Insurance Interests, the Opt-In Abuse Claimants specifically reserve, and do not release, and are not enjoined or otherwise precluded from asserting and litigating through any form of legal proceeding any Claims they may have against the Diocese, the Reorganized Debtor, or any Participating Party solely for the purpose of asserting those Claims to recover on Insurance Coverage under any Non-Settling Insurer Policy, or any Insurance Claims or Insurance Recoveries, and recourse is limited to the proceeds of such Non-Settling Insurer Policy and all Insurance Claims and Insurance Recoveries that may be recoverable against any Non-Settling Insurer; and may not be recovered from or against any other property or assets of the Reorganized Debtor or Participating Parties, and any such judgments or awards shall be handled pursuant to the Plan and the Trust Distribution Plan.

9.6. **Post-Judgment Actions against Non-Settling Insurers.** If the Trust or any Abuse Claimant obtains a judgment against the Reorganized Debtor or Participating Parties as provided in Section 9.5 above, the Reorganized Debtor or Participating Parties will cooperate with the Trust or Abuse Claimant in the pursuit of any action brought by the Trust or Abuse Claimant against a Non-Settling Insurer that may, based upon allegations made in good faith, provide Insurance Coverage applicable to such judgment. The Reorganized Debtor and/or Participating Parties will provide the Trust or Abuse Claimant with any non-privileged and relevant documents and information reasonably requested by the Trust or Abuse Claimant in pursuit of such an action. The Reorganized Debtor shall be reimbursed for any legal fees and costs incurred by the Reorganized Debtor to comply with this Section as provided in Section 9.3(a)(4) above.

9.7. **Settlement with Non-Settling Insurers.** Following the Effective Date and prior to the Trust Termination Date (as defined in the Trust), the Reorganized Debtor and the Participating Parties shall not enter into an agreement affecting any Non-Settling Insurer Policies or any Insurance Claims against or any Insurance Recoveries from any Non-Settling Insurer without the express written consent of the Trustee, which consent may be granted or withheld at the Trustee's sole and absolute discretion. Following the Effective Date and prior to the Trust Termination Date (as defined in the Trust), the Trust shall exclusively act on the Reorganized Debtor's and Participating Parties' behalf to negotiate a settlement with any Non-Settling Insurer because of such Transferred Insurance Interests, unless Section 9.3 applies. Such settlements may provide for the Non-Settling Insurer to become a Settled Insurer.

49

**9.8. Cooperation with Non-Settling Insurer in Defense of Claims.** Without limiting the Diocese's and/or Participating Party's obligations under this Section IX, if any Abuse Claimant prosecutes an action against the Diocese and/or Participating Party, the Diocese and/or Participating Party will cooperate, under the terms of any applicable Non-Settling Insurer Policy, with a Non-Settling Insurer providing a defense to such a Claim. The Reorganized Debtor shall be reimbursed for any legal fees and costs incurred by the Reorganized Debtor to comply with this section as provided in Section 9.3 (a)(4) above.

**9.9. Insurance Neutrality.** Other than as expressly provided in this Section, no provision of this Plan shall diminish or impair the right of any Insurer to assert any defense to any Insurance Claim. That the Trust is liquidating and paying/reserving monies because of the Abuse Claims shall not be construed to diminish any duty of any Insurer under any Insurance Policy to provide Insurance Coverage to the Diocese or the Participating Parties for Abuse Claims. The duties and obligations, if any, of the Non-Settling Insurers under each Non-Settling Insurer's Insurance Policy shall not be impaired, altered, reduced or diminished by: (a) the discharge granted to the Debtor under the Plan under § 1141(d) of the Bankruptcy Code, (b) the exonerations, exculpations and releases in the Plan or the other Plan Documents, or (c) the Channeling Injunction and the Supplemental Catholic Mutual Injunction.

**9.10. Judgment Reduction.** In connection to any action by the Trust to enforce Insurance Claims regarding a Non-Settling Insurer Policy, if any Non-Settling Insurer obtains a judicial determination or binding arbitration award that would entitle it to obtain a sum certain from a Settled Insurer because of a claim for contribution, subrogation, indemnification, or other similar claim against a Settled Insurer for such Settled Insurer's alleged share or equitable share, or to enforce subrogation rights, if any, of the defense and/or indemnity obligation of such Settled Insurer for any Claims released or resolved under any Settlement Agreement with a Settled Insurer, the Diocese, the Trustee or Participating Party, as applicable, shall be deemed to have reduced its judgment or Claim against, or settlement with, such other Insurer to the extent necessary to satisfy such contribution, subrogation, indemnification, or other claims against such Settled Insurer. To make sure such a reduction is accomplished, such Settled Insurer shall be entitled to assert this Section as a defense to any action against it brought by any other Insurer for any such portion of the judgment or Claim and shall be entitled to request that the court or appropriate tribunal issue such orders as are necessary to effectuate the reduction to protect such Settled Insurer or any released parties under a Settlement Agreement with a Settled Insurer from any liability for the judgment or Claim. If a Non-Settling Insurer asserts that it has a Claim for contribution, indemnity, subrogation, or similar relief against a Settled Insurer, such Claim may be asserted as a defense against the Trust, the Diocese or any Participating Party in any litigation of Insurance Claims (and the Trust, the Diocese and the Participating Party may assert the legal and equitable rights of such Settled Insurer in response thereto); and to the extent such a Claim is found to be valid by the court presiding over such action, the liability of such Non-Settling Insurer to the Trust, the Diocese or Participating Party shall be reduced dollar for dollar by the amount so determined. The Bankruptcy Court shall retain nonexclusive jurisdiction to determine the amount, if any, of any judgment reduction under this Section. In addition, any court of competent jurisdiction may determine the amount, if any, of any judgment reduction under this Section.

**9.11. No Duty of Diocese or Trust to Prosecute Insurance Claims.** Neither the Trust nor the Diocese have any obligation to take any action to enforce any Non-Settling Insurer Policy

or any Insurance Claims against any Non-Settling Insurer (for the Trust, pursuant to the rights and interests conferred pursuant to Sections 9.1 through 9.3 of the Plan), including any obligation to commence and prosecute any action against any Non-Settling Insurer or to defend an action commenced by a Non-Settling Insurer, though the Trust (or the Diocese, as applicable), may choose to do so. **Notwithstanding and for the avoidance of doubt, pursuant to this Plan and specifically Section 9.4 and 9.5, and subject to the provisions of Section 10 of the Trust Distribution Plan, each Class 4 Claimant retains the right to assert and litigate through any form of legal proceeding any Claims they may have against the Diocese, the Reorganized Debtor, or any Participating Party solely for the purpose of asserting those Claims to recover on Insurance Coverage under any Non-Settling Insurer Policy, or any Insurance Claims or Insurance Recoveries.**

**9.12.   Effect Under Non-Settling Insurer Policies.** The Debtor's and Participating Party's contributions are being made in respect of the uninsured or underinsured exposure of the Debtor and the Participating Parties for Abuse Claims and, to the extent required under applicable law, to satisfy self-insured retentions or deductibles under Non-Settling Insurer Policies.

**9.13.   D&O Coverage.** The Catholic Mutual Certificates include coverage for the defense and indemnification of the Diocese's officers, employees and directors subject to the terms, conditions, exclusions and limits contained therein ("D&O Coverage") during the Bankruptcy Case and, except for the Sold Certificates, will continue provide D&O Coverage as part of the Preserved Coverage of the Reorganized Debtor after the Effective Date notwithstanding the provisions of the Plan.

## SECTION X
## SETTLED INSURERS AND PARTICIPATING PARTIES

**10.1.   Settlement Agreements**. Each Settlement Agreement shall comply and be consistent with the provisions of this Plan and, in particular, without limitation, the provisions of this Section X. Upon satisfaction of the conditions precedent to any Settlement Agreement becoming effective, including the Confirmation Order and the order approving the Settlement Agreement becoming a Non-Appealable Order (only if such Settlement Agreement contemplates or the Bankruptcy Court requires a separate order), any Settlement Agreement will be fully binding on the Settled Insurer Parties, the Trust, the Unknown Abuse Claims Trust, the Participating Parties, the Reorganized Debtor, the Committee, the Abuse Claimants, and parties in interest, and any of the foregoing Persons' successors.

**10.2.   Settlement Payments; Escrow**. Each Participating Party and Settled Insurer will pay to the Trust the sums set forth in each applicable Settlement Agreement on the terms and subject to the conditions set forth in such Settlement Agreement including within the time set forth in such Settlement Agreement. In the event that a payment by a Participating Party or a Settled Insurer is made prior to the Effective Date, it shall be paid to the Effective Date Escrow Agent and held in escrow and delivered to the Trust or returned promptly in accordance with the Confirmation Order and the Effective Date Escrow Agreement.

**10.3.    Post-Effective Date Approval**. After the Effective Date, upon consent of the Trustee, a Person may become a Settled Insurer or a Participating Party if the Bankruptcy Court, after notice and hearing, approves the Settlement Agreement between, *inter alia*, the Person and the Trustee. After the Effective Date, the Trustee shall have the exclusive authority to seek approval of such a Settlement Agreement. Such approval shall be subject to the same standards of law applicable to the approval of a compromise or settlement pursuant to Fed. R. Bankr. P. 9019(a). Upon the Bankruptcy Court's entry of a Non-Appealable Order approving such Settlement Agreement, if required by such Settlement Agreement, the definition of Participating Parties and/or Settled Insurers in this Plan, and the list of Participating Parties and/or Settled Insurers set forth in **Exhibit E** and/or **Exhibit F** to the Plan, as appropriate, shall be amended by the Trustee to include such Person. The Bankruptcy Court's retained jurisdiction to approve an agreement under this Section shall include jurisdiction to determine the adequacy of notice of a motion to approve such an agreement.

**10.4.    Effect of Post-Effective Date Settlement Agreements**. Any Person that enters into a Settlement Agreement with the Trustee after the Effective Date which has been approved by a Non-Appealable Order shall, if required by such Settlement Agreement, have all of the rights, remedies and duties of a Participating Party or a Settled Insurer under this Plan notwithstanding that such Person originally may have been a Non-Settling Insurer or may not have been a Participating Party under any provision of the Plan on the Effective Date. Such rights, remedies and duties may include the terms and conditions of this Plan including the Channeling Injunction provided for in Section XIII.

**10.5.    Debtor and Trustee Waiver and Release of Estate's Claims and Causes of Action against Participating Parties and Settled Insurers.** In consideration of the contributions and other consideration to be provided by each Participating Party and Settled Insurer Party, and conditioned upon the occurrence of and effective upon the Effective Date, the Debtor and Trust, as applicable, irrevocably and unconditionally, without limitation, hereby waive, release, acquit, and forever discharge such Participating Party and Settled Insurer Party of and from any and all Claims and Causes of Action of the Estate against any Participating Party or Settled Insurer, or the property thereof; provided, however, that notwithstanding the foregoing, the foregoing release is subject to all exclusions and limitations set forth in this Plan applicable to releases provided in or pursuant to this Plan, and does not waive, release, acquit or forever discharge the Participating Parties' and Settled Insurer Parties' rights and obligations provided in or pursuant to this Plan.

