## Exhibit 4

**Events Leading to and During the Bankruptcy Case**

## EVENTS LEADING TO AND DURING THE BANKRUPTCY CASE

### A.    Events Leading to the Bankruptcy Case

On or about July 11, 2014, the individual using the pseudonym, Hector Doe, commenced a civil action against Mount St. John, the Diocese and Bishop Reilly in the Superior Court, State of Connecticut, alleging their responsibility for the sexual abuse he suffered as a child committed by Br. McGlade when Hector Doe resided at Mount St. John's School.

In 2017, two additional survivors commenced their civil actions against the Diocese, Mount St. John and Bishop Reilly, alleging child sexual abuse committed by Br. McGlade at Mount St. John's School. In 2018, survivors commenced an additional twenty (20) civil actions alleging acts of sexual abuse that had occurred at Mount St. John's School. Most of these claims asserted sexual abuse committed by Br. McGlade. Some survivors asserted that they had suffered sexual abuse committed by Br. Alford. While some survivors asserted that Br. Alford had acted together with Br. McGlade, some survivors alleged claims of sexual abuse solely against Br. Alford.

In the years that followed, numerous additional complaints had been filed against the Diocese, Mount St. John and Bishop Reilly asserting that the plaintiffs had been sexually abused as children residing at Mount St. John's School during the years from approximately 1989 through 2002, by Br. McGlade, Br. Alford, and multiple other distinct perpetrators. In total, approximately fifty-four (54) civil lawsuits had been commenced. As these lawsuits progressed, Hector Doe and the other survivors amended their complaints to assert related claims against Oceania for its role in transferring Br. McGlade and Br. Alford to Mount St. John's School.

On January 28, 2019, Catholic Mutual provided the Diocese with its coverage position letter related to the coverage of claims of sexual abuse arising at Mt. St. John that were subject to the July 1, 2014 to July 1, 2015 certificate.  Over these years since 2019 and before the Diocese filed bankruptcy, the attorneys for the survivors, the Diocese, The Oceania Province of the Congregation of Christian Brothers and Catholic Mutual negotiated in an effort to settle the abuse claims related to Mt. St. John.  They were unsuccessful. After carefully considering its options, on July 15, 2021, the Diocese filed bankruptcy to ensure: (a) an orderly claims administration process resulting in a more equitable distribution of funds to Abuse Claimants and Unknown Abuse Claimants; and (b) that the mission of the Diocese may continue to be fulfilled in service of the Catholic faith.

The Diocese commenced the Bankruptcy Case: (a) to maximize its assets (including any available insurance assets) in order to provide the greatest recovery for the greatest number of Abuse Claimants; (b) to provide an orderly claims administration process that ensures fairness in distribution and avoids the inherent inequities in the proverbial "race to the courthouse" that would otherwise have occurred; and (c) to enable the Diocese to continue to fulfil its charitable, humanitarian and religious mission in service of the Catholic faith.

The decision to file for relief under chapter 11 of the Bankruptcy Code was not an easy one. The Diocese is a not-for-profit religious corporation with limited resources, including limited coverage under Catholic Mutual Certificates and other insurance by Non-Settling Insurers which

may be available to compensate Abuse Claimants. The Diocese acknowledges its moral obligation to compensate victims of abuse fairly and equitably from the limited funds available. Beyond its obligation to creditors, the Diocese has a fundamental and moral obligation to the Catholic faithful it serves to continue the ministries of the Church in fulfillment of the canonical and secular legal purposes of the Diocese.

The Diocese represents that it did not seek chapter 11 relief to evade responsibility for any asserted Abuse Claims or for any decisions made by Diocesan authorities when addressing that misconduct. In fact, the Diocese is committed to pursuing the truth, evidenced by its publication of a list of credibly accused clergy, and by retaining Retired Judge Michael E. Riley of Pullman & Comley to conduct a thorough diocesan accountability investigation. The Diocese's Bishop has acknowledged past shortcomings by the Diocese and has attempted to offer aid and comfort to survivors of Abuse. To remedy these past shortcomings, the Diocese has established standards for the training and background assessment of all employees, clerics and volunteers who will likely interact with children and young people. And, as part of the Plan, the Diocese, in concert with the Committee and the Parishes, have established and agreed to comprehensive non-monetary provisions. See Exhibit G of the Plan.

Additionally, the Diocese maintains a list of credibly accused clergy online at https://www.norwichdiocese.org/Find/Accused-Clergy (the "Credibly Accused List"). The Credibly Accused List contains the names of clergy who served in the Diocese with allegations of substance of sexual abuse of a minor. The Credibly Accused List also contains the year the clergy member was ordained and their current status. The Credibly Accused List is attached hereto as Schedule 1.

## B.     Events During the Bankruptcy Case

### Bankruptcy Filing and First Day Orders

The Diocese commenced the Bankruptcy Case on the Petition Date, by filing a voluntary petition under chapter 11 of the Bankruptcy Code [Dkt. No. 1]. The Diocese has continued in possession of its assets and the management of its business as debtor-in-possession, pursuant to §§ 1107(a) and 1108 of the Bankruptcy Code.

Concurrently with the filing of its chapter 11 petition, the Diocese filed certain motions and proposed orders (collectively, the "First Day Orders"). A summary of the relief granted in the First Day Orders is set forth below:

- **Cash Management Motion.** On July 22, 2021, the Bankruptcy Court entered the *Interim Order (I) Authorizing the Continued Use of the Debtor's Cash Management System, Bank Accounts and Business Forms and (II) Granting Related Relief* [Dkt. No. 59] authorizing the Diocese to continue use of its cash management system, bank accounts and business forms as they existed immediately prior to the Petition Date. On September 13, 2021, the Bankruptcy Court entered a final order granting such relief on a final basis. [Dkt No. 239]. On September 16, 2021, the Bankruptcy Court entered an amended final order grating such relief on a final basis. [Dkt. No. 266].

- **Wage and Benefits Motion.** On July 22, 2021, the Bankruptcy Court entered the *Interim Order (I) Authorizing the Debtor to (A) Pay Prepetition Wages, Salaries, Reimbursable Expenses, and Other Obligations on Account of Compensation and Benefits Programs and (B) Continue Compensation and Benefits Programs; and (II) Granting Related Relief* [Dkt. No. 61] authorizing the payment of certain pre- and post-petition wage, benefit, and expense obligations. On September 13, 2021, the Bankruptcy Court entered a second interim order granting such relief. [Dkt. No. 237]. On September 22, 2021, the Bankruptcy Court entered a final order granting such relief on a final basis. [Dkt. No. 286].