**10.6.    Additional Documentation; Non-Material Modifications.** From and after the Effective Date, the Trustee, the Unknown Abuse Claims Trustee, the Reorganized Debtor, and the Participating Parties are authorized to enter into, execute, adopt, deliver and/or implement all contracts, notes, security documents, leases, instruments, releases, and other agreements or documents necessary to effectuate or memorialize the settlements in this Plan without further Order of the Bankruptcy Court. Also, the Trustee, the Unknown Abuse Claims Trustee, the Reorganized Debtor, and the Participating Parties may make technical and/or immaterial alterations, amendments, modifications or supplements to the terms of any settlement in this Plan and/or any Settlement Agreement, without Bankruptcy Court approval, provided that such change does not materially and adversely change the treatment of any Claim. A class of Claims that has accepted the Plan shall be deemed to have accepted the Plan, as altered, amended, modified or

supplemented under this Section, if the proposed alteration, amendment, modification or supplement does not materially and adversely change the treatment of the Claims within such class. An Order of the Bankruptcy Court approving any amendment or modification made under this Section shall constitute an Order in aid of consummation of the Plan and shall not require the re-solicitation of votes on the Plan.

**10.7.   Mercy Settlement Agreement.**   The Mercy Settlement Agreement shall be effective and binding on all parties in interest in this Bankruptcy Case and any of their respective successors and assigns, upon entry of the Confirmation Order and the satisfaction of all conditions set forth in the Mercy Settlement Agreement. The rights of the parties under the Mercy Settlement Agreement shall be determined exclusively under the Mercy Settlement Agreement, those provisions of the Confirmation Order approving such Mercy Settlement Agreement and the Plan. The Mercy Settlement Agreement is incorporated into the Plan by reference and shall survive the confirmation, effectiveness, and consummation of the Plan.

**10.8.   St. Bernard Settlement Agreement.**   The St. Bernard Settlement Agreement shall be effective and binding on all parties in interest in this Bankruptcy Case and any of their respective successors and assigns, upon entry of the Confirmation Order and the satisfaction of all conditions set forth in the St. Bernard Settlement Agreement. The rights of the parties under the St. Bernard Settlement Agreement shall be determined exclusively under the St. Bernard Settlement Agreement, those provisions of the Confirmation Order approving such St. Bernard Settlement Agreement and the Plan.  The St. Bernard Settlement Agreement is incorporated into the Plan by reference and shall survive the confirmation, effectiveness, and consummation of the Plan.

**10.9.   Xavier Settlement Agreement.**   The Xavier Settlement Agreement shall be effective and binding on all parties in interest in this Bankruptcy Case and any of their respective successors and assigns, upon entry of the Confirmation Order and the satisfaction of all conditions set forth in the Xavier Settlement Agreement. The rights of the parties under the Xavier Settlement Agreement shall be determined exclusively under the Xavier Settlement Agreement, those provisions of the Confirmation Order approving such Xavier Settlement Agreement and the Plan. The Xavier Settlement Agreement is incorporated into the Plan by reference and shall survive the confirmation, effectiveness, and consummation of the Plan.

**10.10.  Mount St. John Settlement Agreement.**   The Mount St. John Settlement Agreement shall be effective and binding on all parties in interest in this Bankruptcy Case and any of their respective successors and assigns, upon entry of the Confirmation Order and the satisfaction of all conditions set forth in the Mount St. John Settlement Agreement.  The rights of the parties under the Mount St. John Settlement Agreement shall be determined exclusively under the Mount St. John Settlement Agreement, those provisions of the Confirmation Order approving such Mount St. John Settlement Agreement and the Plan.  The Mount St. John Settlement Agreement is incorporated into the Plan by reference and shall survive the confirmation, effectiveness, and consummation of the Plan.

**10.11.  Catholic Mutual Settlement.** The Catholic Mutual Settlement Agreement, and all releases, amendments, and indemnifications contained therein shall be effective and binding on all parties in interest in this Bankruptcy Case including the Trust, the Diocese Parties, the Catholic

53

Entity Parties, Xavier, Oceania, the Claimants and Catholic Mutual, and any of their respective successors and assigns, upon entry of an Approval Order with respect to the Catholic Mutual Settlement Agreement, and the satisfaction of all conditions set forth in the Catholic Mutual Settlement Agreement. The rights of the parties under the Catholic Mutual Settlement Agreement shall be determined exclusively under the Catholic Mutual Settlement Agreement, those provisions of the Approval Order approving such Catholic Mutual Settlement Agreement, the Plan and the Confirmation Order. The Catholic Mutual Settlement Agreement is incorporated into the Plan by reference and shall survive the confirmation, effectiveness, and consummation of the Plan.

**10.12. Sale of Sold Certificates, Free and Clear of Liens, Claims and Interests.** Pursuant to and solely to the extent provided in the Approval Order authorizing and approving the Catholic Mutual Settlement Agreement and the Confirmation Order, effective on the date set forth in the Catholic Mutual Settlement Agreement, each and every Sold Certificate shall be sold to Catholic Mutual, pursuant to §§ 105, 363, and 1123 of the Bankruptcy Code, free and clear of all Liens, Claims and interests of all Persons, including, without limitation, the Diocese Parties, the Catholic Entity Parties, Xavier and Oceania, and Catholic Mutual shall be a good faith purchaser thereof entitled to all of the benefits of § 363(m) of the Bankruptcy Code.

**10.13. Full Payment by Catholic Mutual for Settlement.** Catholic Mutual shall pay the Catholic Mutual Contribution to the Effective Date Escrow Agent subject to the terms and conditions of the Catholic Mutual Settlement Agreement, the Plan and the Confirmation Order. The Effective Date Escrow Agent shall hold the Catholic Mutual Contribution as escrowee and return such contribution to Catholic Mutual in the event of termination as provided in Section 5.1 of the Catholic Mutual Settlement Agreement. In the absence of such termination, the Catholic Mutual Contribution is the total amount the Catholic Mutual Parties are and shall ever be obligated to pay on account of any and all Channeled Claims or on account of any Claims or interests relating to the Sold Certificates. The consideration to be provided by the Catholic Mutual Parties pursuant to this Plan (including the Catholic Mutual Contribution) constitutes a fair and reasonable exchange for (i) the consideration granted by the Estate to the Catholic Mutual Parties in this Plan, the Sold Certificates and the Catholic Mutual Settlement Agreement (including the releases, Channeling Injunction and the Supplemental Catholic Mutual Injunction), and (ii) the consideration to be provided by the Diocese Parties and the Catholic Entity Parties to the Catholic Mutual Parties pursuant to this Plan (including the releases and injunctions herein). The Catholic Mutual Parties are not acting as volunteers in paying the Catholic Mutual Contribution, which is in settlement of liability under the Catholic Mutual Certificates and the Catholic Mutual Parties' liability thereunder (other than the Preserved Coverage).

**10.14. Continuation of Preserved Coverage, as Amended.** The Preserved Coverage under the Catholic Mutual Certificates and any other Insurance Policies issued by any other Person ("Other Insurance Policy"), shall either be deemed assumed by the Reorganized Debtor pursuant to §§ 365, 1123(a)(5)(A), and 1123(b)(2) of the Bankruptcy Code, to the extent such Other Insurance Policy or certificate is or was an Executory Contract of the Diocese, or continued in accordance with its terms pursuant to § 1123(a)(5)(A) of the Bankruptcy Code, to the extent such Other Insurance Policy or certificate is not an Executory Contract of the Diocese, such that each of the parties' contractual, legal, and equitable rights under each such Other Insurance Policy shall continue. To the extent that any or all such Other Insurance Policies and certificates are considered

to be Executory Contracts, then the Plan shall constitute a motion to assume such Other Insurance Policies in connection with the Plan. The Diocese shall not have any responsibility to pay any cure costs in connection with the assumption of the Preserved Coverage or any Insurance Policies issued by the Non-Settling Insurers, and confirmation of this Plan shall constitute a finding of adequate assurances of performance by the Diocese with respect to such Preserved Coverage and Insurance Policies under applicable law. Subject to the occurrence of the Effective Date, the Confirmation Order shall approve such assumption pursuant to §§ 365(a), 1123(a)(5)(A), and 1123(b)(2) of the Bankruptcy Code and include a finding by the Bankruptcy Court that each such assumption is in the best interest of the Diocese, the Estate, and all parties in interest in this Bankruptcy Case. For the avoidance of doubt, the Plan and Catholic Mutual Settlement Agreement do not affect the Preserved Coverage under the Catholic Mutual Certificates under which Catholic Mutual has provided coverage to the Diocese and the Catholic Entities during the Bankruptcy Case, as amended by the Plan and Catholic Mutual Settlement Agreement. Unless otherwise determined by the Bankruptcy Court pursuant to an order which becomes a Non-Appealable Order or agreed to by the parties thereto prior to the Effective Date, no payments are required to cure any defaults of the Diocese existing as of the Effective Date with respect to any Other Insurance Policy or certificate.

**10.15. Catholic Mutual Consent to Amendments.** The Confirmation Order and any subsequent modifications or amendments to this Plan shall be in all respects acceptable to Catholic Mutual and shall not deprive the Catholic Mutual Parties of any right or benefit under this Plan or Catholic Mutual Settlement Agreement or otherwise adversely affect the rights and interests of the Catholic Mutual Parties pursuant to this Plan; provided, however, that nothing herein shall preclude the filing of a competing or alternative plan by the Debtor or other parties in interest which might be adverse to Catholic Mutual.

**10.16. Indemnification Obligations of Trust and Reorganized Debtor.**

(a) From and after the Effective Date, the Trust shall defend, indemnify, and hold harmless the Catholic Mutual Parties with respect to any and all Opt-In Abuse Claims classified in Class 4 and all Medicare Claims and Related Insurance Claims arising on account of, in connection with or related to such Opt-In Abuse Claims, including: all such Claims made by (i) any Person claiming to be covered (as a protected party or otherwise) under any Catholic Mutual Certificates; (ii) any Person who has made, will make, or can make an Abuse Claim or Related Insurance Claim; and (iii) any Person who has actually or allegedly acquired or been assigned the right to make a Claim under any Catholic Mutual Certificates; *provided, however,* that the Catholic Mutual Parties shall not seek to recover from an Opt-In Abuse Claimant classified in Class 4 or any transferee of an Opt-In Abuse Claimant classified in Class 4 any property distributed or to be distributed after the Effective Date by the Trust in accordance with the confirmed Plan and neither the Trust nor the Reorganized Debtor shall have any liability from a breach of this proviso. The Reorganized Debtor shall defend, indemnify, and hold harmless the Catholic Mutual Parties with respect to any and all Opt-In Abuse Claims and all Related Insurance Claims arising on account of, in connection with or related to such Opt-In Abuse Claims made by (i) any Person claiming to be covered (as a protected party or otherwise) under any Catholic Mutual Certificates; (ii) any Person who has made, will make, or can make an Abuse Claim or Related Insurance Claim; and (iii) any Person who has actually or allegedly acquired or been assigned the right to make a Claim under any Catholic Mutual

Certificates subject to the limitations set forth in any other Settlement Agreement with an Insurer that has been approved by the Bankruptcy Court. The Catholic Mutual Parties shall have the right to defend any Claims identified in this section and shall do so in good faith.