- **Motion to Seal.** On July 24, 2021, the Bankruptcy Court entered the *Interim Order on Debtor's Motion for Entry of Interim and Final Orders (I) Authorizing and Approving Special Noticing and Confidentiality Procedures; (II) Authorizing and Approving Procedures for Providing Notice of Commencement and (III) Granting Related Relief* [Dkt. No. 74] approving the Diocese's proposed procedures to protect the confidentiality of the identities and personal contact information of certain Holders of Claims against the Diocese arising from allegations of Abuse. On September 16, 2021, the Bankruptcy Court entered a final order granting such relief on a final basis [Dkt. No. 265].

- **Utility Motion.** On August 10, 2021, the Bankruptcy Court entered the *Interim Order Granting Motion of Debtor for Entry of an Order (I) Approving Proposed Form of Adequate Assurance of Payment to Utility Providers; (II) Establishing Procedures for Determining Adequate Assurance of Payment for Future Utility Services; (III) Prohibiting Utility Providers from Altering, Refusing, or Discontinuing Utility Service; and (IV) Granting Related Relief* [Dkt. No. 128] approving the Diocese's proposed adequate assurance of future performance and related procedures, and barring utility providers from altering, refusing, or discontinuing service. On August 30, 2021, the Bankruptcy Court entered a second interim order granting such relief. [Dkt. No. 178]. On September 16, 2021, the Bankruptcy Court entered a final order granting such relief on a final basis. [Dkt. No. 264].

- **Insurance Motion.** On August 31, 2021, the Bankruptcy Court entered the *Interim Order Authorizing Debtor To (I) Continue Insurance Coverage and Insurance Programs Entered into Prepetition and Satisfy Prepetition Obligations Related Thereto and (II) Renew, Amend, Supplement, Extend, or Purchase Insurance Policies; and (III) Granting Related Relief* [Dkt. No. 180] authorizing the Diocese to continue their insurance program in the ordinary course of business and renew or extend insurance coverage with the written consent of the Committee. On September 13, 2021, the Bankruptcy Court entered a final order granting such relief on a final basis [Dkt. No. 236].

**Retention and Employment of the Diocese's Professionals**

During the Bankruptcy Case, the Bankruptcy Court approved the Diocese's retention and employment of the following professionals to assist in the administration of the Diocese's

Bankruptcy Case: (1) Ice Miller LLP as bankruptcy co-counsel to the Diocese [Dkt. No. 272]; (2) Robinson & Cole LLP as bankruptcy co-counsel to the Diocese [Dkt. No. 321]; (3) Brown Jacobson PC as special counsel to the Diocese [Dkt. No. 234]; (4) Gellert Scali Busenkell & Brown, LLC as special counsel to the Diocese [Dkt. No. 482]; (5) GlassRatner Advisory & Capital Group, LLC d/b/a B. Riley Advisory Services as financial advisors to the Diocese [Dkt. No. 271]; (6) Epiq Corporate Restructuring, LLC as claims and noticing agent [Dkt. No. 168] (services terminated by order entered on March 17, 2023 [Dkt. No. 1213]); (7) Hilco Real Estate Appraisal, LLC as real estate appraiser to the Diocese [Dkt. No. 483]; (8) Omni Agent Solutions as replacement claims and noticing agent [Dkt. No. 1213]; and (9) U.S. Properties Real Estate Services, LLC as real estate broker [Dkt. No. 1381].

### Appointment of the Official Committee of Unsecured Creditors

On July 29, 2021, the Office of the United States Trustee appointed the Committee pursuant to § 1102(a)(1) of the Bankruptcy Code [Dkt. No. 90]. On September 10, 2021, the Bankruptcy Court approved the Committee's retention of Zeisler & Zeisler, P.C. as counsel to the Committee [Dkt No. 233]. During the Bankruptcy Case, the Bankruptcy Court also approved the Committee's retention and employment of the following professionals to assist in the administration of the Bankruptcy Case: (1) Wellspeak Dugas & Kane, L.L.C. as real estate appraiser to the Committee [Dkt. No. 448]; (2) O'Sullivan McCormack Jensen & Bliss PC as special counsel to the Committee [Dkt. No. 551]; and (3) Karp & Langerman, P.C. as special counsel to the Committee on trust, corporate, and real estate matters [Dkt. No. 1453].

### Bar Date and Claims Process

By order dated November 19, 2021, the Bankruptcy Court set March 15, 2022 at 5:00 P.M. (prevailing Eastern time) (the "Claims Bar Date") as the last day for creditors, including Abuse Claimants, to file a proof of claim. Pursuant to both the Court's *Order Establishing March 15, 2022 Deadline for Filing Proofs of Claim and Approving the Form and Manner of Notice Thereof* (the "Bar Date Order") [Dkt. No. 386] and the Court's *Final Order on Debtor's Motion for Entry of Interim and Final Orders (I) Authorizing and Approving Special Noticing and Confidentiality Procedures; (II) Authorizing and Approving Procedures for Providing Notice of Commencement; and (III) Granting Related Relief* [Dkt. No. 265] notice of the Bar Date was published in a variety of both local and national publications.

### Committee's Objection to Proof of Claim Filed by Oceania

On March 15, 2022, Oceania filed its proof of claim in this case against the Debtor in an unspecified amount. Oceania asserted a claim for "indemnification, reimbursement and contribution and similar liability" arising from the "alleged sexual abuse by clergy or any other persons, or for negligence, negligent supervision, or other tort or breach of duty claims, under appliable common law or any statute." It also asserted "a claim against the Debtor for insurance coverage under any policies of insurance issued to or on behalf of the Debtor or others under which the [Oceania] may be entitled to insurance coverage or some other payment or benefit … ."

On May 2, 2022, the Committee filed *The Official Committee of Unsecured Creditors' Objection to Claim No. 10014 Filed by the Oceania Province of the Christian Brothers f/k/a The*

*St. Patrick Province of the Christian Brothers* [Dkt. No. 588]. The Committee asserted that based on Oceania's knowledge and/or reckless conduct at the time of the transfer of Br. McGlade and Br. Alford, the Court should disallow Oceania's claim in its entirety.

The Committee ultimately elected not to prosecute its objection based first upon Oceania's willingness to mediate and, then, based upon the significant progress made in its settlement discussions with Oceania.

### Appointment of the Unknown Abuse Claims Representative

On July 18, 2022, the Diocese moved for the appointment of an unknown abuse claims representative and applied to approve the employment of retired U.S. District Judge Michael R. Hogan as the "Unknown Abuse Claims Representative" (the "Application") [Dkt. No. 720] to represent the interests of persons who may have claims arising from sexual abuse experienced as minors, but who did not, as a result of a valid legal excuse, timely submit a Proof of Claim in this Bankruptcy Case against the Diocese (defined below as the Unknown Abuse Claimants). On August 4, 2022, an order was entered appointing an Unknown Abuse Claims Representative and approving the employment of Judge Hogan to serve in this role [Dkt. No. 753]. Pursuant to §§ 327 and 328 of the Bankruptcy Code, the Unknown Abuse Claims Representative is authorized to perform the services as the legal representative for the Unknown Abuse Claimants that are necessary and appropriate in connection with this Bankruptcy Case, including those described in the Application.