(b)     The indemnification obligations of the Trust and the Reorganized Debtor provided for in foregoing Section 10.16(a) include Opt-In Abuse Claims made by Persons over whom the Diocese or Parishes do not have control, including any other Person who asserts Opt-In Abuse Claims (for the Trust, other than Unknown Abuse Claims) against or right to coverage under the Catholic Mutual Certificates. The Catholic Mutual Parties may, but are not obligated to undertake the defense of any Claim on receipt of such Claim and their choice to defend or not shall not affect the indemnification obligations of the Trust and Reorganized Debtor. The Catholic Mutual Parties shall notify the Trust or the Reorganized Debtor, as applicable, as soon as practicable (but, in no case, later 30 dates after receipt) of any Claims subject to indemnification pursuant to this section and of their choice of counsel. The Trust or Reorganized Debtor, as applicable, is not obligated to indemnify the Catholic Mutual Parties for Claims that are or may be made against the Catholic Mutual Parties by other insurers. The obligation of the Trust or Reorganized Debtor, as applicable, to indemnify the Catholic Mutual Parties under this Section 10.16 shall not exceed in the aggregate dollar amount the amount of the Catholic Mutual Contribution set forth herein, which shall be deemed to be distributed to Abuse Claimants pro rata with other contributions to the Trust. Subject to the limitations above concerning the maximum amounts the indemnifying party must pay, the Trust shall reimburse all reasonable and necessary attorneys' fees, expenses, costs, and amounts incurred by the Catholic Mutual Parties in defending such indemnified Claims (other than Unknown Abuse Claims), and the Reorganized Debtor shall reimburse all reasonable and necessary attorney's fees, expenses, costs and amounts incurred by the Catholic Mutual Parties in defending such indemnified Claims. In defense of any such indemnified Claims, the Catholic Mutual Parties may settle or otherwise resolve a Claim consistent with the terms of this Plan and with the prior consent of the indemnifying party, which consent shall not be unreasonably withheld.

(c)     The indemnification obligations of the Trust set forth in this Section 10.17 may give rise to a liability on the part of the Trust but shall not create any right on the part of Catholic Mutual to "claw back" or otherwise recover any specifically identifiable proceeds of the contribution paid to the Trust by Catholic Mutual, or any interest therein.

(d)     Any dispute with respect to the indemnification obligations set forth in this Section 10.17, including any attorneys' fees, expenses, costs, or other amounts allegedly incurred by the Catholic Mutual Parties and subject to reimbursement by the Trust or the Reorganized Debtor, shall be adjudicated and finally determined by the Bankruptcy Court.

(e)     Waiver/Consent/Fees

i.      Subject to the occurrence of the Effective Date, in consideration of the releases and Channeling Injunction, the Supplemental Catholic Mutual Injunction, and other covenants set forth herein, each of the Diocese Parties and the Catholic Entity Parties irrevocably and unconditionally, without limitation, releases, acquit, forever discharge, and waive any Claims and/or interests they have or might have now or in the future have against the other Participating Parties and the Reorganized Debtor with respect to any and all Related Insurance Claims, any

contribution, subrogation, indemnification, or other similar Claim arising from or relating to Abuse Claims, and any Catholic Mutual Certificates.

        **ii.**      **Nothing in this Plan shall be construed to bar either (a) a Claim based on Abuse against a Person who is not a Participating Party or (b) a Claim by such Person for Insurance Coverage in connection with a Claim described in the foregoing subsection (a) under an insurance policy or other form of indemnification against loss other than the Settled Insurer Policies including the Catholic Mutual Certificates.**

      **10.17. Rights under Catholic Mutual Settlement Agreement**. The rights of the parties under the Catholic Mutual Settlement Agreement shall be determined exclusively under the Catholic Mutual Settlement Agreement and those provisions of the Approval Order approving such Catholic Mutual Settlement Agreement, the Plan and the Confirmation Order.

**SECTION XI**
**MEANS FOR IMPLEMENTATION OF THE PLAN**

      **11.1. Funding of Plan**. On the Effective Date, the Debtor shall make all payments and effectuate all transfers required to be performed on the Effective Date pursuant to this Plan, including by transferring any Trust Assets due on the Effective Date to the Trust on the Effective Date. On or immediately after the Effective Date, the Effective Date Escrow Agent shall transfer to the Trustee, for the benefit of the Trust, in accordance with this Plan and the Effective Date Escrow Agreement, all Cash Contributions received by the Effective Date Escrow Agent in accordance with Section 7.1(a)3 of the Plan.

      **11.2. Transfer of Real Estate and Reversionary Interests**. Subject to Section 7.3, on and after the Effective Date, the Debtor shall take all steps necessary to effectuate transfer of ownership to the Trust of all Transferred Real Estate. On and after the Effective Date, the Diocese shall also take all steps necessary to effectuate transfer of all reversionary interests in the Transferred Real Estate if any portion of the properties are leased, sold, or subject to an option for lease or sale on or before the Trust Termination Date (as that term is defined in the Trust Documents).

      **11.3. Preservation of Causes of Action**. The Trustee, on behalf of the Trust, shall retain the Trust's Causes of Action, whether arising before or after the Petition Date, in any court or other tribunal, including, without limitation, the Bankruptcy Court. The Trustee, on behalf of the Trust, shall have the exclusive right, authority, and discretion to institute, prosecute, abandon, settle, or compromise any such Causes of Action, subject to the requirements of the Bankruptcy Code. To the extent the Committee is the named plaintiff in any Cause of Action vested in the Trust, the Trustee may be substituted as the named plaintiff without additional notice to the parties in such Cause of Action. For the avoidance of doubt, nothing in this paragraph modifies the scope of the waiver, release and discharge of Claims provided for in Section 13.14 by and between the Participating Parties and the Catholic Mutual Parties.

      **11.4. Reorganized Debtor's Officers, Directors and Senior Management.** In accordance with § 1129(a)(5) of the Bankruptcy Code, the identities and affiliations of the persons

57

proposed to serve as the officers, directors and senior management of the Reorganized Debtor on and after the Effective Date are set forth on **Exhibit H**. Pursuant to § 1129(a)(5)(B) of the Bankruptcy Code, **Exhibit H** further discloses the nature of compensation to be paid by the Reorganized Debtor to each of the Reorganized Debtor's insiders (the Bishop and the named officers).

**11.5.   Closing.** Closing will be conducted at the offices of Zeisler & Zeisler, P.C., or at such other location designated by the Committee, including remotely, as soon as reasonably practicable following the Effective Date for the Diocese and the Participating Parties to execute and deliver the Plan Documents and completing those actions necessary for the Reorganized Debtor and the Participating Parties to establish and fund the Trust and make other Distributions required to be made upon, or promptly following, the Effective Date. As soon as practicable after conditions in Section 12.1 have been satisfied or waived under Section 12.2, the Diocese shall file notice of the Closing and the occurrence of the Effective Date.

**11.6.   Obligations of the Reorganized Debtor and the Implicated Participating Parties.** The Reorganized Debtor and any implicated Participating Parties will:

(a)   In the exercise of their respective business judgment, review all Claims filed against the Estate (except for Opt-In Abuse Claims) and, if advisable, object to such Claims;

(b)   Not object to any Opt-In Abuse Claims. Despite the foregoing, the Reorganized Debtor and any implicated Participating Parties shall timely provide the Abuse Claims Reviewer or Trustee, as applicable, with information regarding Opt-In Abuse Claims as may be requested by the Trustee or Abuse Claims Reviewer;

(c)   Fulfill the Diocese's obligations under the Insurance Policies issued by the Non-Settling Insurers and under applicable non-bankruptcy law;

(d)   Honor the Diocese's obligations arising under any Settlement Agreement approved by the Bankruptcy Court; and

(e)   Perform all of their obligations under this Plan and Plan Documents, in each case, as and when the same become due.

**11.7.   Objections to Claims.** Objections to a Claim (except for Opt-In Abuse Claims) as to which no objection is pending as of the Effective Date, must be filed by the Claims Objection Deadline, provided that the Reorganized Debtor may request extensions of the Claims Objection Deadline, or of any Bankruptcy Court approved extensions thereof, by filing a motion with the Bankruptcy Court. A motion seeking to extend the deadline to object to any Claim is not an amendment to the Plan. No party in interest other than the Trustee may object to an Opt-In Abuse Claim classified in Class 4. No party in interest other than the Unknown Abuse Claims Trustee may object to a Class 5 Claim.

**11.8.** **Provisions Governing Distributions.**

(a)  **Distribution Only to Holders of Allowed Claims.** Except as otherwise provided in the Plan, Distributions under this Plan and the Plan Documents will be made only to the Holders of Allowed Claims and in the case of Abuse Claims, pursuant only to the Plan and the Trust Documents or Unknown Abuse Claims Trust Documents, as applicable. Until a Disputed Claim becomes an Allowed Claim, the Holder of that Disputed Claim will receive no Distribution otherwise provided to the Claimants under this Plan or the Plan Documents.

(b)  **Transmittal of Distributions.** Except as otherwise provided in this Plan, in the Plan Documents, or in an order of the Bankruptcy Court, Distributions to be made under this Plan, Confirmation Order, Trust Documents, or Unknown Abuse Claims Trust Documents, as applicable, to Abuse Claimants that opt to not litigate will be made by the Trustee or Unknown Abuse Claims Trustee, as applicable, and Distributions to all other Claimants will be made by the Reorganized Debtor. Distributions to Abuse Claimants will be made (a) to the client trust account for attorneys of record of Abuse Claimants, (b) if the Abuse Claimant does not have an attorney of record, to the latest mailing address set forth in a proof of claim filed with the Claims Agent or the Bankruptcy Court by or on behalf of such Claimant, or to such other address as may be provided to the Reorganized Debtor or Trustee, as applicable, by such Claimant in writing, or (c) if no such proof of claim has been filed and no written notice setting forth a mailing address is provided by or on behalf of such Claimant to the Reorganized Debtor, Trustee, or Unknown Abuse Claims Trustee to the mailing address in the schedules filed by the Debtor in this Case. Distributions to other Claimants will be made by wire or first class United States mail, postage prepaid, (a) to the client trust account for attorneys of record of the Claimant, (b) if the Claimant does not have an attorney of record, to the latest mailing address in a proof of claim filed with the Claims Agent or the Bankruptcy Court by or on behalf of such Claimant, or to such other address as may be provided to the Reorganized Debtor, as applicable, by such Claimant in writing, or (c) if no such proof of claim has been filed and no written notice setting forth a mailing address is provided by or on behalf of such Claimant to the Reorganized Debtor, to the mailing address in the schedules filed by the Debtor in this Case. If a Claimant's Distribution is not mailed or is returned to the Reorganized Debtor, Trustee, or Unknown Abuse Claims Trustee because of the absence of a proper mailing address, the Reorganized Debtor, Trustee, or Unknown Abuse Claims Trustee, as the case may be, shall make a reasonable effort to locate or ascertain the correct mailing address for such Claimant from information generally available to the public and from such party's own records, but shall not be liable to such Claimant for having not found a correct mailing address. The Trustee or the Unknown Abuse Claims Trustee, as applicable, shall have no liability to an Abuse Claimant because of Distributions made to the client trust account of an Abuse Claimant's attorney.