The Unknown Abuse Claims Representative is the legal representative for any Person with an Abuse Claim that occurred against such Person when that Person was a minor for which a Proof of Claim was not filed before the Claims Bar Date and such Person (a) was under a disability (such as minority, mental disability, or alienage) on the Petition Date, (b) neither discovered, nor reasonably should have discovered before the Claims Bar Date that their childhood injury was caused by an act of Abuse, or (c) such Claim was barred by the applicable statute of limitations as of the Claims Bar Date, but is no longer barred by the applicable statute of limitations for any reason.

The Unknown Abuse Claims Representative's responsibilities and duties include:

- Undertaking an investigation and analysis to assist the Bankruptcy Court in determining the estimated number of Unknown Abuse Claimants and the estimated amounts of the Abuse Claims (Unknown Abuse Claims) held by the Unknown Abuse Claimants;

- Filing one or more Proofs of Claim on behalf of all Unknown Abuse Claimants by any (i) extension by consent of the Diocese, the Committee and the United States Trustee, or (ii) Court-ordered extension of the Bar Date and voting such Proofs of Claim to accept or reject a plan of reorganization;

- Negotiating, with the Diocese and other appropriate parties, the treatment of Unknown Abuse Claims through the provisions of a plan of reorganization for the

evaluation, determination, and number and amounts of Abuse Claims of Unknown Abuse Claimants;

- Advocating the legal positions of the Unknown Abuse Claimants before this Court, and if necessary, filing pleadings and presenting evidence on any issue affecting the claims of the Unknown Abuse Claimants;

- Taking all other legal actions reasonably necessary to represent the interests of the Unknown Abuse Claimants; and

- Serving as an independent fiduciary acting solely on behalf of all Unknown Abuse Claimants.

The Unknown Abuse Claims Representative has access to the confidential Abuse Claimants' Proofs of Claim, subject to the confidentiality protocol established in the Bar Date Order (the "Confidentiality Protocol") that applies to all Abuse Claimants' Proofs of Claim submitted to the Claims and Noticing Agent (but not those submitted to the Clerk of Court) and the *Confidentiality Agreement and Protective Order Between the Debtor and Official Committee of Unsecured Creditors* [Dkt. No. 276], entered on September 20, 2021.

The Unknown Abuse Claims Representative also has standing, pursuant to § 1109(b) of the Bankruptcy Code, to raise and appear and be heard as a party in interest on any issue in this Bankruptcy Case. Additionally, the Unknown Abuse Claims Representative may employ attorneys and other professionals consistent with the applicable provisions of the Bankruptcy Code, §§ 105, 327, and 328, but only with prior approval of the Court.

### Committee Investigation and Discovery

Since its appointment, the Committee has conducted an extensive investigation into the insurance coverage, assets, liabilities and affairs of the Diocese. The Committee has focused, in particular, on attempting to recover the greatest value possible to enhance funds available to pay Creditors including Abuse Claimants. In furtherance of this investigation, the Committee has sought discovery over the course of this Bankruptcy Case.

The Committee's extensive review of thousands of pages of production and substantive conversations with various parties both in mediation and outside of mediation has allowed the Committee to conduct substantial investigation into the issues relevant to this case and determine the existence and scope of claims against various parties all in an effort to maximize Distributions to Creditors, including Abuse Claimants. It is with the benefit of all of this information that the Committee negotiated and ultimately agreed to with the Debtor and the other Participating Parties and Catholic Mutual the terms and conditions of reorganization as set forth in the Plan.

### Assessments and Other Debts

The Diocese's books and records reflect certain entries that are memorialized as amounts owed to the Diocese by certain Parishes and other Catholic Entities (the "Assessments"). The Assessments have at times been referred to as "accounts receivable" for bookkeeping and

convenience, but the Diocese submits that they do not have the conventional meaning ordinarily attributed to that term, and that the Assessments are truly a canonical, as opposed to a civil, obligation of the Parishes and Catholic Entities. *See* Can. 1263. The Assessments reflect annual assessments imposed on the Parishes and Catholic Entities (calculated based on income), which the Parishes and Catholic Entities are directed by Canon Law[1] to remit to the Diocese, at the discretion of the bishop. The Assessments are not supported by loan agreements, promissory notes or other formal written agreements.

Under Canon Law, the bishop of a diocese is authorized to assess a tax on parishes. This tax is commonly known as the "Cathedraticum." The authority of the diocese to assess this tax and the parishes' obligation to pay is found in Canon 1263 of the Code of Canon Law. Canon 1263 states:

> After the diocesan bishop has heard the finance council and the presbyteral council, he has the right to impose a moderate tax for the needs of the diocese upon public juridic persons subject to his governance; this tax is to be proportionate to their income. He is permitted only to impose an extraordinary and moderate exaction upon other physical and juridic persons in case of grave necessity and under the same conditions, without prejudice to particular laws and customs which attribute greater rights to him.

Can. 1263.

A parish is considered a juridic person for purposes of this Canon.[2] A diocesan bishop cannot freely impose assessments and nothing in the Canon states a bishop must impose assessments. A bishop only has the "right to impose a moderate tax" after hearing from both the finance and presbyteral council. Accordingly, imposing assessments is discretionary and such decision can only be made by high-ranking church leadership.

The Bishop has authorized the Assessments, which the Parishes and Catholic Entities are directed by Canon Law to remit to the Diocese. Some Parishes and Catholic Entities timely pay the Assessment, while some Parishes and Catholic Entities pay the Assessment when they are financially able. Some Parishes and Catholic Entities in the latter group have accrued what would be considered an arrearage if the Assessments were a debt or obligation imposed by civil law, which they are not.

The Diocese does not compel payment of these arrearages, but it does track them. There is currently approximately $13.7 million due in Assessments arrearages, many of which have been

---

[1] The codified laws of the Roman Catholic Church that govern, among other things, the relationship of the Diocese and the parishes under its care.

[2] Matthew J. Barrett, *The Theological Case for Progressive Taxation as Applied to Diocesan Taxes or Assessments Under Canon Law in the United States*, 63 THE JURIST 312, 323 (2003), https://scholarship.law.nd.edu/cgi/viewcontent.cgi?article=1827&context=law_faculty_scholarship ("The diocesan bishop can impose an ordinary tax under canon 1263 only on *public juridic persons*, most notably parishes").

on the Diocese's books for many years and the Diocese submits that the liquidation value of this Assessments is below $3.78 million as of August 31, 2023.