(c)  **Timing of Distributions.** Unless otherwise agreed by the Reorganized Debtor, the Trustee, or the Unknown Abuse Claims Trustee, as applicable, and the recipient of

a Distribution under this Plan or the Plan Documents, whenever any payment to be made is due on a day other than a Business Day, such payment will instead be made on the next Business Day, with interest to the extent expressly contemplated by this Plan or any applicable agreement or instrument. Any Claimant otherwise entitled to an undeliverable Distribution and that does not, within thirty (30) days after a Distribution is returned to the Trustee, Unknown Abuse Claims Trustee, or Diocese as undeliverable, or is deemed to be an undeliverable Distribution, provide the Trustee or Diocese with a written notice asserting its claim to that undeliverable Distribution and setting forth a current, deliverable address will be deemed to waive any claim to such undeliverable Distribution and will be forever barred from receiving such undeliverable Distribution or asserting any Claim against the Reorganized Debtor, the Participating Parties, the Settled Insurer Parties, the Trust, the Trustee, the Unknown Abuse Claims Trust, the Unknown Abuse Claims Trustee, or their property. Any undeliverable Distributions not claimed under this Section will become available to distribute to other Claimants or be retained by the Reorganized Debtor under the Plan. Nothing in the Plan requires the Reorganized Debtor, the Trust, the Trustee, the Unknown Abuse Claims Trust, or the Unknown Abuse Claims Trustee to attempt to locate any Claimant whose Distribution is undeliverable.

(d) **Form of Distributions.** Unless otherwise agreed by the Reorganized Debtor or Trustee, as applicable, and the recipient of a Distribution under this Plan or the Plan Documents, all Distributions will be made, at the option of the Reorganized Debtor or Trustee, by a check by first class mail, postage prepaid or wire transfer.

(e) **No Professional Fees or Expenses.** No professional fees or expenses incurred by a Claimant will be paid by the Debtor, the Reorganized Debtor, or the Trustee regarding any Claim except as specified in this Plan or the Trust Documents.

**11.9. Reservation of Rights to Object to Claims Other Than Opt-In Abuse Claims.** Unless a Claim is expressly described as an Allowed Claim under the Plan, or otherwise becomes an Allowed Claim before the Effective Date, upon the Effective Date, the Reorganized Debtor shall be deemed to have a reservation of any rights, interests and objections of the Debtor to any Claims and motions or requests for the payment of or because of Claims, whether administrative expense, priority, secured or unsecured (but not Opt-In Abuse Claims), whether under the Bankruptcy Code, other applicable law or contract. Subject to the Claims Objection Deadline, the Debtor's failure to object to any Claim in the Case shall be without prejudice to the Reorganized Debtor's rights, and if such Claim (other than an Opt-In Abuse Claim) is alleged to fall within Catholic Mutual's coverage period, Catholic Mutual's rights to contest or otherwise defend against such Claim in the Bankruptcy Court in this Section when and if such Claim is sought to be enforced by the holder of such Claim.

**11.10. Service of Objections.** An objection to a Claim shall be deemed properly served on the holder of such Claim if the objector effects service by any of the following methods: (i) under Rule 4 of the Federal Rules of Civil Procedure, as modified and made applicable by Bankruptcy Rule 7004; (ii) to the extent counsel for such Holder is unknown, by first class mail,

postage prepaid, on the signatory on the Proof of Claim or other representative identified on the Proof of Claim or any attachment thereto; or (iii) by first class mail, postage prepaid, on any counsel that has appeared on the behalf of such Holder in the Case.

**11.11.  Determination of Claims.** From and after the Effective Date, any Claim (except for Abuse Claims) as to which a Proof of Claim or motion or request for payment was timely filed in the Case or deemed timely filed by Order of the Bankruptcy Court, may be determined and (so long as such determination has not been stayed, reversed or amended) and as to which determination (or any revision, modification or amendment thereof) the time to appeal or seek review or rehearing has expired and as to which no appeal or petition for review or rehearing was filed or, if filed, remains pending) liquidated under (i) an Order of the Bankruptcy Court, (ii) applicable bankruptcy law, (iii) agreement of the parties with no Bankruptcy Court approval, (iv) applicable non-bankruptcy law or (v) the lack of (a) an objection to such Claim, (b) an application to equitably subordinate such Claim and (c) an application to otherwise limit recovery regarding such Claim, filed by the Diocese or any other party in interest on or before any applicable deadline for Filing such objection or application regarding such Claim. Any such Claim so determined and liquidated shall be deemed to be an Allowed Claim for such liquidated amount and shall be satisfied under the Plan. Nothing in this Section shall be or be deemed a waiver of any Claims, rights, interests or Causes of Action that the Diocese may have against any Person in connection with or arising out of any Claim or Claims, including any rights under 28 U.S.C. § 157. Notwithstanding the foregoing, no party in interest other than the Trustee or Unknown Abuse Claim Trustee, as applicable, may object to an Opt-In Abuse Claim.

**11.12.  No Distributions Pending Allowance.** No payments or Distributions will be made regarding all or any part of a Disputed Claim unless and until all objections to such Disputed Claim have been settled or withdrawn or have been determined by a Non-Appealable Order, and the Disputed Claim has become an Allowed Claim; provided, however, that if only a portion of such Claim is an Allowed Claim, the Reorganized Debtor may, in their discretion, make a Distribution because of the part of such Claim that is an Allowed Claim.

**11.13.  Claim Estimation.** To effectuate Distributions under the Plan and avoid undue delay in the administration of the Case, the Diocese, after notice and a hearing (which notice may be limited to the Holder of such Disputed Claim), shall have the right to seek an Order of the Bankruptcy Court or the District Court under § 502(c) of the Bankruptcy Code, estimating all Abuse Claims to be $1.00 in value for voting purposes only, and estimating or limiting, because of a Disputed Claim, the amount of (i) property that must be withheld from or reserved for distribution purposes because of such Disputed Claim(s), (ii) such Claim for allowance or disallowance purposes, or (iii) such Claim for any other purpose allowed under the Bankruptcy Code; provided, however, that the Bankruptcy Court or the District Court, as applicable, shall determine (i) whether such Claims are subject to estimation under § 502(c) of the Bankruptcy Code and (ii) the timing and procedures for such estimation proceedings, if any, such matters being beyond the scope of the Plan. Notwithstanding the foregoing, no party in interest except the Trustee may seek to estimate a Class 4 Claim and no party in interest except the Unknown Abuse Claim Trustee may seek to estimate an Unknown Abuse Claim.

**11.14.  Setoffs.** The Diocese may, to the extent permitted under applicable law, set off against any Allowed Claim and the Distributions to be made under the Plan because of such

Allowed Claim, the Claims, rights and Causes of Action of any nature that the Diocese may hold against the Holder of such Allowed Claim not otherwise waived, released or compromised under the Plan; provided, however, that neither such a setoff nor the allowance of any Claim under the Plan shall constitute a waiver or release by the Diocese of any such Claims, rights and Causes of Action that the Diocese possesses against such Holder.

**11.15. No Interest on Claims.** Unless otherwise specifically provided for in the Plan, the Confirmation Order, or a post-petition agreement in writing between the Diocese and a Holder of a Claim and approved by an Order of the Bankruptcy Court, post-petition interest shall not accrue or be paid on any Claim, and no Holder of a Claim shall be entitled to interest accruing on or after the Petition Date on any Claim. In addition, and without limiting the foregoing or any other provision of the Plan, Confirmation Order, Trust Agreement, or Unknown Abuse Claims Trust Agreement interest shall not accrue on or be paid on any Disputed Claim regarding the period from the Effective Date to the date a final Distribution is made when and if such Disputed Claim becomes an Allowed Claim.

**11.16. Withholding Taxes.** The Diocese shall comply with all withholding and reporting requirements imposed by any federal, state, local or foreign taxing authority, and all Distributions under the Plan shall be subject to any such withholding and reporting requirements. As a condition to making any Distribution under the Plan, the Diocese may require that the Holder of an Allowed Claim provide such Holder's taxpayer identification number and such other information and certification as may be deemed necessary to comply with applicable tax reporting and withholding laws.

**11.17. Post-Confirmation Reports.** After the Effective Date and until the Bankruptcy Case is closed, the Reorganized Debtor, Trustee and Unknown Abuse Claims Trustee shall timely file the Post-Confirmation Reports as required by United States Trustee Program's rule entitled *Uniform Periodic Reports in Cases Filed Under Chapter 11 of Title 11*, published at 28 C.F.R. § 58.8.

**11.18. Closing of the Case.** As soon as practicable after the Effective Date, when the Diocese deems appropriate, the Diocese will seek authority from the Bankruptcy Court to close the Case under the Bankruptcy Code and the Bankruptcy Rules; provided, however, that entry of a final decree closing the Case shall, whether or not specified therein, be without prejudice to the right of the Diocese, the Trustee, Unknown Abuse Claim Trustee, or any other party in interest to reopen the Case for any matter over which the Bankruptcy Court or the District Court has retained jurisdiction under this Plan. Any order closing this Case will provide that the Bankruptcy Court or the District Court, as appropriate, will retain (a) jurisdiction to enforce, by injunctive relief or otherwise, the Confirmation Order, any other orders entered in this Case, and the obligations created by this Plan and the Plan Documents; and (b) all other jurisdiction and authority granted to it under this Plan and the Plan Documents.

**11.19. No De Minimis Distributions.** Notwithstanding anything to the contrary in this Plan, no cash payment of less than $100 will be made by the Reorganized Debtor, the Trustee, or Unknown Abuse Claim Trustee, as applicable, to any Holder of an Allowed Claim. No consideration will be provided in lieu of the *de minimis* Distributions not made under this Section.

Allowed Claims entitled to a Distribution of less than $100 shall continue to accrue until the Distribution because of such Claim will be $100 or more.

**11.20. Manner of Cash Payments.** Cash payments to domestic Claimants will be denominated in U.S. dollars and will be made by checks drawn on a domestic bank selected by the Trustee or Unknown Abuse Claim Trustee, as applicable, or at the Trustee's or Unknown Abuse Claim Trustee's option, by wire transfer from a domestic bank. Cash payments to foreign Claimants may be paid, at the Trustee's or Unknown Abuse Claim Trustee's option, either in the same manner as payments to domestic entities or in any funds and by any means that are necessary or customary in the particular foreign jurisdiction.

## SECTION XII
## CONDITIONS PRECEDENT

**12.1. Conditions to Effectiveness.** The Effective Date shall occur when each of the following conditions have been satisfied or, as to those certain specific conditions only, waived under Section 12.2:

(a)   All Approval Orders authorizing and approving all Settlement Agreements involving the Participating Parties and Settled Insurers (for agreements executed before the Confirmation Date) and any appropriate judgments consistent therewith, shall have been entered by a court of competent jurisdiction in form and substance reasonably acceptable to each party and such orders shall have become Non-Appealable Orders, and no stay of such Orders shall be in effect;

(b)   The Confirmation Order shall have been entered by a court of competent jurisdiction in form and substance reasonably acceptable to the Plan Proponents and no stay of such Confirmation Order shall be in effect;

(c)   The Trustee and Debtor shall have signed the Trust Agreement;

(d)   The Bankruptcy Court shall have approved the Effective Date Escrow Agreement;

(e)   The Unknown Abuse Claims Trustee and Debtor have signed the Unknown Abuse Claims Trust Agreement; and

(f)   The Debtor, the Participating Parties, and Catholic Mutual have each delivered to the Effective Date Escrow Agent under and in accordance with the terms of the Effective Date Escrow Agreement, all of the Cash Contributions described in Section 7.1(a)3, in good and immediately available funds.

**12.2. Waiver of Conditions.** The condition in Section 12.1(a) and (b) requiring Non-Appealable Orders may be waived by the mutual written consent of the Committee, the Debtor, Catholic Mutual, the Association of Parishes, Xavier, Mercy, St. Bernard, Oceania and the ACA.