It is the Diocese's position that the Assessments are not collectable, as they are subject to material challenges, including (a) the fact that the debts evidenced by the Assessments have no underlying basis in secular civil law; (b) the absence of any writing memorializing or acknowledging the alleged debt or the agreement of the non-debtor party to pay the alleged obligations; (c) the solvency and ability to pay by the Parish or other Catholic Entity; and (d) Connecticut's three-year statute of limitations for the collection of oral contracts. Conn. Gen. Stat. § 52-581. It is the Diocese's stance that any attempt to collect the amounts owed will run afoul of the First Amendment, Supreme Court precedent, the Connecticut Constitution, and Connecticut legal precedent.

In an effort to achieve the greatest possible recovery for its constituency, the Committee vehemently pursued the Assessments as a source of funding for the Plan. The Assessments, and their collectability, was discussed at length by the Diocese, Committee, Parishes, and other interested parties throughout the five in-person mediation sessions led by two different mediators, and numerous informal negotiations. The Plan, and the contributions contained therein including, in particular, by the Parishes, appropriately reflect consideration from all parties regarding the collectability of the Assessments.

### Avoidance Actions

The Diocese and the Committee have identified certain potential claims and avoidance actions that may be brought by the Diocese, the Diocese's Estate, and if granted standing, the Committee, a plan settlement trust or the Catholic Entities. Such potential claims include, but are not limited to, claims pursuant to §§ 502(d), 542, 544, 545, 547, 548, 549, 550 and/or 553 of the Bankruptcy Code and applicable state and federal laws (the "Potential Claims"). Following mediation, the Diocese, Committee, Parishes, and various Catholic Entities, including Mercy, and Xavier high schools (the "Tolling Agreement Parties") agreed to resolve the Potential Claims through the terms and conditions set forth in the Plan, and executed a tolling agreement dated July 14, 2023, and then again by their First Amended Tolling Agreement dated as of October 11, 2023 ("First Amended Tolling Agreement"), to facilitate the final resolution of any actions or proceedings relating to the Potential Claims through confirmation of the Plan without the time and expense of litigation.

Specifically, effective currently, the Tolling Agreement Parties have agreed pursuant to the First Amended Tolling Agreement to toll and extend any limitations periods (including, without limitation, those arising by virtue of state law, federal law, 11 U.S.C. § 546(a), 11 U.S.C. § 108 or otherwise) that would bar any claim or remedy or the bringing of any action or proceeding related to the Potential Claims, through and including 11:59 p.m. (Eastern) February 1, 2024 (the "Tolling Period"). The Tolling Agreement Parties have expressly agreed not to assert any time-based defense of any kind, including but not limited to laches, waiver, or estoppel, to the Potential Claims due to the passage of time during the Tolling Period. The Tolling Period may be extended if further tolling agreements are executed.

**Settlement Negotiations and the First Mediation**

To facilitate settlement negotiations, the Diocese and the Committee filed the *Joint Motion for Entry of an Order Referring Parties to Mediation and Appointing Mediator* [Dkt. No. 645] (the "Mediation Motion") seeking to submit several matters to negotiation and appointing Attorney Paul A. Finn as mediator. On August 4, 2022, the Bankruptcy Court entered the *Order Referring Parties to Mediation and Appointing Mediator* [Dkt. No. 752] approving the relief sought in the Mediation Motion and appointing Attorney Paul A. Finn as mediator, with a term to serve for six months.

The Mediation Parties subsequently participated in four in-person and two remote mediation sessions with Attorney Paul A. Finn. Two mediation sessions were held on September 14, 2022, and September 15, 2022, in New York, New York. Early in these mediation sessions, the Debtor and Committee reached an agreement in principle with Oceania on its contribution to the contemplated settlement fund to be established for the benefit of Abuse Claimants, and the releases, channeling injunction and other terms to be provided in exchange. Two additional mediation sessions took place on October 24, 2022, and October 25, 2022, also in New York, where all five members of the Committee, Bishop Michael R. Cote, D.D. and Monsignor Leszek T. Janik, JCL, were in attendance. Two additional remote mediation sessions were held on November 22, 2022 and January 20, 2023.

Near the end of Atty. Finn's sixth-month term to conduct the mediation, on January 20, 2023, the Diocese and Committee disagreed regarding whether Mr. Finn's term should be extended. See *Motion to Extend the Term of Appointment of Paul A. Finn as Mediator* [Dkt. No. 1051] and *Objection of the Official Committee of Unsecured Creditors to the Debtor's Motion to Extend the Term of Appointment of Paul A. Finn as Mediator* [Dkt. No. 1075].

On February 24, 2023, the Bankruptcy Court entered its order appointing former Second Circuit Judge Christopher Droney to serve as mediator for a period of sixty (60) days pursuant to the same terms and provisions of the Bankruptcy Court's initial mediation order, and that the service period of Atty. Finn having expired, it was suspended until further order of the Bankruptcy Court [Dkt. No. 1167].

**Debtor's Plan Exclusivity and Committee's Competing Plan**

Pursuant to § 1121 of the Bankruptcy Code, a debtor in possession is granted a 120-day period from the chapter 11 filing date to file a plan of reorganization. During such time, only a debtor can file a plan of reorganization. However, the Bankruptcy Code provides that the court can increase a debtor's exclusive period to file a plan of reorganization for cause shown but such period cannot be extended beyond eighteen (18) months after the commencement of the case.

During the pendency of the Bankruptcy Case, the Diocese had requested and the Court had granted, seven (7) extensions of exclusivity [Dkt. Nos. 362, 480, 543, 665, 847, 912, and 1037] based upon the perceived progress made in the Bankruptcy Case including in settlement negotiations through the mediation. The 18-month deadline expired on January 17, 2023, and so the Diocese filed a plan of reorganization (the "Diocese Plan") on that day. The Debtor was then

9

provided an addition 60-day period to solicit and obtain the acceptances of each class of claims that is impaired under the Diocese Plan.

The Committee sought to file its own plan of reorganization to be considered by the Bankruptcy Court, the Diocese and all other parties in interest in this Bankruptcy Case including the Abuse Claimants. Accordingly, on February 3, 2023, the Committee filed *The Official Committee of Unsecured Creditors' Motion to Terminate Debtor's Exclusive Period to Solicit Acceptances of Chapter 11 Plan* [Dkt. No 1076]. After argument by counsel for the Diocese and counsel for the Committee, among others, and considering comments made by the Bankruptcy Court at the hearing held on February 21, 2023, the Diocese decided to consent to the termination of its exclusive period to solicit acceptance of the Diocese Plan. On February 24, 2023, the Bankruptcy Court entered its order [Dkt. 1164] granting the Committee's motion and terminating the Diocese's exclusive solicitation period. The Bankruptcy Court then entered a further order, consistent with the representation made by the Committee's counsel, that the Committee shall file its competing plan of reorganization by February 28, 2023 [Dkt. No. 1166]. Accordingly, on February 28, 2023, the Committee filed its own plan of reorganization [Dkt. No. 1169] and corresponding disclosure statement.