**12.3.   Notice of Occurrence of Effective Date.**  Within three (3) Business Days after the occurrence of the Effective Date, the Diocese shall file with the Bankruptcy Court a notice thereof.

**12.4.   Non-Occurrence of Effective Date.** In the absence of an order of the Bankruptcy Court providing otherwise, if the Effective Date does not occur within ninety (90) calendar days of entry of the Confirmation Order, within three (3) Business Days after the expiration of said ninety (90) calendar day period, either the Debtor or the Committee shall file a notice of termination with the Bankruptcy Court.

**12.5.   Termination Following Non-Occurrence of Effective Date.** In the absence of an order of the Bankruptcy Court providing otherwise, upon the filing of a notice of termination with the Bankruptcy Court by either the Diocese or the Committee as required by Section 12.4 of the Plan, the Plan shall become null and void and all contributions theretofore received by the Effective Date Escrow Agent shall be returned to their contributor, with accrued interest.

## SECTION XIII
## EFFECTS OF PLAN CONFIRMATION AND DISCHARGE

**13.1.   Discharge.**

(a)   Except as expressly provided in the Plan or in the Confirmation Order, on the Effective Date, under § 1141(d) of the Bankruptcy Code, the Debtor will be discharged from all liability for any and all Claims (expressly including all Opt-Out Abuse Claims and Unknown Abuse Claims) and debts, known or unknown, whether or not giving rise to a right to payment or an equitable remedy, that arose, directly or indirectly, from any action, inaction, event, conduct, circumstance, happening, occurrence, agreement, or obligation of the Debtor before the Confirmation Date, or that otherwise arose before the Confirmation Date, including all interest, if any, on any such Claims and debts, whether such interest accrued before or after the date of commencement of this Case, and including all Claims and debts based upon or arising out of an Abuse Claim or alleged Abuse Claim (including any Opt-Out Abuse Claim) and from any liability of the kind specified in §§ 502(g), 502(h), and 502(i) of the Bankruptcy Code, whether or not (a) a proof of claim is filed or is deemed filed under § 501 of the Bankruptcy Code; (b) such Claim is Allowed under this Plan; (c) the Holder of such Claim has accepted this Plan; and/or (d) the Holder of such Claim has elected to not Opt-In and is not, therefore, the holder of a Channeled Claim.

(b)   The discharge provided for in Bankruptcy Code § 1141(d), this Section 13.1 and otherwise in this Plan and the Confirmation Order shall not in any way affect any Abuse Claim against the Debtor solely to the extent necessary for the Trust or an Abuse Claimant to enforce against Non-Settling Insurers or under any Non-Settling Insurer's Insurance Policies and thereby recover upon Insurance Coverage, Insurance Claims, and/or Insurance Recoveries, *provided, however,* that any such non-discharged Abuse Claim shall be nonrecourse to the Reorganized Debtor and its assets, including the Revested Assets and recourse is limited to the recoveries

from the Trust, the proceeds of the Non-Settling Insurer's Insurance Policies and all other damages (including extra-contractual damages), awards, judgments in excess of policy limits, penalties, punitive damages and attorney's fees and costs that may be recoverable against any Non-Settling Insurers, and any such judgments or awards will be handled under the Plan and the Trust Distribution Plan, if applicable.

(c)     As provided in Bankruptcy Code § 524(e), unless otherwise provided in the Plan, the discharge as provided in Section 13.1 shall not apply to and shall not affect the liability of any other Person on, or the property of any other Person for, Abuse Claims including the liability of against a Perpetrator, which liability shall continue unaffected by the terms of this Plan or the discharge granted to the Debtor or the Reorganized Debtor under this Plan and Bankruptcy Code § 1141(d).

(d)     Abuse Claimants and the Trust shall be permitted to name the Diocese or any Participating Party in any proceeding to resolve whether the Diocese or any Participating Party has liability for Abuse Claims and the amount of any such liability, solely for the purposes permitted by this Section 13.1. The discharge hereunder does not apply to and shall not limit in any way the obligations of Non-Settling Insurers to defend and pay, the Diocese's or any Participating Party's liability for Abuse Claims under Non-Settling Insurer Insurance Policies.

(e)     This discharge provided for in Bankruptcy Code § 1141(d), this Section 13.1 and otherwise in this Plan and the Confirmation Order shall not apply to and shall not affect the obligations arising under any (i) Settlement Agreement that is approved by the Bankruptcy Court, or (ii) Non-Settling Insurer's Insurance Policies, which are not and will not be discharged.

**13.2.    Revested Assets. Pursuant to § 1141 of the Bankruptcy Code, and except as otherwise provided in the Plan, the Confirmation Order or in subsections 1141(d)(2) and (d)(3) of the Bankruptcy Code, on the Effective Date, all of the Revested Assets shall vest in the Reorganized Debtor free and clear of all Claims and interests of Claimants. On and after the Effective Date, the Reorganized Debtor may operate and manage its affairs and may use, acquire and dispose of property without notice to any Person, and without supervision or approval by the Bankruptcy Court and free of any restrictions imposed by the Bankruptcy Code, Bankruptcy Rules, or the Bankruptcy Court, other than those restrictions imposed by the Plan or the Confirmation Order.**

**13.3.    Continued Existence of Reorganized Debtor.   The Debtor will, as the Reorganized Debtor, continue to exist after the Effective Date under the applicable laws of the State of Connecticut, with all the powers of a not-for-profit, non-stock member corporation having tax-exempt status under 26 U.S.C. § 501(c)(3) under applicable law and without prejudice to any right to alter or terminate such existence under applicable state law, except as such rights may be limited and conditioned by the Plan and the documents and instruments executed and delivered in connection therewith.**

13.4.    **Exculpation and Limitation of Liability**.  **Except as expressly provided in this Plan, on and after the Effective Date, none of the Exculpated Parties will have or incur any liability to, or be subject to any right of action by, any holder of a Claim, any other party in interest, or any of their related parties, for any act or omission occurring between the Petition Date and the Effective Date in connection with or relating to this Bankruptcy Case, including the exercise of their respective business judgment and the performance of their respective fiduciary obligations, the pursuit of confirmation of the Plan, or the negotiation of the Disclosure Statement, the Plan and related settlement agreements. For the avoidance of doubt, (a) this section shall not exculpate any Claim for any act or omission that is determined by a Non-Appealable Order to have constituted actual fraud, willful misconduct, criminal conduct, gross negligence, or professional malpractice of an Exculpated Party or any Causes of Action arising from or related to denials of coverage or coverage defenses raised by Non-Settling Insurers, and (b) the definition of "Exculpated Parties" shall not, directly or indirectly, inure to or for the benefit of (i) a Perpetrator, or (ii) the Holy See.**

13.5.    **Effective Date Injunctions.  On the Effective Date, the injunctions provided for in this Plan shall be deemed issued, entered, valid and enforceable according to their terms. The injunctions shall be permanent and irrevocable and may only be modified by the Bankruptcy Court.**

13.6.    **Channeling Injunction Preventing Prosecution of Channeled Claims against Participating Parties and Settled Insurer Parties.**

(a)    **Applicability. This Section 13.6 is only applicable to Participating Parties and Settled Insurer Parties and is effective on and after the Effective Date.**

(b)    **In consideration of the undertakings of the Participating Parties and Settled Insurer Parties, pursuant to this Plan and their respective settlements with the Debtor or the Trustee, the funding of the Trust, other consideration, and to further preserve and promote the agreements between and among the Participating Parties, Settled Insurer Parties and the Debtor or the Trustee, and the protections afforded the Participating Parties and Settled Insurer Parties, and pursuant, *inter alia*, to §§ 105, 363, 524, 1123 and 1141 of the Bankruptcy Code and subject to the provisions of the Plan and except as otherwise provided in the Plan:**

1.    **Any and all Channeled Claims (other than Unknown Abuse Claims and their associated Related Insurance Claims) are channeled into the Trust and Unknown Abuse Claims and their associated Related Insurance Claims are channeled to the Unknown Abuse Claims Trust.**

2.    **All Persons that have held or asserted, hold or assert, or may hold or assert, any Channeled Claim (including all debt holders, governmental, tax and regulatory authorities, lenders, trade and other creditors, Abuse Claimants, other Insurers, and all others holding Claims of any kind or**

nature whatsoever) are hereby permanently stayed, enjoined, barred and restrained from taking any action, directly or indirectly, for the purposes of asserting, enforcing, or attempting to assert or enforce any Channeled Claim, including:

(i)     Commencing or continuing in any manner any action or other proceeding of any kind with respect to any Channeled Claim against any Participating Party, any Settled Insurer Party, and any such person's respective predecessors, successors, and assigns, or their respective employees, officers, and directors, or against the property of any Participating Party or Settled Insurer Party;

(ii)     Enforcing, attaching, collecting or recovering, by any manner or means, from any Participating Party or Settled Insurer Party or from the property of any Participating Party or Settled Insurer Party, with respect to any such Channeled Claim, any judgment, award, decree, or order against any Participating Party or Settled Insurer Party;

(iii)     Creating, perfecting or enforcing any Lien of any kind against any Participating Party, or Settled Insurer Party or the property of any Participating Party or Settled Insurer Party with respect to any such Channeled Claim (except as provided in the Plan); and

(iv)     Asserting, implementing or effectuating any Channeled Claim of any kind against: (1) any obligation due any Participating Party or Settled Insurer Party; (2) any Participating Party or Settled Insurer Party; or (3) the property of any Participating Party or Settled Insurer Party with respect to any such Channeled Claim.

13.7.     **Specific Channeling Injunction Exclusions.** Notwithstanding any provision of this Plan, the foregoing Channeling Injunction provides absolutely no protection to: (i) a Perpetrator; (ii) the Holy See; (iii) a Non-Settling Insurer, or (iv) any person or Claims expressly excepted from the exculpation as set forth in Section 13.4 (and identified in subclauses (a) and (b)) of this Plan).

13.8.     **Supplemental Catholic Mutual Injunction.** On and after the Effective Date, in consideration of the undertakings of the Catholic Mutual Parties (including, but not limited to, the undertakings of Catholic Mutual pursuant to the Catholic Mutual Settlement Agreement and specifically including, without limitation, Catholic Mutual's purchase of the Sold Certificates free and clear of all Liens, Claims and interests pursuant to §§ 363(f) and 1123 of the Bankruptcy Code), pursuant to their respective settlements with the Debtor or the Trustee, the funding of the Trust, other consideration, and to further preserve and promote the agreements between and among the Catholic Mutual Parties and the Debtor or the Trustee, and the protections afforded the Catholic Mutual Parties, and pursuant to §§ 105, 363 and 1123 of the Bankruptcy Code, and except as otherwise provided in the Plan, including, but not limited to Sections 9.4 and 9.5, each and every Opt-In Abuse Claimant is

permanently enjoined and barred from asserting against a Catholic Mutual Party any Claim (including, without limitation, any Channeled Claim) or interest of any kind or nature whatsoever arising from or relating in any way to (i) any Channeled Claim or (ii) any of the Catholic Mutual Certificates) or (iii) any and all other Claims relating to the payment of any of the claims identified in clauses (i) and (ii) which, directly or indirectly, relate to any and all Catholic Mutual Certificates or any Abuse Claims that are covered or may be covered under the Catholic Mutual Certificates), or (v) any released Catholic Mutual Claims, including from:

(a) Commencing or continuing in any manner any action or other proceeding, whether legal, equitable or otherwise, against the Catholic Mutual Party or the property of the Catholic Mutual Party;

(b) Enforcing, attaching, collecting, or recovering, or seeking to do any of the preceding, by any manner or means, any judgment, award, decree or order against the Catholic Mutual Party or the property of the Catholic Mutual Party;

(c) Creating, perfecting, or enforcing, or seeking to do any of the preceding, any lien of any kind against the Catholic Mutual Party or the property of the Catholic Mutual Party;

(d) Asserting or accomplishing any setoff, right of indemnity, subrogation, contribution, or recoupment of any kind against any obligation due to the Catholic Mutual Party or the property of the Catholic Mutual Party; and

(e) Taking any act, in any manner, in any place whatsoever, that does not conform to, or comply with, the provisions of the Plan.