### The Second Mediation

Following the Mediation Parties' submission of their respective mediation statements on March 16, 2023, Judge Droney on March 23, 2023, held an in-person mediation session with all Mediation Parties in order to break the impasse and resolve the remaining issues between them. Significant progress had been made and a global agreement nearly reached. Unfortunately, several items remained to be resolved but enough progress had been accomplished for the parties to agree to begin drafting a joint plan of reorganization between the Debtor and the Committee.

The parties then spent the next several months attempting resolve the remaining issues, and drafting the joint plan of reorganization, corresponding disclosure statement and related documents. During this process, additional issues surfaced. Further negotiations took plan which required the assistance of Judge Droney. Ultimately, the parties were successful in reaching an agreement as set forth in the Plan and this Disclosure Statement.

### Sale of Real Estate Used by St. Bernard

Founded in 1967, St. Bernard is a Roman Catholic co-educational college preparatory school for grades 6 through 12 located in Montville, Connecticut. It is co-sponsored by the Diocese and the Xaverian Brothers and welcomes students of all faith backgrounds who value academic excellence, personal and spiritual growth, and a commitment to community.

The Diocese owned the real estate and building and improvements (the "Montville Property") used by St. Bernard to operate its school. The Montville Property consists of a 113-acre site on Route 32 that is improved with the 155,865 square foot school, an 800 square foot detached garage and two 80 square foot sheds. Besides the buildings and improvements, the Montville Property includes extensive woodlands and clearings for fields, lawns and parking.

In September 2022, the Committee received an unsolicited letter of intent ("Thames River LOI") from an attorney acting on behalf of an unidentified private entity interested in purchasing

the Montville Property. The Committee's counsel promptly forwarded the Thames River LOI to the Debtor's counsel. The Thames River LOI contemplated, and counsel for the unidentified potential purchaser insisted, that the sale of the Montville Property be effectuated through a private sale for $6 million that was not subject to higher and better offers (the "Private Sale"). The unidentified potential purchaser, Thames River Acquisitions, LLC ("Thames River"), thereafter incorporated as a Connecticut limited liability company in December 2022, three months after the Thames River LOI.

The Thames River LOI and subsequent negotiations with Thames River reflected an interest in entering into a new written lease with St. Bernard (the "School Lease"). In or around December 2022 through early February 2023, attorneys for the Debtor, Thames River and the St. Bernard negotiated the terms of the Private Sale, including the terms of the School Lease; however, those discussions collapsed after an impasse arose related to certain deal terms, including the terms related to the School Lease.

Since February 23, 2023, Thames River resurfaced with an increased bid, which included a willingness to expose the increased bid to higher and better offers through formal sale procedures and a public auction.

On or about January 27, 2023, Saints Country submitted its unsolicited letter of intent ("Saints LOI") which provided, among other things, that Saints Country would purchase the Property for $6 million. Subsequent discussions with Saints Country that ensued revealed that Saints Country was a consortium of the school's alumni and certain entities that were devoted to continuing the school's Catholic education mission. In addition to disclosing the names and identities of all individuals, trusts and entities with an interest in Saints Country, its counsel shared proof of financial capacity to close.

Subsequent discussions with Saints Country also revealed its desire to enter into a School Lease and willingness to expose the Montville Property to higher and better offers through formal sale procedures and a public auction.

After discussions with the various parties in interest during March 2023, and after consulting with the Committee, the Debtor determined in the exercise of its business judgment to file a motion seeking (i) an order approving sale procedures and scheduling an auction and sale hearing, and (ii) an order approving the ultimate sale of the Montville Property, among other related relief [Dkt. No. 1225].

Following due notice and a hearing, on May 8, 2023, the Bankruptcy Court entered its *Order (A) Approving Sale Procedures for the Sale of Certain Property, Including All Improvements Thereon in Montville, Connecticut; (B) Scheduling an Auction and a Sale Hearing Related Thereto; (C) Approving the Form of Purchase and Sale Agreement; and (D) Approving the Form of Notice of the Auction and Sale Hearing* [Dkt. No. 1307] ("Sale Procedures Order"). The Sale Procedures Order established May 26, 2023 as the deadline for all bids for the Montville Property, June 2, 2023 as the auction date (in the event competing qualified bids had been timely submitted), and June 7, 2023 as the hearing on the approval of the sale of the Montville Property.

Two competing bids were submitted by the May 26th bid deadline each for $6,500,000, including one by Thames River. The Debtor thereafter determined that both bids constituted qualified bids pursuant to the Sale Procedures Order. At that auction on June 2nd, Thames River increased its bid to $6,550,000. No competing bids were submitted and the Debtor determined, in consultation with the Committee, that Thames Rivers had submitted the highest and best bid at the auction for the purchase of the Montville Property.

At the Sale Hearing on June 7th, the Debtor presented the highest and best bid submitted by Thames River and requested, with the support of the Committee and St. Bernard, that the Bankruptcy Court approve the sale of the Montville Property to Thames River in exchange for the payment of $6,550,000. Following the submission of evidence and argument by counsel, the Bankruptcy Court approved the sale subject to the submission of a revised proposed order consistent with statements made on the record. Counsel submitted such revised proposed order which the Bankruptcy Court entered on June 20, 2023 [Dkt. No. 1344]. The Debtor closed on its sale of the Montville Property to Thames River on June 21, 2023, and received the net proceeds of the sale in the amount of $6,550,000.

**Sale of Transferred Real Estate by Diocese**

Following the entry of the order approving the employment of U.S. Properties Real Estate Services, LLC ("U.S. Properties") as real estate broker for the Debtor, U.S. Properties immediately began marketing the Transferred Real Estate for sale, subject to the Debtor's oversight and the Committee's input. Ultimately, U.S. Properties was able to secure offers to purchase four of the properties on terms and conditions acceptable to the Debtor and the Committee.