This Supplemental Catholic Mutual Injunction is an integral part of the Plan and is essential to the Plan's consummation and implementation. It is intended that the Supplemental Catholic Mutual Injunction shall be in addition to channeling of the Channeled Claims as provided in this Section 13.8 and shall inure to the benefit of the Catholic Mutual Parties. In a successful action to enforce the injunctive provisions of this Section 13.8 in response to a willful violation thereof, the moving party may seek an award of costs (including reasonable attorneys' fees) against the non-moving party, and such other legal or equitable remedies as are just and proper, after notice and a hearing.

This Supplemental Catholic Mutual Injunction will be effective with respect to any Catholic Mutual Party only as of the date that the Effective Date Escrow Agent or Trust, as applicable, receives the settlement amount required by such Catholic Mutual Settlement Agreement and the Plan. Nothing in this Supplemental Catholic Mutual Injunction shall limit, or be deemed or otherwise interpreted to limit, the scope of the discharge or Channeling Injunction in favor of the Participating Parties or to limit the Preserved Coverage. The foregoing injunctive provisions are an integral part of this Plan and are essential to its implementation.

**13.9.   Term of Channeling Injunction and Supplemental Catholic Mutual Injunction and Confirmation of Settlements with Participating Parties and Catholic Mutual Parties.** The Channeling Injunction and the Supplemental Catholic Mutual Injunction provided for in this Plan, and the injunctive provisions of §§ 524 and 1141 of the Bankruptcy Code are permanent and will remain in full force and effect on and after the Effective Date and are not subject to being vacated or modified. Debtor's Settlement Agreements, if any, with the Catholic Mutual Parties and the Participating Parties previously authorized by the Bankruptcy Court prior to the Confirmation Date, if any, are hereby affirmed and any obligations of Debtor with respect to such Settlement Agreements are excepted from the Debtor's discharge and shall be assumed by the Reorganized Debtor and Trustee, as applicable, on the Effective Date.

**13.10.   Post-Petition Abuse Claims Temporary Injunction and Gatekeeping Provisions.** Effective immediately upon the Effective Date, all Post-Petition Abuse Claimants are temporarily enjoined and barred (the "Post-Petition Abuse Claims Temporary Injunction") from taking any action, directly or indirectly, for the purposes of asserting, enforcing, or attempting to assert or enforce their Post-Petition Abuse Claim against the Diocese for the lesser of (a) one (1) year after the Effective Date or (b) the conclusion of the claims management activities in subsections 1 and 2 below, during which period no Post-Petition Abuse Claimant can take any action for the purposes of asserting, enforcing or attempting to assert or enforce the Post-Petition Abuse Claim against the Reorganized Debtor unless and until:

1.   the Post-Petition Abuse Claimant has notified the Reorganized Debtor, the Abuse Claim Reviewer, and Catholic Mutual, and to the extent applicable, the Parish and Catholic Entity (if any) implicated by such Post-Petition Abuse Claim of their Post-Petition Abuse Claim, and consulted with them; and

2.   if, after notifying and consulting with the appropriate parties as set forth immediately above, unless the Post-Petition Abuse Claim has been resolved or the Diocese has waived the following requirement, the Post-Petition Abuse Claimant, by motion, and after notice and hearing, must obtain an order from the Bankruptcy Court that (i) determines that their Post-Petition Abuse Claim constitutes an Administrative Claim entitled to Administrative Claim priority under the Bankruptcy Code and this Plan, and (ii) specifically authorizes such Post-Petition Abuse Claimant to bring their Post-Petition Abuse Claim against the Diocese. The Bankruptcy Court will have sole and exclusive jurisdiction to determine whether any Post-Petition Abuse Claim constitutes an Administrative Claim entitled to administrative claim priority under the Bankruptcy Code and this Plan. Upon obtaining such an order from the Bankruptcy Court (ordering both (i) and (ii) above), the Post-Petition Abuse Claims Temporary Injunction shall terminate automatically as to such Post-Petition Abuse Claimant who may then proceed to assert, enforce and litigate their Post-Petition

Abuse Claim against the Diocese before the appropriate court of competent jurisdiction, other than the Bankruptcy Court.

For the avoidance of doubt, nothing in this Section 13.10 of the Plan is intended to limit the Discharge of the Debtor in Section 13.1 of the Plan, Exculpations in Section 13.4 of the Plan, or the releases and injunctions in Sections 13.12, 13.13, and 13.14 of the Plan.

13.11.  **Opt-Out Abuse Claims Temporary Injunction and Gatekeeping Provisions.** Effective immediately upon the Effective Date, all Opt-Out Abuse Claimants are temporarily enjoined and barred (the "Opt-Out Abuse Claims Temporary Injunction") from taking any action, directly or indirectly, for the purposes of asserting, enforcing, or attempting to assert or enforce their Opt-Out Abuse Claim against any Participating Party for the lesser of (a) one (1) year after the Effective Date or (b) the conclusion of the claims management activities in subsections 1 through 3 below, during which period no Opt-Out Abuse Claimant can take any action for the purposes of asserting, enforcing or attempting to assert or enforce the Abuse Claim against any Participating Party unless and until:

1.  the Abuse Claims Reviewer has evaluated and assigned the Opt-Out Abuse Claim a value pursuant to the Trust Distribution Plan;

2.  the Opt-Out Abuse Claimant has consulted with the Reorganized Debtor, Trustee, the Unknown Abuse Claims Trustee, and Catholic Mutual, if such Claim is alleged to fall within its coverage period, to assess whether their Opt-Out Abuse Claim is a Barred Abuse Claim or Late-Filed Abuse Claim, subject to objection and/or Disallowance; and

3.  if, after notifying and consulting with the appropriate parties as set forth immediately above, unless the Opt-Out Abuse Claim has been resolved or the Diocese has waived the following requirement, the Opt-Out Abuse Claimant, by motion, and after notice and hearing, must obtain an order by the Bankruptcy Court that (i) determines that the Opt-Out Abuse Claim represents a colorable claim of any kind against the applicable Participating Party, and (ii) specifically authorizes such Opt-Out Abuse Claimant to bring its Opt-Out Abuse Claim against the applicable Participating Party. The Bankruptcy Court will have sole and exclusive jurisdiction to determine whether any Opt-Out Abuse Claim is colorable. Upon obtaining such an order from the Bankruptcy Court (ordering both (i) and (ii) above), the Opt-Out Abuse Claims Temporary Injunction shall terminate automatically as to such Opt-Out Abuse Claimant who may then proceed to assert, enforce and litigate their Post-Petition Abuse Claim against the applicable Participating Party before the appropriate court of competent jurisdiction.

For the avoidance of doubt, nothing in this Section 13.11 of the Plan is intended to limit the discharge of the Debtor under Section 13.1 of the Plan, Exculpations as set forth in

Section 13.4 of the Plan, or the releases and injunctions in Sections 13.10, 13.12, 13.13, and 13.14 of the Plan.

**13.12. Release of Avoidance Rights against Participating Parties and Catholic Mutual Parties.** On and after the Effective Date, all avoidance rights, including those arising under §§ 544, 547, 548, 549, 550, and 553 of the Bankruptcy Code, against each of the Participating Parties and Catholic Mutual Parties and the Debtor and Reorganized Debtor shall be deemed settled, compromised, and released by this Plan.

**13.13. Release by Debtor, Reorganized Debtor and Estate of Claims against Each and Every Participating Party or Catholic Mutual Party.** Effective on and after the Effective Date, except for the obligations arising under any executory contract assumed by the Reorganized Debtor pursuant to Section XIV, the obligations under any Settlement Agreement, Claims excepted from exculpation and discharge under Section 13.1 and 13.4, the MSJ Debt and the MSJ Mortgage Documents, and except as otherwise provided in this Plan, as of the Effective Date, the Debtor, Reorganized Debtor and the Estate waive, release and discharge any and all Claims or Causes of Action of every kind and nature that Debtor, the Reorganized Debtor, or the Estate have or may have against a Participating Party or Catholic Mutual Party, including avoidance rights, and any Claim that such Participating Party or Catholic Mutual Party or its assets are a part of or owned by the Debtor or the Estate. No Claim subject to this Release will survive the Effective Date or be deemed to be assigned to the Trust.

**13.14. Release of Claims between Each and Every Participating Party and Catholic Mutual Party.** Effective on and after the Effective Date, each of the Participating Parties and each of the Catholic Mutual Parties waive, release and discharge any and all Claims or Causes of Action of every kind and nature arising on account of, in connection with or related to an Abuse Claim, that (i) the Participating Parties have or may have against any other Participating Parties or the Catholic Mutual Parties and (ii) that the Catholic Mutual Parties have against any other Catholic Mutual Parties or the Participating Parties, in each case that arise from, relate to or arise in connection with Abuse Claims or the Catholic Mutual Policies; provided that such release shall not release the obligations of the Participating Parties and Catholic Mutual under the Preserved Coverage, this Plan or any Settlement Agreement. No Claim subject to this release will survive the Effective Date or be deemed to be assigned to the Trust. This release is in addition to any releases in a Bankruptcy Court-approved Settlement Agreement with a Participating Party or Catholic Mutual.

13.15. **Pension Plan**. No provision in the Plan, Confirmation Order, the Bankruptcy Code (including § 1141 of the Bankruptcy Code), or any other document filed or order entered in the Bankruptcy Case shall be construed to exculpate, discharge, release or relieve the Debtor, the Catholic Entities, or any other party, in any capacity, from any liability or responsibility to any Person regarding the Pension Plans under any law, governmental policy, or regulatory provision. The Pension Plans shall not be enjoined or precluded from enforcing any such liability or responsibility because of the provisions of the Plan (including those provisions providing for exculpation, satisfaction, release and discharge of Claims against the Debtor), the Confirmation Order, the Bankruptcy Code (including § 1141 of the Bankruptcy Code), or any other document filed or order entered in the Bankruptcy Case. The Trust shall not have any liability to any Person

on account of the Pension Plans, including liability as a member of a "Controlled Group" as defined in 29 U.S.C. § 1301(a)(14)(A) or on any other basis.

As of the Effective Date, the Reorganized Debtor shall assume and continue the Pension Plans to the extent of its obligations under the Pension Plans and applicable law. Notwithstanding the foregoing, the Reorganized Debtor reserves all of its rights under the Pension Plan. For the avoidance of doubt, any claims asserted by any beneficiary of the Pension Plan shall be reinstated and shall remain with the same priority and validity as before the Petition Date.