Accordingly, on September 29, 2023, the Debtor filed its motion [Dkt. No. 1461] for approval of the sale of 17 Otis St., Norwich, Connecticut, in exchange for the payment of $191,000. The Bankruptcy Court approved the sale on October 27, 2023. [Dkt. No. 1512]

On October 20, 2023, the Debtor filed separate motions [Dkt. Nos. 1489 & 1490] for the approval of the sale of 31 Perkins St. and 7-11 Bath St., both situated in Norwich, Connecticut, in exchange for $145,000 and $190,000, respectively. On November 8, 2023, the Debtor filed its motion [Dkt. No. 1520] for the approval of the sale of 25 Otis St., Norwich, Connecticut, in exchange for the payment of $174,000.

After a hearing before the Bankruptcy Court, on November 22, 2023, the Bankruptcy Court entered its orders [Dkt. Nos. 1557, 1558 & 1559] approving the Debtor's motions for entry of orders approving the sale of 31 Perkins St., 7-11 Bath St. and 25 Otis St. on the terms and conditions set forth in the motion.

Pursuant to the orders approving the sale of these properties, the Net Proceeds realized shall be held in an interest-bearing account designated for the purpose of maintaining proceeds from the sales of real estate used by the Debtor to fund its contributions to the Trust, or as otherwise ordered by the Bankruptcy Court.

U.S. Properties continues to market and attempt to sell the unsold properties identified as the Transferred Real Estate.

**The Joint Plan and Significant Delays**

After extensive further negotiations to attempt to resolve the myriad of issues which arose while drafting the joint plan, the corresponding joint disclosure statement and the other related documents, the Diocese and the Committee ultimately agreed upon the terms and conditions of a joint plan of reorganization to be filed in the Bankruptcy Case. Essential to the joint plan was the ability of the Bankruptcy Court to compel the release of all known and unknown Abuse Claims, to channel those Abuse Claims to trusts created for their benefit, and to enter injunctions precluding the assertion and enforcement of these Abuse Claims against the Mediation Parties. The Mediation Parties agreed to make the contributions set forth in the joint plan for the benefit of Abuse Claimants in exchange for receiving the benefits of these releases and injunctions, and the channeling of their Abuse Claims.

On May 30, 2023—during the time that the Debtor, the Committee and the other Mediation Parties continued to work on preparing the joint plan of reorganization and all related documents— the United States Court of Appeals for the Second Circuit, in considering the plan of reorganization proposed by Purdue Pharma L.P., decided that the Bankruptcy Code authorized the plan's nonconsensual third-party releases. Based upon this decision, the Debtor and the Committee concluded that their contemplated joint plan would comply with the standards enunciated by the Second Circuit. On July 30, 2023, the Debtor and the Committee filed their joint plan.

Less than two weeks later, on August 10, 2023, the United States Supreme Court granted certiorari to decide the issue: "Whether the Bankruptcy Code authorizes a court to approve, as part of a plan of reorganization under Chapter 11 of the Bankruptcy Code, a release that extinguishes claims held by nondebtors against nondebtor third parties, without the claimant's consent." The Supreme Court heard oral argument on December 4, 2023. Recognizing that the Supreme Court likely would not decide the appeal in *In re: Purdue Pharma L.P.* until sometime in June 2024, the Debtor and the Committee endeavored to move forward with the confirmation process with respect to their joint plan in the hopes of confirming the Joint Plan prior to a decision by the Supreme Court.

On August 29, 2023, the Bankruptcy Court held the initial hearing to consider the disclosure statement filed in connection with the then-filed joint plan and *sua sponte* raised the issue of whether the Debtor and Committee could or should proceed with their joint plan while *In re: Purdue Pharma L.P.* was before the Supreme Court. The Bankruptcy Court scheduled a status conference for September 13, 2023, to consider this issue. On August 30, 2023, the Bankruptcy Court specifically ordered the status conference to "hear parties on the question of whether it is in the best interest of this Chapter 11 Estate and the administration of this Bankruptcy Case to pause or reorder the priorities or scheduling of [the Joint] Plan confirmation and related motions in judicial deference to, and in light of the stay by the United States Supreme Court and the pending petition for certiorari of *[I]n re Purdue Pharma L.P.* confirmation decision on non-consensual third party releases." [Dkt. No. 1413.]

On September 1, 2023, the Bankruptcy Court entered The Court's Preliminary Statement of Concerns, Questions, and Issues Presented by the Joint Disclosure Statement and Plan identifying twenty-nine (29) issues related to the disclosure statement and thirteen (13) related to the Joint Plan. [Dkt. No. 1418.] At the status conference held on September 13, 2023, the Debtor's

13

and the Committee's counsel reported that they needed more time to address the concerns raised by the Bankruptcy Court and to address other issues.

Ultimately, the Debtor and the Committee filed their second amended disclosure statement and second amended joint plan [Dkt. Nos. 1472 & 1473] on October 12, 2023, and their third amended disclosure statement and third amended joint plan on October 27, 2023. [Dkt. No. 1513 & 1514.] Following the objection to the third amended disclosure statement filed by the United States Trustee on November 14, 2023, and the hearing on the third amended disclosure statement held on November 17, 2023, the Bankruptcy Court entered the following decision and orders on November 22, 2023:

- Preliminary Order Related to: (I) Proposed Order Approving Disclosure Statement and Providing Other Relief [sic] and, (II) The Court's Review and Approval of Ancillary Proposed Documents [Dkt. No. 1555];
- Preliminary Ruling on Objection of the United States Trustee to the Adequacy of the Information Contained in the Third Amended Joint Disclosure Statement of the Debtor and the Official Committee of Unsecured Creditors [Dkt. No. 1556];
- Preliminary Order Regarding Third Amended Disclosure Statement [Dkt. No. 1560]; and
- Preliminary Order Regarding Separate Motions in the Exercise of the Court's Case Management Authority [Dkt. No. 1561].

The Debtor and Committee spent the following several months attempting to satisfy the requirements imposed and otherwise address the issues raised by the Bankruptcy Court in the above orders and decision. On December 29, 2023, the Debtor and Committee filed their fourth amended disclosure statement and fourth amended joint plan. [Dkt. Nos. 1594 & 1595.]

On January 16, 2024, the Debtor provided notice and a copy of the Unknown Claims Representative's Report and Recommendations. [Dkt. No. 1622.] On January 24, 2024, the Bankruptcy Court entered its Order to Show Cause Regarding Unknown Claims Representatives Report [Dkt. No. 1640] ("Order to Show Cause") raising eight (8) issues to be addressed at the show cause hearing to be held on February 13, 2023.

Also on January 16, 2024, the Bankruptcy Court ordered a deadline of February 2, 2024, to file any missing documents and motions, to file any responses to the filings by February 12, 2024, and a hearing for February 14, 2024. On February 2, 2024, the Debtor and the Committee filed their fifth amended disclosure statement and fifth amended joint plan [Dkt. Nos. 1653 & 1654] along with other related motions and documents.