**13.16. Police Power**. **No provision in the Plan, the Confirmation Order, the Bankruptcy Code (including § 1141 of the Bankruptcy Code), or any other document filed or order entered in the Chapter 11 Bankruptcy Case (including the discharge, releases and injunctions set forth in this Section XIII), shall be construed to exculpate, discharge, release or relieve the Debtor, the other Participating Parties, or any other Person, in any capacity, for their liability or responsibility with respect to any criminal action or proceeding or any action or proceeding by a governmental unit to enforce such governmental unit's police and regulatory power.**

## SECTION XIV
## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

**14.1. Assumed Employee and Retiree Benefit Plans.** To the extent not previously assumed, all employee and retiree benefit plans to which the Debtor are a party will be deemed assumed by the Reorganized Debtor on the Effective Date.

**14.2. General; Assumed if Not Rejected.** Subject to the requirements of § 365, all Executory Contracts of the Debtor not rejected by order of the Bankruptcy Court or are not the subject of a motion to reject pending on the Confirmation Date will be deemed assumed by the Reorganized Debtor on the Effective Date. If any party to an Executory Contract that is being assumed objects to such assumption, the Bankruptcy Court may conduct a hearing on such objection on any date that is either mutually agreeable to the parties or fixed by the Bankruptcy Court. All payments to cure defaults that may be required under § 365(b)(1) of the Bankruptcy Code will be made by the Reorganized Debtor. In the event of a dispute regarding the amount of any such payments, or the ability of the Debtor to provide adequate assurance of future performance, the Reorganized Debtor will make any payments required by § 365(b)(1) of the Bankruptcy Code after the entry of the Non-Appealable Order resolving such dispute.

**14.3. Claims for Contract Rejection.** All proofs of claim regarding Claims arising from the rejection of Executory Contracts must be filed with the Bankruptcy Court within thirty (30) days after the Effective Date or such Claims will be forever barred as against the Reorganized Debtor. If any order providing for the rejection of an Executory Contract did not provide a deadline for filing Claims arising from such rejection, proofs of Claim with respect thereto must be filed within thirty (30) days after the later to occur of (a) the Effective Date or, (b) if the order is entered after the Effective Date, the date such order becomes a Non-Appealable Order, or such Claims will be forever barred as against the Reorganized Debtor.

## SECTION XV
## NON-MONETARY COMMITMENTS

**15.1.   Non-Monetary Commitment to Healing and Reconciliation.** To further promote healing and reconciliation, and to continue its efforts to prevent Abuse and other injury to children from occurring in the Diocese in the future, the Diocese agrees that it will undertake and the Diocese shall comply with the Non-Monetary Commitments to Healing and Reconciliation set forth in **Exhibit G** attached hereto and incorporated herein.

## SECTION XVI
## MISCELLANEOUS PROVISIONS

**16.1.   Retention of Jurisdiction.** Notwithstanding entry of the Confirmation Order or the occurrence of the Effective Date:

(a)      Except as otherwise stated in this Plan or in the Confirmation Order, the Bankruptcy Court will retain jurisdiction over all matters arising under, to further, or in connection with this Plan, including the following:

1.      The determination of objections to Disputed Claims; the determination of requests for payment of Claims entitled to priority under § 507 of the Bankruptcy Code, including compensation of and reimbursement of expenses of parties entitled thereto;

2.      The resolution of controversies and disputes regarding interpretation and implementation of this Plan and the Plan Documents;

3.      The compelling of the Diocese and/or a Participating Party to cooperate with the Trust as required under this Plan;

4.      The granting of relief in aid of this Plan and the Plan Documents including the entry of appropriate orders (which may include removal of actions in non-Bankruptcy Court forums to the Bankruptcy Court, contempt or other sanctions) to protect the Reorganized Debtor, the Participating Parties, and the Settled Insurer Parties from actions prohibited under this Plan or the Plan Documents;

5.      Amendments to and modifications of this Plan;

6.      Subject to the limitations and exclusions described above, the determination of any and all applications, adversary proceedings, and contested or litigated matters pending on the Effective Date;

7.      Allowance or Disallowance of Administrative Claims including Professional Fees and Post-Petition Abuse Claims (following entry of a final, no longer appealable judgment or order of a court of competent

73

jurisdiction as to such Post-Petition Abuse Claim), and post-confirmation fees provided for in the Plan;

8.    The approval of a Settlement Agreement whereby a Person, including a Non-Settling Insurer, may become a Participating Party or Settled Insurer and whereby the Bankruptcy Court may appoint a future claims representative and provide for treatment of future claims;

9.    The enforcement all injunctions provided for in this Plan; and

10.    The closing of this Case.

**16.2.   Modification of Plan.** The Plan Proponents jointly reserve the right, under the Bankruptcy Code, to amend, modify or withdraw this Plan prior to the entry of the Confirmation Order. After the entry of the Confirmation Order, the Plan Proponents may, jointly, upon order, amend or modify this Plan under § 1127(b) of the Bankruptcy Code, or remedy any defect or omission or reconcile any inconsistency in this Plan in such manner as may be necessary to carry out the purpose and intent of this Plan.

**16.3.   Severability.** If, before confirmation, the Bankruptcy Court holds that any Plan term or provision is invalid, void, or unenforceable, the Bankruptcy Court may alter or interpret that term or provision so it is valid and enforceable to the maximum extent possible consistent with the original purpose of that term or provision. That term or provision will then be applicable as altered or interpreted, unless such term or provision is inconsistent with the intent of the Plan Proponents, in which case the Plan may be jointly withdrawn by the Plan Proponents. Notwithstanding any such holding, alteration, or interpretation, the Plan's remaining terms and provisions will remain in full force and effect and will in no way be affected, impaired, or invalidated. The Confirmation Order will constitute a judicial determination providing that each Plan term and provision, as it may have been altered or interpreted under this Section, is valid and enforceable under its terms. In the event of a successful collateral attack on any provision of this Plan (*i.e.*, an attack other than through a direct appeal of the Confirmation Order), the remaining provisions of this Plan will remain binding on the Diocese, the Participating Parties, the Settled Insurer Parties, the Non-Settling Insurers, the Trustee, the Unknown Abuse Claims Trustee, the Committee, all Claimants, all Creditors, and all other parties in interest.

**16.4.   Headings.** The headings of the Sections of this Plan are inserted for convenience only and will not affect the interpretation hereof.

**16.5.   Notices.** All notices or requests in connection with this Plan shall be in writing and served either by (i) United States mail, postage prepaid, (ii) hand delivery, or (iii) reputable overnight delivery service, all charges prepaid, and shall be deemed given when received by the following parties:

If to the Debtor or Reorganized Debtor:

        Rev. Peter J. Langevin, S.T.B., Ph.L.
        Chancellor
        Diocese of Norwich
        The Chancery
        201 Broadway
        Norwich, CT 06360
        (860) 887-9294 x235

With a copy to:

        Ice Miller LLP
        1500 Broadway, Suite 2900
        Attn:  Louis T. DeLucia
               Alyson M. Fiedler
        Telephone: (212) 835-6312
        Email: Louis.DeLucia@icemiller.com
              Alyson.Fiedler@icemiller.com
  *-and-*

        Robinson & Cole LLP
        One State Street
        Hartford, CT 06103
        Attn:  Patrick M. Birney
               Annecca H. Smith
        Telephone: (860) 275-8275
        Email: pbirney@rc.com
              asmith@rc.com

If to the Trustee:

        Craig R. Jalbert, CIRA
        Verdolino & Lowey, P.C.
        124 Washington Street, Suite 101
        Foxboro, MA  02035
        Telephone: (508)-543-1720
        Email: cjalbert@vlpc.com

With a copy to:

        Zeisler & Zeisler, P.C.
        10 Middle St., 15th Fl.
        Bridgeport, CT 06525
        Attn:  Stephen M. Kindseth, Esq.
        Telephone: (203) 368-5487
        Email: skindseth@zeislaw.com

If to the Unknown Abuse Claims Trustee:

> Kara S. Rescia
> Rescia Law, P.C.
> 5104 Bigelow Cmns.
> Enfield, CT 06082
> Telephone: (860) 452-0052
> Email: kara@ctmalaw.com

With a copy to:

> Rescia Law, P.C.
> 5104 Bigelow Cmns.
> Enfield, CT 06082
> Attn.:   Paige M. Vaillancourt, Esq.
> Telephone: (860) 452-0052
> Email: paige@ctmalaw.com

If to Catholic Mutual:

> Michael Lee
> Catholic Mutual Group
> Director of Specialty Claims
> 10843 Old Mill Road
> Omaha, NE 68154
> Telephone: (402) 514-2412
> mlee@catholicmutual.org

with a copy to:

> Everett J. Cygal
> ArentFox Schiff LLP
> 233 S. Wacker Drive, Suite 7100
> Chicago, IL 60606
> Telephone: (312)258-5783
> everett.cygal@afslaw.com

If to the Office of the United States Trustee:

        Holley L. Claiborn
        Trial Attorney
        Office of the United States Trustee
        Giaimo Federal Building
        150 Court Street, Room 302
        New Haven, CT 06510
        Telephone: (203) 773.5504
        Email:  Holley.L.Claiborn@usdoj.gov

**16.6.  Notices to Claimants.** All notices and requests to a Person holding any Claim will be sent to them at the last known address listed for such Person with the Bankruptcy Court or with the Debtor's Claims Agent, or to the last known address of their attorney of record. The holder of a Claim may designate in writing any other address, which designation will be effective upon actual receipt by the Reorganized Debtor, the Trustee, and the Unknown Abuse Claims Trustee. Any Person entitled to receive notice under this Plan will have the obligation to provide the Reorganized Debtor, the Trustee, and the Unknown Abuse Claims Trustee with such Person's current address for notice purposes. The Reorganized Debtor, the Trustee, and the Unknown Abuse Claims Trustee will have no obligation to attempt to locate a more current address if any notice proves to be undeliverable to the most recent address provided to the Reorganized Debtor, the Trustee, and the Unknown Abuse Claims Trustee.

**16.7.  Post-Confirmation Court Approval.** Any action requiring Bankruptcy Court, U.S. District Court or state court approval after the Effective Date will require the Person seeking such approval to file an application, motion, or other request with the Bankruptcy Court, U.S. District Court, or state court, as applicable, and obtain a Non-Appealable Order approving such action before the requested action may be taken. The Person filing such application, motion, or other request shall serve such application, motion, or other request, together with a notice setting forth the time in which objections must be filed with the court, on the Reorganized Debtor, the Committee, the Trustee, and the Unknown Abuse Claims Trustee by first-class mail, electronic mail, ECF, overnight courier, facsimile, or hand delivery. Unless the court orders otherwise, all notices shall provide the recipients at least 21 days in which to file an objection to the application, motion, or other request. If no objection is timely filed, the court may authorize the proposed action without further notice or a hearing. If an objection is timely filed, the court will determine whether to conduct a hearing, or to require the submission of further documentation, prior to ruling on the application, motion, or other request.

**16.8.  Election under § 1129(b) of the Bankruptcy Code.** The Plan Proponents request confirmation of the Plan under § 1129(b) of the Bankruptcy Code if the requirements of all provisions of § 1129(a) of the Bankruptcy Code, except subsection (a)(8) thereof, are met regarding the Plan. In determining whether the requirements of § 1129(a)(8) of the Bankruptcy Code have been met, any Class that does not have as an element of it an Allowed Claim or a Claim temporarily allowed under Bankruptcy Rule 3018 as of the date fixed by the Bankruptcy Court for filing acceptances or rejections of this Plan shall be deemed deleted from this Plan for purposes of

voting to accept or reject this Plan and for purposes of determining acceptance or rejection of this Plan by such Class.