While the Debtor and the Committee were able to proceed with various motions related to the joint plan on February 12th and 13th before the Bankruptcy Court, they were not able to address the issues raised in the Order to Show Cause. That matter was not heard until March 26, 2024, when after hearing the testimony of the Unknown Abuse Claims Representative and arguments of counsel, the Bankruptcy Court found that the Unknown Abuse Claims Representative's report was incomplete. [Dkt. No. 1733.] The Bankruptcy Court concluded that the Unknown Abuse Claims Representative needed to review all of the Diocese records evidencing the Abuse within the

Diocese over its history and revise his report. The Bankruptcy Court then on March 28, 2024, entered its Supplemental Filing Order, [Dkt. No. 1739], ordering that, "[i]n order to assist the Court in its analysis of these and other issues, … [t]he debtor and debtor-in-possession, The Norwich Roman Catholic Diocesan Corporation (Debtor), shall, within ten days of the date of this order, file upon the record a matrix of additional information regarding the allegations of substance of sexual abuse of a minor." *Id.*

In response, the Debtor and the Committee on April 1, 2024, requested a status conference which request the Bankruptcy Court granted on April 3, 2024. [Dkt. Nos. 1741 & 1743.) At the status conference held on April 4, 2024, the Debtor explained various logistical issues related to its compliance with the Supplemental Filing Order and sought and obtained certain clarifications from the Bankruptcy Court.

By that time, the Committee and its counsel had concluded that the fifth amended joint plan could not be confirmed and become effective prior to a decision by the Supreme Court in *In re Purdue Pharma L.P.* Accordingly, at that status conference on April 4, 2024, the Committee's counsel stated that the Committee would not be seeking a hearing on the approval of the fifth amended disclosure statement at that time. The Committee's counsel explained that, in the Committee's view, the confirmation process needed to wait until the Supreme Court entered a decision in *In re Purdue Pharma L.P.*, so the Debtor, the Committee and the other Mediation Parties could be guided by the Supreme Court's decision.

**The United States Supreme Court Reverses the Second Circuit's Decision**

On June 27, 2024, the Supreme Court held that "the bankruptcy code does not authorize a release and injunction that, as part of a plan or reorganization under Chapter 11, effectively seeks to discharge claims against a nondebtor without the consent of the affected claimants." *Harrington v. Purdue Pharma L.P.*, 603 U.S. 204, 206-07, 219 L.Ed.2d 721, 144 S.Ct. 2071 (2024) ("*Purdue Pharma*").

**Competing Plans**

Later in the day on June 27, 2024, the Committee filed its withdrawal of the fifth amended joint plan and filed its First Amended Chapter 11 Plan of Reorganization Proposed by the Official Committee of Unsecured Creditors [Dkt. No. 1780]. Through its first amended plan, the Committee sought to address the issues decided by the Supreme Court in *Purdue Pharma* by reorganizing the Debtor without any provision for non-consensual third-party releases of non-debtor third-parties, the channeling of Abuse Claims or channeling injunctions. At the same time, the Committee sought through its first amended plan to realize from many of the Debtor's assets and other potential sources a significant and meaningful recovery for all of the Diocese's Claimants including all Abuse Claimants.

After multiple status conferences before the Bankruptcy Case to address the issues presented by the Supreme Court's decision in *Purdue Pharma* and the Committee's first amended plan, by its scheduling order entered August 13, 2024 [Dkt. No. 1810], the Bankruptcy Court provided the Debtor until September 6, 2024, to file its own plan of reorganization.

On September 6, 2024, the Debtor along with Catholic Mutual and the Association of Parishes filed their Joint Chapter 11 Plan of Reorganization [Dkt. No. 1821].

**The Third Mediation**

On September 11, 2024, the Bankruptcy Court entered its Order Directing Parties to Chapter 11 Plan Mediation and Appointing Hon. Joan N. Feeney (Ret.) as Mediator [Dkt. No. 1825].

Commencing in October 2024, and culminating in a one-week in-person mediation the first week of December 2024, the Diocese, the Committee and the other Mediation Parties engaged in a mediation with the assistance of the court-appointed mediator to attempt once again to negotiate a global resolution of the Diocese's reorganization. After extensive negotiations, the Plan Proponents agreed to propose jointly the terms and conditions of reorganization now set forth in the sixth amendment to the original joint plan, defined herein as the Plan. Significantly, they agreed to address the affirmative consent requirement set forth in *Purdue Pharma* by establishing a process whereby Abuse Claimants could voluntarily "Opt-In" to the Plan's release and injunction provisions precluding the assertion of their "Opt-In Abuse Claims" against those certain third-parties specifically identified in the plan, namely, the Participating Parties and the Catholic Mutual Parties.

## **Schedule 1**

List of Credibly Accused

# LIST OF CLERGY WITH ALLEGATIONS OF SUBSTANCE OF SEXUAL ABUSE OF A MINOR

## INCARDINATED PRIESTS OF THE DIOCESE OF NORWICH

| | | | |
|---|---|---|---|
| Robert | W. | Barnes | Ordained 02-23-1980 | Removed from ministry in 2002; Deceased 2008 |
| Norbert | E. | Belliveau | Ordained May 10, 1956 | Deceased 1989 |
| Bernard | W. | Bissonnette | Ordained 05-15-1958 | Dismissed from the clerical state 2005; Deceased 2008 |
| Normand | R. | Boulanger | Ordained May 31, 1957 | Left Diocese 1972; Dismissed from the clerical state 1973; Deceased 1996. |
| Richard | T. | Buongirno | Ordained 05-26-1984 | Removed from ministry in 1998; Dismissed from the clerical state 2005 |
| Salvatore | L. | Busca | Ordained 06-04-1955 | Removed from ministry in 1961; Excardinated from the Diocese of Norwich 1969; Perpetually professed into the Servants of the Paraclete; Deceased 2006 |
| Dennis | G. | Carey | Ordained 05-30-1998 | Arrested and removed from ministry in 2012; Deceased 2013 |
| Anthony | R. | Caron | Ordained 07-14-1935 | Removed from ministry in 1959; Deceased 1969 |
| Santino | A. | Casimano | Ordained 08-16-1975 | Removed from ministry in 2004; Deceased 2005 |
| Roger | M. | Comtois | Ordained 06-05-1955 | Resigned; Leave of Absence 1988; In Residence 1992; Deceased 1998 |
| James | A. | Curry | Ordained 05-26-1949 | Removed from ministry in 1981; Deceased 1986 |
| Edward | F. | Frigault | Ordained 05-26-1949 | Removed from ministry in 2002; Deceased 2008 |
| Denis | | Galipeau | Ordained 05-27-1961 | Removed from ministry in 1964; Excardinated from Diocese of Norwich 1970; Incardinated into Archdiocese of Montreal |