**16.9.    Consummation of the Plan.** The Plan Proponents reserve the right to request that the Confirmation Order include a finding by the Bankruptcy Court that Bankruptcy Rule 3020(e) shall not apply to the Confirmation Order.

**16.10.    Exemption from Transfer Taxes.** Under § 1146(a) of the Bankruptcy Code, after due notice to the relevant taxing authorities (state and local), Trustee's, Debtor's or Reorganized Debtor's delivery of any deed or other instrument of transfer under, in furtherance of, or in connection with this Plan, whether occurring before or after the Confirmation Date, including any deeds, bills of sale or assignments executed with any sale or disposition of assets and/or properties contemplated by this Plan, shall not be subject to any stamp tax, real estate transfer tax, excise tax, sales tax, use tax or other similar tax.

**16.11.    Setoffs, Recoupments, and Defenses.** Except for the Sections of the Plan about the Abuse Claims, nothing in the Plan shall constitute a waiver or release by the Debtor, Reorganized Debtor, Participating Parties, the Trustee, or the Unknown Abuse Claims Trustee of any rights of setoff or recoupment, or of any defense, they may have regarding any Claim (including rights under § 502(d) of the Bankruptcy Code), or a waiver or release by any Claimant of any rights of setoff or recoupment, or any defense, they may have regarding any Cause of Action against such Claimant provided such Claimant timely filed a Proof of Claim asserting such right of setoff or recoupment. Except as otherwise provided in the Plan or in the Confirmation Order or in agreements previously approved by a Non-Appealable Order, the Debtor, Reorganized Debtor, Participating Parties, the Trustee, or the Unknown Abuse Claims Trustee may, but will not be required to, set off against any Claim or any Distributions regarding such Claim, any of the claims, rights and Causes of Action of any nature that the Debtor, the Reorganized Debtor, Participating Parties, the Trustee, or the Unknown Abuse Claims Trustee, as applicable, may hold against the Holder of such Claim; provided, however, that neither the failure to effect such a setoff, the allowance of any Claim hereunder, the payment of any Distribution hereunder or any other action or omission of the Debtor, Reorganized Debtor, Participating Parties, the Trustee, or the Unknown Abuse Claims Trustee, nor any provision of the Plan, shall constitute a waiver or release by the Debtor, the Reorganized Debtor, Participating Parties, the Trustee, or the Unknown Abuse Claims Trustee, as applicable, of any such claims, rights and Causes of Action that the Debtor, the Reorganized Debtor, Participating Parties, the Trustee, or the Unknown Abuse Claims Trustee, as applicable, may possess against such Holder.

**16.12.    Compromise of Controversies.**

(a)    **Bankruptcy Court Approval of Settlements**. In consideration for the classification, Distributions and other benefits provided under the Plan, the Plan shall constitute a good faith compromise and settlement of all Claims or controversies resolved under the Plan. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of each compromise and settlement provided for in the Plan, and the Bankruptcy Court's findings shall constitute its

determination under the standards of Bankruptcy Rule 9019 that such compromises and settlements are in the best interests of the Debtor and the Estates.

**(b)** **Settlement with Participating Parties and Settled Insurer Parties.** Specifically included within the Bankruptcy Court's approval of compromises and settlements of Claims and controversies is the Bankruptcy Court's approval of the agreements with Participating Parties and Settled Insurers. Such agreements also bind the Trust.

**16.13.  Withdrawal or Revocation of the Plan.** The Plan Proponents reserve the right, jointly and severally, to revoke or withdraw the Plan prior to the Confirmation Date. If the Plan is revoked or withdrawn, or if the Confirmation Date does not occur, the Plan, and any agreements embodied therein shall have no force and effect and in such event nothing herein shall be deemed to constitute a waiver or release of any Claims by or against the Estate or any other Person, or to prejudice in any other manner the rights of the Plan Proponents, whether one or more, or any other Person in further proceedings involving the Plan Proponents and specifically shall not modify or affect the rights of any party under any prior orders of the Bankruptcy Court.

**16.14.  Default.** Except as otherwise provided in the Plan or in the Confirmation Order, if the Reorganized Debtor, a Participating Party, a Settled Insurer, the Trustee or the Unknown Abuse Claims Trustee shall default in the performance of any of their respective obligations under the Plan or under the Plan Documents and shall not have cured such a default within any applicable cure period (or, if no cure period is specified in the Plan or Plan Documents or in any instrument issued to or retained by a Claimant under the Plan, then within 30 days after receipt of written notice of default), then the Person to whom the performance is due may pursue such remedies as are available at law or in equity. An event of default occurring with respect to one Claim shall not be an event of default regarding any other Claim.

**16.15.  Governing Law.** Except when federal law (including the Bankruptcy Code or Bankruptcy Rules) is applicable, the rights and obligations arising under the Plan or under the Plan Documents shall be governed by and construed and enforced under the laws of the State of Connecticut without giving effect to the principles of conflicts of laws.

**16.16.  Reservation of Rights.** If the Plan is not confirmed by a Non-Appealable Order, or if the Plan is confirmed and the Effective Date does not occur, the rights of all parties in interest in the Case are and will be reserved in full. Any concessions or settlement reflected, if any, are made for purposes of the Plan only, and if the Plan does not become effective, no party in interest in the Case shall be bound or deemed prejudiced by any such concession or settlement.

**16.17.  Controlling Documents.** To the extent any provision of a Settlement Agreement with a Participating Party or Settled Insurer is inconsistent with this Plan or the Confirmation Order, the terms of this Plan and the Confirmation Order shall control, and to the extent any provision of the Confirmation Order is inconsistent with this Plan, the Confirmation Order shall control.

**16.18. Successors and Assigns.** The Plan shall be binding upon and inure to the benefit of the Debtor, the Reorganized Debtor, all Claimants and all other parties in interest affected thereby and their respective successors, heirs, legal representatives and assigns.

**16.19. Direction to a Party.** On and after the Effective Date, the Trust, the Unknown Abuse Claims Trust or the Reorganized Debtor, as applicable, may apply to the Bankruptcy Court for entry of an Order directing any Person to execute or deliver or to join in the execution or delivery of any instrument or document reasonably necessary or reasonably appropriate to effect a transfer of properties dealt with by the Plan, and to perform any other act (including satisfaction of any Lien or security interest) that is reasonably necessary or reasonably appropriate for the consummation of the Plan.

**16.20. Certain Actions.** By reason of entry of the Confirmation Order, prior to, on or after the Effective Date (as appropriate), all matters provided for under the Plan that would otherwise require approval of the officers of the Debtor under the Plan, including (a) the adoption, execution, delivery, and implementation of all contracts, leases, instruments, releases, and other agreements or documents related to the Plan, and (b) the adoption, execution, and implementation of other matters provided for under the Plan involving the Debtor or organizational structure of the Debtor, shall be deemed to have occurred and shall be in effect prior to, on or after the Effective Date (as appropriate), under applicable non-bankruptcy law, with no requirement of further action by the officers of the Debtor.

**16.21. Rounding of Fractional Numbers.** All fractional numbers, including payments or Distributions under the Plan, Trust Documents, and Unknown Abuse Claims Trust Documents shall be rounded (up or down) to the nearest whole number.

**16.22. Dissolution of the Committee.** On the Effective Date, the Committee shall dissolve automatically, whereupon its members, Professionals and agents shall be released from any further duties and responsibilities in the Case and under the Bankruptcy Code, except that such parties shall continue to be bound by any obligations arising under confidentiality agreements, joint defense/common interest agreements (whether formal or informal), and protective Orders entered during the Case, which shall remain in full force and effect according to their terms, provided that such parties shall have a right to be heard regarding any (i) applications for Professional Claims and (ii) requests for compensation and reimbursement of expenses under § 503(b) of the Bankruptcy Code for making a substantial contribution in the Case.

**16.23. Saturday, Sunday or Legal Holiday.** If any payment or act under the Plan should be required to be made or performed on a day that is not a Business Day, then the payment or act may be completed on the next succeeding day that is a Business Day, in which event the payment or act will be deemed to have been completed on the required day.

## SECTION XVII
## RECOMMENDATIONS AND CONCLUSION

The Plan Proponents strongly believe that Plan confirmation and implementation are preferable to any feasible alternative because the Plan will provide Creditors holding Claims with recoveries significantly greater than any available alternatives.

*[ Signatures on following page  ]*

Dated at Hartford, Connecticut, this 10th day of February 2025.

By: /s/ Stephen M. Kindseth
**ZEISLER & ZEISLER P.C.**
Eric A. Henzy (ct12849)
Stephen M. Kindseth (ct14640)
Daniel A. Byrd (ct31151)
10 Middle Street, 15th Floor
Bridgeport, CT 06604
Telephone: (203) 368-4234
Facsimile: (203) 549-0903
E-mail: skindseth@zeislaw.com
        ehenzy@zeislaw.com
        dbyrd@zeislaw.com

*Attorneys for the Official Committee of*
*Unsecured Creditors*

By: /s/  Patrick M. Birney
**ROBINSON & COLE LLP**
Patrick M. Birney (ct19875)
Andrew A. DePeau (ct30051)
Annecca H. Smith (ct31148)
280 Trumbull Street
Hartford, CT 06103
Telephone: (860) 275-8275
Facsimile: (860) 275-8299
E-mail:  pbirney@rc.com
        adepeau@rc.com
        asmith@rc.com

- and -

**ICE MILLER LLP**
Louis T. DeLucia (admitted *pro hac vice*)
Alyson M. Fiedler (admitted *pro hac vice*)
1500 Broadway, 29th Floor
New York, NY 10036
Telephone: (212) 824-4940
Facsimile: (212) 824-4982
E-Mail:  louis.delucia@icemiller.com
        alyson.fiedler@icemiller.com

*Attorneys for the Debtor*
*and Debtor-in-Possession*

By: /s/  Mark A. Mintz
**JONES WALKER LLP**
Mark A. Mintz (admitted *pro hac vice*)
Samantha A. Oppenheim (admitted *pro hac vice*)
201 St. Charles Avenue, 51st Floor
New Orleans, LA 70170
Telephone: (504) 582-8368 / (504) 582-8641
Facsimile: (504) 589-8368 / (504) 589-8641
Email: mmintz@joneswalker.com
        soppenheim@joneswalker.com

*Counsel for The Association of Parishes of the*
*Roman Catholic Diocese of Norwich, Connecticut*

By: /s/  Everett J. Cygal
**ARENTFOX SCHIFF LLP**
Everett J. Cygal (*admitted pro hac vice*)
David M. Spector (*admitted pro hac vice*)
J. Mark Fisher (*admitted pro hac vice*)
Jin Yan (*admitted pro hac vice*)
Daniel J. Schufreider (*admitted pro hac vice*)
ArentFox Schiff LLP
233 S. Wacker Dr., Suite 7100
Chicago, IL 60606
T: 312.258.5500
F: 312.258.5600
E: everett.cygal@afslaw.com
        david.spector@afslaw.com
        mark.fisher@afslaw.com
        jin.yan@afslaw.com
        daniel.schufreider@afslaw.com

- and -

**GREEN & SKLARZ LLC**
Jeffrey M. Sklarz (ct20938)
One Audubon Street, Third Floor
New Haven, CT 06511
T: 203.285.8545
F: 203.823.4546
E: jsklarz@gs-lawfirm.com

*Counsel for The Catholic Mutual Relief Society of America*