# LIST OF CLERGY WITH ALLEGATIONS OF SUBSTANCE OF SEXUAL ABUSE OF A MINOR

| | | | |
|---|---|---|---|
| Roman | S. | Gromala | Ordained 05-18-1950 | Left diocesan ministry 1955; Excardinated from Diocese of Norwich 1972; Incardinated into Diocese of St. Petersburg; Deceased 1991 |

Roman    S.    Gromala          Ordained 05-18-1950          Left diocesan ministry 1955; Excardinated from Diocese of Norwich 1972; Incardinated into Diocese of St. Petersburg; Deceased 1991

Paul    L.    Hebert          Ordained 05-23-1959          Removed from ministry 2004;  Deceased in 2010

Raymond J.    Jean          Ordained 07-13-1957          Removed from ministry in 1990; Deceased in 2001

John    A.    Kozon          Ordained 05-26-1949          Removed from ministry 2005; Deceased 2013

Vincent    F.    Marino          Ordained 05-28-1983          Excardinated from Diocese of Norwich 1989; Incardinated into Archdiocese of Siracusa, Italy, prior to receiving allegation

R. Thomas    McConaghy          Ordained 05-30-1981          Removed from ministry in 2005

Joseph    P.    Murphy          Ordained 09-24-1988          Removed from ministry in 1998; Deceased 2015

John    C.    Nash          Ordained 05-10-1975          Removed from ministry in 2002; Petitioned for removal from the clerical state 2002; Deceased 2010

J. Lawrence    Ouimet          Ordained 06-15-1974          Resigned; Appointed Parochial Vicar with restricted ministry 1999; Deceased 2002

John    B.    Ramsay          Ordained 05-10-1956          Retired 1977 before any allegations received; Deceased 1994

Thomas    W.    Shea          Ordained 06-29-1946          Removed from ministry 1984; Deceased 2006

## PRIESTS INCARDINATED IN ANOTHER DIOCESE WHO SERVED IN THE DIOCESE OF NORWICH

Louis    Paturzo          Ordained 05-26-73          Removed from ministry 2002; Dismissed from the clerical state 2008

Bruno    Primavera          Ordained 1973          Removed from ministry 1980; Deceased 2006

# LIST OF CLERGY WITH ALLEGATIONS OF SUBSTANCE OF SEXUAL ABUSE OF A MINOR

## PRIESTS BELONGING TO A RELIGIOUS ORDER WHO SERVED IN THE DIOCESE OF NORWICH

| | | | | |
|---|---|---|---|---|
| Thomas | J. | Doyle, SM | Ordained 10-06-1974 (Society of Mary) | Removed from ministry in 1992; Deceased 2007 |
| Charles | | Many, SSE | Ordained 01-26-1974 (Society of St. Edmund) | Assigned in Diocese by Religious Order 1978; Reassigned by Religious Order 1981 before allegation received |
| Eugene | | Orteneau, SJ | Ordained 06-19-1982 (Society of Jesus) | Reassigned by Religious Order 1981; Deceased 2009 |
| Robert | Leo | Pelkington, OP | Ordained 1968 (Dominican) | Removed from ministry; Dismissed from the clerical state 2011; Deceased 2015 |
| Patrick | | Sullivan, OCSO | Ordained 06-12-1954 (Trappist) | Dismissed from the clerical state 1970 |
| Thomas | | Paschal, OSB | Order of St. Benedict | Reassigned by Religious Order 1993 |

## PRIESTS WHO SERVED IN THE DIOCESE OF NORWICH WHO HAD ALLEGATIONS IN OTHER PLACES BUT NOT IN THE DIOCESE OF NORWICH

| | | | | |
|---|---|---|---|---|
| Kenneth | P. | Bonadies | Ordained 5-21-1965 | Priest of Diocese of Steubenville, OH, Retired, December 31, 2004, before any claims against him were received. Removed from ministry September 11, 2018. |
| Joseph | | Buckley | Ordained 05-21-1932 (Hartford) | Deceased 1975 |
| William | J. | Cullen, SJ | Ordained 1965 (Society of Jesus) | Removed from ministry in 2005; Deceased 2010 |

## LIST OF CLERGY WITH ALLEGATIONS OF SUBSTANCE OF SEXUAL ABUSE OF A MINOR

| John | F. | Dority, OFM | Ordained 02-18-1967 (Order of Friars Minor) | Granted an Indult of Departure from Religious Order and returned to the Lay State-1980; Resides in the Diocese of Norwich but has never been affiliated with the Diocese in any capacity. |
| Ivan | | Ferguson | Ordained 05/06/1970 (Auxiliary Priest-Missionaries of the Holy Apostles) | Incardinated into the Archdiocese of Hartford 02/09/1979; Removed from Ministry 03/04/1993; Deceased 12/16/2002; Diocese has no other information. |
| Joseph | | Gorecky | Ordained 1959 (Bridgeport) | Deceased 1988 |
| Michael | | Krol | Ordained 1945 (Austin, TX) | Left diocese 1963; Deceased 1996 |
| Stephan | | Johnson, CSP | Ordained 05-16-1981 (Paulist Fathers) | Left diocese 1987; Left Religious Order 07/12/1996 |
| Felix | | Maguire | Ordained 05-18-1950 (Hartford) | Removed from ministry 1992; Deceased 2008 |
| Edward | P. | McGrath, SDB | Ordained 06-29-1969 (Salesians Don Bosco) | Deceased 1998 |
| Frank | J. | McManus, SJ | Ordained 06-09-1973 (Society of Jesus) | Deceased 2015 |
| Peter | | Mitchell | Ordained 05-03-1951 (Hartford) | Removed from ministry 2001 |
| Joseph | | Owens, SJ | Ordained 1971 (Society of Jesus) | Resided in the Diocese, assigned by religious superiors to work not affiliated with the Diocese of Norwich. Diocese has no other information. |
| Paul | | Pinard, SSE | Ordained 05-22-1959 (Society of St. Edmund) | Removed from diocesan ministry 2004; Deceased 2017 |

# LIST OF CLERGY WITH ALLEGATIONS OF SUBSTANCE OF SEXUAL ABUSE OF A MINOR

| | | | |
|---|---|---|---|
| Edward | Reardon | Ordained 05-14-1931 (Hartford) | Deceased 1991 |
| Robert | E. | Shea | Ordained 05-22-1941 (Hartford) | Deceased 1995 |
| George | St. Jean, OMI | Date of Ordination Unknown (Oblates of Mary Immaculate) | Left Diocese in 1962; Deceased 1982 |
| Felix | Werpechowski | Ordained 05-25-1929 (Hartford) | Deceased 1972 |